Susan F. Balaschak
AKERMAN LLP
666 Fifth Avenue, 20th Floor
New York, NY 10103
Tel.: (212) 880-3800
Fax: (212) 880-8965

John E. Mitchell (*Pro Hac Vice Pending*)
AKERMAN LLP
2001 Ross Avenue, Ste. 3600
Dallas, TX 75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Pro Hac Vice Pending*)
Katherine C. Fackler (*Pro Hac Vice Pending*)
AKERMAN LLP
98 Southeast Seventh Street, Ste. 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC METALS REFINING | ) | |
| CORPORATION, *et al.*,[1] | ) | Case No. 18-13359 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| | ) | |

**DECLARATION OF SCOTT AVILA, AS CHIEF RESTRUCTURING OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Scott Avila ("Avila"), pursuant to Section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge:

1.      I am a principal of Paladin Management Group, LLC ("Paladin"), a financial

advisory firm.   I submit this declaration (the "Declaration") in my capacity as Chief

Restructuring Officer ("CRO") of Republic Metals Refining Corporation ("RMRC"), Republic

Metals Corporation ("RMC"), and Republic Carbon Company, LLC ("RCC"), the debtors and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), and Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833).

debtors-in-possession (together, the "Debtors" or the "Company"), in support of the Debtors' first day motions described below (the "First Day Motions") in the above-captioned cases (the "Chapter 11 Cases").  Except as otherwise noted, I have personal knowledge of the matters set forth herein.

2.      As a principal of Paladin, I am primarily responsible for providing the Company with restructuring and financial advice.  I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

3.      Prior to my involvement with the Debtors and with Paladin, I was Chief Executive Officer of Armory Strategic Partners.  I also was a Principal in Deloitte's Corporate Restructuring Group and Managing Partner at CRG Partners Group (formerly Corporate Revitalization Partners) ("CRG") prior to the sale of CRG to Deloitte in 2012.  Prior to joining CRG, I served as a Principal of XRoads Solutions Group, LLC (from 1997 through joining CRG).  Throughout this time, I have served as the Chief Restructuring Officer for numerous companies guiding each through in-court and out-of-court restructurings.  My CRO experience includes, but is not limited to, Arecont Vision Holdings, LLC, First River Energy, LLC, Beaulieu Group, LLC, Jamberry Nails, LLC, Kawa Solar Holdings, Limited, Velti, Inc., El Camino Resources, General Media, Global Motorsports Group, Coast Crane Company, Elephant Bar Restaurants, ISE Corporation, General Media Group, Kent & Spiegel Direct, Point Blank Solutions, Sexy Hair Concepts, and The Culver Studios.

4.      To minimize the adverse effects of filing for chapter 11 on the Debtors, contemporaneously herewith, the Debtors filed the First Day Motions seeking relief intended to allow the Debtors to perform and meet those obligations that are necessary to fulfill their duties as debtors in possession and to continue to operate their business in the immediate future.  I am

familiar with the contents of each First Day Motion and believe (i) the relief sought in each First Day Motion is critical and necessary to enable the Debtors to operate in chapter 11 with minimal disruption, and (ii) each First Day Motion constitutes a critical element in achieving a successful orderly sale and/or liquidation of the Debtors' business and best serves the interests of the Debtors' estates, their creditors, and all parties in interest.

5.      I submit this Declaration to provide an overview of the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions (the "Petitions") and the First Day Motions. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      This Declaration is intended to provide a summary overview of the Debtors and facts leading up to the commencement of these Chapter 11 Cases. Parts I through V of this Declaration provide an overview of the business, organizational structure and debt structure, and the circumstances giving rise to the commencement of these Chapter 11 Cases. Part VI summarizes the First Day Pleadings filed concurrently herewith.

## I.

## THE BUSINESS

### A.      Overview of Company, Assets and Operations

7.      Founded in 1980 by Richard Rubin, the Debtors are an internationally-recognized "Good Delivery" refiner of precious metals with a primary focus on gold and silver. Products

include delivery of refined bars of both gold and silver, grains, and minted and casted investment grade coins and bars in gold and silver of various designs and sizes. The Debtors have the capacity to produce approximately 80 million ounces of silver and 350 tons of gold, along with over 55 million pieces of minted products, per annum. Suppliers ship unrefined gold and silver to the Debtors for refining from all over the United States and the Western Hemisphere. Precious metal is refined and, depending on the arrangement with the applicable buyer, the Debtors pay for unrefined metal either by check or wire transfer or delivery of refined product (physical metal) in "metals credit" on the London metals exchange, commonly referred to as "Loco London." Most often, customers request payment "Loco London."

8.     Debtor RMC's principal office is located at 12900 NW 38th Avenue, Miami, Florida 33054, where RMC runs fully integrated gold and silver refineries (the "<u>Refinery</u>"). The Debtors' books and records are primarily held at this location. Debtor RMRC's principal office and operations are located at 15 West 47th Street, Suites 206 and 209, New York, New York 10036. In New York, RMRC services smaller customers in the New York metropolitan area, such as jewelry manufacturers, precious metal recyclers, and pawnshops, by purchasing metal from those suppliers, melting it, and sending the melted metals to RMC's Refinery in Florida. Debtor RCC's principal business office is located at 5295 NW 163rd Street, Miami Gardens, Florida 33014, where RCC processes spent carbon from metals mines by drying, homogenizing, sampling, analyzing, and sending to a third party low grade smelter for further processing. The Debtors also maintain offices at leased premises in Los Angeles, Toronto, Shanghai, and Mexico. Upon belief, no material assets are held outside the United States.

9.     Collectively, from its two Debtor locations, as well as through non-debtor subsidiaries, the Debtors provide numerous products and services to a diverse base of global

mining corporations, financial institutions and jewelry manufacturers. In addition to refining and minting, vaulting, assaying and risk management / hedging services. The Debtors also have a state of the art carbon sampling / processing facility and, prior to the Chapter 11 filing, looked to further develop their market-leading position through new growth opportunities in high technology precious metals products and services.

10.     At the Refinery, the Debtors also maintain an ISO9001 and LBMA approved laboratory, as well as a fully-integrated fabricated products division including die design and production, extrusion, flameless casting, machining, and minting of precious metals investment grade products. The Debtors have a segregated small batch refinery within the Refinery where materials with diamonds and other precious stones are treated chemically, thus freeing the precious stones unharmed. The precious metals are refined and recooperated in this circuit as well.

11.     The Debtors do not have an office in Lima, Peru, but do have a representative there who manages the Debtors' compliance in Peru and helps secure metal sourcing there.

12.     The Debtors also maintain a leased sales office in Shanghai, China for RMC's wholly-owned subsidiary, Republic Metals Trading (Shanghai) Co., Ltd. ("Republic Shanghai") with two representatives who maintain direct contact with the Chinese banks in regards to the bar supply and sales, as well as sourcing consumables (chemicals, supplies, etc.) for the Refinery.

13.     The Debtors do not have an office in Los Angeles, but employ a sales manager there who handles all west coast United States refining and product sales efforts. Republic Trans Mexico Metals ("RTMM"), an indirect, wholly-owned subsidiary of RMC, leases an office and melt facility in Mexico City (Madero district) where its 15 independent contractors melt/assay and finance the purchase of precious metals scrap that are sent to the Refinery weekly.

14.     In the period prior to the Petition Date, there were approximately two hundred (200) salaried and hourly employees of Debtor Republic Metals, approximately four (4) salaried and hourly employees of Debtor Republic Refining, and approximately ten (10) salaried and hourly employees of Debtor Republic Carbon.

15.     As required by Local Rule 1007(a)(6), a summary of the Debtors' assets and liabilities is as follows:

**Summary of Assets & Liabilities**

**Estimated as of November 2, 2018**

*(000's)*

| Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Cash | $ | 8,562 | Senior Debt | $ | 177,355 |
| Inventory | | 141,211 | Accounts Payable | | 1,400 |
| Property. Plant and Equipment | | 25,000 | Metal Obligations | | 86,346 |
| | $ | 174,773 | | $ | 265,101 |

**II.**

**ORGANIZATIONAL STRUCTURE**

16.     RMRC and RMC are each owned 100% by the Amended and Restated Richard Rubin Revocable Trust (the "R. Rubin Trust"). RMC owns 100% of RCC.

17.     RMC owns 100% of each of non-debtors Republic Shanghai, Republic High Tech Metals, RMC Diamonds, LLC, RMC2, J&L Republic, LLC, and R&R Metals, LLC. J&L Republic, LLC and R&R Metals, LLC each own 50% of RTMM.

18.     I am the Chief Restructuring Officer of the Company. The other individuals who comprise the Debtors' existing senior management, and tenure (in years) with the Company, are:

a.  Jason Rubin, President and CEO (11);

b. David Comite, Treasurer and CFO (20);

c. Zachary Shair, Refinery Operations Director (7);

d. James Gavilan, SVP, Business Development (5);

e. Luis Pena, Head of Global Sales (21);

f. Alan Silverstein, General Counsel (5);

g. Richard Lani, Chief Compliance Officer (5);

h. JR Rao, VP, Environmental Health & Safety (5);

i. Lindsey Rubin, Corporate Secretary (7); and

j. Rafael Carbonell, COO (4).

### III.

### DEBT STRUCTURE

**A.    The Senior Lenders and the Second Amended and Restated Intercreditor Agreement**

19.    The Senior Lenders (defined below) are parties to that certain Second Amended and Restated Intercreditor Agreement dated February 19, 2016, as amended from time to time (the "Intercreditor Agreement"), by and among Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest"), Bank Leumi USA ("Leumi") (Leumi, Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet, and Woodforest are collectively, the "Senior Lenders"). RMC acknowledged and agreed to the Intercreditor Agreement.

20.    Each Senior Lender is party to its own respective credit documents with the Company. Neither the Intercreditor Agreement nor the Senior Lenders' credit documents provide

for a syndication or consolidation of the obligations owed the Senior Lenders, and no administrative agent is appointed to act for the Senior Lenders.

21.     The Senior Lenders assert blanket liens on all assets of RMC, RMRC, and RCC, including all personal and real property, instruments and intangibles. The security interest of each Senior Lender is deemed to be equal priority with the security interest of every other Senior Lender pursuant to the Intercreditor Agreement (except as otherwise expressly provided therein), without regard to the time of attachment or perfection of the security interests, the order of filing financing statements and the giving or failure to give notice of a purchase money security interest.

22.     Furthermore, and pursuant the Intercreditor Agreement, after an event of default, with certain exceptions, the Senior Lenders shall share *pro rata* all amounts and collections realized by a Senior Lender from any of RMC's collateral, whether or not such Senior Lender is perfected.

## B.     RMC's Loans and Precious Metals Lease Agreements

23.     Rabobank agreed to loan to RMC the principal amount of $45,000,000 at a per annum contract rate of interest in the amount of a margin plus defined "Base Rate" or LIBOR and default rate of interest of 2% over the existing rate or 3.2% over the Base Rate, pursuant to a Promissory Note, Security Agreement and Line Letter Agreement dated on or about June 26, 2017.

24.     BBH agreed to loan to RMC the principal amount of $15,000,000 at a per annum contract rate of interest of Overnight LIBOR (or fixed up to 90 days, at Maker's option) plus 2.00% and default rate of interest of 120% of the rate payable on the due date or demand, pursuant to a Secured Demand Promissory Note and General Security Agreement Letter Agreement dated on or about May 20, 2016.

25.     Hapoalim agreed to loan to RMC the principal amount of $25,000,000 at a per annum contract rate of interest of LIBOR plus agreed margin and a default rate of interest of Hapoalim's prime rate pursuant to an Amended and Restated Promissory Note, Security Agreement and Letter Agreement dated on or about November 10, 2016.

26.     Mitsubishi agreed to lease certain precious metals to RMC pursuant to a Metals Lease Agreement dated November 22, 2016.

27.     ICBCS agreed to lease a certain amount of silver to RMC pursuant to the FOA Master Netting Agreement (including any annexes, schedules or exhibits thereto) entered into by ICBCS (formerly known as Standard Bank Plc) and RMC dated as of January 19, 2011, as amended and restated from time to time (the "ICBCS Master Netting Agreement").

28.     Techemet agreed to lease certain precious metals to RMC a Lease Agreement dated on or about March 6, 2017.

29.      Woodforest agreed to loan RMC the principal amount of $15,000,000 at the per annum contract rate of interest of LIBOR plus 2.25% and default rate at the highest rate allowed by applicable law, pursuant to a Revolving Line of Credit Promissory Note, Security Agreement, and Guaranty of Payment and Performance dated on or about October 30, 2017.

30.     Leumi agreed to loan RMC the principal amount of $25,000,000 at a per annum interest rate of LIBOR plus 2.25% and default rate of the current rate plus 3% pursuant to the Line of Credit Note (Discretionary) Security Agreement, Letter Agreement and Pledge Agreement dated on or about October 31, 2017.

31.     The loan documents described in the foregoing paragraphs 22 through 29 are referred to herein collectively, the "Individual Credit Documents").

32.     As required by Local Rule 1007 (a)(5), the name, address, claim amount, brief description of collateral, estimated value, and statement regarding liens of the Senior Lenders is attached hereto as **Attachment A**.

## IV.

## <u>SUPPLIER AGREEMENTS</u>

33.     RMC is also a party to approximately 35 agreements (each a "<u>Supplier Agreement</u>"), providing for the supplier to deliver materials to RMC such as gold and silver dore bars or other similar raw materials ("<u>Raw Materials</u>") for refining pursuant to the standards agreed upon in the Supplier Agreement.

34.     Generally, upon completion of RMC's obligations to refine the Raw Materials under a Supplier Agreement, the Supplier has the option to elect that RMC transfer the value of the refined material to the Supplier's designated account, or alternatively, may have the "<u>Recoverable Metals</u>" due from each lot of Refined Material transferred to the Supplier's designated metal account.

35.     It is estimated that total outstanding Supplier obligations are approximately $86,346,000.

## V.

## <u>EVENTS LEADING TO THE CHAPTER 11 FILING</u>

### A.     **Liquidity Demands on the Company**

36.     In April 2018, the Debtors discovered a significant discrepancy in its inventory accounting as part of its preparation of 2017 year end financials and quarterly financials for the first quarter, 2018. This led to the Debtors retaining the accounting firm of Eisner-Amper to conduct a physical inventory. On June 8, 2018, Eisner-Amper conducted the physical inventory

and, thereafter, on June 20, 2018, delivered a final report that confirmed inventory discrepancies in the Debtors' books and records.

37.     On June 24, 2018 in Miami, the Debtors organized a meeting of the Senior Lenders to discuss the inventory issue. The Debtors' request was for the Senior Lenders to give the Debtors the necessary breathing room to continue to operate as a going concern for the near future in order to further evaluate and understand the inventory issues and develop a plan to either immediately rectify the inventory issues or otherwise restructure the Debtors.

**B.     The Default Notices**

38.     On July 10, 2018, the Senior Lenders served termination, default and demand notices on RMC that among other things, accelerated all debt obligations and terminated lease obligations under the Individual Credit Documents pursuant to the Default Notices (as defined below). On or about July 10, 2018, ICBCS, one of the Senior Lenders, also exercised its rights under the ICBCS Master Netting Agreement and the Unallocated Precious Metals Accounts Agreement dated Mary 28, 2015 (as novated, amended, restated, modified or supplemented from time to time) between ICBCS and RMC (the "London Clearing Account Agreement") resulting in RMC's loss of access to and use of its London clearinghouse account maintained by ICBCS (the "London Clearing Account"), and for all intents and purposes, ended the Debtors' ability to service customer deliveries via "Loco London" credit transactions.  On July 10, 2018, the Senior Lenders issued the following notices to the Debtor:

    a.  By letter dated July 10, 2018, Rabobank sent RMC a Notice of Demand for Payment Under Line Letter Agreement;

    b.  By letter dated July 10, 2018, Techemet sent RMC a Notice of Early Termination Date Under Lease Agreement;

    c.  By letter dated July 10, 2018, BBH sent RMC a Notice of Demand for Payment Under Loan Documents;

d. By letter dated July 10, 2018, Bank Hapoalim B.M., New York Branch sent RMC a Notice of Demand for Payment Under Line Letter Agreement;

e. By letter dated July 10, 2018, Bank Leumi USA sent RMC a Notice of Demand for Payment Under Line Letter Agreement;

f. By letter dated July 10, 2018, Woodforest National Bank sent RMC a Notice of Acceleration and Demand for Payment;

g. By electronic mail dated July 10, 2018, Mitsubishi sent RMC a Notice of Event of Default; and

h. By letter dated July 10, 2018, ICBCS sent RMC a Notice of Liquidation Date and Termination of Transactions Under Master Netting Agreement.

(each of the foregoing, collectively, the "Default Notices").

### C. The Forbearance Agreement and Sale Process

39. At or about that same time, the Debtors contacted a major, strategic metals refiner about the possible acquisition of the Debtors as a going concern (the "Potential Buyer"). Shortly thereafter, the Potential Buyer produced a letter of intent to acquire the Debtors' business. This lead to an immediate call between the Debtors, the Senior Lenders and the Potential Buyer. As a result of this call, among other reasons, the Senior Lenders agreed to forebear, temporarily, and allow the Debtors to operate in the ordinary course, pending negotiation of a more formal forbearance arrangement to allow the Debtors to pursue a sale with the Potential Buyer, or otherwise to pursue a sale on a broader scale. On or about July 16, 2018, an agreement was reached whereby RMC's access to and use of its London Clearing Account, and the net credits therein, were restored allowing the Debtors to service customer deliveries via "Loco London" credit transactions.

40. Substantial, extensive negotiations ensued which ultimately resulted in the execution of a Forbearance Agreement on August 7, 2018 (the "Forbearance Agreement"), which then became effective on August 17, 2018 (the "Forbearance Effective Date"). The Senior

Lenders agreed, among other things, to forbear during the Forbearance Period (as defined therein) from making demand for payment under their respective Individual Credit Documents and exercising their respective rights and remedies under or in connection with any and all of the Individual Credit Documents and the Intercreditor Agreement, arising from all Existing Defaults (as defined therein).

41.     With the Forbearance Agreement in place, the Company immediately retained SSG Capital ("SSG") as investment banker to assist with the sale of the Debtors' business to the Potential Buyer, or otherwise market the Debtors' business on a broader scale.

42.     Intense and good faith negotiations with the Potential Buyer continued for over three (3) months. No broader marketing effort was undertaken as all parties, including the Debtors and the Senior Lenders, agreed that a broader marketing effort would likely be detrimental to the Debtors' business in light of the nature of the metals refining and trading industry (a very small market and closed knit industry). Despite numerous, lengthy telephone calls, an in-person meeting in New York City, and multiple exchanges of term sheets and offers, the Debtors and the Senior Lenders were unable to reach terms with the Potential Buyer acceptable to the Senior Lenders. The Forbearance Agreement also terminated prior to the Petition Date.

43.     On or about October 18, 2018, ICBCS exercised its right to suspend the Debtors' access to the London Clearing Account.  Thereafter, the Senior Lenders informed the Debtors that the Senior Lenders were ceasing negotiations with the Potential Buyer.

44.     Notwithstanding what appeared to be the cessation of discussions with the Potential Buyer, and concurrently during the Debtors' preparations for Chapter 11, the Debtors, Lenders and Potential Buyer continued to discuss what, if any, acquisition prior to and outside of

a Chapter 11 might be possible. By October 26, 2018, the parties were extremely close to finalizing the material terms of an immediate, going concern acquisition of the Debtors by the Potential Purchaser, with the last open diligence items to be resolved by October 31, 2018.

45.     Unfortunately, the Potential Buyer, Debtors and Lenders were unable to finalize the terms of an acquisition by the end of the day, October 31. With limited cash, and the inability to trade metals or deliver refined goods, the Debtors commenced these proceedings on November 2, 2018, to run an orderly sale process of their assets and operations. It is the Debtors intent to attempt to sell the Company as a going concern, but if unsuccessful, the Debtors will engage in a process to liquidate their assets and inventory for the ratable benefit of their creditors.

46.     In addition to Paladin, the Debtors are seeking to retain Akerman LLP ("Akerman") as their lead restructuring counsel in this Case. The Debtors have chosen Donlin Recano & Co., Inc. ("Donlin") to serve as claims and noticing agent.

## VI.

### SUMMARY OF FIRST DAY MOTIONS, PLEADINGS & OTHER REQUIRED DISCLOSURES OF PER THE LOCAL RULES

47.     Concurrently with the filing of the Petition, the Debtors submitted, for the Court's approval, a number proposed orders accompanying the First Day Motions (the "First Day Orders"), which the Debtors believe are necessary to enable them to operate with minimum disruption and to maximize value to the creditors. The Debtors request the Court enter each of the First Day Orders, as each is a critical element in maintaining stable business operations during the liquidation process. A description of the relief requested and the facts supporting entry of each of the First Day Orders is set forth below.

A. **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Lenders, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief**

48.     The Debtors seek an Order authorizing them to use Cash Collateral (as defined therein), granting the Senior Lenders adequate protection as a result of the Debtors' use of certain prepetition collateral, modifying the automatic stay, and granting related relief to facilitate the Debtors' ability to use Cash Collateral on terms acceptable to the Senior Lenders.

49.     The Debtors also seek approval of certain stipulations and releases by and between the Debtors and the Senior Lenders, subject to a challenge period, as set forth in the Motion, together with approval of a 13-week operating budget.

50.     Finally, the Debtors seek approval of a 13-week budget to facilitate their ability to operate in Chapter 11.  I believe approval of the Budget and the relief requested in connection therewith is critical to Debtors' ability to operate successfully going forward and to comply with their duties and obligations under the other First Day Orders.

B. **Motion for Entry of Interim and Final Order (I) Authorizing Debtor to, In the Ordinary Course, (A) Use Its Cash Management System, Bank Accounts, and Business Forms and (B) Perform Intercompany Transactions, (II) Authorizing Banks and Financial Institutions to Honor and Process All Related Check and Electronic Payment Requests, and (III) Granting Related Relief**

51.     The Debtors seek permission to continue to utilize their cash management system during these bankruptcy cases. The Debtors have an established cash management system they utilize to collect, manage, and disburse funds used in the Debtors' operations in the ordinary course of business (the "Cash Management System"). The Cash Management System enables the Debtors to facilitate their cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

52.     As of the Petition Date, RMRC maintains bank accounts with TD Bank, N.A., and Bank Leumi USA (the "RMRC Banks"). As of the Petition Date, RCC, maintains bank accounts with TD Bank, N.A. and HSBC (the "RCC Banks").  As of the Petition Date, RMC maintains bank accounts with the following banks: Fifth Third Bank; HSBC; Woodforest National Bank; Bank Hapoalim B.M.; Bank Leumi USA; Brown Brothers Harriman & Co.; ICBC Standard Bank; and TD Bank, N.A (the "RMC Banks" and, collectively with the RMRC Banks and RCC Banks, the "Cash Management Banks"). In connection with the Cash Management System, the Debtors collectively maintain nineteen (19) bank accounts in their names (the "Bank Accounts") with the various Cash Management Banks. In the ordinary course of business, the Debtors routinely transfer money between the Bank Accounts via wire transfers and other electronic funds transfers.

53.     Because the Debtors operate a centralized cash management system, intercompany receivables and payables are created in the ordinary course of business (collectively, the "Intercompany Claims"). As funds are disbursed throughout the Cash Management System and as business is transacted by and among non-Debtor entities, at any given time there may be Intercompany Claims owing by the Debtors to a non-Debtor entity, and vice versa.  Certain Intercompany Claims have historically been settled on a monthly basis while others have not, but may be reflected as receivables and payables, as applicable, in the entity's accounting system. The Debtors can, therefore, ascertain, trace, and account for all Intercompany Transactions and will be able to continue doing so on a postpetition basis.

54.     The Debtors also seek to continue to use their current business forms, checks, business cards, letterhead, purchase orders, and invoices (the "Business Forms"). Given the Debtors' well established cash management structure, to minimize the expense to the Debtors'

estates associated with developing and/or purchasing new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue to use their Business Forms as such forms existed immediately prior to the Petition Date, without reference therein to the Debtors' status as debtors-in-possession.

55.     I believe preserving the Cash Management System and Business Forms in their current forms will assist the Debtors in operating smoothly as they transition into their new roles as debtors-in-possession and will minimize disruption and distractions that would might arise from implementing new systems at this critical juncture, thereby preserving and maximizing the return to creditors in these bankruptcy cases.

**C.     Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases**

56.     The Debtors seek entry of order directing joint administration of their bankruptcy estates for procedural purposes only. I believe that joint administration will yield significant cost savings by improving efficiency in administration of the Debtors' interrelated chapter 11 cases. Absent the relief requested herein, the Debtors would be forced to prepare, replicate, file and serve duplicative notices, applications, and orders in each case. I believe joint administration would reduce such duplicative work, both for the Debtors and for the Court. The Debtors seek only procedural consolidation and not substantive consolidation, and therefore believe that such relief will not adversely affect any of the Debtors' creditors.

**D.     Debtors' Emergency Motion for Entry of an Order (I) Granting an Extension of Time to File Schedules and Statements, and (II) Granting Related Relief**

57.     The Debtors seek additional time to compile information and complete their schedules. The Debtors have begun compiling the information required to complete their Schedules and Statements. Nevertheless, as a consequence of the complexity of the Debtors'

business operations, coupled with the limited time and resources available, the Debtors have not yet finished gathering such information.

58.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, and the volume of information that must be reviewed, prepared, and included in the Schedules and Statements, the Debtors anticipate they will be unable to complete their Schedules and Statements within the time required under Bankruptcy Rule 1007. Moreover, the Debtors respectfully submit that focusing the attention of key accounting and legal personnel on vital operational and restructuring matters during the critical first weeks after filing the Chapter 11 Cases, rather than on preparing their Schedules and Statements, will facilitate the Debtors' smooth transition into Chapter 11 and maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest.

59.     Accordingly, the Debtors seek entry of an Order (extending by an additional thirty (30) days the date by which each of the Debtors' Schedules and Statements must be filed. I believe this additional time will assist the Debtors in complying with the duties to provide complete and accurate information regarding their assets, liabilities, and operations to the Court, creditors, and parties-in-interest.

**E.     Debtor's Emergency Motion for Order Approving the Form and Manner of Notice of the Case to Creditors and Parties in Interest**

60.     The Debtors seek authority to prepare and serve the notice of commencement of these bankruptcy cases. The burden would otherwise fall on the Court and the United States Trustee. The Debtors also seek for the Court to approve the form of notice proposed in this motion, which is more closely tailored to the needs of this case than the national form and will

efficiently communicate important information to creditors. I believe the proposed form and manner of notice is reasonable and appropriate under the circumstances.

**F.     Debtors' Application for an Order Pursuant to 28 U.S.C. § 157(c) and S.D.N.Y. LBR 5075-1 (I) Approving Retention and Appointment of Donlin, Recano & Company, Inc. as Claims and Noticing Agent to Debtors Effective *Nunc Pro Tunc* to the Petition Date and (II) Granting Related Relief**

61.     The Debtors request, pursuant to 28 U.S.C. § 156(c) and the Local Rules for the United States Bankruptcy Court for the Southern District of New York, authorization to (i) employ and retain Donlin as claims and noticing agent for the Debtors and (ii) to appoint Donlin as agent of the Bankruptcy Court.

62.     Based on Donlin's experience in providing similar services in large chapter 11 cases, I believe that Donlin is eminently qualified to serve as Claims and Noticing Agent in this Chapter 11 case. A detailed description of the services that Donlin has agreed to render and the compensation and other terms of the engagement are provided in the Donlin's Retention Application.

63.     I believe the retention and appointment of Donlin in connection with the administration of this chapter 11 case is in the best interest of the Debtors and their estates and will enable the Debtors to continue to effectively liquidate its business in chapter 11 without disruption.

**G.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Pre-Petition Wages and Other Compensation and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payments Requests, (III) Approving the Debtors' Discretionary Employee Incentive Programs**

64.     The Debtors seek authorization, but not direction, to (a) pay pre-petition wages and other compensation, employee business expense allowances and reimbursements, employee benefits, and (b) continue existing employee benefit plans and programs, (ii) for banks and other

financial institutions to receive, process, honor, and pay all checks and electronic payment requests relating to the foregoing, and (iii) continue the Debtors' discretionary employee incentive programs.

65.     The Debtors employ employees who perform a broad spectrum of services for the Debtors, including, without limitation, marketing, ensuring compliance with various regulatory scheme, various operational, technical, and managerial roles at the Refinery and related laboratories, finance and accounting, and information technology services (the "Employees").

      a.     Wages

66.     As of the Petition Date, the Debtors estimate the aggregate amount of accrued Employee Wages (excluding Payroll Taxes and Deductions, defined below) earned prior to the Petition Date that remain unpaid totals approximately $85,000 (the "Unpaid Wages").

      b.     Business Expenses

67.     The Debtors maintain corporate credit cards for Employees to use for certain business expenses, and also reimburse Employees for certain business expenses not paid with those credit cards. The Debtors seek to pay all such obligations outstanding as of the petition date and to continue to use the corporate credit cards and to reimburse Employees for business expenses as they operate in these cases.

      c.     Health Insurance

68.     The Debtors offer health insurance to Employees through United Healthcare, as well as various other plans for dental, vision, COBRA, and mental wellness (the "Health Insurance Programs"). Both the Debtors and the Employees contribute to the premium payment requirements for these plans, however, the Debtors pay approximately $170,000 per month for their portions of the medical premium. The Debtors seek authority to: (a) continue to provide the Health Insurance Programs for the Employees in the ordinary course of business; (b) continue to

honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts owed the Health Insurance Programs to the extent that they remain unpaid as of the Petition Date.

        d.      Vacation, Sick, Holiday and Leave Benefits

69.    The Debtors provide certain of the Employees with paid vacation time (the "Vacation Time") as well as paid sick time and other paid time off (collectively, with the Vacation Time, the "Paid Time Off"). These programs are typical and customary, and continuing to offer them is necessary for the Employees to remain during the reorganization process. Because Vacation Time and Paid Time Off are accrued and used by Employees based on the anniversary date of each Employee's hire by the Debtors, it is difficult to precisely quantify the cost of accrued Vacation Time and Paid Time Off as of the Petition Date. However, the Debtors estimate that as of the Petition Date the value of Vacation Time is approximately $375,000. The Debtors seek authority to: (a) continue to provide Paid Time Off to the Employees in the ordinary course of business; (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees; and (c) pay any amounts the Debtors owe to Employees on account of Paid Time Off to the extent that such amounts remain unpaid as of the Petition Date.

        e.      Employee Incentive and Bonus Programs

70.    The Debtors have discretionary incentive plans designed to provide additional compensation and other benefits to Employees to encourage exceptional Employee performance for the benefit of the Debtors' business (collectively, the "Discretionary Employee Incentive Programs"). The Discretionary Employee Incentive Programs include:

- discretionary yearly bonuses paid in the first quarter of each year, and based upon the Employee's performance in the previous year;

- an additional incentive for silver smelters paid once per quarter at the beginning of the following quarter, which is based on six categories of performance;

- a $60 per payroll incentive for employees who participate in the voluntary emergency responder program;

- a $20-50 discretionary bonus paid by the Department of Environmental Health and Safety; and

- monthly and quarterly safety incentive bonuses.

71.     The Debtors typically pay approximately $6,000-7,000 per month under the Discretionary Employee Incentive Programs. The Debtors seek authority to continue to honor each of the Discretionary Employee Incentive Programs after the Petition Date, as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' operations, including payment of any pre-Petition amounts outstanding on account of the Discretionary Employee Incentive Programs.

f.      401(k) and Disability Insurance

72.     The Debtors also provide disability insurance and a 401(k) retirement savings plan.  These programs are typically and customary, and continuing to offer them is necessary for the Employees to remain during the orderly liquidation of the Debtors' business affairs.

73.     The Debtors request entry of an Order (a) authorizing the Debtors to pay, in their sole discretion, all payments required under or related to Employee Wages, Unpaid Wages, Reimbursable Expenses, Payroll Taxes, and Deductions (each as defined above and collectively, the "Employee Compensation"); (b) authorizing the Debtors to continue to satisfy or honor, in their sole discretion, Paid Time Off Policies (collectively, the "Employee Benefits" and, together

with the Employee Compensation, the "Employee Obligations")[2] and all costs incident to the foregoing, and to continue to honor its practices, programs and policies for its Employees, as those practices, programs and policies were in effect as of the Petition Date and as such practices, programs and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business; and (c) authorizing and directing the applicable banks and other financial institutions (collectively, the "Disbursement Banks") to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts (collectively, the "Disbursement Accounts"), and automatic payroll transfers to the extent that those checks or transfers relate to any of the foregoing; and (d) approving the Discretionary Employee Incentive Programs.

74.     Additionally, the Debtors seek authority to honor, pay, satisfy, or remit all claims and pre-petition obligations related to the Discretionary Employee Incentive Programs.

75.     I believe the relief requested in this motion is essential to preventing serious and damaging losses of personnel that are central to the Debtors' operations. Without being compensated for their time via the Employee Obligations, many of the Employees will likely seek alternative employment and it will be difficult for the Debtors to continue to operate with such attrition.

**H.      Debtors' Motion for Order (I) Authorizing the Debtors to Pay Certain Pre-Petition Taxes, and (II) Granting Related Relief**

76.     The Debtors seek Court authority, but not direction, to pay certain taxes (the "Taxes") in the ordinary course of their business. The Debtors estimate that the Taxes amount to $50,000 as of the date of filing. I believe that paying these tax obligations now is reasonable and

---

[2] The Debtors believe that the Employee Obligations described herein constitute a comprehensive list of such obligations. To the extent any plan, program or other obligation was inadvertently omitted, however, the term "Employee Obligations" includes such plan, program or other obligation.

necessary because (a) certain of the Taxes are not property of the estate pursuant to section 541(a) of the Bankruptcy Code; (b) paying the Taxes will avoid distracting and costly audits, liens, penalties and other enforcement actions while the Debtors focus on reorganizing their businesses and obligations; (c) the Debtors' directors and officers may be held personally liable for the non-payment of certain Taxes; and (d) certain Authorities may take precipitous actions against the Debtors' directors and officers for unpaid Taxes, which would distract the Debtors from their efforts to complete a successful reorganization.

I. **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Determining that Utility Providers Have Been Provided with Adequate Assurance of Payment, (II) Approving Proposed Adequate Assurance Procedures, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (IV) Determining that Debtors are not Required to Provide any Additional Assurance, (V) Scheduling a Hearing to Consider Entry of a Final Order, and (VI) Granting Related Relief**

77.     The Debtors intend to pay post-petition obligations owed to the Utility Providers in the ordinary course.  The Debtors seek to pay all pre-petition amounts, as well, as adequate assurance of payment for electricity, telephone, water, waste disposal, internet, and other essential services (collectively "Utility Services"), in lieu of an additional deposit.  I believe payment of prepetition amounts is in the best interest of the estates because the Debtors are current on all obligations to the providers of the Utility Services (the "Utility Providers") and posting, by way of example, one additional month of estimated service for each Utility Provider would far exceed and actually be a greater detriment to the Debtors' cash flow than simply paying the Utility Providers in the ordinary course of business, to include payment of prepetition amounts.  The Debtors estimate they make payments for Utility Services in the total amount of $180,000 per month.

78.     The Debtors also request, as additional adequate assurances, the Utility Providers be allowed to continue to debit the Debtors' bank accounts for Utility Services, in the ordinary

course of business. The Debtors assert that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from business operations as set forth in Budget.

79. The Debtors submit that payment of any prepetition amount owed, in the ordinary course of business, and in conjunction with the continued ability to debit the Debtors' accounts for amounts owed, demonstrates the Debtors' ability to pay for future Utility Services in the ordinary course of business and constitutes adequate assurance to the Utility Providers (the "Proposed Adequate Assurance").

80. The Debtors seek entry of orders pursuant to sections 105(a) and 366 of the Bankruptcy Code and Bankruptcy Rule 6004, (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code by virtue of the Proposed Adequate Assurance, (b) approving the Adequate Assurance Procedures, (c) prohibiting the Utility Providers from altering, refusing, or discontinuing Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Adequate Assurance Procedures, and (d) determining that the Debtors are not required to provide any additional assurance beyond what is proposed in this Motion. I believe this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

**J. Debtors' Emergency Motion for Entry of Order (I) Authorizing but not Directing Debtors to (A) Maintain Existing Insurance Programs and Existing Insurance Premium Financing Agreement, and (B) Fund All Obligations in Respect Thereof, and (II) Granting Related Relief**

81. The Debtors seek authorization, but not direction, to maintain their insurance policies during these cases. In connection with the operation of the Debtors' business, the Debtors maintain comprehensive insurance programs (collectively, the "Insurance Programs")

that include a variety of policies through several different insurance carriers (collectively, the "Insurance Carriers"). The premiums with respect to certain of the Insurance Programs are financed pursuant to a premium financing agreement between AFCO Credit Corporation ("AFCO") and Republic Metals Corporation.

82.     The Insurance Programs protect the Debtors and their personnel against various risks that may arise in the course of the Debtors' business. To protect the Debtors against such risks, the Insurance Programs include the following types of coverage: Director & Officer Liability, Crime & Flood, General Liability and Commercial Property Policies, Workers' Compensation, Pollution Policies, and Automobile Insurance.

83.     I believe having the authority to continue the Insurance Programs and to pay the Debtors' obligations under the Premium Financing Agreement is necessary to protect and preserve the value of the Debtors' assets during these bankruptcy cases.

84.     Absent payments by the Debtors for the purpose of funding the Insurance Obligations, the Insurance Programs and the Premium Financing Agreement will not be funded and the Debtors' coverage under the Insurance Programs can be voided. Disruption of the Debtors' insurance coverage will expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs and which could be treated as administrative claims in the Cases, (c) losing good-standing certification to conduct business inasmuch as the jurisdiction in which they operate requires the Debtors to maintain certain levels of insurance coverage, (d) being unable to obtain

similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

85.     Under the Premium Finance Agreement, the Debtors are obligated to make monthly payments to AFCO in the amount of $19,107.60. The Debtors previously funded $46,485.48 toward the down payment of the Premium Finance Agreement. In the aggregate, in 2018 the Debtors will or have paid in the aggregate approximately $240,000 as to the Insurance Obligations.

86.     Accordingly, the Debtors seek this Court's authorization, but not direction, to pay any such outstanding amounts and other amounts as may come due in order to maintain their insurance coverage.

### K.     Disclosures Pursuant to Local Rule 1007

87.     Pursuant to Local Rule 1007(a)(4) and (a)(5), a list of the Top 30 unsecured creditors of the Debtors (on a consolidated basis) and the Top 5 Secured Creditors is attached hereto as Attachment 2 (the "Creditor Disclosures").

88.     Pursuant to Local Rule 1007(b)(1), the estimated payroll for the first thirty (30) days of the Case for employees (other than the senior officers, directors and shareholders) is $1,140,021.00.

89.     Pursuant to Local Rule 1007(b)(2)(A), the aggregate amount proposed to be paid to stockholders, directors and officers of the Company (Jason Rubin, Rose Rubin, Lindsey Rubin, Alan Silverstein, David Comite, and Raphael Carbonell) for the first thirty (30) days of the Case is $121,808.00.

90.     Pursuant to Local Rule 1007(b)(3), reference is made to the Cash Collateral Budget submitted with the Cash Collateral Budget.

## VII.

### Conclusion

91.     I believe approval of the First Day Orders is in the best interest of all stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 2, 2018.

/s/
Scott Avila

# ATTACHMENT A - SECURED LENDERS

| NO. | NAME AND ADDRESS | CLAIM AMOUNT[3] | COLLATERAL DESCRIPTION | VALUE OF COLLATERAL[4] |
|---|---|---|---|---|
| 1. | Coöperatieve Rabobank U.A., New York Branch<br>245 Park Avenue, 37th Floor<br>New York, New York 10167 | $31,730,463.98 | All Assets | $174,773,000 |
| 2. | Brown Brothers Harriman & Co.<br>140 Broadway<br>New York, New York 10005 | $9,098,340.92 | All Assets | $174,773,000 |
| 3. | Bank Hapoalim B.M.<br>1120 Avenue of the Americas<br>New York, New York 10036 | $11,372,926.15 | All Assets | $174,773,000 |
| 4. | Mitsubishi International Corporation<br>655 Third Avenue<br>New York, New York 10017 | $54,278,325.84 | All Assets | $174,773,000 |
| 5. | ICBC Standard Bank Plc<br>20 Gresham Street<br>London, EC2V 7JE<br>United Kingdom | $20,034,083.29 | All Assets | $174,773,000 |
| 6. | Techemet Metal Trading LLC<br>6025 Genoa Red Bluff Road<br>Pasadena, Texas 77507 | $14,447,158.99 | All Assets | $174,773,000 |
| 7. | Woodforest National Bank<br>1330 Lake Robbins, Suite 500<br>The Woodlands, TX 77380 | $13,647,511.39 | All Assets | $174,773,000 |
| 8. | Bank Leumi USA<br>579 Fifth Avenue<br>New York, NY 10017 | $22,745,852.32 | All Assets | $174,773,000 |

---

[3]     Outstanding principal amounts as of the Petition Date exclusive of unpaid interest, fees and expenses which continue to accrue on the terms set forth in the applicable loan and lease documentation.

[4]     The exact value of the Debtors' assets is unknown at this time.  The Secured Lenders assert their claims as secured claims to the extent of the value of the collateral and as unsecured claims to the extent of any deficiency.