Susan F. Balaschak
AKERMAN LLP
666 Fifth Avenue, 20th Floor
New York, NY 10103
Tel.: (212) 880-3800
Fax: (212) 880-8965

John E. Mitchell (*Pro Hac Vice Pending*)
AKERMAN LLP
2001 Ross Avenue, Ste. 3600
Dallas, TX  75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Pro Hac Vice Pending*)
Katherine C. Fackler (*Pro Hac Vice Pending*)
AKERMAN LLP
98 Southeast Seventh Street, Ste. 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| REPUBLIC METALS REFINING ) | |
| CORPORATION, *et al.*,[1] ) | Case No. 18-13359 (___) |
| ) | |
| Debtors. ) | |
| ) | (Joint Administration Pending) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDER (I) AUTHORIZING DEBTORS TO, IN THE ORDINARY COURSE, (A) USE CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, AND BUSINESS FORMS AND (B) PERFORM INTERCOMPANY TRANSACTIONS, AND (II) AUTHORIZING BANKS AND FINANCIAL INSTITUTIONS TO HONOR AND PROCESS ALL RELATED CHECK AND ELECTRONIC PAYMENT REQUESTS**

Republic Metals Refining Corporation ("Republic Refining"), Republic Metals

Corporation ("Republic Metals"), and Republic Carbon Company, LLC ("Republic Carbon"), as

debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11

cases (the "Chapter 11 Cases" or "Cases"), by and through their undersigned counsel, hereby file

this motion (the "Motion") seeking entry of interim and final orders, substantially in the form

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), and Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833).

attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a), 345, 363, 364, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors to, in the ordinary course of business: (a) use  existing cash management system, pre-petition bank accounts, and pre-petition business forms (without reference to the Debtors' status as a debtors-in-possession), (b) perform intercompany transactions, (ii) authorizing the Debtors' banks and financial institutions to: (a) maintain, service, and administer the Debtors' bank accounts and (b) honor and process all related checks and electronic payment requests consistent with the relief requested herein, (iii) waiving the Debtors' compliance with the guidelines set forth in section 345(b) of the Bankruptcy Code and certain United States Trustee requirements for a period of forty-five (45) days, and (iv) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.  In support of this Motion, the Debtors submit the *Declaration of Scott Avila In Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated herein by reference. In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of New York (the "Court" or "Bankruptcy Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 345, 363, 364, 507, 1107, and 1108 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

## BACKGROUND

4.      On November 2, 2018, (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

5.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

## THE BUSINESS

**Overview of Company, Assets and Operations**

6.      Founded in 1980 by Richard Rubin, the Debtors are an internationally-recognized "Good Delivery" refiner of precious metals with a primary focus on gold and silver. Products include delivery of refined bars of both gold and silver, grains, and minted and casted investment grade coins and bars in gold and silver of various designs and sizes. The Debtors have the capacity to produce approximately 80 million ounces of silver and 350 tons of gold, along with over 55 million pieces of minted products, per annum. Suppliers ship unrefined gold and silver to the Debtors for refining from all over the United States and the Western Hemisphere. Precious metal is refined and, depending on the arrangement with the applicable buyer, the Debtors pay for unrefined metal either by check or wire transfer or delivery of refined product (physical metal) in "metals credit" on the London metals exchange, commonly referred to as "Loco London." Most often, customers request payment "Loco London."

7.      Debtor RMC's principal office is located at 12900 NW 38th Avenue, Miami, Florida 33054, where RMC runs fully integrated gold and silver refineries (the "Refinery"). The Debtors' books and records are primarily held at this location. Debtor RMRC's principal office and operations are located at 15 West 47th Street, Suites 206 and 209, New York, New York 10036. In New York, RMRC services smaller customers in the New York metropolitan area, such as jewelry manufacturers, precious metal recyclers, and pawnshops, by purchasing metal from those suppliers, melting it, and sending the melted metals to RMC's Refinery in Florida. Debtor RCC's principal business office is located at 5295 NW 163rd Street, Miami Gardens, Florida 33014, where RCC processes spent carbon from metals mines by drying, homogenizing, sampling, analyzing, and sending to a third party low grade smelter for further processing. The Debtors also maintain offices at leased premises in Los Angeles, Toronto, Shanghai, and Mexico. Upon belief, no material assets are held outside the United States.

8.      Collectively, from its two Debtor locations, as well as through non-debtor subsidiaries, the Debtors provide numerous products and services to a diverse base of global mining corporations, financial institutions and jewelry manufacturers. In addition to refining and minting, vaulting, assaying and risk management / hedging services. The Debtors also have a state of the art carbon sampling / processing facility and, prior to the Chapter 11 filing, looked to further develop their market-leading position through new growth opportunities in high technology precious metals products and services.

9.      At the Refinery, the Debtors also maintain an ISO9001 and LBMA approved laboratory, as well as a fully-integrated fabricated products division including die design and production, extrusion, flameless casting, machining, and minting of precious metals investment grade products. The Debtors have a segregated small batch refinery within the Refinery where

materials with diamonds and other precious stones are treated chemically, thus freeing the precious stones unharmed. The precious metals are refined and recooperated in this circuit as well.

10.     The Debtors do not have an office in Lima, Peru, but do have a representative there who manages the Debtors' compliance in Peru and helps secure metal sourcing there.

11.     The Debtors also maintain a leased sales office in Shanghai, China for RMC's wholly-owned subsidiary, Republic Metals Trading (Shanghai) Co., Ltd. ("Republic Shanghai") with two representatives who maintain direct contact with the Chinese banks in regards to the bar supply and sales, as well as sourcing consumables (chemicals, supplies, etc.) for the Refinery.

12.     The Debtors do not have an office in Los Angeles, but employ a sales manager there who handles all west coast United States refining and product sales efforts. Republic Trans Mexico Metals ("RTMM"), an indirect, wholly-owned subsidiary of RMC, leases an office and melt facility in Mexico City (Madero district) where its 15 independent contractors melt/assay and finance the purchase of precious metals scrap that are sent to the Refinery weekly.

13.     In the period prior to the Petition Date, there were approximately two hundred (200) salaried and hourly employees of Debtor Republic Metals, approximately four (4) salaried and hourly employees of Debtor Republic Refining, and approximately ten (10) salaried and hourly employees of Debtor Republic Carbon.

14.     As required by Local Rule 1007(a)(6), a summary of the Debtors' assets and liabilities is as follows:

### Summary of Assets & Liabilities

### Estimated as of November 2, 2018

*(000's)*

| Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Cash | $ | 8,562 | Senior Debt | $ | 177,355 |
| Inventory | | 141,211 | Accounts Payable | | 1,400 |
| Property. Plant and Equipment | | 25,000 | Metal Obligations | | 86,346 |
| | $ | 174,773 | | $ | 265,101 |

## ORGANIZATIONAL STRUCTURE

15.     RMRC and RMC are each owned 100% by the Amended and Restated Richard Rubin Revocable Trust (the "R. Rubin Trust"). RMC owns 100% of RCC.

16.     RMC owns 100% of each of non-debtors Republic Shanghai, Republic High Tech Metals, RMC Diamonds, LLC, RMC2, J&L Republic, LLC, and R&R Metals, LLC. J&L Republic, LLC and R&R Metals, LLC each own 50% of RTMM.

17.     Avila is the Chief Restructuring Officer of the Company. The other individuals who comprise the Debtors' existing senior management, and tenure (in years) with the Company, are:

   a.   Jason Rubin, President and CEO (11);

   b.   David Comite, Treasurer and CFO (20);

   c.   Zachary Shair, Refinery Operations Director (7);

   d.   James Gavilan, SVP, Business Development (5);

   e.   Luis Pena, Head of Global Sales (21);

   f.   Alan Silverstein, General Counsel (5);

   g.   Richard Lani, Chief Compliance Officer (5);

    h.   JR Rao, VP, Environmental Health & Safety (5);

    i.   Lindsey Rubin, Corporate Secretary (7); and

    j.   Rafael Carbonell, COO (4).

## DEBT STRUCTURE

**The Senior Lenders and the Second Amended and Restated Intercreditor Agreement**

18.    The Senior Lenders (defined below) are parties to that certain Second Amended and Restated Intercreditor Agreement dated February 19, 2016, as amended from time to time (the "Intercreditor Agreement"), by and among Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest"), Bank Leumi USA ("Leumi") (Leumi, Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet, and Woodforest are collectively, the "Senior Lenders"). RMC acknowledged and agreed to the Intercreditor Agreement.

19.    Each Senior Lender is party to its own respective credit documents with the Company. Neither the Intercreditor Agreement nor the Senior Lenders' credit documents provide for a syndication or consolidation of the obligations owed the Senior Lenders, and no administrative agent is appointed to act for the Senior Lenders.

20.    The Senior Lenders assert blanket liens on all assets of RMC, RMRC, and RCC, including all personal and real property, instruments and intangibles. The security interest of each Senior Lender is deemed to be equal priority with the security interest of every other Senior Lender pursuant to the Intercreditor Agreement (except as otherwise expressly provided therein), without regard to the time of attachment or perfection of the security interests, the order of filing

financing statements and the giving or failure to give notice of a purchase money security interest.

21.     Furthermore, and pursuant the Intercreditor Agreement, after an event of default, with certain exceptions, the Senior Lenders shall share *pro rata* all amounts and collections realized by a Senior Lender from any of RMC's collateral, whether or not such Senior Lender is perfected.

**B.     RMC's Loans and Precious Metals Lease Agreements**

22.     Rabobank agreed to loan to RMC the principal amount of $45,000,000 at a per annum contract rate of interest in the amount of a margin plus defined "Base Rate" or LIBOR and default rate of interest of 2% over the existing rate or 3.2% over the Base Rate, pursuant to a Promissory Note, Security Agreement and Line Letter Agreement dated on or about June 26, 2017.

23.     BBH agreed to loan to RMC the principal amount of $15,000,000 at a per annum contract rate of interest of Overnight LIBOR (or fixed up to 90 days, at Maker's option) plus 2.00% and default rate of interest of 120% of the rate payable on the due date or demand, pursuant to a Secured Demand Promissory Note and General Security Agreement Letter Agreement dated on or about May 20, 2016.

24.     Hapoalim agreed to loan to RMC the principal amount of $25,000,000 at a per annum contract rate of interest of LIBOR plus agreed margin and a default rate of interest of Hapoalim's prime rate pursuant to an Amended and Restated Promissory Note, Security Agreement and Letter Agreement dated on or about November 10, 2016.

25.     Mitsubishi agreed to lease certain precious metals to RMC pursuant to a Metals Lease Agreement dated November 22, 2016.

26.     ICBCS agreed to lease a certain amount of silver to RMC pursuant to the FOA Master Netting Agreement (including any annexes, schedules or exhibits thereto) entered into by ICBCS (formerly known as Standard Bank Plc) and RMC dated as of January 19, 2011, as amended and restated from time to time (the "ICBCS Master Netting Agreement").

27.     Techemet agreed to lease certain precious metals to RMC a Lease Agreement dated on or about March 6, 2017.

28.     Woodforest agreed to loan RMC the principal amount of $15,000,000 at the per annum contract rate of interest of LIBOR plus 2.25% and default rate at the highest rate allowed by applicable law, pursuant to a Revolving Line of Credit Promissory Note, Security Agreement, and Guaranty of Payment and Performance dated on or about October 30, 2017.

29.     Leumi agreed to loan RMC the principal amount of $25,000,000 at a per annum interest rate of LIBOR plus 2.25% and default rate of the current rate plus 3% pursuant to the Line of Credit Note (Discretionary) Security Agreement, Letter Agreement and Pledge Agreement dated on or about October 31, 2017.

30.     The loan documents described in the foregoing paragraphs are referred to herein collectively, the "Individual Credit Documents").

31.     As required by Local Rule 1007 (a)(5), the name, address, claim amount, brief description of collateral, estimated value, and statement regarding liens of the Senior Lenders is attached to the First Day Declaration as **Attachment A**.

## SUPPLIER AGREEMENTS

32.     RMC is also a party to approximately 35 agreements (each a "Supplier Agreement"), providing for the supplier to deliver materials to RMC such as gold and silver dore

bars or other similar raw materials ("Raw Materials") for refining pursuant to the standards agreed upon in the Supplier Agreement.

33.    Generally, upon completion of RMC's obligations to refine the Raw Materials under a Supplier Agreement, the Supplier has the option to elect that RMC transfer the value of the refined material to the Supplier's designated account, or alternatively, may have the "Recoverable Metals" due from each lot of Refined Material transferred to the Supplier's designated metal account.

34.    It is estimated that total outstanding Supplier obligations are approximately $86,346,000.

## EVENTS LEADING TO THE CHAPTER 11 FILING

**Liquidity Demands on the Company**

35.    In April 2018, the Debtors discovered a significant discrepancy in its inventory accounting as part of its preparation of 2017 year end financials and quarterly financials for the first quarter, 2018. This led to the Debtors retaining the accounting firm of Eisner-Amper to conduct a physical inventory. On June 8, 2018, Eisner-Amper conducted the physical inventory and, thereafter, on June 20, 2018, delivered a final report that confirmed inventory discrepancies in the Debtors' books and records.

36.    On June 24, 2018 in Miami, the Debtors organized a meeting of the Senior Lenders to discuss the inventory issue. The Debtors' request was for the Senior Lenders to give the Debtors the necessary breathing room to continue to operate as a going concern for the near future in order to further evaluate and understand the inventory issues and develop a plan to either immediately rectify the inventory issues or otherwise restructure the Debtors.

**The Default Notices**

37.     On July 10, 2018, the Senior Lenders served termination, default and demand notices on RMC that among other things, accelerated all debt obligations and terminated lease obligations under the Individual Credit Documents pursuant to the Default Notices (as defined below). On or about July 10, 2018, ICBCS, one of the Senior Lenders, also exercised its rights under the ICBCS Master Netting Agreement and the Unallocated Precious Metals Accounts Agreement dated Mary 28, 2015 (as novated, amended, restated, modified or supplemented from time to time) between ICBCS and RMC (the "London Clearing Account Agreement") resulting in RMC's loss of access to and use of its London clearinghouse account maintained by ICBCS (the "London Clearing Account"), and for all intents and purposes, ended the Debtors' ability to service customer deliveries via "Loco London" credit transactions. On July 10, 2018, the Senior Lenders issued the following notices to the Debtor:

a.  By letter dated July 10, 2018, Rabobank sent RMC a Notice of Demand for Payment Under Line Letter Agreement;

b.  By letter dated July 10, 2018, Techemet sent RMC a Notice of Early Termination Date Under Lease Agreement;

c.  By letter dated July 10, 2018, BBH sent RMC a Notice of Demand for Payment Under Loan Documents;

d.  By letter dated July 10, 2018, Bank Hapoalim B.M., New York Branch sent RMC a Notice of Demand for Payment Under Line Letter Agreement;

e.  By letter dated July 10, 2018, Bank Leumi USA sent RMC a Notice of Demand for Payment Under Line Letter Agreement;

f.  By letter dated July 10, 2018, Woodforest National Bank sent RMC a Notice of Acceleration and Demand for Payment;

g.  By electronic mail dated July 10, 2018, Mitsubishi sent RMC a Notice of Event of Default; and

h.  By letter dated July 10, 2018, ICBCS sent RMC a Notice of Liquidation Date and Termination of Transactions Under Master Netting Agreement.

(each of the foregoing, collectively, the "Default Notices").

**The Forbearance Agreement and Sale Process**

38.    At or about that same time, the Debtors contacted a major, strategic metals refiner about the possible acquisition of the Debtors as a going concern (the "Potential Buyer"). Shortly thereafter, the Potential Buyer produced a letter of intent to acquire the Debtors' business. This lead to an immediate call between the Debtors, the Senior Lenders and the Potential Buyer. As a result of this call, among other reasons, the Senior Lenders agreed to forebear, temporarily, and allow the Debtors to operate in the ordinary course, pending negotiation of a more formal forbearance arrangement to allow the Debtors to pursue a sale with the Potential Buyer, or otherwise to pursue a sale on a broader scale. On or about July 16, 2018, an agreement was reached whereby RMC's access to and use of its London Clearing Account, and the net credits therein, were restored allowing the Debtors to service customer deliveries via "Loco London" credit transactions.

39.    Substantial, extensive negotiations ensued which ultimately resulted in the execution of a Forbearance Agreement on August 7, 2018 (the "Forbearance Agreement"), which then became effective on August 17, 2018 (the "Forbearance Effective Date"). The Senior Lenders agreed, among other things, to forbear during the Forbearance Period (as defined therein) from making demand for payment under their respective Individual Credit Documents and exercising their respective rights and remedies under or in connection with any and all of the Individual Credit Documents and the Intercreditor Agreement, arising from all Existing Defaults (as defined therein).

40.    With the Forbearance Agreement in place, the Company immediately retained SSG Capital ("SSG") as investment banker to assist with the sale of the Debtors' business to the Potential Buyer, or otherwise market the Debtors' business on a broader scale.

41.    Intense and good faith negotiations with the Potential Buyer continued for over three (3) months. No broader marketing effort was undertaken as all parties, including the Debtors and the Senior Lenders, agreed that a broader marketing effort would likely be detrimental to the Debtors' business in light of the nature of the metals refining and trading industry (a very small market and closed knit industry). Despite numerous, lengthy telephone calls, an in-person meeting in New York City, and multiple exchanges of term sheets and offers, the Debtors and the Senior Lenders were unable to reach terms with the Potential Buyer acceptable to the Senior Lenders. The Forbearance Agreement also terminated prior to the Petition Date.

42.    On or about October 18, 2018, ICBCS exercised its right to suspend the Debtors' access to the London Clearing Account.  Thereafter, the Senior Lenders informed the Debtors that the Senior Lenders were ceasing negotiations with the Potential Buyer.

43.    Notwithstanding what appeared to be the cessation of discussions with the Potential Buyer, and concurrently during the Debtors' preparations for Chapter 11, the Debtors, Lenders and Potential Buyer continued to discuss what, if any, acquisition prior to and outside of a Chapter 11 might be possible.  By October 26, 2018, the parties were extremely close to finalizing the material terms of an immediate, going concern acquisition of the Debtors by the Potential Purchaser, with the last open diligence items to be resolved by October 31, 2018.

44.    Unfortunately, the Potential Buyer, Debtors and Lenders were unable to finalize the terms of an acquisition by the end of the day, October 31.  With limited cash, and the

inability to trade metals or deliver refined goods, the Debtors commenced these proceedings on November 2, 2018, to run an orderly sale process of their assets and operations. It is the Debtors intent to attempt to sell the Company as a going concern, but if unsuccessful, the Debtors will engage in a process to liquidate their assets and inventory for the ratable benefit of their creditors.

45.     Additional details regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases are set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference as though set forth in full.

## CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS

### A.     Overview of the Debtors' Cash Management System

46.     The Debtors have an established cash management system they utilize to collect, manage, and disburse funds used in the Debtors' operations in the ordinary course of business (the "Cash Management System"). A chart depicting the Cash Management System (the "Cash Management Banks") and related banks is attached hereto as **Exhibit B**.

47.     The Cash Management System enables the Debtors to facilitate their cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

48.     As of the Petition Date, Debtor Republic Refining maintains bank accounts with the following banks:

      a.     TD Bank, N.A., and

      b.     Bank Leumi USA.

49. As discussed in greater detail below, as of the Petition Date, Debtor Republic Metals maintains bank accounts with the following banks:

     a.     Fifth Third Bank;

     b.     HSBC;

     c.     Woodforest National Bank;

     d.     Bank Hapoalim B.M.;

     e.     Bank Leumi USA;

     f.     Brown Brothers Harriman & Co.;

     g.     ICBC Standard Bank; and

     h.     TD Bank, N.A.

**B.     The Debtors' Bank Accounts**

50. In connection with the Cash Management System, the Debtors collectively maintain nineteen (19) bank accounts in their names (the "Bank Accounts").  In the ordinary course of business, the Debtors routinely transfer money between the Bank Accounts *via* wire transfers and other electronic funds transfers.

**The Main Operating Accounts**

***REPUBLIC REFINING***

51. As of the Petition Date, Debtor Republic Refining's primary account is an operating account with TD Bank (the "RMRC Main Operating Account").

52. Republic Refining receives payments from its customers by wires, checks, and ACH (the "RMRC Customer Payments").  The RMRC Customer Payments are made directly into the RMRC Main Operating Account and into smaller accounts with TD Bank (payroll), (ii) Bank Leumi (smaller operating account), and TD Bank (supplies account).

53.     Republic Refining also pays metal vendors directly from the RMRC Main Operating Account.

### *REPUBLIC METALS*

54.     As of the Petition Date, Debtor Republic Metals' primary account is an operating account with TD Bank (the "RMC Main Operating Account").

55.     Republic Metals receives payments from its customers by wires, checks, and ACH (the "RMC Customer Payments").  The RMC Customer Payments are made directly into the RMC Main Operating Account and into smaller operating accounts with Bank Leumi, TD Bank, and HSBC, and into a products account with TD Bank.

56.     From the RMC Main Operating Account, Republic Metals transfers funds into (i) operating accounts with each of Fifth Third, HSBC, Bank Leumi, Woodforest, Bank Hapoalim and TD Bank; (ii) a payroll account with TD Bank; (iii) a products account with TD Bank; (iv) a checking account with Bank Leumi; (v) a supplies account with TD Bank; (vi) a workers' compensation account with TD Bank; and (vii) a metals account with TD Bank.

57.     Republic Metals also pays customers and vendors directly from the RMC Main Operating Account.

### *REPUBLIC CARBON*

58.     As of the Petition Date, Republic Carbon, maintains bank accounts with TD Bank, N.A. and HSBC (the "RCC Banks").

### Republic Metals' Brokerage and Commodities Accounts

59.     Republic Metals also uses the RMC Main Operating Account to fund its non-operating accounts, including (i) two Raymond James brokerage accounts[2], (ii) a Rosenthal Collins commodities account, and (iii) an INTL FCStone futures account (collectively, the "Brokerage Accounts").

60.     As of the Petition Date, there was a total of approximately $259,000 in the Brokerage Accounts.

## C.     Intercompany Transactions

61.     Because the Debtors operate a centralized cash management system, intercompany receivables and payables are created in the ordinary course of business (collectively, the "Intercompany Claims".)   As funds are disbursed throughout the Cash Management System and as business is transacted by and among non-Debtor entities, at any given time there may be Intercompany Claims owing by the Debtors to a non-Debtor entity, and vice versa.   Certain Intercompany Claims have historically been settled on a monthly basis while others have not, but may be reflected as receivables and payables, as applicable, in the Debtors' entities accounting system.   The Debtors can, therefore, ascertain, trace, and account for all intercompany transactions and will be able to continue doing so on a post-petition basis.   The intercompany transactions are reflected on the second page of Exhibit B hereto.

## D.     The Debtors' Existing Business Forms and Checks

62.     In the ordinary course of business, the Debtors use numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders, and invoices (collectively, the "Business Forms"). Given the Debtors' well established cash management structure, to minimize the expense to the Debtors' estates associated with developing and/or

---

[2] The two Raymond James Brokerage accounts were liquidated (i.e., the balances were sold and transferred) pursuant to the pre-Petition forbearance agreement with the Debtors' secured lending group, however, those amounts remain open with nominal balances.

purchasing new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue to use their Business Forms as such forms existed immediately prior to the Petition Date, without reference therein to the Debtors' status as debtors-in-possession.

**E.      Bank Fees and Charges**

63.      In the ordinary course, the Debtors' Cash Management Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service and other fees, costs, charges, and expenses (collectively, the "Bank Fees"). In the six (6) months preceding the Petition Date, the Bank Fees averaged approximately $15,000 per month.

**RELIEF REQUESTED**

64.      By this Motion, the Debtors respectfully requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a), 345, 363, 364, 507, 1107, and 1108 of the Bankruptcy Code, (a) authorizing the Debtors to, in the ordinary course of their businesses, (i) use the Cash Management System, Bank Accounts, and Business Forms (without reference to the Debtors' status as debtors-in-possession) and (ii) perform intercompany transactions; (b) authorizing the Cash Management Banks to (i) maintain, service, and administer the Bank Accounts[3] and (ii) honor and process all related checks and electronic payment requests consistent with the relief requested herein, (c) waiving the Debtors' compliance with the guidelines set forth in section 345(b) of the Bankruptcy Code for a period of forty-five (45) days, except as to the collateralization requirements under section 345(b) of the Bankruptcy Code, and

---

[3] The Debtors believe Exhibit B sets forth a complete list of Bank Accounts. Nevertheless, the Debtors request the Order granting the relief sought herein apply to all bank accounts that are actually a part of or are linked to the Cash Management System. Thus, to the extent any bank account has been inadvertently omitted from the list, the Debtors request the Order granting the relief sought herein apply to such account.

(d) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.

65.    More specifically, the Debtors request authority to use the Cash Management System during the pendency of these Chapter 11 Cases in accordance with the ordinary course of the Debtors' businesses, but in all respects subject to the Cash Collateral Order and the Budget (as defined in the Cash Collateral Order).

66.    The Debtors further request the Court authorize the Cash Management Banks to (a) continue to maintain, service, and administer the Bank Accounts, (b) debit the Bank Accounts in the ordinary course of business on account of (i) all checks drawn on the Bank Accounts that are cashed at the Cash Management Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts at the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (iii) all undisputed pre-petition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of any aspect of the applicable Cash Management System, and (c) recognize and give effect to the transfers between the various Bank Accounts as contemplated herein.

67.    Furthermore, to guard against improper transfers resulting from the post-petition honoring of prepetition obligations, the Debtors request their banks be directed not to honor, subject to certain exceptions approved by the Court (such as employee benefits and utilities), any checks and disbursements, including automatic or "ACH" withdrawals drawn on the Debtors' bank accounts, or for obligations, prior to the Petition Date, and not to honor any checks or disbursements drawn Prepetition on the Bank Accounts.

## BASIS FOR RELIEF

**F.    The Debtors Should be Authorized to Use Their Cash Management System and Existing Bank Accounts**

68.    Allowing the Debtors to maintain uninterrupted used of the Cash Management System and Bank Accounts will accomplish the dual goals of minimizing the disruption to the Debtors' operations and satisfying the United States Trustee's Operating Guidelines.  To ensure that all transfers and transactions will be documented in their books and records, the Debtors will maintain records of all transfers within the Cash Management System.

69.    Courts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash.  Bankruptcy courts therefore treat requests for authority to utilize existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.,* 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In *In re Charter Co.,* 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtor and 43 of its subsidiaries "to continue to consolidate the management of its cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id*. at 620. The Court of Appeals for the Eleventh Circuit then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their pre-petition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id*. at 621.

70.    Here, the Debtors have utilized the Cash Management System as part of their ordinary and usual business practices and as such, the Debtors believe use of the Cash Management System falls within the purview of ordinary course transactions permitted under

section 363(c)(1) of the Bankruptcy Code. Moreover, appropriate circumstances exist for the Courts to authorize the Debtors' use of the Cash Management System under sections 363(b)(1) and section 105(a) of the Bankruptcy Code.

71.    As an initial matter, the relief requested in this Motion will help minimize any disruption in the Debtors' business operations caused by the filing of these Chapter 11 Cases and preserve the value of the estates.

72.    Second, strict adherence to the Guidelines of the Office of the United States Trustee (the "U.S. Trustee") will prove to be exceedingly burdensome to the Debtors and management, reduce efficiencies, and cause unnecessary expense. Absent the relief requested herein, the Debtors will be required to, among other things, (a) close all existing bank accounts and open new debtor-in-possession accounts, (b) maintain a separate debtor-in-possession account for cash collateral, (c) obtain checks that bear the designation "debtor-in-possession", and (d) create new systems for manually issuing checks and paying post-petition obligations. The delays that will result from opening the new accounts and revising cash management procedures would disrupt the Debtors' business operations at this critical time, have little or no benefit to the Debtors' estates or creditors, and potentially erode the value of the Debtors' businesses. Accordingly, the Debtors should be allowed to use the Cash Management System consistent with the ordinary course of the Debtors' business.

**G.    The Debtors Should Be Authorized To Continue Using Existing Business Forms and Checks**

73.    As described above, in the ordinary course of business, the Debtors use numerous varieties of Business Forms. By virtue of the nature and scope of the Debtors' business operations, and in order to minimize expenses to the Debtors' estates, it is important that the

Debtors be permitted to continue using the existing Business Forms without alteration or change, except as requested herein.

74.     Furthermore, parties doing business directly with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the communications and notice of the commencement of these Chapter 11 Cases that the Debtors will distribute to such parties.  Accordingly, the requirement to change the Business Forms is unnecessary, would be unduly burdensome, and should be waived.

**H.    The Debtors Should Be Authorized To Continue Using Debit, Wire, and Electronic Transfers**

75.     The U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Given the Debtors' current operations, it is necessary for the Debtors to conduct transactions by debit, wire, automated clearing house ("ACH") transfers, ACH credit, ACH debit, and other similar methods of electronic transfers. Denying the Debtors the opportunity to conduct transactions by these methods would likely interfere with the Debtors' performance under their contracts and obligations, unnecessarily distract the Debtors and their management from the Debtors' business operations, and create additional costs to be borne by the Debtors and their creditors. Accordingly, the Debtors believe that it is imperative that the Cash Management Banks be authorized to continue to pay, honor, and execute any and all debit instructions, wires, ACH payments, and other forms of electronic transfers issued and drawn on the Bank Accounts after the Petition Date.

**I.    The Debtors Should Be Authorized To Continue Performing Intercompany Transactions in the Ordinary Course**

76.     The continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses and preserve and maintain the

Debtors' going-concern value for the benefit of all parties in interest.[4] Because the Debtors' businesses are operationally and functionally interconnected to their affiliates, they maintain the centralized Cash Management System described above that necessarily requires numerous Intercompany Transactions. Altering this system would require the Debtors to divert attention from their bankruptcy-related efforts and the desired smooth transition into operating as a debtors-in-possession. In contrast, the continuation of the Intercompany Transactions helps preserve the "business as usual" atmosphere and avoids the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System. Accordingly, the Debtors should be expressly authorized to continue performing the Intercompany Transactions consistent with the Debtors' customary practice.

77.     Based on the foregoing, the Debtors submit the relief requested herein is necessary and appropriate, is in the best interests of their estates, creditors, and other parties-in-interest, and should be granted in all respects. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## RESERVATION OF RIGHTS

78.     To the extent that any contract or agreement in connection with the Cash Management System, the Bank Accounts, or the Intercompany Transactions is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not at this time intend to assume or reject such contract or agreement. As such, the Court's authorization of payment shall not be deemed to constitute an assumption of such contract or agreement pursuant to section 365 of the Bankruptcy Code. The Debtors are currently in the

---

[4] Because the Debtors engage in Intercompany Transactions on a regular basis, and such transactions are common among enterprises similar to the Debtors, the Debtors believe that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code that do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions after the Petition Date.

process of reviewing all of their contracts and agreements and reserve all of its rights with respect thereto. Nothing herein shall acknowledge, grant, or otherwise permit any right of offset or recoupment by a non-debtor with respect to any claim asserted against the Debtors. If the Court grants the relief sought herein, any payments made pursuant to the Court's order are not intended and should not be construed as an admission to the validity of any claim or a waiver of the rights of the Debtors to dispute such claim subsequently.

79.     Additionally, except as expressly stated herein or the Cash Collateral Order, nothing contained herein is intended or should be construed as (a) an agreement or admission by the Debtors as to the validity of any claim against the estates, (b) a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, (c) a promise by the Debtors to pay any claim, or (d) an implication or admission by the Debtors that such claim is payable pursuant to an Order granting the relief requested in this Motion.

## THE DEBTORS SATISFY BANKRUPTCY RULE 6003

80.     Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding ... a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." FED. R. BANKR. P. 6003(b). The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

81.     To implement the foregoing successfully, the Debtors respectfully request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than

cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." As set forth above, the payments proposed herein are essential to prevent

potentially irreparable damage to the Debtors' operations and value. Accordingly, the Debtors

submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy

Rule 6004(h), to the extent it applies.

## NO PREVIOUS REQUEST

82.     No prior motion for the relief requested herein has been made by the Debtors to

this or any other court.

## NOTICE

83.     The Debtors will provide overnight mail notice and when available electronically

mail notice of this Motion to: (a) the Office of the U.S. Trustee for the Southern District of New

York; (b) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed

by the Debtors in these Chapter 11 Cases; (c) the Internal Revenue Service; (d) the Cash

Management Banks; and (e) any other party entitled to notice pursuant to Local Rule 9013-1(b).

The Debtors submit that, in light of the nature of the relief requested, no other or further notice

need be given.

## CONCLUSION

WHEREFORE, for the reasons set forth above and in the First Day Declaration, the

Debtors respectfully requests that the Court enter the Order, substantially in the form attached as

**Exhibit A** hereto, (i) authorizing the Debtors to, in the ordinary course of its business, (a) use the

Cash Management System, Bank Accounts, and Business Forms (without reference to the

Debtors' status as debtors in possession) and (b) perform Intercompany Transactions,

(ii) authorizing the Cash Management Banks to (a) maintain, service, and administer the Bank

Accounts and (b) honor and process all related checks and electronic payment requests consistent

with the relief requested herein, and (iii) granting such other and further relief as requested

herein or as the Court otherwise deems necessary or appropriate.

Dated:  New York, New York
         November 2, 2018

AKERMAN LLP

By:   */s/Susan F. Balaschak*
   Susan F. Balaschak
   666 Fifth Avenue, 20th Floor
   New York, NY  10103
   Tel.: (212) 880-3800
   Fax: (212) 880-8965
   E-Mail: susan.balaschak@akerman.com

-and-

   John E. Mitchell
   **(*Pro Hac Vic Pending*)**
   AKERMAN LLP
   2001 Ross Avenue, Suite 3600
   Dallas, TX  75201
   Tel.: (214) 720-4300
   Fax: (214) 981-9339
   E-Mail: john.mitchell@akerman.com

   Andrea S. Hartley
   (***Pro Hac Vice Pending***)
   Katherine C. Fackler
   (***Pro Hac Vice Pending***)
   AKERMAN LLP
   98 Southeast Seventh Street, Suite 1100
   Miami, FL 3313
   Tel.: (305) 374-5600
   Fax: (305) 374-5095
   E-Mail: andrea.hartley@akerman.com
   E-Mail: katherine.fackler@akerman.com

   *Proposed Counsel for Debtors and Debtors-in-Possession*

**<u>EXHIBIT A</u>**

**<u>PROPOSED ORDER</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC METALS REFINING | ) | |
| CORPORATION, *et al.*,[1] | ) | Case No. 18-13359 (___) |
| | ) | |
| Debtors. | ) | |
| | ) | (Joint Administration Pending) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO, IN**
**THE ORDINARY COURSE, USE ITS CASH MANAGEMENT SYSTEM BANK**
**ACCOUNTS AND BUSINESS FORMS (II) AUTHORIZING BANKS AND FINANCIAL**
**INSTITUTIONS TO HONOR AND PROCESS ALL RELATED CHECK AND**
**ELECTRONIC PAYMENT REQUESTS AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Republic Metals Refining Corporation and its debtor

affiliates (collectively, the "Debtors"), as debtors-in-possession in the above-captioned chapter

11 cases (the "Chapter 11 Cases" or "Cases"), for entry of an order pursuant to sections 105(a),

345, 363, 364, 507, 1107, and 1108 of the Bankruptcy Code, and Rules 6003 and 6004 of the

Bankruptcy Rules, (i) authorizing the Debtors to, in the ordinary course of their businesses, use

the Cash Management System, Bank Accounts, and Business Forms (with the exceptions of

checks, without reference to the Debtors' status as debtors-in-possession), (ii) authorizing the

Cash Management Banks to (a) maintain, service and administer the Bank Accounts and (b)

honor and process all checks and electronic payment requests consistent with the relief requested

in the Motion, and (iii) granting such other and further relief as requested in the Motion or as the

Court otherwise deems necessary or appropriate; and the Court having jurisdiction over this

matter pursuant to 28 U.S.C. § 1334; and this proceeding being a core proceeding pursuant to 28

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), and Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

U.S.C. § 157(b)(2); and the Court having determined that good and sufficient  notice of the

Motion was  given to the Notice Parties and no other or further notice is needed or necessary;

just cause exists for granting the Motion; the relief requested in the Motion is in the best interests

of the Debtors' estates, creditors, and other parties-in-interest; and the Court having reviewed the

Motion and any objections thereto;  and after due deliberation and sufficient cause appearing

therefor, it is hereby ORDERED that:

1.      The Motion is granted.

2.      The Debtors are authorized to (a) use the Cash Management System, and (b)

maintain and continue using the Bank Accounts with the same account numbers, in existence on

the Petition Date, including, without limitation, those accounts identified on Exhibits B and C to

the Motion.  The Debtors are authorized to maintain and continue using the existing Business

Forms, other than checks, without reference to the Debtors status as a debtors-in-possession.

The Debtors are authorized to open any new debtor-in-possession bank accounts in the name of

the Debtors as a "Debtor-in-Possession" with authorized depository banks and close any existing

Bank Accounts, as the Debtors may deem necessary and appropriate in their sole discretion.

3.      As soon as practicable after the entry of this Order, the Debtors shall stamp or

print their check stock with "Debtor in Possession" and the Chapter 11 case number under which

this case is being administered.  The Debtors are authorized to continue using its existing

business forms without reference to the Debtors' status as debtors in possession; provided,

however, that the Debtors will make reasonable best efforts to include a reference to their status

as debtors in possession on any business form.  To the extent the Debtors obtain new Business

Forms, the Debtors will order new Business Forms identifying their status as Debtors in

Possession.

45828656;8

4.      Except as otherwise provided in this Interim Order, the Cash Management Banks are authorized to charge, and the Debtors are authorized, but not directed, to pay, honor, or allow, prepetition and postpetition fees, costs, charges, and expenses, including the Bank Fees, and charge back returned items, whether such items were deposited prepetition or postpetition, to the Bank Accounts in the ordinary course of business and consistent with prepetition practices. Any such postpetition fees, costs, charges, and expenses, including the Bank Fees, or chargebacks that are not so paid shall be entitled to priority as administrative expenses pursuant to section 503(b)(1) of the Bankruptcy Code.

5.      Each of the Debtors' Cash Management Banks is authorized to debit the Debtors' accounts in the ordinary course of business without need for further order of this Court for: (i) all checks, items, and other payment orders drawn on the Debtors' accounts which are cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Cash Management Bank's receipt of notice of filing of the Petition; (ii) all checks, automated clearing house entries and other items deposited or credited to one of Debtor's accounts with such Cash Management Bank prior to filing of the Petition which have been dishonored, reversed, or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to filing of the Petition; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of the Cash Management System.

6.      Any of the Debtors' Cash Management Banks may rely on the representations of one or more of the Debtors with respect to whether any check, item, or other payment order drawn or issued by the Debtors prior to filing of the Petition should be honored pursuant to this

45828656;8

or any other order of this Court, and such Cash Management Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

7.    Those certain existing deposit agreements between the Debtors and their existing depository and disbursement banks (collectively the "Banks") shall continue to govern the post-petition cash management relationship between the Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect, and the Debtors and the Cash Management Banks may, without further Order of this Court, agree to and implement changes to the cash management systems and procedures which shall be deemed to be in the Debtors' ordinary course of businesses, including, without limitation, the opening and closing of bank accounts, and subject to the notice provisions provided herein to the U.S. Trustee and other parties in interest (including the Secured) Parties (as defined in the Cash Collateral Order)).

8.    The Debtors shall notify the U.S. Trustee of the opening of any new bank account, provided, however, that any new bank accounts shall be opened at authorized S.D.N.Y. Depositories.

9.    No party shall in any way interfere with the Cash Management System by seizing, sweeping, or otherwise exerting any control over funds in the Bank Accounts or by, among other things, taking any action to collect, assess, or recover a claim against any of the Debtors that arose prior to the commencement of these Chapter 11 Cases or offsetting any debt owing to any of the Debtors that arose before the commencement of these Chapter 11 Cases against any claim against any of the Debtors.

10.    The London Clearing Account shall remain suspended, and the Debtors shall not have access or use of the London Clearing Account without prior written authorization from

ICBCS or further order of the Court.  In the event the Debtors determine they no longer need the London Clearing Account, the Debtors may authorize ICBCS to terminate the London Clearing Account Agreement and close the London Clearing Account without further order of the Court.

11.     Subject to the terms of this Order, the provisions of the Bankruptcy Code, and any other applicable laws, the applicable agreements governing the Bank Accounts shall remain in full force and effect; provided that nothing herein shall be deemed to be an agreement by the Debtors to assume or reject any such agreements and all parties' rights with respect to such agreements are expressly reserved and preserved.

12.     The Debtors shall maintain accurate records of all transfers within the Cash Management System, including the Intercompany Transactions, so that all post-petition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records to the same extent as before the Petition Date.

13.     The Cash Management Banks are authorized to pay obligations in accordance with this or any separate order of the Court.

14.     Except as otherwise provided in this Order or in a separate order of the Court, the Cash Management Banks shall not honor or pay any payments drawn on the listed Bank Accounts or otherwise issued prior to the Petition Date.

15.     The Debtors shall have a period of forty-five (45) days from the entry of this Interim Order to come into compliance with the requirements of section 345(b) of the Bankruptcy Code, without prejudice to the Debtors' right to seek a further interim modification or final modification upon final hearing.

16.     As soon as practicable after entry of this Order, the Debtors shall serve a copy of this Order on the Cash Management Banks.

45828656;8

17.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(a) and 6004(h) or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and the requirements of Bankruptcy Rules 6004(a) and 6004(h) are hereby waived.

18.     The terms of this Order shall apply to any new bank account opened by the Debtors.

19.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

20.     The Court retains jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

Dated: New York, New York
       November ____, 2018

**PROPOSED**

_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

## CHART OF CASH MANAGEMENT BANKS

# RMC Bank Account Structure (Balances as of 11/01/18)



**Note:**
RMC – Republic Metals Corporation.
RMRC – Republic Metals Refining Corporation (NY Office).
RMC2 – RMC 2, LLC (Small Customers).
(1) Little or no account activity.

DRAFT – PRIVILEGED AND CONFIDENTIAL                    1

# Bank Account Structure (Balances as of 11/01/18)



**Note:**
RMCD – RMC Diamonds, LLC.
RCC – Republic Carbon Company, LLC.
RHTM – Republic High Tech Metals, LLC.
RTM – Republic Trans Mexico Metals S. DE. RL
RDR – Richard Dennis Rubin Enterprises
RMW – Republic Metals Warehouse LLC
RREG – Rubin Real Estate Groups LLC
(1) - Little or no account activity.

## Brokerage/Commodity Account Structure (Balances as of 11/01/18)

