Michael Luskin
Richard Stern
Alex Talesnick
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC METALS REFINING | ) | Case No. 18-13359 (SHL) |
| CORPORATION, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related Doc. Nos. 10, 78** |

### OMNIBUS REPLY OF THE SENIOR LENDERS
### TO OBJECTIONS TO THE DEBTORS' CASH COLLATERAL MOTION

Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers

Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International

Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC

("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and,

together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the

"Senior Lenders") respectfully submit this reply (the "Reply") to the objections and responses

(collectively, the "Objections") filed with respect to the *Debtors' Motion For Entry of Interim*

*and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include: Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209,
New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378) and
Republic Carbon Company, LLC, 5295 NW 163rd St., Miami Gardens, FL 33014 (5833).

*Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related*

*Relief* (the "Motion")[2] [Docket No. 10], and in support thereof respectfully state as follows:

## PRELIMINARY STATEMENT

1.      26 Objections have been filed to the Motion.  Other than the Committee and certain insiders of the Debtors, each of the objectors is a purported supplier, customer or lessor of the Debtors and party to a refining, sale or lease agreement or similar arrangement with a Debtor (each a "Customer Counterparty").  The Committee itself is comprised of seven Customer Counterparties, six of which have filed Objections in their individual capacities.  No Customer Counterparty contests that the Debtors have an immediate need to use Cash Collateral or that the continued use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates (nor does the Committee).  Rather, substantially all of the Customer Counterparties' Objections relate to the single issue of who has title to precious metal delivered to the Debtors prepetition—the Debtors or the Customer Counterparties?  If title transferred to the Debtors, the metal is the property of the estates and is subject to the Senior Lenders' liens; if it did not, the Customer Counterparties may have rights senior to the Senior Lenders.  This dispute is referred to herein as the "Inventory Dispute."

2.      The Senior Lenders acknowledge that the Inventory Dispute needs to be addressed prior to the distribution of certain inventory sale proceeds to creditors in these cases. Accordingly, the Senior Lenders have proposed streamlined procedures to the Debtors and the Committee for the resolution of the Inventory Dispute (such procedures, the "Customer Claim Procedures").  The Debtors are in general agreement with the proposed Customer Claim Procedures.  The Committee's only response was its Objection.  The Customer Claim Procedures

---

[2]      All capitalized terms used but not defined herein have the meaning ascribed to such terms in the Motion.

are described in detail below and, if agreed, will be incorporated in the proposed Final Order, together with any further changes agreed to before the final hearing.

3.       In order to give the parties more time to discuss the Customer Claim Procedures, agree on a final Budget (including the treatment of certain proposed payments to insiders and insider affiliates) and address the issues raised by the Committee's Objection, the Senior Lenders, the Debtors and the Committee have agreed to extend the term of the First Interim Order and the Debtors' authority to use cash collateral on an interim basis through December 19, 2018.  A proposed second interim cash collateral order (the "Second Interim Order") will be filed by the Debtors in advance of the hearing on November 29, 2018.

4.       For the reasons set forth in the Motion and herein, the Senior Lenders respectfully request that the Court enter the Second Interim Order.

## JURISDICTION

5.       The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

6.       Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 4001, 6003 and 6004 and Local Rule 4001-2.

## BACKGROUND

### A.  The Chapter 11 Cases

8.       On November 2, 2018, (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

3

9.      The Debtors are continuing to operate and manage their properties and assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the chapter 11 cases.[3]

10.     On November 19, 2018, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors in these cases (the "Committee") [Docket No. 113].  The Committee consists of the following seven members: (i) Coeur Rochester, Inc., (ii) Bayside Metal Exchange, (iii) So Accurate Group Inc., (iv) Cyber-Fox Trading, Inc., (v) Minera Triton Argentina S.A. (Chair of the Committee), (vi) Pyropure Inc. and (vii) Minera Real de Ora S.A. de C.V.

11.     Six of the seven Committee members have filed Objections asserting property interests in the Debtors' assets or, alternatively, 503(b)(9) administrative expense claims, in each case positions demonstrably opposed to the interests of unsecured creditors.  See Docket Nos. 146, 147, 164, 178, 181 and 195.

12.     The factual background relating to the commencement of the chapter 11 cases is set forth in detail in the *Declaration of Scott Avila, as Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 3].

**B.  The Senior Lenders' Relationship with the Debtors**

13.     As described in the First Day Declaration, the Senior Lenders are collectively owed over $177 million by the Debtors under certain Credit and Lease Agreements.  First Day Decl., Attachment A.  The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including the Debtors'

---

[3]      Given, among other things, the Debtors' insistence on making continued salary, benefits and rent payments to various insiders and insider affiliates notwithstanding the serious claims of wrongdoing that exist against them and the dubious benefit the insiders provide to the Debtors in return for their proposed salaries, the Senior Lenders reserve their rights to move for appointment of a chapter 11 trustee or move to convert these cases to chapter 7.

inventory and the Debtors' cash.  Id. ¶ 21.  The Senior Lenders continue to incur professional

fees and other expenses, and interest continues to accrue on the amount of their claims on the

terms set forth in their respective Credit and Lease Agreements.

14.    The Senior Lenders are party to a certain Second Amended and Restated

Intercreditor Agreement, dated as of February 19, 2016 (as amended from time to time, the

"Intercreditor Agreement"), which governs the respective rights and interests of the Senior

Lenders in the assets of Debtor Republic Metals Corporation ("RMC").  Id. ¶ 19.  RMC

acknowledged and agreed to the Intercreditor Agreement.  Id.

15.    With the exception of Mitsubishi and ICBCS, each of the Senior Lenders first

entered into Credit and Lease Agreements with the Debtors between January 2016 and October

2017.  Id. ¶¶ 23–30.

16.    The Debtors made certain representations and warranties in the Credit and Lease

Agreements with respect to, among other things, the financial condition and solvency of the

Debtors, the accuracy of the financial statements provided to the Senior Lenders, the Debtors'

compliance with certain financial covenants and the absence of defaults.  The Credit and Lease

Documents were all executed either by Jason Rubin, the President and Chief Executive Officer

of the Debtors, and/or David Comite, the Treasurer and Chief Financial Officer of the Debtors.

17.    Pursuant to the Credit and Lease Agreements, RMC was obligated to periodically

furnish the Senior Lenders with borrowing base reports (the "Borrowing Base Reports"), which

calculated the collateral borrowing base available to support RMC's existing extensions of credit

and requests for additional extensions of credit under the Credit and Lease Agreements.  The

Borrowing Base Reports calculated, among other things, the Debtor's eligible inventory and

eligible net liquidity in brokerage accounts.  Each Borrowing Base Report was executed by

David Comite and certified both the accuracy of the information contained therein and the absence of any defaults under the Credit and Lease Agreements.

18.    In addition to the Borrowing Base Reports, RMC was also obligated to provide the Senior Lenders with annual and quarterly financial statements pursuant to the Credit and Lease Agreements.  The annual financial statements were audited by independent outside accounting firms (Crowe Horwath LLP and EisnerAmper LLP) and the quarterly financial statements were unaudited and delivered with an independent accountants' compilation report from Maria I. Machado, P.A.

19.    In June 2018, the Senior Lenders were first advised by RMC of significant discrepancies in the value of the Senior Lenders' collateral as disclosed in the Borrowing Base Reports.  Specifically, the Borrowing Base Certificate delivered to the Senior Lenders on May 30, 2018 listed eligible inventory of $219,570,312.54 as of May 25, 2018 and a borrowing base excess of $11,124,342.34.  However, the subsequent Borrowing Base Certificate delivered to the Senior Lenders on June 20, 2018 listed eligible inventory of $144,157,698.29 as of June 8, 2018 and a borrowing base shortfall of $39,486,098.03—a loss of over $75 million in asset value from one Borrowing Base Certificate to the next—delivered only three weeks later.  The loss remains unaccounted for today.  As a result of this precipitous drop in collateral value, a myriad of defaults were triggered under the various Credit and Lease Agreements, and serious questions arose regarding management's competence and honesty.

20.    The draft financial statements delivered to the Senior Lenders in June 2018 for the fiscal quarter ending March 31, 2018 further confirmed the apparent massive loss of collateral, reflecting a decrease in inventory value from $252,322,502 as of March 31, 2017 to $171,319,259 as of March 31, 2018, a drop of over $80 million.

21.    The Debtors attribute the collateral disappearance to "a significant discrepancy in [the Debtors'] inventory accounting".  First Day Decl. ¶ 36.  However, to date, despite millions of dollars in professional fees paid to the Debtors' CRO, financial advisor and accounting and law firms, no satisfactory explanation has been provided for the inventory deficiency and loss of the Senior Lenders' collateral.  Based on the information provided after the fact, the Senior Lenders believe that the Debtors may have been insolvent for years, that the Debtors masked continued operating losses with borrowed funds, and that there are substantial claims against the Debtors' insiders and auditors arising from and related to the foregoing.  Over the same period, the Debtors' officers and shareholders took in excess of $40 million from the Debtors in the form of dividends, salaries and bonuses.[4]

22.    On July 10, 2018, the Senior Lenders served termination, default and demand notices on RMC that among other things, accelerated all debt obligations and terminated and liquidated lease obligations under the Credit and Lease Agreements.  First Day Decl. ¶ 38.  Despite the existing events of default under the Credit and Lease Agreements, continuing operational losses, and substantial deterioration in and depletion of the Senior Lenders' collateral, the Senior Lenders entered into a forbearance arrangement with the Debtors and agreed to stand still while the Debtors and the Debtors' principal stakeholders attempted in vain to consummate either a restructuring or a sale transaction.  Following the failure of the out of court efforts, the Debtors commenced these chapter 11 cases on November 2, 2018.

---

[4]    This summary of the inventory issue is provided solely for background purposes.  The Senior Lenders reserve all rights with respect to the Debtors' financial affairs and any rights, remedies, claims and/or causes of action, whether at law or in equity, of any of the Senior Lenders against any current and former directors, officers, principals, agents, advisors, accountants, auditors, consultants, attorneys, employees and other professionals of the Debtors arising from or related thereto.

7

### C. The Cash Collateral Motion

23.     The Debtors filed the Motion on the Petition Date.  The Court heard oral

argument on the Motion at the first day hearing on November 6, 2018.  Following argument, the

Court approved the Motion on the record on an interim basis, subject to certain requested

modifications.

24.     On November 8, 2018, the Court entered its *Interim Order Pursuant to 11 U.S.C.*

*§§ 105, 361, 362, 363, 503 and 507 (I) Authorizing the Debtors to Use Cash Collateral,*

*(II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and*

*(IV) Granting Related Relief* (the "First Interim Order") [Docket No. 54].

25.     Pursuant to the First Interim Order, the Senior Lenders consented to the Debtors'

use of their collateral to fund the costs and expenses of administering the chapter 11 cases

pursuant to the agreed Initial Budget.  The Initial Budget provides for, among other things, the

payment of fees of professional firms retained by the Debtors and the Creditors' Committee and

a minimum consolidated cash balance of $5 million for the payment of operating expenses.  In

exchange, the Senior Lenders were granted Superpriority Claims and Adequate Protection Liens

(both as defined in the First Interim Order) to protect against any further diminution in value of

their collateral.

26.     Pursuant to Paragraph 5(a) of the First Interim Order, the Debtors' right to use

cash collateral automatically terminates following, among other things, the first business day that

is 35 days after the Petition Date (unless extended by the Senior Lenders in their sole discretion)

if the Final Order has not been entered by the Court before then.  The first business day that is 35

days after the Petition Date is December 7, 2018.

27.    It is important to note that once used, the Senior Lenders' cash collateral is gone—there is no replacing it given that the Debtors are no longer receiving any new inventory to process or sell.  Accordingly, an integral part of the Motion and the Senior Lenders' consent to the use of their collateral is the Debtors' proposed payment to the Senior Lenders of the cash proceeds from the sale of the Debtors' inventory as adequate protection (the "Inventory Payments").  See First Interim Order, ¶ 8(e).  The Inventory Payments were initially estimated at an aggregate amount of $117 million, to be paid during the week ending December 1, 2018, subject to entry of the Final Order.  Id., Exhibit A.  The Debtors' failure to liquidate substantially all of their inventory by December 3, 2018 constitutes a Termination Event under the First Interim Order.  Id. ¶ 5(d).

28.    On November 13, 2018, at the Court's request, the Debtors and the Senior Lenders filed the *Joint Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* [Docket No. 78] to supplement the Motion and explain the basis for the Inventory Payments and give all parties in interest specific notice of the provision.

29.    Pursuant to Paragraph 24 of the First Interim Order, a final hearing was scheduled on the Motion for November 29, 2018.

30.    In advance of the final hearing, the Debtors notified the Senior Lenders that the inventory liquidation process would not be completed prior to December 3, 2018, as originally expected and, in fact, would not be completed for "several months" and that the proceeds would be substantially less than the $117 million amount specified in the First Interim Order.  Further, the Debtors informed the Senior Lenders that certain insiders of the Debtors were demanding lease payments for property leased to the Debtors (formerly purchased with "loans" and "bonuses" made by the Debtors to the insiders) as well as the continued payment of salaries and

other compensation for their purported services to the Debtors.[5]  The Senior Lenders are not

willing to consent to these payments given the substantial claims that exist against the insiders.

The Committee also filed an Objection asserting a litany of issues without previously reaching

out to the Senior Lenders or the Debtors to request any changes or modifications to the form of

Order.  As a result, the parties have been unable to agree to a consensual Final Order in advance

of the hearing.  However, the parties are working on a consensual Second Interim Order to

extend the Debtors' authority to use cash collateral on an interim basis while the parties to

continue evaluate the aforementioned issues.

## **REPLY**

### A.  **The Senior Lenders Have Valid and Perfected First Priority Liens on the Debtors' Assets**

31.    The Debtors stipulated to the validity, perfection, priority and enforceability of

the Senior Lenders' liens and claims in the First Interim Order.  See First Interim Order ¶ F.

Accordingly, the Debtors have recognized and do not dispute the validity, priority or amount of

the Senior Lenders' liens and claims.  The Senior Lenders voluntarily provided copies of their

loan documents and UCC-1 financing statements to the Committee within 24 hours of the

---

[5]      See Objection of Jason Rubin, Lindsey Rubin, Rose Rubin and certain affiliated entities at Docket No. 199.

Committee's formation.  The Committee has begun its review of the relevant documentation and the Senior Lenders intend to cooperate with all inquiries in connection therewith.[6]

32.     UCC-1 searches reflect that the Debtors have no secured creditors other than the Senior Lenders and that not a single Customer Counterparty filed a UCC-1 financing statement against the Debtors.  Accordingly, while the Senior Lenders recognize that other creditors may have claims against the Debtors' estates (including, without limitation, reclamation claims and 503(b)(9) claims), such claims are unsecured and subordinate in all respects to the Senior Lenders' secured claims.[7]  No party can reasonably dispute this fact.

### B. The Legal Issues in Connection with the Inventory Dispute Are Narrow and Will Be Duly Resolved by the Proposed Customer Claim Procedures

33.     To date, 24 Objections to the Motion have been filed by Customer Counterparties (including six members of the Committee).  A summary of the Objections is attached hereto as Exhibit 1.  The Objections can generally be categorized into six groups:  (1) six reclamation and

---

[6]     The Committee's Objection makes conclusory statements about the liens and claims of certain Senior Lenders (although, by its own admission, it has not conducted any meaningful investigation of the Senior Lenders' liens and claims and in fact requests $200,000 of additional professional fees to conduct this very investigation).  See Docket No. 193 ¶ 3.  Adequate protection is not provided to a prepetition secured creditor based on speculation as to what might happen later in a bankruptcy case.  Whatever claims against the Senior Lenders the Committee believes may exist—and the Senior Lenders submit there are no viable claims—will be addressed by the Court in due course.  The Committee's offhanded comments regarding the nature of the Senior Lenders' claims and liens do not obviate the need of the Debtors to provide adequate protection for use of cash collateral.  Moreover, the Interim Order and the proposed Final Order provide adequate safeguards in the unlikely event a lien or claim challenge against the Senior Lenders is successful.

    Similarly, the Committee's Objection states that the Debtors have not provided a document demonstrating that certain Senior Lenders were granted a lien on all personal property of RMC.  See id.  Section 6(a) of the Intercreditor Agreement, a copy of which has been delivered to the Committee, provides that "all Security Instruments shall secure all Obligations of [RMC] to all [Senior Lenders], as if such Security Instruments specifically described the Obligations and specifically granted a lien or security interest on or in the property covered thereby to secure same".  RMC executed the Intercreditor Agreement specifically acknowledging and agreeing to the terms thereof for all purposes.

[7]     See, e.g., In re Dairy Mart Convenience Stores, Inc., 302 B.R. 128, 134-36 (Bankr. S.D.N.Y. 2003) (holding that reclamation claims were without value in light of a secured lender's prior floating lien on the debtor's inventory); see also 11 U.S.C. § 546(c) (subjecting a seller's right to reclaim goods to "the prior rights of a holder of a security interest in such goods or the proceeds thereof . . ."); 11 U.S.C. § 503(b)(9) (providing sellers with an unsecured administrative claim for the value of any goods sold in the ordinary course of business and received by the debtor within 20 days of the bankruptcy filing).

503(b)(9) claims; (2) eight bailment claims based on the Debtors' Standard Terms and

Conditions; (3) four bailment claims based on agreements other than the Debtors' Standard

Terms and Conditions; (4) one claim based on an unsecured lease agreement; (5) four claims to

finished goods based on alleged prepayments; and (6) one claim to carbon products.

34.    As described above, no Customer Counterparty filed a UCC-1 financing

statement against the Debtors.  Accordingly, to the extent that a Customer Counterparty's

arrangement with a Debtor is a secured financing transaction that created a security interest in

metal it delivered to the Debtors, its interest is unperfected and subject to avoidance.  See, e.g.,

General Motors Corp. v. Bristol Indus., Corp., 38 U.C.C. Rep. Serv. 989 (Bankr. D. Conn. 1981),

rev'd on procedural grounds, 690 F.2d 26 (2d Cir. 1982) (holding that a tolling agreement

between a customer and a debtor copper refinery did not create a bailment and that the

customer's retention of title in scrap metal shipped to the debtor and the debtor's

debiting/crediting of a toll account created a security interest in favor of the customer which

must be perfected in accordance with Article 9 of the Uniform Commercial Code).  Similarly, to

the extent that a Customer Counterparty's arrangement with a Debtor is a consignment, there are

also Uniform Commercial Code filing requirements that were not met by any Customer

Counterparty.  See NY U.C.C. §§ 9-324(b) & 9-515.

35.    As a result, the Customer Counterparties sole recourse is to argue that such parties

retained title to metals delivered to the Debtors prepetition.  Several of the Customer

Counterparties attempt to establish title by asserting bailment arguments.  See, e.g., Docket Nos.

144, 146, 148, 161, 162, 178 and 185.  While the Customer Counterparties generally cite the

correct factors for establishing a bailment, each fails to establish how its relationship with the

Debtors gave rise to a bailment as opposed to a sale transaction.  Specifically, (a) none of the

customer contracts refers to a bailment; (b) the majority of contracts expressly provide that they are agreements for "refining *and forward/spot sales* of precious metal" or "refining *and purchase of doré*", refer to the Debtors as "the Buyer" and the customer as "the Seller", or otherwise contain terms indicative of a purchase and sale transaction; (c) the contracts generally require the Debtors to purchase refined product, with payment in the form of a purchase price established by an agreed-upon formula or in refined metal of like kind and quality less a processing fee; (d) the contracts generally provide that risk of loss transfers to the Debtors upon delivery at the Debtors' facility or upon receipt at the customer's mine; (e) the contracts generally do not provide that title to metal remains with the customer nor do they grant customers the right to demand the return of metal after weight is confirmed; (f) the contracts generally do not provide for, nor did the parties contemplate, that metal would remain separate and identifiable after commencement of the refining process; (g) all metal delivered to the Debtors was commingled promptly after receipt as part of the refining process; (h) none of the contracts provides that the applicable customer will receive the refined metal actually recovered from the identical raw materials delivered by it to the Debtors; and (i) the Debtors' accounting records include all metal delivered by customers as the Debtors' inventory. Each Customer Counterparty could have taken a security interest in the metal it delivered to the Debtors. None did.

36.    In support of their arguments, the Customer Counterparties rely primarily on two factually distinguishable cases[8] and fail to cite a subsequent case arising from one of the same bankruptcy proceedings that is completely analogous to the case at hand. <u>Wesgo Div. of GTE</u>

---

[8]    <u>In re Medomak Canning Co.</u>, 25 U.C.C. Rep. Serv. 437 (Bankr. D. Me. 1977), <u>aff'd</u>, 588 F.2d 818 (1st Cir. 1978); and <u>Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Ref., Inc.)</u>, 639 F.2d 1213 (5th Cir. 1981).

<u>Prods. Corp. v. Harrison (In re Sitkin Smelting & Ref., Inc.)</u>, 648 F.2d 252 (5th Cir. 1981)

(distinguishing the contract in <u>Eastman Kodak</u> as "somewhat unique" and holding that an

agreement for the refining of scrap metal did not create a bailment and was instead a contract for

sale for future goods where the debtor "agreed to either purchase the precious metals recovered

upon processing or return metals of like kind and quality less a processing fee").

37.     Moreover, the Customer Counterparties further fail to mention that the

commingling of metal delivered to the Debtors renders them no better than general unsecured

claimants.  <u>See</u>, <u>e.g.</u>, <u>In re Delta Smelting & Refining, Inc.</u>, 53 B.R. 877, 882 (Bankr. D. Alaska

1985) (holding that "[e]ven where property subject to a bailment is sold, if the proceeds are not

segregated or traceable, it is clear that the claimant is relegated to the status of a general

unsecured creditor" where silver bars delivered to debtor were commingled and unidentifiable as

of the petition date) (<u>citing</u> <u>In re United Precious Metals, Inc.</u>, 39 B.R. 14 (Bankr. S.D. Fla.

1984); <u>In re STN Enterprises, Inc.</u>, 45 B.R. 935 (Bankr. D. Vt. 1984)).[9]  Given the Senior

Lenders' understanding of the Debtors' operations and refining process, it will be impossible for

Customer Counterparties to trace metal delivered to the Debtors prepetition, substantially all of

which has been sold in the ordinary course or was otherwise processed promptly upon receipt

and currently consists of commingled work in process inventory or finished product.

38.     These issues will be litigated in the coming months and need not be resolved prior

to the entry of the Second Interim Order or any proposed Final Order.

---

[9]     One Customer Counterparty acknowledges this issue but attempts to skirt it by citing two cases regarding contracts for the delivery of natural gas through pipelines for the proposition that a bailment in not destroyed by the commingling of fungible products.  <u>See</u> Docket No. 144 § 9 (<u>citing</u> <u>In re Enron Corp.</u>, 2003 Bankr. Lexis 2262, * 7 (Bankr. S.D.N.Y. 2003); and <u>Public Service Electric & Gas Co. v. Federal Power Commission</u>, 371 F.2d 1 (3d Cir. 1967).  Both cases involved natural gas that was merely transported through a pipeline and not altered in any form.  Accordingly, the cases are wholly inapposite of the Debtors' refinement of doré and scrap metal into finished metal products.

## PROPOSED CUSTOMER CLAIM PROCEDURES

39.    In an effort to proactively address the Customer Counterparties' claims while preserving the rights of all parties in interest, the Senior Lenders conferred with the Debtors and the Committee to establish Customer Claim Procedures for the expedited and streamlined resolution of the Inventory Dispute.  The proposed Customer Claim Procedures are summarized below:[10]

(1) Document Production.   The parties shall produce, on an expedited basis, the documents relevant to their respective claims and defenses set forth below. This production will be without prejudice to all parties' rights to serve formal discovery notices and to request additional documents as may be appropriate.

    i.  Debtors:  All contracts, amendments, standard terms, and other agreements relating to the Customer Counterparties' claims; metal delivery documents for the metal that is the subject of the Customer Counterparties' claims; ledger accounts and other bookkeeping records relating to the Customer Counterparties' claims; and correspondence with the Customer Counterparties regarding their claims.

    ii.  Senior Lenders:  All loan documents, amendments, intercreditor agreements, forbearance agreements, UCC-1 filings and related lien perfection documents and statements of amounts due.

    iii.  Customer Counterparties:  All contracts, amendments, standard terms, and other agreements supporting the Customer Counterparties' claims; metal delivery documents for the metal that is the subject of their claims; ledger accounts and other bookkeeping records relating to their claims; and correspondence with the Debtors regarding their claims.

(2) Depositions.  To be agreed; all parties' rights to be reserved.

(3) Meet and Confer.  The parties will conduct a "meet and confer" to discuss and attempt to resolve any discovery disputes prior to the initial status conference (see paragraph (4) below).

(4) Initial Status Conference.  The parties shall appear in Bankruptcy Court for a status conference on December 19, 2018, subject to the Court's calendar, to report on the status of document production, any discovery disputes, any additional discovery that may be required, and the scheduling of further

---

[10]    The Senior Lenders believe that the Debtors are in agreement with these procedures.  As of the time of the filing of his Reply, the Committee has not formally responded.

proceedings.  The parties shall submit a joint status conference agenda one day before the conference.

(5) <u>Adversary Proceedings</u>.  All pending adversary proceedings will be held in abeyance pending the resolution of the contested matters commenced by the filing of the various Customer Counterparties' Objections.[11]  All discovery taken in connection with the objections shall be deemed to have been taken in the relevant adversary proceeding, without prejudice to the parties to the adversary proceeding being able to serve formal discovery notices and to request additional discovery as may be appropriate, or to object to the same.

(6) <u>Hearing and Dispositive Motions</u>.  The parties shall make every effort to resolve the objections by dispositive motion, without the need for live testimony, on an expedited basis and in accordance with a schedule to be agreed and submitted to the Court as soon as practicable.

40.    The Senior Lenders submit that the Customer Claim Procedures are in the best interests of the Debtors and all parties-in-interest, and will allow the chapter 11 cases to move forward in an efficient and expedient manner without prejudicing the rights of any party.  The Customer Claim Procedures will be incorporated into the proposed Final Order and the Senior Lenders remain willing to confer with and address the concerns of any parties in interest.

## **RESERVATION OF RIGHTS**

41.    The Senior Lenders invited the Committee to discuss any issues related to cash collateral prior to the Committee filing an objection to the Motion.  The Committee declined to request any modifications or negotiate the form of Order prior to filing its Objection.  Setting aside the Inventory Dispute (which is addressed by the proposed Customer Claim Procedures),[12] the majority of the issues raised in the Committee's Objection are boilerplate creditors' committee cash collateral objections, including but not limited to:  (a) replacement liens on

---

[11]    As of the date hereof, the Senior Lenders are only aware of one such adversary proceeding.  <u>Cornerstone Asset Metals, LLC v. Republic Metals Refining Corporation</u>, et al., Adv. Pro. No. 18-01771 (SHL).

[12]    Although the Committee claims that it "takes no position at this time" as to the outcome of the Inventory Dispute, its Objection is replete with references designed to protect the parochial interests of its members.  The Committee is chaired by, and comprised entirely of, purported holders of property rights and administrative claims that allege they do not hold unsecured claims and cannot be expected to serve as fiduciaries for the estates or any parties in interest other than themselves.

unencumbered property; (b) releases of the Senior Lenders; (c) waiver of marshaling; (d) waiver

of any collateral surcharge rights of the Debtors under Section 506(c); (e) waiver of the Section

552(b) "equities of the case" exception; (f) amount of the Committee's investigation budget and

length of the Challenge Period; (g) adequate protection payments for the interest, fees and

expenses of the Senior Lenders;[13] and (h) certain termination events and remedies.

42.      All of these provisions were negotiated with the Debtors, are reasonable and

customary in cash collateral orders, and Courts in this District have routinely approved similar

adequate protection packages in other chapter 11 cases.  See, e.g., In re Cumulus Media Inc., No.

17-13381 (SCC) (Bankr. S.D.N.Y. Dec. 21, 2017) (Docket No. 164); In re Aeropostale, Inc., No.

16-11275 (SHL) (Bankr. S.D.N.Y. December 21, 2017) (Docket No. 1586); In re Ultrapetrol

(Bahamas) Ltd., No. 17-22168 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2017) (Docket No. 108); In re

Transmar Commodity Group Ltd., No. 16-13625 (JLG) (Bankr. S.D.N.Y. Feb. 10, 2017)

(Docket No. 119); In re Atlas Resource Partners, L.P., No. 16-12149 (SHL) (Bankr. S.D.N.Y.

August 29, 2016) (Docket No. 132); In re Primorsk Int'l Shipping Ltd., No. 16-10073 (MG)

(Bankr. S.D.N.Y. Feb. 18, 2016) (Docket No. 64); In re Sabine Oil & Gas Corp., No. 15-11835

(SCC) (Bankr. S.D.N.Y. Sept. 16, 2015) (Docket No. 339); In re Lightsquared Inc., No. 12-

---

[13]      The Committee questions the Senior Lenders' entitlement to payment of fees, interest and expenses.  Even
assuming, arguendo, that the Senior Lenders are unsecured, undersecured creditors are entitled to adequate
protection in the form of periodic cash payments under the Bankruptcy Code. See Gonzalez Class Action Plaintiffs
v. Freedom Commc'ns Holdings, Inc. (In re Freedom Commc'ns Holdings, Inc.), Case No. 09-13046 (BLS), 2009
2009 U.S. Dist. LEXIS 113725, at *4 (D. Del. Dec. 4, 2009) ("the bankruptcy code permits a secured creditor,
including an undersecured creditor, to receive periodic adequate protection payments against the risk of diminution
in value of the collateral.") (citations omitted).  Courts in this District and others have routinely permitted adequate
protection payments to be made to undersecured creditors where, as here, the cash collateral order provides that
those payments can be recharacterized.  See infra ¶ 42.  The Senior Lenders are not being paid postpetition interest,
fees and expenses under Section 506(b).  Objection ¶ 47.  Rather, the Debtors are making adequate protection
payments under Section 361 to compensate the Senior Lenders for the decrease in the value of their interest in the
prepetition collateral in an amount equal to the interest that would be paid under the Secured Credit/Lease
Documents, plus fees and expenses incurred by the Senior Lenders' professionals.

Moreover, the Senior Lenders are each entitled to retain their own professionals under their respective
Credit and Lease Documents.  However, the Senior Lenders voluntarily agreed to hire a single primary bankruptcy
counsel, a single Florida counsel and a single financial advisor in order to minimize costs to the estates.

12080 (SCC) (Bankr. S.D.N.Y. Apr. 8, 2015) (Docket No. 2304); In re Inversiones Alsacia S.A.,

No. 14-12896 (MG) (Bankr. S.D.N.Y. Nov. 5, 2014) (Docket No. 74); In re Boston Generating

LLC, No. 10-14419 (SCC) (Bankr. S.D.N.Y. Sept. 22, 2010) (Docket No. 165); and In re Charter

Commc'ns, Inc., Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009) (Docket No. 193).

43.      The Committee, purportedly acting on behalf of all unsecured creditors, appears

to want unfettered access to the Senior Lenders' cash collateral, no meaningful adequate

protection granted to the Senior Lenders for the undeniable decrease in the Senior Lenders'

collateral position, the payment of all 503(b)(9) claims (including those of the Committee

members) out of the Senior Lenders' collateral, and an excessive investigation budget to review

documents already provided to the Committee.  Not one Committee member has offered to

finance the Debtors, ship metal to the Debtors or otherwise pay the expenses of the Debtors'

chapter 11 cases out of their alleged "property rights" as the Senior Lenders have.  Yet, the

Committee seeks to deny the Senior Lenders basic protections under the Bankruptcy Code.

44.      The Senior Lenders reserve all rights with respect to the issues raised in the

Committee's Objection and whether the individual members of the Committee have conflicts of

interests.  Notwithstanding the foregoing, the Senior Lenders remain open to discussing the

Committee's Objection in advance of the final hearing and hope to be in a position to present a

consensual Final Order to the Court agreeable to the Senior Lenders, the Debtors and the

Committee.

*[Remainder of page intentionally left blank.]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Senior Lenders respectfully request that the Court (i) approve the Second Interim Order and (ii) grant such other and further relief as is just and proper.

Dated:  New York, New York
        November 28, 2018

Respectfully submitted,

LUSKIN, STERN & EISLER LLP

/s/     Michael Luskin
Michael Luskin
Richard Stern
Alex Talesnick
Eleven Times Square
New York, New York 10036
Telephone:  (212) 597-8200
Facsimile:  (212) 974-3205
E-Mail: luskin@lsellp.com
E-Mail: stern@lsellp.com
E-Mail: talesnick@lsellp.com

*Counsel for Senior Lenders*

## Exhibit 1

### Summary of Customer Counterparty Objections

1. <u>Reclamation and Section 503(b)(9) Claims</u>.

| Docket No. | Party | Claim Amount Asserted in Objection |
|---|---|---|
| 147 | Argonaut Gold Inc. <br>(Compania Minera Pitalla, S.A. de C.V. <br>Minera Real de Oro S.A. de C.V. <br>**(member of the Committee))** <br><br>First Majestic Silver Corp. <br>(Nusantara de Mexico S.A. de C.V.) <br><br>Mitchell T. Levine <br>(Erie Management Partners and Plat/Co.) | $5.87 million <br><br><br><br>$8.36 million <br><br><br>$8.04 million |
| 152 | Alex Morningstar Corp. <br>Deb Schott, Inc. <br>FCP Diamonds LLC <br>Mid-States Recycling Inc. <br>Noble Metal Services, Inc. | Unspecified |
| 158 | Minas de Oroco Resources, S.A. de C.V. | Unspecified |
| 159 | Tiffany and Company (Laurelton Sourcing, LLC) | Unspecified |
| 178 | Compania Minera Dolores, S.A. De CV <br>Minera Triton Argentina SA <br>**(chair of the Committee)** | $4,879,440 |
| 195 | Cyber-Fox Trading Incorporated <br>**(member of the Committee))** | Unspecified |

2. <u>Claim under Unsecured Lease Agreement</u>.

| Docket No. | Party | Claim Amount Asserted in Objection |
|---|---|---|
| 137 | SCMI US Inc. (Sumitomo) | $8,652,000 |

3. <u>Bailment Claims Based on Debtors' Standard Terms and Conditions</u>.

| Docket No. | Party | Claim Amount Asserted in Objection |
|---|---|---|
| 185 | Brilliant Jewelers/MJJ Inc. (Anjay Corp.) | Unspecified |
| 148 | Midwest Refineries, LLC | Unspecified |
| 157 | Music City Group, LLC | Unspecified |

| 163 | Design Gold Group, Inc. | $160,000 |
| 164 | Pyropure, Inc. d/b/a Pyromet | $1,838,212 |
| 174 | Ottawa Gold Buyer<br>Vancouver Gold Buyer<br>7907109 Canada Inc. | Unspecified |
| 181 | So Accurate Group, Inc.<br>**(member of the Committee)** | $3,920,469.44 |
| 185 | Brilliant Jewelers/MJJ Inc. (Anjay Corp.) | Unspecified |

4.   Bailment Claims Based on Agreements other than the Debtors' Standard Terms and Conditions.

| Docket No. | Party | Claim Amount Asserted in Objection |
|---|---|---|
| 144 | Premier Gold Mines Limited | $9.9 million |
| 146 | Coeur Mexicana S.A. De C.V.<br>Coeur Rochester, Inc.<br>**(member of the Committee)**<br>Warf Resources (USA) | $13,841,377.27 (total) |
| 161 | Pretium Exploration Inc. | Unspecified |
| 162 | Yamana Gold Inc. | $8,030,844.01 |

5.   Claims to Finished Goods Based on Alleged Prepayments.

| Docket No. | Party | Claim Amount Asserted in Objection |
|---|---|---|
| 135 | Cornerstone Asset Metals, LLC | Unspecified |
| 154<br>156 | Texas Precious Metals, L.L.C. | $130,700 |
| 189 | APMEX, Inc. | $7,628,966.30 |
| 202 | Prince & Izant Company | $492,780 |

6.   Claims to Carbon Products.

| Docket No. | Party | Claim Amount Asserted in Objection |
|---|---|---|
| 117<br>121 | Alamos Gold Inc.<br>Minas de Oro Nacional, S.A. de C.V.<br>Miner Santa Rita S. de R.L. de C.V. | $2,586,969.418 [*sic*] |

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of November, 2018, I caused a true and correct copy
of the foregoing *Omnibus Reply of the Senior Lenders to Objections to the Debtors' Cash
Collateral Motion* to be filed and served through ECF notification upon all parties who receive
notice in this matter pursuant to the Court's ECF filing system.

_____/s/ Michael Luskin_____
Michael Luskin
