Michael Luskin
Richard Stern
Alex Talesnick
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC METALS REFINING | ) | Case No. 18-13359 (SHL) |
| CORPORATION, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**OMNIBUS RESPONSE OF THE SENIOR LENDERS**
**TO CUSTOMER STATEMENTS PURSUANT TO ORDER APPROVING**
**UNIFORM PROCEDURES FOR RESOLUTION OF OWNERSHIP DISPUTES**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833), Republic High Tech Metals, LLC, 13001 NW 38th Avenue, Miami, FL 33054 (6102), RMC Diamonds, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (1507), RMC2, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (4696), J & L Republic LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7604), R & R Metals, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7848), Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639) and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 2

    A.    The Chapter 11 Cases ........................................................................... 2

    B.    The Senior Lenders' Relationship with the Debtors ............................. 3

    C.    The Cash Collateral Motion and Interim Cash Collateral Orders ........... 7

    D.    The Debtors' Refining Process .............................................................. 8

    E.    Identifiable Customer Materials as of the Petition Date ....................... 11

CUSTOMER STATEMENTS .......................................................................................... 12

GOVERNING LAW ........................................................................................................ 13

    A.    New York Law ...................................................................................... 13

    B.    Florida Law ........................................................................................... 13

SUMMARY OF LEGAL BASIS (SENIOR LENDERS' LIENS) ................................... 15

    A.    The Senior Lenders Have Valid and Perfected First Priority Liens on the
    Debtors' Inventory and its Proceeds ......................................................... 15

        (1)    Value Has Been Given ................................................................ 15

        (2)    The Debtors Had the Power to Transfer Rights in the Collateral to the Senior
        Lenders ...................................................................................... 16

        (3)    The Debtors Authenticated a Security Agreement That Provides a Description
        of the Collateral ........................................................................ 18

        (4)    The Senior Lenders' Security Interests Are Properly Perfected .............. 19

    B.    The Customers Elected Not to Perfect Security Interests in Goods Sold to the
    Debtors .................................................................................................... 19

    C.    The Senior Lenders Are Good Faith Purchasers ....................................... 20

SUMMARY OF LEGAL BASIS (PROPERTY OF THE DEBTORS' ESTATES) ................... 21

    Bailment Claims ............................................................................................. 21

    A.    Republic's Standard Terms and Conditions Clearly Evidence Purchase/Sale
    Transactions ............................................................................................. 22

    B.    Republic's Refining Agreements Clearly Evidence Purchase/Sale
    Transactions ............................................................................................. 24

    C.    The Proper Test For Determining Sale or Bailment is Whether the Identical
    Article Delivered is To Be Returned ........................................................ 25

D.    The Cases Cited by the Customers are Inapposite ................................................... 27

E.    The Customers Cannot Trace Their Purported Property to Estate Property ............. 29

Unsecured Lease Agreement Claims ................................................................................ 31

Prepaid Finished Product Claims ..................................................................................... 32

A.    No Customer Can Establish Legal Title to Prepaid Product .................................... 33

B.    Identification of Goods and Special Property ......................................................... 34

C.    No Customer Can Establish a Right to Recover as a Buyer in the Ordinary
Course ................................................................................................................................. 35

Consignment Agreement Claims ...................................................................................... 37

RESERVATION OF RIGHTS ................................................................................................ 38

CONCLUSION ........................................................................................................................ 40

SCHEDULES

Schedule A – Summary of Customer Statements

Schedule B – Collateral Documents

Schedule C – UCC-1 Financing Statements

EXHIBITS

Exhibit 1 – Peace of Mined Terms

Exhibit 2 – RMC Standard Terms and Conditions

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*B.A. Ballou and Company, Inc. v. Citytrust*,
    218 Conn. 749, 591 A.2d 126 (Conn. 1991) ............................................... 26, 28, 29

*Chisholm v. Eagle Ore Sampling Co.*,
    144 F. 670 (8th Cir. 1906) ............................................................................. 27

*Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.)*,
    639 F.2d 1213 (5th Cir. 1981) ...................................................................... 28

*General Motors Corp. v. Bristol Indus. Corp.*,
    690 F.2d 26 (2d Cir. 1982) ........................................................................... 28

*General Motors Corp. v. Bristol Indus. Corp. (In re Bristol Indus. Corp.)*,
    1981 Bankr. LEXIS 5204, (Bankr. D. Conn. Dec. 14, 1981)......................... 26

*GMAC Bus. Credit*,
    100 Fed. Appx. 404 (6th Cir. 2004) ......................................................... 17, 29

*Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA Corp.*,
    805 F. Supp. 133 (W.D.N.Y. 1992)............................................................ 14, 15

*In re Dairy Mart Convenience Stores, Inc.*,
    302 B.R. 128 (S.D.N.Y. 2003) ...................................................................... 20

*In re Delta Smelting & Refining, Inc.*,
    53 B.R. 877 (Bankr. D. Alaska 1985) ........................................................... 31

*In re Dewey & Leboeuf LLP*,
    493 B.R. 421 (Bankr. S.D.N.Y. 2013) .......................................................... 29

*In re Eagle Enters., Inc.*,
    223 B.R. 290 (Bankr. E.D.P.A. 1998)........................................................... 15

*In re Enron Corp.*,
    2003 Bankr. Lexis 2262 (Bankr. S.D.N.Y. 2003) ......................................... 28

*In re Handy & Harman Ref. Group, Inc.*,
    266 B.R. 24 (Bankr. D. Conn. 2001).............................................................. 29

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016).............................................................. 39

*In re J. Adrian Sons, Inc.*,
    205 B.R. 24 (Bankr. W.D.N.Y. 1997)........................................................... 16

*In re Jeff Benfield Nursery, Inc.*,
  565 B.R. 603 (Bankr. W.D.N.C. Jan. 24, 2017)....................................................... 27

*In re Medomak Canning Co.*,
  25 U.C.C. Rep. Serv. 437 (Bankr. D. Me. 1977) *aff'd*, 588 F.2d 818 (1st Cir. 1978) ........... 28

*In re Miss. Valley Livestock, Inc.*,
  745 F.3d 299 (7th Cir. 2014) ........................................................................ 29

*In re Omegas Group, Inc.*,
  16 F.3d 1443 (6th Cir. 1994) ........................................................................ 29

*Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa*,
  705 F.2d 396 (10th Cir. 1983) ................................................................... 17, 20

*King v. Bray*,
  867 So. 2d 1224 (Fla. 5th DCA 2004)................................................................. 23

*Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC)*,
  475 B.R. 9 (S.D.N.Y. 2012) ..................................................................... 14, 15

*Litwiller Machine & Mfg., Inc. v. NBD Alpena Bank*,
  184 Mich. App. 369 (Mich. App. 1990)............................................................ 16, 17

*Monroe Sys. for Bus., Inc. v. Intertrans Corp.*,
  650 So. 2d 72 (Fla. 3d DCA 1994)................................................................... 25

*Morton Booth Co. v. Tiara Furniture, Inc.*,
  564 P.2d 210 (Okla. 1977)....................................................................... 16, 17

*Powder Company v. Burkhardt*,
  97 U.S. 110, 24 L. Ed. 973 (1877).................................................................. 26

*Praxis Energy Agents v. Allfirst Bank (In re Millenium Seacarriers)*,
  2003 U.S. Dist. LEXIS 22346 (S.D.N.Y. Dec. 10, 2003) ............................................. 27

*Pub. Serv. Elec. & Gas Co. v. Fed. Power Comm'n*,
  371 F2d 1 (3d Cir. 1967) ........................................................................ 28

*Sitkin v. R-One Alloys, Inc.*,
  2006 R.I. Super. LEXIS 25 (R.I. Super. Ct. 2006)............................................ 26, 28, 29

*Speth v. Whitham Farms Feedyard, L.P. (In re Sunbelt Grain WKS, LLC)*,
  406 B.R. 918 (Bankr. D. Kan. 20090, *aff'd* 427 B.R. 896 (D. Kan. 2010) ........................... 39

*Sturm v. Boker*,
  150 U.S. 312, 14 S. Ct. 99, 37 L. Ed. 1093 (1893) ................................................. 25

*Welding Metals v. Foothill Capital Corp.*,
  1997 U.S. Dist. LEXIS 7672 (D. Conn. April 14, 1997) ......................................... 26, 27

*WESGO Division of GTE Products Corp. v. Harrison (In re Sitkin Smelting & Refining, Inc.)*,
   648 F.2d 252 (5th Cir. 1981) ......................................................................... 21, 26, 28

**Statutes**

11 U.S.C. § 503(b)(9) ......................................................................................... 20

11 U.S.C. § 546(c) .............................................................................................. 20

Fla. Stat. § 671.105 ............................................................................................. 14

Fla. Stat. § 671.201 ............................................................................................. 35

Fla. Stat. § 672.401 ................................................................................ 16, 17, 19, 34

Fla. Stat. § 672.403 ........................................................................................ 20, 21

Fla. Stat. § 672.501 ............................................................................................. 34

Fla. Stat. § 672.502 ............................................................................................. 36

Fla. Stat. § 672.716 ............................................................................................. 36

Fla. Stat. § 679.320 ............................................................................................. 35

Fla. Stat. § 679.322 ............................................................................................. 19

Fla. Stat. § 679.324 ............................................................................................. 20

Fla. Stat. § 679.1031 ........................................................................................... 19

Fla. Stat. § 679.3011 ........................................................................................... 14

NY UCC § 1-204 ................................................................................................. 15

NY UCC § 9-102 ................................................................................................. 18

NY UCC § 9-203 ................................................................................................. 15

NY UCC § 9-310 ................................................................................................. 19

Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers

Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International

Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC

("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and,

together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the

"Senior Lenders") submit this omnibus response (this "Response") to the Statements of Claimed

Ownership and Claims (the "Customer Statements") filed pursuant to the Court's *Order*

*Approving Uniform Procedures for Resolution of Ownership Disputes* (the "Procedures Order")[2]

[Docket No. 395], and in support thereof respectfully state as follows:

## PRELIMINARY STATEMENT

1.      50 Customer Statements have been filed by Customers pursuant to the Procedures

Order.  The Customers each assert ownership interests in the Assets based on various theories—

bailments, leases, transfers of title, constructive trusts and other equitable arguments.  The truth

is simple:  Each Customer is a general unsecured claimant of the estates.  The Senior Lenders

hold duly perfected first priority security interests in, among other things, all of the Debtors'

inventory and proceeds.  The Customers had the same opportunity to perfect security interests in

goods sold to, or purchased from, the Debtors, but none did.  Further, even assuming, *arguendo*,

that any Customer could establish a valid ownership claim, the only identifiable material subject

to the Ownership Dispute located at the Debtors' refinery as of the Petition Date consisted of

$8.2 million of prepaid finished product and $212,484 of unrefined raw material.  Accordingly,

with a few exceptions, no Customer can trace its purported "owned" materials to property or

proceeds in the hands of the estates as of the Petition Date.  Tracing is a prerequisite to recovery

---

[2]      All capitalized terms used but not defined herein have the meaning ascribed to such terms in the
Procedures Order.

under each theory advanced by the Customers.  Accordingly, no Customer can establish rights to the Debtors' inventory or proceeds superior to the rights of the Senior Lenders.

2.       In accordance with Paragraph 2(e) of the Procedures Order, this Response is broken into five sections:  (i) background on the Senior Lenders and their relationship with the Debtors; (ii) an overview of the Customer Statements, addressed by "bucket"; (iii) a summary of the applicable law governing the Ownership Dispute; (iv) a summary of the legal basis for the Senior Lenders' security interests and liens on the Assets; and (v) a summary of the legal basis for asserting that the Assets are property of the estates.

## BACKGROUND

### A.  The Chapter 11 Cases

3.       Each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on November 2, 2018 or November 21, 2018.

4.       The Debtors are continuing to operate and manage their properties and assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the chapter 11 cases.

5.       On November 19, 2018, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors in these cases (the "Committee") [Docket No. 113].  The Committee consists of the following seven members: (i) Coeur Rochester, Inc., (ii) Bayside Metal Exchange, (iii) So Accurate Group Inc., (iv) Cyber-

Fox Trading, Inc., (v) Minera Triton Argentina S.A., (vi) Pyropure Inc. and (vii) Minera Real de Ora S.A. de C.V.[3]

6.      The factual background relating to the commencement of the chapter 11 cases is set forth in detail in the *Declaration of Scott Avila, as Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "Avila Decl.") [Docket No. 3].

**B.  The Senior Lenders' Relationship with the Debtors**

7.      As described in the Avila Decl., as of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) over $177 million by the Debtors under certain credit agreements, master netting agreements and lease agreements (collectively, the "Credit and Lease Agreements").[4]  Avila Decl., Attachment A.  The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including the Debtors' inventory and the proceeds thereof.  Id. ¶ 21.

8.      The Senior Lenders are party to a certain Second Amended and Restated Intercreditor Agreement, dated as of February 19, 2016 (as amended from time to time, the "Intercreditor Agreement"), which governs the respective rights and interests of the Senior Lenders in the assets of RMC.  Id. ¶ 19.  RMC executed the Intercreditor Agreement.  Id.

9.      With the exception of Mitsubishi and ICBCS, each of the Senior Lenders first entered into Credit and Lease Agreements with the Debtors between January 2016 and October

---

[3]      Each Committee member other than Minera Triton Argentina S.A. filed a Customer Statement asserting, among other things, that the Assets are not property of the estates.  See Docket Nos. 411, 432, 441, 456, 470 and 471.

[4]      In addition, ICBCS and Debtor Republic Metals Corporation ("RMC") are parties to a certain Unallocated Precious Metals Accounts Agreement dated May 28, 2015 (as amended, the "UPMAA").  Pursuant to the UPMAA, ICBCS maintained RMC's "Loco London" clearing account (the "London Clearing Account").  In the ordinary course of its business, RMC used the London Clearing Account to settle transactions with Customers via Loco London metal credit.  The UPMAA and the London Clearing Account services provided by ICBCS to RMC thereunder were separate and independent of ICBCS' Credit and Lease Agreement with RMC.

3

2017.  Id. ¶¶ 23–30.  Mitsubishi and ICBCS first entered into Credit and Lease Agreements with RMC in December 2008 and January 2011, respectively.  Id.

10.    The Debtors made certain representations and warranties in the Credit and Lease Agreements with respect to, among other things, the financial condition and solvency of the Debtors, the accuracy of the financial statements provided to the Senior Lenders, the Debtors' compliance with certain financial covenants and the absence of defaults.  The Credit and Lease Agreements were all executed by Jason Rubin, the President and Chief Executive Officer of the Debtors, or David Comite, the Treasurer and Chief Financial Officer of the Debtors, or both.

11.    Pursuant to the Credit and Lease Agreements, RMC was obligated to periodically furnish the Senior Lenders with borrowing base reports (the "Borrowing Base Reports"), which calculated the collateral borrowing base available to support RMC's existing extensions of credit and requests for additional extensions of credit under the Credit and Lease Agreements.  Each Borrowing Base Report was executed by David Comite and certified both the accuracy of the information contained therein and the absence of any defaults under the Credit and Lease Agreements.

12.    In addition to the Borrowing Base Reports, RMC was also obligated to provide the Senior Lenders with annual and quarterly financial statements pursuant to the Credit and Lease Agreements.  The annual financial statements were audited by independent outside accounting firms (Crowe Horwath LLP and EisnerAmper LLP) and the quarterly financial statements were unaudited and delivered with an independent accountants' compilation report from Maria I. Machado, P.A.

13.    In or around June 2018, the Senior Lenders were first advised by the Debtors of significant discrepancies in the value of the Senior Lenders' collateral as disclosed in the

Borrowing Base Reports.  Specifically, the Borrowing Base Report delivered to the Senior Lenders on May 30, 2018 listed eligible inventory of $219,570,312.54 as of May 25, 2018 and a borrowing base excess of $11,124,342.34.  However, the subsequent Borrowing Base Report, delivered to the Senior Lenders on June 20, 2018, listed eligible inventory of $144,157,698.29 as of June 8, 2018 and a borrowing base shortfall of $39,486,098.03—a loss of over $75 million in asset value from one Borrowing Base Report to the next—delivered only three weeks later.  The loss remains unaccounted for today.  As a result of this precipitous drop in collateral value, numerous defaults were triggered under the Credit and Lease Agreements.

14.    The draft financial statements delivered to the Senior Lenders in June 2018 for the fiscal quarter ending March 31, 2018, further confirmed the apparent massive loss of collateral, reflecting a decrease in inventory value from $252,322,502 as of March 31, 2017, to $171,319,259 as of March 31, 2018, a drop of over $80 million.

15.    The Debtors attribute the collateral disappearance to "a significant discrepancy in [the Debtors'] inventory accounting."  Id. at ¶ 36.  However, to date, no satisfactory explanation has been provided for the inventory deficiency and loss of the Senior Lenders' collateral.  Based on the information provided after the fact, the Senior Lenders believe that the Debtors were insolvent as early as 2012, that the Debtors masked continued operating losses with substantial cash loans and precious metals leases from the Senior Lenders, and that there are substantial claims against the Debtors' insiders and auditors arising from and related to the foregoing.  Over

the same period, the Debtors' officers and shareholders took in excess of $40 million from the

Debtors in the form of dividends, salaries and bonuses.[5]

16.    On July 10, 2018, the Senior Lenders served termination, default and demand

notices on the Debtors that among other things, accelerated all debt obligations and terminated

and liquidated lease obligations under the Credit and Lease Agreements. Id. at ¶ 38.  Despite the

existing events of default under the Credit and Lease Agreements, continuing operational losses,

and substantial deterioration in and depletion of the Senior Lenders' collateral, the Senior

Lenders entered into a forbearance arrangement with the Debtors and agreed to stand still from

exercising their rights and remedies.  Instead, the Senior Lenders elected to work constructively

with the Debtors and their professionals to find a long-term solution for the benefit of all parties

in interest.

17.    After nearly four months of intense good faith negotiations, the Senior Lenders

were ready, able and willing to close a prepetition sale transaction that would have provided for,

among other things, an assumption of substantially all of the Customers' obligations without

repayment in full of the Senior Lenders' debt.  The deal fell apart due to insurmountable tax

issues through no fault of the Senior Lenders.

18.    During this period, the Senior Lenders agreed to forego principal payments and

default rate interest.  At the same time, the Debtors continued to purchase and refine raw

materials from Customers.  The Debtors' schedules reflect that Customers received payments in

---

[5]        This summary of the inventory issue is provided solely for background purposes.  The Senior Lenders
reserve all rights with respect to the Debtors' financial affairs and any rights, remedies, claims and/or causes of
action, whether at law or in equity, of any of the Senior Lenders against any current and former directors, officers,
principals, agents, advisors, accountants, auditors, consultants, attorneys, employees and other professionals of the
Debtors arising from or related thereto.  The Senior Lenders understand that the Committee is also investigating
potential claims, including claims relating to the inventory shortfall.

excess of $400 million during the 90-day period preceding the Petition Date, primarily in the form of Loco London metal credit from the London Clearing Account.[6]

19.    Following the failure of the out of court efforts, the Debtors commenced these chapter 11 cases on November 2, 2018 (the "Petition Date").

### C.   The Cash Collateral Motion and Interim Cash Collateral Orders

20.    On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "Initial Cash Collateral Motion") [Docket No. 10].

21.    On November 13, 2018, the Debtors and the Senior Lenders filed the *Joint Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* (together with the Initial Cash Collateral Motion, the "Cash Collateral Motion") [Docket No. 78].

22.    The Court has entered four interim cash collateral orders [Docket Nos. 54, 277, 372 and 538] (collectively, the "Interim Cash Collateral Orders").

23.    Pursuant to the Interim Cash Collateral Orders, among other things, the Senior Lenders consented to the Debtors' use of their cash collateral to fund the costs and expenses of administering the chapter 11 cases, and the Senior Lenders were granted superpriority claims and adequate protection liens on substantially all of the Debtors' assets to protect against any diminution in value of their collateral.

---

[6]    See Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, Republic Metals Corporation, Part 2 (the "RMC SOFA") [Docket No. 484].  By way of example only, the RMC SOFA reflects aggregate payments to certain Customers party to the Ownership Dispute in the following amounts: Coeur Rochester, Inc. and Coeur Mexicana S.A. de C.V. ($19,554,546.92); GEIB Refining Corp. ($7,943,734); Mid-States Recycling, Inc. ($4,766,256); Premier Gold Mines Ltd. ($19,625,543); Pretium Exploration Inc. ($41,374,571); So Accurate Group ($12,191,800); and Yamana Gold, Inc. ($40,577,016).

**D. The Debtors' Refining Process**

24.    As set forth in the Avila Decl., prior to the Petition Date, the Debtors were a
refiner of precious metals, with a primary focus on gold and silver.  Avila Decl. ¶ 7.  Customers
shipped unrefined gold and silver to the Debtors for refining from all over the United States and
the Western Hemisphere.  Id.  The Debtors refined unrefined metals into finished products,
including refined bars of both gold and silver, grains, and minted and casted investment grade
coins and bars of gold and silver of various designs and sizes.  Id.

25.    When a Customer shipped raw materials to the Debtors, the Customer elected, on
a shipment by shipment basis, whether to receive an "advance" or to designate the shipment as
"pooled" and defer payment until a later date.  If the Customer elected to receive an "advance"
for a shipment, the Debtors would pay the Customer an advance of generally between 96%−98%
of the estimated value of the shipment upfront (generally upon shipment and prior to receipt) and
then reconcile the final amount owed after the assays establishing the actual precious metal
content (and hence value) were finalized.  A "pooled" shipment did not require any advance
payment prior to refining.  Rather, "pooled" shipments were paid on an agreed upon settlement
date or when the Customer requested settlement.  The Debtors paid Customers for their
unrefined metal either by check or wire transfer, Loco London metal credit transfer to the
Customer's designated metal account or return of refined metal of like kind and quality, less, in
each case, applicable refining and/or retention charges.  Id. at ¶ 7.  Most often, Customers
requested payment in Loco London metal credit.  Id.

26.    After raw materials were received, they were weighed, melted, sampled for assay
testing and put into the refining process, generally on the same day.  With the exception of Peace
of Mined customers (discussed below), individual customer lots were commingled with other

customer lots and "clean up bars" (i.e., residual material that comes out of the refining process) to create a "house bar" and were put into the dissolve process. The dissolve process was a procedure by which "house bars" were dissolved in acid to a create a solution, analogous to dissolving sugar in hot water. Depending on the type of metal, the solution was then treated, filtered, dried, melted into bars, grains or ingots and then sampled for assay testing in various stages. The refined materials were then sent to the vault as finished product, sent to the mint for value-added processing or put back through the refining process for further refining. The Debtors cannot identify (1) the customer lots associated with given raw materials once commingled (i.e., upon dissolution if not earlier), (2) when given raw materials come out of the refining process or (3) what finished products are produced from given raw materials.

27.    As advertised on the Debtors' website, the Debtors offered a "Peace of Mined" service to Customers for traceable closed-circuit single-batch refining at an additional cost. See Republic Metals Corporation, Peace of Mined™, https://www.republicmetalscorp.com/peace-of-mined (last visited Feb. 18, 2019) (the "Peace of Mined Terms"). A copy of the Peace of Mined Terms is attached hereto as Exhibit 1.

28.    Customers paying for the Peace of Mined service could ensure that their metals were never commingled at any point during the refining process. The Peace of Mined Terms provide, in pertinent part:

> In order to create a 100% traceable product, Republic Metals' Peace of Mined™ refining circuit uses a proprietary process that allows for batch refining. Unlike electrolytic refining, batch refining allows for material to freshly enter a clean circuit during the refining process, and at no point come in contact with any other-sourced metal. In the Peace of Mined™ refining circuit, the designated material is the only material present, and all of that material is removed at termination of the process, so there are no leftovers in the circuit—it can in no way be commingled with metal originating from other sources.

See Peace of Mined Terms.

29.    No Customer that filed a Customer Statement paid for the Peace of Mined service.[7]  No Customer disputes this.  Based on the foregoing, no Customer received back, or was entitled to receive back, the identical raw material that it delivered to the Debtors for refining as a finished product.  The Customers knew this fact—as plainly stated in RMC's Standard Terms and Conditions (the "Standard Terms"):

> Precious metals are fungible; therefore any unit of material is equivalent to another of like kind, i.e. similar quality and/or value, and is deemed adequate payment for purposes of outstanding Pool Accounts.  Returnable metal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable metal; rather it represents a future obligation of RMC to return common inventory of gold, silver, platinum, palladium, or platinum group metals. RMC reserves the right to return precious metals to Customer of like kind representing the ounces of precious metals owed to Customer.

Standard Terms, p. 3.

30.    A copy of the Standard Terms is attached hereto as Exhibit 2 and available on the Debtors' website.  See Republic Metals Corporation, Republic Metals Corporation Standard Terms and General Operating Conditions, https://www.republicmetalscorp.com/terms-conditions (last visited Feb. 18, 2019).[8]

31.    Each Customer executed a copy of the Standard Terms as part of the Debtors' new customer onboarding process.  See Standard Terms at p.5.[9]

---

[7]    Upon information and belief, the Debtors only had two Customers that utilized the program.  Neither Customer has filed a Customer Statement or appeared in the chapter 11 cases.

[8]    Upon information and belief, the Standard Terms and Conditions for Debtors RMC2, LLC ("RMC2") and Republic Metals Refining Corporation ("RMRC") are substantially identical to RMC's Standard Terms.

[9]    The Debtors have produced (or will timely produce) copies of the Standard Terms executed by each Customer in accordance with Section 3(a) of the Procedures Order.

### E. **Identifiable Customer Materials as of the Petition Date**

32.     According to the Debtors, the only identifiable materials subject to Customer claims located at the Debtors' refinery as of the Petition Date included approximately $8.2 million of prepaid finished product[10] and the following raw materials:

| Customer | Estimated Value |
|---|---|
| Alamos Gold Inc. | $1,805,080 |
| Bay Area Metals | $36,204 |
| Los Filos/Leagold | $1,757,586 |
| Marigold Mining Company | $312,788 |
| Midwest Refineries | $2,767 |
| Pollock-Cameron Investments Corporation o/a Vancouver Gold Buyer | $88,242 |
| Pyropure, Inc. (Pyromet) | $53,420 |
| So Accurate | $31,851 |
| Wharf Resources (U.S.A.), Inc. | $298,090 |
| **TOTAL** | **$4,386,028** |

See Debtors' *Amended Motion to Sell Remaining Assets of the Estate Free and Clear of All Liens, Claims, Rights, Title, Interests and Encumbrances Pursuant to 11 U.S.C. § 363* [Docket No. 563] at ¶ 14.

33.     Of this $4,386,028 in identifiable raw materials, approximately $4,173,544 is related to carbon materials and thus excluded from the Procedures Order.[11] See Procedures Order at p. 2. Thus, only approximately $212,484 of raw materials subject to Customer Statements was identifiable as of the Petition Date. All other raw materials allegedly delivered by Customers had already entered or completed the refining process and consisted of commingled, unidentifiable work-in-process inventory or finished product or was previously sold by the Debtors to Customers or other third parties or monetized on physical commodities

---

[10]     See Exhibit B and Exhibit C to the Debtors' *Motion To Sell Property of the Estate Free and Clear of all Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. §363* (the "Prepaid Sale Motion") [Docket No. 219].

[11]     The Senior Lenders and the Debtors have reached settlement agreements with all of the Debtors' carbon customers. See Docket Nos. 576 (Alamos Gold Inc.), 574 (Los Filos/Leagold), 599 (Marigold Mining Company) and 632 (Wharf Resources (U.S.A.), Inc.).

markets (such as the London Bullion Market, Chicago Mercantile Exchange or Shanghai Gold Exchange).

34.    Moreover, ICBCS sent a notice to RMC suspending RMC's access to and use of the London Clearing Account on October 18, 2018.  RMC's access to the London Clearing Account was suspended only after all trades with Customers were cleared, leaving a zero balance and no remaining Loco London metal credits in the account.  Accordingly, to the extent any raw materials are traceable to the London Clearing Account, the proceeds associated therewith were paid to other Customers and are not traceable to inventory or cash held by the Debtors as of the Petition Date.

## CUSTOMER STATEMENTS

35.    A summary of the 50 Customer Statements filed pursuant to the Procedures Order is attached hereto as Schedule A.

36.    The Customer Statements can generally be categorized into six "buckets": (1) 20 bailment claims based on RMC's Standard Terms; (2) 8 bailment claims based on agreements with RMC other than RMC's Standard Terms; (3) 6 bailment claims based on agreements with Debtors other than RMC; (4) two claims based on unsecured lease agreements with RMC; (5) 13 claims to finished goods based on alleged prepayments to RMC; and (6) one claim based on a consignment agreement with RMC.[12]

37.    As detailed below, 100% of the Assets claimed by the Customers are subject to the Senior Lenders' valid, perfected first-priority security interests.

---

[12]    This Response does not address non-ownership claims asserted by the Customers in their Customer Statement, including, without limitation, Section 503(b)(9) administrative expense claims, reclamation claims, claims for interest, fees and expenses and tort claims and other equitable claims.  This Response also does not address claims relating to carbon materials, which are expressly carved out of the Procedures Order, or the Customer Statement filed by Action Forklift, Inc. [Docket No. 529], which relates to forklifts purportedly leased to the Debtors.  See Procedures Order at p. 2.

## GOVERNING LAW

38.     Two sets of applicable law govern the Ownership Dispute.  First, the validity,

perfection, priority and enforceability of the Senior Lenders' liens and claims are governed by

New York law.  Second, the Customers' purported ownership claims are governed by Florida

law.

### A.  New York Law

39.     The Senior Lenders' Collateral Documents (as defined below) and the

Intercreditor Agreement all provide that they shall be construed in accordance with and governed

by the laws of the State of New York.  Accordingly, the Senior Lenders submit that the validity,

perfection, priority and enforceability of the Senior Lenders' liens and security interests are

governed by New York law.  The Customers do not dispute this.

### B.  Florida Law

40.     The property of the estate dispute between the Customers, on the one hand, and

the Debtors and the Senior Lenders, on the other hand, is governed by Florida law.  As detailed

below, the Customers assert a variety of ownership claims, primarily based on either common

law or the Uniform Commercial Code ("UCC").  The Standard Terms contain multiple

references to Florida and Florida law.[13]  Meanwhile, certain Refining Agreements (as defined

below) contain Florida, New York, Ontario, British Columbia or Mexican choice of law

provisions, while others are entirely silent on choice of law.  As explained below, any prepetition

contractual choice of law provisions are irrelevant and Florida law controls.

41.     "Whether the debtor has a legal or equitable interest in property such that it

becomes 'property of the estate' under section 541 is determined by applicable state law."

---

[13]     RMC's Standard Terms specify Florida as the venue for arbitration proceedings and any related actions
and include numerous references to the Florida UCC.

Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC), 475 B.R. 9, 21−22

(S.D.N.Y. 2012) (citations omitted).  Bankruptcy courts apply the rule observed by federal

district courts hearing diversity cases and use the choice of law rules of the state in which they

sit.  Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA Corp., 805 F. Supp. 133, 140

(W.D.N.Y. 1992) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S. Ct. 1020,

85 L. Ed. 1477 (1941)).

42.    New York applies an "interest analysis" to choice of law problems.  Id. at 140,

n.3; Salander-O'Reilly, 475 B.R. at 31−32.  Here, the Debtors are primarily Florida entities, the

Debtors' refinery and operations were located in Florida, the Assets subject to the Customers'

alleged ownership interests were located in Florida, the Senior Lenders' filed UCC-1 financing

statements against the Debtors in Florida and the Standard Terms contain multiple references to

Florida and Florida law.  Accordingly, Florida law should govern the Ownership Dispute under

the "interest analysis" test.

43.    Under Florida law, the UCC in turn also dictates that Florida law should apply.

Under UCC § 1-301(a), choice of law provisions should be upheld where the chosen law and

forum bear a reasonable relation to the transaction.  See Fla. Stat. § 671.105(1).  However, UCC

§ 1-301(c) contains a specific carve out to this general rule where UCC §§ 9-301 through 9-307

(governing perfection, the effect of perfection or non-perfection and the priority of security

interests) specify the applicable law.  Id. at § 671.105(2).  UCC § 9-301 states that perfection and

priority issues are governed by the law of the state where the debtor or collateral is located.  Id.

at § 679.3011(1)−(2).  As set forth below, the Customers are all parties to commercial

transactions with the Debtors for the purchase and sale of goods and each Customer failed to

perfect a security interest in the Assets (whether purchase-money, under reservation of title or

contractual).  As a result, application of UCC § 1-301(c) also dictates that Florida law applies to the Ownership Dispute.  See also Salander-O'Reilly, 475 B.R. at 31−33; HSBC, 805 F. Supp. at 140−41.

44.    Lastly, it is well established that prepetition contractual choice of law provisions are not binding on third parties, such as the bankruptcy trustee, or creditors, like the Senior Lenders.  Salander-O'Reilly, 475 B.R. at 32; In re Eagle Enters., Inc., 223 B.R. 290, 293−94 (Bankr. E.D. Pa. 1998); HSBC, 805 F. Supp. at 139−40.

## SUMMARY OF LEGAL BASIS
### (SENIOR LENDERS' LIENS)

### A.  The Senior Lenders Have Valid and Perfected First Priority Liens on the Debtors' Inventory and its Proceeds

45.    Under UCC § 9-203, a security interest is enforceable with respect to collateral if "(1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) . . . (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ."  NY UCC § 9-203(b).[14]  Each of these requirements has been fulfilled here.  Thus, the Senior Lenders hold valid security interests that attached to the Assets.  The Senior Lenders duly perfected their security interests by filling UCC-1 financing statements against the Debtors.

### (1) Value Has Been Given

46.    "[A] person gives value for rights if the person acquires them: (1) in return for a binding commitment to extend credit or for the extension of immediately available credit . . . or (4) in return for any consideration sufficient to support a simple contract."  NY UCC § 1-204.

---

[14]    As explained above, the validity, perfection, priority and enforceability of the Senior Lenders' liens and security interests are governed by New York law.  Accordingly, all references in this section are to the NY UCC.  However, the provisions of the Florida UCC are substantively identical.

47.     In exchange for various covenants and promises of the Debtors and the grant to
the Senior Lenders of a security interest in collateral, the Senior Lenders provided the Debtors
with nearly $200 million in credit.  The Senior Lenders' extensions of credit to the Debtors
satisfy the value prerequisite to the enforceability of the Senior Lenders' security interests.  No
party can reasonably dispute this.

### (2) The Debtors Had the Power to Transfer Rights in the Collateral to the Senior Lenders

48.     The phrase "rights in the collateral" is not defined in the UCC.  Certain
Customers assert that they and not the Debtors owned the Assets because they retained "title" to
the Assets and therefore the Debtors could not properly grant a security interest therein to the
Senior Lenders.  This is a complete misstatement of the law.  As an initial matter, under UCC
§ 2-401(1) any attempted reservation of title by a seller in goods delivered to a buyer gives the
seller at most a security interest in the goods.  See Fla. Stat. § 672.401(1) ("Any retention or
reservation by the seller of the title (property) in goods shipped or delivered to the buyer is
limited in effect to a reservation of a security interest."); see also In re J. Adrian Sons, Inc., 205
B.R. 24, 26 (Bankr. W.D.N.Y. 1997) ("§ 2-401(1) negates any attempt to forestall passage of
title beyond the moment of final delivery; contract language purporting to do so merely results in
a security interest being retained") (citations omitted); Morton Booth Co. v. Tiara Furniture, Inc.,
564 P.2d 210, 212 (Okla. 1977) ("Title to goods is of little relative consequence under the
Uniform Commercial Code (Code).  A deliberate effort was made by the drafters of the Code to
avoid defining the rights of parties to goods in terms of who has title . . .").

49.     There is no requirement that the debtor have "title" or "full ownership rights" in
order to grant a valid security interest in property.  Litwiller Machine & Mfg., Inc. v. NBD
Alpena Bank, 184 Mich. App. 369, 374 (1990) (citations omitted).  To the contrary, "where a

debtor gains possession of collateral pursuant to an agreement endowing him with ***any interest other than naked possession***, the debtor has acquired such rights as would allow the security interest to attach." GMAC Bus. Credit, 100 Fed. Appx. 404, 408 (6th Cir. 2004); (quoting Morton Booth at 214) (emphasis added).

50.    Here, the Senior Lenders submit that the Debtors obtained full ownership and title to the Assets upon their shipment by the Customers. Fla. Stat. § 672.401(2). However, at a minimum, it is indisputable that the Debtors obtained an interest in the Assets greater than "naked possession" upon their delivery to the Debtors' refinery. Id. at § 672.401(1). The Debtors received raw materials from Customers and had the right to melt and refine the materials into finished products upon receipt. With the Customers' knowledge and consent (both actual and constructive), the Debtors physically changed the character and form of the delivered raw materials through the refining process and subsequently sold the finished products to customers, on physical commodities markets or to other third parties. Courts considering this issue in the manufacturing and refining contexts have universally held that such actions constitute more than "naked possession." GMAC at 408−09; Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa, 705 F.2d 396, 398−400 (10th Cir. 1983); Litwiller at 374; Morton Booth at 214.

51.    Given these powers to melt, refine and sell the raw materials delivered by the Customers, the Debtors clearly had sufficient rights in the Assets under UCC § 9-203(2) to grant security interests in them to the Senior Lenders. See Kinetics at 399 ("Otherwise, if a debtor received collateral from a third party under an agreement giving the debtor authority to exercise any outward indicia or manifestations of ownership or control, a would-be creditor could easily be misled into making a loan under an ineffective security agreement.").

**(3) The Debtors Authenticated a Security Agreement That Provides a
Description of the Collateral**

52.    "Authenticate" means "to sign." NY UCC § 9-102(a)(7)(A). The Debtors signed

certain collateral and security documents (collectively, the "Collateral Documents") securing

their obligations under the Credit and Lease Agreements, fulfilling the authentication

requirement for granting an enforceable security interest. A list of the Collateral Documents is

attached hereto as Schedule B.[15]

53.    The collateral described under the Collateral Documents (collectively, the

"Collateral") includes all personal property of each Debtor grantor, including, without limitation,

"inventory" and "proceeds," as such terms are defined in the UCC. The UCC defines

"inventory," in relevant part, as goods which are "held by a person for sale" or "consist of raw

materials, work in process, or material used or consumed in a business." NY UCC § 9-

102(a)(48). The UCC defines "proceeds," in relevant part, to include "whatever is acquired upon

the sale . . . or other disposition of collateral." NY UCC § 9-102(a)(64).

54.    Moreover, Section 6(a) of the Intercreditor Agreement, provides, in pertinent part,

that "all [Collateral Documents] shall secure all Obligations of [RMC] to all [Senior Lenders], as

if such [Collateral Documents] specifically described the Obligations and specifically granted a

lien or security interest on or in the property covered thereby to secure same." Intercreditor

Agreement at § 6(a). RMC signed the Intercreditor Agreement specifically acknowledging and

agreeing to its terms for all purposes.

55.    Accordingly, under the UCC, the Collateral Documents and the Intercreditor

Agreement, the Senior Lenders have valid security interests in the Assets and their proceeds.

---

[15]    The Collateral Documents are voluminous, contain confidential and proprietary information and are
subject to confidentiality provisions and, accordingly, have not been attached to this Response. The Senior Lenders
have produced (or will timely produce) copies of the Collateral Documents to the Customers in accordance with
Section 3(a) of the Procedures Order.

### (4) <u>The Senior Lenders' Security Interests Are Properly Perfected</u>

56.     Pursuant to Section 9-310(a) of the UCC, the Senior Lenders properly perfected their security interests in the Collateral by filing UCC-1 financing statements and have duly filed all required continuations statements.  <u>See</u> NY UCC § 9-310(a) (providing that a "financing statement must be filed to perfect all security interests").  A list of the filed UCC-1 financing statements is attached hereto as <u>Schedule C</u>.[16]  Accordingly, the Senior Lenders have properly perfected security interests in the Assets and their proceeds.

### B.  The Customers Elected Not to Perfect Security Interests in Goods Sold to the Debtors

57.     UCC-1 searches reflect that not a single Customer filed a UCC-1 financing statement against the Debtors, and none claims otherwise.

58.     However, the Customers nevertheless could have taken security interests in the Assets:  <u>First</u>, under UCC § 9-103, each Customer could have taken a purchase-money security interest ("<u>PMSI</u>") in goods delivered by it to the Debtors.  <u>See</u> Fla. Stat. § 679.1031.  <u>Second</u>, certain Customers' agreements with the Debtors contain reservations of title.  As noted above, a reservation of title by a seller of goods delivered to a buyer is deemed to be a security interest under UCC § 2-401(1).  <u>Id.</u> at § 672.401(1).  <u>Lastly</u>, certain Customers' agreements included security grants by the Debtors in favor of the Customers to secure the Debtors' obligations thereunder.

59.     Under the general "first in time, first in right" rule of priority under UCC § 9-322, the Senior Lenders have a security interest in the Assets senior to any later perfected security interest.  <u>Id.</u> at § 679.322.  While UCC § 9-324(b) provides the means for the holder of a PMSI

---

[16]     The Senior Lenders have produced (or will timely produce) copies of the UCC-1 financing statements to the Customers in accordance with Section 3(a) of the Procedures Order.

to achieve an exception to the "first in time, first in right" rule, qualifying for this exception requires, among other things, that the PMSI holder perfect its security interest by filing a UCC-1 financing statement prior to its delivery of goods.  Id. at § 679.324(2).  Absent compliance with UCC § 9-324(b), the rights of the Customers as secured parties with a PMSI are subject to the "first in time, first in right" rule of priority.  Id.  As noted above, no Customer filed a UCC-1 financing statement.  Accordingly, no Customer has a valid perfected security interest (whether PMSI or otherwise) in the Assets.

60.    Each Customer could have perfected a security interest to protect its respective exposure.  None did.  See Kinetics at 399−400 (noting a supplier of goods can "easily protect itself from after-acquired property creditors of its contractor by filing an Article Nine purchase money security interest in the goods supplied by it to the contractor, as well as those purchased or otherwise identified in the contract by the contractor.").  Accordingly, the Senior Lenders have perfected security interests in the Assets and their proceeds senior to any interest of the Customers.  While the Senior Lenders recognize that the Customers may have claims against the Debtors' estates (including, without limitation, reclamation claims and 503(b)(9) claims), any such claims would be unsecured and subordinate in all respects to the Senior Lenders' secured claims.[17]  The Ownership Dispute should end here.

C. **The Senior Lenders Are Good Faith Purchasers**

61.    Although the UCC priority analysis is determinative, the Senior Lenders additionally qualify as good faith purchasers under UCC § 2-403(1).  Fla. Stat. § 672.403(1).

---

[17]    See, e.g., In re Dairy Mart Convenience Stores, Inc., 302 B.R. 128, 134−36 (Bankr. S.D.N.Y. 2003) (holding that reclamation claims were without value in light of a secured lender's prior floating lien on the debtor's inventory); see also 11 U.S.C. § 546(c) (subjecting a seller's right to reclaim goods to "the prior rights of a holder of a security interest in such goods or the proceeds thereof . . ."); 11 U.S.C. § 503(b)(9) (providing sellers with an unsecured administrative claim for the value of any goods sold in the ordinary course of business and received by the debtor within 20 days of the bankruptcy filing).

§ 2-403(1) provides that a buyer of goods who holds only voidable title has the power to transfer

good title to a "good faith purchaser." Id. A secured creditor may be a "good faith purchaser"

within the meaning of subsection (1) and may thus take good title to property to which its

security interest attaches. See, e.g., WESGO Division of GTE Products Corp. v. Harrison (In re

Sitkin Smelting & Refining, Inc.), 648 F.2d 252 (5th Cir. 1981) (holding that, as a good faith

purchaser under UCC § 2-403(1), a secured creditor was entitled to prevail against a supplier to

the debtor where the refining contract at issue provided for a sale of goods).

## SUMMARY OF LEGAL BASIS
### (PROPERTY OF THE DEBTORS' ESTATES)

62.     As described above, no Customer filed a UCC-1 financing statement.

Consequently, the Customers' sole recourse is to argue that the Debtors had only naked

possession of the Assets—whether raw materials delivered, sold or leased to the Debtors, or

finished product purchased from the Debtors—and that, accordingly, the Customers are entitled

to the extraordinary remedy of a constructive trust over estate property.  These arguments fail as

a matter of law.  Each "bucket" of claims is addressed in turn below:

### Bailment Claims

63.     Several Customers attempt to establish rights to the Assets by asserting bailment

claims.  As detailed below, the Customers and the Debtors were parties to commercial

transactions for the purchase and sale of goods.  The applicable contracts—whether the Debtors'

Standard Terms or other negotiated agreements—are unambiguous on this point.  In an attempt

to avoid this fatal flaw, the Customers cite inapposite case law to try to establish common law

bailment relationships outside the scope of the four corners of their contracts.  The cases the

Customers cite are contrary to well-established law distinguishing bailments from sales and are

inapplicable in the toll metal refining context.  Lastly, even if a Customer could successfully

establish a bailment relationship (which none can), the Customers ignore the critical fact that, as

they knew or should have known, all raw materials delivered to the Debtors were commingled in

the ordinary course of the Debtors' business and became unidentifiable upon entering the

refining process.  As a result, no Customer can trace its purported "owned" materials and,

accordingly, none is entitled to a constructive trust over property held by the estates.

### A. Republic's Standard Terms and Conditions Clearly Evidence Purchase/Sale Transactions

64.    The Standard Terms broadly apply to all transactions between the Debtors and the

Customers.  Specifically, the recitals to the Standard Terms provide:

> Unless otherwise stipulated, these Standard Terms and General Operating
> Conditions "Standard Terms" are applicable to transactions and/or contracts
> between Republic Metals Corporation, "RMC", and Customer.  "Customer" is
> defined as any business, corporation, company, person, entity, or anyone else
> transacting business with RMC in any manner whatsoever.  Any contract or
> agreement entered into between Customer and RMC will operate as if the terms
> represented in these Standard Terms were made expressly a part thereof.  RMC's
> Standard Terms is the governing document with respect to any and all business
> dealings between RMC and Customer and shall override any and all provisions,
> terms, and stipulations in Customer purchase orders, sales orders and/or any other
> Customer documents.  RMC's failure to object to any terms, provisions, and/or
> stipulations represented in any Customer documents that are at variance with
> RMC's Standard Terms shall not be deemed a waiver of the terms and conditions
> contained herein.

Standard Terms at p. 1.

65.    As discussed above, each Customer executed a copy of the Standard Terms.

25 Customers acknowledge that they do not have additional contracts with the Debtors and are

subject only to the Standard Terms.[18]  A review of the Standard Terms unequivocally establishes

---

[18]        This group includes 7645635 Canada Inc. o/a Ottowa Gold Buyer, Brilliant Jewelers/MJJ Inc. (Anjay
Corp.), Eddie & Co. of NY, Inc. d/b/a Diamond Kingdom, Midwest Refineries, LLC and Pollock-Cameron
Investments Corporation o/a Vancouver Gold Buyer, each of which asserts it did business with either RMC2 or
RMRC.

that such Customers were parties to commercial transactions with the Debtors for the purchase

and sale of goods.  Specifically:

- Warranty of Title: "Customer warrants to RMC that it has good and marketable title to said property, full authority **to sell and transfer** said property, and that **said property is sold** free of all liens, encumbrances, liabilities, and adverse claims of every nature and description whatsoever."  Standard Terms at p.1 (emphasis added).

- Indemnity: "Customer further warrants to RMC that it will fully, defend, protect, indemnify, and hold harmless RMC and its lawful successors and assigns from any adverse claim thereto."  Id.

- Risk of Loss: "Risk of loss of material will pass from Customer to RMC upon delivery to and acceptance at RMC's refinery, unless otherwise agreed."  Id.

- Refining Charges: "All RMC [refining] charges are payable upon the rendering of an invoice. [. . .]  Until such time, **RMC shall be deemed to retain title** to and a security interest in all material covered by any RMC invoice to secure the payment of the same."  Id. at 2−3 (emphasis added).

- RMC Purchases:

  o "Customer warrants that any **purchase or sale contract** has been effectuated by Customer for the sole purpose of securing pricing for the ultimate sale or purchase of precious metals and has not been made for any speculative reason whatsoever."  Id. at 4 (emphasis added).

  o "By agreeing to the terms and conditions contained herein, and receiving an e-mail confirming the details of Customer's trade, **Customer agrees that he has entered into a written, legally binding contract for the sale/purchase of precious metals** contained within the confirmation e-mail.  **Customer further warrants that said contract is in compliance with the Florida Uniform Commercial Code § 672.201, § 668.003 (4) and § 668.004 and agrees to waive any defenses under Florida Uniform Commercial Code § 672.201.**"  Id.  (emphasis added).

- Parties: "**Both Parties agree that they are merchants as defined in the Uniform Commercial Code § 2-104(1)**."  Id. (emphasis added).

66.    The Standard Terms are clear and unambiguous.  Accordingly, each Customer

should be estopped from introducing extrinsic evidence in an attempt to establish common law

bailments.  See, e.g., King v. Bray, 867 So. 2d 1224, 1226 (Fla. 5th DCA 2004) ("[T]he party

seeking to introduce parol evidence must establish that the document is ambiguous and in need of interpretation.").

**B.    Republic's Refining Agreements Clearly Evidence Purchase/Sale Transactions**

67.    9 Customers assert bailment claims based on agreements with the Debtors other than RMC's Standard Terms (each, a "Refining Agreement").[19]  With two exceptions,[20] each Refining Agreement is based on RMC's standard template form.  Like the Standard Terms, the Refining Agreements unequivocally establish that these Customers were parties to purchase and sale transactions with the Debtors.

68.    Specifically, (a) no Refining Agreement refers to a bailment or entrustment; (b) the Refining Agreements expressly provide that they are agreements for "refining ***and forward/spot sales*** of precious metal" or "refining ***and purchase of doré***", refer to the Debtors as "the Buyer" and the Customer as "the Seller" or otherwise contain terms indicative of a purchase and sale transaction; (c) the Refining Agreements require the Debtors to purchase raw materials, with payment in the form of cash or metal credit with a purchase price established by an agreed-upon formula or in refined metal of like kind and quality less, in each case, refining and/or retention charges; (d) the Refining Agreements generally provide that risk of loss transfers to the Debtors upon delivery at the Debtors' facility or upon shipment from the Customer's mine; (e) the Refining Agreements generally do not provide that title to metal remains with the Customer nor do they grant Customers the right to demand the return of metal after weight is

---

[19]        This group includes Fundación Rafael Dondé, I.A.P ("FRD"), an entity that asserts it did business with Republic Trans Mexico Metals, S.R.L.

[20]        Tiffany and Company (Laurelton Sourcing, LLC) ("Tiffany") and FRD each cite agreements that appear to be based on non-standard forms.  See Docket Nos. 450 and 454.  However, Tiffany executed a copy of the Standard Terms subsequent to the date of its Refining Agreement.  Moreover, the Senior Lenders understand that raw materials delivered by both entities were commingled in the ordinary course of business and, accordingly, the Senior Lenders assert that, like the other Customers, neither entity can establish a valid bailment or trace its purported property for the reasons set forth below.

confirmed; (f) the Refining Agreements do not provide for, nor did the parties contemplate, that metal would remain separate and identifiable after commencement of the refining process nor that they would not be commingled with other metals; and (g) no Refining Agreement provides that the applicable Customer will receive the refined metal actually recovered from the identical raw materials delivered by it to the Debtors.

69.    As with the Standard Terms, the Refining Agreements are clear and unambiguous.  Accordingly, regardless of whether a Customer's Refining Agreement is deemed to supersede the Standard Terms,[21] the Customers' common law bailment claims must be denied.

**C.  The Proper Test For Determining Sale or Bailment is Whether the Identical Article Delivered is To Be Returned**

70.    Under Florida common law, a bailment is defined as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be."  Monroe Sys. for Bus., Inc. v. Intertrans Corp., 650 So. 2d 72, 75 (Fla. 3d DCA 1994) (quoting Dunham v. State, 140 Fla. 754, 192 So. 324, 326 (Fla. 1939)).

71.    As to whether a transaction constitutes a bailment or a sale, the United States Supreme Court has stated:

> The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed.  On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed.  The transaction is a sale.

Sturm v. Boker, 150 U.S. 312, 14 S. Ct. 99, 37 L. Ed. 1093 (1893).

---

[21]    The Senior Lenders reserve all rights on this issue.  It appears that many of the Customers executed copies of the Standard Terms either contemporaneously with or subsequent to the date of their respective Refining Agreements.

72.    This rule applies even where the thing delivered is changed or transformed in

some manner:

> Where logs are delivered to be sawed into boards, or leather to be made into
> shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the
> product of the identical articles delivered is to be returned to the original owner in
> a new form, it is said to be a bailment, and the title never vests in the
> manufacturer.  If, on the other hand, the manufacturer is not bound to return the
> same wheat or flour or paper, but may deliver any other of equal value, it is said
> to be sale or a loan, and the title to the thing delivered vests in the manufacturer.
> We understand this to be a correct exposition of the law.

Powder Company v. Burkhardt, 97 U.S. 110, 116, 24 L. Ed. 973 (1877).

73.    Some courts have called this type of bailment "'a bailment . . . locatio operis

faciendi [i.e.] a bailment where work and labor . . . are to be performed upon the thing delivered

to the bailee.'"  B.A. Ballou and Company, Inc. v. Citytrust, 218 Conn. 749, 591 A.2d 126, 130

(Conn. 1991) (quoting Douglass v. Hart, 103 Conn. 685, 131 A. 401, 402 (Conn. 1925)).  A

bailment of this character is formed when the parties "enter into a contract, express or implied, or

both, by which the bailee engages to perform the agreed services and return the thing bailed in its

altered form . . . and, the bailor in return for the services of the bailee agrees to pay him the

agreed upon compensation."  Id.

74.    Accordingly, in distinguishing bailments from sales, the test of a bailment is that

the **_identical_** thing is to be returned in the same or some altered form; if another thing of equal

value is to be returned, the transaction is a sale.  This test has been consistently applied by courts

considering the sale versus bailment question, particularly in the toll metal refining context.  See,

e.g., Sitkin v. R-One Alloys, Inc., 2006 R.I. Super. LEXIS 25, *8−11 (R.I. Super. Ct. 2006);

Welding Metals v. Foothill Capital Corp., 1997 U.S. Dist. LEXIS 7672, *25 (D. Conn. April 14,

1997); Ballou at 755−56; WESGO at 254; General Motors Corp. v. Bristol Indus. Corp. (In re

Bristol Indus. Corp.), 1981 Bankr. LEXIS 5204, *21−24 (Bankr. D. Conn. Dec. 14, 1981), rev'd

26

on other grounds, 690 F.2d 26 (2d Cir. 1982); Chisholm v. Eagle Ore Sampling Co., 144 F. 670,

671−72 (8th Cir. 1906); see also In re Jeff Benfield Nursery, Inc., 565 B.R. 603, 611, n.4 (Bankr.

W.D.N.C. Jan. 24, 2017); Praxis Energy Agents v. Allfirst Bank (In re Millenium Seacarriers),

2003 U.S. Dist. LEXIS 22346, at *13−*14 (S.D.N.Y. Dec. 10, 2003).

75.      As explained above, raw materials delivered by Customers to the Debtors were

commingled and became unidentifiable after entering the refining process.  The Standard Terms

and Refining Agreements made clear that precious metals are fungible, and that returnable metal

did not pertain to specific, segregated or identifiable metal.  As mentioned above, no Customer

elected to pay for the Peace of Mined program.  Rather, the Debtors refined raw materials

received from the Customers and paid the Customers with cash, Loco London metal credit or, in

rare instances, refined metal of like kind and quality.  To the extent any customer received back

refined metal that was the product of raw material originally delivered by it to the Debtors, it

would be "solely by chance."  Thus, the identical thing sent by the Customers to the Debtors was

not returned to the Customers and the arrangements between the Customers and the Debtors

could not constitute bailments as a matter of law.  See Welding Metals at * 25 ("because there is

no evidence that the metal returned to [the customer] was the product of the metal originally

delivered, except 'solely by chance,' the arrangement between [the debtor and the customer]

could not constitute a bailment").

### D.  The Cases Cited by the Customers are Inapposite

76.      In support of their bailment arguments, the Customers ignore the applicable

governing precedent and cite a number of factually inapposite cases.  A summary of the primary

cases relied on by the Customers and an explanation of why they fail to support the Customers'

position follows:

- <u>Public Service Electric & Gas Co. v. Federal Power Commission, 371 F.2d 1 (3d Cir. 1967)</u>: In <u>Public Service</u>, a company arranged to have natural gas transported through a pipeline. The court found that a bailment existed even though the company was not entitled to have the identical gas delivered back to it. <u>Id.</u> at 6−7. Because the gas was merely transported and not altered in any manner, that case is distinguishable from the type of bailment alleged here. As discussed above, where, as here, a bailed thing is altered, transformed or remanufactured and the bailee does not return the identical thing delivered, a bailment cannot exist. <u>See</u> <u>R-One</u> at *11, n. 6 (distinguishing <u>Public Service</u>); <u>Ballou</u> at 754, n. 3 (same). Accordingly, <u>Public Service</u> stands only for the limited proposition that commingling of unaltered fungible goods alone does not defeat an otherwise valid bailment.

- <u>In re Enron Corp., 2003 Bankr. Lexis 2262 (Bankr. S.D.N.Y. 2003)</u>: In <u>Enron</u>, a company arranged to have natural gas stored in a pipeline. The court found that a bailment existed even though the natural gas was commingled. Like <u>Public Service</u>, the natural gas was merely stored and not altered in any manner. <u>Enron</u> relies principally on <u>Public Service</u> and stands for the same limited proposition.

- <u>In re Medomak Canning Co., 25 U.C.C. Rep. Serv. 437 (Bankr. D. Me. 1977), aff'd, 588 F.2d 818 (1st Cir. 1978)</u>: In <u>Medomak</u>, a supplier entered into a contract with the debtor for the processing of canned baked pork and beans. Under the contract, the supplier sent ingredients, packaging, and shipping supplies to the debtor and the debtor processed the pork and beans and canned and shipped them directly to the supplier's customers. The ingredients supplied by the supplier were kept segregated and identifiable at all times and were never commingled with the debtor's other inventory. Moreover, there was no purchase price mechanism in the contract. Accordingly, <u>Medomak</u> is distinguishable on its facts.

- <u>Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.), 639 F.2d 1213 (5th Cir. 1981)</u>: In <u>Kodak</u>, the court found that a bailment existed where a supplier delivered film waste to the debtor for waste processing and to extract the silver. Unlike here, the film waste was labeled, segregated and identified at every stage of the process and never commingled with the debtor's other inventory. Moreover, in <u>WESGO</u>, a case involving the same debtor as <u>Kodak</u> and with the same judge writing the opinion, the same court distinguished the contract in <u>Kodak</u> as "somewhat unique" and held that another refining agreement entered into by the debtor for scrap metal was a sale contract rather than a bailment where the supplier's metal was commingled and the debtor purchased the scrap metal, with payment in the form of a purchase price established by an agreed-upon formula or in refined metals of like kind and quality less a processing fee. As a result, <u>WESGO</u>, not <u>Kodak</u>, is clearly the more relevant precedent.

- <u>General Motors Corporation v. Bristol, 690 F.2d 26 (2d Cir. 1982)</u>: In <u>Bristol</u>, the court, in a concurring opinion in dicta, found that a bailment existed when a supplier shipped scrap metal to the debtor for processing into alloy strips under a tolling arrangement. The concurrence, relying on <u>Public Service</u>, stated that "where commingling is required by the needs of the trade and is done with the consent of the parties a bailment is established ***if that is the intent of the parties***." <u>Id.</u> at 30−31 (emphasis added). The concurring

28

opinion has been subsequently criticized and distinguished for its reliance on <u>Public Service</u>.  <u>R-One</u> at *11, n. 6 ("The precedent, however, to which the court in <u>Bristol</u> cites in support of this maxim, is misplaced."); <u>GMAC</u> at 409 ("We respectfully disagree with the concurring judge in [<u>Bristol</u>]"); <u>Ballou</u> at 754, n. 3 ("[<u>Public Service</u>] stands only for the proposition that commingling alone does not defeat a bailment").  In any event, as discussed above, the Standard Terms and the Refining Agreements clearly establish purchase/sale transactions, not bailments.

### E.   <u>The Customers Cannot Trace Their Purported Property to Estate Property</u>

77.     Lastly, in the unlikely event that any Customer could establish a bailment claim, with certain limited exceptions, its purported "owned" raw materials were not identifiable on the Petition Date.  Accordingly, the Customers' sole recourse would be to seek a constructive trust against inventory or proceeds currently held by the Debtors on the basis of conversion or other equitable claims.

78.     Constructive trusts are an extraordinary equitable remedy, to be used sparingly. <u>In re Miss. Valley Livestock, Inc.</u>, 745 F.3d 299, 305 (7th Cir. 2014) (citations omitted); <u>see also</u> <u>In re Omegas Group, Inc.</u>, 16 F.3d 1443, 1451 (6th Cir. 1994) (describing constructive trusts as "fundamentally at odds with the general goals of the Bankruptcy Code").  Constructive trusts are particularly disfavored in the bankruptcy context because they alter the distribution rules provided under the Bankruptcy Code.  <u>See</u> <u>In re Dewey & Leboeuf LLP</u>, 493 B.R. 421, 432 (Bankr. S.D.N.Y. 2013).

79.     In any event, "[i]t is hornbook law before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his property into a product in the hands of the wrongdoer."  <u>In re Handy & Harman Ref. Group, Inc.</u>, 266 B.R. 24, 27 (Bankr. D. Conn. 2001). Each Customer asserting the existence of a constructive trust bears the burden of proof that the trust exists and that the property which is the subject of the trust can be traced.  <u>Id.</u> at 29 (citing <u>In re Columbia Gas Systems, Inc.</u>, 997 F.2d 1039, 1063 (3d Cir. 1993), <u>cert.</u> <u>denied</u>, 510 U.S. 1110, 114 S. Ct. 1050, 127 L. Ed. 2d 372, 114 S. Ct. 1051 (1994); <u>see also</u> <u>Miss. Valley</u> at 307

("[t]here can be no constructive trust without tracing a claimant's interest to specific property")
(citations omitted).

80.     Therefore, assuming, *arguendo*, that any Customer could (a) establish a valid
bailment relationship and (b) meet the high burden of establishing grounds warranting a
constructive trust, the Customer would still have to trace raw materials it delivered to the Debtors
to specific property in the estates' possession on the Petition Date in order to impose a
constructive trust.

81.     Aside from the few Customers with identifiable segregated materials as of the
Petition Date, no Customer will be able to trace raw materials delivered to the Debtors to specific
inventory or cash proceeds.  As described above, all raw materials delivered to the Debtors were
rendered unidentifiable once commingled.  As a result, at any given time specific raw materials
delivered to the Debtors could be (fully or partially):  contained in commingled work-in-process
inventory at various stages in the refining process; contained in sweeps (i.e., dust, collected
waste and cleaning materials physically located in filters, screens, pipes or tubes in the refinery
or on the floor of the refinery); part of byproduct generated from refining and clean ups in in the
form of slag or hydroxides; incorporated in finished coins, bars or other custom minted products;
incorporated in finished generic RMC grain or bars held in general inventory; incorporated in
finished products sold to other Customers; incorporated in investment grade bars sold on the
London Bullion Market, Chicago Mercantile Exchange or Shanghai Gold Exchange or to third
parties for cash or metal credit; or monetized into proceeds in the form of cash or metal credit
that was subsequently used to pay Customers, vendors, employees and other third parties in the
ordinary course of business.  The Debtors quite simply did not (and could not) track individual
raw materials or proceeds after the materials entered the refining process.

82.    Moreover, substantially all raw materials refined prior to October 18, 2018 (i.e.,
the date that RMC's London Clearing Account was suspended) would have been monetized by
the Debtors into Loco London metal credit in the ordinary course of business and used by the
Debtors to settle transactions with Customers.  Accordingly, any such raw materials cannot be
traced to inventory or cash proceeds generated by the Debtors after that date.

83.    Based on the foregoing, no Customer is entitled to a constructive trust over the
Assets.  As a result, the Customers are at best general unsecured creditors of the estates or, in
certain circumstances, 503(b)(9) claimants.  See, e.g., In re Delta Smelting & Refining, Inc., 53
B.R. 877, 882 (Bankr. D. Alaska 1985) (holding that "[e]ven where property subject to a
bailment is sold, if the proceeds are not segregated or traceable, it is clear that the claimant is
relegated to the status of a general unsecured creditor" where silver bars delivered by a customer
to the debtor precious metals refiner were commingled and unidentifiable as of the petition date)
(citations omitted).

**Unsecured Lease Agreement Claims**

84.    Two Customers claim to be parties to lease arrangements with the Debtors.

85.    First, SCMI US INC. ("SCMI") is party to a Master Agreement for Precious
Metals Transactions dated October 4, 2017 with RMC.  See Customer Statement by SCMI US,
Inc., Exhibit A (the "SCMI Master Agreement") [Docket No. 428].  Second, Mitchell Levine and
Erie Management Partners, LLC (together, "Levine") assert that they are parties to lease
arrangements with RMC.  There are no contracts documenting the Levine arrangements; rather,
Levine claims that it leased certain precious metals to the Debtors and that the Debtors paid
Levine a monthly "Lease Fee" calculated based on the value of the "leased" materials on a daily
basis.  See *Statement of Claims Ownership and Claims* [Docket No. 468] at p. 3−4.

86. At this time, the Senior Lenders do not take a position as to whether these purported "leases" were true leases or in fact disguised financing arrangements (or, in the case of Levine, enforceable at all).[22]  See UCC § 1-203 (Fla. Stat. § 671.201).  However, in either case, SCMI and Levine failed to perfect security interests in precious metals delivered to the Debtors. The SCMI Master Agreement contains an explicit security grant in favor of SCMI.[23]  Levine has no contract, but could have taken a PMSI in metals "leased" to the Debtors.  Neither filed a UCC-1 financing statement.  Further, even if either SCMI or Levine could establish a true lease, each would face the same tracing issues outlined above.

### Prepaid Finished Product Claims

87. Prior to the Petition Date, certain Customers placed orders with and prepaid RMC for certain materials such as minted products and grain ("Prepaid Product").  See Prepaid Sale Motion at ¶ 7.  The Prepaid Product included custom orders placed by Customers for specialized minted products, as well as "off the shelf" inventory of stock items minted by RMC, including include coins and gold pieces usually purchased for investment or resale purposes.  Id.

88. As of the Petition Date, RMC had orders for $13,550,000 worth of Prepaid Product.  Id. at ¶ 8.  Of that $13,550,000 in Prepaid Product, $3,200,0000 of customer orders were packaged for shipment to the applicable Customer on the Petition Date.  Id.  Additionally,

---

[22]    SCMI also takes the position that its lease arrangement created a bailment as well as a lease.  See Docket No. 428 at ¶¶ 11–12.  To the extent that SCMI asserts bailment claims, the Senior Lenders incorporate the arguments set forth in the "Bailment" section above.  Moreover, as evidenced by the trade confirmation annexed to SCMI's Customer Statement, the Senior Lenders note that SCMI appears to have transferred Loco London metal credit to RMC's London Clearing Account in accordance with Section 5.1 of the SCMI Master Agreement; SCMI never physically delivered precious metals to RMC.  Id. at Exhibit B.  Accordingly, it would appear to be impossible for SCMI to establish a bailment under these circumstances.

[23]    See SCMI Master Agreement at § 7.7 ("Without prejudice to any other provision of this Part 7, each Party ("Party L") grants the other Party (""Party M") a security interest over all Material that is or may come into Party L's possession (actual or constructive) but to which Party M retains title under this Agreement.  Each Party hereby grants the other irrevocable authority to act as its agent to file any financing statement or other registration or notification document, or to take other such similar measure as is required by applicable law in any jurisdiction in which such Material is or might be located, in order to perfect, or to put third parties on notice of, such security interest, or to otherwise confer on Party M priority over Party L's unsecured creditors in respect of such Material.").

as of the Petition Date, RMC had an additional $5,000,000 in Prepaid Product that, while generally available for fulfilling Customer orders, remained in RMC's general inventory.  Id. at ¶ 9.

89.     13 Customers filed Customer Statements asserting ownership interests in Prepaid Product.  In order to defeat the Senior Lenders' preexisting liens on RMC's inventory, each Customer must prove either that (i) it obtained title to specific Prepaid Product under UCC § 2-401 (Fla. Stat. § 672.401) or (ii) it has a right to recover specific Prepaid Product from RMC under Article 2 of the UCC (Fla. Stat. ch. 672) as a "buyer in the ordinary course of business."  For the reasons set forth below, no Customer has established (or can establish) either condition.

**A.  No Customer Can Establish Legal Title to Prepaid Product**

90.     Here, no Customer asserts that it had a standalone contract with RMC.  Rather, it appears that all Prepaid Product orders were placed on invoices containing a reference to RMC's Standard Terms.  As discussed above, the Standard Terms are governed by Florida law.

91.     The passing of title in connection with a contract for the purchase and sale of goods is governed by UCC § 2-401.  Fla. Stat. § 672.401.  UCC § 2-401 provides, in relevant part:

> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (s. 672.501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by [Article 2 of the UCC].  Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.  Subject to these provisions and to the provisions of [Article 9 of the UCC], title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
>
> (2) *Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods*, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . . .

Id. at § 672.401 (emphasis added).

92.     Thus, unless otherwise specified in a contract, title to goods does not pass from a
seller to a buyer until the seller completes its performance of the physical delivery of the goods
to the buyer.  Here, the Standard Terms do not contain explicit provisions regarding transfer of
title for Prepaid Product.[24]  Thus, the default rule under UCC § 2-401(2) applies and title did not
transfer until RMC physically shipped Prepaid Product to its customers.  Id. at § 672.401(2).
Although certain Prepaid Product was packaged, none was shipped.  Accordingly, no transfer of
title to any Customer occurred under UCC §2-401.

**B.    Identification of Goods and Special Property**

93.     Although title to goods may not transfer until shipment, a buyer acquires a
"special property" interest and "an insurable interest in goods" upon the identification of goods
to a contract under UCC § 2-501.  See Fla. Stat. § 672.501.  Unless otherwise specified,
identification occurs (a) if the contract is for the sale of goods already existing and identified,
when the contract is made, and (b) if the contract is for the sale of future goods, when goods are
shipped, marked or otherwise designated by the seller as goods to which the contract refers.  Id.
at § 672.501(1)(a)−(b)).

94.     Here, RMC did not generally maintain sufficient Prepaid Product on hand to
fulfill Customer orders and only minted product after orders were placed and payment was

---

[24]     Certain Customers point to the section of the Standard Terms titled "Charges" as evidence that the
parties agreed that title would transfer upon payment.  As an initial matter, this is not a transfer of title provision for
goods purchased from the Debtors.  By its terms, the section applies to preparation, treatment and refining charges
related to raw materials delivered to the Debtors for refining.  Moreover, as discussed explained above, retention of
title provisions in contracts for the sale of goods are deemed security interests under UCC § 2-401.  When read in
context, this provision is clearly intended as a security grant in favor of RMC ("RMC shall be deemed to retain title
to and a security interest in all material covered by any RMC invoice to secure the payment of the same.").  Standard
Terms, p. 3.

received.[25]  Thus, RMC's contracts for Prepaid Product are contracts for the sale of future goods.

As a result, the underlying Prepaid Product could not be identified to the applicable contracts

until the Prepaid Product was shipped, marked or otherwise designated by RMC as goods to

which the contracts refer.  Id.

### C.  No Customer Can Establish a Right to Recover as a Buyer in the Ordinary Course

95.     Notwithstanding the Customers' lack of legal title, certain Customers assert that

they qualify as "buyers in the ordinary course" ("BIOC").  Pursuant to UCC § 9-320, a BIOC

"takes free of a security interest created by the buyer's seller, even if the security interest is

perfected and the buyer knows of its existence."  Fla. Stat. § 679.320(1).

96.     Pursuant to UCC § 1-201, a BIOC is defined as "a person who, in ordinary

course, buys goods in good faith, without knowledge that the sale violates the rights of another

person in the goods, from a person . . . in the business of selling goods of that kind."  Id. at

§ 671.201(9)).  However, "[o]nly a buyer who takes possession of the goods or *has a right to*

*recover the goods from the seller under [Article 2 of the UCC]* may be a buyer in [the] ordinary

course of business."  Id. (emphasis added).  Every Customer omits this critical fact from its

Customer Statement.

97.     Therefore, a Customer must establish either that (a) it has possession of the

Prepaid Product or (b) otherwise has a right to recover the Prepaid Product from RMC under

Article 2 of the UCC (i.e., Fla. Stat. ch. 672).  No Customer can establish possession.  As a

result, a Customer is entitled to BIOC status only if it could show a right to recover under

Article 2.

---

[25]        Based on the Prepaid Sale Motion, it appears that the Debtors maintained minimal levels of generic
RMC product and excess custom product in its general inventory at any given time.  See Prepaid Sale Motion,
Exhibit C.

98.     Under Article 2, a buyer has three possible theories under which it could establish

a right to recover:  (a) the right to recover in certain insolvency situations under UCC § 2-502

(Fla. Stat. § 672.502), (b) the right to specific performance under UCC § 2-716(1) (Fla. Stat.

§ 672.716(1)) and (c) the right to replevin under UCC § 2-716(3) (Fla. Stat. § 672.716(3)).

Under each of these theories (other than specific performance), it is a prerequisite that goods

have been identified to the contract.

> (1) <u>Buyer's Right to Recover in Insolvency Situation</u>

99.     Fla. Stat. § 672.502(1) provides, in pertinent part:

> (1) Subject to subsections (2) and (3), and even though the goods have not
> been shipped, a buyer who has paid a part or all of the price of goods in
> which she or he has a special property under the provisions of the
> immediately preceding section may on making and keeping good a tender
> of any unpaid portion of their price recover them from the seller if:  . . .
> (b) In all cases, ***the seller becomes insolvent within ten days after receipt
> of the first installment on their price***.

Fla. Stat. § 672.502(1) (emphasis added).

100.    Thus, if a Customer prepaid for goods that have been identified to a contract, it

has a right to recover the goods if it can establish that RMC became insolvent within ten days

after receipt of its first installment payment.  As described above, RMC was insolvent for years

prior to the Petition Date.  Accordingly, the 10-day insolvency requirement will be impossible to

prove for any Customer.

> (2) <u>Buyer's Right to Specific Performance or Replevin</u>

101.    Fla. Stat. § 672.716 provides, in pertinent part:

> (1) Specific performance may be decreed where the goods are unique or in
> other proper circumstances.
>
> . . .
>
> (3) The buyer has a right of replevin for goods identified to the contract if
> after reasonable effort she or he is unable to effect cover for such goods or

the circumstances reasonably indicate that such effort will be unavailing or if the goods have been shipped under reservation and satisfaction of the security interest in them has been made or tendered.

Fla. Stat. § 672.716.

102.    Thus, specific performance is only appropriate when the goods are "unique" or "in other proper circumstances."  Here, the Prepaid Product is hardly unique.  Gold and silver are fungible assets and are available for purchase from a myriad of precious metals dealers, refiners and traders and on various recognized markets throughout the world.  The majority of the Prepaid Product was generic RMC brand grain or bars.  The remainder, even if customized in some manner, could easily be re-melted and refashioned into generic product.  This is not a case involving unique works of art or antiques.

103.    With respect to replevin, a Customer must establish that goods were identified and that they unsuccessfully attempted to cover (or that doing so would be unavailing).  Here, only Prepaid Product that RMC actually packaged for shipment to the applicable Customers could be considered identified for purposes of UCC § 2-501.  See Prepaid Sale Motion, Exhibit B (listing $3,200,0000 of total Prepaid Product).  However, no Customer, including those who can purportedly identify goods, has introduced any evidence of an attempt to cover.

### Consignment Agreement Claims

104.    A single Customer, USGB LLC d/b/a United States Gold Bureau ("USGB"), filed a Customer Statement in connection with a certain Consignment Agreement dated May 12, 2017 with RMC (the "Consignment Agreement").  See Customer Statement of Claimed Ownership by USGB LLC and Wholesale Coins Direct, LLC [Docket No. 521] at ¶ 1.  Pursuant to the Consignment Agreement, USGB asserts that RMC delivered precious metals to USGB prepetition on a consignment basis.  Id. at ¶ 3.  USGB states that it is currently in possession of $114,403.86 worth of consigned metals.  Id. at ¶ 4.  USGB does not contest that the consigned

metals are property of the Debtors' estates. Rather, USGB asserts that it is entitled to offset the value of the consigned metals against certain amounts purportedly owed by RMC to USGB under the Consignment Agreement via the doctrine of recoupment. Id. at ¶ 6. The Senior Lenders lack sufficient information at this time to analyze the validity of USGB's recoupment claim. However, the Senior Lenders understand that the Debtors have made a turnover demand on USGB for the consigned metals and dispute USGB's right to recoupment.

## **RESERVATION OF RIGHTS**

105.    Certain Customers use their Customer Statements as an opportunity to assert groundless allegations against the Senior Lenders. See, e.g., *Designation of and Supplement to Statement of Claimed Ownership Interest and Claims by Pretium Exploration Inc.* [Docket No. 464] at ¶ 10(c) (asserting an equitable subordination claim against the Senior Lenders).

106.    The Procedures Order required that each Customer Statement include a description of all of each Customer's claims "**against the Debtors**." Procedures Order at ¶ 2(c)(iii). Claims against the Senior Lenders are not contemplated by the Procedures Order or relevant to the Ownership Dispute—a legal dispute over whether the Assets are property of the estates. To the extent that any Customer attempts to use the Procedures Order as a venue to seek or assert claims against the Senior Lenders, the Senior Lenders reserve the right to ask the Court to remove the Customer from the purview of the Procedures Order.

107.    Rather, it is for the Committee to investigate and assert any such claims within the "challenge period" provided for in the cash collateral order. The Committee has not asserted any claims against the Senior Lenders and, if it does, they will be asserted in an appropriate adversary proceeding, not as part of the Ownership Dispute resolution process governed by the

Procedures Order.  The Senior Lenders have worked (and continue to work) consensually with the Committee to proactively address all of their questions and concerns, including those relating to the prepetition sales process and events leading up to the bankruptcy.

108.    The Senior Lenders will not respond on the merits to each of the Customers' frivolous allegations.  Suffice to say, it is well established that subordination claims against non-insider secured lenders are universally rejected where the lenders are simply exercising their rights under their loan documents, including in the distressed workout and forbearance context. See, e.g., In re Hercules Offshore, Inc., 565 B.R. 732, 762 (Bankr. D. Del. 2016) ("While the Court acknowledges that the First Lien Lenders were strategic in their actions, lenders are free to enforce contract rights and negotiate hard against borrowers at arms-length, particularly those that are in distress, as here."); Speth v. Whitham Farms Feedyard, L.P. (In re Sunbelt Grain WKS, LLC), 406 B.R. 918, 934−35, n. 77 (Bankr. D. Kan. 2009), aff'd 427 B.R. 896 (D. Kan. 2010) ("Subordination claims against secured lenders . . .  have generally been rejected when the secured creditor is simply enforcing its rights, even though the exercise of those rights may be detrimental to other creditors.") (citing Hon. William L. Norton, Jr. and William L. Norton III, 3 NORTON BANKRUPTCY LAW & PRACTICE § 53:4 (3RD ED, Thomson/West 2008).

109.    Any allegations of misconduct are baseless and misinformed and the Senior Lenders reserve all rights and waive none with respect thereto.

110.    The Senior Lenders further reserve the right to amend or otherwise supplement this Response in any respect at any time.

*[Remainder of page intentionally left blank.]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Senior Lenders respectfully request

that the Court (i) find that the Assets are the property of the Debtors' estates and, accordingly,

the Senior Lenders' collateral and (ii) grant such other and further relief as is just and proper.

Dated:  New York, New York              Respectfully submitted,
        February 18, 2019

                                           LUSKIN, STERN & EISLER LLP

                                           /s/        Michael Luskin
                                           Michael Luskin
                                           Richard Stern
                                           Alex Talesnick
                                           Eleven Times Square
                                           New York, New York 10036
                                           Telephone:  (212) 597-8200
                                           Facsimile:  (212) 974-3205
                                           E-Mail: luskin@lsellp.com
                                           E-Mail: stern@lsellp.com
                                           E-Mail: talesnick@lsellp.com

                                           *Counsel for the Senior Lenders*

## Schedule A

### Summary of Customer Statements[26]

1. <u>Bailment Claims Based on RMC's Standard Terms.</u>

| Dkt No. | Customer | Asserted Claim Amount |
|---------|----------|----------------------|
| 478 | Alex Morningstar Corp. d/b/a Morningstar's | $253,202.30 |
| 425 | Bay Area Metals | $200,948.03 |
| 463 | Brilliant Jewelers / MJJ Inc. (Anjay Corp.) | $185,000.00 |
| 441 | Cyber-Fox Trading Inc. | $415,391.00 |
| 475 | Deb Schott, Inc. | $136,227.91 |
| 396 | Design Gold Group, Inc. | $160,000.00 |
| 474 | FCP Diamonds, LLC | $268,396.36 |
| 444 | GEIB Refining Corp. | $5,627,185.30 |
| 477 | General Refining and Smelting Corporation | $1,164,893.00 |
| 434 | Intl. FCStone Ltd | $141,642.60 |
| 476 | Mid-States Recycling, Inc. | $963,070.05 |
| 447 | Minas de Oroco Resources, S.A. de C.V. | $804,224.00 |
| 468 | Mitchell Levine (Plat/Co.) | $120,000.00 |
| 445 | Music City Group, LLC | $46,072.00 |
| 481 | Noble Metal Services, Inc. | $280,752.36 |
| 479 | PLLC, PPC, Inc. (PPS, Inc.) d/b/a Braswell & Sons | $33,258.00 |
| 411 | Pyropure, Inc. d/b/a Pyromet | $1,838,212.00[27] |
| 456 | So Accurate Group, Inc. | $3,920,469.44 |
| 452 | Texas Ezpawn, L.P. | $2,852,468.49 |
| 466 | The Gold Refinery, LLC / Norman Bean | $1,329,188.00 |
| **TOTAL** | | **$20,740,600.84** |

---

[26]    This Schedule and the information contained herein is provided for summary purposes only.  In particular, the amount of each Customer's claim should be based on the spot price of the applicable precious metals on the Petition Date.  However, certain Customers used the spot price on the date of their Customer Statement.  Accordingly, certain of the claim amounts are inflated.  The Senior Lenders reserve all right with respect thereto.

[27]    The Senior Lenders and the Debtors have reached a settlement agreement with Pyromet that would, among other things, reduce the amount of Pyromet's ownership claim to $1,381,660.35.  <u>See</u> Docket No. 599.

2.  Bailment Claims Based on RMC Refining Agreements.

| Dkt No. | Customer | Asserted Claim Amount |
|---------|----------|----------------------|
| 433 | Alamos Gold Inc.<br>(Minas de Oro Nacional, S.A. de C.V.)<br>(Minera Santa Rita S. de R.L. de C.V.) | $87,078.33 |
| 471 | Argonaut Gold, Inc.<br>(Compania Minera Pitalla, S.A. de C.V.)<br>(Minera Real del Oro S.A. de C.V.) | $6,161,862.46 |
| 470 | Coeur Rochester, Inc.<br>(Coeur Mexicana S.A. de C.V.) | $13,031,589.59 |
| 460 | First Majestic Silver Corp.<br>(Nusantara De Mexico, S.A. de C.V.)<br>(Primero Empresa Minera, S.A. de C.V.) | $11,803,824.35 |
| 451 | Premier Gold Mines Ltd. | $10,500,000 |
| 464 | Pretium Exploration Inc. | $5,124,328.91 |
| 450 | Tiffany and Company (Laurelton Sourcing LLC) | $20,809,351.03 |
| 485 | Yamana Gold, Inc. | $8,030,844.01 |
| **TOTAL** | | **$75,548,878.68** |

3.  Bailment Claims Based on Agreements with Non-RMC Debtors.

| Dkt No. | Customer | Asserted Claim Amount |
|---------|----------|----------------------|
| 465 | 7645635 Canada Inc. o/a Ottowa Gold Buyer | $230,885.00 |
| 463 | Brilliant Jewelers / MJJ Inc. (Anjay Corp.) | $185,000.00 |
| 458 | Eddie & Co. of Ny, Inc. d/b/a Diamond Kingdom | $93,366.67 |
| 454 | Fundacion Rafeal Donde I.A.P. | $15,610,000.00 |
| 449 | Midwest Refineries, LLC | $3,453,308.00 |
| 465 | Pollock-Cameron Investments Corporation o/a Vancouver Gold Buyer | $250,072.45 |
| **TOTAL** | | **$19,822,632.12** |

4.  Unsecured Lease Agreement Claims.

| Dkt No. | Customer | Asserted Claim Amount |
|---------|----------|----------------------|
| 468 | Mitchell Levine (Erie Management Partners, LLC) | $8,041,760.71 |
| 428 | SCMI US Inc. (Sumitomo) | $8,652,000.00 |
| **TOTAL** | | **$16,693,760.71** |

5.  Claims to Finished Goods Based on Alleged Prepayments.

| Dkt No. | Customer | Asserted Claim Amount |
|---|---|---|
| 440 | APMEX, Inc. | $7,616,226.12 |
| 432 | Bayside Metal Exchange | $1,600,360.84 |
| 591 | BGASC, LLC | $155,704.00 |
| 518 | Goldsilver, LLC | $81,210.64 |
| 462 | Israel Coins & Medals | $145,072.96 |
| 512 | James Avery Craftsman, Inc. | $433,747.00 |
| 602 | Jewelry Quarter Bullion Limited | $15,120.00 |
| 476 | Mid-States Recycling, Inc. | $72,610.00 |
| 511 | My Gold Limited[28] | $76,834.63 |
| 461 | Prince & Izant | $492,780 |
| 584 | San Diego Gold Exchange | $60,361.00 |
| 446 | SK Bullion | $745,660.00 |
| 510 | Texas Precious Metals[29] | $130,700.00 |
| **TOTAL** | | **$11,626,387.19** |

6.  Consignment-Related Claims.

| Dkt No. | Customer | Asserted Claim Amount |
|---|---|---|
| 521 | United States Gold Bureau /Wholesale Coins Direct, LLC | $138,749.80 |
| **TOTAL** | | **$138,749.80** |

---

[28]    Settlement agreement pending before the Court for approval [Docket No. 599].

[29]    Settlement agreement pending before the Court for approval [Docket No. 565].

## Schedule B[30]

### Collateral Documents

Security Agreement dated January 29, 2016 between Republic Metals Corporation and Bank Hapoalim B.M.

Security Agreement dated March 23, 2016 between Republic Metals Corporation and ICBC Standard Bank Plc.

General Security Agreement dated June 24, 2016 between Republic Metals Corporation and Brown Brothers Harriman & Co.

General Security Agreement dated June 24, 2016 between J & L Republic, LLC and Brown Brothers Harriman & Co.

General Security Agreement dated June 24, 2016 between R & R Metals, LLC and Brown Brothers Harriman & Co.

General Security Agreement dated June 24, 2016 between Richard Denis Rubin Enterprises LLC and Brown Brothers Harriman & Co.

General Security Agreement dated June 24, 2016 between RMC Diamonds LLC and Brown Brothers Harriman & Co.

General Security Agreement dated June 24, 2016 between RMC2 LLC and Brown Brothers Harriman & Co.

Metals Lease Agreement dated March 6, 2017 between Republic Metals Corporation and Mitsubishi International Corporation.

Lease Agreement dated March 6, 2017 between Republic Metals Corporation and Techemet Metal Trading LLC.

Security Agreement dated June 26, 2017 between Republic Metals Corporation and Coöperatieve Rabobank U.A., New York Branch.

Security Agreement dated October 31, 2017 by Republic Metals Corporation in favor of Bank Leumi USA.

Security Agreement dated October 31, 2017 between Republic Metals Corporation and Woodforest National Bank.

Second Amended and Restated Intercreditor Agreement dated February 19, 2016 among Coöperatieve Rabobank U.A., New York Branch, Brown Brothers Harriman & Co., Bank Hapoalim B.M., Mitsubishi International Corporation, ICBC Standard Bank Plc, Techemet Metal Trading LLC, Woodforest National Bank and Bank Leumi USA and acknowledged and agreed to

---

[30]    This Schedule and the information contained herein is provided for summary purposes only.

by Republic Metals Corporation, as amended by that certain First Amendment dated June 24, 2016, that certain Second Amendment dated February 19, 2016, that certain Third Amendment dated June 2017 and that certain Fourth Amendment dated October 31, 2017.

Forbearance Agreement dated August 7, 2018 among Republic Metals Corporation and Coöperatieve Rabobank U.A., New York Branch, Brown Brothers Harriman & Co., Bank Hapoalim B.M., Mitsubishi International Corporation, ICBC Standard Bank Plc, Techemet Metal Trading LLC, Woodforest National Bank and Bank Leumi USA, as amended by that certain First Amendment to Forbearance Agreement dated August 17, 2018.

Security and Pledge Agreement dated September 7, 2018 among Republic Metals Corporation, Republic Metals Refining Corporation, J&L Republic, LLC, R&R Metals, LLC, Richard Dennis Rubin Enterprises LLC, RMC Diamonds LLC, RMC2 LLC, Republic High Tech Metals, LLC and Republic Carbon Company, LLC and Rabobank, in its capacity as Collateral Agent for the Senior Lenders.

## Schedule C[31]

## UCC-1 Financing Statements

| Creditor | Debtor | File Date | File Number |
|----------|--------|-----------|-------------|
| Bank Hapoalim B.M. | Republic Metals Corporation | 2/26/2016 | 201606619452 |
| ICBC Standard Bank Plc | Republic Metals Corporation | 3/24/2016 | 201607043295 |
| Brown Brothers Harriman & Co. | Republic Metals Corporation | 6/17/2016 | 201607923805 |
| Brown Brothers Harriman & Co. | J & L Republic, LLC | 2/14/2018 | 201804185297 |
| Brown Brothers Harriman & Co. | R & R Metals, LLC | 2/14/2018 | 201804185300 |
| Brown Brothers Harriman & Co. | Richard Dennis Rubin Enterprises LLC | 2/14/2018 | 201804185319 |
| Brown Brothers Harriman & Co. | RMC 2 LLC | 2/14/2018 | 201804185327 |
| Brown Brothers Harriman & Co. | RMC Diamonds LLC | 2/14/2018 | 201804185335 |
| Cooperatieve Rabobank U.A., New York Branch | Republic Metals Corporation | 6/27/2017 | 201701655649 |
| Bank Leumi USA | Republic Metals Corporation | 10/31/2017 | 201703123024 |
| Woodforest National Bank | Republic Metals Corporation | 11/1/2017 | 201703134735 |
| Mitsubishi International Corporation | Republic Metals Corporation | 11/21/2012 (original); 6/03/2016 (amendment); 11/14/2017 (continuation) | 20120792491X (original); 201607778244 (amendment); 201703258299 (continuation) |
| Techemet Metal | Republic Metals | 7/3/2018 (original); | 20180575385X (original); |

---

[31]    This Schedule and the information contained herein is provided for summary purposes only.

| Creditor | Debtor | File Date | File Number |
|---|---|---|---|
| Trading LLC | Corporation | 7/30/2018 (amendment) | 201806013647 (amendment) |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | Republic Metals Corporation | 9/10/2018 | 201806464916 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | Republic Metals Refining Corporation | 9/10/2018 | 201806464924 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | Richard Dennis Rubin Enterprises LLC | 9/10/2018 | 201806464932 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | RMC 2 LLC | 9/10/2018 | 201806464940 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | RMC Diamonds LLC | 9/10/2018 | 201806464959 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | J & L Republic, LLC | 9/10/2018 | 201806464878 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | R & R Metals, LLC | 9/10/2018 | 201806464886 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | Republic Carbon Company, LLC | 9/10/2018 | 201806464894 |
| Cooperatieve Rabobank U.A., New York Branch, as Collateral Agent | Republic High Tech Metals, LLC | 9/10/2018 | 201806464908 |

## Exhibit 1

**Peace of Mined Terms**



TRACE THE SUPPLY CHAIN

RESPONSIBLE SOURCING
FROM START TO FINISH

Find Out More

## PEACE OF MINED™

In a world of increasing social consciousness, today's leading brands strive to satisfy their customers' desires for ethical products.

Peace of Mined™ is a service provided by Republic Metals Corporation that combines **responsible supply-chain practices** with a proprietary single-batch refining technology to give brand owners the ability to **choose the exact origin of their responsibly sourced material**.

Peace of Mined™ customers have the flexibility to select their desired sources of precious metal and ensure that no other metals are co-mingled at any point in the process. The Peace of Mined™ promise is backed by documented provenance from origin to end consumer, along with certifications from the industry's most trusted organizations for responsible human, labor, supply chain, health, safety, environmental, and mining practices.

### THE SUPPLY CHAIN



| SOURCE | REFINE | MANUFACTURE |
|--------|--------|-------------|
| FIND OUT MORE | FIND OUT MORE | FIND OUT MORE |

Peace of Mined™ - Republic Metals Corp | Closed Circuit Refining

HOW IT WORKS



## CHOOSE YOUR SOURCE

Republic Metals works with publicly traded and household private mining names to ensure a supply chain that is traceable directly back to its point of extraction from the ground.

Through the Peace of Mined™ process, clients have the ability to choose the entity they wish to source their feedstock from using Republic Metals' approved **mine list**. The mine list is comprised of companies who meet a high standard of **responsible sourcing practices**. Clients are given the unprecedented ability to **filter their selection of choice using criteria such as country or location of origin**.

---

### INTERESTED IN RECYCLED MATERIAL? CLICK HERE

⌄

---

### REFINE WITH TRANSPARENCY

In order to create a **100% traceable product**, Republic Metals' Peace of Mined™ refining circuit uses a proprietary process that allows for batch refining. Unlike electrolytic refining, batch refining allows for material to freshly enter a clean circuit during the refining process, and at no point come in contact with any other-sourced metal. In the Peace of Mined™ refining circuit, the designated material is the only material present, and **all** of that material is removed at termination of the process, so there are no leftovers in the circuit – it can in no way be comingled with metal originating from other sources.

The Peace of Mined™ process maintains a direct link all the way to the manufacturer and allows for true verification and assurance; **removing doubt gives you Peace of Mined™.**



---



### MANUFACTURE WITH PEACE OF MINED

With the Peace of Mined™ refining process, the client is handed complete control of the supply chain. Source from an extensive list of certified suppliers and have Peace of Mined™ in knowing the exact point of origin.

End users receive the final refined product with a certificate guaranteeing its authenticity and the ability to tell the story of origin behind their final creation, from the ground up.

CONTACT US FOR MORE INFO

---

### WANT TO KNOW MORE ABOUT CLOSED CIRCUIT BATCH REFINING?

CONTACT US TO FIND OUT MORE










**Exhibit 2**

**RMC Standard Terms and Conditions**

## TERMS & CONDITIONS

**REPUBLIC METALS CORPORATION STANDARD TERMS AND GENERAL OPERATING CONDITIONS**

*Unless otherwise stipulated, these Standard Terms and General Operating Conditions "Standard Terms" are applicable to transactions and/or contracts between Republic Metals Corporation, "RMC", and Customer. "Customer" is defined as any business, corporation, company, person, entity, or anyone else transacting business with RMC in any manner whatsoever. Any contract or agreement entered into between Customer and RMC will operate as if the terms represented in these Standard Terms were made expressly a part thereof. RMC's Standard Terms is the governing document with respect to any and all business dealings between RMC and Customer and shall override any and all provisions, terms, and stipulations in Customer purchase orders, sales orders and/or any other Customer documents. RMC's failure to object to any terms, provisions, and/or stipulations represented in any Customer documents that are at variance with RMC's Standard Terms shall not be deemed a waiver of the terms and conditions contained herein. Any acknowledgement by Customer of these Standard Terms with changes made to it by Customer constitutes a counter-offer.*

**Warranty of Title**: Customer warrants to RMC that it has good and marketable title to said property, full authority to sell and transfer said property, and that said property is sold free of all liens, encumbrances, liabilities, and adverse claims of every nature and description whatsoever. Customer further warrants that the said property is not from or the result of illegal activity in this country or any other country. Customer further warrants to RMC that it will fully, defend, protect, indemnify, and hold harmless RMC and its lawful successors and assigns from any adverse claim thereto. Customer warrants that any transaction initiated by Customer will not cause RMC to be in violation of any anti-money laundering, anti-terrorism, or other applicable law of the U.S., any state or province thereof or any foreign country.

**Arbitration, Forum**

**A.  (General)** Any controversy, dispute or claim, of whatsoever kind and nature, arising out of or related to: these Terms And Conditions or any Agreement or Contract or any other document or instrument between the parties or the relationship between the parties, alleged State or Federal statutory violations and/or any rights, duties or obligations between the parties shall be submitted to binding Arbitration and not to a court for determination. Each party acknowledges and agrees that it has unequivocally given up and waived any right or opportunity to file, litigate, or have heard any claims, causes of actions or disputes in a federal or state or other court of law or equity whether by non-jury or jury.  The Arbitration shall be conducted in accordance with the rules of the American Arbitration Association (AAA). The arbitration shall be conducted by a panel of three arbitrators. Each party shall select one arbitrator and the both selected arbitrators shall jointly select the third arbitrators. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Each party shall initially pay his/her/its own legal fees and costs and any other fees and costs incurred in connection with the arbitration. In this regard, the parties shall initially equally divide any fees, costs or expenses charged by the AAA for its involvement in the arbitration proceedings, provided however, that the arbitration panel shall award the arbitrators' fees and costs to the prevailing party as well as that party's reasonable attorney's fees.  Venue for the arbitration proceedings shall be Miami Dade County, Florida regardless of the residency of the Customer. In addition, venue for any proceedings or action to enforce the arbitration award, set it aside and/or compel arbitration shall be in Miami Dade County, Florida.  Customer waives such defenses as forum non convenience and any other similar defense to the venue provision herein. However, to the extent reasonably possible, the Customer may appear at any arbitration hearing or proceeding including depositions by video conference communication or such similar other technology. The unavailability of such conferencing equipment shall not be grounds for avoidance of arbitration or in any way be the basis for voiding the arbitration provisions appearing herein.

**B. (Class Action Waiver). THE ARBITRATORS SHALL NOT CONDUCT CLASS ACTION ARBITRATION; THAT IS, THE ARBITRATORS SHALL NOT ALLOW ANY CUSTOMER AS DEFINED IN THESE TERMS AND CONDITIONS TO SERVE AS A REPRESENTATIVE, AS PARENS PATRIAE, AS A PRIVATE ATTORNEY GENERAL OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION. FURTHERMORE, SAID CUSTOMER SHALL NOT PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS IN ANY LAWSUIT FILED AGAINST REPUBLIC METALS, (AS THAT TERM IS DEFINED IN HEREIN) OR RELATED THIRD PARTIES.**

**C. BY VIRTUE OF THE TERMS SET FORTH HEREIN, THE CUSTOMER IS WAIVING HIS/HER/ITS RIGHT TO SERVE AS A REPRESENTATIVE, AS A PARENS PATRIAE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST REPUBLIC METALS CORPORATION (AS DEFINED HEREIN) OR RELATED PARTIES.**

D. By virtue of the arbitration provisions set forth herein, the Customer acknowledges that she, he, it is **giving up the right of a trial by jury** of any and all of the matters set forth in this section, captioned **Arbitration Forum.**

**Insurance, Delivery, Weighing, and Sampling**: Customer shall be responsible for insuring any incoming shipments, unless otherwise agreed to in writing. To insure incoming shipments through RMC, Customer must notify RMC, within a reasonable period of time, of any shipments destined for RMC. Failure to do so will result in Customer bearing the risk of loss of the material until such time as RMC is able to insure the incoming material. Risk of loss of material will pass from Customer to RMC upon delivery to and acceptance at RMC's refinery, unless otherwise agreed. Upon receipt by RMC of metal sent by Customer for refining and purchase by RMC, RMC shall bear the responsibility of insurance for loss or damage to such metal while at RMC. Any and all metal sent by Customer shall be labeled bearing the gross, net, and tare weights of said metal. In an effort to minimize refining costs, RMC may request Customer material be packaged in a particular way prior to shipment to RMC. Customer must follow all instructions that RMC may give to Customer regarding the packaging of material. Material that arrives packaged in a manner other than that requested by RMC is subject to processing fees. All weights of Customer material are to be ultimately determined by personnel of RMC. In the event Customer's material should arrive at RMC with any broken seals, damaged seals, or seals that evidence tampering, RMC will seek Customer permission prior to the weighing, sampling, assaying, and/or any other procedures with respect to said material, unless otherwise agreed to in writing. Settlement weights are determined and governed by RMC.

RMC's acknowledgment of receipt of Customer material shall not constitute agreement as to the quantity, weight, composition, or description stipulated by Customer. RMC shall, within a reasonable amount of time, inspect Customer material and shall promptly notify Customer of any significant variances in the material including but not limited to quantity, weight, and composition of the material. RMC shall keep Customer informed of the processing of Customer's material. Customer must notify

RMC within a reasonable period of time from receipt of notice of any reported shortage. An objection concerning such variances. Customer's failure to so object shall be deemed a waiver by Customer of any claim Customer may have against RMC with regard to such variances. Any disagreement between RMC and Customer resulting in a frustration of the agreement, and requiring return of unrefined material, will be done at the Customer's expense.

**Special Provisions for Customer Express Delivery Shipments related to Insurance, Delivery, Weighing, and Sampling:** Customer **must notify** RMC of the insurable value of any shipments destined for RMC, PRIOR TO DELIVERY TO OR PICKUP BY AN EXPRESS DELIVERY SERVICE SUCH AS BUT NOT LIMITED TO UPS OR FED EX **(Completion of an on-line form provided on RMC's Website for Delivery Service satisfies the notice requirement).** Failure to provide such notice provided for above or an alternate valuation notice specifically approved by RMC in writing prior to delivery to an express delivery service as described above, will result in customer bearing the risk of loss of the material until such time as it is received and accepted by RMC, in accordance with the provisions set forth below. Accordingly, if customer fails to provide the notice or alternate valuation notice as specified herein, risk of loss of material will pass from customer to RMC only upon delivery to and acceptance at RMC's refinery, unless otherwise agreed to in writing. If, however, customer timely provides the notice or alternate valuation notice aforesaid, risk of loss shall pass to RMC at the time of delivery to and receipt by the express delivery service referred to above. In any event, upon both receipt by RMC of metal sent by customer for refining and acceptance by RMC, RMC shall bear the responsibility of insurance for loss or damage to such metal while at RMC provided, however, RMC expressly reserves the right to reject and return materials to customer as provided for below, at customer's expense.

In the event that RMC's agreement with Customer includes insurance, PLEASE NOTE: The insurance afforded the client is (1) specifically limited to and subject to the insuring agreements between RMC and its insurance underwriters and (2) generally, RMC's insurance does not include or cover/protect packages that have been rejected by RMC's shipping department because the packing material seems to be compromised or if there is a weight discrepancy between the customers' reported shipping weight and the weight ascertained by RMC's shipping department at the time of arrival. In these instances, if appropriate, RMC will file a claim with its insurers to ascertain the responsibility for the rejected or compromised shipments and both the customer and RMC will be subject to and bound by said insurer's coverage decision in this regard.

Further, RMC's insurance does not cover "said to contain" material. Thus, should RMC accept a package containing items other than the items purported to be contained as per customer shipping documentation, customer shall not be entitled to insurance coverage or proceeds for what was said to be contained therein (i.e. Customer's package contains rocks instead of precious metals).
Individual incoming boxes delivered via ground transportation which originate from outside of Florida, may be insured for up to and including $50,000 per box, depending on Customer's agreement with RMC.

**Deleterious Elements**:   Customer MUST contact RMC and seek approval prior to shipment of material containing any of the following elements.

| As – Arsenic | Be – Beryllium | Cd – Cadmium | Hg – Mercury | Ni – Nickel |
| Pb – Lead | Sb – Antimony | Se – Selenium | Sn – Tin | Te – Tellurium |

Failure to do so may result in any of the following including but not limited to: (a) The return of Customer's metal to Customer at Customer's expense, (b) A handling fee of up to $5,000.00 USD.

**Melting and Assaying**: From each lot and/or melt RMC shall collect a representative sample in the form of a button, bar, thief sample, and/or by and through any sampling procedure RMC may deem appropriate for the given material. This sample is then used conduct an analysis of Customer's material.

RMC will conduct assay trials and report the results to the Customer. Customer has forty-eight (48) hours in which to object to the assay report after which time the assay report will be deemed accepted by Customer and the right to contest the assay report will be deemed waived. Upon objection by Customer to the assay report, RMC may pursue various options including but not limited to:

Negotiating mutually agreeable figures with which to compute the precious metals contained in the lot or melt, or (b) agreeing with Customer to solicit an umpire assay (third party assay). (Please request an "Umpire Procedure" document should you desire further explanation) Note: RMC will dispose of any and all precious and non-precious material including but not limited to any slag, magnetic, and or any precious and non- precious material not requested for return. RMC shall be free of any liability to return any additional metal not requested by Customer and/or agreed upon by Customer and RMC or specifically noted in the refining terms. Settlement times may vary depending on available production capacity. Settlement shall not occur during weekends, legal holidays and RMC's vacation periods

**Charges**: Unless otherwise agreed, Customer agrees to pay any and all preparation, treatment, refining, and/or any other customary charges related to the said material. Sales, use, excise, and/or any taxes or assessments, levies, or governmental charges be it federal, state, local that are in addition to the above mentioned charges shall be paid by the Customer. All charges become payable after Customer receipt of the invoice. RMC is entitled and empowered to withhold delivery of any returnable or transferable metals or money due to the Customer until such time as all amounts due to RMC by Customer are received. In attempting to retrieve any monies due RMC by Customer or its assigns, RMC reserves the rights and remedies including but not limited to: (a) to cancel any Customer order (b) to refuse to make further deliveries due to Customer (C) to declare due and payable immediately any and all unpaid amounts for goods previously delivered to Customer.

All RMC charges are payable upon the rendering of an invoice. Acceptance of check, draft, credit card payment(s), or any remittance except legal tender (cash) shall not constitute payment until such payment processes are completed and any pay period to contest any charges reflected on this invoice have expired. Until such time, RMC shall be deemed to retain title to and a security interest in all material covered by any RMC invoice to secure the payment of the same. If Customer fails to make payments when due, the amount unpaid is subject to an interest charge of ten percent (10%) per annum discounted to represent the amount of time passed for which payment has not been received. This interest rate is subject to fluctuation without notice based on current bank base lending rates.

**Power of Attorney**: Customer hereby appoints RMC as Customer's attorney-in-fact, with full power of substitution, to demand, receive, and collect for RMC's own use and benefit all debts, obligations, and accounts receivable now owing to RMC. Customer further authorizes RMC to do all things legally permissible, required, or deemed by RMC to be required, to recover and collect the debts, obligations, and accounts receivable and to use Customer's name in any manner RMC may deem necessary for the collection and recovery of the debts, obligations, and accounts receivable but without cost, expense, or damage to Customer.

Additionally, as a course of business, RMC reserves the right to offset refining charges by liquidating Customer's pool account to the extent that such charges are paid. Such charges include but are not limited to any overdraft fees, unpaid fees or charges, and handling fees for deleterious materials for which Customer is responsible. Customer empowers RMC to offset and/or liquidate any Customer pool account under any company or corporate name where Customer is found to have common ownership, to secure any and all debts owed to RMC. In addition to any costs incurred by RMC in connection with its enforcement of any sums of money, or metal, or value thereof due hereunder or enforcement of its rights hereunder, if RMC employs an attorney to enforce collection of any sums due hereunder or to enforce any of its rights hereunder, in whole or in part, then Customer will pay a reasonable fee representing such attorneys' services including costs, regardless of whether suit is instituted, and whether at trial, on appeal, in mediation, arbitration, or administrative proceedings.

**Pool/Toll Account**: A pool account is a ledger account representing the amount of returnable metal owed to Customer (if account reflects a positive balance), or the amount of metal owed to RMC (if the account reflects a negative balance). Precious metals are fungible; therefore any unit of material is equivalent to another of like kind i.e. similar quality and/or value, and is deemed adequate payment for purposes of outstanding Pool Accounts. Returnable metal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable metal; rather it represents a future obligation of RMC to return common inventory of gold, silver, platinum, palladium, or platinum group metals. RMC reserves the right to return precious metals to Customer of like kind representing the ounces of precious metals owed to Customer. RMC reserves the right to offset negative balances in Customer's pool account with respect to any and all metal in Customer's pool account by purchasing and/or liquidating any metals reflecting a positive balance in Customer's pool account. Republic reserves the right to price out any unfixed ounces remaining in Customer pool account in an effort to settle Customer lot. Should Customer desire to leave ounces un-priced in Customer pool account, Customer must notify Republic in writing at least twenty four (24) hours prior to the settlement date of the respective lot; after such time has elapsed, Customer shall be deemed to have waived such right. *Note: Please see RMC Purchases for a description of RMC's returnable metal.*

**Consignment:** It is expressly agreed upon by both parties that any and all material shipped to Customer, and/or delivered to Customer, and/or released to Customer on a consignment/bailment basis remains the property of RMC, with a security interest in RMC, until the material is returned to RMC in its entirety with interest paid, or material of equal quality, kind, and value is returned to RMC. Customer does not have legal title to such property until the above obligations are fulfilled. Should Customer transfer, assign, sell, or attempt to pass title to said material in any other way, Customer will be responsible for returning to RMC material of like kind, representing the same value. UNLESS OTHERWISE EXPRESSLY AGREED TO IN WRITING ALL CONSIGNMENT TRANSACTIONS ARE FURTHER SUBJECT TO TERMS + PROVISSIONS SET FORTH IN RMC'S FORM CONSIGNMENT CONTRACT WHICH WILL BE FURNISHED UPON REQUEST.

**RMC Purchases:** Customers will be paid according to their returnable metals. The returnable metal represents the amount of precious metals contained in the Customer lot minus any RMC refining charges and/or any other charges. Returnable metals shall be in the form of fine gold bars and/or granulation unless otherwise agreed Unless otherwise agreed, fine gold bars and/or fine gold granulation shall assay a minimum .9999 fine, and the fine silver bars and/or granulation shall assay a minimum .999 fine. Returnable Platinum, Palladium, and Platinum group metals shall assay a minimum of .9995 fine. RMC shall not be liable for direct or consequential losses stemming directly or indirectly from market fluctuations and/or any other cause whatsoever as a result of late delivery of any material by RMC. RMC delivery schedules are subject to change without notice.

**Advances:** Should Customer request an advance and RMC approve such a request, Customer will be responsible for any deficit in Customer's account as a result of an over-advance. Customer will be charged of $1.00 per ounce per day with a minimum charge of

$150.00. (Subject to change without notice) Any and all security interest in Customer's material held by Customer will be reduced by the amount of such advance. Upon RMC transferring consideration, in the form of wire transfer, check, metal transfer or otherwise, to Customer for and against Customer's metal, Title to said metal shall pass immediately to RMC. After said metal is sampled, Republic may co-mingle, destroy, or use said metal in any manner RMC deems appropriate. Advances will only be made against lots and/or material for which the estimated elemental content has been Price Fixed.

**Fixing of Metal:** Customer has the following options when fixing precious metals with RMC:

1. SPOT – price is determined by RMC Trading Personnel based on the metal price as determined by global markets at the time of fixing.

1. LONDON PM- fix request must be received by RMC Trading Personnel by 9:30 AM E.S.T. the day of the fix

*Note: RMC market prices may reflect a slight discount as stipulated by market conditions.*

Customer warrants that any purchase or sale contract has been effectuated by Customer for the sole purpose of securing pricing for the ultimate sale or purchase of precious metals and has not been made for any speculative reason whatsoever. Customer hereby has an obligation to deliver or purchase said metal to or from RMC within ten (10) business days from the effective contract Trade Date. Should Customer fail to deliver/purchase said metal within ten (10) business days, RMC reserves the right to reverse and/or of these outstanding sales/purchase contract. In the event of a reversal of this contract, RMC will be responsible for the return of any moneys due Customer as a result of the offset within a reasonable amount of time. Should the offset result in Customer owing moneys to RMC, Customer shall be responsible for said funds and RMC may take the following steps to recover said funds owed and outstanding, including but not limited to: (1) liquidation of customer's pool account, (2) liquidation of customer balance, (3) legal action in furtherance of an attempt by RMC to recover funds due as a result of a reversal of this contract. If legal action is required, customer hereby accepts full responsibility for any reasonable costs and/or fees and/or expenses incurred on behalf of RMC in furtherance of this legal action.

Upon the commencement of a trade with RMC, Customer shall receive an e-mail from RMC confirming the trade details. Customer shall be responsible for providing RMC with a proper e-mail address to which trade confirmations shall be sent. Customer shall also bear responsibility for notifying RMC should any changes occur in regards to the desired recipient of the e-mail and/or e-mail address therein. It shall be the responsibility of Customer to notify RMC in the event Customer conducts a trade with RMC and does not receive an e-mail confirmation. Further, Customer agrees that should RMC's records show that RMC sent an e-mail confirmation to Customer, Customer shall be conclusively deemed to have received said e-mail confirmation. By agreeing to the terms and conditions contained herein, and receiving an

e-mail confirming the details of Customer's trade, Customer agrees that he has entered into a written, legally binding contract for the sale/purchase of precious metals contained within the confirmation e- mail. Customer further warrants that said contract is in compliance with the Florida Uniform Commercial Code § 672.201, § 668.003

(4) And § 668.004 and agrees to waive any defenses under Florida Uniform Commercial Code § 672.201.

**Force Majeure:** If Republic Metals Corporation is prevented from completing performance of any or all of its obligations under this Agreement by an act of God or any other occurrence beyond its control, then Republic Metals Corporation shall be excused from further performance upon notice to Customer stating the reason for the nonperformance. Additionally, the parties understand that performance by Republic Metals Corporation may be interrupted or delayed by an occurrence outside of its control, including but not limited to the following: an act of God e.g. hurricanes and floods, war, riot, sovereign conduct, loss of electrical power for any reason whatsoever, or conduct of third parties. If that should occur, Republic Metals Corporation shall be excused from performance for as long as reasonably necessary to complete performance.

**Liability:** Under no circumstances shall RMC be liable for any incidental or consequential damages incurred by Customer for breach of any obligation arising out of or relating to the transactions herein or to the subsequent sale or use of returnable metals delivered to Customer hereunder. Except otherwise provided, the aggregate liabilities of RMC to Customer arising out of or relating to any breach of warranty shall not exceed the aggregate refining fees actually paid by Customer to RMC in regard to the materials or returnable metals which are the subject to the breach.

As a condition precedent to conducting business with RMC, Customer agrees that if Customer fails to comply with any of its obligations herein, Customer will indemnify and hold RMC harmless from all injuries, costs, suits, expenses (including without limitation attorney's fees and other costs of defenses), liabilities, fines, penalties, judgments, cost of settlement, losses and other damages that RMC may incur as a result of such failure by Customer.

**Integration:** This instrument contains the entire agreement between the parties relating to the rights granted and the obligations assumed, and incorporated all representations or modifications concerning this instrument whether arising from any usage or trade, course of dealing, accepted industry practice, course of performance, evidence of consistent additional terms, or otherwise.

**Parties:** Both Parties agree that they are merchants as defined in the Uniform Commercial Code § 2-104 (1).

**Waiver:** The waiver by RMC of any Customer breach of these Standard Terms or forbearance of RMC to enforce its rights hereunder shall not operate as or be construed as a waiver of subsequent breach by Customer or a waiver of rights of RMC.

**Severability:** If any provision of these Standard Terms is found by a court of competent jurisdiction to be wholly or partially invalid, the remaining provisions will nonetheless be valid and enforceable

**Modification of Terms and Conditions:** The terms, conditions, stipulations, rules, regulations and schedules set forth herein are subject to change without prior notice. RMC specifically reserves the right to so amend, change, revise and/or modify same in its sole option and discretion. Upon receipt of these Standard Terms and General Operating Conditions and as they may be subsequently amended, changed, revised and/or modified, the Customer agrees to be bound by and subject to same upon delivery.  Delivery shall be deemed completed by having been made in person, by regular mail, by fax, via email or on the internet. In addition, these Standard Terms and Conditions shall be deemed to be incorporated into each and every transaction between RMC and Customer, whether or not specifically stated therein.

**Execution of Standard Terms and General Operating Conditions:** In the event an electronic signature or such similar signature accepting RMC's Standard Terms and General Operating Conditions is required by RMC as part of the onboarding process of a new Customer the Customer shall comply with that requirement. Failure to so comply will result in the RMC's declining to approve the Customer. Until such time as an electronic signature or such other similar signature of a new Customer is required as part of the on boarding process the failure of the new Customer to execute RMC's Standard Terms and General Operating Conditions   shall not relieve that Customer from being subject to same. Completion of the then existing on boarding process shall conclusively be deemed to be acceptance by Customer of said terms and conditions. The terms and conditions set forth herein contain schedules and terms and conditions are subject to change without notice. Upon receipt of these Standard Terms and General Conditions, whether via fax, mail, or in person, I, and/or the company I represent and/or for which I am an agent, agrees to be bound by the terms, conditions, stipulations, rules, and regulations contained herein. Delivering material or doing business with RMC after having received the Standard Terms and General Operating Conditions deems that I have agreed to accept the Terms and General Conditions contained herein regardless of whether I have signed this agreement.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of February, 2019, I caused a true and correct copy of the foregoing *Omnibus Response of The Senior Lenders to Customer Statements Pursuant to Order Approving Uniform Procedures for Resolution of Ownership Disputes* to be filed and served through ECF notification upon all parties who receive notice in this matter pursuant to the Court's ECF filing system.

      /s/ Michael Luskin      
Michael Luskin
