# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REPUBLIC METALS REFINING | ) |  |
| CORPORATION, *et al.*,[1] | ) | Case No. 18-13359 (shl) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

## ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS "FREE AND CLEAR" OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon consideration of the *Motion for Order (i) Authorizing and Approving Procedures for the Sale of the Debtors' Assets; (ii) Scheduling a Sale Hearing; (iii) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale; (iv) Approving Sale of Property Free and Clear of Interests; and (v) Approving Form of Notice of Sale* (the "Motion") [Doc. No. 358],[2] filed by the above-captioned Debtors and Debtors-in-possession (collectively, the "Debtors"); and a hearing having been held on January 9, 2019 (the "Bid Procedures Hearing"), whereupon the Court entered an Order approving bidding procedures (the "Bid Procedures Order") [Doc. No. 399]; and the Debtors seeking approval to sell substantially all of their assets to the Successful Bidder (as defined in the Bid Procedures Order), Asahi Refining Florida Inc., a Delaware corporation (the "Purchaser"), "free and clear" of all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833), Republic High Tech Metals, LLC, 13001 NW 38 Avenue, Miami, FL 33054 (6102), RMC Diamonds, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (1507), RMC2, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (4696), J & L Republic LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7604); R & R Metals, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7848), Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639), and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

[2] All capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Motion.

liens, claims, encumbrances and other interests, upon the terms and conditions set forth in the

Asset Purchase Agreement by and between the Debtors and the Purchaser attached hereto

(without exhibits or schedules) as **Exhibit 1** (the "APA"); and the Debtors, in consultation with

the Consultation Parties (as defined in the Bid Procedures Order), having determined that the

APA and the transactions contemplated therein constitute the "highest and best" offer for the

Assets (as defined in the APA); and a sale hearing having been commenced on February 13,

2019 (the "Sale Hearing"), to consider the relief requested in the Motion and approval of the

APA and the transactions contemplated thereby; and appearances of all interested parties having

been noted on the record of the Sale Hearing; and upon all of the evidence presented in support

of such relief and representations on the record by counsel at the Bid Procedures Hearing and

Sale Hearing (including but not limited to testimony and other evidence proffered or adduced at

such hearings); and the Court having found and determined that the relief granted herein is in

the best interests of the Debtors, their estates, the Senior Lenders, and all other creditors, equity

holders and parties in interest, and that the legal and factual bases set forth in the Motion and at

the Bid Procedures Hearing and Sale Hearing establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:[3]**

A.   **Jurisdiction**. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1134

to hear and determine the Motion and grant the relief set forth in this Order.  This is a core

proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

B.   **Venue.**  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and
conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy
Rule 9014. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed,
and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

**C.    Statutory Predicates.**  The statutory predicates for approval of the APA and the transactions contemplated therein are: (i) sections 105, 363, and 365 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014; (iii) Local Rules 2002-1, 6004-1, 6006-1, and 9006-1(b), and (iv) the Sale Guidelines.

**D.    Notice.**  As evidenced by, *inter alia*, the affidavits of service filed by the Debtors, proper, timely, adequate, and sufficient notice of the Motion, the relief requested therein, the Auction, the Sale Hearing, the sale of the Debtors' Assets to the Purchaser pursuant to the APA (the "Sale"), and the Assumption and Assignment of the Assumed Executory Contracts (as defined herein) to the Purchaser, has been provided in accordance with sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, including without limitation to the following parties (collectively, the "Notice Parties"): (i) the United States Trustee for the Southern District of New York; (ii) counsel to the Committee; (iii) counsel for the Senior Lenders; (iv) the Debtors' 30 largest unsecured creditors; (v) the United States Attorney's Offices for the Southern District of New York and the Southern District of Florida; (vi) the Internal Revenue Service; (vii) the office of the attorneys general for the states in which the Debtors operate; (viii) all state and local taxing authorities in the jurisdictions in which the Debtors have or may have any tax liability and any other governmental agency that is an interested party with respect to the Sale; (ix) the Environmental Protection Agency and any state and local environmental agencies in jurisdictions in which the Debtors may have environmental liabilities; (x) all parties who have expressed a written interest in some or all of the Assets; (xi) all parties which, to the best of the Debtors' knowledge, information, and belief, had asserted or then may have asserted a lien in any of the Debtors' Assets, (xii) all parties to executory contracts and unexpired leases proposed to be assumed and assigned, or rejected, in

connection with the transactions contemplated by the APA; and (xiii) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rules 2002 and 9010(b).  The Debtors have complied with all obligations in the Bid Procedures Order to provide notice of the Auction, the Sale Hearing, and the Sale.  No other or further notice is required.

E.      **Executory Contracts/Unexpired Leases.**  The Debtors served notice upon all counterparties to executory Assigned Contracts and Assigned Leases proposed to be assumed and assigned in connection with the APA and the transactions contemplated thereby (collectively, the "Assumed Executory Contracts"): (i) that the Debtors seek to assume and assign such Assumed Executory Contracts at Closing (as defined in the APA), or such later date as provided in the APA or agreed between the parties thereto, and (ii) of the proposed Cure Amounts, if any.  Such notice was proper, timely, adequate, and sufficient for purposes of Bankruptcy Rule 6006(c) and in compliance with the Bid Procedures Order.  No other or further notice is required.

F.      **Opportunity to be Heard.** The Debtors afforded a reasonable opportunity to object or be heard regarding the relief requested in the Motion and the transactions contemplated thereby to all interested persons and entities, including, without limitation, the Notice Parties. All non-Debtor counterparties to Assumed Executory Contracts were given a reasonable opportunity to object or be heard, including in connection with their Cure Amounts, if any.

G.      **Objections**.  All objections, if any, to the Motion or relief granted herein have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

H.      **Marketing Process.** As demonstrated by the testimony and other evidence proffered or adduced at the Bid Procedures Hearing and Sale Hearing and the representations of counsel made on the record at the Bid Procedures Hearing and Sale Hearing, (i) the Debtors

thoroughly marketed the Assets and conducted the bidding solicitation fairly, in accordance with the Bid Procedures Order and the sound exercise of their business judgment; (ii) the Debtors conducted a fair and open sale process; and (iii) the sale process, the Bid Procedures, and the Auction were noncollusive, duly noticed, and provided a full, fair, reasonable and adequate opportunity for any person or entity that either expressed an interest in acquiring or liquidating the Assets, or whom the Debtors believe may have an interest in acquiring or liquidating the Assets, to offer to purchase the Assets. The Debtors and Purchaser have respectively negotiated and undertaken their roles leading to entry into the APA and the Sale and the other transactions contemplated thereby in a diligent, noncollusive, fair, reasonable, and good faith manner.

**I.    Highest and Best Offer.** The APA, including the form and total consideration to be realized by the Debtors pursuant to the APA, (i) was the result of the sale process conducted by the Debtors pursuant to the Bid Procedures Order, (ii) constitutes the highest or otherwise best offer received by the Debtors for the Assets, (iii) is fair and reasonable, and (iv) is in the best interests of the Debtors, their estates, creditors, equity holders, and all other parties in interest. There is no legal or equitable reason to delay entry into the APA, and the transactions contemplated therein, including, without limitation, the Sale of the Assets to the Purchaser.

**J.    Business Judgment.** The Debtors' decision, in consultation with the Consultation Parties, to (i) enter into the APA, and (ii) perform as required by the APA and consummate the transactions contemplated thereby, is a reasonable exercise of the sound business judgment of the Debtors and Mr. Avila, as CRO of the Debtors, consistent with their fiduciary duties, and is in the best interests of the Debtors, the estates, creditors, and all other parties in interest.

**K.    Final Order; Time of the Essence.** This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Time is of the essence in effectuating the APA

and proceeding with the Sale and other transactions contemplated therein without interruption. Based upon the testimony and other evidence proffered or adduced at the Bid Procedures Hearing and Sale Hearing, and the representations of counsel made on the record at the Bid Procedures Hearing and Sale Hearing, the Sale and other transactions contemplated by the APA must be closed as soon as reasonably practicable after entry of this Order to maximize the value that the Debtors' estates may realize from entering into the APA. Accordingly, to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason to delay implementation of this Order, and expressly directs that the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d) be and hereby are vacated to any extent necessary to permit the immediate effectiveness of this Order as set forth herein. In the absence of a stay pending appeal, the Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the APA and the Sale and other transactions contemplated thereby at any time after entry of this Order.

L.    **Sale Free and Clear.** A sale of the Assets other than one free and clear of liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and

claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Interests or Claims") and without the protections of this Order would hinder the Debtors' ability to obtain the consideration provided for in the APA and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such assets. But for the protections afforded to the Purchaser under the Bankruptcy Code and this Order, the Purchaser would not have offered to pay the consideration contemplated in the APA. The Senior Lenders have consented to the sale of the Assets pursuant to the APA, subject to application of proceeds from such Sale in accordance with a further Order of this Court (other than payment of the Break-up Fee to the Stalking Horse Bidder and Ad Valorem Taxes (as defined below), each to the extent authorized below). In addition, each entity with an Interest or Claim upon the Assets, (i) has either consented to the Sale, has not objected, or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests or Claims who did not object, or who withdrew objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Therefore, approval of the APA and the consummation of the Sale free and clear of Interests or Claims (with such

Interests and Claims attaching to the proceeds of such sale by the Debtors) is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**M.** **Attachment of Interests or Claims to Proceeds.** Any currently existing Interests or Claims encumbering all or any portion of the Assets (unless otherwise paid and satisfied at Closing) shall attach to the amounts to be received by the Debtors under the APA, with the same validity, priority, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist. The Purchaser has not agreed to assume and shall have no obligations with respect to any liabilities of the Debtors or their subsidiaries or affiliates other than, solely with respect to the Purchaser, the Assumed Liabilities (as defined in the APA).

**N.** **Arm's-length Sale; No Fraudulent Transfer.** The APA, including the consideration to be paid by the Purchaser, is the product of negotiations between the Debtors and the Purchaser that were conducted at arm's-length, in good faith, and without collusion, and constitutes reasonably equivalent value and fair and adequate consideration for the Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the laws of the United States, any state, territory, possession thereof or the District of Columbia. The terms and conditions of the APA are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws.

**O.** **No Insider Status.** The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between the Purchaser and the Debtors.

P.    **Good Faith.** The Debtors, their management and board of directors, the Purchaser and its officers, directors, employees, agents and representatives, and the Purchaser's direct and indirect equity holders and their respective officers, directors, employees, agents and representatives, acted in good faith in the bidding process. The Debtors and their advisors, after appropriate deliberation and in consultation with the Consultation Parties, determined that the APA constitutes the highest and best offer for the Assets, following multiple rounds of competitive bids received by the Debtors during the Auction conducted on January 31, 2019. The APA was negotiated and entered into by the parties thereto based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in section 363(m) of the Bankruptcy Code. The Purchaser is purchasing the Assets in good faith and is entitled to the full protection of section 363(m) of the Bankruptcy Code, including without limitation in the event that this Order is reversed or modified on appeal. The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estates some or all of the Assets. Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Sale, the APA, or any related action or the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or that would prevent the application of section 363(m) of the Bankruptcy Code. The Purchaser did not violate section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, the Purchaser has not acted in a collusive manner with any person or entity and was not controlled by any agreement among bidders. The Purchaser's prospective performance and payment of amounts owing under the APA are in good faith and for valid business purposes and uses.

Q.    **Corporate Authority.** The Debtors have full corporate or other power and authority to execute, deliver, and perform their obligations under the APA and to consummate all

transactions contemplated thereby (including, without limitation, entering into and performing under each of the ancillary agreements, instruments or other documents contemplated by the APA) and entry into, delivery and performance under the APA and consummation of all transactions contemplated thereby (including, without limitation, entering into and performing under each of the ancillary agreements, instruments or other documents contemplated by the APA) has been duly and validly authorized by all necessary corporate or similar action. No consents or approvals, other than those expressly provided for herein or in the APA, are required for the Debtors to consummate such transactions.

**R.    No Successor Liability.** No sale, transfer, or other disposition of the Assets pursuant to the APA, entry in the APA or consummation of the transactions contemplated by the APA, will subject the Purchaser to any liability for Interests or Claims asserted against the Debtors or the Debtors' interests in the Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger, or substantial continuity or similar theories. The Purchaser is not the alter ego of, a successor in interest to, or a continuation of the Debtors or their estates, and there is no continuity between the Purchaser, on the one hand, and the Debtors, on the other hand. The Purchaser is not holding itself out to the public as a continuation of the Debtors. The Purchaser is not a successor to the Debtors or their estates and consummation of the Sale contemplated by the APA does not amount to a consolidation, merger, or *de facto* merger of the Purchaser, on the one hand, and the Debtors, on the other hand.

**S.    No *De Facto* or *Sub Rosa* Plan.** The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.   Entry into the APA and the transactions

contemplated thereby neither impermissibly restructures the rights of the Debtors' creditors or equity holders, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  Entry into the APA does not constitute a *de facto* or *sub rosa* chapter 11 plan.

  **T.**  **Assumption and Assignment; Cure.** The assumption and assignment of the Assumed Executory Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtors and their estates, creditors, equity holders and other parties in interest, and represents the reasonable exercise of sound and prudent business judgments by the Debtors.  The Debtors have met all the requirements of section 365(b) of the Bankruptcy Code for each Assumed Executory Contract. The Purchaser has (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all Assumed Executory Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; (ii) provided compensation or adequate assurance of compensation to all counterparties for actual pecuniary loss, if any, resulting from a default prior to Closing under any Assumed Executory Contracts; and (iii) provided adequate assurance of future performance under the Assumed Executory Contracts, all within the meaning of sections 365(b)(1)(B) and (C) of the Bankruptcy Code.

  **U.**  **Cure Amounts.** Except as provided in this Order or as subsequently agreed by the parties or determined by this Court, the Cure Amounts on **Exhibit 2** are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under Assumed Executory Contracts.

  **V.**  **Back-Up Bidder.** Valcambi SA is designated the Back-Up Bidder, with a Back-Up bid of $25,000,000 (25 Million Dollars).

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

**THAT:**

    A.    **Motion Granted, Objections Overruled.**

1.    The relief requested in the Motion is granted as set forth herein, and the Sale contemplated by this Order and the APA is approved as set forth herein.

2.    Any objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled in all respects and denied. All persons and entities who did not object or withdraw their objections to the Motion are hereby deemed to have provided their irrevocable consent to the Sale of the Assets to the Purchaser pursuant to section 363(f)(2) of the Bankruptcy Code.

    B.    **Back-up Bidder.**

3.    Should the Purchaser fail to consummate the Sale, the Debtors are authorized to consummate the Sale of the Assets to the Back-up Bidder, on the terms set forth in the Back-up Bidder APA, in which event, the Back-up Bidder and the Back-up APA shall be substituted in the place of Purchaser and APA, as applicable in this Order, as if originally set forth herein.

    C.    **APA Approved and Authorized.**

4.    The APA and all terms and conditions thereof are hereby approved pursuant to (i) sections 105, 363, and 365 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014; (iii) Local Rules 2002-1, 6004-1, 6006-1, and 9006-1(b); and (iv) the Sale Guidelines. The Debtors are hereby authorized, empowered and directed to enter into and perform under the APA and the transactions contemplated therein (including, without limitation, entering into and performing under each of the ancillary agreements, instruments, or other documents contemplated thereby), each of which is hereby approved in its entirety and is incorporated herein by reference. The failure to include specifically any particular provision of

the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being

the intent of the Court that the APA and all of its provisions, payments and transaction, be

authorized and approved in their entirety. Likewise, all of the provisions of this Order are

nonseverable and mutually dependent.

5.      Subject to the provisions of this Order, the Debtors and the Purchaser are hereby

authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to consummate

the Sale in accordance with the APA.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, the Purchaser,

the Purchaser's direct and indirect equity holders, and each of the respective officers, directors,

employees, agents and representatives of any of the foregoing, are hereby authorized and

directed to execute such documents and to take any and all actions as are reasonably necessary or

appropriate to consummate the Sale contemplated by the APA and to effectuate the APA and the

transactions contemplated therein.  The Debtors are authorized to take all actions necessary to

effectuate the relief granted pursuant to this Order.

**D.      Proceeds; Break-Up Fee.**

7.      At or following the Closing, the Debtors are authorized to pay (i) the Break-up

Fee to the Stalking Horse Bidder pursuant to the Bid Procedures Order and (ii) ad valorem taxes

(the "Ad Valorem Taxes") assessed against the 12800 Real Property (as defined below) for 2018,

plus the *pro rata* amount of ad valorem taxes for 2019 for the period prior to Closing, calculated

at 105% of ad valorem taxes assessed for 2018.  All other amounts payable by the Purchaser

under the APA shall be payable to the Debtors to be held in a separate and segregated debtor-in-

possession account for distribution pursuant to a further Order of this Court.

### E.    Order Binding.

8.    This Order may be presented to any and all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, to facilitate the effectuation of the duties of its office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets. This Order, and the terms and provisions of the APA, shall be binding in all respects upon the Debtors, their estates, all creditors and equity holders (whether known or unknown) of any Debtor, the Purchaser, the Purchaser's affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting any Interest or Claim against the Debtors or in the Assets or any portion thereof, and all counterparties to any executory contract or unexpired lease of the Debtors, notwithstanding any subsequent appointment of any trustee, party, entity, or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding. The provisions of this Order and the terms and provisions of the APA, and any actions taken pursuant hereto or thereto, shall survive the entry of any order which may be entered confirming or consummating any plan(s) of the Debtors, converting any Debtor's case from chapter 11 to chapter 7 or dismissing any Debtor's case, and the terms and provisions of the APA, as well as the rights and interests granted pursuant to this Order and the APA, shall continue in this or any superseding cases and shall be binding upon the Debtors, the Purchaser and its respective successors and permitted assigns, and any trustee or other fiduciary hereafter appointed as a legal representative of any Debtor under chapter

7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in these cases shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Order and the APA, and the Purchaser and the trustee shall be and hereby are authorized to perform under the APA upon the appointment of the trustee without the need for further order of this Court.  The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, or any trustee, examiner or receiver.

**F.      Good Faith.**

9.      Entry into the APA, and the Sale and other transactions contemplated thereby, are undertaken by the parties thereto in good faith, as that term is used in section 363(m) of the Bankruptcy Code.  The Purchaser is purchasing the Assets in good faith and shall be protected as a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal. The reversal or modification on appeal of the authorization provided herein to enter into the APA and to consummate the Sale and other transactions contemplated thereby shall not affect the validity of such transaction, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal. The Purchaser is entitled to all of the benefits and protections afforded to good faith purchasers by section 363(m) of the Bankruptcy Code. The Sale and other transactions contemplated by the APA are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

**G.      Conduct of the Sale.**

10.      Except as otherwise provided in the APA, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, following the Closing, the Debtors shall be authorized and directed to sell and transfer to the Purchaser the Assets pursuant to the APA, in each case free and clear of any and all Interests or Claims, whether arising by agreement, any

statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases was commenced, with any presently existing Interests or Claims encumbering all or any portion of the Assets or the proceeds thereof (including, but not limited to, the security interest of the Senior Lenders) attaching only to the proceeds with the same validity, priority, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist.

11.    If any person or entity that has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreement evidencing Interests or Claims on or in the Assets shall not have delivered to the Debtors, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Interests or Claims which the person or entity has with respect to the Assets, each such person or entity is hereby authorized and directed to deliver all such statements, instruments and releases and Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity asserting the same and the Debtors and the Purchaser are authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such Interest or Claim. Each and every federal, state and local governmental unit is hereby authorized to accept any and all documents and instruments necessary or appropriate to give effect to the Sale contemplated by the APA. Moreover, effective as of the Closing, the Purchaser (and its successors and assigns) shall be designated and appointed the Debtors' true and lawful attorney, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Purchaser (and its successors and assigns), to demand and receive any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to

institute and prosecute in the Debtors' name, for the benefit of the Purchaser (and its successors and assigns), any and all proceedings at law, in equity or otherwise, which the Purchaser (and its successors and assigns) may deem proper for the collection or reduction to possession of any of the Assets, and to do all acts and things with respect to the Assets which the Purchaser (and its successors and assigns) shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

12.     At Closing, on the terms and conditions of the APA, all of the Debtors' right, title, and interest in and to, and possession of, the Assets shall be immediately vested in the Purchaser pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code.  Such transfer shall constitute a legal, valid, binding, and effective transfer of the Assets.

13.     All persons and entities in possession of some or all of the Assets on or after Closing hereby are directed to surrender possession of such Assets to the Purchaser at Closing.

14.     Except as expressly provided for herein or in the APA, no person or entity, including but not limited to any landlord, licensor, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale pursuant to the terms of the APA, and all such parties and persons of every nature and description, including landlords, licensors, creditors and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise impeding, the consummation of the sale of the Assets to the Purchaser or the conduct of the Sale and/or (ii) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtors or the Purchaser that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the consummation of the Sale

and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

15.     Except as expressly set forth in the APA, the Purchaser shall not have any obligation, as successor or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans), or any other payment to employees of the Debtors or any of its affiliates, and the Purchaser shall not have any liability, as successor or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, with respect to the following (collectively, the "Employee Obligations"): (a) any employment or labor agreements (including, without limitation, any collective bargaining agreements), consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which any Debtors or any of its affiliates are a party; (b) any pension, welfare, compensation, retention, incentive or other employee benefit plans, agreements, practices, or programs to which any Debtors or any of its affiliates are a party, including, without limitation, any pension plan at any time sponsored, maintained, contributed to, or required to be contributed to by any of the Debtors, any of its affiliates or any member of any of its respective controlled groups (within the meaning of Sections 414(b), (c), (m) or (o) of the Internal Revenue Code or Section 4001(b)(1) of Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (c) the cessation of the Debtors' operations, dismissal of employees, or termination (including, without limitation, rejection) of employment or labor agreements (including, without limitation, any collective bargaining agreements), consulting agreements, severance agreements, change-in-control

18

agreements, other similar agreements or pension, welfare, compensation, retention, incentive or other employee benefit plans, agreements, practices, programs, or obligations that might otherwise arise from or pursuant to ERISA, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Worker Adjustment and Retraining Notification Act or otherwise; or (d) workmen's compensation or occupational disease, unemployment, or temporary disability insurance claims (any agreement, plan, policy, practice, arrangement, or program described in (a) through (d), collectively the "Employee Arrangements"). The Purchaser shall not in any way, as successor or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, be deemed a party to or assignee of any Employee Arrangement, and no employee of the Purchaser shall be deemed in any way covered by or a party to any Employee Arrangement, and all parties to any Employee Arrangement are hereby enjoined from asserting against the Purchaser any and all Interests or Claims arising from or relating to such Employee Arrangement. Any and all notices, if any, required to be given to the Debtors' or their Affiliates' employees pursuant to the Workers Adjustment and Relocation Adjustment Act, or any similar federal, state or other applicable law, shall be the sole responsibility and obligation of the Debtors and its affiliates, and the Purchaser shall have no responsibility or liability therefor. Except as expressly set forth in the APA, the Assets are transferred by the Debtors to the Purchaser free and clear of all Employee Obligations and all Employee Arrangements.

**H.    Assets Provisions.**

16.    Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized

and directed without further order of this Court to sell and transfer the Assets to the Purchaser

pursuant to, and in accordance with, the terms and conditions of the APA and this Order and to

take any and all actions necessary or appropriate to (a) perform, consummate, implement and

close the Sale and other transactions contemplated by the APA, pursuant to and in accordance

with the terms and conditions of the APA and this Order, (b) transfer and assign all right, title,

and interest (including, without limitation, common law rights) to all property, licenses, and

rights to be conveyed in accordance with the terms and conditions of the APA, and (c) execute

and deliver, perform under, consummate, implement, and close fully the APA, together with all

additional instruments and documents that may be reasonably necessary or desirable to

implement the APA and the Sale and other transactions contemplated by the APA, including,

without limitation, any ancillary documents, or as may be reasonably necessary or appropriate to

the performance of the obligations as contemplated by the APA and such ancillary documents.

17.    The Debtors' transfer of the Assets to the Purchaser pursuant to the APA does not

require any consents or approvals other than as specifically provided for in the APA and

constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Purchaser with all

of the right, title, and interest of the Debtors in and to the Assets as set forth in the APA, as

applicable, free and clear of all Interests or Claims of any kind or nature whatsoever.

18.    To the greatest extent available under applicable law, (i) the Purchaser shall be

authorized, as of the Closing Date, to operate under any license, permit, registration, and

governmental authorization or approval of the Debtors with respect to the Assets, and (ii) all

such licenses, permits, registrations, and governmental authorizations and approvals are deemed

to have been, and hereby are, authorized to be transferred to the Purchaser as of the Closing Date

as provided by the APA. To the extent provided by section 525 of the Bankruptcy Code, no

governmental unit may revoke or suspend any license, permit, registration, or governmental authorization or approval relating to the operation of the Assets on account of the filing or pendency of the Bankruptcy Case or the conduct of the Sale contemplated by the APA.

### I.    Assumed Executory Contracts

19.    The Purchaser has provided adequate assurance of future performance under the Assumed Executory Contracts.  The Purchaser has established, among other things, that it has the financial capability to perform under the Assumed Executory Contracts and has substantial experience operating a precious metals refining business in the US.  The Debtors are authorized to assume and assign to the Purchaser all of the Debtors' right title and interest in the Assumed Executory Contracts identified on **Exhibit 2**, *provided, however,* that the Purchaser is authorized, at any time prior to Closing (or such later date as the Purchaser, the Debtors, and the non-Debtor parties to such executory contract or lease may agree in writing), to modify its election to take assignment of any such executory contract or lease.  The Purchaser is authorized to assume and satisfy the Assumed Liabilities, including the Cure Amounts, as contemplated in the APA.

20.    The payment of the applicable Cure Amounts (if any) shall (a) effect a cure of all defaults existing thereunder as of the Closing, (b) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (c) together with the assumption of the Assigned Contracts by the Debtors and the assignment of the Assigned Contracts to the Purchaser, constitute adequate assurance of future performance thereof.

21.    Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Amounts, the Assumed Executory Contracts to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting

their assignment or transfer. Any provisions in any Assumed Executory Contract that prohibit or condition the assignment of such Assumed Executory Contract to the Purchaser or allow the counterparty to such Assumed Executory Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Executory Contract to the Purchaser, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assumed Executory Contract have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assumed Executory Contracts, and such Assumed Executory Contracts shall remain in full force and effect for the benefit of the Purchaser. Each counterparty to an Assumed Executory Contract shall be forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the Purchaser or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control provisions in such Assumed Executory Contract, or any purported written or oral modification to such Assumed Executory Contract and (b) asserting against the Purchaser (or its property, including the Assets) any claim, counterclaim, defense, breach, condition, setoff asserted, or assertable against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

22.    Upon the Closing and the payment of the applicable Cure Amounts, if any, the Purchaser shall be deemed to be substituted for the Debtors as a party to each Assumed

Executory Contract and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assumed Executory Contracts. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Executory Contracts. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Executory Contract shall not be a waiver of such terms or conditions or of the right of the Debtors or the Purchaser, as the case may be, to enforce every term and condition of such Assumed Executory Contract. The validity of the assumption and assignment of any Assumed Executory Contract to the Purchaser shall not be affected by any existing dispute between the Debtors and any counterparty to such Assumed Executory Contract. Any party that may have had the right to consent to the assignment of any Assumed Executory Contract is hereby deemed to have consented for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

23.    All defaults or other obligations of the Debtors under the Assumed Executory Contracts arising or accruing after the Sale objection deadline and prior to Closing (without giving effect to any acceleration or default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured at Closing or as soon thereafter as practicable.

24.    The Debtors' assignment to the Purchaser of each of the Assumed Executory Contracts is made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

**J.    Other Provisions.**

25.    The Purchaser shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against the Purchaser, in each case, other than as expressly provided for in the APA or this Order. The Purchaser shall have no successor liability whatsoever with respect to any Interests or Claims of any nature that may exist against the

Debtors, including, without limitation, the Purchaser shall not be, or deemed to be: (i) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or successor employer with the Debtors, and the Purchaser shall have no obligation to pay the Debtors' wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees of the Debtors, including pursuant to any collective bargaining agreement, pension plan, or otherwise, except as expressly set forth in the APA.

26.     Except as expressly permitted by the APA or this Order, all persons and entities and their respective successors and assigns (including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors and other creditors) holding Interests or Claims against, in or with respect to the Debtors or all or any portion of the Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' businesses, the Sale or the transfer of the Assets to the Purchaser, hereby are forever permanently prohibited, barred, estopped, and enjoined from asserting against the Purchaser or its affiliates, designees, successors or assigns or any of its respective property or assets (including, but not limited to, the Assets), such persons' or entities' Interests or Claims. This Order is and shall be effective as a determination that all Interests or Claims shall be and are, without further action by any person or entity, released with respect to the Assets as of the Closing. The provisions of this Order authorizing the Sale of the Assets free and clear of Interests or Claims shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases,

termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order. The APA and the Sale and the other transactions contemplated thereby shall be of full force and effect, regardless of the Debtors' lack of good standing in any jurisdiction in which such Debtors are formed or authorized to transact business.

27.     All persons and entities and their respective successors and assigns (including without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors and other creditors) hereby are forever permanently prohibited, barred, estopped, and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its respective affiliates, designees, successors or assigns, or any of its respective property or assets (including, but not limited to, the Assets), with respect to any (a) Interests or Claims arising under, out of, in connection with or in any way relating to the Debtors, the Assets, or the operation of the Debtors' businesses, or the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its respective affiliates, designees, successors or assigns, or any of its respective property or assets (including, but not limited to, the Assets); (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its respective affiliates, designees, successors or assigns, or any of its respective property or assets (including, but not limited to, the Assets); (iii) creating, perfecting, or enforcing any Interests or Claims against the Purchaser, its respective affiliates, designees, successors or assigns, or any of its respective property or assets (including, but not limited to, the Assets); (iv) asserting any setoff or right of subrogation or

recoupment of any kind against any obligation due the Purchaser or its respective affiliates, designees, successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order, all other orders of this Court or the APA; or (vi) revoking, terminating, or failing or refusing to issue or renew any license, permit, or authorization to conduct any of the businesses operated with the Assets.

28.    Except for the Assumed Liabilities (as defined in the APA) and as otherwise expressly provided in the APA, the Purchaser is not, by virtue of the consummation of the Sale contemplated by the APA, assuming, nor shall it be liable or responsible, as successors or otherwise (including, without limitation, with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, including, without limitation, any theory of antitrust, environmental successor or transferee liability, labor law, alter ego, *de facto* merger or substantial continuity, whether known or unknown, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any of its predecessors or affiliates or the obligations of the Debtors or their predecessors or affiliates, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from the Assets or the Debtors' operation of its businesses or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Closing Date or are to be observed, paid, discharged, or performed on or prior to the Closing Date, or any liabilities calculable by reference to the Debtors or their assets or operations, or relating to continuing conditions existing on or prior to the Closing Date, including, without limitation, with respect to any of the Debtors' predecessors or affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they

may give rise to successor liability, without regard to whether the claimant asserting any such

liabilities, debts, commitments, or obligations has delivered to the Purchaser a release thereof.

Without limiting the generality of the foregoing and except for the Assumed Liabilities and as

otherwise expressly provided in the APA, by virtue of the consummation of the Sale

contemplated by the APA, the Purchaser shall not be liable or responsible, as a successor or

otherwise (including, without limitation, with respect to successor or vicarious liabilities of any

kind or character) under any theory of law or equity, for the Debtors' liabilities, debts,

commitments, or obligations arising under or in connection with: (a) environmental liabilities,

debts, claims, or obligations which may be asserted on any basis, including, without limitation,

under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.

§ 9601 et seq.; (b) any bulk sales or similar law; (c) any liabilities, debts, commitments, or

obligations of, or required to be paid by, the Debtors for any Taxes of any kind for any period;

(d) any liabilities, debts, commitments, or obligations for any Taxes relating to the Assets for or

applicable to the pre-closing period; (e) any litigation; (f) any products liability, other tort, or

similar claims, whether pursuant to any state or any federal laws or otherwise, including,

without limitation, those arising from products or distribution thereof by or on behalf of

Debtors; and (g) any Excluded Liabilities (as defined in the APA).

      29.    Nothing in this Order or the APA releases, nullifies, precludes or enjoins the

enforcement of any liability to a governmental unit under police and regulatory statutes or

regulations (including but not limited to environmental laws or regulations), and any associated

liabilities for penalties, damages, cost recovery, or injunctive relief, that any entity would be

subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this

Order; provided, however, that nothing herein shall subject the Purchaser to any liabilities (under

any state successor liability doctrine or otherwise) to a governmental unit for penalties for days of violation prior to Closing, for response costs incurred prior to Closing, or to any liabilities relating to off-site disposal of wastes by the Debtors prior to Closing. Nothing contained in this Order or in the APA shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws. Nothing in this Order or the APA authorizes the transfer to the Purchaser of any licenses, permits, registrations, or governmental authorizations and approvals without the Purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

30.    Pursuant to the APA and at Closing, Purchaser, as tenant, will enter into new leases (the "New Leases") with (i) Republic Metals Warehouse LLC, (ii) Rose Rubin, as Trustee of the Richard Rubin Intervivos Revocable Trust Agreement dated March 28, 1991 and Rose Rubin as Trustee of the Rose Rubin Intervivos Revocable Trust Agreement dated March 28, 1991, and (iii) RRLJI2, LLC (collectively, the "Rubin Landlords"), as landlords, for certain real properties and improvements (the "Land and Improvements") that are more particularly described in the APA. Further, at Closing, Purchaser and the Rubin Landlords will enter into applicable easement and similar agreements for the benefit of such real properties (the "REA"). The New Leases grant Purchaser and its successors and assigns the option to purchase such Land and Improvements as described in, and subject to the terms and conditions contained in, the New Leases. Subject to the limitations on the purchase options contained in the New Lease, the purchase options in the New Leases shall be superior to all prior Interests or Claims. Any Interests or Claims held by all persons and entities and their respective successors and assigns against, in, or with respect to all or any portion of the Land and Improvements referenced in the New Leases, or held against, in, or with respect to the Rubin Landlords, shall be subject and

subordinate to all of the following: (a) Purchaser's and its successors' and assigns' right, title, and interest in the New Leases (subject to Purchaser (and its successors and assigns) complying with the New Leases without default thereunder), (b) the REA (subject to Purchaser (and its successors and assigns) complying with the New Leases without default thereunder), and (c) Purchaser's options to purchase the Land and Improvements as set forth in (but subject to all the applicable terms and conditions of such options set forth in) the New Leases. Should Purchaser acquire title to all or any part of the Land and Improvements pursuant to (and in accordance with the terms and conditions of) the New Leases (including, without limitation, purchasing the same utilizing the fair market valuation process set forth therein), then any judgment, award, decree, or order (each, a "Judgment") against any or all of the Rubin Landlords shall be subject to and subordinate to Purchaser's fee simple interest in the Land and Improvements, provided that, for the avoidance of doubt, any such Judgment may attach to the sale proceeds paid by Purchaser to the Rubin Landlords for the Land and Improvements to the full extent provided under applicable law. For the avoidance of doubt and notwithstanding anything herein or in the APA to the contrary, the Purchaser and Rubin Landlords' entry into the REA and New Leases does not prejudice, modify, nullify or otherwise affect any Claims (as defined in the APA) of any Debtors or any other party that may exist against the Rubin Landlords (in connection with the Land and Improvements or otherwise), except for with respect to any Claims (as defined in the APA) being sold to Purchaser under Section 2.1(b)(x) of the APA.

31.    All of the Debtors' right title and interest in the real property located at 12800 NW 38th Avenue, Opa Locka, FL 33054 (the "12800 Real Property"), is sold and transferred to the Purchaser free and clear of all Interests and Claims, including, without limitation, that certain

mortgage in favor of Cooperative Rabobank U.A., New York Branch, in its capacity as Collateral Agent in the original principal amount of $5,625,000.00, dated October 10, 2018 and recorded in Official Records Book 31192, Page 1797.

32.     The Purchaser has given substantial consideration under the APA for the benefit of the holders of any Interests or Claims. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Interests or Claims against or in the Debtors or any of the Assets.

33.     The Purchaser is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Sale and/or the APA.

34.     Nothing contained in any plan confirmed in the Debtors' chapter 11 cases or any order of this Court confirming such plans or in any other order in the Debtors' cases (including, without limitation, any order dismissing one or more of these cases or any order entered after any conversion of any of these cases to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the APA or the terms of this Order.

35.     The APA and related documents may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, provided that no such modification, amendment or supplement that is materially adverse to the Debtors or any other party in interest shall be effective without further order of the Court.

36.     Notwithstanding Bankruptcy Rules 4001, 6004, 6006, 7062, and 9014, or any other law that might serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In

the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to perform under the APA at any time, subject to the terms of the APA.

37.    To the extent that anything contained in this Order explicitly conflicts with a provision in the APA, this Order shall govern and control.

38.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.    No bulk sales law, bulk sales tax law, or any similar law of any state or other jurisdiction applies in any way to the Sale contemplated by the APA.

40.    The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Debtors any notice provided for in the APA, (b) to allow the Purchaser to take any and all actions permitted by the APA in accordance with the terms and conditions thereof, including, without limitation, effectuating the Sale contemplated by the APA and (c) to otherwise implement the terms and provisions of the APA and this Order.

41.    This Court shall retain jurisdiction with regard to, *inter alia*, all issues or disputes relating to interpretation, implementation and enforcement of this Order or the APA, including without limitation Purchaser's post-Closing obligations under Assumed Executory Contracts.

Dated: February 21, 2019
New York, New York                              */s/ Sean H. Lane*
                                                United States Bankruptcy Judge

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**among**

**REPUBLIC METALS CORPORATION (FL) AND REPUBLIC METALS REFINING CORPORATION (FL) (THE "PARENT COMPANIES") AND THE SUBSIDIARIES OF THE PARENT COMPANIES LISTED ON ANNEX 1 (COLLECTIVELY WITH THE PARENT COMPANIES, THE "SELLERS")**

**and**

**ASAHI HOLDINGS, INC. ("BUYER")**

**dated as of**

**February 13, 2019**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS** ............................................................................................2
    1.1     Definitions. ...........................................................................................2
    1.2     Other Definitions and Interpretive Matters. .......................................13

**ARTICLE 2 PURCHASE AND SALE** ...............................................................................14
    2.1     Purchase and Sale. ..............................................................................14
    2.2     Excluded Assets. .................................................................................17
    2.3     Assumed Liabilities. ...........................................................................19
    2.4     Excluded Liabilities. ...........................................................................19
    2.5     Assignments, Cure Amounts. .............................................................21
    2.6     Further Assurances. ............................................................................21

**ARTICLE 3 PURCHASE PRICE** ....................................................................................22
    3.1     Purchase Price. ...................................................................................22
    3.2     Allocation of Purchase Price. .............................................................22

**ARTICLE 4 CLOSING** .................................................................................................23
    4.1     Closing Date. ......................................................................................23
    4.2     Closing Date Payment of Purchase Price. ..........................................23
    4.3     Buyer's Closing Deliveries. ................................................................23
    4.4     Sellers' Closing Deliveries. ................................................................24

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLERS** ................................24
    5.1     Organization; Authority; Validity. ......................................................24
    5.2     Subsidiaries. .......................................................................................25
    5.3     No Conflicts; Consents. ......................................................................25
    5.4     Encumbrances; Title to Assets; Real Property. ...................................25
    5.5     Taxes. .................................................................................................26
    5.6     Intellectual Property. ..........................................................................27
    5.7     Insurance. ...........................................................................................27
    5.8     Compliance with Laws. ......................................................................27
    5.9     Absence of Certain Changes. ..............................................................27
    5.10    Contracts. ............................................................................................27
    5.11    Permits. ...............................................................................................28
    5.12    Consents and Approvals. ....................................................................28
    5.13    Legal Proceedings; Government Orders. .............................................28
    5.14    Employees. .........................................................................................29
    5.15    Environmental Matters. ......................................................................30
    5.16    Brokers or Finders. .............................................................................31
    5.17    FCPA. .................................................................................................31
    5.18    International Trade. .............................................................................32

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER** ..................................32
    6.1     Organization and Good Standing. .......................................................32

6.2    Authority; Validity; Consents. ....................................................................33
6.3    No Conflict. ................................................................................................33
6.4    Availability of Funds. ................................................................................33
6.5    Litigation. ..................................................................................................33
6.6    Brokers or Finders. ...................................................................................34

**ARTICLE 7 ACTIONS PRIOR TO AND FOLLOWING THE CLOSING DATE** ...................................**34**
7.1    Operations Prior to the Closing Date. .......................................................34
7.2    Commercially Reasonable Efforts. ............................................................35
7.3    Bankruptcy Court Approval. .....................................................................36
7.4    Notification of Certain Matters; Schedules. ..............................................36
7.5    Bankruptcy Filings. ...................................................................................37
7.6    Access. .......................................................................................................37

**ARTICLE 8 ADDITIONAL AGREEMENTS** ...............................................................................**37**
8.1    Governmental Approvals and Consents. ....................................................37
8.2    Taxes. ........................................................................................................38
8.3    Bulk Sales. .................................................................................................40
8.4    Payments Received. ...................................................................................40
8.5    Assigned Contracts and Assigned Leases. .................................................40
8.6    Employee Matters. ....................................................................................40
8.7    Permits. .....................................................................................................41
8.8    Post-Closing Books and Records, Personnel, and Services. .......................41
8.9    Post-MAE Insurance Proceeds. .................................................................42
8.10   Name Changes. ..........................................................................................43
8.11   Tax Payments. ...........................................................................................43
8.12   No Other Representations or Warranties; Disclaimers. ..............................43

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE** .......................**44**
9.1    Representations and Warranties; Covenants. .............................................44
9.2    No Order. ...................................................................................................44
9.3    Sellers' Deliveries. ....................................................................................45
9.4    Assigned Contracts and Assigned Leases. .................................................45
9.5    Permits. .....................................................................................................45
9.6    Sale Order. .................................................................................................45
9.7    Employees. ................................................................................................45

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE** .............**45**
10.1   Sale Order in Effect. ..................................................................................45
10.2   Representations and Warranties; Covenants. .............................................46
10.3   No Order. ...................................................................................................46
10.4   Buyer's Deliveries. ....................................................................................46

**ARTICLE 11 TERMINATION** .................................................................................................**46**
11.1   Termination Events. ...................................................................................46
11.2   Effect of Termination. ...............................................................................48

ii

**ARTICLE 12 GENERAL PROVISIONS** ..........................................................................**49**
    12.1    Survival. ...................................................................................49
    12.2    Confidentiality. .........................................................................49
    12.3    Public Announcements. ..............................................................50
    12.4    Notices. ...................................................................................50
    12.5    Waiver, Waiver of Damages. .....................................................52
    12.6    Entire Agreement; Amendment. ..................................................52
    12.7    Assignment. .............................................................................52
    12.8    Severability. ............................................................................53
    12.9    Expenses. ................................................................................53
    12.10   Time of Essence. ......................................................................53
    12.11   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver..............54
    12.12   Counterparts.............................................................................54
    12.13   Parties in Interest; No Third Party Beneficiaries. ................................54
    12.14   Non-Recourse. .........................................................................55
    12.15   Headings. ................................................................................55
    12.16   Disclosure Schedules; Materiality. ..............................................55

SCHEDULES

Disclosure Schedules

Schedule 7.1          Operations Prior to the Closing Date
Schedule 8.5          Security Arrangements
Schedule 8.6          Potential Transferred Employees

EXHIBITS

Exhibit A          Assigned Real Property
Exhibit B          Assigned Leases
Exhibit C          Assigned Contracts
Exhibit D          Assigned Inventory
Exhibit E          Additional Excluded Assets
Exhibit F          Form of Assignment and Assumption Agreement
Exhibit G          Additional Assumed Liabilities
Exhibit H          Bidding Procedures Order
Exhibit I          Form of Deed
Exhibit J          Form of Assignment and Bill of Sale
Exhibit K          Form of New Leases
Exhibit L          Form of Sale Order
Exhibit M          Assumed Sellers' Plans

ANNEXES

Annex 1          Subsidiary Sellers

**EXECUTION VERSION**

## ASSET PURCHASE AGREEMENT

### PREAMBLE

This Asset Purchase Agreement (this "Agreement"), dated as of February 13, 2019, is entered into among Republic Metals Corporation, a Florida corporation ("RMC"), and Republic Metals Refining Corporation, a Florida corporation (together with RMC, the "Parent Companies"), and the subsidiaries of the Parent Companies listed on Annex 1 (collectively with the Parent Companies, each a "Seller" and collectively, the "Sellers") and Asahi Holdings, Inc., a Japanese corporation ("Buyer").

### RECITALS

WHEREAS, certain terms used in this Agreement are defined in Section 1.1;

WHEREAS, the Sellers have filed voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), on either November 2, 2018 or November 21, 2018, as applicable (collectively, the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (such cases, collectively, the "Bankruptcy Cases");

WHEREAS, the Sellers are engaged in the business of owning and operating facilities that offer gold, silver or other precious metals or high-technology metals refining or minting and all currently conducted business activities that are ancillary thereto (the "Business");

WHEREAS, subject to the terms and conditions hereof and of the Transaction Documents provided for herein, the Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from the Sellers, all of the Assets and Assumed Liabilities (as each such term is defined below);

WHEREAS, the board of managers, managing member, sole shareholder, sole member, or applicable governing body of each Seller has determined that a sale of the assets of its applicable Seller is necessary to maximize value and it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein and has approved this Agreement;

WHEREAS, the Bankruptcy Court having approved certain bidding procedures pursuant to the Bidding Procedures Order entered on January 11, 2019; and, prior to the deadline on January 28, 2019, the Buyer having submitted a timely Bid (as defined in the Bidding Procedures), to acquire and assume from the Sellers all of the Assets and Assumed Liabilities (each as defined below); and the Sellers having determined that the Buyer's Bid was a Qualified Bid (as defined in the Bidding Procedures); and the Sellers having conducted the Auction (as defined in the Bidding Procedures) on January 31, 2019; and at the close of the Auction, the Sellers having determined, in consultation with the Consultation Parties (as defined in the Bidding Procedures) that the Buyer's Bid, as modified at the Auction, was the Successful Bid (as defined in the Bidding Procedures); and the Bankruptcy Court having scheduled a hearing to commence on February 13, 2019, to consider the Debtors' request for approval of the transactions contemplated by this Agreement; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bidding Procedures Order and, if Buyer is the Successful Bidder, in accordance with the Bidding Procedure Order, the Sale Order to be entered by the Bankruptcy Court in the Bankruptcy Cases.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1        Definitions.

The following terms have the meanings specified or referred to in this ARTICLE 1:

"2019 Opa Locka Pro-Rated Amount" means, notwithstanding Section 8.2(b), a reasonable amount agreed to by the Parties prior to Closing pursuant to the Sale Order, of the accrued general real estate taxes for 2019 for the property located at 12800 NW 38th Avenue, Opa Locka, FL 33504 not yet due and payable, prorated as of the Closing Date based on the number of days, determined on the basis of the actual taxes for such year, if known, or if unknown, on the basis of the most recent ascertainable taxes, but in either case based on the maximum allowable discount for early payment.

"Action" means (i) any claim, action, cause of action, demand, lawsuit, arbitration, notice of violation, proceeding, litigation, mediation, citation or summons or (ii) to the Sellers' Knowledge, any inquiry, investigation or audit, in each case, whether formal or informal, public or private, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means a proposal relating to any sale, transfer or other disposition, directly or indirectly, whether by means of an asset sale, merger, sale of stock, amalgamation, reorganization, liquidation or otherwise, of 20% or more of the Assets, in a transaction or a series of transactions with one or more Persons, other than Buyer or an Affiliate of Buyer; provided that "Alternative Transaction" shall not include sales of Inventory or other dispositions of immaterial or obsolete assets in the Ordinary Course of Business.

"Asset Taxes" has the meaning set forth in Section 8.2(b).

2

"Assets" has the meaning set forth in Section 2.1(b).

"Assigned Contracts" has the meaning set forth in Section 2.1(b)(v).

"Assigned Leases" means those leases set forth on Exhibit B.

"Assigned Real Property" has the meaning set forth in Section 2.1(b)(i).

"Assignment and Assumption Agreement(s)" means the Assignment and Assumption Agreement(s) in substantially the form attached hereto as **Exhibit F**, evidencing the assignment to and assumption by Buyer of all rights and obligations under the Assigned Contracts.

"Assignment(s) and Bill(s) of Sale" means the Assignment(s) and Bill(s) of Sale in substantially the form attached hereto as **Exhibit J**, evidencing the sale, assignment, conveyance, transfer and delivery to Buyer all of Sellers' right, title and interest in and to the Assets and Buyer's assumption of all Assumed Liabilities with respect to such Assets, including the assignment of the registered trademarks and domain names registrations.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction as contemplated by the Bidding Procedures Order.

"Avoidance Actions" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) or comparable state law and all proceeds thereof.

"Backup Bidder" has the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the Recitals hereto.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Bidding Procedures Order" means the bidding procedures order of the Bankruptcy Court entered in the Bankruptcy Cases on January 11, 2019 (Docket No. 399), substantially and in all material respects in the form attached hereto as **Exhibit H**.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Buyer Previously Omitted Contract" has the meaning set forth in Section 2.1(b)(v).

3

"Buyer Termination Notice" has the meaning set forth in Section 11.1(b)(i).

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.*

"Claims" means any claims, damages, actions, suits, causes of action, rights, liens, demands, obligations and/or liabilities, of any nature whatsoever, whether known or unknown, asserted or unasserted, that existed or that may have existed at any time up until the Closing Date.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"COBRA" has the meaning set forth in Section 2.1(b)(xiv).

"Code" means the Internal Revenue Code of 1986, Title 26 of the United States Code, 26 U.S.C. § 1 *et seq.*, as amended.

"Confidentiality Agreement" has the meaning set forth in Section 12.2.

"Contract" means any contract, indenture, note, bond, lease for personal property or other lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement, but excluding the Leases.

"Cure Amounts" means all amounts, costs and expenses necessary to cure any monetary default as required by Section 365 of the Bankruptcy Code with respect to the assumption and assignment of an Assigned Contract.

"Deed" means the special warranty deed substantially in the form attached hereto as **Exhibit I**.

"Deposit" has the meaning set forth in Section 3.1(a).

"DIP Account" means the segregated debtor-in-possession account opened by Sellers solely for the purpose of the sale of the Assets contemplated by this Agreement.

"Disclosure Schedules" means the Schedules referred to in ARTICLE 5.

"Dollars or $" means the lawful currency of the United States.

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Environmental Attributes" means any emissions and renewable energy credits, energy conservation credits, benefits, offsets and allowances, emission reduction credits or words of

4

similar import or regulatory effect (including emissions reduction credits or allowances under all applicable emission trading, compliance or budget programs, or any other federal, state or regional emission, renewable energy or energy conservation trading or budget program) that have been held, allocated to or acquired for the development, construction, ownership, lease, operation, use or maintenance of any of the Sellers as of: (i) the date of this Agreement; and (ii) future years for which allocations have been established and are in effect as of the date of this Agreement.

"Environmental Claim" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for, or for the costs of, enforcement proceedings, investigations, groundwater monitoring, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"Environmental Notice" means any written inquiry, written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equipment" has the meaning set forth in Section 2.1(b)(iii).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any corporation or other entity that is included in a controlled group of corporations within which any Seller is also included, as provided in Section 414(b) of the Code; or which is a trade or business under common control with any Seller, as provided in Section 414(c) of the Code; or which constitutes a member of an affiliated service group within which any Seller is also included, as provided in Section 414(m) of the Code.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" has the meaning set forth in Section 2.2(d).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Real Property" has the meaning set forth in Section 2.2(b).

"Ex-Im Laws" means all U.S. and non-U.S. Laws relating to export, reexport, transfer and import controls, including the Export Administration Regulations, the International Traffic in Arms Regulations, the customs and import Laws administered by U.S. Customs and Border Protection, and the EU Dual Use Regulation.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Final" means, with respect to an order, judgment or other decree of the Bankruptcy Court or other court of competent jurisdiction, in full force and effect, with respect to the relevant subject matter entered by the clerk of the Bankruptcy Court or such other court on the docket in Sellers' Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or such other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that any potential for modification or amendment pursuant to Federal Rules of Bankruptcy Procedure 9023 and/or 9024 or request for stay pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8007 or other similar rule shall not be considered in determining whether an order is Final.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, any agency or instrumentality of such government or political subdivision, any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such

6

organization or authority have the force of Law), any arbitrator (public or private), court or tribunal of competent jurisdiction, or any instrumentality or agency of any of the foregoing, any taxing authority or any other entity exercising executive, legislative, judicial, regulatory, taxing or administrative functions of or pertaining to government pursuant to any legal authority.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, decision, determination or award entered by or with any Governmental Authority, including any Governmental Order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

"Hazardous Materials" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services or goods acquired in the Ordinary Course of Business), all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Insider" has the meaning set forth in Section 101(31) of the Bankruptcy Code.

"Insurance Policies" has the meaning set forth in Section 5.7.

"Intellectual Property" means any and all intellectual property rights or assets (whether arising under statutory or common law, contract or otherwise) in any jurisdiction throughout the world, including the following: (a) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know how; (d) patents and patent applications; (e) websites and internet domain name registrations; and (f) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

7

"<u>Intellectual Property Agreements</u>" means all licenses, sublicenses and other agreements by or through which any Person grants to any Seller or any Seller grants to any other Person any exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used in connection with the Business.

"<u>Intellectual Property Assets</u>" means all Intellectual Property that is owned by any Seller and used or held for use in connection with the Business, including the Intellectual Property Registrations set forth on <u>Schedule 5.6(a)</u> (including the internet domain name registrations and trademark registrations set forth thereon).

"<u>Intellectual Property Registrations</u>" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction.

"<u>Inventory</u>" means all of the Sellers' inventory (including, without limitation, finished goods, merchandise, work in progress, residual by-products, samples, shipping materials, packaging materials, raw materials and other consumables) owned and maintained, held or stored by or for any of the Sellers as of the Closing Date, excluding spare parts.

"<u>Knowledge of Sellers</u>" or "<u>Sellers' Knowledge</u>" or any other similar knowledge qualification, means the knowledge of Jason Rubin, David Comite, Zachary Shair, James Gavilan, Luis Pena, Alan Silverstein, Robert Lani, Alex Galguera, JR Rao, Scott Avila and Rafael Carbonell, after reasonable inquiry and investigation.

"<u>Law</u>" means any statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, permit, directive, guideline or other requirement or rule of law of any Governmental Authority.

"<u>Leases</u>" has the meaning set forth in <u>Section 5.4(b)</u>.

"<u>Leased Real Property</u>" means the parcels of real property of which any Seller is the lessee or sublessee (together with all Structures thereon), including without limitation parcels of real property that a Seller occupies pursuant to a verbal or at-will lease or arrangement.

"<u>Liability</u>" means any debt, loss, claim (as defined in Bankruptcy Code Section 101(5)), damage, demand, fine, judgment, penalty, liability, or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability, or otherwise), and including all costs and expenses related thereto (including expenses of legal counsel, experts, engineers and consultants, and costs of investigations).

"<u>Material Adverse Effect</u>" means any fact, condition, change, circumstance, effect, event, or occurrence that, individually or in the aggregate, has had, or would be reasonably likely to have, a material adverse change in or material adverse effect on (A) the ability of the Sellers to perform their obligations hereunder and consummate the transactions contemplated by this Agreement and other Transaction Documents or (B) the Assets and the Assumed Liabilities, taken as a whole (but excluding the Excluded Assets and Excluded Liabilities), but excluding (a) any change or effect to the extent that it results from or arises out of (i) pendency of the

Bankruptcy Case or the financial condition of the Sellers; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (iii) changes in (or proposals to change) Law, GAAP, or other accounting regulations or principles, or (iv) any action contemplated by this Agreement or taken at the request of Buyer; (b) any change or effect generally applicable to (i) the industries and markets in which Sellers operate or (ii) economic or political conditions or the securities or financial markets in any country or region; (c) any outbreak or escalation of hostilities or war or any act of terrorism; (d) any objections in the Bankruptcy Court to (i) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (ii) the reorganization of Sellers and any related plan of reorganization or disclosure statement, or (iii) the Bidding Procedures Order or the Sale Motion; (e) the assumption or rejection of any Assigned Contract; (f) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith; (g) any loss of accreditation or certification with the London Bullion Market Association or Chicago Mercantile Exchange by any Seller; (h) any action taken by Sellers at the request of, or with the written consent of, Buyer; and (i) any of the matters disclosed on any Exhibit, Annex, Schedule, or Disclosure Schedule to this Agreement; provided that any fact, condition, change, circumstance, effect, event, or occurrence described in clauses (a)(iii), (b) or (c) shall be taken into account in determining whether there has been, or would reasonably be likely to have a Material Adverse Effect to the extent such fact, condition, change, circumstance, effect, event, or occurrence has had or would be reasonably likely to have a disproportionate effect on the Assets and the Assumed Liabilities, taken as a whole, relative to other similarly situated Persons.

"Neutral Accountant" means Grant Thornton LLP, and if such firm refuses or is unable to perform the requested services (including in connection with a conflict of interest), Buyer and RMC shall negotiate in good faith to mutually agree upon a different nationally-recognized, independent accounting firm.

"New Leases" means (i) the leases that will be entered into at Closing substantially in the form attached hereto as **Exhibit K** for the three (3) properties located at (a) 12900 N.W. 38th Avenue, Opa Locka, Florida, (b) 13000 N.W. 38th Avenue, Opa Locka, Florida, and (c) 5295 N.W. 163 Street, Opa Locka, Florida, together with (ii) all easement agreements, access agreements, parking agreements, license agreements and similar agreements requested by the Buyer to encumber the applicable Leased Real Property (including the fee interest therein) for the benefit of a parcel or parcels of Real Property to the extent such agreements are reasonably necessary for the continued use of the Real Property in the manner most recently used prior to this Agreement. The New Leases will also simultaneously terminate any existing Seller Related Leases with respect to (a) 12900 N.W. 38th Avenue, Opa Locka, Florida, (b) 13000 N.W. 38th Avenue, Opa Locka, Florida, and (c) 5295 N.W. 163 Street, Opa Locka, Florida. For the avoidance of doubt, the Seller Related Leases that are not terminated and replaced by the New Leases are Excluded Assets.

"Ordinary Course of Business" means the ordinary and usual course of operations of the Business (including acts and omissions of Sellers in the ordinary and usual course), taken as a whole.

"Outside Date" has the meaning set forth in Section 11.1(a)(iii).

"Owned Real Property" has the meaning set forth in Section 5.4(a).

"Parent Companies" has the meaning set forth in the Preamble hereto.

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Paying Party" has the meaning set forth in Section 8.2(c).

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"Permitted Encumbrances" means any (i) items set forth on Schedule 1.1; (ii) liens for Taxes (a) not yet due and payable or (b) which are being contested in good faith, by appropriate proceedings and for which adequate reserves have been established; (iii) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the Ordinary Course of Business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the Business; (iv) easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the Business; or (v) any liens that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, estate or any other entity.

"Petition Date" has the meaning set forth in the recitals.

"Plans" means (i) all employee benefit plans as defined in Section 3(3) of ERISA (whether or not subject to ERISA); and (ii) all other pension, retirement, group insurance, excess or supplemental benefit, bonus, stock option, stock purchase, restricted stock, or other equity-based compensation, incentive, deferred compensation, vacation, severance or other benefit plans, contracts, schemes, programs, funds, commitments, or arrangements of any kind, whether written or oral, formal or informal, qualified or nonqualified, funded or unfunded, and including any that have been frozen or terminated, which pertain to any current or former employee, director, manager, officer, stockholder, member, manager, consultant or independent contractor of any Seller or any ERISA Affiliate (or any respective dependents or beneficiaries thereof) and with respect to which any Seller may otherwise have any liability or obligations (including any such plan or arrangement maintained or formerly maintained by the Company or any ERISA Affiliate).

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Previously Omitted Contract" has the meaning set forth in Section 2.1(b)(v).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.1(b)(v)(1).

"Purchase Price" has the meaning set forth in Section 3.1.

"Sellers Previously Omitted Contract" has the meaning set forth in Section 2.1(b)(v).

"Records" has the meaning set forth in Section 2.1(b)(vii).

"Real Property" means the Leased Real Property and the Owned Real Property.

"Reimbursing Party" has the meaning set forth in Section 8.2(c).

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Sale Hearing" means the hearing of the Bankruptcy Court to consider, *inter alia*, the Debtors' request for approval of this Agreement and the transactions contemplated herein and entry of the Sale Order, which hearing is scheduled to commence on February 13, 2019.

"Sale Motion" means the motion filed by Sellers with the Clerk of the Bankruptcy Court on December 21, 2018 (Docket No. 358) pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code seeking entry of the Sale Order and approval of the transactions contemplated by this Agreement.

"Sale Order" means an Order substantially in the form attached hereto as **Exhibit L**, and otherwise reasonably acceptable to the parties, to be entered by the Bankruptcy Court pursuant to, inter alia, Sections 105, 363, and 365 of the Bankruptcy Code.

"Sanctioned Country" means any country or region that is the subject or target of a comprehensive embargo under Sanctions Laws (including Cuba, Iran, North Korea, Syria, and the Crimea region of Ukraine).

"Sanctions Laws" means all U.S. and non-U.S. Laws relating to economic or trade sanctions, including the Laws administered or enforced by the United States (including by OFAC or the U.S. Department of State), the United Nations Security Council, and the European Union.

"Sanctioned Person" means any individual or entity that is the subject or target of sanctions or restrictions under Sanctions Laws or Ex-Im Laws, including: (i) any individual or entity listed on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including OFAC's Specially Designated Nationals and Blocked Persons List and the EU

Consolidated List; (ii) any entity that is, in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled by a person or persons described in clause (i); or (iii) any national of a Sanctioned Country.

"Security Arrangements" has the meaning set forth in Section 8.5(c).

"Seller Fundamental Representations" has the meaning set forth in Section 9.1(a).

"Seller Related Leases" means the five (5) leases listed under the heading of "Seller Related Leases" on Schedule 5.4(b).

"Seller Related Party" means, with respect to any Seller, (i) any member, shareholder, employee, manager or director, (ii) any estate, spouse, former spouse, parent, sibling, descendant of such member, employee, manager or director, and (iii) any trust, general or limited partnership, limited liability company or similar entity for the benefit of such member, employee, manager or director and/or such member, employee, manager or director's estate, spouse, former spouse, parent, sibling or descendant, in each case other than another Seller.

"Seller Termination Notice" has the meaning set forth in Section 11.1(b)(iii).

"Seller(s)" has the meaning set forth in the preamble.

"Sellers' Obligations" has the meaning set forth in Section 8.5(c).

"Straddle Period" has the meaning set forth in Section 8.2(b).

"Structures" means, collectively, buildings, structures and fixtures on, and other improvements to, the Real Property, to which any Seller has a fee or leasehold, as applicable, interest.

"Subsidiaries" has the meaning set forth in Section 5.2.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Taxes" means (i) all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, value-added, net worth, capital stock, capital gains, documentary, alternative or add-on minimum, disability, recording, insurance, social security (or similar), environmental (including taxes under Section 59A of the Code), payroll, stamp, escheat or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, and (ii) any liability for any item described in clause (i) above as a result of being a member of a combined, consolidated, unitary or affiliated group (including pursuant to Section 1.1502-6 of the Treasury Regulations or any predecessor or successor thereof or any comparable

provisions of state, local or non-U.S. tax law); by reason of any agreements, contracts or arrangements; as a transferee or successor or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Consents" have the meaning set forth in Section 5.12.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreements, the Deed, the Assignments and Bills of Sale, the New Leases and any other agreements, instruments, or documents that are to be entered into pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.2(a).

"Transferred Employees" has the meaning set forth in Section 8.6(a).

"Treasury Regulations" means the regulations issued by the IRS and the regulations under Title 26 of the Code of Federal Regulations.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"Winddown Requirements" has the meaning set forth in Section 8.8.

1.2    Other Definitions and Interpretive Matters.

Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

Exhibits/Annexes/Schedules/Disclosure Schedules. All Exhibits, Annexes, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex, Schedules or Disclosure Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender includes all genders, and words imparting only the singular number include the plural and vice versa.

Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of

reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.    All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

<u>Herein</u>.  Words such as "herein," "hereof," "hereby," "hereunder"  and other similar terms refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

<u>Including</u>.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

<u>No Strict Construction</u>.    Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1    <u>Purchase and Sale.</u>

(a) Upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Sellers (as applicable) shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase from Sellers, free and clear of all Liabilities and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), all of Sellers' right, title, and interest in, to, or under the Assets.

(b) The "<u>Assets</u>" shall include all right, title, and interest of Sellers in, to, or under all properties (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased or licensed, used or held for use in or relating to the Business including, but not limited to, the following:

(i)   the Real Property and Structures thereon more specifically identified on **Exhibit A** attached hereto (the "<u>Assigned Real Property</u>");

(ii)    **[Intentionally Omitted]**;

(iii)   all equipment, machinery, furniture, fixtures, computers and automation equipment, apparatus, appliances, signage, supplies, trucks, trailers, vehicles and other rolling stock not described below in <u>Section 2.2</u>, and other tangible personal property and Structures located on the Assigned Real Property, or used or held for use or obtained in connection with the

14

ownership, operation, use, maintenance or repair of the Business or the Assets, including, without limitation, tanks, plants, buildings, field offices and other structures, fixtures, and other refining facilities (whether installed or not), or processing systems or facilities, meters, machinery, power and other utility lines, telecommunications equipment, central processing equipment, tools, spare parts, warehouse stock, and other appurtenances (collectively, the "Equipment");

(iv)    to the extent transferable pursuant to applicable Law, all Permits required for Sellers to conduct the Business as currently conducted or for the ownership, operation, use, maintenance or repair of the Assets;

(v)    those certain Contracts described on **Exhibit C** attached hereto, insofar as they relate to any other Asset, except for any Contracts Buyer, in its sole discretion, instructs Sellers to remove from **Exhibit C** prior to Closing (collectively, the "Assigned Contracts"). If prior to or following Closing, it is discovered that a Contract should have been listed on **Exhibit C** but was not listed on **Exhibit C** (any such Contract, a "Sellers Previously Omitted Contract"), Sellers shall, promptly following the discovery thereof notify Buyer in writing of such Sellers Previously Omitted Contract.  Buyer shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Sellers Previously Omitted Contract from Sellers, designating such Sellers Previously Omitted Contract as "Assumed" or "Rejected." If prior to Closing (or such later date as Buyer, Sellers, and the counterparty to any executory contract or lease may agree in writing), Buyer elects to add any additional Contract to **Exhibit C** that was not listed on **Exhibit C** as of the date hereof (any such Contract, a "Buyer Previously Omitted Contract" and together with any Sellers Previously Omitted Contract, a "Previously Omitted Contract"), Buyer shall notify Sellers in writing of its designation of such Buyer Previously Omitted Contract as "Assumed."

(1) If Buyer designates a Previously Omitted Contract as "Assumed" prior to entry of the Sale Order, (A) **Exhibit C** shall be amended to include such Previously Omitted Contract and (B) Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Agreement. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) days to object, in writing to Sellers and Buyer, to the Cure Amounts or the assumption of its Contract; and

(2) If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to such objection, or if Buyer designates a Previously Omitted Contract as "Assumed" after entry of the Sale Order, Sellers will file all pleadings required to seek a timely hearing before the Bankruptcy Court to determine the applicable Cure Amounts and approve such assumption and to obtain an order of the Bankruptcy Court fixing the applicable Cure Amounts and approving the assumption of the Previously Omitted Contract and payment by Buyer of such applicable Cure Amount;

(vi)    all Intellectual Property Assets (including goodwill associated therewith and the right to enforce and represent to third parties that Buyer is the successor of the Intellectual Property Assets);

(vii)    all books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the Assets (including Intellectual Property Assets), Business or operations of the Business of Sellers (collectively, the "Records");

(viii)    all rights of Sellers under or pursuant to all warranties, representations, indemnities, and guarantees made by suppliers, manufacturers, and contractors to the extent relating to property or property sold, or services provided, to Sellers affecting the Assigned Real Property, Assigned Leases, Assigned Contracts, Equipment or Intellectual Property Assets, excluding only any warranties, representations, indemnities, and guarantees relating to any Excluded Assets;

(ix)    all rights of Sellers to rebates and discounts payable by manufacturers, vendors, suppliers, or others in connection with the Assets, except for currently due and payable amounts excluded by Section 2.2;

(x)    claims, causes of action and other legal rights and remedies against other Persons (including for royalties, fees or other income, past, present or future infringement, misappropriation or violation of, any of the Intellectual Property Assets) to the extent directly related to the Equipment, Intellectual Property Assets or Assets identified in Section 2.1(b)(viii), Section 2.1(b)(ix), Section 2.1(b)(xiv) (solely to the extent relating to administration of the Plans), and Section 2.1(b)(xv) or, solely to the extent relating to defects in title, Assigned Real Property, in each case, regardless of whether or not asserted by any Seller, all of the proceeds from the foregoing which are accrued and unpaid as of the Closing, all rights of indemnity, warranty rights, guaranties received from vendors, suppliers or manufacturers, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by any Seller against other Persons and the prosecution files of Sellers related thereto, in each case, to the extent directly related to the Equipment, Intellectual Property Assets or Assets identified in Section 2.1(b)(viii), Section 2.1(b)(ix), Section 2.1(b)(xiv) (solely to the extent relating to administration of the Plans), and Section 2.1(b)(xv) or, solely to the extent relating to defects in title, Assigned Real Property, in each case, regardless of whether such rights are currently exercisable;

(xi) the telephone and fax numbers for the Business of Sellers listed in Schedule 2.1(b)(xi);

(xii)    all other goodwill and other intangible assets (other than Claims) associated with the Assets or the Business of Sellers and the right to represent to third parties that Buyer is the successor of the Business of Sellers (excluding, for the avoidance of doubt, any and all goodwill and intangible assets to the extent associated with or constituting the Excluded Assets);

(xiii)    the Inventory specifically identified on **Exhibit D** attached hereto;

(xiv)    all rights, liabilities or obligations arising under, or with respect to, those Sellers' Plans specifically identified on **Exhibit M** attached hereto, except for any Sellers' Plans Buyer, in its sole discretion, instructs Sellers to remove from **Exhibit M** prior to any hearing before the Bankruptcy Court to approve the Sale Order; and

(xv)    all confidentiality, non-compete, non-disclosure, invention assignment, non-disparagement and similar agreements in favor of any of the Sellers with current or former employees or agents of any such Seller or with third parties; provided, however, that Buyer shall not be deemed to assume any such agreements except to the extent they explicitly become Assigned Contracts under the terms of this Agreement.

*provided, however,* none of the Parties hereto intends that Buyer, or any of its Affiliates, shall be deemed to be a successor to Sellers with respect to the Assets.

2.2        Excluded Assets.

Notwithstanding the foregoing, the Assets shall not include, and there is excepted, reserved and excluded from the transaction contemplated hereby, the following (collectively, the "Excluded Assets"):

(a) the Purchase Price delivered to Sellers pursuant to this Agreement;

(b) all Real Property and Structures thereon that are not listed on **Exhibit A** attached hereto (the "Excluded Real Property");

(c) all Leases related to the Assets or the Business of Sellers that are not listed on **Exhibit B** attached hereto, including without limitation the leases for facilities in in all geographic regions other than the State of Florida and, for the avoidance of doubt, the Seller Related Leases;

(d) all Contracts and agreements related to the Assets or the Business of Sellers that are not listed on **Exhibit C** attached hereto (the "Excluded Contracts");

(e) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits as of the Closing Date;

(f) all trade credits, accounts receivable, note receivables, and other receivables with respect to any period of time prior to the Closing Date;

(g) all Inventory consisting of or containing precious metals, all hydroxides and all ores and all other Inventory that is not listed on **Exhibit D** attached hereto;

(h) any shares of capital stock or other equity interest of Sellers or any of Sellers' Affiliates or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Sellers or any of Sellers' Affiliates;

(i)  any confidential personnel and medical records pertaining to any employee of any Seller and its Affiliates, pertaining to any employee who is not a Transferred Employee;

(j)  all rights, liabilities or obligations arising under, or with respect to, any of Sellers' Plans that are not listed on **Exhibit M** attached hereto;

(k)  all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(l)  all (i) corporate, financial, Tax and legal records of Sellers that relate to Sellers' business generally (excepting the same to the extent relating to the Assumed Liabilities and the Assets), and (ii) books, records and files that relate to any Excluded Assets;

(m)  all rights to any refunds, credits, or rebates of or relating to Taxes (or other related costs or expenses) that are borne by or the responsibility of Sellers or attributable to any Tax asset of Sellers;

(n)  any refunds due to any Seller by a third party for any overpayment attributable to the Assets with respect to any period of time on or prior to the Closing Date;

(o)  all insurance policies and rights to proceeds thereof  and  unearned premiums related thereto;

(p)  all prepayments, good faith, and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(q)  all security deposits;

(r)  all Claims of Sellers or their respective estates other than those specifically constituting Assets, provided, however, that any such Claims consisting of rights of set-off, rights of indemnity, contribution or recoupment counter-claims, cross-claims and defenses of Sellers pursuant to any Assigned Contract shall not be Excluded Assets;

(s)  all Claims of Sellers or their respective estates against any current or former equityholder, any Seller or Affiliate of any Seller, or any director, officer, Insider, auditor, insurer, accountant or other retained professional of any Seller (including without limitation any such Claims arising out of or related to any Assigned Contracts, Assigned Leases, or Assigned Real Property, except for claims, causes of action and other legal rights and remedies set forth in Section 2.1(b)(x));

(t)  all Avoidance Actions;

(u)  all Claims of Sellers or their respective estates against any Person arising out of or in connection with any act or omission made by a party identified in Section 2.2(s) prior to the Closing Date, except for claims, causes of action and other legal rights and remedies set forth in Section 2.1(b)(x);

(v)  all Claims arising under this Agreement or any other Transaction Document;

(w) all Claims arising under any antitrust laws;

(x) all rights of Sellers to rebates and discounts that have accrued and are currently due and payable by manufacturers, vendors, suppliers, or others in connection with the Assets;

(y) the other assets, properties and rights, if any, located outside of the United States; and

(z) the other assets, properties and rights, if any, listed on **Exhibit E** attached hereto.

For the avoidance of doubt, "Claims" do not include claims to enforce the rights under this Agreement.

2.3        Assumed Liabilities.

Upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Buyer shall execute and deliver to Sellers the Assignment and Assumption Agreements, pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities (collectively, the "Assumed Liabilities") and no others:

(a) all Transfer Taxes;

(b) any Cure Amounts;

(c) the Liabilities specifically identified on **Exhibit G** hereto; and

(d) all other Liabilities related to, or associated with the Assets, but only to the extent arising after the Closing Date.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4        Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform, or otherwise discharge any Liability of Sellers, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers and their Affiliates, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"), nor shall Buyer be deemed a successor of Sellers with respect to the foregoing.  For purposes of clarity, and without limitation of the generality of the foregoing, the Excluded Liabilities shall include, without limitation, each of the following Liabilities of Sellers, other than the Assumed Liabilities:

(a) any Liability of Sellers and their respective Affiliates arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of Sellers;

(b) any Liability of Sellers and their respective Affiliates relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Business of Sellers as operated prior to the Closing Date, or (ii) the ownership, possession, use, operation, or sale or other disposition prior to the Closing Date of any of the Assets;

(c) any Liability for (i) Taxes imposed on any of the Sellers or (ii) Taxes attributable to the Assets or the Business with respect to any Pre-Closing Tax Period (including, but not limited to, Asset Taxes that are the responsibility of Sellers pursuant to Section 8.2);

(d) any Liability for any failure to comply with any "bulk sales," "bulk transfer" and similar laws;

(e) any Liability incurred by Sellers or its directors, officers, stockholders, managers, members, agents, or employees (acting in such capacities) after the Closing Date;

(f) any Liability of Sellers and its Affiliates to any Person on account of any Action;

(g) any Liability of Sellers and their respective Affiliates relating to or arising out of an Excluded Asset, including Inventory consisting of or containing hydroxides and the Seller Related Leases;

(h) any Liability or obligation of Sellers and their respective Affiliates under any Indebtedness, including, without limitation, any Indebtedness owed to any stockholder or other Affiliate of Sellers, and any Contract evidencing any such financing arrangement unless such Contract is an Assigned Contract;

(i) any Liability of Sellers and their respective Affiliates (i) arising under Environmental Laws attributable to or incurred as a result of any acts, omissions, or conditions occurring or in existence prior to the Closing Date, including, but not limited to, any Liability with respect to the Release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Materials at any location, and including without limitation any financial liability for groundwater monitoring for selenium or other Hazardous Materials, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease, or death of any Person, or (iii) compliance with any Laws relating to any of the foregoing;

(j) any fees or expenses of Sellers and their respective Affiliates incurred with respect to the transactions contemplated herein;

(k) any Liability of Sellers and their respective Affiliates relating to any employee or consultant, including, but not limited to any liabilities associated with any compensation plans, wages, benefit plans, pension plans, deferred compensation plans, welfare plans, or similar benefits applicable to any Seller's employees (whether arising prior to or after the Closing);

(l) any Liability of any Seller under any guarantees of third party obligations by any such Seller (other than Sellers' Obligations or security deposits required with respect to any Assigned Lease) and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit;

(m) all accrued expenses and accounts payables;

(n) drafts or checks outstanding at the Closing;

(o) any Liability for claims of employees;

(p) any Liability or claim based on the WARN Act; and

(q) any Liability to the extent related to the Excluded Assets.

    2.5    <u>Assignments, Cure Amounts.</u>

    (a)  Sellers shall transfer and assign to Buyer all Assigned Contracts and Assigned Leases (and such other Contracts and Leases intended to be Assigned Contracts and Assigned Leases subsequently identified by Buyer after the Closing Date), and Buyer shall assume all Assigned Contracts and Assigned Leases from Sellers, as of the Closing Date pursuant to the Sale Order. In connection with such assignment and assumption, Buyer shall, on or prior to the Closing, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, pay any and all Cure Amounts attributable to such Assigned Contracts and Assigned Leases (and such other Contracts and Leases intended to be Assigned Contracts and Assigned Leases subsequently identified by Buyer after the Closing Date).

    (b) The Sale Order shall provide that as of the Closing, Sellers shall assign to Buyer the Assigned Contracts and the Assigned Leases, and the Assigned Contracts and Assigned Leases shall be identified by the name and date (if available), the counter-party to the Assigned Contract or Assigned Lease, as the case may be, and the address of such counter-party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Assigned Contracts and Assigned Leases. Such exhibit shall also (i) set forth the Cure Amounts, and (ii) delineate a procedure for transferring to Buyer the rights to any security deposits in the form of cash or letters of credit on deposit with the counter-party to any Assigned Lease or Assigned Contract.

    2.6  <u>Further Assurances.</u>

    The Parties agree, prior to and after the Closing, to (a) furnish upon request to each other such further information, (b) execute, acknowledge, and deliver to each other such other documents, and (c) do such other acts and things, all as the other Party may reasonably request, for the purpose of vesting in Buyer title to the Assets, free and clear of all Liabilities and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), and for Buyer to assume the Assumed Liabilities, including the Cure Amounts, and reasonably necessary to carrying out the intent of this Agreement and the Transaction Documents; *provided, however,* that nothing in this <u>Section 2.6</u> shall prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

# ARTICLE 3

## PURCHASE PRICE

3.1    Purchase Price.

The purchase price for the purchase, sale, assignment, and conveyance of Sellers' right, title, and interest in, to, and under the Assets shall consist of the following (collectively, the "Purchase Price"):

(a)  Twenty five million, five hundred thousand, and no/100 Dollars ($25,500,000), which includes the cash deposit of one million, six hundred fifty-eight thousand and no/100 Dollars ($1,658,000) (the "Deposit") that was deposited by Buyer with the Sellers on or before January 28, 2019, and is being held in escrow and will be treated in accordance with the Bidding Procedures; plus

(b)  the assumption of the Assumed Liabilities, including the Cure Amounts; minus

(c)  the 2019 Opa Locka Pro-Rated Amount.

The cash components of the Purchase Price shall be delivered by Buyer at Closing as set forth in Section 4.2.

3.2    Allocation of Purchase Price.

Within 90 days after the Closing Date, Buyer shall provide Sellers with its proposed allocation of the Purchase Price (plus any other relevant items) in accordance with Section 1060 of the Code and Treasury Regulations promulgated thereunder (the "Allocation"). Sellers shall have the right to raise reasonable objections to the Allocation within 30 days after its receipt thereof. The Allocation shall be deemed to be final if Sellers do not deliver written notice of a dispute to Buyer within such 30-day period. To the extent Sellers deliver written notice of a dispute to Buyer within such 30-day period, the Parties agree to act in good faith to resolve any differences between them with respect to the Allocation for a period of 30 days. In the event that an agreement cannot be reached during such 30-day period, then the parties shall engage, and the items in dispute shall be promptly (and in no event later than 15 days from the end of the 30-day period described in the previous sentence) submitted to the Neutral Accountant. The Neutral Accountant's final determination shall be binding upon Buyer and Seller. Sellers and Buyer shall (a) use such allocation (as finally determined pursuant to this Section 3.2) for the purpose of making the requisite filings under Section 1060 of the Code and the regulations thereunder, namely, IRS Form 8594 (Asset Acquisition Statement under Section 1060) and (b) report, and to cause their respective Affiliates to report, the U.S. federal, state and local income and other Tax consequences of the transactions contemplated herein consistent with such allocation (as finally determined pursuant to this Section 3.2), in each case, except as may be adjusted by subsequent agreement following an audit by the IRS (or other Governmental Authority) or as required by applicable Law. Sellers and Buyer shall promptly notify the other of the existence of any Tax audit, controversy or litigation related to such allocation. The cost of such Neutral Accountant shall be paid fifty percent (50%) by Buyer and fifty percent (50%) by Sellers. Notwithstanding the allocation of the Purchase Price agreed between Sellers and Buyer pursuant to this Section

<u>3.2</u> for the aforementioned Tax purposes, nothing in the foregoing shall be determinative of values ascribed to the Assets or the allocation of the value of the Assets for any other purpose.

**ARTICLE 4**

<u>**CLOSING**</u>

4.1        <u>Closing Date.</u>

Upon the terms and subject to the conditions hereof, the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place at 9:00 a.m., local time at the offices of Akerman LLP, Three Brickell City Centre, 98 Southeast Seventh Street, Suite 1100, Miami, FL 33131, no later than three (3) Business Days following the date on which the conditions set forth in <u>ARTICLE 9</u> and <u>ARTICLE 10</u> have been satisfied or, if permissible, waived, excepting the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, if permissible, waiver of such conditions. The date and time at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date.</u>"

4.2        <u>Closing Date Payment of Purchase Price.</u>

Subject to satisfaction or, if permissible, waiver of the conditions set forth in <u>ARTICLE 9</u> and <u>ARTICLE 10</u>, at the Closing, Buyer shall pay, or cause to be paid, the cash components of the Purchase Price less the Deposit by wire transfer of immediately available funds to the DIP Account for the benefit of Sellers.

4.3        <u>Buyer's Closing Deliveries.</u>

At the Closing, Buyer shall deliver or cause to be delivered to Sellers (or such other Persons where so designated):

(a) a certificate of the corporate secretary or other applicable officer of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Sellers, as to (i) Buyer's authorization to execute and perform its obligations under the Transaction Documents to which Buyer is a party; and (ii) incumbency and signatures of the CEO or other authorized officers of Buyer executing the Transaction Documents;

(b) each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer;

(c) the certificate of Buyer to be received by Sellers pursuant to <u>Section 10.2</u>; and

(d) such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

4.4        Sellers' Closing Deliveries.

At the Closing, Sellers shall deliver to Buyer:

(a)  the Assignment and Assumption Agreements, duly executed by the applicable Sellers;

(b)  the Assignments and Bills of Sale, duly executed by the applicable Sellers;

(c)  the Deed, duly executed (and acknowledged) by the applicable Sellers;

(d)  the New Leases, duly executed by all applicable counterparties to such New Leases;

(e)  the certificate of Sellers to be received by Buyer pursuant to Section 9.1;

(f)  a non-foreign affidavit by each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Code Section 1445, stating that such Seller is not a "foreign person" as defined therein;

(g)  evidence of receipt of the Third Party Consents to the extent such consents are not provided for or satisfied in the Sale Order, that have been obtained prior to the Closing Date;

(h)  the Records; and

(i)  such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Assets, each duly executed (and acknowledged, where applicable) by Sellers.

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered section and subsection of the Disclosure Schedules, Sellers, jointly and severally, represent and warrant to Buyer that the statements contained in this ARTICLE 5 are true and correct as of the  date hereof, and will be true and correct in all material respects as of the Closing Date:

5.1    Organization; Authority; Validity.

Each of the Parent Companies is a corporation duly organized, validly existing and in good standing under the Laws of the state of Florida and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted. Each of the other Sellers is an entity of the type and domicile indicated on Schedule 5.1 and is duly organized, validly existing and in good standing under the Laws of its state of domicile and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.  Subject to requisite Bankruptcy Court

24

approval, each Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which such Seller is a party, to carry out its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approval, the execution and delivery by each Seller of this Agreement and any other Transaction Document to which such Seller is a party, the performance by Sellers of their respective obligations hereunder and thereunder and the consummation by Sellers of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Sellers.  Subject to requisite Bankruptcy Court approvals, no other action on the part of any Seller is necessary to authorize the execution and delivery of this Agreement or any other Transaction Document to which a Seller is a party, the consummation of the transactions contemplated hereby or thereby on the terms set forth herein and therein, or the performance of any Seller of its obligations hereunder or thereunder. This Agreement has been duly executed and delivered by Sellers, and (assuming due authorization, execution and delivery by Buyer and subject to requisite Bankruptcy Court approval) this Agreement will constitute a legal, valid and binding obligation of each Seller enforceable against such Seller in accordance with its terms.  When each other Transaction Document to which any Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto and subject to requisite Bankruptcy Court approval), such Transaction Document will constitute a legal and binding obligation of such Seller enforceable against it in accordance with its terms.

5.2     Subsidiaries.

The Sellers do not own or have any interest in any shares or have an ownership interest in any other Person except for other Sellers that are a party hereto or as set forth on Schedule 5.2 which identifies all subsidiaries of each Seller and which indicates the particular parent corporation and their respective jurisdictions of organization for each such subsidiary.

5.3     No Conflicts; Consents.

Subject to requisite Bankruptcy Court approval except (a) for entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case and (c) for the notices, filings and consents set forth on Schedule 5.3, (i) Sellers are not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement, (ii) neither the execution and delivery of this Agreement and the other Transaction Documents to which any Seller is a party, nor the performance by Sellers of their respective obligations hereunder and thereunder, nor the consummation by Sellers of the transactions contemplated hereby and thereby do or will, in any material respect, (A) violate, conflict with or result in any breach of any provision of the certificate of incorporation or formation, bylaws, operating agreement or other organizational document of any Seller, (B) violate any Law applicable to any such Seller or by which any of the Assets or the Assumed Liabilities is subject, or (C) result in the creation or imposition of any Encumbrance on any of the Assets (other than any Permitted Encumbrance).

5.4     Encumbrances; Title to Assets; Real Property.

(a) Schedule 5.4 sets forth the legal description and address of each parcel of real property owned by any Seller and used in connection with the Business (such owned parcel of real estate together with all Structures located thereon, the "Owned Real Property").

(b) Schedule 5.4 includes a true, correct and complete list of the Seller Related Leases and the third party leases (where the Sellers are leasing real property from an unrelated third party landlord). Schedule 5.4 sets forth Leased Real Property, including the Seller Related Leases, and the leases under which such Leased Real Property is leased, subleased or licensed, including all amendments or modifications to such leases, and including without limitation any verbal or at-will lease or arrangement (the "Leases"). The Sellers have delivered to the Buyer true, correct and complete copies of all written Leases and a summary in Schedule 5.4 of the material terms of any verbal lease or arrangement under which any Leased Real Property is occupied.

(c) Except as set forth on Schedule 5.4, there are no existing or pending or, to the Knowledge of the Sellers, threatened, condemnation or eminent domain proceedings relating to or affecting any portion of the Real Property.

(d) Except as set forth on Schedule 5.4, to the Knowledge of the Sellers, all Structures on the Real Property (i) comply with valid and current certificates of occupancy or similar permits to the extent required by Law for the use thereof and (ii) conform in all material respects to all applicable Laws. Each parcel of Real Property is zoned for the purposes for which the Real Property and Structures thereon have been used in connection with the normal operation of the Business.

(e) No Seller is obligated under or bound by any option, obligation, right of first refusal, purchase contract or other contractual right to sell, lease or purchase any real property or any portions thereof or interests therein. Except as set forth on Schedule 5.4, there are no leases, subleases, licenses, concessions or other Contracts (written or oral) granting any Person or Persons the right to use, possess or occupy any parcel or portion of the Real Property, other than the Leases, easements of record or other Permitted Encumbrances.

(f) Sellers have, and, upon delivery to Buyer at the Closing of the instruments of transfer contemplated by ARTICLE 4, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, and Buyer will acquire from Sellers, good, valid and marketable title to (or (i) in the case of the Real Property, insurable fee simple title to, or, (ii) in the case of property leased or licensed by Sellers, a valid and subsisting leasehold interest in, or a legal, valid and enforceable licensed interest in or right to use) all of the Assets, free and clear of all Liabilities and Encumbrances, except for the Assumed Liabilities and Permitted Encumbrances. Except for Sellers, none of Sellers' other Subsidiaries or Affiliates owns any material Asset or any material assets, other than the Excluded Assets, used or held for use in, and necessary for, the operation of the Business as presently operated.

5.5    Taxes.

(a) Sellers have delivered to Buyer copies of all federal, state, local and non-U.S. income and franchise Tax Returns for all Tax periods ending after December 31, 2015.

(b) Schedule 5.5 sets forth all non-U.S. jurisdictions in which any Seller is subject to Tax, is engaged in business or has a permanent establishment.

5.6      Intellectual Property.

(a) Schedule 5.6(a) lists (i) all Intellectual Property Registrations and (ii) all Intellectual Property Agreements, other than any (a) non-disclosure agreements entered into in the Ordinary Course of Business; (b) non-exclusive licenses of commercially available Intellectual Property licensed to any Seller for internal use on standard terms; and (c) non-exclusive licenses to software and materials licensed as open-source, public-source or freeware. All material Intellectual Property Registrations are subsisting and in full force and effect. Except as set forth on Schedule 5.6(a), Sellers own all Intellectual Property Assets and Sellers have the right to use all of the Intellectual Property licensed to Sellers under the Intellectual Property Agreements.

(b) Except as set forth on Schedule 5.6(b), or as would not have a Material Adverse Effect: (i) the conduct of the Business as currently conducted does not infringe or otherwise violate the Intellectual Property of any Person; and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Assets.

(c) To the Knowledge of the Sellers, no internet domain name constituting an Asset is involved in any dispute, opposition, invalidation or cancellation proceeding and no such action is threatened in writing with respect to any such internet domain name.

5.7      Insurance.

Schedule 5.7 sets forth a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors' and officers' liability, fiduciary liability and other casualty and property insurance maintained by any of the Sellers and relating to the assets, business, operations, employees, officers and directors of any such Seller (collectively, the "Insurance Policies") and true and complete copies of such Insurance Policies have been made available to Buyer.

5.8      Compliance with Laws.

To Sellers' Knowledge, each Seller is in material compliance with all material Laws applicable to such Seller, or to the conduct or operation of its Business, or the ownership or use of any of its assets. No Seller has, in the last ninety (90) days, received notice of a material violation or alleged material violation of any Law.

5.9      Absence of Certain Changes.

Except as set forth on Schedule 5.9, in the last ninety (90) days, no Seller has amended or terminated, or waived any material right or remedy under, any Assigned Contract or Sellers' Plan, and no Seller or Affiliate of any Seller has agreed to take any of the foregoing actions.

5.10     Contracts.

27

(a)     Schedule 5.10(a) sets forth a true, complete and accurate list, as of the date hereof and as of the Closing Date, of all Contracts to which any Seller is a party that are material to the Business of Sellers. True and correct copies of each such Contract have been provided to Buyer.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Amounts), except as a result of the commencement of the Bankruptcy Case, and except as set forth in Schedule 5.10(b), the Assigned Contracts are valid, binding and enforceable obligations of the applicable Seller, in accordance with their terms and conditions, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally, and the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought, and to the Knowledge of Sellers, is a valid, legal and binding obligation of the other parties thereto and enforceable against such parties in accordance with their terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally, and the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought. Except for filings in the Bankruptcy Case, no Seller has received any written notice regarding any termination or suspension of such Assigned Contracts and, to the Knowledge of Sellers, no such termination or suspension has been threatened by any counterparty to any such Assigned Contract.

5.11    Permits.

To the Sellers' Knowledge, Schedule 5.11 contains a complete and accurate list of all material Permits required for Sellers to conduct the Business as currently conducted or for the ownership and use of the Assets.

5.12    Consents and Approvals.

Each material consent, waiver, authorization or approval of any Governmental Authority, or of any other Person, and each declaration to or filing or registration with any such Governmental Authority, that is required in connection with the execution and delivery of this Agreement and the Transaction Documents by Sellers or the performance by Sellers of their obligations thereunder (the "Third Party Consents") is set forth accurately and completely on Schedule 5.12.

5.13    Legal Proceedings; Government Orders.

(a) Except for the Bankruptcy Cases and as set forth on Schedule 5.13(a), there are no (x) Actions pending or, to Sellers' Knowledge, threatened (i) against or by any Seller or any Affiliate thereof and relating to any Seller, the Assets, the Assumed Liabilities or the Business (other than Excluded Assets); (ii) against or by any Seller or any Affiliate of any Seller

that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement; or (iii) against any Seller or their respective directors and officers that would cause any terms or conditions of this Agreement not to be performed or satisfied, or (y) to Sellers' Knowledge, inquiries, investigations or audits, in each case, whether formal or informal, public or private, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity. Since ninety (90) days prior to the date hereof, no Seller or any Affiliate of any Seller has entered into any settlement or other Contract with respect to any Action and no Seller or Affiliate of any Seller has agreed to enter into any such settlement or Contract.

(b) Except as set forth on Schedule 5.13(b), there are no outstanding, or to the Knowledge of the Sellers threatened, Governmental Orders against or affecting any Seller, any Affiliate of Seller or any of their respective properties or assets. Each such Seller is in compliance with the terms of each Governmental Order set forth on Schedule 5.13(b). No event has occurred or circumstances exist that may constitute or result in (with or without notice or lapse of time) a violation of any such Governmental Order.

5.14    Employees.

(a) Schedule 5.14(a) contains a list of all persons who are employees, independent contractors or consultants of any Seller as of the date hereof, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof.

(b) All material Plans and ERISA Affiliates are listed on Schedule 5.14(b) of the Disclosure Schedules.

(c) Each Plan is in compliance in all material respects with its terms, with ERISA and other applicable Laws, and with any agreements and instruments applicable to such Plan. Each Plan intended to be qualified under Section 401(a) of the Code has been determined by the IRS to be so qualified under the Code, or is maintained pursuant to a volume submitter or prototype document for which it may properly rely on the applicable opinion or advisory letter. There are no actions, suits, investigations, or claims (other than routine, non-contested claims for benefits) pending or, to Sellers' Knowledge, threatened against the Plans, or any administrator or fiduciary thereof, which could result in any Liability.

(d) No Seller or ERISA Affiliate, either currently or at any time in the past six (6) years, maintains or maintained, contributes or contributed to, sponsors or sponsored or otherwise has or has had any Liability with respect to (i) a multiemployer plan as defined in Section 3(37) of ERISA, or (ii) a Plan subject to Title IV of ERISA or Sections 412 or 430 of the Code.

(e) None of the Plans provides health care or any other non-pension benefits to any employees after their employment is terminated (other than as required by COBRA or similar state law).

5.15    Environmental Matters.

(a) Except as set forth on Schedule 5.15(a), each Seller is currently and has been in material compliance with all Environmental Laws and has not received from any Person and there is no: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b) Except as set forth on Schedule 5.15(b), each Seller has obtained and is in compliance with all material Environmental Permits (each of which is disclosed on Schedule 5.15(b)) necessary for the ownership, lease, operation or use of the Business or assets of such Seller and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Sellers through the Closing Date in accordance with Environmental Law, and there is no condition, event or circumstance that might materially prevent or impede, after the Closing Date, the ownership, lease, operation or use of the business or assets of any Seller as currently conducted.

(c) Except as set forth on Schedule 5.15(c), none of the Owned Real Property or the Leased Real Property or, to the Knowledge of the Sellers, any real property formerly owned, operated or leased by any Seller is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d) Except as set forth on Schedule 5.15(d), there has been no Release of Hazardous Materials in material violation of Environmental Law with respect to the Business or assets of any Seller or the Owned Real Property or the Leased Real Property or any real property formerly owned, operated or leased by any Seller, and neither any such Seller nor Sellers have received an Environmental Notice that any such real property (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material, which could reasonably be expected to result in an Environmental Claim against, or a material violation of Environmental Law or termination or suspension of any Environmental Permit, which is not the subject of any environmental response, assessment, investigation or remediation activities by Sellers.

(e) Schedule 5.15(e) contains a complete and accurate list of all active, abandoned or removed aboveground or underground storage tanks owned or operated by any Seller.

(f) Schedule 5.15(f) contains a complete and accurate list of all off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by any Seller or Sellers and, to the Knowledge of Sellers', any predecessors. Except as set forth on Schedule 5.15(f), (i) none of these facilities or locations has been placed or proposed for placement on the National Priorities List (or CERCLIS) under CERCLA, or any Governmental Authority list, and (ii) neither Sellers nor any such Seller has received any Environmental Notice regarding potential liabilities with respect to such off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by a Company or Sellers.

(g) Except as set forth on Schedule 5.15(g), neither Sellers nor any Seller has retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

(h) Sellers have provided or otherwise made available to Buyer and listed on Schedule 5.15(h): (i) any and all material, non-attorney-client-privileged environmental reports, studies, audits, records, sampling data, site assessments, risk assessments and other similar documents with respect to the business or assets of any Seller or any currently or formerly owned, operated or leased real property, which are in the possession or control of the Sellers or any Seller, related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise cause or ensure compliance with current or reasonably anticipated future Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

(i) Except as set forth on Schedule 5.15(i), to Sellers' Knowledge, there is no condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, materially prevent, impede or increase the costs associated with the ownership, lease, operation, performance or use of the Business or assets of any of the Sellers as currently conducted.

(j) One or more of the Sellers owns and controls all Environmental Attributes (a complete and accurate list of which is set forth on Schedule 5.15(j)) and no such Seller has entered into any contract or pledge to transfer, lease, license, guarantee, sell, mortgage, pledge or otherwise dispose of or encumber any Environmental Attributes as of the date hereof. There is no condition, event or circumstance that might materially prevent, impede or increase the costs associated with the transfer (if required) to Buyer of any Environmental Attributes after the Closing Date.

5.16    Brokers or Finders.

Except with regard to SSG Capital Advisors, LLC as provided in Section 12.9, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

5.17    FCPA.

In the past ninety (90) days, no Seller nor any of Sellers' directors, officers, or employees or, to the Knowledge of Sellers, any agents acting on behalf of Sellers have, directly or knowingly indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the FCPA), foreign political party or official thereof or candidate for foreign political office for the purpose of (a) influencing any official act or decision of such official, party or candidate, (b)

inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (c) securing any improper advantage, in the case of (a), (b) and (c) above in order to assist any Seller or any of its affiliates in obtaining or retaining business for or with, or directing business to, any Person. In the past ninety (90) days, no Seller nor any of its directors, officers, employees, nor, to the Knowledge of Sellers, any agents acting on behalf of Sellers have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any law, rule or regulation prohibiting bribery or corruption. No Seller, or, to Knowledge of Sellers, any of its officers, directors or employees are the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA or any other anticorruption law.

5.18    International Trade.

(a) No Sellers, nor any of their respective officers, directors or employees, nor to the Knowledge of Sellers, any agent or other third party representative acting on behalf of Sellers, is: (i) a Sanctioned Person, (ii) organized, resident or located in a Sanctioned Country,(iii) engaging in any dealings or transactions with any Sanctioned Person or in any Sanctioned Country, to the extent such activities materially violate applicable Sanctions Laws or Ex-Im Laws, (iv) engaging in any export, reexport, transfer or provision of any goods, software, technology, data or service without, or exceeding the scope of, any required or applicable licenses or authorizations under all applicable Ex-Im Laws, or (v) otherwise in material violation of applicable Sanctions Laws, Ex-Im Laws, or the anti-boycott Laws administered by the U.S. Department of Commerce and the U.S. Department of Treasury's Internal Revenue Service.

(b) No Seller is importing merchandise into the United States, the European Union, or other relevant countries that has been or is covered by an antidumping duty order or countervailing duty order or is subject to or otherwise covered by any pending antidumping or countervailing duty investigation by agencies of the United States government, the European Union, or other relevant countries.

(c) No Seller is importing merchandise into the United States, the European Union, or other relevant countries in material violation of U.S. or EU import Laws, including those with respect to valuation, classification or duty treatment requirements of imported merchandise, the eligibility requirements of imported merchandise for favorable duty rates or other special treatment, or country of origin marking requirements.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

6.1    Organization and Good Standing.

Buyer is a company, duly organized and validly existing under the laws of Japan. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement, and the other Transaction Documents to which it is a party, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer, and the consummation by Buyer of the transactions contemplated herein, have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer, and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  This Agreement, and the other Transaction Documents to which Buyer is a party, constitute the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Buyer is not or will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party, or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, affect Buyer's ability to perform its obligations under this Agreement, or any other Transaction Documents, or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement, and the other Transaction Documents, and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the certificate of formation of Buyer, as applicable, (c) any Order, or (d) any Law.

6.4     Availability of Funds.

As of the Closing, Buyer will have sufficient cash in immediately available funds (without giving effect to any unfunded financing, regardless of whether any such financing is committed) to pay the Purchase Price, all costs, fees, and expenses to be paid by Buyer that are necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, and assume the Assumed Liabilities.

6.5     Litigation.

There are no Actions pending or, to the Knowledge of Buyer, threatened, that would affect Buyer's ability to perform its obligations under this Agreement, or any other Transaction Documents, or to consummate the transactions contemplated hereby or thereby.

6.6    Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Sellers is or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

# ARTICLE 7

## ACTIONS PRIOR TO AND FOLLOWING THE CLOSING DATE

7.1    Operations Prior to the Closing Date.

Sellers covenant and agree that, except (v) as expressly contemplated by this Agreement, (w) as disclosed on Schedule 7.1, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), and (y) as otherwise required by Law, after the execution of this Agreement and prior to the Closing Date:

(a)    Each Seller shall:

(i)    use commercially reasonable efforts, taking into account Sellers' status as debtor-in-possession, to maintain the Assets;

(ii)    maintain its books, accounts, and Records in the Ordinary Course of Business;

(iii)    maintain the personal property comprising part of the Assets operated by any Seller in at least as good a condition as it is on the date hereof, subject to ordinary wear and tear;

(iv)    use commercially reasonable efforts, taking into account Sellers' status as debtor-in-possession, to obtain all Third Party Consents to the extent such consents are not provided for or satisfied by the Sale Order;

(v)    maintain (including necessary renewals thereof) insurance policies against risk and Liabilities, to the extent and in the manner, and at the levels maintained by Sellers as of the date hereof, with respect to its business and the Assets;

(vi)    use commercially reasonable efforts, taking into account Sellers' status as debtor-in-possession, to (A) retain its employees who are in good standing and are employed as of the date hereof, and (B) maintain their relationships with and preserve the goodwill of its key service providers; and

(vii)    promptly notify Buyer in writing upon receipt by such Seller of notice of any pending or threatened tax audits or assessments relating to the Assets or Business.

(b)    Sellers shall not:

(i)  abandon any Asset, other than Excluded Assets;

(ii) terminate, reject, cancel, or materially amend or modify any Assigned Contract or Assigned Lease;

(iii) sell, lease, encumber, or otherwise dispose of all or any portion of any Assets, other than Excluded Assets;

(iv)  grant to any Transferred Employee any increase in compensation;

(v)  propose, approve, or support dismissal or conversion to chapter 7 of any of the Bankruptcy Cases or any parts thereof; or

(vi) enter into any agreement or commitment to take any action prohibited by this Section 7.1.

7.2    Commercially Reasonable Efforts.

(a)  Without limiting the other provisions of this Agreement, including Section 8.1, Sellers, on the one hand, and Buyer, on the other hand, shall, before and after Closing, use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (a) the taking of all reasonable acts necessary to cause satisfaction (but not waiver of) the conditions precedent to the Closing set forth in ARTICLE 9 and ARTICLE 10 to be satisfied, (b) the obtaining, at the earliest practicable date, of all necessary approvals and authorizations from Governmental Authorities, and the making of all necessary registrations, declarations, and filings (including registrations, declarations and filings with Governmental Authorities, if any), and the taking of all reasonable steps as may be necessary to avoid any Action by any Governmental Authority, and (c) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(b)  Without limiting the generality of the foregoing, from and after the Closing, Sellers shall cooperate with Buyer in executing and delivering copies of any assignment documents for filing with any Governmental Authority (including the United States Patent and Trademark Office) or other Person reasonably requested and prepared by Buyer at Buyer's expense necessary to effect the assignment and transfer to Buyer of all rights, privileges and priorities provided under any applicable Law relating to the Transferred Intellectual Assets.

(c)  In addition, from and after the Closing, Sellers and Buyer shall reasonably cooperate, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Agreement and any Action with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such Action and making

employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

7.3     Bankruptcy Court Approval.

(a)  Sellers and Buyer acknowledge that this Agreement, the sale of the Assets, the Buyer's assumption of the Assumed Liabilities, the assumption and assignment of the Assigned Contracts and the Assigned Leases, and consummation of the other transactions contemplated herein, are subject to Bankruptcy Court approval.

(b)  As soon as practicable after execution of this Agreement, the Sellers shall notify the Bankruptcy Court designating the Buyer as the Successful Bidder (as defined in the Bidding Procedures), attaching this Agreement, and stating that the Sellers intend to seek entry of the Sale Order approving the sale to the Buyer in accordance with this Agreement.

(c)  Sellers shall use their reasonable best efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as practicable following conclusion of the Sale Hearing.

(d)  In the event an appeal is taken or a stay pending appeal or reconsideration is requested regarding either the Bidding Procedures Order or the Sale Order, Sellers shall promptly notify Buyer of such appeal or stay or reconsideration request and shall provide to Buyer promptly a copy of the related pleadings.  Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from or request for reconsideration of either of such Orders.

(e)  Buyer acknowledges and agrees that it may be required to serve as the Back-Up Bidder as provided for in the Bidding Procedures Order.

7.4     Notification of Certain Matters; Schedules.

(a)  Sellers shall give notice to Buyer, as promptly as practicable (but in no event more than three (3) Business Days after the occurrence of the event giving rise to a notice obligation pursuant to this Section 7.4(a)), of (i) the occurrence or nonoccurrence of any event that causes or would be reasonably likely to cause either (A) any representation or warranty of Sellers contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing (as if made each date through the Closing) or (B) directly or indirectly, any Material Adverse Effect on any Seller or the Business, or (ii) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder, provided, however, that Sellers' failure to provide notice in accordance with this sentence, shall not constitute a breach that, in and of itself, permits Buyer not to consummate the transaction contemplated hereunder.  After the Auction and prior to the Closing, Sellers shall give notice to Buyer of the receipt of any written Alternative Transactions (including providing a copy thereof) they receive promptly upon receipt. Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 7.4(a) shall not be deemed to amend or supplement the Disclosure Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to Buyer.

36

(b) Sellers shall add Buyer, and Buyer's counsel, to Sellers' so-called "Rule 2002 notice list" and otherwise provide notice to Buyer of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and Rules.

7.5    <u>Bankruptcy Filings.</u>

From and after the date of execution of this Agreement and until the Closing Date, Sellers shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports, and other papers that relate, in whole or in part, to this Agreement and the transactions contemplated hereby, or to Buyer or its respective agents or Representatives, that are to be filed by Sellers in the Bankruptcy Case in advance of their filing, in each case, if reasonably practicable under the circumstances before the filing of such papers. Notwithstanding the foregoing, neither Sellers' inadvertent failure to comply with this <u>Section 7.5</u>, nor Sellers' unintentional failure to comply with this <u>Section 7.5</u>, shall constitute a breach under this Agreement.

7.6    <u>Access.</u>

Subject to applicable Law, from and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, the non-privileged books and records of Sellers, (b) shall furnish to Buyer and its Representatives such financial, operating and property data related to the Assets and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Business. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the Assigned Real Property by Sellers. All information obtained pursuant to this <u>Section 7.6</u> shall be subject to the terms and conditions of the Confidentiality Agreement.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1    <u>Governmental Approvals and Consents.</u>

(a) Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates; and (ii) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.

(b) Sellers and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in the Disclosure Schedules.

(i)    Without limiting the generality of the parties' undertakings pursuant to subsections (a) and (b) above, each of the parties hereto shall use all commercially reasonable efforts to:

(ii)    respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any Transaction Document;

(iii)    avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any Transaction Document; and

(iv)    in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any Transaction Document has been issued, to have such Governmental Order vacated or lifted.

(c) If any consent, approval or authorization necessary to preserve any right or benefit under any Contract to which any Seller is a party is not obtained prior to the Closing, Sellers shall, subsequent to the Closing, use commercially reasonable efforts to cooperate with Buyer attempting to obtain such consent, approval or authorization as promptly thereafter as practicable.

(d) Notwithstanding the foregoing, nothing in this <u>Section 8.1</u> shall require, or be construed to require, Buyer or any of its Affiliates to agree to (i) sell, hold, divest, discontinue or limit, before or after the Closing Date, any assets, businesses or interests of Buyer, any Seller or any of their respective Affiliates; (ii) any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests which, in either case, could reasonably be expected to result in a Material Adverse Effect or materially and adversely impact the economic or business benefits to Buyer of the transactions contemplated by this Agreement; or (iii) any material modification or waiver of the terms and conditions of this Agreement.

8.2    <u>Taxes.</u>

(a) Any transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "<u>Transfer Taxes</u>") shall be borne by Buyer. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.  Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b) Sellers shall retain responsibility for, and shall bear and pay, all real and personal property ad valorem, property, excise or similar Taxes based upon operation or ownership of the Assets (but excluding, for the avoidance of doubt, Transfer Taxes) (collectively, the "Asset Taxes") assessed with respect to the Assets for any period ending on or prior to the Closing Date.  Buyer shall assume responsibility for, and shall bear and pay, all Asset Taxes assessed with respect to the Assets for any period after the Closing Date.  All Asset Taxes for any taxable period that includes the Closing Date and ends after the Closing Date (a "Straddle Period") shall be borne and prorated between Sellers and Buyer based on a fraction (a) the numerator of which is (i) in the case of Sellers, the number of days in the Straddle Period through and including the Closing Date, or (ii) in the case of Buyer, the number of days in the Straddle Period beginning 12:01 a.m. (local Miami, Florida time) on the day after the Closing Date, and (b) the denominator of which is the total number of days in the entire Straddle Period. Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Asset Taxes for Straddle Periods with the prior consent of Sellers (not to be unreasonably withheld, conditioned or delayed) and, if required by applicable law, the Sellers and Buyer will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.  If the exact amount of any Asset Taxes is not known as of the Closing Date, the apportionment shall be based upon a reasonable amount agreed to by the Parties without subsequent adjustment.

(c) Sellers, on the one hand, or Buyer, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Section 8.2 or which represents an overpayment for Taxes by the Paying Party.  Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor, although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby.  Any amounts which may become payable from any Seller to Buyer pursuant to this Section 8.2 shall constitute a super priority administrative expense of Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

(d) Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Assets are located; *provided*, *however*, that neither Buyer nor Sellers shall be required to disclose the contents of its income Tax Returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.2 shall be borne by the Party requesting it.

8.3    <u>Bulk Sales.</u>

Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer," and similar laws that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to Buyer.

8.4    <u>Payments Received.</u>

Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

8.5    <u>Assigned Contracts and Assigned Leases</u>.

(a) With respect to each Assigned Contract and each Assigned Lease, Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assigned Contract and Assigned Lease. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and Assigned Leases, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and Representatives available to testify before the Bankruptcy Court.

(b) Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time, and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c) Without limiting the provisions of this <u>Section 8.5</u>, Buyer acknowledges that various bonds, surety bonds, letters of credit, guarantees, and/or cash deposits have been provided by Sellers and/or their respective Affiliates to secure the payment and/or performance of certain of Sellers' obligations related to the Assets or Assigned Contracts as set forth on <u>Schedule 8.5</u> (collectively the "<u>Security Arrangements</u>"). Buyer acknowledges that Sellers have no duty to maintain any such Security Arrangements for the benefit of Buyer after the Closing. To the extent Sellers and/or any of their respective Affiliates have any obligations pursuant to any Security Arrangement or have pledged or otherwise provided any property that secures any such Security Arrangement related to the Assets or Assigned Contracts (collectively, the "<u>Sellers' Obligations</u>"), Buyer shall take such actions as are necessary to cause the Sellers' Obligations arising under the Security Arrangements set forth on <u>Schedule 8.5</u> (and such Security Arrangements) to be released and terminated, and any of Sellers' property pledged or otherwise provided to secure such Security Arrangements returned to Sellers, concurrent with the Closing.

8.6    <u>Employee Matters.</u>

(a) Buyer shall offer employment effective as of the Closing Date to those employees whose jobs are listed on Schedule 8.6 (if any) at the same or similar location, with the same title and job responsibilities. The employees who accept Buyer's offer of employment made pursuant to this Section 8.6 and commence working for Buyer on the Closing Date are referred to herein as "Transferred Employees." Buyer shall have no obligation or Liability for any back pay, accrued benefits, or similar claims of any Transferred Employees. Each other employee of Sellers and their Affiliates, including those who are not active employees as of the Closing Date, shall remain the sole responsibility of Sellers, and their Affiliates, as applicable. All Buyer's decisions to offer or not offer employment to employees listed on Schedule 8.6 shall be in accordance with all applicable Laws.

(b) Buyer shall have no obligation to provide any severance, payments, or benefits to any employees of Sellers and their Affiliates. Sellers acknowledge that Sellers and their Affiliates, as applicable, are alone responsible for (i) issuing, serving, and delivering all orders and notices required, if any, pursuant to applicable Laws, in connection with the termination of employees or contractors, and (ii) any financial obligations and Liabilities in connection therewith or otherwise required in connection with the termination of such employees or contractors.

(c) Nothing in this Section 8.6(c) or otherwise in this Agreement (i) shall require Buyer to continue to employ any particular Transferred Employee following the Closing Date for any particular period of time, (ii) shall be construed to prohibit the Buyer from amending or terminating any benefit plan, program, practice, policy or arrangement maintained by Buyer following the Closing Date and in which any of the Transferred Employees participate, or (iii) shall confer upon any Transferred Employee any rights or remedies of any nature or create or be intended to create any third-party beneficiary rights.

8.7   Permits.

Sellers shall use commercially reasonable efforts prior to and after the Closing to assist Buyer in transferring the Permits, to the extent permitted by applicable Laws. Sellers agree to use commercially reasonable efforts to assist Buyer to obtain such Permits prior to and after Closing.

8.8   Post-Closing Books and Records, Personnel, and Services.

(a) Until the later of (i) three (3) years after the Closing Date, except, solely with respect to Taxes, such period shall be five (5) years after the Closing Date, (ii) the date of entry of a final decree closing each Bankruptcy Case or (iii) such later date as to which Buyer may agree or as may be ordered by the Bankruptcy Court, (a) Buyer shall, at its own expense, preserve and not dispose of or destroy any of the Records, files, or other information received from Sellers, and (b) Buyer shall allow Sellers, any trust established under a chapter 11 plan of Sellers or otherwise, or any other successor of a Seller (each a "Seller or Successor") and any of their directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the Buyer, and upon reasonable advance notice, to former employees of the Sellers that are employed by the Buyer at such time, and any files, books,

41

Records and other materials received from Sellers, for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the marketing and sale of the Excluded Assets, reconciling claims filed in the Bankruptcy Case, investigating, prosecuting or defending any Claims or insurance claims, the filing of tax returns, and any other reasonable purposes to which Buyer may agree or as may be ordered by a court of competent jurisdiction (collectively, the "Winddown Requirements"), and any Seller or Successor and such directors, officers, employees, counsel, representatives, accountants and auditors thereof shall have the right to make copies of any such files, books, Records and other materials at such Seller or Successor's sole expense; provided, however, that for the avoidance of doubt, nothing herein shall require Buyer to take any such action if (x) such action would reasonably be expected to result in a waiver or breach of any attorney-client privilege of Buyer or (y) such action could reasonably be expected to result in a violation of applicable Law.   Until the later of closing of the Bankruptcy Case or the liquidation and winding up of Sellers' estates, Sellers shall preserve and keep the records relating to the Business that were not part of the Assets and shall make such records and Sellers' personnel available to Buyer as may be reasonably required by Buyer in connection with, among other things, any insurance claims by, Actions or Tax audits against, or governmental investigations of, Buyer or any of its Affiliates or in order to enable Buyer to comply with its obligations under this Agreement and each other Transaction Document.  In the event any Party desires to destroy any such records during or after the time during which they must be maintained pursuant to this Section 8.8, such Party shall seek, on written notice to such other Party, and obtain an Order of the Bankruptcy Court; provided, however, that such Order will provide that the other Party shall have the right at its option and its expense to take possession of the records within one hundred and eighty (180) days after the date of such Order.

(b) Until the later of (i) three (3) years after the Closing Date, (ii) the date of entry of a final decree closing each Bankruptcy Case or (iii) such later date as to which Buyer may agree or as may be ordered by the Bankruptcy Court, Buyer, at Buyer's expense (other than with respect to out-of-pocket expenses incurred by Buyer), agrees to make former employees of the Sellers that are employed by the Buyer at such time reasonably available to any Seller or Successor (or their agents or representatives) as may be requested by the Seller or Successor during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of the Buyer, and with reasonable prior notice, in connection with, among other things, the Winddown Requirements or in order to enable Sellers to comply with their obligations under this Agreement and the other Transaction Documents. Notwithstanding the foregoing, (a) Buyer shall not be required to pay any out-of-pocket expenses from its own funds in order to provide the service contemplated by this Section 8.8(b) and (b) to the extent any Seller or Successor pays the amount of such out-of-pocket expenses to Buyer in advance of incurring such expenses, Buyer shall pay, or cause to be paid, such amounts to the applicable service provider. Buyer understands that making such employees reasonably available to any Seller or Successor pursuant to this Section 8.8(b) includes making such employees available to respond to reasonable inquiries, participate in interviews and/or provide testimony (including deposition testimony).

8.9    Post-MAE Insurance Proceeds.

In the event that the parties hereto agree in writing that a Material Adverse Effect consisting of casualty damage or loss from fire, storm, earthquake, criminal or negligent acts or

similar events affecting in a material fashion a substantial portion of the Assets (excluding the Excluded Assets and Excluded Liabilities) has occurred following the date of this Agreement and, notwithstanding such Material Adverse Effect, the Buyer agrees to close the transactions contemplated hereby, then (a) the Buyer shall be entitled to any insurance proceeds actually received by the Sellers in connection therewith *less* any proportionate share of collection costs related to such proceeds (such aggregate net amount, the "Recovered Insurance Proceeds"), and (b) the Recovered Insurance Proceeds shall be promptly paid over by the Sellers to the Buyer.

8.10    Name Changes.

As promptly as practicable following the Closing Date, each Seller shall, and shall cause its Affiliates, to change each of their respective legal names to a name bearing no resemblance to (i) "Republic Metals" or any of the names set forth on the signature pages to this Agreement or (ii) any trade names, trademarks or service marks included in the Intellectual Property Assets.

8.11    Tax Payments.

At or promptly following the Closing, Sellers shall pay the taxes, assessments and service charges assessed against the property located at 12800 NW 38th Avenue, Opa Locka, FL 33054 for 2018, pursuant to the Sale Order.

8.12    No Other Representations or Warranties; Disclaimers.

(a) **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF ANY SELLER OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, SELLERS' COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLERS EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (I) THE TITLE TO ANY OF THE ASSETS, (II) THE CONDITION OF THE ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING DISTINCTLY UNDERSTOOD THAT THE ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (III) ANY INFRINGEMENT BY SELLERS OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (IV) ANY INFORMATION, DATA, OR OTHER MATERIALS (WHETHER WRITTEN OR ORAL) FURNISHED TO BUYER BY OR ON BEHALF OF SELLERS, AND (V) THE ENVIRONMENTAL CONDITION AND OTHER CONDITION OF THE ASSETS AND ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE ASSETS.**

(b) Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Assets. Buyer acknowledges that in entering into this Agreement, it has relied only on the aforementioned investigation and the express representations and warranties of Sellers contained in this Agreement and the Transaction Documents. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Action of any kind against Sellers or their respective Affiliates, alleging facts contrary to the foregoing acknowledgment and affirmation.

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are, subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

9.1     Representations and Warranties; Covenants.

(a) Since the date hereof, there shall not have occurred any Material Adverse Effect consisting of casualty damage or loss from fire, storm, earthquake, criminal or negligent acts or similar events affecting in a material fashion a substantial portion of the Assets (excluding the Excluded Assets and Excluded Liabilities).

(b) The representations and warranties of Sellers contained in ARTICLE 5 shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect, which representations and warranties shall be true in all respects) both when made and as of the Closing Date with the same effect as though made anew at and as of such date (except those representations and warranties that specifically address matters only as of a specified date, which shall be true and correct in all respects as of that specified date); provided that, the representations and warranties set forth in Section 5.1 and Section 5.16 (collectively, the "Seller Fundamental Representations") shall be true and correct in all respects both when made and as of the Closing Date with the same effect as though made anew at and as of such date.  Buyer shall have received a certificate of Sellers signed by a duly authorized officer thereof to the effect that the conditions specified in this Section 9.1(a) have been fulfilled.

(c) The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects.  Buyer shall have received a certificate of Sellers signed by a duly authorized officer thereof to the effect that the conditions specified in this Section 9.1(c) have been fulfilled.

9.2     No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any Governmental Order which is in effect and has the effect of making illegal or otherwise

prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

9.3     Sellers' Deliveries.

Each of the deliveries required to be made by Sellers pursuant to Section 4.4 shall have been so delivered.

9.4     Assigned Contracts and Assigned Leases.

The Bankruptcy Court shall have approved and authorized the assumption and assignment of the Assigned Contracts and the Assigned Leases.

9.5     Permits.

Buyer shall have received by assignment or by new issue all necessary Permits, so that Buyer would not be prevented from continuing the operations of Sellers without any material interruption following the Closing.

9.6     Sale Order.

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be Final and in full force and effect.

9.7     Employees.

(a) As of the Closing Date, none of the employees set forth on Schedule 9.7(a) shall have been terminated by any Seller.

(b) As of the Closing Date, Sellers shall not have (i) terminated more than ten percent (10%) of the individuals who are employees of the Sellers as of the date of this Agreement (other than the individuals listed on Schedule 9.7(a)).

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

Sellers' obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

10.1     Sale Order in Effect.

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be Final and in full force and effect.

10.2    Representations and Warranties; Covenants.

(a) The representations and warranties of Buyer contained in ARTICLE 6 shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality or Material Adverse Effect, which representations and warranties shall be true in all respects) both when made and as of the Closing Date with the same effect as though made anew at and as of such date (except those representations and warranties that specifically address matters only as of a specified date, which shall be true and correct in all respects as of that specified date); provided that, the representations and warranties set forth in Section 6.1 and Section 6.6 (collectively, the "Buyer Fundamental Representations") shall be true and correct in all respects both when made and as of the Closing Date with the same effect as though made anew at and as of such date.  Sellers shall have received a certificate of Buyer signed by a duly authorized officer thereof to the effect that the conditions specified in this Section 10.2(a) have been fulfilled.

(b) The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects.  Sellers shall have received a certificate of Buyer signed by a duly authorized officer thereof to the effect that the conditions specified in this Section 10.2(b) have been fulfilled.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

10.4    Buyer's Deliveries.

Each of the deliveries required to be made by Buyer pursuant to Section 4.2 and Section 4.3 shall have been so delivered.

## ARTICLE 11

### TERMINATION

11.1    Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)  by either Sellers or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Governmental Order prohibiting the transactions contemplated hereby where such ruling or Governmental Order was not requested, encouraged or supported by any of Sellers or Buyer;

(ii)    by mutual written consent of Sellers and Buyer;

(iii)    if the Closing shall not have occurred by the close of business on February 28, 2019 (the "Outside Date"); *provided*, *however*, that if the Closing has not occurred by such date, but on such date all of the conditions set forth in ARTICLE 9 and ARTICLE 10 have been satisfied or waived (to the extent such conditions may be waived) other than the conditions set forth in Sections 9.6 and 10.1, then the Outside Date shall automatically be extended until one (1) month after such date (and such date shall be deemed to be the "Outside Date" for all purposes hereunder); *provided*, *further*, that (A) Buyer shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if (x) Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein and (y) Buyer has provided written notice to Sellers of its intention to exercise its rights under this Section 11.1(a)(iii) and Sellers have not provided written notice to Buyer that it is ready, willing and able to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Buyer, and (B) Sellers shall be permitted to terminate this Agreement pursuant to this Section 11.1(a)(iii) only if (x) no Seller is itself in material breach of any of its representations, warranties, covenants or agreements contained herein and (y) Sellers have provided written notice to Buyer of their intention to exercise their rights under this Section 11.1(a)(iii) and Buyer has not provided written notice to Sellers that it is ready, willing and able to close the transactions contemplated by this Agreement on or before the date that is five (5) Business Days after the date of such notice from Sellers; or

(iv)    if the Bankruptcy Court enters an order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Cases, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in any of the Bankruptcy Cases.

(b)    by Buyer,

(i)    in the event of any breach by Sellers of any of Sellers' agreements, covenants, representations, or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in ARTICLE 9 to be satisfied) or (if such breach is material) in the Bidding Procedures Order or Sale Order, and the failure of Sellers to cure such breach within ten (10) days after receipt of the Buyer Termination Notice; *provided*, *however*, that (A) Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (B) Buyer notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Section 11.1(b) as a result of the breach, and (C) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bidding Procedures Order or Sale Order of which Sellers is allegedly in breach and a description of the specific factual circumstances to support the allegation;

(ii)    if any Seller files, consents to, or supports any pleading filed in the Bankruptcy Court that is in conflict with this Agreement or any of the transactions contemplated herein;

47

(iii)        if the Bankruptcy Court enters an Order approving any Alternative Transaction; or

(iv)    if the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, modified, reversed or stayed, or rendered ineffective by a court of competent jurisdiction.

(c) by Sellers,

(i)        in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein (*provided* such breach would result in the failure of a condition set forth in ARTICLE 10 to be satisfied) or (if such breach is material) in the Bidding Procedures Order or Sale Order, and the failure of Buyer to cure such breach within ten (10) days after receipt of the Seller Termination Notice; *provided*, *however*, that Sellers (A) are not themselves in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order or the Sale Order, (B) notifies Buyer in writing (the "Seller Termination Notice") of its intention to exercise its rights under this Section 11.1(c)(i) as a result of the breach, and (C) specifies in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bidding Procedures Order or Sale Order of which Buyer is allegedly in breach and a description of the specific factual circumstances to support the allegation.

(ii)        [Intentionally Omitted]

11.2    Effect of Termination.

(a) Generally. Except as provided below in this Section 11.2, in the event of termination of this Agreement by Buyer or Sellers pursuant to this ARTICLE 11, all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party; *provided, however*, that (subject to Section 11.2(f)) nothing herein shall relieve any Party from liability for breach of this Agreement prior to such termination.  The provisions of this Section 11.2 and ARTICLE 12 (and, to the extent applicable to the interpretation or enforcement of such provisions, ARTICLE 1), shall expressly survive the termination of this Agreement.

(b) Each Party acknowledges that the agreements contained in this Section 11.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that such agreements shall survive the Closing.

(c) If Buyer terminates this Agreement as permitted by Section 11.1(a)(iii) or Sections 11.1(b)(i), (ii), (iii) or (iv) or, if at the time of termination of this Agreement for any other reason, Buyer would be entitled to terminate this Agreement pursuant to these aforementioned Sections, then Buyer shall be entitled to return of the entire Deposit (without interest thereon), and the entire Deposit (without interest thereon) shall be returned to Buyer.

(d) If Sellers terminate this Agreement as permitted by <u>Section 11.1(a)(iii)</u> (and Buyer would not have been entitled to terminate this Agreement pursuant to <u>Section 11.1(a)(iii)</u>) or <u>Section 11.1(c)(i)</u> then Buyer shall forfeit the Deposit to the Sellers and the Deposit shall be paid to the Sellers pursuant to the Bidding Procedures Order (without interest thereon).

(e) If the Agreement is terminated by any Party pursuant to <u>Sections 11.1(a)(i)</u> or <u>11.1(a)(iv)</u> or if the Agreement is terminated by mutual written consent pursuant to <u>Section 11.1(a)(ii)</u>, then Buyer shall be entitled to recover the Deposit and the Deposit shall be paid to Buyer pursuant to the Bidding Procedures Order (without interest thereon).

(f) In the event that the Deposit is forfeited or paid to the Sellers pursuant to <u>Section 11.2(d)</u> or <u>Section 11.2(e)</u> the Parties agree that such forfeiture or payment of the Deposit shall constitute liquidated damages and neither Buyer nor any of its Affiliates shall have any liability or obligation relating to or arising out of this Agreement or the Transaction Documents or the transactions contemplated hereby or thereby.

## ARTICLE 12

### GENERAL PROVISIONS

12.1    <u>Survival.</u>

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms.  The representations and warranties contained herein shall not survive the Closing.  The covenants and agreements that shall survive shall include the covenants and obligations with respect to (x) the obligations of Sellers to transfer, or to bring about the transfer, to Buyer of title to, and ownership of, the Assets and the obligation of Buyer to assume the Assumed Liabilities and (y) the Excluded Liabilities and Excluded Assets.  The covenants and agreements contained in this Agreement which by their terms are to be performed entirely prior to the Closing (and not at or after the Closing) shall not survive the Closing.

12.2    <u>Confidentiality.</u>

The Parties agree that the confidentiality agreement entered into by RMC and Asahi Holdings, Inc., dated November 14, 2018 (the "<u>Confidentiality Agreement</u>"), shall be deemed incorporated here by reference and shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement or the Closing; *provided*, *however*, that (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Confidentiality Agreement, and (b) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreement, provided, further, that, upon the Closing, Buyer's obligations thereunder with respect to Confidential Information (as such term is defined in the Confidentiality Agreement), to the extent relating to the Assets and Assumed Liabilities, shall terminate.

12.3    Public Announcements.

Neither party shall issue any press release or otherwise make any public statements or public disclosure with respect to the transactions contemplated by this Agreement without the prior written consent of the other parties, except to the extent such disclosure is required by applicable Law, the Bankruptcy Code or Bankruptcy Rules or the rules of any stock exchange, in which case the affected party shall (if legally permissible and reasonably practicable under the circumstances) promptly notify the other party thereof and the parties shall use reasonable efforts to cause a mutually agreeable release or announcement to be issued; provided, that each party shall be permitted to respond to private inquiries in a manner not inconsistent with the terms and provisions of this Agreement and public disclosures existing (including in the Bankruptcy Case) at the time of such inquiry; provided further that such responses do not involve any press release or other public statement or disclosure other than in accordance with this Section 12.3.

12.4    Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) received by the addressee, if sent by a delivery service (prepaid, receipt requested), or (c) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), with a copy of such notice simultaneously provided by email, in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by written notice to the other Parties):

    (i)  If to Sellers, then to:

> Republic Metals Corp.
> 12900 N.W. 38th Avenue
> Miami, FL 33054
> Attention: Scott Avila, CRO
> Email:  savila@paladinmgmt.com

> with a copy (which shall not constitute notice) to:

> Akerman LLP
> 2001 Ross Avenue
> Suite 3600
> Dallas, TX 75201
> Attention: John Mitchell
> Email:  john.mitchell@akerman.com

> and

> Akerman LLP
> 98 Southeast Seventh Street
> Suite 1100
> Miami, FL 33131

Attention:  Martin Burkett
Email:  martin.burkett@akerman.com

and

SSG Capital Advisors
300 Barr Harbor Drive, Suite 420
West Conshohocken, PA 19428
Attention:  Mark E. Chesen and Michael Goodman
Email:  mgoodman@ssgca.com
            mchesen@ssgca.com

and

Luskin, Stern & Eisler, LLP
Eleven Times Square
New York, NY 10036
Attention: Richard Stern
Email: stern@lsellp.com

(ii)   If to Buyer:

Asahi Holdings, Inc.
Sapia Tower 11F
1-7-12 Marunouchi
Chiyoda-ku, Tokyo 100-0005
Japan
Attention: Tomoya Higashiura and Amane Kojima
Email: t-higashiura@asahiholdings.com
            a-kojima@asahiholdings.com

with a copy (which shall not constitute notice) to:

EY Law Co.
1-1-2 Yurakucho, Chiyoda-ku, Tokyo
Tokyo Midtown Hibiya, Hibiya Mitsui Tower
100-0006
Attention: Junzaburo "JB" Kiuchi and Paul Wong
Email: JB.Kiuchi@jp.ey.com
            Paul.Wong@jp.ey.com

and

Ernst & Young Capital Advisors, LLC
560 Mission Street, Suite 1600
San Francisco, CA 94105

Attention: Rocky Ho
Email: Rocky.Ho@ey.com

and

Arnold & Porter Kaye Scholer LLP
70 West Madison Street Suite 4200
Chicago, IL  60602-4231
Attention: D. Tyler Nurnberg
Email: tyler.nurnberg@arnoldporter.com

and

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC  20001-3743
Attention: Andrew Varner
Email: andrew.varner@arnoldporter.com

12.5      Waiver, Waiver of Damages.

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER SAME MAY BE CAUSED) AND THE  PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES.

12.6      Entire Agreement; Amendment.

This Agreement (including the Exhibits, Annexes, Schedules and Disclosure Schedules) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter.  This Agreement may not be amended except by a written agreement executed by all of the Parties.

12.7      Assignment.

(a) Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable, by operation of Law or otherwise, by any Party without the written consent of the other Parties hereto, and any attempted or purported assignment in violation of this <u>Section 12.7</u> shall be null and void.  Notwithstanding the foregoing, Buyer shall have the unrestricted right to assign this Agreement (i) as collateral, and in connection therewith to delegate all or any part of its obligations hereunder to any lender or financing sources or (ii) to any Affiliate of Buyer, but in each such event Buyer shall remain fully liable for the performance of all of such obligations in the manner prescribed in this Agreement.

(b) Buyer may, designate, at or prior to the Closing, one or more Persons to acquire the Assets and assume the Assumed Liabilities or any rights or obligations of the Buyer hereunder; provided that no such designation shall relieve Buyer from its obligations or Liabilities hereunder or delay or interfere with the Closing of the transactions contemplated by this Agreement. The parties agree to modify any Closing deliverables in accordance with the foregoing designation.

(c) This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.  The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise).  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the Parties and successors and assigns permitted by this <u>Section 12.7</u> any right, remedy or claim under or by reason of this Agreement.

12.8    <u>Severability.</u>

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provisions shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    <u>Expenses.</u>

Whether or not the transactions contemplated by this Agreement are consummated, except as provided in <u>Section 11.2</u>, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby; *provided, however*, Sellers shall pay all amounts payable to SSG Capital Advisors, LLC, in accordant with an order of the Bankruptcy Court.

12.10    <u>Time of Essence.</u>

Time shall be of the essence with respect to all time periods and notice periods set forth

in this Agreement.

12.11    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a) EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAWS OR ANY OTHER LAW THAT WOULD MAKE THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF NEW YORK APPLICABLE HERETO.

(b) Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in New York, New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 12.4) or any other manner permitted by law.

(c) THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.12    Counterparts.

This Agreement and any amendment hereto may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.13    Parties in Interest; No Third Party Beneficiaries.

This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer

upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

12.14    <u>Non-Recourse.</u>

No past, present or future director, officer, employee, incorporator, member, partner or equity holder of Buyer or any Seller shall have any Liability for any obligations or liabilities of such Party under this Agreement or any other Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

12.15    <u>Headings</u>.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

12.16    <u>Disclosure Schedules; Materiality.</u>

The disclosure of any particular fact or item in any Disclosure Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

*[Signature page follows.]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

Asahi Holdings, Inc.


By: _____
Name:_____
Title:_____

**SELLERS**

Republic Metals Corporation


By: _____
Name:_____
Title:_____


Republic Metals Refining Corporation


By: _____
Name:_____
Title:_____


Republic High Tech Metals, LLC


By: _____
Name:_____
Title:_____


Republic Carbon Company, LLC


By: _____
Name:_____
Title:_____


RMC Diamonds LLC


By: _____
Name:_____
Title:_____

RMC 2 LLC


By: _____

Name:_____

Title:_____


J & L Republic, LLC


By: _____

Name:_____

Title:_____


R & R Metals, LLC


By: _____

Name:_____

Title:_____

**ANNEX 1**

**SUBSIDIARY SELLERS**

1.  Republic High Tech Metals, LLC, a Florida limited liability company
2.  Republic Carbon Company, LLC, a Florida limited liability company
3.  RMC Diamonds LLC, a Florida limited liability company
4.  RMC 2 LLC, a Florida limited liability company
5.  J & L Republic, LLC, a Florida limited liability company
6.  R & R Metals, LLC, a Florida limited liability company

| COUNT | COUNTERPARTY WITH WHOM THE DEBTOR HAS AN EXECUTORY CONTRACT OR | DEBTOR ENTITY NAME | TITLE OF CONTRACT | STATE THE TERM | LIST THE CONTRACT NUMBER IF ANY | ADDRESS1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY | CURE COSTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 15 W. 47th Street LLC | Republic Metals Refining Corporation | Office Lease | Month to Month | 15W47-206-CU | 989 AVENUE of the AMERICAS, FL 15 | | NEW YORK | NY | 10018 | US | $    - |
| 2 | ADOBE INC. | Republic Metals Corporation | Software | Month to Month | 4490 | 345 Park Avenue | | SAN JOSE | CA | 95110 | US | - |
| 3 | AFCO | Republic Metals Corporation | Insurance | 5 months | 15358382502 | 5600 N. RIVER ROAD, SUITE 400 | | ROSEMONT | IL | 60018 | US | - |
| 4 | AIRGAS USA, LLC. | Republic Metals Corporation | Supplier | Month to Month | 3445657 | P O BOX 7777 - W3645 | | PHILADELPHIA | PA | 19175-0001 | US | 4,746.97 |
| 5 | ALARM AND ELECTRONICS SYSTEMS, LLC | Republic Metals Corporation | Security | Month to Month | 12016643 | 13973 S.W. 140 STREET | | MIAMI | FL | 33186 | US | 230.05 |
| 6 | ALSCO LINEN AND UNIFORM RENTAL SERVICES | Republic Metals Corporation | Supplier | Month to Month | N/A | 1415 N.W. 21st TERRACE | | MIAMI | FL | 33142 | US | 3,795.67 |
| 7 | American Steel Products | Republic Metals Corporation | Equipment Purchase | N/A | N/A | 3171 N. Republic Blvd. | | Toledo | OH | 43615 | US | - |
| 8 | APPLIED UNDERWRITERS | Republic Metals Corporation | Insurance | 3 months | 73-7201710106 | P.O. BOX 3646 | | OMAHA | NE | 68103 | US | - |
| 9 | ASPIREUP, LLC | Republic Metals Corporation | Contractor | N/A | N/A | 1301 CHESTNUT AVE. | | WILMETTE | IL | 60091 | US | 31,994.00 |
| 10 | AT&T | Republic Metals Corporation | Telephone | Month to Month | N/A | PO BOX 105262 | | ATLANTA | GA | 30348 | US | 2,025.68 |
| 11 | Atlantic Hosiery, LLC | Republic Metals Corporation | Warehouse lease | Month to Month | N/A | 13449 N.W. 42 AVENUE | | OPA-LOCKA | FL | 33054 | US | - |
| 12 | BAKER & MCKENZIE LLP | Republic Metals Corporation | Professional Fees | N/A | N/A | 1111 BRICKELL AVENUE, SUITE 1700 | | Miami | FL | 33131 | US | 4,598.00 |
| 13 | BALDASSARE BALISTRERI | Republic Metals Corporation | Warehouse lease | Month to Month | N/A | 9349 N.W. 23 STREET | | PEMBROKE PINES | FL | 33024 | US | - |
| 14 | BURGLAR ALARM TECHNICIANS, INC. | Republic Metals Corporation | Security | Month to Month | N/A | 4826 NE 10 Avenue | | Fort Lauderdale | FL | 33334 | US | - |
| 15 | CASCADE WATER SERVICES | Republic Metals Corporation | Supplier | Month to Month | N/A | 113 BLOOMINGDALE ROAD | | HICKSVILLE | NY | 11801 | US | 4,431.00 |
| 16 | CBJ CONSTRUCTION, INC. | Republic Metals Corporation | Contractor | Month to Month | N/A | 7 NW 3rd Ave | | Dania Beach | FL | 33004 | US | 132,356.00 |
| 17 | CELTIC COMMERCIAL FINANCE | Republic Metals Corporation | Equipment Lease | 15 months | CML-3704A | DEP. 10295, | P.O. BOX 87618 | CHICAGO | IL | 60680 | US | 1,665.00 |
| 18 | CESAR OSWALDO MENDOZA PEREZ | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | PRIVADA DE LA BOTA 182, RANCHO DON ANTONIO | TIZAYUCA | HIDALGO | HIDALGO | 43800 | MÉXICO | - |
| 19 | Dakota Software | Republic Metals Corporation | Software | 7 months | SOW18-328 | P.O. BOX 18559 | | ROCHESTER | NY | 14618 | US | - |
| 20 | DEI FOOD SERVICE EQUIPMENT & DESIGN | Republic Metals Corporation | Storage Lease | Month to Month | N/A | 3908 NORTH 29th AVENUE | | HOLLYWOOD | FL | 33020 | US | 412.80 |
| 21 | DELL MARKETING L.P. | Republic Metals Corporation | Software | 1 month | 409360671 | P.O. BOX 534118 | C/O DELL USA L.P. | ATLANTA | GA | 30353 | US | 4,862.00 |
| 22 | DGA SECURITY SYSTEMS INC | Republic Metals Refining Corporation | Security | Month to Month | 80978 | PO BOX 1920 | | NEW YORK | NY | 10101-1920 | US | - |
| 23 | Diversified Administration, Inc. | Republic Metals Corporation | Contractor | Month to Month | N/A | 6161 WASHINGTON STREET | | HOLLYWOOD | FL | 33023 | US | - |
| 24 | EVOQUA WATER TECHNOLOGIES LLC | Republic Metals Corporation | Supplier | 7 months | 322171517 | 28563 NETWORK PLACE | | CHICAGO | IL | 60673 | US | 1,062.23 |
| 25 | FLEXENTIAL COLORADO CORP. | Republic Metals Corporation | Supplier - Datacenter | 88044 | | PO Box 732368 | | DALLAS | TX | 75373 | US | - |
| 26 | G4S SECURE SOLUTIONS (USA) INC. | Republic Metals Corporation | Security | Month to Month | N/A | P O BOX 277469 | | ATLANTA | GA | 30384-7469 | US | 49,029.72 |
| 27 | GERARDO ROMAN HUERTA GONZALEZ | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | AVENIDA JIMENEZ CANTU LOTE 90 CASA 37 COL. ARCOS 1 | TULTITLAN | MÉXICO | MÉXICO | 54938 | MÉXICO | - |
| 28 | Gregg Driscoll | Republic Metals Corporation | Employee | N/A | N/A | 200 WEST BROW ROAD | | LOOKOUT MOUNTAIN | TN | 37350 | US | - |
| 29 | HIGINIO LEAL MACIAS | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | CENTENARIO MZ 2 LOTE 9 COL. LA JOYA | CHIMALHUACAN | MÉXICO | MÉXICO | | MEXICO | - |
| 30 | HUGO HERNANDEZ  VELAZQUEZ | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | CALLE VALLE DEL PARAISO MZ 5 LOTE 8 COL. VALLE DE LUCES | IZTAPALAPA | CDMX | MÉXICO | 09800 | MÉXICO | - |
| 31 | IJU AGENCY OF FLORIDA | RMC2, LLC | Insurance | 1 day | MAR/22034 | 6355 N.W. 36th STREET | | MIAMI | FL | 33166 | US | - |
| 32 | IKOI | Republic Metals Corporation | Equipment Purchase | N/A | MOFF 17127 | VIA MONTE VERENA, 20 | 36022-S.ZENO DI CASSOLA | VICENZA | VICENZA | NA | Italy | - |
| 33 | INUNISON | Republic Metals Corporation | Supplier | Month to Month | 20160001834 | 4747 NOB HILL ROAD, SUITE 8 | | SUNRISE | FL | 33351 | US | - |
| 34 | Isaac Amponsah | Republic Carbon Company, LLC | Employee | N/A | N/A | 16213 NW 84 Place | | Miami Lakes | FL | 33016 | US | - |
| 35 | James Gavilan | Republic Metals Corporation | Employee | N/A | N/A | 6426 Dieterle Crescent | | Rego Park | NY | 11374 | US | - |
| 36 | Jaw Property Holdings, LLC | Republic Metals Corporation | Warehouse lease | Month to Month | N/A | 13449 NW 42 AVENUE | | OPA LOCKA | FL | 33054 | US | - |
| 37 | JEFF BAXTER | Republic Metals Corporation | International Consultant | Month to Month | N/A | 27 QUEEN STREET EAST | SUITE 702 | TORONTO | ONTARIO | M5C 2B3 | Canada | - |
| 38 | JESSICA CASTAÑEDA MONDRAGON | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | DOCTOR ATL 172 COL SANTA MARIA LA RIBERA | CUAUHTEMOC | CDMX | MÉXICO | 06400 | MÉXICO | - |
| 39 | JLT SPECIALTY INSURANCE SERVICES, INC. | Republic Metals Corporation | Insurance | 8 Months | ADL30000779600 | 135 MAIN STREET, SUITE 1600 | | SAN FRANCISCO | CA | 94105 | US | - |
| 40 | JOHNSON CONTROLS, INC. | Republic Metals Corporation | Security | Month to Month | N/A | PO Box 730068 | | DALLAS | TX | 75373 | US | 9,286.57 |
| 41 | JORGE LUIS MALPARTIDA RAMOS | Republic Metals Corporation | International Consultant | Month to Month | N/A | CALLE BRASILIA NOR. 313, DPT101 URB SANTA PATRICIA | | LA MOLINA | LIMA | NA | Peru | - |
| 42 | JOSE ANTONIO HERNANDEZ  VELAZQUEZ | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | FRANCISCO I MADERO 55 INT 409 | CENTRO | CUAUHTEMOC | CIUDAD DE MEXICO | 06000 | MÉXICO | - |

2/14/2019

SRC Donlin Recano

| No. | Creditor | Debtor | Type | Term | Account/Ref | Address | Attn | City | State | Zip | Country | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43 | JOSE HERNANDEZ HERNANDEZ | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | CALLE ORTENCIA MZ 32 LOTE 471 COL. PRIMAVERA | | LA PAZ | MÉXICO | 56516 | MÉXICO | - |
| 44 | JOSE LUIS HERNANDEZ HERNANDEZ | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | REAL DE SANTA ELENA MZ 19 LOTE 66 CASA B. REAL DE SAN MARTIN | | VALLE DE CHALCO | MÉXICO | 56614 | MÉXICO | - |
| 45 | KARLA LUCIA LEZAMA ROCHA | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | AV. CENTENARIO 1080 INT 21 COL. LA PERA XOCHINAHUAC | | ALVARO OBREGON | CDM,X | 01619 | MÉXICO | - |
| 46 | KONICA MINOLTA | Republic Metals Corporation | Equipment Lease | 8 Months | 1316522, 1395979 | 21146 NETWORK PLACE | | CHICAGO | IL | 60673 | US | 7,352.53 |
| 47 | LUPITA ISABEL ACEVEDO VILLALOBOS | Republic Metals Corporation | International Consultant | Month to Month | N/A | CALLE TORRES QUIINTERO 191 EDIFICIO 11C DEPTO 102 | | IZTAPALAPA | CDM,X | 09360 | MÉXICO | - |
| 48 | MALCA-AMIT CANADA, INC. | Republic Metals Corporation | Vault Lease | Month to Month | N/A | 702-27 QUEEN STREET EAST | | TORONTO | ON | M5C 2M6 | CANADA | - |
| 49 | MARIA ENRIQUETA ESTHER GONZALEZ CENTENO | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | CALLE LAGUNA DEL CARMEN 36 COL. LA TURBA | | TLAHUAC | CDMX | 13250 | MÉXICO | - |
| 50 | MARSHALL & STERLING, INC. | Republic Metals Corporation | Insurance | 4 Months | FINFR: 1803165, 1804888, 1801596, | 110 MAIN STREET | | POUGHKEEPSIE | NY | 12601 | US | - |
| 51 | Mass Mutual (401k) | Republic Metals Corporation | Benefits | N/A | GN-835644 | P.O. BOX 1583 | | HARTFORD | CT | 6144 | | - |
| 52 | MCNEILL GROUP | Republic Metals Corporation | Insurance | 8 Months | 9115171021600' | PO BOX 33070 | | ST PETERSBURG | FL | 33733-8070 | US | - |
| 53 | MERCEDES-BENZ FINANCIAL SERVICES | Republic Metals Corporation | Auto Lease | 12 Months | 5000366411001' | P O BOX 5209 | DOWNTOWN KIA MOTORS, LP | CAROL STREAM | IL | 60197 | US | - |
| 54 | MERCUTEK | Republic Metals Corporation | Service Contractor | N/A | N/A | 153 SOUTH MAIN ST. | | NEWTON | CT | 6470 | US | 20,713.05 |
| 55 | METTLER TOLEDO, INC. | Republic Metals Corporation | Supplier | Month to Month | N/A | 5 Barr Road | | Ithica | NY | 14850-9117 | US | 1,131.77 |
| 56 | MICROSOFT CORP. | Republic Metals Corporation | Software | 10 days | N/A | P.O. BOX 842103 | | DALLAS | TX | 75284 | US | 6,961.29 |
| 57 | MIRIAN COLIN FONSECA | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | RIO SAN JOAQUIN 64 A UNIDAD HABITACIONLA EL ARBOLILLO I | | GUSTAVO A MADERO | CDMX | 07269 | MÉXICO | - |
| 58 | MITEL CLOUD SERVICES, INC. | Republic Metals Corporation | Telephone | Month to Month | 1305639139 | 4921 SOLUTION CENTER | | CHICAGO | IL | 60677 | US | - |
| 59 | Mutual of Omaha ( STD,LTD, and Life ) | Republic Metals Corporation | Insurance | 5 Months | GVTL-AQ32, GUPR-AQ32, GUC-AQ32 | P.O. BOX 2147 | | OMAHA | NE | 68103 | US | - |
| 60 | Nico Scheeres | Republic Carbon Company, LLC | Employee | N/A | N/A | 398 NE 3rd Court | | Boca Raton | FL | 33432 | | - |
| 61 | PAULINO GABRIEL CAMACHO | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | CALLE QUIMICHIN MZ 100 LOTE 35 COL. BARRIO PESCADORES | | CHIMALHUACAN | MÉXICO | 56334 | MÉXICO | - |
| 62 | PITNEY BOWES GLOBAL FINANCIAL SERVICES, LLC | Republic Metals Refining Corporation | Equipment Lease | Month to Month | N/A | P.O. BOX 371887 | | PITTSBURGH | PA | 15250 | US | - |
| 63 | PODHURST ORSECK, P.A. | Republic Metals Refining Corporation | Attorney | Month to Month | N/A | ONE S.E. 3 AVENUE, SUITE 2300 | | MIAMI | FL | 33131 | US | 4,410.00 |
| 64 | PODS Enterprises LLC | Republic Metals Corporation | Equipment Lease | Month to Month | N/A | P.O. BOX 791003 | | BALTIMORE | MD | 21279 | US | - |
| 65 | QUALITY TECHNOLOGY SERVICES MIAMI II, LLC | Republic Metals Corporation | Software | Month to Month | N/A | P.O. BOX 74501 | | CLEVELAND | OH | 44194 | US | 2,205.47 |
| 66 | RIGHTPOINT CONSULTING, LLC | Republic Metals Corporation | Contractor | 11 Months | SOW | 29 N WACKER DRIVE | 4th FLOOR | CHICAGO | IL | 60606 | US | - |
| 67 | Robert Acker | Republic Metals Corporation | Employee | N/A | N/A | 21091 E Country Club Dr. | Apt. 2411 | Aventura | FL | 33180 | US | - |
| 68 | SECURITY & FIRE SYSTEMS, INC. | Republic Metals Corporation | Security | Month to Month | N/A | P.O. BOX 164444 | | MIAMI | FL | 33116 | US | - |
| 69 | SERGIO PEREZ EULAGE | Republic Trans Mexico Metals, S.R.L. | International Consultant | Month to Month | N/A | AVENIDA SANTA LUCIA CONDOMINIO 48 MZ 7 LOTE 8 | | CUAUTITLAN | MÉXICO | 54850 | MÉXICO | - |
| 70 | SOLARWINDS | Republic Metals Corporation | Software | Month to Month | N/A | P.O. BOX 730720 | | DALLAS | TX | 75373 | US | - |
| 71 | STANLEY CONVERGENT SECURITY SOLUTIONS, INC. | Republic Metals Corporation | Security | Month to Month | N/A | Dept. CH 10651 | | Palatine | IL | 60055 | US | 525.17 |
| 72 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 2 Months | 624-3166-C20-59I | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 73 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 11 Days | 956-8815-A26-59D | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 74 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 1 month | C76-7006-B24-59C | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 75 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 2 Months | D94-0448-C31-59B | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 76 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 2 Months | 908-8292-C26-59C | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 77 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 7 Days | D13-6220-A22-59Q | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 78 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 1 month | C31-4857-B19-59C | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 79 | STATE FARM INSURANCE COMPANIES | Republic Metals Corporation | Auto Insurance | 3 months | 947-4333-D11-59F | P O BOX 588002 | | NORTH METRO | GA | 30029 | US | - |
| 80 | STEVE EDWARDS ARCHITECTURE LLC | Republic Metals Corporation | Contractor | Month to Month | N/A | 941 S.E. 14th TERRACE | | DEERFIELD BEACH | FL | 33062 | US | 22,003.92 |
| 81 | TecScan | Republic Metals Corporation | Equipment Purchase | N/A | N/A | 75 Boul. de Mortagne | Suite 122 | Boucherville | Quebec | J4B 6Y4 | CANADA | 21,400.00 |
| 82 | THE LINCOLN NATIONAL LIFE INSURANCE | Republic Metals Corporation | Insurance | 8 Months | 7159192 | PO BOX 7247-0477 | | PHILADELPHIA | PA | 19170-0477 | US | - |
| 83 | THE ULTIMATE SOFTWARE GROUP, INC. | Republic Metals Corporation | Software | Month to Month | N/A | P.O. BOX 930953 | | ATLANTA | GA | 31193 | US | 13,251.20 |
| 84 | THOMSON REUTERS - WEST | Republic Metals Corporation | Supplier | Month to Month | 1005004624 | P.O. BOX 417175 | | BOSTON | MA | 02241 | US | 11,144.59 |
| 85 | T-MOBILE | Republic Metals Corporation | Telephone | Month to Month | N/A | P.O. BOX 790047 | | ST. LOUIS | MO | 63179 | US | - |

2/14/2019

| 86 | Tod Claytor | Republic Metals Corporation | Employee | N/A | N/A | 20411 NW 4th Street | | Pembroke Pines | FL | 33029 | US | - |
| 87 | TRANE U.S., INC. | Republic Metals Corporation | Supplier | Month to Month | N/A | P.O. BOX 406469 | | ATLANTA | GA | 30384-6469 | US | - |
| 88 | TRAVELERS CL | Republic Metals Corporation | Auto Insurance | 1.5 Months | BA-2J473692-17 | P.O. BOX 660317 | | DALLAS | TX | 75266 | US | - |
| 89 | TRULY NOLEN BRANCH 086 | Republic Metals Corporation | Supplier | 1 month | 083-83106568 | 6520 SW 40th St. | | MIAMI | FL | 33155 | US | 721.39 |
| 90 | United Healthcare (Health, Dental & Vision) | Republic Metals Corporation | Insurance | 5 months | 723106 | 22703 NETWORK PLACE | | CHICAGO | IL | 60673 | US | - |
| 91 | United Healthcare Global / Expatriate | Republic Metals Corporation | Insurance | 5 months | 724149 | 22703 NETWORK PLACE | | CHICAGO | IL | 60673 | US | - |
| 92 | VERIZON | Republic Metals Refining Corporation | Telephone | Month to Month | N/A | PO Box 15124 | | ALBANY | NY | 12212-5124 | US | 279.30 |

2/14/2019