**Hearing Date and Time: March 18, 2019 at 11:00 a.m. (EST)**
**Objection Deadline:  March 1, 2019 at 5:00 p.m. (EST)**
**Reply Deadline: March 14, 2019 at 12:00 p.m. (EST)**

Michael Luskin
Lucia Chapman
Alex Talesnick
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REPUBLIC METALS REFINING | ) | Case No. 18-13359 (SHL) |
| CORPORATION, *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related Doc. No. 553** |

**OBJECTION OF THE SENIOR LENDERS**
**TO MOTION TO COMPEL PAYMENT OF POST-PETITION RENT**
**AND RELATED OBLIGATIONS PURSUANT TO 11 U.S.C. § 365(d)(3)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833), Republic High Tech Metals, LLC, 13001 NW 38th Avenue, Miami, FL 33054 (6102), RMC Diamonds, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (1507), RMC2, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (4696), J & L Republic LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7604), R & R Metals, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7848), Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639) and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    A.   The Chapter 11 Cases ................................................................................................ 2

    B.   Republic and The Rubin Family ................................................................................ 3

    C.   The Leased Premises.................................................................................................. 5

    D.   The Senior Lenders' Relationship with the Debtors.................................................. 8

    E.   The Forbearance Agreement.................................................................................... 11

    F.   The Cash Collateral Motion and Interim Cash Collateral Orders................................... 12

    G.   The Asahi Sale and the Lease Rejections ............................................................... 13

ARGUMENT ...................................................................................................................... 14

    A.   The Court Should Defer a Decision on the Motion Until All  of the Estate's Claims are Adjudicated ........................................................................................................... 16

    B.   The Rent Claims Will Likely Be Subordinated ...................................................... 18

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Bala v. Kaler (In re Racing Servs.)*,
  340 B.R. 73 (BAP 8th Cir. 2006) ...................................................................... 18, 19

*Coöperatieve Rabobank U.A., N.Y. Branch, et al. v. Lindsey Rubin*,
  Case No. 1:19-cv-20429 (S.D. Fla.) .............................................................. 4 n. 3, 19

*Dubai World Corp. v. Jaubert*,
  Case. No. 09-14314-CIV, 2011 WL 579213 (S.D. Fla. Feb. 9, 2011) ........................... 15 n. 10

*In re Goody's Family Clothing, Inc.*,
  392 B.R. 604 (Bankr. D. Del. 2008) .................................................................. 17, 18

*In re Joseph Spiess Co.*,
  145 B.R. 597 (Bankr. N.D. Ill. 1992) ...................................................................... 17

*In re Microvideo Learning Sys., Inc.*,
  232 B.R. 602 (Bankr. S.D.N.Y. 1999) ................................................................ 16, 17

*In re Racing Servs., Inc.*,
  386 B.R. 751 (8th Cir. BAP 2008), *aff'd*, 571 F.3d 729 (8th Cir. 2009) ........................ 18 n. 12

*Kolski ex rel Kolski v. Kolski*,
  731 So. 2d 169 (Fla. 3d DCA 1999) ................................................................ 15 n. 10

*United States v. Bala*,
  489 F.3d 334 (8th Cir. 2007) ........................................................................ 18 n. 12

**Statutes**

11 U.S.C. § 1107 ........................................................................................... 2

11 U.S.C. § 1108 ........................................................................................... 2

11 U.S.C. § 365(d)(3) ............................................................................. 1, 16, 18

11 U.S.C. § 365(d)(4) ..................................................................................... 18

11 U.S.C. § 503(b) ........................................................................................ 16

11 U.S.C. § 503(b)(1) ..................................................................................... 17

11 U.S.C. § 510(c) ..................................................................................... 2, 15

11 U.S.C. § 510(c)(1) ..................................................................................... 18

Fla. Stat. § 689.01 .................................................................................................. 15 n. 9, 16 n. 11

Fla. Stat. § 725.01 ................................................................................................ 15 n. 10, 16 n. 11

Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers
Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International
Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC
("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and,
together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the
"Senior Lenders") hereby submit this objection (this "Objection") to the *Motion to Compel
Payment of Post-Petition Rent and Related Obligations Pursuant to 11 U.S.C. § 365(d)(3)* (the
"Motion")[2] [Docket No. 553] filed by The Second Amended and Restated Rose Rubin
Revocable Trust u/d/a 9/25/2013, the Amended and Restated Richard Rubin Revocable Trust
u/d/a 12/8/2008, Republic Metals Warehouse, LLC, Richard Rubin Lindjay Investments, LLC,
Jason Ross Rubin Enterprises, LLC and RRLJ12, LLC (collectively, the "Lessors"), and in
support thereof respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Motion is premature.  The Lessors, all insiders and their affiliates, are the
subject of investigations by the Senior Lenders and the Official Committee of Unsecured
Creditors (the "Committee") into possible fraud, breach of fiduciary duty, and fraudulent transfer
claims.  The Senior Lenders and the Committee are also investigating whether the Lessors
purchased one or more of the Leased Premises at issue in the Motion with sums that constitute
fraudulent transfers.  The Committee has been granted standing to bring such claims.  See
Docket No. 696.  The investigations are ongoing, but the facts already uncovered establish that
there are good grounds to assert the claims and that the claims, if proved, would constitute
offsets to the Lessors' rent claims and would be a basis to subordinate their claims under

---

[2]      All capitalized terms used but not defined in this Objection have the meaning ascribed to them in
the Motion.

Section 510(c).  Adjudication of the rent claims should await the adjudication of the Senior

Lenders' and the Committee's claims against the Rubins.  Should the Court choose to address the

Motion on its merits at this time, however, the Court should deny or defer the Motion:

2.      *First*, the Leased Premises were acquired, at least in part, with funds from the

Debtors that were fraudulent transfers and should be offset against the rent sought by the

Lessors.  This will require resolution of the estate's claims against the Lessors.

3.      *Second*, the Lessors' claims for rent likely are likely to be equitably subordinated

to the claims of all other creditors on the basis of the Lessors' inequitable conduct.  Because the

investigations into that conduct are ongoing, resolution of the Motion should await their

completion.

**BACKGROUND**

**A.  The Chapter 11 Cases**

4.      Each of the Debtors filed a voluntary petition for relief under chapter 11 of the

United States Bankruptcy Code (the "Bankruptcy Code") on November 2, 2018 (the "Petition

Date") or November 21, 2018.

5.      The Debtors are continuing to operate and manage their properties and assets as

debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee

or examiner has been appointed in the chapter 11 cases.

6.      On November 19, 2018, the Office of the United States Trustee for the Southern

District of New York appointed the Official Committee of Unsecured Creditors in these cases

[Docket No. 113].

2

7.      The factual background relating to the commencement of these cases is set forth in detail in the *Declaration of Scott Avila, as Chief Restructuring Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "Avila Decl.") [Docket No. 2].

### B. Republic and The Rubin Family

8.      Prior to the Petition Date, Debtor Republic Metals Corporation ("Republic") was a precious metals refinery and mint located in south Florida.  Republic was founded in 1980 by Richard Rubin.  The Rubin family, consisting of Richard Rubin, his widow, Rose Rubin, and his children, Jason Rubin and Lindsey Rubin (collectively, the "Rubins"), have controlled Republic and its affiliates since their inception.  Declaration of Edward Kleinschmidt, dated March 1, 2019 (the "Kleinschmidt Decl."), ¶ 12, attached as Exhibit A.

9.      Republic's sole shareholder is the Amended and Restated Richard Rubin Revocable Trust u/a/d 12/8/2008 (the "Rubin Trust").  Rose Rubin is the sole Trustee of the Rubin Trust and is also its sole beneficiary.  Id. ¶ 13.

10.      Jason Rubin is currently President and Chief Executive Officer of Republic, a position he assumed after the death of Richard Rubin on June 24, 2013.  Lindsey Rubin is the Corporate Secretary of Republic and previously served as Executive Director of Stone Removal and Diamond Acquisitions.  Rose Rubin and Lindsey Rubin were directors of Republic until shortly after the filing of these cases.  Jason Rubin remains on the board of directors.  Id. ¶ 14.

11.      In the years preceding these cases, the Rubins caused the Debtors to transfer substantial sums to themselves through extravagant salaries, bonuses, and dividends to fund lavish lifestyles, including luxury homes and automobiles, boats, travel, clothing, and entertainment, and to fund the purchases of real property by the Rubins and their affiliates, at least one of which is the subject of the Motion.  Id. ¶ 31.

3

12.    By way of example only, the following chart reflects more than $48 million of salaries, bonuses and dividends that the Debtors paid to the Rubins since 2012:

| Name/Position/Relationship | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 6 Year Total |
|---|---|---|---|---|---|---|---|---|
| **Rubin, Jason R.** | Salary | $ 376,601 | $ 583,551 | $ 458,655 | $ 450,000 | $ 450,000 | $ 450,000 | $ 2,768,807 |
| Chief Executive Officer | Bonus | 1,405,784 | 948,073 | 1,378,317 | 2,590,267 | 368,858 | 546,322 | 7,237,621 |
| Officer & Director | **Total** | $ 1,782,385 | $ 1,531,624 | $ 1,836,972 | $ 3,040,267 | $ 818,858 | $ 996,322 | $ 10,006,428 |
| | | | | | | | | |
| **Rubin, Rose** | Salary | $ 12,000 | $ 17,267 | $ 1,847,038 | $ 2,523,494 | $ 1,122,915 | $ 1,111,200 | $ 6,633,914 |
| Vice-President | Bonus | - | 2,585 | - | - | - | 200,000 | 202,585 |
| | Dividends | 9,208,815 | 1,908,096 | 7,649,249 | 2,045,265 | | 1,057,256 | 21,868,681 |
| Officer & Director | **Total** | $ 9,220,815 | $ 1,927,948 | $ 9,496,287 | $ 4,568,759 | $ 1,122,915 | $ 2,368,456 | $ 28,705,180 |
| | | | | | | | | |
| **Rubin, Lindsey** | Salary | $ 57,300 | $ 86,962 | $ 101,924 | $ 140,000 | $ 140,000 | $ 140,000 | $ 666,186 |
| Corporate Secretary | Bonus | 74,984 | 159,414 | 6,198,550 | 2,649,753 | 94,787 | 136,355 | 9,313,843 |
| Officer | **Total** | $ 132,284 | $ 246,376 | $ 6,300,474 | $ 2,789,753 | $ 234,787 | $ 276,355 | $ 9,980,029 |
| | | | | | | | | |
| **Total Rubin Family** | | $ 11,135,484 | $ 3,705,948 | $ 17,633,733 | $ 10,398,779 | $ 2,176,560 | $ 3,641,133 | $ 48,691,637 |

Notes
- This schedule was prepared by RPA with information provided by Republic which has not been independently verified.
- Republic has represented that dividend payments were made to Rose Rubin for the payment of Trust income tax liabilities.
- Dividend payments in 2012 and 2013 are listed under Rose Rubin for purposes of this schedule.
- Dividends for 2012–2017 are the amounts reported in Republic's annual financial statements.
- Per discussion with Jason Rubin, Lindsey Rubin's bonus in 2014 was used to purchase a personal residence.
- Per discussion with Jason Rubin, Lindsey & Jason Rubin's bonuses in 2015 were used to purchase 13001 NW 38th Ave.

13.    This chart does not reflect off-balance sheet transfers that may have been made to the Rubins, such as automobiles and boats purchased with company funds or corporate credit cards used for personal purchases.  Kleinschmidt Decl. ¶ 33.

14.    At least one of these transfers, a "bonus" of $5,738,508 paid by Republic to Lindsey Rubin on October 22, 2014, was used to purchase a personal residence, id. ¶ 34, potentially subject to the Florida statutory homestead exemption from judgments.[3]

15.    Upon information and belief, the Committee is investigating all salary, bonus, dividend, and other transfers made to or for the benefit of the Rubins as part of the Committee's 2004 examination.

---

[3]    The Senior Lenders filed a complaint against Lindsey Rubin in the United States District Court for the Southern District of Florida in order to preserve this claim for the benefit of the estates.  See Coöperatieve Rabobank U.A., N.Y. Branch, et al. v. Lindsey Rubin, Case No. 1:19-cv-20429 (S.D. Fla. Feb. 1, 2019).

### C.  **The Leased Premises**

16.    The Rubins used their salaries, bonuses and dividends as well as other "loans" from the Debtors to personally acquire fee interests in the Leased Premises, which constitute substantially all of the real properties that comprised the Debtors' refining facility in southern Florida.  The Rubins then leased the properties back to the Debtors to enhance their personal gains to the detriment of the Debtors.

17.    The following chart reflects the Leased Premises at issue, the purchase price for each, and the source of funds used for acquisition based on the Senior Lenders' knowledge and the deeds produced in discovery on the Motion:

| Address | Use | Landlord Entity | Acquisition Date | Purchase Price | Source of Funds[4] |
|---|---|---|---|---|---|
| 13000 NW 38th Avenue, Opa Locka, FL 33054 | Silver Refinery | Republic Metals Warehouse LLC | 9/1/2009 | $3,950,000 | Loan from Republic[5] |
| 12900 NW 38th Avenue, Opa Locka, FL 33054 | Gold Refinery | Rubin Trust | 4/2/1992 | Unknown | Construction loan |
| 13001 NW 38th Avenue, Opa Locka, FL 33054 | High-Tech Facility | Richard Rubin Lindjay Invest LLC | 1/6/2015 | $3,342,000 | Bonuses received by Jason and Lindsey Rubin |
| 3859 NW 125th Street, Opa Locka, FL 33054 | Storage Facility | Jason Ross Rubin Enterprises LLC | 5/1/2008 | $370,000 | Financing by Daniel Whitebook |
| 3863 NW 125th Street, Opa Locka, FL 33054 | Storage Facility | Jason Ross Rubin Enterprises LLC | 4/29/2008 | $370,000 | Financing by Daniel Whitebook |
| 5295 NW 163rd Street, Miami Gardens, FL 33014 | Carbon Facility | RRLJ12 LLC | 9/27/2016 | $1,920,000 | Personal funds and loans from Republic[6] |

18.    Upon information and belief, the Rubins are the sole beneficial owners of each landlord entity listed above.[7]

---

[4]    The information in this column is derived in part from a narrative provided by counsel for the Lessors and Rubins regarding the sources of funds used for the acquisitions.  The Senior Lenders reserve the right to supplement this Objection following receipt of any additional pertinent information.

[5]    During the forbearance period, the Rubin Trusts satisfied the outstanding notes, and the resulting funds were paid to the Senior Lenders to reduce the principal balance of their loans.

[6]    These loans were also repaid during the forbearance period, with the proceeds going to the Senior Lenders.

[7]    Counsel for the Rubins stipulated that the landlords of the Leased Premises are all ultimately owned by the Rubins (Feb. 14, 2019 Discovery Conference).

19.    Upon information and belief, certain of the leased properties were acquired with funds transferred to the Rubins by the Debtors at a time when the Debtors were insolvent.  See paragraphs 32–33 below regarding insolvency.

20.    Four of the Leases – the Leases for 13000 NW 38th Avenue (the "Silver Refinery Lease"), 12900 NW 38th Avenue (the "Gold Refinery Lease"), 13001 NW 38th Avenue (the "High-Tech Lease"), and 5295 NW 163rd Street (the "Carbon Lease" and collectively with the Silver Refinery Lease, the Gold Refinery Lease and the High-Tech Lease, the "Written Leases") – were executed by Jason Rubin, Rose Rubin, Jason Rubin, and Lindsey Rubin, respectively, on behalf of the Lessors.  Jason Rubin also executed all four of the Written Leases on behalf of the Debtors, as Lessees.  He signed as President of Republic for the Silver Refinery Lease and the Gold Refinery Lease; as Member/Manager of Republic High Tech Metals, LLC for the High-Tech Lease; and as Member of Republic Carbon Company, LLC for the Carbon Lease.

21.    The Silver Refinery Lease and the Gold Refinery Lease are bare bones documents providing for terms of five years beginning March 1, 2014, although the Silver Refinery Lease was not executed until March 10, 2014.[8]  Both of those leases expired on February 28, 2019. The High-Tech Lease and the Carbon Lease are for terms of 60 months, beginning January 1, 2018, and May 1, 2017, respectively.  Except for the terms relating to the specific properties, the two documents are substantially similar and more fleshed out than the earlier leases.

22.    Two of the Leases – the Leases for 3863 NW 125th Street and 3859 NW 125th Street (collectively, the "Oral Leases") – are oral leases, and there is no evidence of their terms other than the amounts of rent paid.

---

[8]    The Gold Refinery Lease was executed on February 5, 2014.

23.     As explained in paragraphs 37–38 below, there was also a Lease for 12800 NW 38th Avenue (the "Office and Mint Lease"), which terminated prepetition when ownership of the underlying property was transferred to the Debtors pursuant to the Forbearance Agreement (as defined below).

**D.  The Senior Lenders' Relationship with the Debtors**

24.     As of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) over $177 million by the Debtors under certain credit agreements, master netting agreements and lease agreements (collectively, the "Credit and Lease Agreements").  The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including the Debtors' inventory and the proceeds thereof.  Kleinschmidt Decl. ¶ 15.

25.     With the exception of Mitsubishi and ICBCS, each of the Senior Lenders first entered into Credit and Lease Agreements with the Debtors between January 2016 and October 2017.  Mitsubishi and ICBCS first entered into Credit and Lease Agreements with Republic in December 2008 and January 2011, respectively.  Id. ¶ 16.

26.     The Debtors made certain representations and warranties in the Credit and Lease Agreements with respect to, among other things, the financial condition and solvency of the Debtors, the accuracy of the financial statements provided to the Senior Lenders, the Debtors' compliance with certain financial covenants and the absence of defaults.  The Credit and Lease Agreements were all executed by Jason Rubin, as President and Chief Executive Officer of the Debtors, or David Comite, as Treasurer and Chief Financial Officer of the Debtors, or both.  Id. ¶ 17.

27.     Pursuant to the Credit and Lease Agreements, Republic was obligated to periodically furnish the Senior Lenders with borrowing base reports (the "Borrowing Base Reports"), which calculated the collateral borrowing base available to support Republic's existing extensions of credit and requests for additional extensions of credit under the Credit and Lease Agreements.  Each Borrowing Base Report was executed by David Comite and certified both the accuracy of the information contained therein and the absence of any defaults under the Credit and Lease Agreements.  Id. ¶ 18.

28.     In addition to the Borrowing Base Reports, Republic was also obligated to provide the Senior Lenders with annual and quarterly financial statements pursuant to the Credit and Lease Agreements.  The annual financial statements through 2016 were audited by independent outside accounting firms (most recently, Crowe Horwath LLP and EisnerAmper LLP) and the quarterly financial statements were unaudited and delivered with an independent accountants' compilation report from Maria I. Machado, P.A.  The 2017 audit report was never issued.  Id. ¶ 19.

29.     In June 2018, the Senior Lenders were first advised by the Debtors of significant discrepancies in the value of the Senior Lenders' collateral as disclosed in the Borrowing Base Reports.  Specifically, the Borrowing Base Report delivered to the Senior Lenders on May 30, 2018 listed eligible inventory of $219,570,312.54 as of May 25, 2018 and a borrowing base excess of $11,124,342.34.  However, the subsequent Borrowing Base Report, delivered to the Senior Lenders on June 20, 2018, listed eligible inventory of $144,157,698.29 as of June 8, 2018 and a borrowing base shortfall of $39,486,098.03 – a loss of over $75 million in asset value from one Borrowing Base Report to the next – delivered only three weeks later.  As a result of this

precipitous drop in collateral value, numerous defaults were triggered under the Credit and Lease Agreements.  Id. ¶ 20.

30.    The draft financial statements delivered to the Senior Lenders in June 2018 for the fiscal quarter ending March 31, 2018, further confirmed the apparent massive loss of collateral, reflecting a decrease in inventory value from $252,322,502 as of March 31, 2017, to $171,319,259 as of March 31, 2018, a drop of over $80 million.  Id. ¶ 21.

31.    The Debtors attribute the collateral disappearance to "a significant discrepancy in [the Debtors'] inventory accounting."  See, e.g., Avila Decl. at ¶ 36.  However, to date, no satisfactory explanation has been provided for the inventory deficiency and loss of the Senior Lenders' collateral.

32.    Based on the information provided after disclosure of the inventory shortfall, the Senior Lenders believe that the Debtors were likely insolvent as early as 2012, that the Debtors funded continued operating losses with substantial cash loans and precious metals leases from the Senior Lenders, and that there appear to be substantial claims against the Debtors' officers and directors (including the Rubins) and auditors arising from and related to the foregoing. Kleinschmidt Decl. ¶ 22.

33.    Specifically, the Senior Lenders believe that the Debtors' officers and directors (including the Rubins) misstated inventory values to persuade the Senior Lenders to enter into and remain in the Credit and Lease Agreements.  One method of misstating Republic's inventory was assigning a significant, unsubstantiated value to barrels of "hydroxides," which are byproducts generated from the refining process that contain unknown amounts of precious metal. Id. ¶ 23.  Paladin Management Group, LLC, the Debtors' financial advisor, has confirmed that

the hydroxide accounting misstatements resulted in an overstatement of inventory value that supports the conclusion that the Debtors have been insolvent for many years.

34.    On July 10, 2018, the Senior Lenders served termination, default and demand notices on the Debtors that among other things, accelerated all debt obligations and terminated and liquidated lease obligations under the Credit and Lease Agreements.  Id. at ¶ 24.

### E.  The Forbearance Agreement

35.    Despite the existing events of default under the Credit and Lease Agreements, continuing operational losses, and substantial deterioration in and depletion of the Senior Lenders' collateral, the Senior Lenders entered into a forbearance agreement (the "Forbearance Agreement") with the Debtors on August 7, 2018, and agreed to stand still from exercising their rights and remedies.  Id. at ¶ 25.

36.    As part of the Forbearance Agreement, the Debtors agreed not to make rent or lease payments to the Rubins under the Leases.  Id. at ¶ 26.

37.    The Forbearance Agreement also required that the Rubins convey 100% of the fee interest in Republic's office and mint (i.e., 12800 NW 38th Avenue) to Republic in exchange for the satisfaction of certain notes payable to Republic issued in connection with the "loan" made by Republic to the Rubins to acquire the property and that Republic simultaneously grant the Senior Lenders a mortgage on the property.  Through this mechanism, the Debtors were able to recover title to Republic's office and mint from the Rubins.  Id. at ¶ 27.

38.    Rose Rubin and Jason Rubin acknowledged and agreed to the terms of the Forbearance Agreement and provided limited personal guarantees in connection with the Agreement.  Jason Rubin's guaranty specifically prohibited him from, among other things, taking any action, or causing any other person or entity to take any action, with the intent to

challenge, prevent, hinder, delay or otherwise frustrate the Senior Lenders or any action to be

taken in connection with, or in furtherance of, the Forbearance Agreement.  Id. at ¶ 28.

39.     The Forbearance Agreement expired pursuant to its terms prior to the Petition

Date.  Id. at ¶ 29.

**F.    The Cash Collateral Motion and Interim Cash Collateral Orders**

40.     To finance the Debtors' chapter 11 cases, the wind down of their operations, and

the liquidation of their assets, the Debtors required the use of the Senior Lenders' cash collateral.

The Senior Lenders worked with the Debtors to negotiate the terms of a consensual cash

collateral order prior to the Petition Date.

41.     On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final

Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to

the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the

"Initial Cash Collateral Motion") [Docket No. 10].

42.     On November 13, 2018, the Debtors and the Senior Lenders filed the *Joint

Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* (together with

the Initial Cash Collateral Motion, the "Cash Collateral Motion") [Docket No. 78].

43.     The Court has entered five interim cash collateral orders [Docket Nos. 54, 277,

373, 538 and 675]. .

44.     Pursuant to the interim cash collateral orders, among other things, the Senior

Lenders consented to the Debtors' use of their cash collateral to fund the costs and expenses of

administering the chapter 11 cases, and the Senior Lenders were granted superpriority claims and

adequate protection liens on substantially all of the Debtors' assets to protect against any

diminution in value of their collateral.

45.    Consistent with their prepetition position, the Senior Lenders did not consent to the payment of rent to the Rubins under the Leases and the Initial Cash Collateral Order did not provide for such payment.  The Rubins and Lessors objected to the Initial Cash Collateral Order insofar as it did not provide for payment of rent to the Lessors or for compensation to the Rubins. See *Objection of Jason Rubin, Rose Rubin, Lindsey Rubin, the Second Amended and Restated Rose Rubin Revocable Trust u/d/a 9/25/2013, the Amended and Restated Richard Rubin Revocable Trust u/d/a/12/8/2008, Republic Metals Warehouse LLC, Richard Rubin Lindjay Investments, LLC, Jason Ross Rubin Enterprises LLC, and RRLJ12 LLC to the Debtors' Motion for Entry of a Final Order (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to the Secured Parties, (iii) Scheduling a Final Hearing and (iv) Granting Related Relief* (the "Rubin Cash Collateral Objection") [Docket No. 199] ¶¶ 11–13.

46.    The Rubin Cash Collateral Objection was resolved prior to the hearing on the Initial Cash Collateral Order, and the parties agreed to defer the rent issue until the final cash collateral hearing.

47.    None of the subsequent interim cash collateral orders has provided for the payment of rent to the Rubins.  However, pursuant to an agreement among the parties, the fifth interim Order includes a procedure pursuant to which all post-petition amounts allegedly due and owing by the Debtors under the Leases will be transferred into a segregated debtor-in-possession account pending further Court order.  See Docket No. 675 at ¶ 7.

## G.  The Asahi Sale and the Lease Rejections

48.    On December 21, 2019, the Debtors filed a motion [Docket No. 358] seeking the entry of an order establishing bid procedures to govern a sale process for substantially all of the Debtors' non-inventory assets.

49.     Following a successful auction, the Court approved a sale (the "Sale") to Asahi

Refining Florida Inc. ("Asahi") pursuant to an order entered on February 21, 2019 (the "Sale

Order") [Docket No. 658].

50.     Pursuant to the Sale, Asahi is acquiring the Debtors' interest in Republic's gold

refinery (12900 N.W. 38th Avenue), silver refinery (13000 N.W. 38th Avenue) and carbon

facility (5295 N.W. 163 Street).  The Rubins have agreed to enter into new market-rate leases

with Asahi for each of those properties at the closing of the Sale.

51.     In conjunction with the Sale, the Debtors filed a motion [Docket No. 541] to

reject the existing Leases for these properties effective as of February 28, 2019, or such other

date as the Debtors close the Sale.  The Court approved the motion on the record at a hearing

held on February 21, 2019.

52.     As a result, the Rubins will receive rent payments for these properties from Asahi

immediately upon the closing of the Sale.  The Sale is expected to close during the week of

March 4, 2019, if not earlier.

## ARGUMENT

53.     The Motion should be denied for two reasons.  *First*, because the Lessors are

insiders who purchased at least one of the Leased Premises with inflated and unwarranted

bonuses – and because the Lessors acquired all of the Leased Premises to the insiders' benefit

and at significant cost to the Debtors, who could have owned them outright – the estate has

offsetting fraudulent transfer claims, and resolution of the Motion should be deferred until after

adjudication of those claims.  *Second*, because there is evidence that the insiders engaged in

wide-scale fraud and inequitable behavior, the Senior Lenders (and, we believe, the Committee)

will be seeking to subordinate the rent claims to the claims of all other creditors pursuant to

Section 510(c) of the Bankruptcy Code, and a ruling on subordination should likewise be deferred until there has been full discovery relating to this Motion and the Committee has completed its comprehensive investigation. Indeed, the Senior Lenders' and Committee's claims, as well as the Rubins' claim for rent, are most appropriately dealt with as part of the plan process.

54.    All of the leases are on their faces insider agreements, with the same parties (or their affiliates) on both sides of the transactions. There is no evidence that the leases were negotiated at arms-length – indeed, the logical inference from the fact that all signatories are Rubin family members is that they were not. There is no evidence that any independent party (witness or otherwise) was involved in their negotiation or execution.[9] For the Oral Leases, there is no evidence of the terms beyond the rent that has been paid.[10] There is no explanation for the

---

[9]    All four of the Written Leases lack the signatures of the two witnesses required by statute. See 2018 XL Fla. Stat. § 689.01 which provides, in part:

> No estate or interest of freehold, or for a term of more than 1 year, or any uncertain interest of, in or out of any messuages, lands, tenements or hereditaments shall be created, made, granted, transferred or released in any other manner than by instrument in writing, signed in the presence of two subscribing witnesses by the party creating, making, granting, conveying, transferring or releasing such estate, interest, or term of more than 1 year . . . ; and no estate or interest, either of freehold, or of term of more than 1 year, or any uncertain interest of, in, to, or out of any messuages, lands, tenements or hereditaments, shall be assigned or surrendered unless it be by instrument signed in the presence of two subscribing witnesses by the party so assigning or surrendering . . . .

Two of the Written Leases provided signature lines for the two statutorily required attesting witnesses, but in both documents someone crossed out those signature lines, which are blank, suggesting that the parties to those Leases were on notice that witness signatures were required but chose not to obtain them. Discovery will reveal why.

[10]    The Oral Leases, which we believe have been in effect since 2008 when Jason Ross Rubin Enterprises LLC purchased the properties, also violate the Florida Statute of Frauds, 2018 XLI Fla. Stat. § 725.01. As a result, the Oral Leases are unenforceable without additional evidencing documentation. See, e.g., Dubai World Corp. v. Jaubert, Case. No. 09-14314-CIV, 2011 WL 579213, at *11–12 (S.D. Fla. Feb. 9, 2011) (citing Kolski ex rel Kolski v. Kolski, 731 So. 2d 169, 171 (Fla. 3d DCA 1999)). In Dubai World, the court held that signed emails satisfied the statute of frauds, and allowed a counterclaim for a percentage of profits as evidenced in an email to proceed to trial. However, the court granted summary judgment to the plaintiff on all other counterclaims for fraud where there were no writings reflecting

fact that insiders purchased the Leased Premises, to their benefit and at significant cost to the

Debtors, instead of the Debtors simply acquiring the properties and using them rent-free.

Answers are especially needed for those properties purchased with the excessive salaries and

bonuses paid by Republic to the Rubins, but are needed for all the Leased Premises if the

Debtors could have owned them outright.  The Senior Lenders do not challenge the right of a

closely-held corporation or even a family-owned business to rent properties from insiders, but

the lease agreements, sources of acquisition funds, and related transactions should be carefully

scrutinized before claims for rent are allowed given the facts and circumstances of these

chapter 11 cases.[11]

### A.  The Court Should Defer a Decision on the Motion Until All of the Estate's Claims are Adjudicated

55.    The Lessors are correct that Section 365(d)(3) was enacted to protect landlords

during the period between a chapter 11 filing and the date when a debtor chooses to assume or

reject a lease.  Motion ¶ 16 (quoting In re Microvideo Learning Systems, Inc., 232 B.R. 602, 604

(Bankr. S.D.N.Y. 1999) (internal citations omitted)).  As that court noted, prior to the enactment

of Section 365(d)(3) debtors commonly did not pay post-petition rent until they had decided to

accept or reject a lease, and then only the portion the court would determine was of benefit to the

estate under Section 503(b).  Id. 607–08.

---

alleged agreements relating to employment and profit-sharing but only allegations of oral promises made
in meetings.  Id.

[11]    While the Lessors' failure to comply with Sections 689.01 and 725.01 and follow formalities
might not in and of themselves render the Leases unenforceable, it is highly irregular and yet another
"badge of fraud" that supports a finding that the Lessors and the Rubins engaged in inequitable conduct.
And should the Lessors argue that they nevertheless are owed back rent on a *quantum meruit* or unjust
enrichment basis, we submit that they are equitably estopped from raising such a claim on the basis of the
underlying wrongdoing we allege in both the purchase and leaseback of the Leased Premises (as potential
fraudulent transfers to the Rubins and their affiliates) and the underlying accounting and inventory
misstatements that the creditors have discovered.

56.    However, Section 365(d)(3) does not exempt rent payments from offsets or subordination, nor does it create a "superpriority administrative claim" for unpaid rent, despite the statute's direction that a "trustee shall timely perform all the obligations of the debtor" arising from a nonresidential lease.  Id. at 609 (such an interpretation "stretches the statute beyond its limits.") (citing In re Joseph Spiess Co., 145 B.R. 597, 608 (Bankr. N.D. Ill. 1992)). The Lessors concede that "administrative expenses ordinarily do not have to be paid until the end of the case," but argue that they are entitled to payment of rent now because deferral would be inconsistent with the purpose of Section 365(d)(3), "particularly if there is an administrative insolvency, which is not beyond the realm of possibility in this case." Motion ¶ 20.  But in In re Microvideo Learning Systems, the debtor was administratively insolvent, and the court declined to order the debtor to pay rent at the time of the motion because doing so "would effectively give the landlord a super-priority over the other administrative expense creditors."  232 B.R. at 609. In any event, there is no evidence of administrative insolvency here.

57.    Nor does the mere fact that the Debtors used and occupied the Leased Premises automatically entitle the Lessors to payment of rent *at this time*.  Motion ¶ 18.  As one court noted:

> The determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court.  In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to the debtor's assets.  Thus, distributions prior to confirmation of a plan are usually disallowed when the estate may not be able to pay all administrative expenses in full.

In re Goody's Family Clothing, Inc., 392 B.R. 604, 614 (Bankr. D. Del. 2008).  There the court found that the fact that the debtors were occupying the landlords' premises was sufficient to support a claim for rent as an "actual, necessary expense" under Section 503(b)(1), but declined to order immediate payment because there was minimal risk of administrative insolvency, a plan

17

of reorganization was expected to be confirmed soon, and there was no evidence of potential harm to the landlords from an ongoing delay in rent payments. Id. at 614–17.

58.    Rent payments under Section 365(d)(3) are not automatic, and this Court has the discretion to delay the adjudication and possible award of such payments. Because the estate has potential offsetting fraudulent transfer claims, and because awarding Lessors the rent they seek at this time would in essence give them a "superpriority administrative claim," the Court should defer a decision on the Motion until after adjudication of all of the estate's claims.

**B.    The Rent Claims Will Likely Be Subordinated**

59.    Just as Section 365(d)(3) does not give landlords priority over other administrative claims, it does not immunize them from equitable subordination under Section 510(c); it should not be used to give insiders against whom the estate has fraudulent transfer claims, as well as other possible claims of fraud or breach of fiduciary duty arising out of accounting irregularities, an advantage over all other creditors. Thus, in Bala v. Kaler (In re Racing Servs.), 340 B.R. 73 (BAP 8th Cir. 2006), the Bankruptcy Appellate Panel upheld the bankruptcy court's equitable subordination of an administrative claim for rent under Section 365(d)(3). Id. at 74–75. The landlord there had been the founder and sole owner of the debtor-lessee and had been convicted of money laundering and illegal gambling in connection with the debtor's operations. Id. at 75. The Bankruptcy Appellate Panel found that "equitable subordination of an administrative expense claim for rent is not inconsistent with Section 365(d)(3) and (4) of the Bankruptcy Code" and is in fact "expressly authorized in Section 510(c)(1)." Id. at 78.[12]

---

[12]    The Eighth Circuit subsequently overturned the convictions. United States v. Bala, 489 F.3d 334 (8th Cir. 2007). The bankruptcy court then vacated the subordination order because the criminal conviction had been "critical" to its decision, and the BAP affirmed. In re Racing Servs., Inc., 386 B.R. 751 (8th Cir. BAP 2008), aff'd, 571 F.3d 729 (8th Cir. 2009).

60.    The Bankruptcy Appellate Panel applied a three-part test for determining whether a bankruptcy court should subordinate an administrative expense claim: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the claimant's misconduct resulted in injury to the creditors of the bankrupt or conferred a unfair advantage on the claimant; and (3) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code." Id. at 76.  Moreover, the "inequitable conduct need not be related to the claim to support equitable distribution." Id.

61.    Here the Senior Lenders have presented credible evidence of inequitable conduct – specifically, fraudulent transfers to the Rubins and their affiliates as well as fraud and breach of fiduciary duty by the Rubins and others relating to the accounting irregularities – that show that the estate has substantial claims against the Rubins.  Based on the information obtained to date, it appears that one or more transactions involving the purchases and lease-backs of the Leased Premises involved fraudulent transfers.  There are similar transactions involving other real property, including Lindsey Rubin's purchase of a personal residence with an inflated and unjustified "bonus" from Republic.  See Coöperatieve Rabobank U.A., New York Branch, et al. v. Lindsey Rubin, Case No. 1:19-cv-20429 (S.D. Fla.) (challenging inflated bonus used to purchase personal residence).  In addition, one or more of the Rubins appears to have been involved in the accounting irregularities; those accounting irregularities masked the fact that Republic likely has been insolvent for years.

62.    The Senior Lenders believe that discovery relating to this motion will uncover additional evidence of inequitable conduct and corroborate the information discovered so far.  This Court has the discretion to order such discovery and to direct that it be conducted in coordination with the comprehensive investigation currently being undertaken by the Committee.

63.     Deferring a ruling on the Motion will result in no prejudice to the Rubins or the

Lessors.  Debtors have deposited and will continue to deposit rents on the Leased Premises into a

segregated account.  The Lessors have not received rent payments since the summer of 2018;

there is no evidence that an additional delay of a few months would cause any significant harm,

particularly given the substantial  sums they have taken out of the Debtors in the years preceding

the bankruptcy.

## **<u>CONCLUSION</u>**

WHEREFORE, for the reasons set forth herein, the Senior Lenders respectfully request

that the Court (i) deny the Motion or defer decision on the Motion until the completion of full

discovery and the Committee's completion of its investigation; and (ii) grant such other and

further relief as is just and proper.

Dated:  New York, New York          Respectfully submitted,
        March 1, 2019

                                     LUSKIN, STERN & EISLER LLP
                                     */s/*      Michael Luskin_____
                                     Michael Luskin
                                     Lucia Chapman
                                     Alex Talesnick
                                     Eleven Times Square
                                     New York, New York 10036
                                     Telephone:  (212) 597-8200
                                     Facsimile:  (212) 974-3205
                                     E-Mail: luskin@lsellp.com
                                     E-Mail: stern@lsellp.com
                                     E-Mail: chapman@lsellp.com

                                     *Counsel for the Senior Lenders*

**<u>EXHIBIT A</u>**

**Hearing Date and Time: March 18, 2019 at 11:00 a.m. (EST)**
**Objection Deadline:  March 1, 2019 at 5:00 p.m. (EST)**
**Reply Deadline: March 14, 2019 at 12:00 p.m. (EST)**

Michael Luskin
Lucia Chapman
Alex Talesnick
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| REPUBLIC METALS REFINING ) | Case No. 18-13359 (SHL) |
| CORPORATION, *et al.*,[1] ) | |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | **Related Doc. No. 553** |

**DECLARATION OF EDWARD KLEINSCHMIDT IN SUPPORT OF**
**OBJECTION OF THE SENIOR LENDERS**
**TO MOTION TO COMPEL PAYMENT OF POST-PETITION RENT**
**AND RELATED OBLIGATIONS PURSUANT TO 11 U.S.C. § 365(d)(3)**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833), Republic High Tech Metals, LLC, 13001 NW 38th Avenue, Miami, FL 33054 (6102), RMC Diamonds, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (1507), RMC2, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (4696), J & L Republic LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7604), R & R Metals, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7848), Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639) and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

I, Edward Kleinschmidt, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge and belief:

1.    I am a Member of RPA Advisors, LLC ("RPA"), financial advisors to Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and, together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the "Senior Lenders").  I submit ths Declaration in support of the Senior Lenders' Objection to the *Motion to Compel Payment of Post-Petition Rent and Related Obligations Pursuant to 11 U.S.C. § 365(d)(3)* (the "Motion")[2] [Docket No. 553] filed by The Second Amended and Restated Rose Rubin Revocable Trust u/d/a 9/25/2013, the Amended and Restated Richard Rubin Revocable Trust u/d/a 12/8/2008, Republic Metals Warehouse, LLC, Richard Rubin Lindjay Investments, LLC, Jason Ross Rubin Enterprises, LLC and RRLJ12, LLC (collectively, the "Lessors")..

2.    I am one of a team of four professionals at RPA who were tasked with, among other things, investigating a significant inventory and accounting discrepancy reported by the Debtors to the Senior Lenders in June 2018 and assisting the Senior Lenders in their investigation and understanding of the Debtors' financial affairs generally.

3.    I make all statements based upon my own personal knowledge,  information, and belief, or upon my team's review of the Debtors' books and records or the other materials that RPA has obtained since we were retained, including, without limitation, accounting and other

---

[2]    All capitalized terms used but not defined herein have the meaning ascribed to such terms in the Motion.

documents, emails, and interviews.[3]  If called upon, I would testify competently as to the matters set forth in this Declaration.

## DETAILS OF RPA'S INVESTIGATION

4.        The Senior Lenders retained RPA as of July 13, 2018 to investigate inventory discrepancies and to perform other financial analysis relating to the business of the Debtors. Together with John Policano,Tony Pacelli, and Kieran Keaveney, we familiarized ourselved with the Debtors and the facts relevant to these chapter 11 cases.

5.        In the course of our investigation to date, we have interviewed or met with over 15 individuals with knowledge of the Debtors' operations.  Those individuals include Jason Rubin, David Comite (the Debtors' Chief Financial Officer), Alan Silverstein (General Counsel), Lindsey Rubin, Rafael Carbonell (Chief Operating Officer), Zach Shair (SVP Refinery Operations), Scott Avila (Chief Restucturing Officer), and the Paladin Management LLC (Debtors' Advisors) team.

6.        The RPA team has reviewed a significant number of documents, including financial statements, the Debtors' books and records, leases for the real property at issue in the Motion, the Debtors' schedule of salaries and bonuses, Republic's tax returns, various Forms W-2, and customer contracts.

7.        The RPA team visited several of the Debtors' physical locations, including the gold refinery and headquarters, the silver refinery, the carbon facility, the high-tech warehouse, and a third-party warehouse where many of the "hydroxides" discussed in paragraph 23 below are stored.  The properties are identified in greater detail in the chart in paragraph 37 below.

---

[3]        We have not  been provided with all of the Debtors' books and records, and did not conduct a full forensic investigation of the Debtors' financial affairs.

## BACKGROUND AND EXPERIENCE

8.      I have advised debtors and lender groups in distressed situations and bankruptcy matters for twenty years.  I have been a Member of RPA for eight years, focusing on advising lenders and stakeholders of distressed companies.  Prior to that, I was a member of Capstone Advisory Group, a Senior Managing Director with FTI Consulting, a consultant with Policano and Manzo, a chief financial officer and controller in private industry, and an audit manager with Ernst & Young LLP.

9.      I have served as a chief executive officer, chief financial officer, controller, or member of the board of directors of more than a dozen companies in various industries, including telecommunications, senior and assisted living, energy, automotive, real estate, and manufacturing.  I have also advised over 100 companies in those and other sectors.

10.      My resume is attached as Exhibit A.

## FACTUAL BACKGROUND

11.      I am familiar with the events leading up to these chapter 11 cases and with Debtors' post-petition business, including facts relevant to the financing provided by the Senior Lenders to the Debtors.

### A.      Republic and The Rubin Family

12.      Prior to the Petition Date, Debtor Republic Metals Corporation ("Republic") was a precious metals refinery and mint located in south Florida.  Republic was founded in 1980 by Richard Rubin.  The Rubin family, consisting of Richard Rubin, his widow, Rose Rubin, and his children, Jason Rubin and Lindsey Rubin (collectively, the "Rubins"), have controlled Republic and its affiliates since their inception.

4

13.    Republic's sole shareholder is the Amended and Restated Richard Rubin Revocable Trust u/a/d 12/8/2008 (the "Rubin Trust").  Rose Rubin is the sole Trustee of the Rubin Trust and is also its sole beneficiary.

14.    Jason Rubin is currently President and Chief Executive Officer of Republic, a position he assumed after the death of Richard Rubin on June 24, 2013.  Lindsey Rubin is the Corporate Secretary of Republic and previously served as Executive Director of Stone Removal and Diamond Acquisitions.  Rose Rubin and Lindsey Rubin were directors of Republic until shortly after the filing of these cases.  Jason Rubin remains on the board of directors.

**B.    The Senior Lenders' Relationship with the Debtors**

15.    As of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) over $177 million by the Debtors under certain credit agreements, master netting agreements and lease agreements (collectively, the "Credit and Lease Agreements").  The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including the Debtors' inventory and the proceeds thereof.

16.    With the exception of Mitsubishi and ICBCS, each of the Senior Lenders first entered into Credit and Lease Agreements with the Debtors between January 2016 and October 2017.  Mitsubishi and ICBCS first entered into Credit and Lease Agreements with Republic in December 2008 and January 2011, respectively.

17.    The Debtors made certain representations and warranties in the Credit and Lease Agreements with respect to, among other things, the financial condition and solvency of the Debtors, the accuracy of the financial statements provided to the Senior Lenders, the Debtors' compliance with certain financial covenants, and the absence of defaults.  The Credit and Lease

5

Agreements were all executed by Jason Rubin, as President and Chief Executive Officer of the Debtors, or David Comite, as Treasurer and Chief Financial Officer of the Debtors, or both.

18.    Pursuant to the Credit and Lease Agreements, Republic was obligated to periodically furnish the Senior Lenders with borrowing base reports (the "Borrowing Base Reports"), which calculated the collateral borrowing base available to support Republic's existing extensions of credit and requests for additional extensions of credit under the Credit and Lease Agreements.  Each Borrowing Base Report was executed by David Comite and certified both the accuracy of the information contained therein and the absence of any defaults under the Credit and Lease Agreements.

19.    In addition to the Borrowing Base Reports, Republic was also obligated to provide the Senior Lenders with annual and quarterly financial statements pursuant to the Credit and Lease Agreements.  The annual financial statements through 2016 were audited by independent outside accounting firms (most recently, Crowe Horwath LLP and EisnerAmper LLP) and the quarterly financial statements were unaudited and delivered with an independent accountants' compilation report from Maria I. Machado, P.A.  The 2017 audit report was never issued.

20.    In June 2018, the Senior Lenders were first advised by the Debtors of significant discrepancies in the value of the Senior Lenders' collateral as compared to the previously submitted Borrowing Base Reports.  Specifically, the Borrowing Base Report delivered to the Senior Lenders on May 30, 2018 listed eligible inventory of $219,570,312.54 as of May 25, 2018 and a borrowing base excess of $11,124,342.34.  However, the subsequent Borrowing Base Report, delivered to the Senior Lenders on June 20, 2018, listed eligible inventory of $144,157,698.29 as of June 8, 2018 and a borrowing base shortfall of $39,486,098.03 – a loss of

over $75 million in asset value from one Borrowing Base Report to the next – delivered only three weeks later.[4]  As a result of this precipitous drop in collateral value, numerous defaults were triggered under the Credit and Lease Agreements.

21.    The draft financial statements delivered to the Senior Lenders in June 2018 for the fiscal quarter ending March 31, 2018, further confirmed the apparent massive loss of collateral, reflecting a decrease in inventory value from $252,322,502 as of March 31, 2017, to $171,319,259 as of March 31, 2018, a drop of over $80 million.

22.    Based on the information provided after disclosure of the inventory shortfall, I believe that the Debtors were likely insolvent as early as 2012, that the Debtors funded continued operating losses with substantial cash loans and precious metals leases from the Senior Lenders. and that there are substantial claims against the Debtors' officers and directors (including the Rubins) and auditors arising from and related to the foregoing.

23.    Specifically, I believe that the Debtors' officers and directors (including the Rubins) misstated  inventory values.  One method of misstating Republic's inventory was assigning a significant, unsubstantiated value to barrels of "hydroxides," which are byproducts generated from the refining process that contain unknown amounts of precious metal.  Paladin Management Group, LLC, the Debtors' financial advisor, has confirmed that the hydroxide accounting misstatements resulted in an overstatement of inventory value.

24.    On July 10, 2018, the Senior Lenders served termination, default and demand notices on the Debtors that among other things, accelerated all debt obligations and terminated and liquidated lease obligations under the Credit and Lease Agreements.

---

[4]    The values ascribed to the inventory are derived from two separate accounts in the Debtors' financial statements.

C.    **The Forbearance Agreement**

25.    Despite the existing events of default under the Credit and Lease Agreements, continuing operational losses, and substantial deterioration in and depletion of the Senior Lenders' collateral, the Senior Lenders entered into a forbearance agreement (the "Forbearance Agreement") with the Debtors on August 7, 2018, and agreed to stand still from exercising their rights and remedies.

26.    As part of the Forbearance Agreement, the Debtors agreed not to make rent or lease payments to the Rubins under the Leases.

27.    The Forbearance Agreement also required that the Rubins convey 100% of the fee interest in Republic's office and mint (i.e., 12800 NW 38th Avenue) to Republic in exchange for the satisfaction of certain notes payable to Republic issued in connection with the "loan" made by Republic to the Rubins to acquire the property and that Republic simultaneously grant the Senior Lenders a mortgage on the property.  Through this mechanism, the Debtors were able to recover title to Republic's office and mint from the Rubins.

28.    Rose Rubin and Jason Rubin acknowledged and agreed to the terms of the Forbearance Agreement and provided limited personal guarantees in connection with the Agreement.  Jason Rubin's guaranty specifically prohibited him from, among other things, taking any action, or causing any other person or entity to take any action, with the intent to challenge, prevent, hinder, delay or otherwise frustrate the Senior Lenders or any action to be taken in connection with, or in furtherance of, the Forbearance Agreement.

29.    The Forbearance Agreement expired pursuant to its terms prior to the Petition Date.

## CONCLUSIONS

30.     Republic's officers and directors misstated inventory values resulting in overstating the Debtors' profitability and value.  One method of misstating Republic's inventory was assigning a significant, wholly unsubstantiated dollar value to barrels of "hydroxides," which are byproducts generated from refining and line clean-ups that contain unknown amounts of precious metal.

31.     In the years preceding these cases, the Rubins caused the Debtors to transfer substantial sums to themselves through extravagant salaries, bonuses, and dividends to fund lavish lifestyles, including luxury homes and automobiles, boats, travel, clothing, and entertainment, and to fund the purchases of real property by the Rubins and their affiliates, at least one of which is the subject of the Motion.

32.     By way of example only, the following chart reflects more than $48 million of salaries, bonuses, and dividends that the Debtors paid to the Rubins since 2012:

| Name/Position/Relationship | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 6 Year Total |
|---|---|---|---|---|---|---|---|---|
| **Rubin, Jason R.** | Salary | $  376,601 | $  583,551 | $  458,655 | $  450,000 | $  450,000 | $  450,000 | $  2,768,807 |
| Chief Executive Officer | Bonus | 1,405,784 | 948,073 | 1,378,317 | 2,590,267 | 368,858 | 546,322 | 7,237,621 |
| Officer & Director | **Total** | **$ 1,782,385** | **$ 1,531,624** | **$ 1,836,972** | **$ 3,040,267** | **$  818,858** | **$  996,322** | **$  10,006,428** |
| | | | | | | | | |
| **Rubin, Rose** | Salary | $  12,000 | $  17,267 | $ 1,847,038 | $ 2,523,494 | $ 1,122,915 | $ 1,111,200 | $  6,633,914 |
| Vice-President | Bonus | - | 2,585 | - | - | - | 200,000 | 202,585 |
| | Dividends | 9,208,815 | 1,908,096 | 7,649,249 | 2,045,265 | | 1,057,256 | 21,868,681 |
| Officer & Director | **Total** | **$ 9,220,815** | **$ 1,927,948** | **$ 9,496,287** | **$ 4,568,759** | **$ 1,122,915** | **$ 2,368,456** | **$  28,705,180** |
| | | | | | | | | |
| **Rubin, Lindsey** | Salary | $  57,300 | $  86,962 | $  101,924 | $  140,000 | $  140,000 | $  140,000 | $  666,186 |
| Corporate Secretary | Bonus | 74,984 | 159,414 | 6,198,550 | 2,649,753 | 94,787 | 136,355 | 9,313,843 |
| Officer | **Total** | **$  132,284** | **$  246,376** | **$ 6,300,474** | **$ 2,789,753** | **$  234,787** | **$  276,355** | **$  9,980,029** |
| | | | | | | | | |
| **Total Rubin Family** | | **$ 11,135,484** | **$ 3,705,948** | **$ 17,633,733** | **$ 10,398,779** | **$ 2,176,560** | **$ 3,641,133** | **$  48,691,637** |

Notes
- This schedule was prepared by RPA with information provided by Republic which has not been independently verified.
- Republic has represented that dividend payments were made to Rose Rubin for the payment of Trust income tax laiabilities.
- Dividend payments in 2012 and 2013 are listed under Rose Rubin for purposes of this schedule.
- Dividends for 2012–2017 are the amounts reported in Republic's annual financial statements.
- Per discussion with Jason Rubin, Lindsey Rubin's bonus in 2014 was used to purchase a personal residence.
- Per discussion with Jason Rubin, Lindsey & Jason Rubin's bonuses in 2015 were used to purchase 13001 NW 38th Ave.

33.     This chart, which was derived from information contained in Forms W-2 and other information provided by the Debtors, does not reflect off-balance sheet transfers that may

9

have been made to the Rubins, such as automobiles and boats purchased with company funds or corporate credit cards used for personal purchases.

34.     At least one of these transfers, a "bonus" of $5,738,508 paid by Republic to Lindsey Rubin on October 22, 2014, was used to purchase a personal residence.

35.     At least two of those transfers, "bonuses" totalling approximately $5.0 million paid by Republic to both Lindsey and Jason Rubin in 2015 (approximately $2.5 million to each), were used to purchase the high tech warehouse (13001 NW 38th Ave.), and the property was then leased back to Republic.

36.     Those payments were made at a time when Republic likely was insolvent.

37.    RPA is familiar with the properties relevant to the Motion (the Leased Premises), including the leases, premises, rent, owners, purchase price, and use.  The following chart accurately describes the information RPA has obtained and the analysis RPA conducted with respect to each of the properties:

<u>Real Properties</u>

| Lease | Property Address | Owner | Date of Purchase | Purchase Funds | Purchase Cost |
|---|---|---|---|---|---|
| Silver Refinery Lease | 1300 NW 38th Ave. Opa Locka, FL | Republic Metals Warehouse LLC | 9/1/2009 | Loan from Republic | $3,950,000 |
| Gold Refinery Lease | 12900 NW 38th Ave. Opa Locka, FL | Richard Rubin Trust & Rose Rubin Trust | 4/2/1992 | Construction loan | Built by Republic |
| High Tech Equipment Storage Lease | 13001 NW 38th Ave. Opa Locka, FL | Richard Rubin Lindjay Investment LLC | 1/6/2015 | Bonuses from Republic to Jason & Lindsey Rubin | $3,342,000 |
| Carbon Lease | 5295 NW 163rd St. Miami Gardens, FL | RRLJ12 LLC | 9/27/2016 | Personal funds and loans from Republic | $1,920,000 |
| Warehouse 3863 Lease | 3863 NW 125th St. Opa Locka, FL | Jason Ross Rubin Enterprises LLC | 4/29/2008 | Financing by Daniel Whitebook | $ 370,000 |
| Warehouse 3859 Lease | 3859 NW 125th St. Opa Locka, FL | Jason Ross Rubin Enterprises LLC | 5/1/2008 | Financing by Daniel Whitebook | $ 370,000 |

I hereby declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 1st day of March 2019 in Bergen County, New Jersey.

/s/   Edward Kleinschmidt
Edward Kleinschmidt

## EXHIBIT A

## Ned Kleinschmidt

(201) 527 6650

nkleinschmidt@rpaadvisors.com

**Industry Experience**

- Commodities
- Consumer Products
- Energy
- Financial Services
- Infrastructure
- Manufacturing
- Metals and Mining
- Real Estate and Construction
- Retail and Wholesale Distribution
- Telecommunications
- Toll Roads and 3P Entities

**Selected Cases**

- Boston Generating LLC
- Calpine
- Energy XXI
- MACH Gen, LLC
- PG&E National Energy Group
- Polaroid Corporation
- Private Auto Parts Manufacturer
- Sunbeam Corporation
- Verasun Energy Corp.
- White Energy Corp.
- Over 38 Power Generation Matters
- Over 32 Ethanol and Biofuel Matters
- Over 24 Oil & Gas Matters
- Various other Commodity related Maters

**Experience**

Ned Kleinschmidt specializes in financial and advisory turnaround services. For over 20 years he has focused on advising debtors and lender groups in various distressed situations and bankruptcy matters. His consulting experience includes strategic planning, business plan analysis, complex negotiations, financings, mergers and acquisitions, interim management and fiduciary roles, cost reduction strategies and forensic services.

Mr. Kleinschmidt has spent a large part of the last two decades as the CEO of, or advising lenders to a large number of commodity related and hard asset industries, including almost all value chain segments of oil & gas, power generation, mining and minerals, ethanol and biofuels. Mr. Kleinschmidt has served as a member of the board of directors, chairman of the board or CFO of over a dozen companies, encompassing industries such as telecom, energy, automotive and manufacturing.

Prior to founding RPA Advisors in 2011, Mr. Kleinschmidt was a member of Capstone Advisory Group, a Senior Managing Director with FTI Consulting and was with Policano and Manzo. Previously, Mr. Kleinschmidt has also

held chief financial officer and controllership positions in the senior and assisted living, manufacturing and real estate industries and was an audit manager with Ernst & Young LLP.

## Education and Affiliations

Mr. Kleinschmidt holds a B.A. in Public Accounting from Fordham University and an M.B.A. in Finance from Pace University.  He has been qualified as a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.  He is also a member of the Association of Insolvency and Restructuring Advisors, the Turnaround Management Association, the American Institute of Certified Public Accountants and the New York Society of Certified Public Accountants.  He is recognized as an expert on restructuring and energy issues and has presented, written and been called upon to provide expert testimony in these areas.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of March, 2019, I caused a true and correct copy of the foregoing *Objection of the Senior Lenders to Motion to Compel Payment of Post-Petition Rent and Related Obligations Pursuant to 11 U.S.C. § 365(d)(3)* to be filed and served through ECF notification upon all parties who receive notice in this matter pursuant to the Court's ECF filing system.

/s/      Michael Luskin
Michael Luskin