John E. Mitchell (*Admitted Pro Hac*)
Yelena Archiyan (*Admitted in New York*)
AKERMAN LLP
2001 Ross Avenue, Ste. 3600
Dallas, TX 75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Admitted Pro Hac*)
Joanne Gelfand (*Admitted in New York*)
Katherine C. Fackler (*Admitted Pro Hac*)
AKERMAN LLP
98 Southeast Seventh Street, Ste. 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

*Counsel for Debtors and Debtors in Possession*

Michael Luskin
Alex Talesnick
Stephan E. Hornung
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIAMI METALS I, INC., *et al.*,[1] | ) | Case No. 18-13359 (SHL) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

# DEBTORS' AND THE SENIOR LENDERS'
# JOINT MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION
# FOR SUMMARY JUDGMENT AS TO BUCKET 1 CUSTOMERS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38 Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 4

    A.    The Chapter 11 Cases ................................................................. 4

    B.    The Senior Lenders' Relationship with the Debtors .............................. 4

    C.    The Cash Collateral Motion, the Interim Cash Collateral Orders and the
           Ownership Dispute.............................................................. 5

    D.    The Debtors' Refining Process............................................... 6

JURISDICTION AND VENUE ................................................................................ 10

LEGAL STANDARD, GOVERNING LAW AND  PRINCIPLES OF CONTRACT
INTERPRETATION............................................................................................... 10

    A.    Summary Judgment Standard ............................................... 10

    B.    Governing Law ................................................................ 11

    C.    Contract Interpretation Principles ......................................... 12

ARGUMENT ....................................................................................................... 14

I.        THE DISPUTED ASSETS ARE PROPERTY OF THE ESTATE...................... 14

    A.    The Standard Terms Govern the Debtors' Commercial Relationship  with
           Each Bucket 1 Customer...................................................... 14

    B.    The Standard Terms Clearly and Unambiguously Evidence Commercial
           Transactions for the Purchase and Sale of Goods................................ 15

    C.    Title to the Materials Delivered to the Debtors Transferred Upon Delivery
           Pursuant to Section 2-401 of the UCC................................... 18

II.       NO BUCKET 1 CUSTOMER CAN ESTABLISH A BAILMENT ................... 21

    A.    The Proper Test for Determining Sale or Bailment is Whether the Identical
           Article Delivered is to be Returned in the Same or Some Altered Form ............. 21

    B.    The Debtors Were not Required to Return the Identical Article  Delivered
           in the Same or Some Altered Form........................................ 24

    C.    None of the Cases Cited by the Bucket 1 Customers Requires a Different
           Result .......................................................................... 25

    D.    The Bucket 1 Customers' Other Claims Are without Merit................................. 28

           1.    Article 7 of the Uniform Commercial Code Is Inapplicable.................... 28

48660950;1

2.      The Debtors Are Not Estopped from Claiming Title to the Raw
        Material ................................................................................................. 30

3.      The Bucket 1 Customers Conversion Claims Fail as a Matter of Law..... 30

4.      There Is No Basis to Impose a Constructive Trust ................................... 31

CONCLUSION ..................................................................................................... 32

48660950;1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986).........................................................................11

B.A. Ballou and Company, Inc. v. Citytrust,
  591 A.2d 126 (Conn. 1991) ..................................................... passim

Bianco v. Erkins (In re Gaston & Snow),
  243 F.3d 599 (2d Cir. 2001)..........................................................11

C.W.B. Enterprises, Inc. v. K.A.T. Equipment Corp.,
  449 So. 2d 354 (Fla. 3d DCA 1984) ..............................................22

Castetter v. Henderson,
  113 So. 3d 153 (Fla. 5th DCA 2013) ..............................................31

Chisholm v. Eagle Ore Sampling Co.,
  144 F. 670 (8th Cir. 1906) ..............................................................22

City of Homestead v. Johnson,
  760 So. 2d 80 (Fla. 2000)...............................................................13

Crouch Supply Co. v. Piknik Prods. Co., Inc. (In re Piknik Prods. Co., Inc),
  346 B.R. 863 (Bankr. M.D. Ala. 2006)...........................................20

De Luca v. De Luca,
  300 A.D.2d 342 (2d Dep't 2002) ....................................................13

Diamond "S" Dev. Corp. v. Mercantile Bank,
  989 So. 2d 696 (Fla. 1st DCA 2008) ..............................................31

Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.),
  639 F.2d 1213 (5th Cir. 1981) ........................................................27

Friedman v. Virginia Metal Prods. Corp.,
  56 So .2d 515, 517 (Sup. Ct. Fla. 1952) .........................................13

General Motors Corp. v. Bristol Indus. Corp. (In re Bristol Indus. Corp.),
  No. 2-81-0512, 1981 Bankr. LEXIS 5204 (Bankr. D. Conn. Dec. 14, 1981),
  rev'd on other grounds, 690 F.2d 26 (2d Cir. 1982)................23, 28

Gibney v. Pillifant,
  32 So. 3d 784 (Fla. 2d DCA 2010) ................................................12

48660950;1

GMAC Bus. Credit, L.L.C. v. Ford Motor Co.,
    100 Fed. App'x 404 (6th Cir. 2004) ...................................................................28

Greenfield v. Philles Records,
    98 N.Y.2d 562 (2002) ...........................................................................12, 13

Herrington v. Verrilli,
    151 F. Supp. 2d 449 (S.D.N.Y. 2001)....................................................................21

In re Aleris Int'l, Inc.,
    456 B.R. 35 (Bankr. D. Del. 2011) ...................................................................20

In re Enron Corp.,
    No. 01-16034 (AJG), 2003 Bankr. LEXIS 2262 (Bankr. S.D.N.Y. 2003)............................26

In re J. Adrian Sons, Inc.,
    205 B.R. 24 (Bankr. W.D.N.Y. 1997) ...................................................................19

In re Medomak Canning Co.,
    No. BK 75-936, 1977 Bankr. LEXIS 11 (Bankr. D. Me. 1977), aff'd, 588 F.2d
    818 (1st Cir. 1978) ...................................................................26

In re Ore Cargo, Inc.,
    544 F.2d 80 (2d Cir. 1976)...................................................................13

Ivey v. Wilson (In re Payne),
    No. 05-2118, 2006 Bankr. LEXIS 4199 (Bankr. M.D.N.C. Dec. 6, 2006) ...........................20

Katel Ltd. Liab. Co. v. AT & T Corp.,
    607 F.3d 60  (2d Cir. 2010)...................................................................13

King v. Bray,
    867 So. 2d 1224 (Fla. 5th DCA 2004) ...................................................................13

Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC),
    475 B.R. 9 (S.D.N.Y. 2012)...................................................................11

Landmark Am. Ins. Co. v. Pin-Pon Corp.,
    155 So. 3d 432 (Fla. 4th DCA 2015) ...................................................................13

MetroPCS Communs., Inc. v. Porter,
    No. 3D17-375, 2018 Fla. App. LEXIS 18605 (Fla. 3d DCA Dec. 26, 2018) ..................14, 15

Monroe Sys. for Bus., Inc. v. Intertrans Corp.,
    650 So. 2d 72 (Fla. 3d DCA 1994) ...................................................................21

Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.),
    407 B.R. 65 (Bankr. D. Vt. 2009) ...................................................................19

48660950;1

Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.,
     781 F.3d 1245 (11th Cir. 2015) ..................................................................31

Phila. Am. Life Ins. Co. v. Buckles,
     350 F. App'x 376 (11th Cir. 2009).............................................................18

Pinnacle Port Cmty. Ass'n v. Orenstein,
     872 F.2d 1536 (11th Cir. 1989) .................................................................30

Powder Company v. Burkhardt,
     97 U.S. 110 (1878)....................................................................................21

Public Service Electric & Gas Co. v. Federal Power Commission,
     371 F.2d 1 (3d Cir. 1967)...............................................................25, 26, 28

Quandrant Structured Products Co., Ltd. v. Vertin,
     23 N.Y.3d 549 (2014) ...............................................................................13

Riddle Farm Equip., Inc. v. Boles (In re Boles),
     Nos. 03-53196C-7W, 04-6027, 2004 Bankr. LEXIS 2384 (Bankr. M.D.N.C.
     Oct. 29, 2004) ...........................................................................................20

RJE Corp. v. Northville Indus. Corp.,
     329 F.3d 310 (2d Cir. 2003).......................................................................13

Schron v. Troutman Sanders LLP,
     986 N.E.2d 430 (N.Y. 2013)......................................................................13

Shumrak v. Broken Sound Club, Inc.,
     898 So.2d 1018 (Fla. Dist. Ct. App. 2005) .................................................13

Sitkin v. R-One Alloys, Inc.,
     No. PB 04-0495, 2006 R.I. Super. LEXIS 25 (R.I. Super. Ct. Mar. 13, 2006) .....23, 24, 25, 28

Smith v. State Farm Mut. Auto. Ins. Co.,
     231 So. 2d 193 (Fla. 1970).........................................................................13

Sturm v. Boker,
     150 U.S. 312 (1893)...................................................................................21

Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.),
     377 F.3d 209 (2d Cir. 2004)...................................................................29, 31

Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.),
     253 B.R. 503 (Bankr. S.D.N.Y. 2000)........................................................32

TL Admin. Corp v. Ideasphere, Inc. (In re TL Admin. Corp.),
     337 B.R. 827 (Bankr. S.D.N.Y. 2006)....................................................10, 11

United States v. Fleet Nat'l Bank (In re Handy and Harman Refining Group, Inc.),
271 B.R. 732 (Bankr. D. Conn. 2001) ......................................................................28

W.W.W. Assocs. v. Giancontieri,
77 N.Y.2d 157 (1990) ...............................................................................................13

Welding Metals v. Foothill Capital Corp.,
No. 3:92 CV 00607 (WWE), 1997 U.S. Dist. LEXIS 7672 (D. Conn. Apr. 14,
1997) .....................................................................................................................22, 25

WESGO Division of GTE Products Corp. v. Harrison (In re Sitkin Smelting &
Refining, Inc.),
648 F.2d 252 (5th Cir. 1981) .........................................................................23, 24, 27

Wild West World L.L.C. v. Larson Int'l, Inc. (In re Wild West World, L.L.C),
No. 07-5257, 2008 Bankr. LEXIS 3580 (Bankr. D. Kan. Oct. 17, 2008) ...............20

Zaki Kulaibee Establishment v. McFliker,
771 F.3d 1301 (11th Cir. 2014) ...............................................................................22

**Statutes**

28 U.S.C. §§ 157 and 1334 ................................................................................................10

28 U.S.C. § 157(b) .............................................................................................................10

28 U.S.C. §§ 1408 and 1409 ..............................................................................................10

Bankruptcy Code §§ 1107 and 1108 ...................................................................................4

Fla. Stat. § 672.102 ............................................................................................................18

Fla. Stat. § 672.401 ......................................................................................................18, 19

N.Y. UCC § 1-201(16) .......................................................................................................29

N.Y. UCC § 1-201(42) .......................................................................................................29

N.Y. UCC § 2-102 ..............................................................................................................18

UCC, Article 2 ...............................................................................................................2, 18

UCC, Article 7 ....................................................................................................................28

UCC § 2-104(1) ..................................................................................................................16

UCC § 2-401 .............................................................................................................2, 18, 19

UCC § 2-401(1) ..................................................................................................................19

UCC § 7-102(a)(1) ...................................................................................................................29

UCC § 7-207 ..................................................................................................................29, 30

**Rules**

Bankruptcy Rule 7008 ............................................................................................................10

Fed. R. Bankr. P. 7056 ............................................................................................................10

Fed. R. Civ. P. 56 ....................................................................................................................10

Fed. R. Civ. P. 56(a) ...............................................................................................................10

Federal Rules of Bankruptcy Procedure Rules 7056 and 9014 ...................................................10

**Other Authorities**

1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial
    Code § 4:31 (6th ed. 2017) ...........................................................................................20

United States Constitution, Article III ........................................................................................10

Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation) and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases and Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and, together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the "Senior Lenders") submit this joint memorandum of law in support of their joint motion for summary judgment (the "Motion") in connection with 25 Customer Statements (the "Bucket 1 Claims") filed by 26 customers (the "Bucket 1 Customers")[2] pursuant to the Court's *Order Approving Uniform Procedures for Resolution of Ownership Disputes* (as amended, the "Uniform Procedures Order")[3] [ECF. No. 913].

## PRELIMINARY STATEMENT

Each Bucket 1 Customer asserts an ownership interest in estate property based on primarily bailment and alternative equitable theories. The reality is simple: Prior to the Petition Date, each Bucket 1 Customer sold raw materials to the Debtors pursuant to the Debtors' Standard Terms and General Operating Conditions (the "Standard Terms").[4] The Debtors failed to pay the Bucket 1 Customers, leaving those customers with general unsecured claims against the Debtors' estates.

---

[2] Bucket 1 Customers Brilliant Jewelers / MJJ Inc. and Anjay Corp. filed one joint Customer Statement.

[3] All capitalized terms used but not defined herein have the meaning ascribed to such terms in the Uniform Procedures Order.

[4] The Standard Terms refer to the Standard Terms of RMC ("RMC Standard Terms") and the Standard Terms of RMC[2] ("RMC[2] Standard Terms"). Both versions were available on the Debtors' website until the sale of substantially all of the Debtors' assets to Asahi and the closing of the website. All references to the Debtors' Standard Terms are to the RMC most recent Standard Terms, which are attached as Exhibit B to the Declaration of Scott Avila, as Chief Restructuring Officer, in Support of Joint Motion for Summary Judgment (the "Avila Declaration" or "Avila Decl."). A copy of the RMC[2] Standard Terms is attached the Avila Declaration as Exhibit C.

1

Unhappy with their status as general unsecured creditors, the Bucket 1 Customers objected to the Debtors' Cash Collateral Motion (as defined below), contending that title to the raw materials delivered to the Debtors never passed to the Debtors. The Bucket 1 Customers argue that the Debtors held only naked possession of the raw materials delivered to them and that the raw materials, therefore, are not property of the Debtors' estates. This argument fails as a matter of law.

The Standard Terms clearly and unambiguously provide for the purchase and sale of goods, transactions which are governed by Article 2 of the Uniform Commercial Code (the "UCC"). Pursuant to Section 2-401 of the UCC, title to the raw materials sold by the Bucket 1 Customers to the Debtors transferred to the Debtors upon delivery of the raw materials to the Debtors' refinery. Hoping to skirt the express provisions of the Standard Terms and the UCC, the Bucket 1 Customers attempt to manufacture a bailment relationship with the Debtors, urging the Court to glean the parties' intent from inadmissible extrinsic evidence even though the Standard Terms clearly and unambiguously demonstrate the parties' intent to enter into a purchase and sale relationship. Critically, the Bucket 1 Customers cannot demonstrate the sine qua non of any bailment: That the Debtors were obligated to return the identical raw materials delivered to the Debtors by the Bucket 1 Customers back to them in the same or some altered form.

The Standard Terms are clear on their face and show that the raw materials delivered to the Debtors by the Bucket 1 Customers for refining would not be returned to the Bucket 1 Customers. Rather, the Bucket 1 Customers could elect that the Debtors pay for the raw materials in either cash, a credit to the customer's "Loco London" metal account, a credit to the Bucket 1 Customer's toll or pool account maintained by the Debtors, or in rare instances, the return of refined metal. If a Bucket 1 Customer elected the return of refined metals, the Standard Terms unambiguously provide that because refined metals are "fungible," the returned metals will be "like kind" or

2

"equivalent." As disclosed in the Standard Terms, the election of a credit to a toll or pool account was merely a ledger entry made by the Debtors that created a balance due to the customer.

The raw materials delivered by the Bucket 1 Customers and other customers to the Debtors are not identical or fungible. The raw materials, generally consisting of scrap and doré, came from different sources and contained different amounts of gold, silver, and other metals that had to be assayed. The materials were commingled shortly after delivery with raw materials delivered by other customers, thereby becoming unidentifiable. The commingled materials were thereafter further commingled during the refining process with other residual materials in the refining equipment. During the refining process, the commingled materials were dissolved, treated, filtered, dried, and then melted into bars, grains or ingots which **could not** be traced to a particular customer. To the extent any Bucket 1 Customer ever elected payment in the form of a return of metals, they **did not** receive back their raw materials in the same or an altered form. The Bucket 1 Customers received refined metals produced from the commingled lots of the raw materials and the residual materials in the equipment at the start of the process. Notably, the Debtors, for an extra fee, offered their refining customers the "Peace of Mined" program ensuring that the customers' materials were segregated, separately refined, and would remain segregated and identifiable throughout the refining process. None of the Bucket 1 Customers elected to pay the additional fees for the Peace of Mined program.

Title to the Disputed Assets passed to the Debtors prepetition upon delivery of the raw materials by the Bucket 1 Customers to the Debtors. There are no material facts in dispute, and the Debtors and the Senior Lenders are entitled to summary judgment as a matter of law determining that the Disputed Assets belong to the Debtors' bankruptcy estates and dismissing the Bucket 1 Customer Claims with prejudice.

3

## FACTUAL BACKGROUND

### A. The Chapter 11 Cases

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on November 2, 2018 or November 21, 2018 (together with the November 2, 2018 date, the "Petition Date").

On November 19, 2018, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors in these cases (the "Committee") [ECF No. 113].

On March 7, 2019, the Debtors consummated the sale of substantially all of their assets to Asahi Holdings, Inc. ("Asahi") [ECF No. 713]. The Debtors are winding down and liquidating their remaining properties and assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. [ECF Nos. 219, 286, 358, and 563]. No trustee or examiner has been appointed in the chapter 11 cases.

### B. The Senior Lenders' Relationship with the Debtors

As of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) more than $177 million by the Debtors under certain credit agreements, master netting agreements, and lease agreements (collectively, the "Credit and Lease Agreements"). First Interim Order (as defined below), ECF No. 54 at Schedule 2. The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of certain Debtors' assets, including such Debtors' inventory and the proceeds thereof. Id. at ¶ F(vi).

The Senior Lenders are party to a certain Second Amended and Restated Intercreditor Agreement, dated as of February 19, 2016 (as amended from time to time, the "Intercreditor Agreement"), which governs the respective rights and interests of the Senior Lenders in the assets of RMC. Id. at ¶ F(iii) . RMC executed the Intercreditor Agreement. Id.

4

### C.  The Cash Collateral Motion, the Interim Cash Collateral Orders and the Ownership Dispute

On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "Initial Cash Collateral Motion") [ECF No. 10].

The Court heard oral argument on the Initial Cash Collateral Motion at the first day hearing on November 6, 2018 (the "First Day Hearing").  Following argument, the Court approved the Initial Cash Collateral Motion on the record on an interim basis, subject to certain requested modifications.

On November 8, 2018, the Court entered its *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503 and 507 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "First Interim Order") [ECF No. 54].

Pursuant to the First Interim Order, among other things, the Senior Lenders consented to the Debtors' use of their cash collateral to fund the costs and expenses of administering the chapter 11 cases, and the Senior Lenders were granted superpriority claims and adequate protection liens on substantially all of the Debtors' assets to protect against any diminution in value of their collateral. Id. at ¶ 8(b).

An integral part of the Initial Cash Collateral Motion and the Senior Lenders' consent to the use of their collateral was the Debtors' proposed payment to the Senior Lenders of the cash proceeds from the sale of the Debtors' inventory as adequate protection (the "Inventory Payments").  See id. at ¶ 8(e).  At the First Day Hearing, the Court requested that the Debtors supplement the Initial Cash Collateral Motion to explain the basis for the Inventory Payments and

give all parties in interest specific notice of the provision.

On November 13, 2018, the Debtors and the Senior Lenders filed the *Joint Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* (together with the Initial Cash Collateral Motion, the "Cash Collateral Motion") [ECF No. 78].

Numerous customers objected to the Cash Collateral Motion and the Inventory Payments on the basis that the Debtors' inventory and its cash proceeds were property of the Customers rather than property of the bankruptcy estates, giving rise to the current disputes concerning the ownership of the Disputed Assets (the "Ownership Disputes"). Following extensive negotiations among the Debtors, the Senior Lenders, and the Customers, the Court entered the Uniform Procedures Order establishing a uniform procedure to resolve the Ownership Disputes.

The Court subsequently entered six additional interim cash collateral orders [ECF Nos. 277, 373, 538, 675 and 864] (collectively, the "Interim Cash Collateral Orders").

### D. The Debtors' Refining Process

Prior to the Petition Date, the Debtors refined precious metals, primarily gold and silver. Avila Decl. ¶ 5. Customers from all over the United States and the Western Hemisphere shipped unrefined material, primarily containing gold and silver, to the Debtors for refining. Id. The Debtors refined this material and produced refined silver and gold bars and casting grains. Based on demand, the refined gold and silver was either sold or sent to the mint for the production of "value added" minted and casted products of various designs and sizes. Id.

Following the final assays for the raw materials delivered to the Debtors, the precious metal content of each shipment was finalized. Remaining balances known as "pool balances" were paid to customers on an agreed upon settlement date or when the customer requested payment. Id. at ¶ 6. The customers, including Bucket 1 Customers, could elect that the Debtors make payment for raw materials either by check or wire transfer or the issuance of a "metal credit" to the customer's

6

designated "Loco London" metal account, less, in each case, applicable refining and/or retention charges. Id. The customers could also request payment in the form of refined metal of like kind and quantity. Customers could request an "advance" payment on a shipment. The Debtors typically paid advances in an amount equal to approximately 95% to 98% of the estimated metal value of the applicable shipment in one or more payments of metal credits or U.S. dollars, less refining and/or retention charges. Id.

After raw materials were received by the Debtors, they were assigned lot numbers, weighed, melted, sampled for assay testing, and put into the refining process, generally on the same day. Id. at ¶ 7. With the exception of Peace of Mined™ customers (discussed below), during the refining process the individual customer lots were commingled with other customer lots. During the refining process the commingled lots were further commingled with "clean up bars" (i.e., residual material that comes out of the refining process) to create "house bars," which were then put through various additional refining processes, including the dissolving of the material. Id. The dissolve process was a procedure by which material was dissolved in acid to create a solution, analogous to dissolving sugar in hot water (the "Dissolution Process"). Id. The refining process produced metal billets, bars, and sacks of grain that each weighed approximately fifty pounds (the "Refined Product"). The Refined Product was then transferred to the vault and then sold or transferred to the mint for the production of various minted products, coins, cast bars, etc. (the "Minted Products"). Id.

The Debtors could not identify the raw materials delivered by customers after they were commingled with other lots for refining and during and after the Dissolution Process. Nor, could the Debtors identify what raw materials or lots were included in Refined Product or Minted Product. Id. at ¶ 8.

7

As advertised on the Debtors' website, the Debtors offered a "Peace of Mined" service to Customers for traceable closed-circuit single-batch refining at an additional cost.  Avila Decl. ¶ 9.[5] Customers paying for the Peace of Mined service could ensure that their metals were never commingled at any point during the refining process.  Id.  The Peace of Mined Terms provide, in pertinent part:

> In order to create a 100% traceable product, Republic Metals' Peace of Mined™ refining circuit uses a proprietary process that allows for batch refining.  Unlike electrolytic refining, batch refining allows for material to freshly enter a clean circuit during the refining process, and at no point come in contact with any other-sourced metal.  In the Peace of Mined™ refining circuit, the designated material is the only material present, and all of that material is removed at termination of the process, so there are no leftovers in the circuit−it can in no way be commingled with metal originating from other sources.

Avila Decl. at Ex. A.

No Bucket 1 Customer that filed a Customer Statement paid for the Peace of Mined service. Id. at ¶ 10.  Accordingly, no Bucket 1 Customer received back, or was entitled to receive back, the identical raw material that it delivered to the Debtors for refining as a finished product.

The Bucket 1 Customers knew this fact—as plainly stated in the Standard Terms:

> Precious metals are fungible; therefore any unit of material is equivalent to another of like kind, i.e. similar quality and/or value, and is deemed adequate payment for purposes of outstanding Pool Accounts.  ***Returnable metal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable metal; rather it represents a future obligation of RMC to return common inventory of gold, silver, platinum, palladium, or platinum group metals***.  RMC reserves the right to return precious metals to Customer of like kind representing the ounces of precious metals owed to Customer.

RMC Standard Terms at 3, Avila Decl. at Ex. B (emphasis added).

Bucket 1 Customers were generally required to execute the Debtors' Standard Terms as

---

[5] Following the closing of the sale of substantially all of the Debtors' assets to Asahi, the former RMC website is no longer available. A copy of the Peace of Mined Terms is attached to the Avila Declaration as Exhibit A.

part of the Debtors' new customer onboarding process.  Avila Decl. at ¶ 11.  However, the failure

to execute the Standard Terms does not make them inapplicable.  The Standard Terms provide that

"[d]elivering material or doing business with RMC after having received the Standard Terms . . .

deems that I have agreed to accept the Terms and General Conditions contained herein regardless

of whether I have signed [the Standard Terms]."  RMC Standard Terms at 4, Avila Decl. at Ex. B.[6]

As set forth in a schedule attached to the Avila Declaration as Exhibit E, 16 of the 26[7]

Bucket 1 Customers executed the RMC Standard Terms.  Six Bucket 1 Customers executed RMC[2]

Standard Terms.[8]  True and correct copies of the governing Standard Terms executed by the Bucket

1 Customers are attached to the Avila Declaration as Composite Exhibit D.[9] A schedule listing the

version (RMC Standard Terms or RMC[2] Standard Terms) executed by Bucket 1 Customers is

attached to the Avila Declaration as Exhibit E.  The Debtors have been unable to locate executed

copies of the Standard Terms in their files for the remaining four Bucket 1 Customers, and to date,

those customers have not produced executed copies of the Standard Terms.[10]  However, every

metal report, invoice, sale/purchase order and other transaction confirmation issued by the Debtors

to the Customers (including the four for whom no executed terms can be located at this time) in

the ordinary course of business expressly provided that it was subject to the Standard Terms and

included a reference to the versions posted on the Debtors' website.  Avila Decl. ¶ 13.  No Bucket

---

[6] The RMC[2] Standard Terms contain a substantially identical provision.  See RMC[2] Standard Terms at 13.

[7] San Diego Gold Exchange, Inc.'s Bucket 1 Claim is subject to a settlement pending Court approval.

[8] See ECF Nos. 465 (7645635 Canada Inc. o/a Ottawa Gold Buyer); 475 (Deb Schott, Inc.); 396 (Design Gold Group, Inc.); 449 (Midwest Refineries, LLC); 479 (PPS, Inc. d/b/a Braswell & Son); and 466 (The Gold Refinery, LLC / Norman Bean).

[9] The Debtors have only signature pages of the Standard Terms for the following Bucket 1 Customers: Anjay Corp. (ECF No. 463); Cyber-Fox Trading, Inc. (ECF No. 441); Eddie & Co. of NY, Inc. d/b/a Diamond Kingdom (ECF No. 458); and Mid-States Recycling, Inc. (ECF No. 476).  The Debtors have an incomplete, but initialed copy of the Standard Terms for Bucket 1 Customer FCP Diamonds, LLC (ECF No. 474).

[10] A list of those customers is attached to the Avila Declaration as Exhibit F.

1 Customer disputes this or argues that it is party to any other contractual agreement with a Debtor.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012 and the Uniform Procedures Order.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

This is a core proceeding pursuant to 28 U.S.C. § 157(b).

The Debtors and the Senior Lenders confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Joint Memorandum of Law to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## LEGAL STANDARD, GOVERNING LAW AND
## PRINCIPLES OF CONTRACT INTERPRETATION

### A.    Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this contested matter pursuant to Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Fed. R. Bankr. P. 7056.

"'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' there is no genuine issue of material fact." TL Admin. Corp v. Ideasphere, Inc. (In re TL Admin. Corp.), 337 B.R. 827, 829 (Bankr. S.D.N.Y. 2006) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "Although all reasonable inferences

10

should be drawn in the nonmoving party's favor, to defeat a properly supported motion for summary judgment the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . it must present 'significant probative supporting evidence' that a genuine issue of material fact exists." Id. (internal citations omitted).  Furthermore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Factual disputes over irrelevant or unnecessary facts are insufficient to warrant denial of a summary judgment motion.  Id.

## B.  Governing Law

Whether assets belong to the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code is determined by applicable state law.  Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC), 475 B.R. 9, 21−22 (S.D.N.Y. 2012) (internal citations and quotation marks omitted).  Bankruptcy Courts, like federal district courts hearing diversity cases, look to the choice of law rules of the state in which they sit.  Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 605 (2d Cir. 2001).

The Debtors and Senior Lenders contend that Florida law governs the Ownership Disputes because Florida has the most significant relationship to the issues and parties.  Eighteen of the 26 Bucket 1 Customers concede that Florida law governs these Ownership Disputes.[11]  One of the Bucket 1 Customers contends that either Florida or New York law applies.[12]  Two of the Bucket

---

[11] See ECF Nos. 396 (Design Gold Group, Inc.), 425 (Bay Area Metals), 434 (INTL FCStone Ltd), 441 (Cyber-Fox Trading, Inc.), 444 (Geib Refining Corp.), 445 (Music City Group, LLC), 449 (Midwest Refineries, LLC), 466 (The Gold Refinery, LLC / Norman Bean), 468 (Mitchell Levine (Plat/Co.)), 474 (FCP Diamonds, LLC), 475 (Deb Schott, Inc.), 476 (Mid-States Recycling, Inc.), 477 (General Refining and Smelting Corp. ), 478 (Alex Morningstar Corp. d/b/a Morningstar's), 479 (PPS, Inc. d/b/a Braswell & Son), 481 (Noble Metal Services, Inc.), 584 (San Diego Gold Exchange, Inc.), and 832 (Auris Noble, LLC).

[12] See ECF No. 456. (So Accurate Group, Inc.)

11

1 Customers contend that New York law governs.[13]  Finally, one of the Bucket 1 Customers posits

that either United States or Canada law may govern, but the Customer makes no attempt to

articulate the applicable Canadian law or the basis for its application to the Ownership Disputes.[14]

The same Bucket One Customer concedes that if U.S. law applies, then Florida or New York law

would likely govern.[15]  The four remaining Bucket 1 Customers are silent as to applicable law.[16]

The outcome of these Ownership Disputes will be the same under both Florida and New

York law eliminating the need for the Court to perform any choice of law analysis.  Citations to

the harmonious laws of Florida and New York are included below in the argument section.

## C.  Contract Interpretation Principles

A written agreement that is clear and unambiguous on its face must be enforced according

to its terms.  Gibney v. Pillifant, 32 So. 3d 784, 785 (Fla. 2d DCA 2010) ("[T]he actual language

used in the contract is the best evidence of the intent of the parties, and the plain meaning of that

language controls." (internal quotation marks omitted)); Greenfield v. Philles Records, 98 N.Y.2d

562, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must

be enforced according to the plain meaning of its terms").

Where a contract is unambiguous the intent of the parties must be gleaned from "the four

corners of the document."  Landmark Am. Ins. Co. v. Pin-Pon Corp., 155 So. 3d 432, 437 (Fla. 4th

DCA 2015) (citation omitted); De Luca v. De Luca, 300 A.D.2d 342, 342 (2d Dep't 2002).  A

---

[13] See ECF Nos. 458 (Eddie & Co. of NY, Inc. d/b/a Diamond Kingdom) and 463 (Brilliant Jewelers / MJJ Inc. (Anjay Corp.).

[14] See ECF No. 465 (7645635 Canada Inc. o/a Ottawa Gold Buyer).

[15] Id.  If necessary, the Debtors and Senior Lenders will address the application of Canadian law in their reply and they reserve the right to show that U.S. law governs the dispute with this Bucket One Customer.

[16] ECF Nos. 411(Pyropure, Inc. d/b/a Pyromet) and 452 (Texas EZPAWN, L.P.).

48660950;1

written document intended by the parties to be the final embodiment of their agreement may not

be contradicted, modified, or varied by extrinsic evidence. King v. Bray, 867 So. 2d 1224, 1226

(Fla. 5th DCA 2004); Schron v. Troutman Sanders LLP, 986 N.E.2d 430, 436 (N.Y. 2013);

W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 163 (1990) (holding that extrinsic evidence

should not "be considered in order to create an ambiguity in the agreement.").

It is black letter law that Courts must "read provisions of a contract harmoniously in order

to give effect to all portions thereof." City of Homestead v. Johnson, 760 So. 2d 80, 84 (Fla. 2000);

see Katel Ltd. Liab. Co. v. AT & T Corp., 607 F.3d 60, 64 (2d Cir. 2010) (a court must "give full

meaning and effect to all of [the contract's] provisions.").

When parties to a contract omit terms, particularly terms that are readily found in other,

similar contracts, the maxim expressio unius est exclusion alterius supports the inescapable

conclusion that the parties intended the omission. Shumrak v. Broken Sound Club, Inc., 898 So.2d

1018, 1020 (Fla. Dist. Ct. App. 2005); Quandrant Structured Products Co., Ltd. v. Vertin, 23

N.Y.3d 549, 560 (2014); In re Ore Cargo, Inc., 544 F.2d 80, 82 (2d Cir. 1976) (finding that the

omission of a term by a sophisticated party precludes the court from implying the term from the

general language of the contract).

Whether an agreement is ambiguous is question of law to be determined by the Court.

Smith v. State Farm Mut. Auto. Ins. Co., 231 So. 2d 193, 194 (Fla. 1970); Greenfield, 98 N.Y.2d

at 569. "A word or phrase in a contract is 'ambiguous' only when it is of uncertain meaning, and

may be fairly understood in more ways than one." Friedman v. Virginia Metal Prods. Corp., 56

So .2d 515, 517 (Sup. Ct. Fla. 1952) (citation omitted); RJE Corp. v. Northville Indus. Corp., 329

F.3d 310, 314 (2d Cir. 2003) (explaining that contract terms are not ambiguous if they "'have a

definite and precise meaning and are not reasonably susceptible to differing interpretations.'"

(citation omitted)).

## ARGUMENT

I. **THE STANDARD TERMS CLEARLY EVIDENCE THAT THE DISPUTED ASSETS ARE PROPERTY OF THE DEBTORS' BANKRUPTCY ESTATES.**

   A. **The Standard Terms Govern the Debtors' Commercial Relationships with the Bucket 1 Customers.**

All but four of the 26 of the Bucket 1 Customers executed the Debtors' Standard Terms (either the RMC or substantially identical RMC[2] version). Although the Debtors have been unable to locate executed copies of the Standard Terms for these four customers, they are nevertheless bound by the Debtors' Standard Terms which are incorporated into all invoices, sale/purchase orders, and other transaction confirmation issued by the Debtors. See, e.g., MetroPCS Communs., Inc. v. Porter, No. 3D17-375, 2018 Fla. App. LEXIS 18605, at * 9 (Fla. 3d DCA Dec. 26, 2018) (holding that purchaser was bound by standard terms where purchaser was on notice of their existence).

The Standard Terms make clear that they govern all commercial transactions with the Debtors. First, the Standard Terms provide in the first paragraph that:

> Unless otherwise stipulated, these Standard Terms and General Operating Conditions "Standard Terms" *are applicable to transactions and/or contracts between Republic Metals Corporation, "RMC", and Customer*. "Customer" is defined as any business, corporation, company, person, entity, or anyone else transacting business with RMC in any manner whatsoever. Any contract or agreement entered into between Customer and RMC will operate as if the terms represented in these Standard Terms were made expressly a part thereof. *RMC's Standard Terms is the governing document with respect to any and all business dealings between RMC and Customer and shall override any and all provisions, terms, and stipulations in Customer purchase orders, sales orders and/or any other Customer documents.* RMC's failure to object to any terms, provisions, and/or stipulations represented in any Customer documents that are at variance with RMC's Standard Terms shall not be deemed a waiver of the terms and conditions contained herein.

14

RMC Standard Terms at 1, Avila Decl. at Ex. B (emphasis added).[17]

Second, the Standard Terms provide that "[d]elivering material or doing business with RMC after having received the Standard Terms . . . deems that I have agreed to accept the Terms and General Operating Conditions contained herein regardless of whether I have signed [the Standard Terms]." Id. at 4, Avila Decl. at Ex. B.[18]

Third, the Standard Terms contain a broad integration clause showing that the Standard Terms constitute the entire agreement between the Debtors and the Customers as follows:

> Integration: This instrument contains the entire agreement between the parties relating to the rights granted and the obligations assumed, and incorporated all representations or modifications concerning this instrument whether arising from any usage or trade, course of dealing, accepted industry practice, course of performance, evidence of consistent additional terms, or otherwise.

Id. at 4, Avila Decl. at Ex. B.[19]

Finally, none of the Bucket 1 Customers contend that their relationship with the Debtors is governed by any other contract.

### B.  The Standard Terms Clearly and Unambiguously Evidence Commercial Transactions for the Purchase and Sale of Goods.

The Standard Terms contain the following complementary provisions that when read harmoniously, clearly and unambiguously show that the relationship between the Debtors and the Bucket 1 Customers is as buyer and seller for the purchase and sale of goods:

- Warranty of Title: "Customer warrants to RMC that *it has good and marketable title* to said property, full authority *to sell and transfer* said property, and that *said property is sold* free of all liens, encumbrances, liabilities, and adverse claims of every nature and

---

[17] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 8.

[18] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 13.

[19] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 12.

48660950;1

description whatsoever."  RMC Standard Terms at 1, Avila Decl. at Ex. B (emphasis added).[20]

- <u>Indemnity</u>: "Customer further warrants to RMC that it will fully, defend, protect, indemnify, and hold harmless RMC and its lawful successors and assigns from any adverse claim thereto." <u>Id.</u>, Avila Decl. at Ex. B.[21]

- <u>Risk of Loss</u>: "Risk of loss of material will pass from Customer to RMC upon delivery to and acceptance at RMC's refinery, unless otherwise agreed." <u>Id.</u>, Avila Decl. at Ex. B.[22]

- <u>Refining Charges</u>: "All RMC [refining] charges are payable upon the rendering of an invoice. . . .  Until such time, ***RMC shall be deemed to retain title*** to and a security interest in all material covered by any RMC invoice to secure the payment of the same." <u>Id.</u> at 2, Avila Decl. at Ex. B (emphasis added).

- <u>RMC Purchases</u>:

  o "Customer warrants that any ***purchase or sale contract*** has been effectuated by Customer for the sole purpose of securing pricing ***for the ultimate sale or purchase of precious metals*** and has not been made for any speculative reason whatsoever." <u>Id.</u> at 3, Avila Decl. at Ex. B (emphasis added).

  o "By agreeing to the terms and conditions contained herein, and receiving an e-mail confirming the details of Customer's trade, ***Customer agrees that he has entered into a written, legally binding contract for the sale/purchase of precious metals*** contained within the confirmation e-mail. ***Customer further warrants that said contract is in compliance with the Florida Uniform Commercial Code § 672.201, § 668.003 (4) and § 668.004 and agrees to waive any defenses under Florida Uniform Commercial Code § 672.201***." <u>Id.</u> at 3-4, Avila Decl. at Ex. B (emphasis added).[23]

- <u>Parties</u>: "***Both Parties agree that they are merchants as defined in the Uniform Commercial Code § 2-104(1)***." <u>Id.</u> at 4, Avila Decl. at Ex. B (emphasis added).[24]

Significantly, when the parties wanted to establish a bailment relationship, they did so expressly.  With respect to consignments (<u>i.e.</u>, metals delivered by the Debtors to Customers for

---

[20] The RMC[2] Standard Terms contain a substantially identical provision. <u>See</u> RMC[2] Standard Terms at 8.

[21] The RMC[2] Standard Terms contain a substantially identical provision. <u>See</u> RMC[2] Standard Terms at 8.

[22] The RMC[2] Standard Terms contain a substantially identical provision. <u>See</u> RMC[2] Standard Terms at 8.

[23] The RMC[2] Standard Terms contain a substantially identical provision. <u>See</u> RMC[2] Standard Terms at 10.

[24] The RMC[2] Standard Terms contain a substantially identical provision. <u>See</u> RMC[2] Standard Terms at 12.

sale to third party buyers), the Standard Terms reserve title in the Debtors. Standard Terms at 3, Avila Decl. at Ex. B ("It is expressly agreed upon by both parties that any and all material shipped to Customer, and/or delivered to Customer, and/or released to Customer on a **consignment/bailment** basis remains property of RMC . . . .  Customer does not have legal title to such property . . . .") (emphasis added).  The failure to include similar title reservations and bailment language in the other portions of the Standard Terms evidences the intention that these transactions were sales, not bailments.

Unsurprisingly, no Bucket 1 Customer has identified a provision in the Standard Terms supporting its bailment claim.

Several Bucket 1 Customers rely on the fact that the Debtors maintained "pool accounts" as evidence that the parties intended to create a bailment.  See, e.g., *Cyber-Fox Trading, Inc.'s Customer Statement Concerning Ownership of Pool Account Metal*, ECF No. 441 at 5.  But the Standard Terms expressly provide that a pool account is merely a "ledger account representing the amount of returnable metal owed to Customer."  RMC Standard Terms at 3, Avila Decl. at Ex. B. A positive balance reflects returnable "like kind" metals and a negative balance reflects that the customer owes metal to RMC.  Id.  The pool account balances do not represent the earmarking of any specific metal owned by the Customers any more than a deposit account at a bank represents specific dollars owned by a depositor.  Rather, the pool accounts were used by customers to hedge on the price of metals and the accounts represent a future payment obligation of the Debtors for those Customers electing to defer payment on the goods they sold to the Debtors.

Moreover, as more fully discussed below, the lynchpin and sine qua non of a bailment is that the identical thing must be returned to the alleged bailor. Here, the Standard Terms expressly state that the identical thing would **not** be returned to the customers electing return of metals,

17

providing that pool account balances are merely a "ledger" entry and that "[r]eturnable metal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable material; rather, it represents a future obligation of RMC to return ***common inventory***." RMC Standard Terms at 3, Avila Decl. at Ex. B (emphasis added).

Other Bucket 1 Customers purport to rely on unidentified extrinsic evidence of "industry practice and custom," the parties' "custom and practice," and the "circumstances" surrounding their commercial relationship.[25]    However, none of this evidence is admissible to explain the unambiguous Standard Terms.  See, e.g., Phila. Am. Life Ins. Co. v. Buckles, 350 F. App'x 376, 380 (11th Cir. 2009) ("We find that the contractual provision at issue is clear and unambiguous. As a result, we are precluded from considering extrinsic evidence and the course of performance offered by Buckles.").

The Standard Terms are clear and plainly show that the Bucket 1 Customers sold raw materials to the Debtors for refining.  The Standard Terms do not demonstrate a bailment or any obligation of the Debtors to return the raw materials to the Bucket 1 Customers.  As shown below, title to the raw materials passed to the Debtors at the time of delivery.

### C. Title to the Materials Transferred to the Debtors Upon Delivery Pursuant to Section 2-401 of the UCC.

The transactions between the Debtors and the Bucket 1 Customers are governed by Article 2 of the UCC relating to the purchase and sale of goods.  Fla. Stat. § 672.102; N.Y. UCC § 2-102. Under Section 2-401 of the UCC, title to goods passes to the buyer upon delivery of the goods by the seller to the buyer.  Fla. Stat. § 672.401; N.Y. UCC § 2-401.  Section 672.401 of the Florida UCC should be considered in its entirety and provides as follows:

Each provision of this chapter with regard to the rights, obligations and remedies of the

---

[25] See, e.g., ECF Nos. 474 (FCP Diamonds, LLC); 475 (Deb Schott, Inc.); 478 (Alex Morningstar Corp. d/b/a Morningstar's); 479 (PPS, Inc. d/b/a Braswell & Son); and 481 (Noble Metal Services, Inc.).

seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and *matters concerning title become material the following rules apply*:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (s. 672.501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this code. *Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.* Subject to these provisions and to the provisions of the chapter on secured transactions (chapter 679), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties**.**

(2) *Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes her or his performance with reference to the physical delivery of the goods,* despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . . .

Fla. Stat. § 672.401 (emphasis added); see N.Y. UCC § 2-401.

The rule that title passes to the buyer upon delivery is unassailable and cannot be negated by the contracting parties.  Section 2-401(1) of the UCC "negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained." In re J. Adrian Sons, Inc., 205 B.R. 24, 26 (Bankr. W.D.N.Y. 1997) (quoting Connecticut Bank & Trust v. Schindelman (In re Bosson), 432 F. Supp. 1013, 1020 n. 24 (D. Conn. 1977)).

As bankruptcy courts uniformly recognize:

*Section 2-401 pronounces two immutable rules to which every sales agreement is subject.* The first rule is that title cannot pass until goods are 'identified to the contract.' The second rule is that once goods are in the possession of the buyer, any reservation of an interest or title by the seller is deemed a security interest.  *Subject to those two rules,* the parties may otherwise determine by mutual agreement the point in the transaction that title will pass to the buyer. . . . *In no event, however, may title remain in the seller after the buyer takes possession of the goods* (or of a 'document of title' to the goods, if applicable), *regardless of the parties' agreement or intent.*

Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.), 407 B.R. 65, 76-77

19

(Bankr. D. Vt. 2009) (quoting <u>Malloy v. Brazeal (In re Callahan)</u>, No. 07-1021, 2007 Bankr. LEXIS 3548, at *12-13 (Bankr. N.D. Okla. Oct. 11, 2007) (emphasis added); <u>accord</u> <u>In re Aleris Int'l, Inc.</u>, 456 B.R. 35, 41 (Bankr. D. Del. 2011) (finding that "irrespective of any agreement between the parties, a seller may never retain title to goods that have already been delivered to the buyer, and any such retention is always reduced to a mere security interest in the delivered goods."); <u>Wild West World L.L.C. v. Larson Int'l, Inc. (In re Wild West World, L.L.C.)</u>, No. 07-5257, 2008 Bankr. LEXIS 3580, at *11 (Bankr. D. Kan. Oct. 17, 2008) ("Section 2–401(1) negates the ability to delay passage of title beyond delivery. Any express agreement of the parties or reservation of title in the seller is limited by § 2–401(1)"); <u>Ivey v. Wilson (In re Payne)</u>, No. 05-2118, 2006 Bankr. LEXIS 4199, at *18-22 (Bankr. M.D.N.C. Dec. 6, 2006) (holding that title passed despite contracting parties' reservation of title, leaving seller only with a reservation of a security interest); <u>Crouch Supply Co. v. Piknik Prods. Co., Inc. (In re Piknik Prods. Co., Inc)</u>, 346 B.R. 863, 866–67 (Bankr. M.D. Ala. 2006) (holding that retention of title provision in sales agreement was ineffective to prevent title from passing); <u>Riddle Farm Equip., Inc. v. Boles (In re Boles)</u>, Nos. 03-53196C-7W, 04-6027, 2004 Bankr. LEXIS 2384, at *5–6 (Bankr. M.D.N.C. Oct. 29, 2004) (finding that even with explicit agreement that title was not to pass until financing was obtained or the purchase price paid, title nevertheless passed by operation of law when tractor was delivered to defendant, leaving plaintiff, at most, only with a security interest); <u>see</u> <u>also</u> 1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code § 4:31 (6th ed. 2017).

It is undisputed that the Bucket 1 Customers' delivery of the Disputed Assets to the Debtors was complete as of the Petition Date. Accordingly, as a matter of law, title passed of the Disputed Assets passed to the Debtors prepetition and the Disputed Assets and their proceeds belong to the Debtors' bankruptcy estates.

20

## II.    NO BUCKET 1 CUSTOMER CAN ESTABLISH A BAILMENT

### A.    The Proper Test for Determining Sale or Bailment Is Whether the Identical Article Delivered is to be Returned in the Same or Some Altered Form

A bailment is defined as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be."  Monroe Sys. for Bus., Inc. v. Intertrans Corp., 650 So. 2d 72, 75 (Fla. 3d DCA 1994) (quoting Dunham v. State, 192 So. 324, 326 (Fla. 1939)); see Herrington v. Verrilli, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001).

In distinguishing a bailment from a sale, the Supreme Court explained over a century ago:

The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed.  On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed.  The transaction is a sale.

Sturm v. Boker, 150 U.S. 312, 329 (1893).

This rule applies even where the thing delivered is changed or transformed in some manner:

[W]here logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer.  If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be sale or a loan, and the title to the thing delivered vests in the manufacturer.  We understand this to be a correct exposition of the law.

Powder Company v. Burkhardt, 97 U.S. 110, 116 (1878).

This type of bailment is referred to as "'a bailment . . . locatio operis faciendi [i.e.] a bailment where work and labor . . . are to be performed upon the thing delivered to the bailee.'"

B.A. Ballou and Company, Inc. v. Citytrust, 591 A.2d 126, 130 (Conn. 1991) (quoting Douglass

v. Hart, 131 A. 401, 402 (Conn. 1925)).  A bailment of this character is formed when the parties

"enter into a contract, express or implied, or both, by which the bailee engages to perform the

agreed services and return the thing bailed in its altered or repaired form and the bailor in return

for the services of the bailee agrees to pay him the agreed upon compensation."  Id.

Accordingly, in distinguishing bailments from sales, the test of a bailment is that the

**identical** thing is to be returned in the same or some altered form; if another thing of equal value

is to be returned, the transaction is a sale.  See, e.g., Zaki Kulaibee Establishment v. McFliker, 771

F.3d 1301, 1312 n.23 (11th Cir. 2014) ("The rule that where a person receiving property is not

bound to return the identical thing received, but may account therefor in money or other property,

or thing of value, the transaction is a sale, is not applicable to bailments . . . ." (quoting 8 C.J.S.

Bailments § 11 (2005))); C.W.B. Enterprises, Inc. v. K.A.T. Equipment Corp., 449 So. 2d 354,

355 (Fla. 3d DCA 1984) (noting that "every bailment contract contemplates return of the property

bailed, either in the same or altered form" (citing D & D Associates, Inc. v. Sierra Plastics, Inc.,

570 S.W.2d 205, 206 (Tex. Civ. App. 1978))).[26]

Courts have applied this test consistently in the refining context, and where the identical

product is not returned, courts routinely conclude the transaction is a sale and not a bailment.  See,

e.g., Chisholm v. Eagle Ore Sampling Co., 144 F. 670, 671−72 (8th Cir. 1906) ("[I]t seems clear

to us that the parties acted under the contract as though the transactions were sales of the ore upon

the basis of the assay values of samples"); Welding Metals v. Foothill Capital Corp., No. 3:92 CV

00607 (WWE), 1997 U.S. Dist. LEXIS 7672, *25 (D. Conn. Apr. 14, 1997) ("because there is no

---

[26] One customer has suggested that Canadian law may be applicable to the Ownership Dispute.  See ECF No. 465 (7645635 Canada Inc. o/a Ottawa Gold Buyer).  However, Canadian bailment law is identical to Florida and New York law.  See Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383, 72 C.B.R. (N.S.) 295, 13 A.C.W.S. (3d) 160 ("A bailment arises only where there is a delivery of property on the basis that the same property will be returned. Its form may be altered, but it must be the same property.  Thus where the material delivered is mixed with other material, on the basis that an equivalent quantity of the same type of material will be returned, the contract is one of sale, not bailment.").  A true and correct copy of this case is attached hereto.

evidence that the metal returned to [the customer] was the product of the metal originally delivered, except 'solely by chance,' the arrangement between [the debtor and the customer] could not constitute a bailment"); Ballou, 591 A.2d at 130 (rejecting bailment claim where scrap metal was "commingled" and "there was no understanding or agreement that the precise thing would be returned"); WESGO Division of GTE Products Corp. v. Harrison (In re Sitkin Smelting & Refining, Inc.), 648 F.2d 252, 254 (5th Cir. 1981) (finding no bailment where scrap material was commingled during refining and could not be returned and refiner "agreed to either purchase the precious metals recovered upon processing or return metals of like kind and quality less a processing fee"); Sitkin v. R-One Alloys, Inc., No. PB 04-0495, 2006 R.I. Super. LEXIS 25, *8−11 (R.I. Super. Ct. Mar. 13, 2006) (holding that a toll account transaction with a customer was a sale and not a bailment because the customer could not "claim control over" the raw material once it entered the refining process and became commingled; because the customer "did not require that the identical metal contained in the material be returned, a sale resulted"); Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383, 72 C.B.R. (N.S.) 295, 13 A.C.W.S. (3d) 160 (dismissing bailment claim where "refining process necessarily involved the intermixing of metal derived from various customers together with Delta's own metal" and "final product was indistinguishable as to source"); see also General Motors Corp. v. Bristol Indus. Corp. (In re Bristol Indus. Corp.), No. 2-81-0512, 1981 Bankr. LEXIS 5204, *21−24 (Bankr. D. Conn. Dec. 14, 1981) ("Here, the finished produced delivered to General Motors after completion of the conversion process is a new product dissimilar from the original raw scrap shipped to Bristol.  The agreement does not provide for, and the parties did not contemplate, that the delivered scrap metals would remain separate and identified."), rev'd on other grounds, 690 F.2d 26 (2d Cir. 1982).

**B.    The Debtors Were Not Required to Return the Identical Article
Delivered in the Same or Some Altered Form.**

Raw materials delivered by Bucket 1 Customers to the Debtors were commingled and became unidentifiable once they entered the refining process. The Standard Terms made clear that precious metals are fungible, and that returnable metal did not pertain to specific, segregated, or identifiable metal. Bucket 1 Customers were given the option of participating in the Peace of Mined program which, for each participating customer, would have ensured that its raw material remained segregated throughout the refining process. However, none of the Bucket 1 Customers elected to pay the additional fees required to participate in that program. Instead, the Bucket 1 Customers sold raw material to the Debtors and received back cash, "Loco London" metal credit, a deposit into the customer's toll or pool account, or in rare instances, refined metal of like kind and quality, in each case, net of processing fees.

The facts here are strikingly similar to the facts in Sitkin v. R-One Alloys, Inc., 2006 R.I. Super. LEXIS 25. In that case, the customer provided scrap to the refiner (R-One) for refining and processing. Id. at *12. Upon delivery, the scrap was weighed and sampled to determine its value. Id. R-One then commingled the scrap with material received from other customers and refined the scrap to produce a finished product. Id. In exchange, the customer received either a cash payment (net of processing fees) or a credit to its toll account that was denominated in quantities of precious metals. Id. at 12. Based on these facts, the court concluded that the customer could have had no expectation that the identical metal would be returned. Id. at 13. Instead, the court reasoned, the customer expected to "receive equal value or an equal amount of gold that was equivalent to the sampled and quantified amount contained in the pre-refined raw material." Id. at *12-13. Thus, the court held, the transaction was a sale and not a bailment. Id. at 14.

Here, like the customer in Sitkin, the Bucket 1 Customers had no expectation that they

24

would receive back the identical metal they delivered to the Debtors.  The raw material delivered by the Bucket 1 Customers was commingled with raw materials delivered by other Customers, and once it entered the refining process, the Bucket 1 Customers had no ability to claim control over it.  The Bucket 1 Customers are entitled to "receive equal value or an equal amount of gold that was equivalent to the sampled and quantified amount contained in the pre-refined raw material."  Id. at 13.  To the extent any customer received back refined metal that was the product of raw material originally delivered by it to the Debtors, it was "solely by chance."  See Ballou, 591 A.2d at 130; Welding Metals, 1997 U.S. Dist. LEXIS 7672, at *25.  Accordingly, the Bucket 1 Customers' bailment claims fail as a matter of law.

### C.  None of the Cases Cited by the Bucket 1 Customers Requires a Different Result.

The cases cited by the Bucket 1 Customers are legally and factually distinguishable.  In Public Service Electric & Gas Co. v. Federal Power Commission, 371 F.2d 1 (3d Cir. 1967), a utility arranged to have fungible natural gas transported through a pipeline.  The court found that a bailment existed even though the defendant was not required to return the identical gas back to the utility, reasoning that, because the gas was merely transported and not altered in any manner, commingling of a fungible commodity did not necessarily defeat an otherwise valid bailment.  Id. at 4-5.  The decision is limited to relationships involving the commingling of unaltered fungible commodities and is inapposite to the current situation.  See R-One Alloys, Inc., 2006 R.I. Super. LEXIS 25, at *11 n.6 (noting that Public Service "stands only for the limited rule that commingling alone does not defeat a bailment"); Ballou, 591 A.2d at 129 n. 3 (same).  While the refined gold produced by the Debtors is a fungible commodity, the raw materials sold to the Debtors by the Bucket 1 Customers are not.  They are comprised of scrap, doré, and other unrefined materials containing different amounts of different metals of different quality and value that must be assayed. The raw materials are then commingled with the raw materials delivered by other customers and

then refined together.  There was no expectation or requirement that the Debtors return the exact raw materials the Bucket 1 Customers originally delivered or an equal amount of commingled raw materials.  Instead, the Bucket 1 Customers could elect to receive refined metal of a specific quality and value.  Where, as here, an object is altered, transformed, or remanufactured, and the identical thing is not returned, a bailment cannot exist.

The facts in In re Enron Corp., No. 01-16034 (AJG), 2003 Bankr. LEXIS 2262 (Bankr. S.D.N.Y. 2003), are nearly identical to the facts in Public Service.  In Enron, the court, relying in part on Public Service, found that a bailment existed with respect to fungible natural gas where the gas was stored and not altered in any manner, even though it was commingled, because the parties' contract made clear that they intended a bailment and not a purchase and sale.  Id. at *7–11, *14–22.  Here, the opposite is true.  As shown above, the Standard Terms evidence a purchase and sale contract.  The raw materials received from the Bucket 1 Customers were commingled with other non-fungible raw materials and became unidentifiable.  The commingled materials were then refined and the raw materials could not be traced into any Refined Product or Minted Product.

In In re Medomak Canning Co., No. BK 75-936, 1977 Bankr. LEXIS 11, at *4 (Bankr. D. Me. 1977), aff'd, 588 F.2d 818 (1st Cir. 1978), a supplier contracted with the debtor to process canned baked pork and beans.  Under the parties' agreement, the supplier sent ingredients and packaging and shipping supplies to the debtor who then processed the pork and beans and canned and shipped them directly to the supplier's customers.  Id. at *4, *21.  Based on these facts and the lack of a sale price (an indispensable contract term under the Maine UCC), the court concluded that no sale was intended or occurred.  Id. at *20–21.  Here, each Bucket 1 Customer's raw material was commingled shortly after it arrived at the Debtors' refinery and the Standard Terms provide a

26

clear sale price mechanism for metals sold to the Debtors.[27]

In Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.), 639 F.2d 1213 (5th Cir. 1981), the Fifth Circuit found that a bailment existed where a supplier delivered film waste to the debtor for processing and extraction of silver.  In that case, unlike here, the film waste was never commingled with the debtor's other inventory.  Id. at 1217.  It was labeled, segregated and identified at every stage of the process.  Id.  By contrast, in WESGO Division of GTE Products Corp., 648 F.2d at 254, a case involving the same debtor, the Fifth Circuit, in an opinion authored by the same judge who wrote the majority decision in Kodak, distinguished the contract in Kodak as "somewhat unique," and affirmed the bankruptcy court's conclusion that the parties' refining contract was a sale contract rather than a bailment contract.  Id.  The court found that the parties' agreement was "essentially a contract for the sale of future goods[,] . . . with payment in the form of a purchase price established by an agreed-upon formula or in refined metals of like kind and quality less a processing fee."  Id. at 254.  The court observed that, "[a]t WESGO's option, Sitkin agreed to either purchase the precious metals recovered upon processing or return metals of like kind and quality less a processing fee."  Id. at 253.  However, "the metals actually recovered from WESGO's scrap could not be returned, because during the refining process the metals from one client's scrap were commingled with those from other scrap."  Id.  The facts in this case are more like WESGO than Kodak and support a finding that the relationship between the Debtors and the

---

[27] As described above, Customers could request an advance payment on shipments prior to receipt by the Debtors.  In that case, the Standard Terms provide that the Debtors would make an advance to the Customer based on the estimated elemental content of the lots and/or material provided by the Customer.  See Standard Terms at 3, Avila Decl. at Ex B.  Upon payment of the advance, title to the material passed immediately to the Debtors.  Id.  After final settlement, the Customer would be responsible for any over-advance to the extent there was a discrepancy between the estimate and actual value of the metals.  Alternatively, if the Customer did not request an advance, payment would be made by the Debtors to the Customer at settlement, or "fixing."  The Standard Terms provided the Customers with two pricing options:  (a) "Spot" pursuant to which the price would be determined by RMC trading personnel based on the metal price as determined by global markets at the time of fixing or (b) "London PM" pursuant to which the price would be determined by RMC trading personnel based on the metal price as determined by the London Bullion Market Association (LBMA) at the time of fixing.  Id. at 3-4.

Bucket 1 Customers is as buyer and seller.

In In re Bristol Indus. Corp., 690 F.2d at 31, the non-binding concurring opinion suggested in dicta that a bailment existed where a supplier shipped scrap metal to the debtor for processing into alloy strips under a tolling arrangement. The concurring opinion, relying on Public Service, noted that "[w]hen commingling is required by the needs of the trade and is done with the consent of the parties a bailment is established *if that is the intent of the parties*." Id. at 30 (emphasis added). Here, as discussed above, the parties' intent is reflected unambiguously in the Standard Terms, which reflect purchase and sale transactions, not bailments.[28]

Finally, in United States v. Fleet Nat'l Bank (In re Handy and Harman Refining Group, Inc.), 271 B.R. 732, 737 (Bankr. D. Conn. 2001), in denying summary judgment, the bankruptcy court found that the parties' contract was ambiguous because it contained "both language of bailment and sale." As discussed above, the Standard and Terms do not contain any bailment language.

**D. The Bucket 1 Customers' Other Claims Are Without Merit.**

**1.     Article 7 of the Uniform Commercial Code Is Inapplicable.**

Brilliant Jewelers/MJJ Inc., and Anjay Corp. (together "Brilliant"), allege that certain "metal reports" indicating "the quantity (i.e., weight and moisture) and grade (i.e., assay)" of raw materials delivered to the Debtors constitute "documents of title" under Article 7 of the New York Uniform Commercial Code. See ECF No. 463 ("Brilliant Customer Statement").[29]   Brilliant

---

[28] The concurring opinion has been subsequently criticized for its reliance on Public Service and distinguished. R-One Alloys, Inc., 2006 R.I. Super. LEXIS 25, at *11, n.6 ("The precedent, however, to which the court in Bristol cites in support of this maxim, is misplaced."); GMAC Bus. Credit L.L.C. v. Ford Motor Co., 100 Fed. App'x 404, 409 (6th Cir. 2004) ("We respectfully disagree with the concurring judge in [Bristol]"); Ballou, 591 A.2d at 129, n. 3 ("[Public Service] stands only for the proposition that commingling alone does not defeat a bailment").

[29] See also ECF No. 425.

further alleges that, under Section 7-207 of the UCC:

> [F]ungible goods (i.e., the metals in question here) that are held by a bailee (i.e., Debtor) will remain property of the bailor (i.e., Customer) even if they are commingled with other fungible goods, provided that is an "identifiable quantity of goods to which the claimant claims title," which may be "either identified or . . . fungible portions of an identified mass."

Brilliant Customer Statement at 4.

This claim fails for at least three reasons. <u>First</u>, Section 7-207, by its terms, applies to "warehouse receipts." N.Y. UCC § 7-207. A "warehouse receipt" is a "document of title issued by a person engaged in the business of storing goods for hire." N.Y. UCC § 1-201(42). The Debtors are not engaged in the business of storing goods for hire; they are refiners of precious metals.

<u>Second</u>, even if the Debtors were engaged in the business of storing goods for hire, the "metal reports" Brilliant relies on could not be warehouse receipts (or any other form of document of title) because they were not issued by a "bailee" (<u>i.e.</u>, a person that "acknowledges possession of goods and contracts to deliver them"). UCC § 7-102(a)(1); N.Y. UCC § 1-201(16). As discussed above, each of the so-called metal reports is subject to the Standard Terms, which make clear that the transactions with Brilliant were for the purchase and sale of raw materials.

<u>Finally</u>, even if Brilliant could overcome these threshold issues, Section 7-207 would have no applicability here because there are no "fungible portions of an identifiable mass." The raw material delivered by Brilliant, like that delivered by all other Bucket 1 Customers, was not fungible. The raw materials were commingled during the refining process with other customer lots and remaining materials in the refining machinery and the product was not identifiable to any particular customer lot. Quite simply, the process of refining metals from nonfungible raw materials is not akin to the delivery of fungible commodities to a warehouse or mere storage (such as the case of grain delivered by a farmer to an elevator), the type of bailor/bailee relationship that

29

Section 7-207 is meant to govern.

**2.      The Debtors Are Not Estopped from Claiming Title to the Raw Material**

Five Bucket 1 Customers allege that, under Florida law, the Debtors are estopped from claiming title to the raw materials they delivered to the Debtors.[30]  Under Florida law, to prove estoppel, a party must establish:

> (1) a representation by the party estopped to the party claiming estoppel as to some material fact, which representation is contrary to the condition of affairs later asserted by the estopped party;
>
> (2) a reliance upon this representation by the party claiming the estoppel; and
>
> (3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon.

Pinnacle Port Cmty. Ass'n v. Orenstein, 872 F.2d 1536, 1542 (11th Cir. 1989).  The Bucket 1 Customers cannot establish any of these elements.

The Standard Terms make clear (and have always made clear) that the transactions conducted pursuant thereto were for the purchase and sale of raw materials.  The Debtors have never taken any other position.  Accordingly, the Bucket 1 Customers have not and cannot identify a representation made by the Debtors that is contrary to the Debtors' current position.  Nor, can the Bucket 1 Customers allege reliance or a detrimental change in position.  As a result, the Debtors cannot be estopped from claiming title to the raw materials they delivered to the Debtors.

**3.      The Bucket 1 Customers' Conversion Claims Fail as a Matter of Law**

Two Bucket 1 Customers assert conversion claims.[31]  "Under Florida law, '[a] conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or

---

[30] See ECF Nos. 475 (Deb Schott, Inc.), 476 (Mid-States Recycling, Inc.), 477 (General Refining and Smelting Corp.), 481 (Noble Metal Services, Inc.), and 479 (PPS, Inc. d/b/a Braswell & Son).

[31] ECF No. 449 (Midwest Refineries, LLC), 466 (The Gold Refinery, LLC / Norman Bean).

assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion.'" Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1258 (11th Cir. 2015) (quoting Star Fruit Co. v. Eagle Lake Growers, Inc., 33 So. 2d 858, 860 (Fla. 1948)). However, as discussed more fully above, title to the raw materials delivered by these two Bucket 1 Customers passed to the Debtors upon delivery. Accordingly, no claim for conversion can lie.

### 4.       There Is No Basis to Impose a Constructive Trust

Finally, nine Bucket 1 Customers seek imposition of a constructive trust on the raw material each delivered to the Debtors and the proceeds derived from the sale of any resulting refined precious metals.[32] The remedy of a constructive trust requires the Customers to establish, by clear and convincing evidence, the following four elements: (i) a promise, express or implied; (ii) a transfer of property and reliance thereon; (iii) a confidential relationship; and (iv) unjust enrichment. See, e.g., Castetter v. Henderson, 113 So. 3d 153, 155 (Fla. 5th DCA 2013); Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.), 377 F.3d 209, 212 (2d Cir. 2004). However, under both Florida and New York law, a party may not pursue a constructive trust – a quasi-contractual remedy– where there is an agreement governing the parties' relationship. See, e.g., Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 697 (Fla. 1st DCA 2008) (affirming dismissal of request for imposition of a constructive trust where there was an express contract between the parties governing the subject matter); In re First Cent. Fin. Corp., 377 F.3d at 212 (holding that the existence of a controlling agreement precludes imposition of a constructive

---

[32] See ECF Nos. 396 (Design Gold Group, Inc.), 441 (Cyber-Fox Trading Inc.), 444 (GEIB Refining Corp.), 445 (Music City Group, LLC), 449 (Midwest Refineries, LLC), 465 (7645635 Canada Inc. o/a Ottowa Gold Buyer), 477 (General Refining and Smelting Corporation), 478 (Alex Morningstar Corp. d/b/a Morningstar's), and 832 (Auris Noble, LLC).

trust); <u>Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)</u>, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000) (dismissing constructive trust claim where relationship was governed by contract).

As discussed more fully above, each of the Bucket 1 Customers is bound by the Standard Terms, which clearly and unambiguously provides for the purchase and sale of the raw material. Because the Bucket 1 Customers' claims are governed by the Standard Terms, their attempts to impose a constructive trust fail as a matter of law.

## CONCLUSION

**WHEREFORE,** for the reasons set forth herein, the Debtors and the Senior Lenders respectfully request that the Court (i) find that: (a) the Disputed Assets constitute property of the Debtors' bankruptcy estates; and (b) the Bucket 1 Customers lack any ownership interests in the Disputed Assets; (ii) dismiss all Bucket 1 Claims with prejudice; and (iii) grant such other and further relief as the Court deems just and proper.

48660950;1

Dated:  New York, New York
        April 19, 2019

Respectfully submitted,

**LUSKIN, STERN & EISLER LLP**

**AKERMAN LLP**

/s/ Michael Luskin
Michael Luskin
Stephan E. Hornung
Alex Talesnick
Eleven Times Square
New York, New York 10036
Tel.:  (212) 597-8200
Fax:  (212) 974-3205

/s/ John E. Mitchell
John E. Mitchell (*Admitted Pro Hac*)
Yelena Archiyan (*Admitted in New York*)
2001 Ross Avenue, Suite 3600
Dallas, TX  75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

*Counsel for the Senior Lenders*

Andrea S. Hartley (*Admitted Pro Hac*)
Joanne Gelfand (*Admitted in New York*)
Katherine C. Fackler (*Admitted Pro Hac*)
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel.:  (305) 374-5600
Fax:  (305) 374-5095

*Counsel for Debtors and Debtors-in-Possession*

# _Delta Smelting & Refining Co. (Re)_

**[1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383, 72 C.B.R. (N.S.) 295**

⚠️ *Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532*

British Columbia and Yukon Judgments

British Columbia Supreme Court

Vancouver, British Columbia

McLachlin C.J.S.C.

Heard: November 7 and 8, 1988

Judgment: December 12, 1988

Vancouver Registry No. 01982 and 660/83

[1988] B.C.J. No. 2532  |  33 B.C.L.R. (2d) 383  |  72 C.B.R. (N.S.) 295  |  *13 A.C.W.S. (3d) 160*

In the Matter of the Bankruptcy of Delta Smelting & Refining Co. Ltd.

## Case Summary

**Bankruptcy — Priorities among creditors — Bankrupt metal refiner doing business with suppliers in five different ways — None of five classes of creditors having direct proprietary interest — All creditors receiving pro rata distribution.**

This was an application by five classes of creditors for a share in the proceeds of certain precious metals held by the debtor's receiver. All claimant creditors had supplied the bankrupt with precious metals. The bankrupt had dealt with each of the five creditors differently: pay by cheque; credit accounts receivable; hold on deposit; return of metal; and, consignment metal creditors. Once the bankrupt had received the metals from the various creditors, it was refined and combined so that the metals supplied were indistinguishable from each other.

HELD: The application was allowed.

There was no legal basis upon which to distinguish between the various classes of creditors and consequently, the proceeds from the metals should be distributed pro rata between them. The pay by cheque and credit accounts receivable claimants both clearly had contracts for the sale of goods. The property had passed to the bankrupt and these claimants had no direct proprietary interest in the fund. The transaction between the hold on deposit claimant and the bankrupt was properly characterized as a loan. The property therefore also passed to the bankrupt and the creditor had no direct proprietary interest in the fund. With respect to the return of metal and consignment creditors, their characterization of the transaction as either a bailment or creating a trust was not made out. The metals supplied by them were intermingled with the metals supplied by others and therefore no bailment could exist. With respect to the claim that a trust was created, the bankrupt did not have a fiduciary duty to the claimant so as to give rise to a trust relationship. In any event, a trust was not enforceable if the property was not traceable.

Counsel for the Consignment Metal Claimants: G. Holeksa. Counsel for the Return of Metal Claimants: R. Dresser. Counsel for Trustee, Pannell, Kerr, MacGillivray Inc.: T.J. Maledy. Counsel for the Pay by Cheque and Credit Accounts Receivable Claimants: Ellen M. McDonald. Counsel for the Hold on Deposit Claimants: J.I. McLean.

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

---

## McLACHLIN C.J.S.C.

I.  Introduction

Delta Smelting & Refining Co. Ltd., now bankrupt carried on the business of refining and storing precious metal. Unfortunately as matters turned out, it used some of the metal in its possession for speculation on the commodities market. The crash of the silver market in 1981 plunged Delta into financial difficulty from which it never recovered.

The Trustee in Bankruptcy recovered $543,738 worth of precious metal, including $541,326 in gold and silver, which he still retains. By order of this Court, a receiver was appointed to hold the metal, and the ownership of the metal was directed to be tried by way of interpleader.

Five classes of creditors seek to share the proceeds of the metal held by the receiver. They represent the creditors who had dealings with Delta in metal and ore. The five classes of claimants arise from the five different ways Delta recorded these transactions. Upon delivery to Delta, each customer's material was tagged by a receipt recording customer information. The official receipt contained four boxes which could be checked off to indicate classification of the transaction as one of accounts receivable, pay by cheque, hold on deposit or return of metal. The document also contained space for special instructions, which was used, among other things, to record the fifth category, consignment transactions.

Initially, each customer's material was kept separate and discrete. After being treated to remove impurities, the resulting product was tested to determine the percentage of precious metal. The assay results were recorded on the receipt, the pricing formula determined, and the customer's credit calculated.

Up to this point each customer's material could be identified. But this changed in the refining process which pooled material from various customers together with metal Delta considered its own.

Gold and silver were refined by different processes. Gold was refined in small batches, normally representing the accumulation of metal over one week. The silver batch process continued for approximately four to six months. During the course of the batch, silver was continually added and removed from the batch.

At the end of a batch, the refined bars of gold or silver were placed in the vault. No attempt was made by Delta to identify proportions of a batch as being attributable to any particular customer. Metal was withdrawn from the vault for Delta's own purposes (including trading and speculation on the metal market) as well as for return or sale to customers, generally on a "last-in, first-out" basis. As a consequence of this policy none of the metal in the vault is specifically identifiable as coming from any of the particular claimants in this proceeding.

The metal which the receiver now holds came in part from the vault and in part from "clean-up". "clean-up metal" is metal which the Trustee recovered after bankruptcy by cleaning out furnaces and ducts, burning carpets, re-running slag, collecting drillings and collecting metal content from the silver bath solutions.

II.  The Issue

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

There are five categories of claimants to the Fund: Pay by Cheque ("PBC"), Credit Accounts Receivable ("CAR"), Hold on Deposit ("HOD"), Return of Metal ("ROM") and Consignment Metal Creditors (CC) . The main issue is what interest if any each class of claimant possesses in the metal held by the Trustee. On the answer to that question hangs the respective entitlement of the five categories of claimants.

III.  Discussion

A.  The "Pay by Cheque" (PBC) and "Credit Accounts Receivable Claimants" (CAR)

The Pay by Cheque and Credit Accounts Receivable claimants may be treated together. In both cases, their transactions with Delta involved the sale of material containing a content of precious metal, for a price to be determined at a later date based on the results of an assay.

The contracts were clearly for the sale of goods, conveying property in the metal to Delta. That conveyance occurred when the contract was made: s. 23(2) of the Sale of Goods Act. Property in the metal containing materials having passed to Delta, the PBC and CAR claimants can claim no direct proprietary interest in the Fund.

B. The "Hold on Deposit" Creditors

The Hold on Deposit creditors assert that under the terms of their contract with Delta property in the metal was retained in the depositor and did not pass to Delta. These creditors each purchased a "hold on deposit" contract for gold or silver from Delta. At the end of the contract they were to receive the metal back, together with interest. Although the contract purported to reserve property in the depositor, Delta was free to use, deal in or trade the metal as it saw fit for a certain period of time, and was not required to account to the depositor for the type of use to which the metal was put nor for any profits made. These facts are inconsistent with either bailment or trust, which would permit the property to remain in the creditors. The correct legal characterization is that the customers loaned their metal to Delta, at which time property passed to Delta.

The position of these creditors is indistinguishable from that of depositors at a bank. The relationship between banker and depositing customer is viewed as a contract of loan, under which property in the money loaned passes to the bank. Baxter, in The Law of Banking. (3d) 1981, at p. 2 states:

... But the ordinary business meeting of a bank deposit is not to create the banker a bailee, an agent, or a trustee for the money. It is not the purpose that the identical res should be returned, nor that the banker shall account to the customer for any profit made by the use of the money, or be subject to the law of relating to trusts and trustees in the manner in which he invests or otherwise employs the money. The basic meaning of a bank deposit is that it is a loan of money by the depositor to the bank. When the money is lodged it becomes the property of the bank to use as it sees fit, within the score of its legal powers. The customer thereafter has no juus in re in the money, and the bank is under no duty to account to the customer for the way in which it uses the money or for any profits earned upon it. The bank's main obligation is to repay the deposit according to the contract. Repayment means return of an equivalent amount of currency. It is misleading to regard the customer as having any rights of property in money after it has been deposited and has passed into the hands of the Bank.

(Emphasis added)

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

It follows that the HOD claimants can claim no proprietary interest in the property of the metal remaining in the Fund.

C.  The "Return of Metal" and "Consignment" Creditors

The return of metal and consignment creditors delivered metal to Delta for refining. After refining, Delta was obliged to return either the specific quantity of purified metal contained within the material delivered, or alternatively, a proportionate share of the specific bulk of pure metal into which the raw material was refined, less charges for the refining process.

These creditors assert that property in the metal which they delivered to Delta never passed to Delta. Delta obtained possession of the material, they contend, only so far as necessary to refine it to a pure product. The relationship, they submit, was one of bailment or trust. If this submission is correct, the ROM and CC claimants would be entitled to priority to the metal held by the receiver over the PCB, CAR and HOD creditors.

A bailment arises only where there is a delivery of property on the basis that the same property will be returned. Its form may be altered, but it must be the same property. Thus where the material delivered is mixed with other material, on the basis that an equivalent quantity of the same type of material will be returned, the contract is one of sale, not bailment: Crawford v. Kingston and Johnston (1952) O.R. 714; South Australian Ins. Co. v. Randell, [1886] 3 L.R.P.C. 101. (The facts are distinguishable from those in Busse v. Edmonton Grain & Hay Co. Ltd., *[1932] 1 W.W.R. 296* (B.C.c.A.), where no intermixing was contemplated and there was a right to return the identical grain and, the grain was not to be consumed).

These principles negate the claim that Delta was merely a bailee with property remaining with the creditors. The refining process necessarily involved the intermixing of metal derived from various customers together with Delta's own metal. The final product was indistinguishable as to source, and was treated as such in Delta's accounting and inventory systems. All the ROM and CC customers bargained for was the return of a certain amount of equivalent metal in kind - not the same property they turned over to Delta.

In the alternative, the Return of Metal and Consignment creditors claim metal from the Fund on the ground that it is impressed by a trust in their favour.

In order for a trust to arise, Delta must be found to have stood in the position of fiduciary to the ROM and CC creditors (Waters, The Law of Trusts, (2ed) (1984) at p. 10). The concept of fiduciary duty does not lend itself to a simple definition because of the diversity of situations in which such a relationship may be found. As Dickson, J. (as he then was) stated in Guerin v. The Queen (1984) 13 D.L.R. (4th) at p. 341:

> It is the nature of the relationship, not the specific category of action involved that gives rise to the fiduciary duty. The categories of fiduciary, like those of negligence should not be considered closed: see Laskin v. Bache & Co. Inc. (1971), 23 D.L.R. (3d) 785 at 392, *[1972] 1 O.R. 465* (C.A.); Goldex Mines Ltd. v. Revill et al. *(1974), 54 D.L.R. (3d) 672* at 680, 7 O.R. 216 (C.A.) at 224.

Although it may be impossible to achieve a definition of fiduciary duty which is at once precise and universally applicable, certain concepts are fundamental in determining whether a fiduciary relationship exists in a given case. First, a fiduciary has a duty to act in the best interests of another, and not in his own: (Midcon Oil & Gas v. New Br. Dom. Oil Co. *(1958), 12 D.L.R. (2d) 705* (S.C.C.); Evans v. Anderson *[1977] 2 W.W.R. 385* (Alta. C.A.); Can. Aero. Service Ltd. v. O'Malley *(1974), 40 D.L.R. (3d)*

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

*371* (S.C.C.)). Second, the term "fiduciary" imports a duty of loyalty: Waters, The Law of Trusts in Canada, (2ed) (1984) at 33; see also Shepherd, The Law of Fiduciaries (1981), at p. 45 et seq. Third, a fiduciary relationship involves scope for the fiduciary's unilateral exercise of power or discretion effecting the beneficiary's legal or practical interest, as a consequence of which the beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary: see Frame v. Smith *(1987) 42 D.L.R. (4th) 81*, per Wilson, J. dissenting.

Finally, an arms-length commercial contractual relationship generally does not give rise to a fiduciary duty. Although certain categories of contractual relationship have historically been regarded in law as being of fiduciary character (such as solicitor/client, principal/agent, partner-to-partner, etc.), the courts have not ordinarily found a fiduciary relationship between businessmen who enter into cormercial dealings at arms length, even if the contract creates continuing obligations between them, including a duty to act in a certain manner: Jirna Ltd. v. Mister Donut of Canada Ltd. *(1972), 22 D.L.R. (3d) 639* (Ont. C.A.), aff'd *(1973) 40 D.L.R. (3d) 303* (S.C.C); Hospital Products231 Ltd. v. U.S. Surgical Corporation (1984), 58 A.L.J.R. 587 (High Ct. of Aust.); International Corona Resources Ltd. v. Lac Minerals Ltd. *(1987), 62 O.R. (2d) 1*. Gibbs, C.J. Australia in Hospital Products, supra, at p. 597 put this proposition as follows:

> On the other hand, the fact that the arrangement between the parties was of a purely commercial kind and that they had dealt at arm's length and on an equal footing has consistently been regarded by the court as important, if not decisive, in indicating no fiduciary duty arose.

In the case at bar, Delta gave no undertaking to act in the best interests of the creditors who delivered metal to it for refining. It owed them no duty of loyalty. It was entitled to use the metal as it chose without accounting to the creditors, its only obligation being to ultimately deliver a specific quantity of metal to them pursuant to its contract with them. Delta's relationship with these creditors was defined by an arm's length commercial contract. The relationship did not fall within any of the classes of special contracts to which the law assigns a higher duty. The relationship was simply one of contract for the sale or exchange of goods. Delta assumed no higher duty than the commercial duty set out in the contract.

I conclude that Delta was not the fiduciary of the Return of Metal and Consignment creditors, and that their claim in trust must fail. But if were wrong in that conclusion there is a further bar to the claim of the Return of Metal and Consignment creditors. For a trust to be enforceable, the property originally impressed with the trust must be traceable. Courts of equity have always been acute to distinguish trust funds and will trace them however much their character or nature may be altered, provided the property which is claimed can be clearly identified as the fruit of the trust property. Conversely, no trust can be enforced if the trust property cannot be identified or traced into some specific fund or thing: Re: C.A. Macdonald and Company Limited (in Bankruptcy (1958), 26 W.W.R. 116 at p. 12 (Alta. S.C.). When a beneficiary seeks to trace his property, he must be able to follow step by step the course of the property through whatever transformation occurred: Br. Can. Securities Ltd. v. Martin, *[1917] 1 W.W.R. 1313*, *27 Man. R. 423*. It is essential that he show that his property is actually or notionally part of the property he seeks to trace. Thus if he seeks to trace funds into purchases, the claimant must show that his monies were in the account when the purchase was made: Br. Can. Securities v. Martin, supra.

The return of metal and consignment creditors can establish that their metal went into Delta's operations. Thereafter, however, their metal lost its identity. it is impossible to say that the metal which the receiver now holds - the bars found in the vault and the proceeds of clean-up contain, actually or notionally, any particular customer's metal. It is equally possible that a particular customer's metal was incorporated in bars that were sold or used in speculation, as in the bars which remained in the vault. In short, the customers who brought their metal to Delta for refining cannot trace their metal to the metal which the receiver now holds. It follows that the principles of trust law cannot assist it.

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

IV.  Conclusion

None of the five categories of claimants are able to assert a proprietory right in the metal held by the receiver. There is thus no legal basis on which to distinguish the various categories of claimants from each other. The fund of precious metal on hand should be distributed o rata amongst the five categories of claimants.

McLACHLIN C.J.S.C.

---

**End of Document**