John E. Mitchell (*Admitted Pro Hac*)  
Yelena Archiyan (*Admitted in New York*)  
AKERMAN LLP  
2001 Ross Avenue, Ste. 3600  
Dallas, TX  75201  
Tel.: (214) 720-4300  
Fax: (214) 981-9339  

Andrea S. Hartley (*Admitted Pro Hac*)  
Joanne Gelfand (*Admitted in New York*)  
Katherine C. Fackler (*Admitted Pro Hac*)  
AKERMAN LLP  
98 Southeast Seventh Street, Ste. 1100  
Miami, FL 33131  
Tel.: (305) 374-5600  
Fax: (305) 374-5095  

*Counsel for Debtors and Debtors in Possession*

Michael Luskin  
Stephan E. Hornung  
Alex Talesnick  
LUSKIN, STERN & EISLER LLP  
Eleven Times Square  
New York, New York 10036  
Tel.: (212) 597-8200  
Fax: (212) 974-3205  

*Counsel for the Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| MIAMI METALS I, INC., *et al.*,[1] ) | Case No. 18-13359 (SHL) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| ) | |

**DEBTORS' AND THE SENIOR LENDERS' JOINT STATEMENT OF MUTUAL UNDISPUTED FACTS PURSUANT TO S.D.N.Y. LOCAL BANKR. RULE 7056-1**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38 Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

48661240;1

Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation) and its affiliated debtors and debtors-in-possession as defined below (collectively, the "Debtors") in the above-captioned chapter 11 cases and Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and, together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the "Senior Lenders"), submit this statement of mutual undisputed facts pursuant to S.D.N.Y. Local Bankruptcy Rule 7056-1 in support of their Joint Motion for Summary Judgment as to Bucket 1 Customers.

**A.    The Chapter 11 Cases**

1.    On November 2, 2018, Debtors Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), Miami Metals II, Inc. (f/k/a Republic Metals Corporation), and Miami Metals III LLC (f/k/a Republic Carbon Company, LLC) each filed voluntarily petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), initiating these Chapter 11 Cases. [ECF No. 1]. On November 21, 2018, Miami Metals VIII LLC (f/k/a Republic High Tech Metals, LLC), Miami Metals VI LLC (f/k/a RMC Diamonds, LLC), Miami Metals VII LLC (f/k/a RMC2, LLC), Miami Metals IV LLC (f/k/a J & L Republic LLC), Miami Metals V LLC (f/k/a R & R Metals, LLC), Republic Trans Mexico Metals, S.R.L., and Republic Metals Trading (Shanghai) Co., Ltd. filed voluntarily petitions for relief under the Bankruptcy Code, initiating their Chapter 11 Cases. (The petition dates of November 2, 2018 and November 21, 2018 shall be collectively referred to hereafter as the "Petition Date").

2.    The Debtors are debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

2

3. On November 19, 2018, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors in these cases. [ECF No. 113].

4. On March 7, 2019, the Debtors closed on the sale of substantially all of their assets to Asahi Holdings, Inc. ("Asahi") [ECF No. 713]. The Debtors are continuing to liquidate their remaining physical assets. [ECF Nos. 219, 286, 358, and 563].

**B.  The Senior Lenders' Relationship with the Debtors**

5. As of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) over $177 million by the Debtors under certain credit agreements, master netting agreements and lease agreements (collectively, the "Credit and Lease Agreements").[2] First Interim Order (as defined below), ECF No. 54 at Schedule 2. The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including the Debtors' inventory and the proceeds thereof (other than Debtors Republic Metals Trading (Shanghai) Co., Ltd. and Republic Trans Mexico Metals, S.R.L.). Id. at ¶ F(vi).

6. The Senior Lenders are parties to that certain Second Amended and Restated Intercreditor Agreement, dated February 19, 2016 (as amended from time to time the "Intercreditor Agreement"), which governs the respective rights and interests of the Senior Lenders in the assets of Debtor Miami Metals II, Inc. (f/k/a Republic Metals Corporation ("RMC"). Id. at ¶ F(iii). RMC executed the Intercreditor Agreement. Id.

**C.  The Interim Cash Collateral Orders and the Ownership Disputes**

7. On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to*

---

[2] The Credit and Lease Documents are listed on Schedule 1 to the Initial Cash Collateral Motion.

*the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "Initial Cash Collateral Motion") [ECF No. 10].

8.      On November 8, 2018, the Court entered its first *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503 and 507 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "First Interim Order") [ECF No. 54].

9.      Pursuant to the First Interim Order, among other things, the Senior Lenders consented to the Debtors' use of their cash collateral to fund the costs and expenses of administering the chapter 11 cases, and the Senior Lenders were granted superpriority claims and adequate protection liens on substantially all of the Debtors' assets to protect against any diminution in value of their collateral. Id. at ¶ 8(b).

10.     On November 13, 2018, the Debtors and the Senior Lenders filed the *Joint Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* (together with the Initial Cash Collateral Motion, the "Cash Collateral Motion") [ECF No. 78]. The Court subsequently entered five additional interim cash collateral orders (collectively, the "Interim Cash Collateral Orders") [ECF Nos. 277, 373, 538, 675 and 864].

11.     Numerous customers and/or suppliers of the Debtors (the "Customers") objected to the Cash Collateral Motion and the Inventory Payments on the basis that the Debtors' inventory and its cash proceeds (the "Disputed Assets") belonged to the Customers and were not property of the Debtors' bankruptcy estates, giving rise to the current disputes concerning the ownership of the Disputed Assets (the "Ownership Disputes"). Following extensive negotiations among the Debtors, the Senior Lenders, and the Customers, the Court entered an Order Approving Uniform

4

Procedures for Resolution of Ownership Disputes ("Uniform Procedures Order) [ECF No. 395].[3]

### D. The Uniform Procedures

12. The Debtors reviewed more than 50 Statements of Claimed Ownership and Claims ("Customer Statements") filed by the Customers pursuant to the Uniform Procedures Order. The Senior Lenders and the Debtors filed their responses to the Customer Statements on February 18, 2019 and February 19, 2019, respectively [ECF Nos. 637, 648], after which more than 20 Customers filed an amendment and/or supplement to their Customer Statement.

13. At the March 21, 2019 status conference, the Debtors and the Senior Lenders identified several buckets of customers and legal issues and proposed a briefing schedule as to two buckets of claims that can be adjudicated as a matter of law. The Court set a briefing deadline for the Debtors and Senior Lenders to brief the legal issues relating to the Bucket 1 Customers. The Court also permitted briefing on Bucket 2, but cautioned that this would depend on how many settlements the Debtors and Senior Lenders would be able to negotiate with Customers in Bucket 2 ("Bucket 2 Customers"). The Debtors and Senior Lenders have resolved, subject to Court approval, all but one claim of a Bucket 2 Customer which is less than $20,000.[4] The Court set aside May 20, 2019 and May 21, 2019 for oral argument on the Bucket 1 and (possibly) Bucket 2 legal issues.

14. Discovery is ongoing under the Amended Uniform Procedures Order.

### E. The Debtors' Refining Process

15. Prior to the Petition Date, the Debtors refined precious metals, primarily gold and

---

[3] On April 15, 2019, the Court entered a First Amended Order Approving Uniform Procedures for Resolution of Ownership Disputes ("Amended Uniform Procedures Order") [ECF No. 913].

[4] The Debtors and the Senior Lenders are attempting to obtain the consent of this customer to enlarge the time for them to file a brief. Alternatively, the Debtors and Senior Lenders will seek court approval to stay the briefing as to the Bucket 2 Customers.

silver. Declaration of Scott Avila, as Chief Restructuring Officer, in Support of Joint Motion for Summary Judgment (the "Avila Decl.") ¶ 5. Customers from all over the United States and the Western Hemisphere shipped unrefined material, primarily containing gold and silver, to the Debtors for refining. Id. The Debtors refined this material and produced refined silver and gold bars and casting grains. Based on demand, the refined gold and silver was either sold or sent to the mint for the production of "value added" minted and casted products of various designs and sizes. Id.

16. Following the final assays for the raw materials delivered to the Debtors, the precious metal content of each shipment was finalized. Remaining balances known as "pool balances" were paid to customers on an agreed upon settlement date or when the customer requested payment. Id. at ¶ 6. The customers, including Bucket 1 Customers, could elect that the Debtors make payment for raw materials either by check or wire transfer or the issuance of a "metal credit" to the customer's designated "Loco London" metal account, less, in each case, applicable refining and/or retention charges. Id. The customers could also request payment in the form of refined metal of like kind and quantity. Customers could request an "advance" payment on a shipment. The Debtors typically paid advances in an amount equal to approximately 95% to 98% of the estimated metal value of the applicable shipment in one or more payments of metal credits or U.S. dollars, less refining and/or retention charges. Id.

17. After raw materials were received by the Debtors, they were assigned lot numbers, weighed, melted, sampled for assay testing and put into the refining process, generally on the same day. Id. at 7. With the exception of Peace of Mined™ customers (discussed below), during the refining process the individual customer lots were commingled with other customer lots. During the refining process the commingled lots were further commingled with "clean up bars" (i.e.,

6

residual material that comes out of the refining process) to create "house bars," which were then put through various additional refining processes, including the dissolving of the material. Id. The dissolve process was a procedure by which material was dissolved in acid to create a solution, analogous to dissolving sugar in hot water (the "Dissolution Process"). Id. The refining process produced metal billets, bars, and sacks of grain that each weighed approximately fifty pounds (the "Refined Product"). The Refined Product was then transferred to the vault and then sold or transferred to the mint for the production of various minted products, coins, cast bars, etc. (the "Minted Products"). Id.

18. The Debtors could not identify the raw materials delivered by customers after they were commingled with other lots for refining and during and after the Dissolution Process. Nor, could the Debtors identify what raw materials or lots were included in Refined Product or Minted Product. Id. at ¶ 8.

### F. The Debtors' Peace of Mined™ Program

19. As advertised on the Debtors' website, the Debtors offered a "Peace of Mined" service to Customers for traceable closed-circuit single-batch refining at an additional cost. Avila Decl. ¶ 9.[5] Customers paying for the Peace of Mined service could ensure that their metals were never commingled at any point during the refining process. Id. The Peace of Mined Terms provide, in pertinent part:

> In order to create a 100% traceable product, Republic Metals' Peace of Mined™ refining circuit uses a proprietary process that allows for batch refining. Unlike electrolytic refining, batch refining allows for material to freshly enter a clean circuit during the refining process, and at no point come in contact with any other-sourced metal. In the Peace of Mined™ refining circuit, the designated material is the only material present, and all of that material is removed at termination of the process, so there are no leftovers

---

[5] Following the closing of the sale of substantially all of the Debtors' assets to Asahi, the former RMC website is no longer available. A copy of the Peace of Mined Terms is attached to the Avila Declaration as Exhibit A.

7

48661240;1

in the circuit−it can in no way be commingled with metal originating from other sources.

Id.

20. None of the Bucket 1 Customers elected or paid for the Peace of Mined service. Id. at ¶ 10.

## G. The Debtor's Standard Terms and Conditions

21. As part of the Debtors' new customer onboarding process, the Debtors had a practice of having each new customer execute their Standard Terms (as defined below). Avila Decl. ¶ 11.

22. Sixteen of the Bucket 1 Customers executed the Standard Terms and General Operating Conditions of RMC ("RMC Standard Terms"). Id. at ¶ 12. Six of the Bucket 1 Customers executed the Standard Terms and General Operating Conditions of $RMC^2$ ("$RMC^2$ Standard Terms" and together with RMC Standard Terms, the "Standard Terms").[6] Id.

23. The Debtors' Standard Terms govern the relationship between the Debtors and the Bucket 1 Customers and evidence a purchase and sale relationship. True and correct copies of the governing Standard Terms executed by the Bucket 1 Customers are attached to the Avila Declaration as Composite Exhibit D. A schedule listing the version (RMC Standard Terms or $RMC^2$ Standard Terms) executed by Bucket 1 Customers is attached to the Avila Declaration as Exhibit E. A schedule of Bucket 1 Customers that have not produced an executed copy of the Standard Terms is attached to the Avila Declaration as Exhibit F. The Debtors have been unable to locate an executed copy of Standard Terms for these customers.

---

[6] The RMC Standard Terms and the $RMC^2$ Standard Terms were available on the Debtors' website until the sale of substantially all of the Debtors' assets to Asahi and the closing of the website. All references to the Debtors' Standard Terms are to the RMC most recent Standard Terms and, for ease of reference, are attached to the Avila Declaration as Exhibit B. A copy of the $RMC^2$ Standard Terms is attached to the Avila Declaration as Exhibit C.

48661240;1

24. The Standard Terms provide as to pool account metal balances that it is merely a ledger and if metals are returned to a customer, the returned metals will be "like kind" metals from "common inventory," specifically providing as follows:

> ***A pool account is a ledger*** account representing the amount of returnable metal owed to Customer (if account reflects a positive balance), or the amount of metal owed to RMC (if the account reflects a negative balance). Precious metals are fungible; therefore any unit of material is equivalent to another of like kind, i.e. similar quality and/or value, and is deemed adequate payment for purposes of outstanding Pool Accounts. ***Returnable metal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable metal; rather it represents a future obligation of RMC to return common inventory of gold, silver, platinum, palladium, or platinum group metals***.  RMC reserves the right to return precious metals to Customer of like kind representing the ounces of precious metals owed to Customer.

RMC Standard Terms at 3, Avila Decl. at Ex. B (emphasis added).

25. The Standard Terms are binding on the Bucket 1 Customers, clearly providing that:

> Unless otherwise stipulated, these Standard Terms and General Operating Conditions "Standard Terms" are applicable to transactions and/or contracts between Republic Metals Corporation, "RMC", and Customer. "Customer" is defined as any business, corporation, company, person, entity, or anyone else transacting business with RMC in any manner whatsoever. Any contract or agreement entered into between Customer and RMC will operate as if the terms represented in these Standard Terms were made expressly a part thereof. ***RMC's Standard Terms is the governing document with respect to any and all business dealings between RMC and Customer and shall override any and all provisions, terms, and stipulations in Customer purchase orders, sales orders and/or any other Customer documents.*** RMC's failure to object to any terms, provisions, and/or stipulations represented in any Customer documents that are at variance with RMC's Standard Terms shall not be deemed a waiver of the terms and conditions contained herein.

Id. at 1, Avila Decl. at Ex. B (emphasis added).[7]

26. The Standard Terms are binding on all Bucket 1 Customers upon receipt and

---

[7] The RMC[2] Standard Terms contain a substantially identical provision.  See RMC[2] Standard Terms at 8.

9

48661240;1

provide as follows: "[d]elivering material or doing business with RMC after having received the Standard Terms . . . deems that I have agreed to accept the Terms and General Operating Conditions contained herein regardless of whether I have signed [the Standard Terms]." Id. at 4, Avila Decl. at Ex. B.[8]

27.     The Standard Terms demonstrate the nature of the Debtors and the Bucket 1 Customers' relationship as buyer and seller as follows:

- Warranty of Title: "Customer warrants to RMC that *it has good and marketable title* to said property, full authority *to sell and transfer* said property, and that *said property is sold* free of all liens, encumbrances, liabilities, and adverse claims of every nature and description whatsoever." Id. at 1 (emphasis added).[9]

- Indemnity: "Customer further warrants to RMC that it will fully, defend, protect, indemnify, and hold harmless RMC and its lawful successors and assigns from any adverse claim thereto." Id.[10]

- Risk of Loss: "Risk of loss of material will pass from Customer to RMC upon delivery to and acceptance at RMC's refinery, unless otherwise agreed." Id.[11]

- Refining Charges: "All RMC [refining] charges are payable upon the rendering of an invoice. . . . Until such time, *RMC shall be deemed to retain title* to and a security interest in all material covered by any RMC invoice to secure the payment of the same." RMC Standard Terms at 2 (emphasis added).

- RMC Purchases:

    o    "Customer warrants that any *purchase or sale contract* has been effectuated by Customer for the sole purpose of securing pricing *for the ultimate sale or purchase of precious metals* and has not been made for any speculative reason whatsoever." Id. at 3 (emphasis added).

    o    "By agreeing to the terms and conditions contained herein, and receiving an e-mail confirming the details of Customer's trade, *Customer agrees that he has entered into a written, legally binding contract for the sale/purchase of precious metals* contained within the confirmation e-mail. *Customer further warrants that said contract is in compliance with the Florida*

---

[8] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 13.

[9] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 8.

[10] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 8.

[11] The RMC[2] Standard Terms contain a substantially identical provision. See RMC[2] Standard Terms at 8.

10

48661240;1

> *Uniform Commercial Code § 672.201, § 668.003 (4) and § 668.004 and agrees to waive any defenses under Florida Uniform Commercial Code § 672.201.*" Id. at 3-4 (emphasis added).[12]

- Parties: "***Both Parties agree that they are merchants as defined in the Uniform Commercial Code § 2-104(1)***." Id. at 4, Avila Decl. at Ex. B (emphasis added).[13]

28. The Debtors also consigned metals to customers. The Standard Terms address these consignments and describe the relationship as a "consignment/bailment," specifically addressing title and stating that the consigned property remains property of the Debtors as follows:

> It is expressly agreed upon by both parties that any and all material shipped to Customer, and/or delivered to Customer, and/or released to customer on a ***consignment/bailment basis remains property of RMC*** . . . . ***Customer does not have legal title to such property*** . . . .")

Id. at 3, Avila Decl. at Ex. B (emphasis added).

29. Finally, the Standard Terms contain a broad integration clause as follows:

> Integration: This instrument contains the entire agreement between the parties relating to the rights granted and the obligations assumed, and incorporated all representations or modifications concerning this instrument whether arising from any usage or trade, course of dealing, accepted industry practice, course of performance, evidence of consistent additional terms, or otherwise.

Id. at 4, Avila Decl. at Ex. B [14]

30. In addition to the Debtors' customary practice of having all new customers execute the Standard Terms, each metal report, invoice, sale/purchase order and other transaction confirmation issued by the Debtors also expressly stated that it was subject to the Standard Terms and included a reference to the versions posted on the Debtors' website. Avila Decl. ¶ 13.

---

[12] The RMC² Standard Terms contain a substantially identical provision. See RMC² Standard Terms at 10.

[13] The RMC² Standard Terms contain a substantially identical provision. See RMC² Standard Terms at 12.

[14] The RMC² Standard Terms contain a substantially identical provision. See RMC² Standard Terms at 12.

11

Dated: New York, New York
      April 19, 2019

Respectfully submitted,

**LUSKIN, STERN & EISLER LLP**

*/s/ Michael Luskin*
Michael Luskin
Stephan E. Hornung
Alex Talesnick
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

**AKERMAN LLP**

*/s/ John E. Mitchell*
John E. Mitchell (*Admitted Pro Hac*)
Yelena Archiyan (*Admitted in New York*)
2001 Ross Avenue, Suite 3600
Dallas, TX 75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Admitted Pro Hac*)
Joanne Gelfand (*Admitted in New York*)
Katherine C. Fackler (*Admitted Pro Hac*)
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

*Counsel for Debtors and Debtors-in-Possession*

48661240;1