John E. Mitchell (*Admitted Pro Hac*)
Yelena Archiyan (*Admitted in New York*)
AKERMAN LLP
2001 Ross Avenue, Ste. 3600
Dallas, TX 75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Admitted Pro Hac*)
Joanne Gelfand (*Admitted in New York*)
Katherine C. Fackler (*Admitted Pro Hac*)
AKERMAN LLP
98 Southeast Seventh Street, Ste. 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

*Counsel for Debtors and Debtors in Possession*

Michael Luskin
Stephan E. Hornung
Alex Talesnick
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIAMI METALS I, INC., *et al.*,[1] | ) | Case No. 18-13359 (SHL) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS AND THE SENIOR LENDERS'**
**JOINT MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION**
**FOR SUMMARY JUDGMENT AS TO BUCKET 3, 4 AND 5 CUSTOMERS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38 Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

    A.    The Chapter 11 Cases .......................................................................... 4

    B.    The Senior Lenders' Relationship with the Debtors ............................ 4

    C.    The Cash Collateral Motion, the Interim Cash Collateral Orders and the Ownership Dispute ............................................................................ 5

    D.    The Debtors' Refining Process ............................................................ 6

    E.    The Peace of Mined Program .............................................................. 9

    F.    The Contract Customer Agreements ................................................. 10

        1.    The Bucket 3 Agreements ..................................................... 10

        2.    The Bucket 4 Agreements ..................................................... 12

        3.    The Bucket 5 Agreements ..................................................... 12

        4.    The RMC Standard Terms ..................................................... 13

JURISDICTION AND VENUE ........................................................................................ 13

LEGAL STANDARD AND GOVERNING LAW ............................................................ 14

    A.    Summary Judgment Standard ........................................................... 14

    B.    Governing Law .................................................................................. 15

    C.    Contract Interpretation Principles ..................................................... 16

ARGUMENT ..................................................................................................................... 17

I.    THE CONTRACT CUSTOMER AGREEMENTS CLEARLY AND UNAMBIGUOUSLY EVIDENCE THAT THE DISPUTED ASSETS ARE PROPERTY OF THE DEBTORS' BANKRUPTCY ESTATES ................................... 17

    A.    The Contract Customer Agreements Are Agreements for the Sale of Future Goods .................................................................................... 18

        1.    Compania Minera Pitalla and Minera Real de Oro (Argonaut) ............... 19

        2.    Nusantara de Mexico S.A. de C.V. and Primero Empresa Minera, S.A. de C.V. (First Majestic) .................................................. 22

        3.    Pretium Exploration Inc. ........................................................ 25

        4.    Coeur Mexicana S.A. de C.V. and Coeur Rochester, Inc. (Coeur) .......... 28

            (i)    Coeur Mexicana .......................................................... 28

49262387;1

|  |  | (ii) | Coeur Rochester...................................................................... 29 |
|  |  | (iii) | Coeur Customer Statement ......................................... 30 |
|  | 5. | Yamana Gold Inc. .................................................................. 32 |
|  | 6. | Premier Gold Mines Limited .................................................. 35 |
|  | 7. | Minas de Oroco ..................................................................... 37 |

B.    The Standard Terms Confirm the Parties' Intent to Enter into Purchase and Sale Contracts ......................................................................... 38

C.    Extrinsic Evidence of Unincorporated Documents, Course of Dealing and Subjective Intent Is Inadmissible ........................................ 39

D.    Title to the Materials Passed to the Debtors No Later than Delivery .................. 41

    1.    Title Passed to the Debtors in Accordance with the Bucket 3 Agreements upon Delivery to an Armored Car Service or to the Debtors' Refinery ...................................................................... 41

    2.    Title to the Doré Passed to the Debtors Under the Bucket 4 and 5 Agreements No Later than Delivery to the Debtors ................................ 42

II.    NO CONTRACT CUSTOMER CAN ESTABLISH A BAILMENT ............................. 47

A.    The Proper Test for Determining Sale or Bailment Is Whether the Identical Article Delivered Is to Be Returned in the Same or Some Altered Form ................................................................................ 47

B.    The Debtors Were Not Required to Return the Identical Article Delivered by the Contract Customers in the Same or Some Altered Form and Did Not Do So ................................................................................ 50

C.    Article 7 of the Uniform Commercial Code Is Inapplicable................................ 53

D.    None of the Cases Cited by the Contract Customers Requires a Different Result ................................................................................ 55

III.    THE CONTRACT CUSTOMERS' OTHER CLAIMS FAIL AS A MATTER OF LAW ................................................................................ 59

A.    The Contract Customers' Conversion Claims Fail as a Matter of Law ................ 59

B.    There Is No Basis to Impose a Constructive Trust ............................... 59

CONCLUSION ................................................................................ 61

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*American Dredging Co. v. Plaza Petroleum, Inc.*,
   799 F. Supp. 1335 (E.D.N.Y. 1992) ...................................................................40

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................14

*B.A. Ballou and Company, Inc. v. Citytrust*,
   591 A.2d 126 (Conn. 1991) ......................................................................... passim

*Barnett v. Jamesway Corp. (In re Jamesway Corp.)*,
   235 B.R. 329 (Bankr. S.D.N.Y. 1999)...............................................................44

*BG Checo Int'l Ltd. v. British Columbia Hydro & Power Auth.*,
   1 S.C.R. 12 (Can.) (1993) ............................................................................16, 17

*Bianco v. Erkins (In re Gaston & Snow)*,
   243 F.3d 599 (2d Cir. 2001).............................................................................15

*C.W.B. Enterprises, Inc. v. K.A.T. Equipment Corp.*,
   449 So. 2d 354 (Fla. 3d DCA 1984) .................................................................47

*Cartaya v. Coastline Distribution*,
   937 So. 2d 700 (Fla. 1st DCA 2006) .................................................................14

*Castetter v. Henderson*,
   113 So. 3d 153 (Fla. 5th DCA 2013) .................................................................58

*Chisholm v. Eagle Ore Sampling Co.*,
   144 F. 670 (8th Cir. 1906) .................................................................................48

*City of Homestead v. Johnson*,
   760 So. 2d 80 (Fla. 2000)..................................................................................16

*Coro (Canada) Inc. (Trustee of) v. Enthone-OMI (Canada) Inc.*,
   O.J. No. 4704, 36 O.R. (3d) 563 (1997) ...........................................................57

*Crouch Supply Co. v. Piknik Prods. Co., Inc. (In re Piknik Prods. Co., Inc)*,
   346 B.R. 863 (Bankr. M.D. Ala. 2006)..............................................................43

*De Luca v. De Luca*,
   300 A.D.2d 342 (2d Dep't 2002) .......................................................................16

*Delta Smelting & Refining Co. (Re)*,
   B.C.J. No. 2532, 33 B.C.L.R. (2d) 383 (1988) .............................................. passim

*Diamond "S" Dev. Corp. v. Mercantile Bank*,
    989 So. 2d 696 (Fla. 1st DCA 2008) ....................................................................58

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*,
    No. 07 Civ. 9580 (HB), 2008 WL 594773 (S.D.N.Y. Mar. 5, 2008) ......................44

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*,
    No. 07 Civ. 9580 (HB), 2009 WL 89115 (S.D.N.Y. Jan. 14, 2009)........................44

*Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.)*,
    639 F.2d 1213 (5th Cir. 1981) ...............................................................................56

*Eli Lilly & Co. v. Novopharm Ltd.*,
    2 S.C.R. 129, para. 54 (Can.) (1998) .....................................................................16

*Elmaleh v. B.H. Old & Co.*,
    28 N.Y.S.2d 44 (App. Term 1st Dep't 1941)..........................................................30

*Friedman v. Virginia Metal Prods. Corp.*,
    56 So. 2d 515 (Fla. 1952).......................................................................................14

*General Motors Corp. v. Bristol Indus. Corp. (In re Bristol Indus. Corp.)*,
    No. 2-81-0512, 1981 Bankr. LEXIS 5204 (Bankr. D. Conn. Dec. 14, 1981) ..................48, 56

*Gibney v. Pillifant*,
    32 So. 3d 784 (Fla. 2d DCA 2010) ........................................................................15

*GMAC Bus. Credit, L.L.C. v. Ford Motor Co.*,
    100 Fed. App'x 404 (6th Cir. 2004) .......................................................................57

*Greenfield v. Philles Records*,
    98 N.Y.2d 562 (2002) .....................................................................................14, 16

*Herrington v. Verrilli*,
    151 F. Supp. 2d 449 (S.D.N.Y. 2001).....................................................................46

*In re Aleris Int'l, Inc.*,
    456 B.R. 35 (Bankr. D. Del. 2011) .........................................................................42

*In re Delta Smelting & Refining Alaska, Inc.*,
    53 B.R. 877 (Bankr. D. Alaska 1985)......................................................................59

*In re Enron Corp.*,
    No. 01-16034 (AJG), 2003 Bankr. LEXIS 2262 (Bankr. S.D.N.Y. 2003)..............55

*In re Handy & Harman Ref. Group, Inc.*,
    266 B.R. 24 (Bankr. D. Conn. 2001) ......................................................................59

iv

*In re J. Adrian Sons, Inc.*,
  205 B.R. 24 (Bankr. W.D.N.Y. 1997) ...................................................................42

*In re Landy Beef Co.*,
  30 B.R. 19 (Bankr. D. Mass. 1983) .....................................................................53

*In re Medomak Canning Co.*,
  No. BK 75-936, 1977 Bankr. LEXIS 11 (Bankr. D. Me. 1977) ...........................55

*Ivey v. Wilson (In re Payne)*,
  No. 05-2118, 2006 WL 3524442 (Bankr. M.D.N.C. Dec. 6, 2006) ......................43

*Jacobson v. Neuensorger Korbwaren-Industrie Friedrich Kretz, K.-G.*,
  109 So. 2d 612 (Fla. 3d DCA 1959) ...................................................................30

*Kantner v. Boutin*,
  624 So. 2d 779 (Fla. 4th DCA 1993) ..................................................................40

*Kass v. Kass*,
  91 N.Y.2d 554 (1998) ........................................................................................17

*Katel Ltd. Liab. Co. v. AT & T Corp.*,
  607 F.3d 60  (2d Cir. 2010)................................................................................16

*King v. Bray*,
  867 So. 2d 1224 (Fla. 5th DCA 2004) ................................................................16

*Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC)*,
  475 B.R. 9 (S.D.N.Y. 2012) ...............................................................................14

*Landmark Am. Ins. Co. v. Pin-Pon Corp.*,
  155 So. 3d 432 (Fla. 4th DCA 2015) ..................................................................16

*Monroe Sys. for Bus., Inc. v. Intertrans Corp.*,
  650 So. 2d 72 (Fla. 3d DCA 1994) .....................................................................46

*Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.)*,
  407 B.R. 65 (Bankr. D. Vt. 2009) .......................................................................42

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996)...............................................................................40

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
  781 F.3d 1245 (11th Cir. 2015) ..........................................................................58

*Powder Company v. Burkhardt*,
  97 U.S. 110 (1878)............................................................................................46

49262387;1

*Public Service Electric & Gas Co. v. Federal Power Commission*,
    371 F.2d 1 (3d Cir. 1967)......................................................................................54, 55, 56, 57

*Riddle Farm Equip., Inc. v. Boles (In re Boles)*,
    Nos. 03-53196C-7W, 04-6027, 2004 WL 3510119 (Bankr. M.D.N.C. Oct. 29,
    2004) ........................................................................................................................................43

*RJE Corp. v. Northville Indus. Corp.*,
    329 F.3d 310 (2d Cir. 2003)....................................................................................................14

*S & H Communs., Inc. v. Seiscor Techs., Inc.*,
    221 A.D.2d 156 (1st Dep't 1995) ...........................................................................................44

*Schron v. Troutman Sanders LLP*,
    986 N.E.2d 430 (N.Y. 2013)....................................................................................................16

*Sitkin v. R-One Alloys, Inc.*,
    No. PB 04-0495, 2006 WL 625273 (R.I. Super. Ct. Mar. 13, 2006)............................... passim

*Staaldam Beheer B.V. v. ASAP Installations, LLC*,
    No. 8:09-CV-02226-T-17EAJ, 2010 WL 1730780 (M.D. Fla. Apr. 28, 2010)......................45

*State Farm Mut. Auto. Ins. Co. v. Mashburn*,
    15 So. 3d 701 (Fla. 1st DCA 2009) ........................................................................................17

*Sturm v. Boker*,
    150 U.S. 312 (1893)..................................................................................................................46

*Subaru Distributors Corp. v. Subaru of Am., Inc.*,
    No. 98 CIV. 5566, 2002 WL 188473 (S.D.N.Y. Feb. 5, 2002)........................................43, 44

*Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*,
    377 F.3d 209 (2d Cir. 2004)....................................................................................................58

*Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*,
    253 B.R. 503 (Bankr. S.D.N.Y. 2000) ...................................................................................58

*TL Admin. Corp v. Ideasphere, Inc. (In re TL Admin. Corp.)*,
    337 B.R. 827 (Bankr. S.D.N.Y. 2006) ...................................................................................14

*U.S. v. Chowaiki*,
    369 F. Supp. 3d 565 (S.D.N.Y. 2019)....................................................................................44

*United States v. Fleet Nat'l Bank (In re Handy and Harman Refining Group,
    Inc.)*,
    271 B.R. 732 (Bankr. D. Conn. 2001) ..............................................................................56, 57

vi

*W.W.W. Assocs. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ..............................................................................................16

*Welding Metals Inc. v. Foothill Capital Corp.*,
    No. 3:92 CV 00607 (WWE), 1997 WL 289671 (D. Conn. Apr. 14, 1997).....................48, 52

*WESGO Division of GTE Products Corp. v. Harrison (In re Sitkin Smelting &
    Refining, Inc.)*,
    648 F.2d 252 (5th Cir. 1981) ..............................................................48, 49, 51, 56

*Wild West World, L.L.C. v. Larson Int'l, Inc. (In re Wild West World, L.L.C)*,
    No. 07-5257, 2008 WL 4642266 (Bankr. D. Kan. Oct. 17, 2008) ..........................................42

**Statutes**

28 U.S.C. §§ 157 and 1334 ..............................................................................................13

28 U.S.C. § 157(b) ..............................................................................................13

28 U.S.C. §§ 1408 and 1409 ..............................................................................................13

Bankruptcy Code §§ 1107 and 1108..............................................................................................4

Fla. Stat. § 672.102 ..............................................................................................41

Fla. Stat. § 672.106(1) ..............................................................................................17

Fla. Stat. § 672.304 ..............................................................................................31

Fla. Stat. § 672.305(1) ..............................................................................................30

Fla. Stat. § 672.305(4) ..............................................................................................30

Fla. Stat. § 672.401 ..............................................................................................19, 33, 41, 42

Fla. Stat. § 672.501(1)(b) ..............................................................................................18, 26

N.Y. U.C.C.§ 2-106(1)..............................................................................................17

N.Y. U.C.C. § 2-304 ..............................................................................................31

N.Y. U.C.C. § 2-305(1) ..............................................................................................30

N.Y. U.C.C. § 2-305(4)..............................................................................................30

N.Y. U.C.C § 2-401 ..............................................................................................19

N.Y. U.C.C. § 2-501(1)(b) ..............................................................................................18

N.Y. U.C.C. § 672.501(b) ........................................................................................26

N.Y. UCC § 1-201(16) ............................................................................................52

N.Y. UCC § 1-201(42) ............................................................................................52

N.Y. UCC § 2-102 ...................................................................................................41

UCC § 2-104(1) .......................................................................................................38

UCC § 2-401 ..................................................................................................... passim

UCC § 2-401(1) .......................................................................................................42

UCC § 7-207 ......................................................................................................52, 53

**Rules**

Fed. R. Bankr. P. 7008 .............................................................................................13

Fed. R. Bankr. P. 7056 .............................................................................................13

Fed. R. Civ. P. 56 .....................................................................................................13

Fed. R. Civ. P. 56(a) ................................................................................................13

**Other Authorities**

1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial
    Code § 4:31 (6th ed. 2017) ...............................................................................43

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed. 1993) ............................24

United States Constitution, Article III .....................................................................13

49262387;1

Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation) and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases and Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest"), and Hain Capital Investors Master Fund, Ltd., as successor-in-interest to Bank Leumi USA ("Hain," and together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet, and Woodforest, the "Senior Lenders," and together with the Debtors, the "Movants") submit this joint memorandum of law in support of their joint motion for summary judgment (the "Motion") in connection with seven Customer Statements filed by the Bucket 3, 4 and 5 Customers (each as defined below, and together, the "Contract Customers") pursuant to the Court's *Second Amended Order Approving Uniform Procedures for Resolution of Ownership Disputes* (the "Uniform Procedures Order").[2] [ECF. No. 1196.]

## PRELIMINARY STATEMENT

Each Contract Customer asserts an ownership interest in estate property based on bailment and alternative equitable theories. None is viable: All of the Contract Customers' agreements are for the purchase and sale of raw materials, not for bailments or anything else.

Prior to the Petition Date, each Contract Customer sold raw materials to the Debtors pursuant to individual purchase and sale agreements with Debtor Miami Metals II, Inc. (f/k/a Republic Metals Corporation) ("RMC") (each a "Contract Customer Agreement," and together,

---

[2] All capitalized terms used but not defined herein have the meaning ascribed to such terms in the Uniform Procedures Order.

49262387;1

the "Contract Customer Agreements").[3]  The Debtors failed to pay the Contract Customers, leaving

those customers with general unsecured claims against the Debtors' estates.  Unhappy with their

status as general unsecured creditors, the Contract Customers objected to the Debtors' Cash

Collateral Motion (as defined below), contending that title to the raw materials delivered to the

Debtors never passed to the Debtors and that their agreements with the Debtors evidence a

bailment relationship.  The Contract Customers argue that the Debtors held only naked possession

of the raw materials delivered to them and that the raw materials, therefore, are not property of the

Debtors' estates.  This argument fails as a matter of law.

The Contract Customer Agreements clearly and unambiguously provide for the purchase

and sale of goods, transactions which are governed by Article 2 of the Uniform Commercial Code

(the "UCC").  Pursuant to Section 2-401 of the UCC, title to the raw materials sold by a Contract

Customers to RMC passed to RMC upon the earlier of the time specified in its respective

agreement and delivery of the raw materials to the Debtors' refinery.  Four of the agreements

expressly provide that title passed to RMC upon delivery of the raw materials to a secured carrier

for delivery to the Debtors' refinery, one agreement provides that title passed to RMC upon

delivery to the Debtors' refinery, and two agreements provide that title passes to RMC once the

purchase price is capable of calculation (*e.g.*, after weighing and assay).  The remaining four

agreements are silent as to when title passes, bringing those agreements within the default rule set

forth in the UCC – *i.e.*, title passes on delivery.

Hoping to avoid the express provisions of their agreements with the Debtors and the UCC,

the Contract Customers attempt to manufacture a bailment relationship with the Debtors, urging

---

[3] There are 11 total Contract Customer Agreements.  The following Contract Customers were each party to two separate Contract Customer Agreements with RMC:  Argonaut, First Majestic, Coeur and Yamana.

49262387;1

the Court to ignore unambiguous and unfavorable language in their agreements evidencing the

parties' intent to enter into purchase and sale agreements and instead to glean the parties' intent

from inadmissible extrinsic evidence.  Critically, the Contract Customers cannot demonstrate the

*sine qua non* of the type of bailment at issue here:  That the Debtors were obligated to return the

identical raw materials delivered to the Debtors by the Contract Customers back to them in the

same or some altered form.

The Contract Customer Agreements are clear on their face and show that the raw materials

delivered to the Debtors by the Contract Customers for refining would not be returned to the

Contract Customers.  Rather, the Contract Customers could elect to be paid in cash or a credit to

their "Loco London" metal account.  None of the Contract Customer Agreements provide for the

return of physical metals.

The raw materials delivered by the Contract Customers and other customers to the Debtors

were not identical or fungible.  They generally consisted of scrap metal, old jewelry and doré, and

contained different amounts of gold, silver, and other metals that had to be weighed and assayed.

Shortly after delivery, the raw materials were commingled with raw materials delivered by other

customers and with other residual materials left behind in the refining equipment rendering the

raw materials unidentifiable and incapable of being returned to the Contract Customers.  During

the refining process, the commingled materials were dissolved, treated, filtered, dried, and then

melted into bars, grains or ingots which, absent participation in the "Peace of Mined" program,

could not be traced to a particular customer.  The Debtors had no obligation to return the raw

materials to the Contract Customers in the same or in an altered form.  To the extent any Contract

Customer received payment in the form of physical metals and received refined metal that was the

product of raw material originally delivered by it to the Debtors (and none of the Contract Customers alleges that it ever did), it was solely by chance.

There are no material facts in dispute, and the Movants are entitled to judgment as a matter of law determining that the Disputed Assets belong to the Debtors' bankruptcy estates and dismissing the Contract Customer's ownership claims with prejudice.

## FACTUAL BACKGROUND

### A.    The Chapter 11 Cases

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on November 2, 2018 or November 21, 2018 (together with the November 2, 2018 date, the "Petition Date").

On November 19, 2018, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors in these cases (the "Committee").  [ECF No. 113.]

On March 7, 2019, the Debtors consummated the sale of substantially all of their assets to Asahi Holdings, Inc. ("Asahi") [ECF No. 713].  The Debtors are winding down and liquidating their remaining properties and assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  [ECF Nos. 219, 286, 358, and 563.]  No trustee or examiner has been appointed in the chapter 11 cases.

### B.    The Senior Lenders' Relationship with the Debtors

As of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) more than $177 million by the Debtors under certain credit agreements, master netting agreements, and lease agreements (collectively, the "Credit and Lease Agreements").  (First Interim Order (as defined below) [ECF No. 54] at Schedule 2.)  The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors'

49262387;1

assets, including the Debtors' inventory and proceeds (other than Debtors Republic Metals Trading (Shanghai) Co., Ltd. and Republic Trans Mexico Metals, S.R.L.). (*Id.* ¶ F(vi).)

The Senior Lenders are party to a certain Second Amended and Restated Intercreditor Agreement, dated as of February 19, 2016 (as amended from time to time, the "<u>Intercreditor Agreement</u>"), which governs the respective rights and interests of the Senior Lenders in the assets of RMC. (*Id.* ¶ F(iii).) RMC executed the Intercreditor Agreement. (*Id.*)

**C.    The Cash Collateral Motion, the Interim Cash Collateral Orders and the Ownership Dispute**

On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "<u>Initial Cash Collateral Motion</u>"). [ECF No. 10].

The Court heard oral argument on the Initial Cash Collateral Motion at the first day hearing on November 6, 2018 (the "<u>First Day Hearing</u>"). Following argument, the Court approved the Initial Cash Collateral Motion on the record on an interim basis, subject to certain requested modifications.

On November 8, 2018, the Court entered its *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503 and 507 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "<u>First Interim Order</u>"). [ECF No. 54.]

Pursuant to the First Interim Order, among other things, the Senior Lenders consented to the Debtors' use of their cash collateral to fund the costs and expenses of administering the chapter 11 cases, and the Senior Lenders were granted superpriority claims and adequate

49262387;1

protection liens on substantially all of the Debtors' assets to protect against any diminution in value of their collateral.  (*Id.* ¶ 8(b).)

An integral part of the Initial Cash Collateral Motion and the Senior Lenders' consent to the use of their collateral was the Debtors' proposed payment to the Senior Lenders of the cash proceeds from the sale of the Debtors' inventory as adequate protection (the "Inventory Payments").  (*See id.* ¶ 8(e).)  At the First Day Hearing, the Court requested that the Debtors supplement the Initial Cash Collateral Motion to explain the basis for the Inventory Payments and give all parties in interest specific notice of the provision.

On November 13, 2018, the Debtors and the Senior Lenders filed the *Joint Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* (together with the Initial Cash Collateral Motion, the "Cash Collateral Motion").  [ECF No. 78.]

Numerous customers objected to the Cash Collateral Motion and the Inventory Payments on the basis that the Debtors' inventory and its cash proceeds were property of the Customers rather than property of the bankruptcy estates, giving rise to the current disputes concerning the ownership of the Disputed Assets (the "Ownership Disputes").  Following extensive negotiations among the Debtors, the Senior Lenders, and the Customers, the Court entered the Uniform Procedures Order establishing the Uniform Procedures.

The Court subsequently entered seven additional interim cash collateral orders (collectively, the "Interim Cash Collateral Orders").  [ECF Nos. 277, 373, 538, 675, 864, 987 and 1160.]

### D.    The Debtors' Refining Process

Prior to the Petition Date, the Debtors refined precious metals, primarily gold and silver. Customers from all over the United States and the Western Hemisphere shipped unrefined, nonidentical and nonfungible material, primarily containing gold and silver, to the Debtors for

49262387;1

refining.  The Debtors refined this material and produced refined silver and gold bars and casting

grains.  Based on demand, the refined gold and silver was either sold or sent to the mint for the

production of "value added" minted and casted products of various designs and sizes.  The Debtors

were not engaged in the business of storing goods for hire.  (Declaration of Scott Avila, as Chief

Restructuring Officer, in Support of Joint Motion for Summary Judgment as to Bucket 3, 4 and 5

("Avila Declaration" or "Avila Decl.") ¶ 5.)

After raw materials were received by the Debtors, the shipment was divided into separate

lots and assigned lot numbers based upon the overall weight of the shipment.  These lots were

subsequently weighed and melted to obtain a homogenous sample for assay testing (determining

the metal content of the respective lot), generally on the same day.  Customers had the right to be

present to witness the weigh and assay processes.  The preliminary assay results of materials

provided RMC with an estimated amount of the precious metals contained in the respective lot(s)

received from a customer.  The final settlement occurred when RMC and the customer agreed on

the metal content in a respective lot.  (*Id.* ¶ 6.)

Prior to the final settlement, a customer, including the Contract Customers, could request

that RMC make an "advance" payment to the customer of up to approximately 95% to 99% of the

estimated metal value of the applicable lot based on the preliminary assay.  These payments could

be in the form of USD wire transfer to the customer's designated bank account or "metal credit"

transfer to the customer's designated "Loco London" metal account.[4]  When a customer elected

---

[4] Customer Pool Accounts represent a ledger account reflecting RMC's obligations to its customers denominated in
ounces of a specific type of metal.  When a customer requested an advance payment in dollars, RMC created an
account receivable due from the customer.  When the final settlement was agreed upon between the parties, the
customer's pool account was increased in the amount of the payable ounces for the metals for that specific lot or
shipment.  Thereafter, if the customer elected payment in cash, RMC generated a "settlement invoice" showing the
dollar amount due from RMC to the customer adjusting for customer advances and all charges incurred by the
customer relating to the lot or shipment, including for refining.  Then, RMC remitted the net cash payment to the
customer and reduced the customer's pool account and the "AR" account for those customers that were given
advances.  (*Id.* ¶ 7, n. 2.)

that metal credit be paid to its Loco London metal account, RMC did not transfer actual physical

metals, but rather generic metal credits from the Debtors' unallocated metal account with ICBCS.[5]

In certain instances, customers provided the Debtors with payment instructions to transfer metal

credits otherwise payable to such customers to third parties.  (*Id.* ¶ 7.)

    After the melting/sampling phase, the raw materials entered the refining process.  With the

exception of the "Peace of Mined" metal (discussed below), during the refining process, individual

customer lots were commingled with other customer lots, various clean up material and residue

material (sometimes referred to as "clean up bars").  During the refining process, the silver and

gold that was contained in the commingled material was dissolved in acid to create a solution,

analogous to dissolving sugar in hot water (the "Dissolution Process").  The refining process

produced metal billets, bars, and sacks of grain (the "Refined Product").  The Refined Product was

then transferred to the Debtors' vault and then sold to third parties or transferred to the Debtors'

mint for the production of various minted products, coins, cast bars, etc. (the "Minted Product").

(*Id.* ¶ 8.)

    With the exception of the "Peace of Mined" metal, the Debtors could not identify the raw

materials delivered by customers after they were commingled with other lots for refining and

during and after the Dissolution Process.  The Debtors commingled the raw materials delivered by

all of the Contract Customers in the ordinary course of business and none of the raw materials

delivered by the Contract Customers were segregated or identifiable during the refining process.

Thus, it was impossible for the Debtors to identify what raw materials or lots were included in

Refined Product or Minted Product.  The Debtors had no obligation to return to any of the Contract

---

[5] Like a USD wire transfer between two bank accounts, a payment of Loco London metal credits was reflected as a credit in the customer's Loco London metal account and as a corresponding debit in RMC's Loco London account. (*Id.* ¶ 7, n. 3.)

Customers the raw materials delivered to the Debtors by the Contract Customers in the same or some altered form.  (*Id.* ¶ 9.)

### E.    The Peace of Mined Program

As advertised on the Debtors' website, the Debtors offered a "Peace of Mined" service to customers.[6]  Peace of Mined was available to downstream customers (*i.e.*, buyers of Refined Product) who, upon paying a premium for the service, could choose the source of the metals in the Refined Products they purchased from an approved mine list, sorted by country and location of origin.  If utilized, the Debtors would then refine the raw materials in a proprietary single-batch closed circuit, ensuring that the materials were always traceable and never commingled at any point during the refining process.  The purpose of the program was to ensure the exact origin of the metals that the downstream customers purchased.   (Avila Decl. ¶ 10.)  The Peace of Mined Terms provide, in pertinent part:

> In order to create a 100% traceable product, Republic Metals' Peace of Mined™ refining circuit uses a proprietary process that allows for batch refining.  Unlike electrolytic refining, batch refining allows for material to freshly enter a clean circuit during the refining process, and at no point come in contact with any other-sourced metal.  In the Peace of Mined$^{TM}$ refining circuit, the designated material is the only material present, and all of that material is removed at termination of the process, so there are no leftovers in the circuit−it can in no way be commingled with metal originating from other sources.

(*Id.* ¶ 11, Ex. A.)

RMC's upstream customers (*i.e.*, mining companies) could become certified Peace of Mined suppliers.  Thereafter, if a downstream customer utilized the service and selected raw materials sourced from the upstream customer, RMC would pay the upstream customer a premium for its raw materials and refine the materials through the single-batch closed circuit for the

---

[6] Following the closing of the sale of substantially all of the Debtors' assets to Asahi, the former RMC website is no longer available. A true and correct copy of the Peace of Mined Terms is attached to the Avila Declaration as **Exhibit A**.

downstream customer.  The downstream customer would then receive traceable Refined Product with a certificate guaranteeing its authenticity and source of origin.  Raw materials were not refined through the Peace of Mined program unless both upstream and downstream customers were present.  (*Id.* ¶ 12.)

Only two Contract Customers – Nusantara de Mexico S.A. de C.V., a subsidiary of First Majestic Silver Corp., and Pretium Exploration Inc. – were included on the Debtors' list of certified Peace of Mined suppliers.  None of the Contract Customers was a downstream customer purchasing Refined Product or otherwise paid to utilize the Peace of Mined single-batch closed circuit to ensure that its raw materials were refined separately and returned as traceable Refined Product.  Accordingly, no Contract Customer received back, or was entitled to receive back, the identical raw materials that it delivered to the Debtors as a finished product.  (*Id.* ¶ 13.)

### F.    The Contract Customer Agreements

The Contract Customers reside in Buckets 3, 4 and 5.  Each Contract Customer entered into a separate agreement with RMC.  The Contract Customers are grouped together for the purposes of this motion based upon their similarity and presence or absence of language in their agreements with RMC expressly addressing the passage of title.  Each "bucket" is described below:[7]

### 1.    The Bucket 3 Agreements

The Bucket 3 Agreements (defined below) provide for the passage of title to RMC upon delivery of a Bucket 3 Customer's doré to a secure carrier or upon delivery to RMC's refinery. The Bucket 3 Customers and their agreements consist of:

---

[7] True and correct copies of the Contract Customer Agreements are attached to the Avila Declaration as **Composite Exhibit B**.

49262387;1

i.    **Argonaut Gold Inc.**  (a) Letter Agreement between RMC and Compania Minera Pitalla, S.A. de C.V. ("<u>Compania Minera Pitalla</u>") dated December 23, 2016, relating to the refining and forward/spot sales of precious metal produced by Compania Minera Pitalla's La Colorada mine (the "<u>Compania Minera Pitalla Agreement</u>"); and (b) Letter Agreement between RMC and Minera Real de Oro S.A. de C.V. ("<u>Minera Real de Oro</u>" and together with Compania Minera Pitalla, "<u>Argonaut</u>") dated January 3, 2017, relating to the refining and forward/spot sales of precious metal produced by Minera Real de Oro's El Castillo mine (the "<u>Minera Real de Oro Agreement</u>," and together with the Compania Minera Pitalla Agreement, the "<u>Argonaut Agreements</u>");

ii.    **First Majestic**.  (a) Agreement between RMC and Nusantara de Mexico S.A. de C.V. ("<u>Nusantara</u>") dated July 21, 2017, relating to the refining and forward/spot sales of precious metal from Nusanatara's Santa Elena mine (as amended by the First Amendment dated June 6, 2018, the "<u>Nusantara Agreement</u>"); and (b) Agreement between RMC and Primero Empresa Minera S.A. de C.V. ("<u>Primero</u>," and together with Nusantara, "<u>First Majestic</u>") dated June 27, 2018, relating to the refining and forward/spot sales of precious metal from Primero's San Dimas mine (the "<u>Primero Agreement</u>," and together with the Nusantara Agreement, the "<u>First Majestic Agreements</u>"); and

iii.    **Pretium Exploration Inc.**    Agreement between RMC and Pretium Exploration Inc. ("<u>Pretium</u>") deemed effective as of June 1, 2018, relating to the refining and forward/spot sales of precious metal (the "<u>Pretium Agreement</u>," and together with the Argonaut Agreements and First Majestic Agreements, the "<u>Bucket 3 Agreements</u>").

### 2.    The Bucket 4 Agreements

The Bucket 4 Agreements (defined below) are between RMC and two affiliates of Coeur Mining, Inc. (together, "Coeur").  The Bucket 4 Agreements provide that title passes to RMC upon the completion of certain defined "Purchaser Obligations" and consist of the following:

i.    Agreement between RMC and Coeur Mexicana S.A. de C.V. ("Coeur Mexicana") dated January 1, 2017 ("Coeur Mexicana Agreement"); and

ii.    Agreement between RMC and Coeur Rochester, Inc. ("Coeur Rochester") dated January 1, 2017, relating to the refining and forward/spot sales of precious metal produced by Coeur Rochester's Rochester mine ("Coeur Rochester Agreement," and together with the Coeur Mexicana Agreement, the "Coeur Agreements" or the "Bucket 4 Agreements").

### 3.    The Bucket 5 Agreements

The Bucket 5 Agreements (defined below) are silent as to when title passed from each Bucket 5 Customer to RMC and consist of the following:

i.    **Premier Gold Mines Limited**.    Letter Agreement between RMC and Premier Gold Mines Limited ("Premier Gold") dated September 30, 2016, relating to the refining and forward/spot sales of precious metal produced by Premier Gold's Mercedes mine ("Premier Gold Agreement");

ii.    **Yamana Gold Inc**.  (a) Letter Agreement between RMC and Yamana Gold Inc. ("Yamana") dated October 26, 2016, relating to the refining and forward/spot sales of precious metal produced by Yamana's Jacobina mine (the "Jacobina Agreement"); and (b) Letter Agreement between RMC and Yamana dated May 17, 2018, relating to the refining and forward/spot sales of precious metal produced by Yamana Gold Inc.'s Cerro Moro

49262387;1

mine (the "Cerro Moro Agreement," and together with the Jacobina Agreement, "Yamana Gold Agreements"); and

      iii.   **Minas de Oroco**.  Letter Agreement between RMC and Minas de Oroco Resources ("Minas de Oroco") dated August 21, 2017, relating to the refining and forward/spot sales of precious metal produced by Minas De Oroco's Cerro Colorado mine ("Minas de Oroco Agreement," and collectively with the Premier Gold Agreement, and the Yamana Gold Agreements, the "Bucket 5 Agreements").

      4.     **The RMC Standard Terms**

Three Contract Customers also executed the Debtors' Standard Terms at approximately the same time each executed its respective agreement with RMC.  Those Contract Customers are (i) Premier Gold, (ii) Primero, and (iii) Pretium.[8]

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012 and the Uniform Procedures Order.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

This is a core proceeding pursuant to 28 U.S.C. § 157(b).

The Debtors and the Senior Lenders confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Joint Memorandum of Law to the extent that it is later determined that the Court, absent consent of the parties, cannot enter

---

[8] True and correct copies of the Standard Terms executed by each of these three Customers are attached to the Avila Declaration as **Composite Exhibit C**.

final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## LEGAL STANDARD AND GOVERNING LAW

### A.      Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this contested matter pursuant to Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Fed. R. Bankr. P. 7056.

"'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' there is no genuine issue of material fact." *TL Admin. Corp v. Ideasphere, Inc. (In re TL Admin. Corp.)*, 337 B.R. 827, 829 (Bankr. S.D.N.Y. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Although all reasonable inferences should be drawn in the nonmoving party's favor, to defeat a properly supported motion for summary judgment the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . it must present 'significant probative supporting evidence' that a genuine issue of material fact exists." *Id.* (internal citations omitted). Furthermore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes over irrelevant or unnecessary facts are insufficient to warrant denial of a summary judgment motion. *Id.*

Whether an agreement is ambiguous is question of law to be determined by the Court. *Cartaya v. Coastline Distribution*, 937 So. 2d 700, 701 (Fla. 1st DCA 2006); *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002). "A word or phrase in a contract is 'ambiguous' only when

it is of uncertain meaning, and may be fairly understood in more ways than one." *Friedman v. Virginia Metal Prods. Corp.*, 56 So. 2d 515, 517 (Fla. 1952) (citation omitted); *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (explaining that contract terms are not ambiguous if they "'have a definite and precise meaning and are not reasonably susceptible to differing interpretations.'" (citation omitted)).

## B.      Governing Law

Whether assets belong to the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code is determined by applicable state law. *Kraken Inv. Ltd. v. Jacobs (In re Salander-O'Reilly Galleries, LLC)*, 475 B.R. 9, 21−22 (S.D.N.Y. 2012). Bankruptcy Courts, like federal district courts hearing diversity cases, look to the choice of law rules of the state in which they sit. *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 605 (2d Cir. 2001).

Seven of the Contract Customers have contracts that purport to be governed by Canadian (either British Columbia or Ontario) law.[9] However, of those seven customers, three (Premier Gold, Yamana and Minas de Oroco) allege in their Customer Statements that Florida or New York law governs.[10] Three more (Compania Minera Pitalla, Minera Real de Oro, and Nusantara) rely only on New York law in their Customer Statements.[11] The Primero Agreement and the Coeur Mexicana Agreements are governed by New York law. (Primero Agreement § 10; Coeur Mexicana Agreement § 22.) Finally, all Contract Customers concede, as they must, that the law in New York, Florida, and Canada is substantially the same. (*See, e.g.*, ECF No. 161 n.10

---

[9] The agreements facially governed by Canadian law are: Compania Minera Pitalla Agreement § 13.7 (Ontario); Minera Real de Oro Agreement § 13.7 (Ontario); Nusantara Agreement § 10 (British Columbia); Pretium Agreement § 22 (British Columbia); Premier Gold Agreement § 13.7 (Ontario); Jacobina Agreement § 13.7 (Ontario); Cerro Moro Agreement § 13.7 (Ontario); Minas de Oroco Agreement § 13.7 (Ontario).

[10] ECF No. 447 ¶ 4 (Minas de Oroco); ECF No. 451 ¶ V (Premier Gold); ECF No. 485 ¶¶ 26–30 (Yamana).

[11] ECF No. 460 (Compania Minera Pitalla and Minera Real de Oro); ECF No. 471 (Nusantara).

49262387;1

(Pretium); ECF No. 460 n.5 (First Majestic); ECF No. 471 n.6 (Argonaut); ECF No. 1119 n.10

(all Contract Customers other than Minas de Oroco).)  Because the outcome of these Ownership

Disputes will be the same under Florida, New York, and Canadian law, there is no need for the

Court to perform any choice of law analysis.  Citations to the harmonious laws of Florida, New

York, and Canada are included below.

### C.    Contract Interpretation Principles

A written agreement that is clear and unambiguous on its face must be enforced according

to its terms.  *Gibney v. Pillifant*, 32 So. 3d 784, 785 (Fla. 2d DCA 2010) ("[T]he actual language

used in the contract is the best evidence of the intent of the parties, and the plain meaning of that

language controls." (internal quotation marks omitted)); *Greenfield*, 98 N.Y.2d at 569 ("[A]

written agreement that is complete, clear and unambiguous on its face must be enforced according

to the plain meaning of its terms.").  Where a contract is unambiguous, the intent of the parties

must be gleaned from "the four corners of the document."  *Landmark Am. Ins. Co. v. Pin-Pon

Corp.*, 155 So. 3d 432, 437 (Fla. 4th DCA 2015) (citation omitted); *De Luca v. De Luca*, 300

A.D.2d 342, 342 (2d Dep't 2002); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, para.

54 (Can.) ("The contractual intent of the parties is to be determined by reference to the words they

used in drafting the document.").[12]

A written document intended by the parties to be the final embodiment of their agreement

may not be contradicted, modified, or varied by extrinsic evidence.  *King v. Bray*, 867 So. 2d 1224,

1226 (Fla. 5th DCA 2004); *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 436 (N.Y. 2013);

*W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (holding that extrinsic evidence

should not "be considered in order to create an ambiguity in the agreement."); *Eli Lilly & Co.*,

---

[12] A copy of *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (Can.) is attached to this brief as **Exhibit A**.

2 S.C.R. 129, para. 55 ("[I]t is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face.").

It is black letter law that Courts must "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000); *see also Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (a court must "give full meaning and effect to all of [the contract's] provisions."); *BG Checo Int'l Ltd. v. British Columbia Hydro & Power Auth.*, [1993] 1 S.C.R. 12, para. 9 (Can.) ("Where there are apparent inconsistencies between different terms of a contract, the court should attempt to find an interpretation which can reasonably give meaning to each of the terms in question.").[13]  Individual contract provisions "should not be read in isolation and out of context, for the contract is to be construed according to its entire terms." *State Farm Mut. Auto. Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. 1st DCA 2009); *see also Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) ("Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."); *BG Checo Int'l Ltd.*, 1 S.C.R. 12, para. 9 ("It is a cardinal rule of the construction of contracts that the various parts of the contract are to be interpreted in the context of the intentions of the parties as evident from the contract as a whole.").

## **ARGUMENT**

## I.  **THE CONTRACT CUSTOMER AGREEMENTS CLEARLY AND UNAMBIGUOUSLY EVIDENCE THAT THE DISPUTED ASSETS ARE PROPERTY OF THE DEBTORS' BANKRUPTCY ESTATES**

The only way to give meaning to all of the terms in the parties' agreements is to find that each of the Contract Customer Agreements is for the purchase and sale of goods.

---

[13] A copy of *BG Checo Int'l Ltd. v. British Columbia Hydro and Power Auth.*, [1993] 1 S.C.R. 12 (Can.) is attached to this brief as **Exhibit B**.

A.    **The Contract Customer Agreements Are Agreements for the Sale of Future Goods**

Under the UCC, a "contract for sale" includes "both a present sale of goods and a contract to sell goods at a future time." Fla. Stat. § 672.106(1); N.Y. U.C.C.§ 2-106(1). Here, the Contract Customer Agreements are contracts for the sale of goods because the agreements were executed by the parties at the commencement of their relationship to govern all future transactions between the parties. The agreements between the Contract Customers and the Debtors served as master agreements governing all transactions between the parties and supplying all material terms globally applicable to each transaction. Although not identical, all of the Contract Customer Agreements generally set forth, among other things, (i) the goods being sold, (ii) when and how title to the raw materials passes from the Contract Customer to RMC, and (iii) when, how and in what manner payment would be made. Notably, each of the Contract Customer Agreements expressly provides that it is a contract for "forward/spot sales" or the "purchase" of doré. None contains language stating or implying that the parties intended to create a bailment, entrustment, or similar relationship. Moreover, no agreement provides for the return of raw materials delivered by the Contract Customers in the same or some altered form or sets forth procedures that could result in anything other than a sale of the raw materials to RMC and the payment of consideration to the Contract Customers (whether in the form of cash or Loco London metal credit).

Where a contract is for the sale of future goods, goods are identified to the contract when the goods are "shipped, marked or otherwise designated by the seller as goods to which the contract refers." Fla. Stat. § 672.501(1)(b); N.Y. U.C.C. 2-501(1)(b); *see also* British Columbia Sale of Goods Act, R.S.B.C. 1996, c. 410, § 23(9) (providing a concept analogous to identification where "[i]f, in pursuance of the contract, the seller delivers the goods to the buyer or to a carrier or other bailee, whether named by the buyer or not, for transmission to the buyer, and does not reserve the

right of disposal, the seller is deemed to have unconditionally appropriated the goods to the contract."); Ontario Sale of Goods Act, R.S.O. 1990, c. S.1, § 19 (same).[14] Here, the raw materials sold by the Contract Customers to the Debtors were identified to their contracts (at the latest) upon shipment to the Debtors' refinery. Identification granted the Debtors a special property right and an insurable interest in the materials, enabling the Debtors to insure incoming shipments. As discussed below, title thereafter transferred to the Debtors (at the latest) upon delivery to the refinery. Fla. Stat. § 672.401; N.Y. U.C.C 2-401.

Each of the Contract Customers' Agreements is discussed separately below:

### 1.    Compania Minera Pitalla and Minera Real de Oro (Argonaut)

The only way to construe the Argonaut Agreements is as contracts for the purchase and sale of doré. The Argonaut Agreements provide, among other things, for (i) the goods being sold (gold and silver doré bars produced by the La Colorada and El Castillo mines), (ii) when title to and risk of loss for the goods shall pass, (iii) how payment shall be calculated, and (iv) when, how and where payment will be made.

First, the preamble in each of the Argonaut Agreements states that the agreement is for "refining and forward/spot sales" of gold and silver doré produced by the La Colorada and El Castillo mines. (Compania Minera Pitalla Agreement at 1; Minera Real de Oro Agreement at 1.)[15]

---

[14] Copies of the relevant sections from the British Columbia and Ontario Sale of Goods Acts are attached to this brief as **Exhibits C and D**, respectively.

[15] True and correct copies of the Compania Minera Pitalla and Minera Real de Oro Agreements are attached to the Avila Declaration as **Composite Exhibit B**, **Tab 1**.

Second, each of the Argonaut Agreements expressly provides that title to and risk of loss for all raw materials transfers to RMC upon delivery to a mutually appointed secure liability carrier (a "Carrier").  Section 2.2 provides:

> Once the material has been picked up by the appointed transportation service Carrier, and the Carrier has signed the operative airway bill evidencing the same, **title and all risks of physical loss and/or damage to the Material shall pass to and remain with the Refiner**.

(Compania Minera Pitalla Agreement § 2.2; Minera Real de Oro Agreement § 2.2 (emphasis added).)

Third, each of the Argonaut Agreements provides that settlement (*i.e.*, payment for the raw material) will take place nine business days after delivery to the Carrier.  However, Argonaut was entitled to request an "advance" payment equal to 95% of the estimated value of the doré delivered to RMC.  (Compania Minera Pitalla Agreement § 4.1; Minera Real de Oro Agreement § 4.1; Avila Decl. ¶ 7.)

Fourth, each of the Argonaut Agreements provides how the purchase price for the raw materials will be finally determined (*e.g.*, "spot or on the prevailing London Bullion Marketing Association (LBMA) Prices (AM or PM in the case of Gold), or as mutually agreed upon by [Argonaut] and the [Debtors].")  (Compania Minera Pitalla Agreement § 6; Minera Real de Oro Agreement § 6.)

Fifth, each of the Argonaut Agreements provides for payment at Argonaut's option in cash or Loco London metal credit on each "value outturn date" to Argonaut's designated bank or Loco London metal account, as applicable.  (Compania Minera Pitalla Agreement § 6.3; Minera Real de Oro Agreement § 6.3.)

Argonaut conspicuously avoids quoting the title transfer provision, and attempts to transform these unambiguous purchase and sale agreements into bailment agreements. The Court should reject Argonaut's tortured interpretation of their agreements with RMC.

Argonaut first relies on provisions requiring unrefined raw materials to be held in a vault prior to refining and allowing it to inspect the facilities and to be present and participate in the weigh and assay process. [ECF No. 471 ¶¶ 12–14 (citing Argonaut Agreements §§ 5.2, 7.1).] However, each of these provisions is entirely consistent with a contract for the sale of goods. Argonaut agreed that title to the doré passed to RMC upon delivery to the Carrier, but agreed that payment would not be made until weeks later after the results of the weigh and assay on the applicable "value outturn date."

Argonaut next relies on the fact that it could be paid in Loco London metal credits and provide standing transfer instructions to RMC identifying Argonaut's designated Loco London metal account. [ECF No. 471 ¶¶ 12–14 (citing Argonaut Agreements § 6.3).] Again, nothing about these provision supports Argonaut's bailment claim. To the contrary, these provisions confirm that the relationship of the parties was that of buyer and seller. Instead of being paid in cash, on the applicable outturn date, Argonaut could receive generic metal credits equal to the "value" of the precious metals contained in the doré bars it sold to RMC. Standing transfer instructions do not indicate the parties' intent to establish a bailment any more than standing wire instructions for cash payments do.

Argonaut next seeks refuge in the "Force Majeure" clause, which allowed Argonaut to find an alternative refinery in the event of unforeseen circumstances. [ECF No. 471 ¶¶ 12–14 (citing Argonaut Agreements § 11.4).] But nothing about inclusion of a commonplace *force majeure* provision suggests that title did not pass to RMC upon delivery in accordance with the express

21

terms of the agreement or that the parties intended there to be a bailment.   The Argonaut Agreements were essentially output agreements whereby the Debtors agreed to purchase the annual production in an agreed upon range from two of Argonaut's mines.   In the event of a *force majeure* preventing RMC from refining and purchasing Argonaut's doré, it was entirely reasonable that Argonaut would be able to sell its doré to another refinery while RMC's operations were shut down.   Moreover, Argonaut was relieved of its obligations under the same clause in the event of any unforeseen circumstances.

Finally, Argonaut relies on a boiler-plate representation that RMC would perform its obligations and services under the Argonaut Agreements, which does not indicate the parties' intent to create a bailment.   [ECF No. 471 ¶¶ 12–14 (citing Argonaut Agreements § 12.1).]

The hollow contention that "Argonaut always exercised control over, and retained title to, the metal," is contradicted and toppled by the many clear and contrary provisions in the Argonaut Agreements, including the ignored title provision.   [ECF No. 471 ¶ 12.]   Harmonizing and giving meaning to every provision of the Argonaut Contracts mandates finding that the Argonaut Agreements are contracts for the purchase and sale of goods.

## 2.    Nusantara de Mexico S.A. de C.V. and Primero Empresa Minera, S.A. de C.V. (First Majestic)

Each of the First Majestic Agreements is substantially similar to the Argonaut Agreements. The first page of each agreement makes clear that the parties were entering into agreements for the

"refining and forward/spot sales of precious metal" from First Majestic's Santa Elena and San Dimas mines.  (Nusantara Agreement at 1; Primero Agreement at 1.)[16]

Similarly, the First Majestic Agreements provide that title passes to RMC upon pick-up by an appointed armored car service.  Section 2.1 of the First Majestic Agreements provides:

> Once the material has been picked up by the appointed armoured car service ("Carrier") and once the Refiner arranges freight and insurance and assumes the Carrier charges to later invoice the Customer, and a representative of the Carrier has signed the operative airway bill evidencing the same, **all risks of physical loss and/or damage and risk of title/ownership to the Material shall pass to and remain with the Refinery**.

(Nusantara Agreement at 1; Primero Agreement at 1 (emphasis added).)

The First Majestic Agreements likewise contains substantially identical provisions setting forth:

- when settlement will take place (ten days after receipt by RMC) (Primero Agreement § 4; Nusantara Agreement § 4);

- the advance rate (98% of the "value" of the doré in the case of Primero and 95% in the case of Nusantara) (Primero Agreement § 4; Nusantara Agreement § 6.3);

- how the purchase price will be calculated (spot or London fixing) (Primero Agreement § 6; Nusantara Agreement § 6); and

- how payment will be made on each "value outturn date" (cash or Loco London metal credit, and in the case of Nusantara, a credit to its pool account).  (Primero Agreement § 6.2; Nusantara Agreement § 6.2.)

Moreover, the Nusantara Agreement provides for a $.05 premium per ounce of gold for participation in the "Peace of Mined Segregated Refining" program, making clear that, in the

---

[16] True and correct copies of the Nusantara and Primero Agreements are attached to the Avila Declaration as **Composite Exhibit B, Tab 2**.

ordinary course, raw materials delivered by Nusantara would not be segregated. Rather Nusantara's doré would be refined separately only if there was a downstream purchaser that sought Nusantara-sourced Refined Product. (Nusantara Agreement § 4; Avila Decl. ¶¶ 12–13.)

In its Customer Statement, First Majestic ignores these provisions, and advances substantially identical arguments to those pressed by Argonaut, suggesting that provisions (i) requiring unrefined raw materials to be held in a vault prior to refining and allowing it to be present and participate in the weigh and assay process and (ii) allowing First Majestic to be paid in Loco London metal credit transformed its sale agreements into bailment agreements. [ECF No. 460 ¶ 13.] These arguments fail for the same reasons discussed in Section I.A.1 above.

Finally, Nusantara also argues that its ability to maintain a metal balance in its pool account with RMC means that it kept title to the raw materials it delivered to RMC. [ECF No. 460 ¶ 16.] Again, accepting such an interpretation would eviscerate the title transfer provision and must, therefore, be rejected. And regardless, as discussed in the Avila Declaration, a "Customer Pool Account represents a ledger account reflecting RMC's obligations to its customers denominated in ounces of a specific type of metal." (Avila Decl. ¶ 7 n.2, Ex. D at 3.)

Harmonizing and giving meaning to every provision of the First Majestic Agreements mandates finding that the First Majestic Agreements are contracts for the sale of goods.

3.    **Pretium Exploration Inc.**

The Pretium Agreement includes the following five provisions demonstrating that it is a contract for the purchase and sale of goods:

First, like the other Bucket 3 Customers, the Pretium Contract states that it is for "refining and forward/spot sales" of gold and silver doré.  (Pretium Agreement at 1).[17]

Second, Section 4.1(b) of the Pretium Agreement provides that title to the doré delivered by Pretium passed to the Debtors when those materials were delivered to the Debtors' refinery. Section 4.1(b) provides that **"[t]itle to all Material and Recoverable Metals produced therefrom (without duplication) shall pass and remain with the Refiner upon delivery of Material at the Refiner's facility**."  (*Id.* § 4.1 (emphasis added).)

Third, the Pretium Agreement provides that RMC "shall recover and credit [Pretium] with the [contractually specified] percentages of the final agreed assayed gold and silver contents of refined Material from each Shipment (the "Recoverable Metals")."  (*Id.* § 4.1.)  Webster's defines "credit" as "to place an amount to the credit of <~ his account with ten dollars>."  *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed. 1993); *see also id.* (*n.* "the balance in an account in a person's favor.").  Had the parties intended that precious metals derived from the raw materials belonged to Pretium, they would not have used the word "credit."

Fourth, the refining charges include a \$.05 per ounce credit if, and only if, Pretium's doré was refined through the Debtors' "Segregated Peace of Mined Program."  (Pretium Agreement § 4.1(a).)  This provision demonstrates that, while RMC had the ability to segregate raw materials provided by particular customers, there could be no reasonable expectation that Pretium's dore

---

[17] A true and correct copy of the Pretium Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 3**.

would be refined through that program in all instances.  It is undisputed that the doré at issue in

this case was not segregated and refined through the Peace of Mined program; it was commingled

with all of the other raw materials delivered by all the other customers and all of the residual gold

and silver in the Debtors' machinery.  (Avila Decl. ¶¶ 9, 12–13.)  The declaration submitted by

Janice Song in opposition to the Debtors' cash collateral motion claim suggesting that the doré

delivered by Pretium was refined separately is not based upon personal knowledge.  [*See* ECF No.

161-1 ¶ 14.]  In fact, it was not (Avila Decl. ¶¶ 9, 12–13), and there is no basis to dispute this.

<u>Fifth</u>, the parties explicitly excluded application of the United Nations Convention in

Contracts for the International Sale of Goods (the "CISG").  (Pretium Agreement § 22.)  The

exclusion of the CISG demonstrates the parties' understanding that the Pretium Agreement was

for the purchase and sale of goods.

In its Customer Statement, Pretium ignores these five provisions and argues, like the other

Contract Customers, that RMC was no more than a bailee of Pretium's doré.  Pretium first argues,

without any factual or legal support other than its "apparent" belief (Pretium does not identify the

basis for this belief), that the explicit title transfer provision granted RMC only "bare possessory

title" so that RMC could secure insurance "during the fleeting period" the doré was in RMC's

possession.  [ECF No. 161 ¶¶ 24, 54; ECF No. 161-1 ¶ 15.]  Nothing about this provision suggests

that title meant anything other than full legal title and ownership.  To the contrary, this provision

makes clear that title to the doré shall "pass and remain" with RMC not just for some period of

time.  Moreover, under the terms of the Pretium Agreement, RMC was required to maintain

insurance even before title passed to RMC – when risk of loss passed from Pretium to RMC at the

26

time the Carrier accepted the doré from Pretium.  (*See* Pretium Agreement §§ 2.1, 3.1.)[18]  Finally, nothing about the indemnities running in favor of Pretium [*see* ECF No. 161 ¶ 25] nullifies the unambiguous title transfer provisions.

Pretium's contention that its agreement with RMC "expressly contemplated that Pretium would 'operate on a toll basis,' in which the specific gold and silver refined from Pretium's doré 'shall be transferred to [Pretium's] designated metal account(s),'" is not true and makes no sense.  [ECF No. 161 ¶ 20, ECF No. 161-1 ¶ 15.]  As discussed above, this provision simply makes clear that Pretium can elect to be paid in Loco London metal credits rather than cash.  Nothing in this provision states or implies that the metal credit would consist of the gold or silver refined from the doré delivered to the Debtors.  Nor could it.  By definition, fungible metal credits – not actual metals – were transferred from the Debtors' ICBC metal account to the metal account designated by Pretium just like a cash wire transfer.  (Avila Decl. ¶ 7.)  Moreover, as the Avila Declaration makes clear, the doré delivered by Pretium was commingled during the refining process with raw materials delivered by other customers and the Debtors' own gold and silver.  (*Id.* ¶¶ 8–9.)  The precious metals realized from the commingled raw materials were either sold or delivered to the mint for value added processing and then sold.  (*Id.* ¶ 5.)  Pretium's unsupported conclusory assertion that the doré was segregated, separately refined in crucibles dedicated to Pretium, and remains traceable are not based upon personal knowledge and are directly refuted by the Avila Declaration.  [*See* ECF No. 161 ¶ 52.]  They are insufficient to withstand summary judgment.

---

[18] Under the UCC, RMC obtained an insurable interest in the doré as soon as it was identified to the parties' agreement; it had no need to secure title before insuring the doré it was purchasing from Pretium.  *See* Fla. Stat. § 672.501(1)(b); N.Y. U.C.C. § 672.501(b).

4.    **Coeur Mexicana S.A. de C.V. and Coeur Rochester, Inc. (Coeur)**

(i)    Coeur Mexicana

The Court Mexicana Agreement contains at least seven complementary provisions that make clear that the Coeur Mexicana Agreement is a contract for the purchase and sale of gold and silver doré.  The parties' intent to enter into a purchase and sale agreement begins with the first page of the agreement, where RMC (defined as "Purchaser") "agrees to purchase" from Coeur Mexicana (defined as "Seller") gold and silver doré bars.  (Coeur Mexicana Agreement Preamble, § 1).[19]  Among other things, the Coeur Mexicana Agreement provides:  (1) the goods being sold; (2) that Coeur Mexicana has the legal right to sell the doré; (3) when title to the doré passes to RMC; (4) how to calculate the purchase price; (5) and when and how payment is to be made.  The Coeur Mexicana Agreement contains the following provisions:

1.3.    Seller represents, warrants, and covenants with the Purchaser that the Seller shall, at the time of each sale and/ or delivery hereunder, have the legal right to sell and/or deliver the applicable Material to the Purchaser as provided in this Agreement.

1.4.    Purchaser represents, warrants, and covenants with the Seller that Purchaser shall purchase the Material and/or perform the services required to be performed by Purchaser pursuant to this Agreement in order to determine the final purchase price for the Material (the "**Purchaser Obligations**") with reasonable skill and care in accordance with the generally accepted industry standards for refiners providing similar services. . . .

4.1    Once the Material has been picked up by the Carrier at the Mine, and the Carrier has signed a receipt for the Material evidencing same, all risk of loss and damage to such Material shall pass from the Seller to the Purchaser. **Title to the Material shall pass to the Purchaser as soon as the Purchaser has completed the Purchaser Obligations**.  (emphasis added).

---

[19] A true and correct copy of the Coeur Mexicana Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 4**.

6.      Recoverable Metals

The Purchaser shall recover and credit the Seller or its designee with the following percentages of the final agreed assayed gold and silver contents of refined Material from each Shipment **(the "Recoverable Metals")**. . . .

8.      Purchase Price and Payment . . .

(a) Seller shall instruct the Purchaser to deliver the payment corresponding to Recoverable Metals other than the Gold Stream Material on the Payment Date. The final Purchase Price will be fixed on the Payment Date based on final settlement ounces multiplied by the prevailing market price over a period of days agreed to by the Parties, and recorded in a final invoice ("**Final Invoice**") which shall include the following information with respect to the corresponding Shipment: (a) the results of the assay conducted in accordance with Article 5, and (b) the amount and content of the Recoverable Metals.

22.     The substantive law of this Agreement shall be the laws of the State of New York, United States of America, without regard to its principles of conflict of laws.  **The Parties hereby exclude the application of the United Nations Convention in Agreements for the International Sale of Goods**.

23.1.   The Seller acknowledges and agrees that customs, excise and export duties, and any other taxes, duties or charges payable in Mexico in connection with or in respect of (i) the export from Mexico of the Material, (ii) **the sale by Seller of gold and silver contents**, and (iii) any other act, matter or transaction contemplated by this Agreement shall be for the account of and paid by Seller.

(Coeur Mexicana Agreement §§ 1.3, 1.4, 4.1, 6, 8, 22 and 23.1) (emphasis added).)

(ii)     <u>Coeur Rochester</u>

The Coeur Rochester Agreement provides that it is for the "refining and forward/spot sales

of precious metal" produced at Coeur Rochester's mine in Lovelock, Nevada.  (Coeur Rochester

Agreement, Preamble, § 1.)[20]

The Coeur Rochester Agreement also contains the following provisions specifying:

•       when title shall pass to RMC (upon completion of the "Purchaser Obligations")

(Coeur Rochester Agreement § 2.2.)

---

[20] A true and correct copy of the Coeur Rochester Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 4**.

49262387;1

- when settlement will take place (ten days after receipt by RMC at the refinery) (*id.* § 4.1);

- the advance rate (95% of the "value" of the doré upon confirmation of pick-up at the mine) (*id.*);

- how the purchase price will be calculated (spot or London fixing) (*id.* § 6); and

- how payment will be made on each "value outturn date" (cash or Loco London metal credit to Coeur Rochester's designated bank or metal account, as applicable). (*Id.* § 6.3.)

### (iii)   Coeur Customer Statement

In its Customer Statement and its objection to the Cash Collateral Motion, Coeur ignores these provisions and claims that the agreements are "more indicative" of a bailment.  Coeur first argues that title never passed to RMC because RMC never paid Coeur for the raw materials.  [ECF No. 334 ¶ 20 n.4.]  However, this argument is foreclosed by the UCC and the text of the Coeur Agreements.  <u>First</u>, as discussed *infra*, title passed to RMC pursuant to section 2-401 of the UCC no later than delivery.  <u>Second</u>, even if the parties could agree to delay transfer of title beyond delivery, paying Coeur for the raw materials is not one of the defined "Purchaser Obligations." Under the express terms of the Coeur Agreements, RMC's "Purchaser Obligations" were complete once the weigh and assay procedure was completed and the parties could "determine the final purchase price for the [doré]."  (Coeur Mexican Agreement § 1.4.)  Indeed, as Coeur conceded at the outset of these cases before the Court established the Ownership Procedures, Coeur Mexicana and Coeur Rochester contracted to sell goods to the Debtors "on credit."  (ECF No. 124, Ex. A-1 ("During the 45-day period prior to the Petition Date, . . . Coeur Rochester, Inc. (the "Seller") contracted to sell and delivered goods (the "Goods") to the Relevant Debtor on credit in the

49262387;1

ordinary course of business for which Seller has not been paid as of the date of this letter."), Ex.

A-2 ("During the 45-day period prior to the Petition Date, . . ., Coeur Mexicana, S.A. de C.V. (the

"Seller") contracted to sell and delivered goods (the "Goods") to the Relevant Debtor on credit in

the ordinary course of business for which Seller has not been paid as of the date of this letter.").)

Coeur next argues that RMC's assumption of risk upon delivery indicates a bailment

[ECF No. 334 ¶ 20], but assumption of risk of loss upon delivery is entirely consistent with a

purchase and sale contract and the passage of title. *See, e.g.*, *Jacobson v. Neuensorger Korbwaren-*

*Industrie Friedrich Kretz, K.-G.*, 109 So. 2d 612, 614 (Fla. 3d DCA 1959); *Elmaleh v. B.H. Old*

*& Co.*, 28 N.Y.S.2d 44, 44 (App. Term 1st Dep't 1941).

It does not matter that the final purchase price could not be determined until after the weigh

and assay process was completed.  [ECF No. 470 ¶ 4.]  As discussed above, the Coeur Agreements

expressly provide a mechanism for calculating the purchase price.  (Mexicana Agreement § 8;

Rochester Agreement § 6.)  Moreover, even if the Coeur Agreements lacked fixed price terms, the

UCC provides "gap fillers" for determining price if the price term is left open.  Fla. Stat.

§ 672.305(1) ("The parties if they so intend can conclude a contract for sale even though the price

is not settled"); N.Y. U.C.C. § 2-305(1).  Assuming Coeur's decision to sell metals to the Debtors

was contingent on an agreement on price (which it was not), Coeur's bailment claims would still

fail.  Under the UCC, if the parties do not intend to be bound "unless the price be fixed or agreed"

and it is not fixed or agreed "there is no contract." Fla. Stat. § 672.305(4); N.Y. U.C.C. § 2-305(4).

However, where, as here, return of any goods already delivered is impossible, the seller's remedy

is an unsecured claim for the "reasonable value [of the goods] at the time of delivery." *Id.*  It

cannot be disputed that return of the same raw materials delivered by Coeur to the Debtors became

impossible shortly after the materials were delivered because they were commingled, refined, and

subsequently sold, and remains impossible now. Thus, if no agreement to sell was reached because the price for the Coeur's doré was never set, Coeur is at most entitled to an unsecured claim for the value of the doré it delivered to the Debtors.

Finally, nothing about "payment" in the form of the specific metals delivered under the Coeur Agreement indicates an intention to create a bailment. [ECF No. 334 ¶ 20.] Payment in cash, metal credits, or even like-kind metals is entirely consistent with a purchase and sale. *See* Fla. Stat. 672.304 ("The price can be made payable in money or otherwise. . . . "); N.Y. U.C.C. § 2-304.

### 5.   **Yamana Gold Inc.**

The Yamana Agreements govern the purchase and sale of gold and silver doré produced by Yamana's Cerro Moro mine located in Santa Cruz, Argentina and Yamana's Jacobina mine located in Bahia, Brazil. They contain the following six provisions, demonstrating that Yamana Agreements are contracts for the purchase and sale of goods.

First, each Yamana Agreement states in the preamble it is for "refining and forward/spot sales" of precious metals. (Cerro Moro Agreement at 1; Jacobina Agreement at 1.)[21]

Second, the Cerro Moro Agreement provides that "[a]ll transactions shall be governed by the Inconterm DAT Ministro Pistarini International Airport, Buenos Aires (EZE)." (Cerro Moro Agreement § 2.1.)[22] DAT means "Delivered at Terminal" and "means that the seller delivers when

---

[21] True and correct copies of the Jacobina and Cerro Moro Agreements are attached to the Avila Declaration as **Composite Exhibit B**, **Tab 6**.

[22] The International Chamber of Commerce ("ICC") international commercial terms (Incoterms) 2010 are a set of generally accepted pre-defined commercial terms published by the ICC used to govern international contracts for the sale of goods. *See, e.g., Incoterms Rules*, ICC, https://iccwbo.org/resources-for-business/incoterms-rules ("First published by ICC in 1936, Incoterms rules provide internationally accepted definitions and rules of interpretation for most common commercial terms used in contracts for the sale of goods.").

the goods, once unloaded from the arriving means of transport, are placed at the disposal of the buyer at a named terminal at the named port or place of destination."[23]

Third, each agreement provides that settlement (*i.e.*, payment for the raw material) will take place eight business days after receipt.  However, Yamana was entitled to request an "advance" payment equal to 99% of the value of the doré delivered to RMC.  (Cerro Moro Agreement § 4.1; Jacobina Agreement § 4.1.)

Fourth, each agreement provides how the purchase price for the doré will be determined (*e.g.*, "spot or on the prevailing London Bullion Marketing Association (LBMA) Prices (AM or PM in the case of Gold), or as mutually agreed upon by [Yamana] and [RMC].")  (Cerro Moro Agreement § 6; Jacobina Agreement § 6.)

Fifth, payment is made, at Yamana's option, in cash or Loco London metal credit on each "value outturn date" to Yamana's designated bank or Loco London metal account, as applicable (Cerro Moro Agreement § 6.3; Jacobina Agreement § 6.3.)

Sixth, the notice provision in each agreement refers to Yamana as "Seller" and RMC as "Buyer."  (Cerro Moro Agreement § 15.1; Jacobina Agreement § 15.1.)

In its Customer Statement, Yamana completely ignores the foregoing provisions and predictably contends that the agreements created a bailment relationship.  Specifically, Yamana argues that the agreements evidence the parties' "unambiguous intent" to preserve Yamana's ownership rights by providing Yamana with "substantive control" over the doré both before and after melting.  [ECF No. 782 ¶ 22.]  In support, Yamana relies on four provisions from the agreements – providing that risk of loss passes to RMC upon delivery to a specified carrier, granting Yamana the right to have a representative present during initial weighing and assaying,

---

[23] *Incoterms rules 2010*, ICC, https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/.

providing that RMC will place the doré in a secure vault pending the arrival of Yamana's representative unless otherwise agreed, and granting Yamana the right to inspect RMC's facilities and activities at reasonable times in a reasonable manner. (*Id.*) Contrary to Yamana's suggestion that it maintained "substantive control" over the doré it delivered to the Debtors, none of the provisions evidences such control over the doré, particularly after weigh and sampling for the assay were complete and the materials entered the refining process.

Next, Yamana argues that the agreements are silent on transfer of title and, as a result, title could, therefore, never pass to RMC. [ECF No. 782 ¶¶ 23–24.] This contention is completely at odds with the UCC. As discussed in Section I.D.2 below, absent express agreement of the parties to the contrary passing title earlier, title to goods passes upon delivery to RMC under the UCC's default rule. Fla. Stat § 672.401; N.Y. U.C.C. § 2-401.

Lastly, Yamana argues that its agreements required RMC to refine its doré into "traceable and identifiable" refined bars consisting exclusively of Yamana metals. [ECF No. 782 ¶ 25.] This argument lacks any foundation whatsoever in the documents or reality. In support, Yamana cites the section of the agreements entitled "Melting" – which describes the process for taking homogenous samples from doré delivered to RMC for initial assay testing – for the proposition that Yamana's doré must, therefore, have also been segregated during the entire refining process and refined into separate and identifiable Yamana-only refined bars. (*Id.* ¶ 26.) The Movants do not contend that doré was commingled prior to weighing, sampling, and assay. However, the doré was immediately commingled following sampling as part of the refining process. (Avila Decl. ¶¶ 8–9.) Nothing in the Yamana Agreements provides or requires otherwise.

Puzzlingly, Yamana highlights the Debtors' "Peace of Mined" program for the proposition that RMC "had the technological capacity to refine [doré] into traceable and identifiable refined

49262387;1

bars" and, therefore, "there is no reason why other customers' doré would need to be commingled with Yamana's to form a refined bar." [ECF No. 782 ¶¶ 26, 27.] However, it is undisputed that the doré at issue was not refined through the Peace of Mined program. (Avila Decl. Ex. ¶ 13.) The Debtors' ability to separately refine a customer's raw materials does not impose an obligation on them to do so.

### 6. Premier Gold Mines Limited

The Premier Gold Agreement is substantially similar to the Yamana Agreements. Page one states that the agreement was for the "refining and forward/spot sales of precious metal" from Premier Gold's Mercedes mine located in Sonora, Mexico. (Premier Gold Agreement at 1.)[24]

The Premier Gold Agreement likewise contains substantially identical provisions setting forth:

- when settlement will take place (eight business days after receipt by RMC) (*id.* § 4.1);

- the advance rate (99% of the value of the doré) (*id.*);

- how the price for the doré will be calculated (spot, London fixing or as mutually agreed upon) (*id.* at § 6);

- how payment will be made on each "value outturn date" (cash to Premier Gold's designated bank account or Loco London metal credit to Premier Gold's designated metal account, as applicable) (*id.* at § 6.2); and

- a notice provision in each agreement refers to Premier as "Seller" and RMC as "Buyer." (*Id.* at § 15.1.)

---

[24] A true and correct copy of the Premier Gold Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 5**.

In its Customer Statement, Premier Gold completely ignores these provisions and argues that its agreement with RMC provided solely for refining services and not for the sale of goods. [ECF No. 451 ¶ IV.b.]  First, Premier Gold argues that the agreement does not include a sales price.  (*Id.*)  As discussed above, the Premier Gold agreement clearly provides a mechanism for determining the purchase price.  This formula is conspicuously set forth in a section of the agreement titled "PRICING FOR GOLD AND SILVER."   (Premier Gold Agreement § 6 (emphasis in original).)  This pricing mechanism fully satisfies the requirements of the UCC. (*See supra* Section I.A.4.(iii).)

Second, Premier Gold inexplicably asserts that "no consideration was ever paid by RMC." [ECF No. 451 ¶ IV.b.]  As described above, the Premier Gold Agreement explicitly provides for both advance payments and final settlements in the form of cash or Loco London metal credit. Premier itself acknowledges that RMC generally paid for doré via metal credit to Premier Gold's designated account at ScotiaMocatta, a Loco London clearinghouse.  (*Id.* ¶ VI.)  Accordingly, Premier does not appear to seriously contest this point.

Third, Premier Gold claims that "any notion that RMC paid for [doré] with [refined metals] is nonsensical because RMC did not own the [refined metals]."  (*Id.* ¶ IV.b.)  The only thing that is nonsensical is this argument.  By its terms, the Premier Gold Agreement provided for RMC to purchase doré from Premier Gold.  Premier Gold agreed to be paid in cash or Loco London metal credits.  Premier Gold was not paid with refined metals and, even if it were, such refined metals would be like-kind and could not be traced to the doré delivered by Premier Gold.

Finally, Premier Gold claims that the parties' course of dealing establishes that no sales were intended.  (*Id.* ¶ IV.a.)  However, as discussed in Section I.C. below, evidence of course of dealing is inadmissible to vary or contradict the unambiguous Premier Gold Agreement.

Regardless, the course of dealing detailed by Premier Gold describes the shipment, weight and assay, refining, advance payment and settlement processes set forth in the Premier Gold Agreement, all of which are consistent with a sale transaction. Nothing in the purported course of dealing suggests a bailment relationship or that RMC was obligated to return the exact precious metals recovered from the doré delivered to it by Premier Gold.

### 7. Minas de Oroco

The Minas de Oroco Agreement is substantially similar to the Yamana and Premier Gold Agreements. Again, page one of the Minas de Oroco Agreement states that it was for the "refining and forward/spot sales of precious metal" from Minas de Oroco's Cerro Colorado mine located in Sonora, Mexico. (Minas de Oroco Agreement at 1.)[25]

Minas de Oroco's agreement likewise contains substantially identical provisions setting forth:

- when settlement will take place (10 business days after receipt by RMC) (*id.* § 4.1);

- the advance rate (95% of the value of the doré) (*id.*);

- how the price for the doré will be calculated (spot, prevailing London Bullion Marketing Association (LBMA) Prices (AM or PM in the case of Gold), or as mutually agreed upon) (*id.* at § 6); and

- how payment will be made on each "value outturn date" (cash or Loco London metal credit to Minas de Oroco's designated bank or metal account, as applicable) (*id.* at § 6.3); and

---

[25] A true and correct copy of the Minas de Oroco Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 7**.

49262387;1

- a notice provision in each agreement refers to Minas de Oroco as "Seller" and RMC as "Buyer." (*Id.* at § 15.1)

In its Customer Statement, Minas de Oroco ignores its individually negotiated agreement with RMC and discusses only the Standard Terms. [ECF No. 447 § 5.] As shown more fully below, the Standard Terms confirm that the transactions between Minas and RMC were for the purchase and sale of goods.

### B. The Standard Terms Confirm the Parties' Intent to Enter into Purchase and Sale Contracts

Primero, Pretium, and Yamana each executed the RMC Standard Terms at approximately the same time each entered into its respective agreement with RMC. The RMC Standard Terms are consistent with these Contract Customers' Agreements and further evidence that the relationship between the Debtors and those customers is that of a buyer and seller for the purchase and sale of goods providing as follows:

- Warranty of Title: "Customer warrants to RMC that *it has good and marketable title* to said property, full authority *to sell and transfer* said property, and that *said property is sold* free of all liens, encumbrances, liabilities, and adverse claims of every nature and description whatsoever." (RMC Standard Terms at 1, Avila Decl. Ex. D (emphasis added).)

- Indemnity: "Customer further warrants to RMC that it will fully, defend, protect, indemnify, and hold harmless RMC and its lawful successors and assigns from any adverse claim thereto." (*Id.*, Avila Decl. Ex. D.)

- Risk of Loss: "Risk of loss of material will pass from Customer to RMC upon delivery to and acceptance at RMC's refinery, unless otherwise agreed." (*Id.*, Avila Decl. Ex. D.)

- Refining Charges: "All RMC [refining] charges are payable upon the rendering of an invoice. . . . Until such time, *RMC shall be deemed to retain title* to and a security interest in all material covered by any RMC invoice to secure the payment of the same." (*Id.* at 2, Avila Decl. Ex. D (emphasis added).)

- RMC Purchases:

  - "Customer warrants that any *purchase or sale contract* has been effectuated by Customer for the sole purpose of securing pricing *for the ultimate sale or purchase*

*of precious metals* and has not been made for any speculative reason whatsoever." (*Id.* at 3, Avila Decl. Ex. D (emphasis added).)

- o "By agreeing to the terms and conditions contained herein, and receiving an e-mail confirming the details of Customer's trade, *Customer agrees that he has entered into a written, legally binding contract for the sale/purchase of precious metals* contained within the confirmation e-mail. *Customer further warrants that said contract is in compliance with the Florida Uniform Commercial Code § 672.201, § 668.003 (4) and § 668.004 and agrees to waive any defenses under Florida Uniform Commercial Code § 672.201*." (*Id.* at 3-4, Avila Decl. Ex. D (emphasis added).)

- Parties: "*Both Parties agree that they are merchants as defined in the Uniform Commercial Code § 2-104(1)*." (*Id.* at 4, Avila Decl. Ex. D (emphasis added).)

Significantly, when the parties wanted to establish a bailment relationship, they did so expressly. With respect to consignments (*i.e.*, metals delivered by the Debtors to Customers for sale to third party buyers), the Standard Terms reserve title in the Debtors. (Standard Terms at 3, Avila Decl. Ex. D ("It is expressly agreed upon by both parties that any and all material shipped to Customer, and/or delivered to Customer, and/or released to Customer on a *consignment/bailment* basis remains property of RMC . . . . Customer does not have legal title to such property . . . .") (emphasis added).) The failure to include similar title reservations and bailment language in the other portions of the Standard Terms further evidences the intention that these transactions were sales, not bailments.

## C.    Extrinsic Evidence of Unincorporated Documents, Course of Dealing and Subjective Intent Is Inadmissible

Unable to establish their claims based on the words in their agreements, the Contract Customers impermissibly rely on evidence beyond the four corners of their agreements to manufacture a bailment claim. The Contract Customers contend that the surrounding circumstances, their course of dealing with the Debtors, their contracts with third parties, or

industry standards, are admissible to establish the parties' intent to create a bailment.[26]  However,

the Court may not consider this extrinsic evidence to vary the terms of the unambiguous Contract

Customer Agreements.  (*See supra* Section I.C.)[27]

Moreover, of the eleven Contract Customer Agreements, eight provide that they are fully

integrated, that they supersede all prior understandings, and that that there are no extraneous

representations, warranties, terms, or conditions except as is expressly set forth in the agreement.

For example, Section 15.3 of the Compania Minera Pitalla Agreement provides:

> 15.3    This letter agreement constitutes the entire agreement between the parties
> with respect to the subject matter hereof and cancels and supersedes any
> prior understandings and agreements between the parties with respect
> thereto. There are no representations, warranties, terms, conditions,
> opinions, advice, assertions of fact, matters. Undertakings or collateral
> agreements, express, implied or statutory, by or between the parties (or by
> any representative thereof) with respect to the subject matter hereof other
> than as expressly set forth in this letter agreement.

(Compania Minera Pitalla Agreement § 15.3.)[28]

Similarly, eight of the Contract Customer Agreements provide that they may not be

amended, modified or supplemented absent a written agreement between the parties.  For example,

Section 15.4 of the Compania Minera Pitalla Agreement provides that the "agreement may be

amended, modified or supplemented only by the written agreement of the parties."  (Compania

Minera Pitalla Agreement § 15.4.)[29]

---

[26] *See, e.g.*, ECF No. 144 ¶ 7–8 (Premier Gold); ECF No. 161 ¶¶ 14–25 (Pretium); ECF No. 447 at 4 (Minas de Oroco); ECF No. 460 ¶ 17 (First Majestic); ECF No. 471 ¶ 15 (Argonaut); ECF No. 470 ¶ 4 (Coeur); ECF No. 451 ¶ IV (Premier Gold).

[27] Pretium, Coeur, and Yamana all contend that their agreements with the Debtors are unambiguous.  [ECF No. 161 ¶¶ 46–47 (Pretium); ECF No. 470 ¶ 3 (Coeur); ECF No. 782 ¶ 22 (Yamana).]

[28] Minera Real de Oro Agreement § 15.3; Pretium Agreement § 16.1; Coeur Mexicana Agreement § 13; Coeur Rochester § 15.3; Jacobina Agreement § 15.3; Cerro Moro Agreement § 15.3; Premier Gold Agreement § 15.3; and Minas de Oroco Agreement § 15.3.

[29] *See* Minera Real de Oro Agreement § 15.4; Pretium Agreement § 16.1; Coeur Mexicana Agreement § 13; Coeur Rochester § 15.4; Jacobina Agreement § 15.4; Cerro Moro Agreement § 15.4; Premier Gold Agreement § 15.4; and Minas de Oroco Agreement § 15.4.

Finally, Pretium's attempts to rely on its contracts with various "Offtakers" that allegedly agreed to purchase metal credits from Pretium are equally unavailing.   [ECF 161 ¶¶ 10–13, 50.] RMC is not a party to those agreements, and they were not incorporated into the Pretium Agreement with RMC by reference.[30]  RMC is not in privity with any of the supposed Offtakers and is not bound by the terms of any agreements that may exist between Pretium and those Offtakers and those agreements are inadmissible to vary or contradict the parties' written agreement.  However, even if the Offtaker agreements were admissible, nothing about delivering Loco London metal credits otherwise payable to Pretium to the Offtakers in accordance with Pretium's payment instructions is inconsistent with a sale transaction.

### D.    Title to the Materials Passed to the Debtors No Later than Delivery

#### 1.    Title Passed to the Debtors in Accordance with the Bucket 3 Agreements upon Delivery to an Armored Car Service or to the Debtors' Refinery

As discussed in Sections I.A.1, I.A.2 and I.A.3, each of the Bucket 3 Agreements provides clearly and unambiguously when title to the doré passes from the Bucket 3 Customer to RMC.  In the case of Argonaut and First Majestic, title passed upon delivery to a secured carrier. (*See* Section I.A.1–2.)   In the case of Pretium, title passed upon delivery to the refinery.

---

[30] Under Florida law, a document "must be considered incorporated by reference where the incorporating document specifically provides that it is subject to the incorporated document" and "may be considered incorporated [by reference] if it is sufficiently described or referred to in the incorporating agreement."  *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993) (quoting *Hurwitz v. C.G.J. Corp.*, 168 So. 2d 84, 87 (Fla. 3d. DCA 1964)).

Under New York law, a document is deemed incorporated by reference where the incorporating agreement specifically references and sufficiently describes the document to be incorporated, such that the latter may be identified beyond doubt. *American Dredging Co. v. Plaza Petroleum, Inc.*, 799 F. Supp. 1335, 1338 (E.D.N.Y. 1992) (citing *Chiacchia v. Nat'l Westminster Bank USA*, 124 A.D.2d 626, 628 (2d Dep't 1986), *vac'd in part on other grounds*, 845 F. Supp. 91 (E.D.N.Y. 1993)).  Certain New York courts have also required that it be "clear that the parties to the agreement had knowledge of and assented to the incorporated terms."  *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995)).

49262387;1

(*See* Section I.A.3.)  The Bucket 3 Customers' attempts to avoid this unambiguous language in their agreements are unavailing.

Even though Pretium acknowledges that, under ordinary rules of contract interpretation, a court should harmonize and give effect to all provisions in an agreement, it nevertheless systematically ignores this well-established rule, even asking the Court to disregard the unambiguous title transfer provision.  [ECF No. 161 ¶ 56; *see id.* ¶ 61 (arguing that the court should "disregard" section 4.1(b).)]  There is absolutely nothing in the Pretium Agreement suggesting that title did not unequivocally transfer to the Debtors upon delivery to the refinery and interpreting Section 4.1(b) as it is written does not conflict with Sections 7, 7.2 and 7.3 (pricing and payment provisions), which  merely confirm that Pretium could elect to receive payment for its doré in cash or metal credits.

First Majestic's and Argonaut's attempts to explain away these unambiguous title transfer provisions in their agreements fail for substantially the same reasons.  [*See* ECF No. 460 ¶ 13, ECF No. 471 ¶ 12.]  The only way to give effect to all of the provision in the Bucket 3 Agreements is to find that title transferred to RMC in accordance with their express terms, upon delivery to a secure carrier or to the Debtors' refinery, as applicable.

> **2.      Title to the Doré Passed to the Debtors Under the Bucket 4 and 5
> Agreements No Later than Delivery to the Debtors**

The transactions between the Debtors and the Bucket 4 and 5 Contract Customers are governed by Article 2 of the UCC relating to the purchase and sale of goods.  Fla. Stat. § 672.102; N.Y. UCC § 2-102.  Under Section 2-401 of the UCC, title to goods passes to the buyer no later than upon delivery of the goods by the seller to the buyer.  Fla. Stat. § 672.401; N.Y. UCC § 2-401.  Section 672.401 of the Florida UCC should be considered in its entirety and provides as follows:

> Each provision of this chapter with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and *matters concerning title become material the following rules apply*:
>
> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (s. 672.501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this code. *Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.* Subject to these provisions and to the provisions of the chapter on secured transactions (chapter 679), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
>
> (2) *Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes her or his performance with reference to the physical delivery of the goods,* despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . . .

Fla. Stat. § 672.401 (emphasis added); *see* N.Y. UCC § 2-401.

The rule that title passes to the buyer no later than delivery is unassailable and cannot be negated by the contracting parties. Section 2-401(1) of the UCC "negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained." *In re J. Adrian Sons, Inc.*, 205 B.R. 24, 26 (Bankr. W.D.N.Y. 1997) (quoting *Connecticut Bank & Trust Co. v. Schindelman (In re Bosson)*, 432 F. Supp. 1013, 1020 n. 24 (D. Conn. 1977)).

As bankruptcy courts uniformly recognize:

> *Section 2-401 pronounces two immutable rules to which every sales agreement is subject.* The first rule is that title cannot pass until goods are 'identified to the contract.' The second rule is that once goods are in the possession of the buyer, any reservation of an interest or title by the seller is deemed a security interest. *Subject to those two rules*, the parties may otherwise determine by mutual agreement the point in the transaction that title will pass to the buyer. . . . *In no event, however, may title remain in the seller after the buyer takes possession of the goods* (or of a 'document of title' to the goods, if applicable), *regardless of the parties' agreement or intent.*

43

*Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.)*, 407 B.R. 65, 76-77 (Bankr. D. Vt. 2009) (emphasis added) (quoting *Malloy v. Brazeal (In re Callahan)*, No. 07-1021, 2007 WL 3018946, at *5-6 (Bankr. N.D. Okla. Oct. 11, 2007); *accord In re Aleris Int'l, Inc.*, 456 B.R. 35, 41 (Bankr. D. Del. 2011) (finding that "irrespective of any agreement between the parties, a seller may never retain title to goods that have already been delivered to the buyer, and any such retention is always reduced to a mere security interest in the delivered goods."); *Wild West World, L.L.C. v. Larson Int'l, Inc. (In re Wild West World, L.L.C)*, No. 07-5257, 2008 WL 4642266, at *4 (Bankr. D. Kan. Oct. 17, 2008) ("Section 2–401(1) negates the ability to delay passage of title beyond delivery. Any express agreement of the parties or reservation of title in the seller is limited by § 2–401(1)"); *Ivey v. Wilson (In re Payne)*, No. 05-2118, 2006 WL 3524442, at *6 (Bankr. M.D.N.C. Dec. 6, 2006) (holding that title passed despite contracting parties' reservation of title, leaving seller only with a reservation of a security interest); *Crouch Supply Co. v. Piknik Prods. Co., Inc. (In re Piknik Prods. Co., Inc)*, 346 B.R. 863, 866–67 (Bankr. M.D. Ala. 2006) (holding that retention of title provision in sales agreement was ineffective to prevent title from passing); *Riddle Farm Equip., Inc. v. Boles (In re Boles)*, Nos. 03-53196C-7W, 04-6027, 2004 WL 3510119, at *2 (Bankr. M.D.N.C. Oct. 29, 2004) (finding that even with explicit agreement that title was not to pass until financing was obtained or the purchase price paid, title nevertheless passed by operation of law when tractor was delivered to defendant, leaving plaintiff, at most, only with a security interest); *see also* 1 James J. White, Robert S. Summers & Robert A. Hillman, Uniform Commercial Code § 4:31 (6th ed. 2017).

It is undisputed that the Contract Customers' delivery of doré to the Debtors was complete as of the Petition Date.  Accordingly, as a matter of law, title to the doré passed to the Debtors prepetition and the Disputed Assets and their proceeds belong to the Debtors' bankruptcy estates.

Nothing in *Subaru Distributors Corp. v. Subaru of Am., Inc.*, No. 98 CIV. 5566, 2002 WL 188473 (S.D.N.Y. Feb. 5, 2002), or any of the other cases cited by the Contract Customers in their opposition to the Bucket 1 Customer summary judgment motion requires a different result. [*See* ECF No. 1119.] In *Subaru*, the Court concluded that title could transfer at the time of payment so long as payment occurred before delivery. *Id.* at *45. The court's observation in dicta that contracting parties may extend transfer of title beyond delivery if they have done so "explicitly" in their contract is not binding on this court and is contrary to multiple well-reasoned bankruptcy decisions discussed above. *Barnett v. Jamesway Corp. (In re Jamesway Corp.)*, 235 B.R. 329, 336 n.1 (Bankr. S.D.N.Y. 1999). Regardless, the facts in *Subaru* were unique (described by the court as a "byzantine commercial relationship that appears to be *sui generis* in the annals of automobile importation"), *Subaru*, at *19, and the court's holding is clearly tied to those facts, which are completely inapplicable here.

In *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ 9580 (HB), 2008 WL 594773, at *4–5 (S.D.N.Y. Mar. 5, 2008), the court did not hold that the parties could extend transfer of title beyond delivery. The court, after concluding that Italian law (and not the UCC) likely governed the parties' dispute, noted in dicta, as an alternative holding, that the *Subaru* decision was sufficient grounds to warrant "further litigation" and granted plaintiffs' motion for a preliminary injunction. *Id.* at *4. Ultimately, the court concluded that Italian law governed and never reached the UCC issue. *See Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580 (HB), 2009 WL 89115, at *10 (S.D.N.Y. Jan. 14, 2009) ("This Court adopts the reasoning set forth in its prior opinion on Plaintiffs' motion for a preliminary injunction to the effect that Italian law, and not the UCC, applies to the Distribution Agreement pursuant to the choice-of-law clause").

*S & H Communs., Inc. v. Seiscor Techs., Inc.*, 221 A.D.2d 156, 156 (1st Dep't 1995), is a four-sentence opinion from the First Department with little discussion of the facts that, as best the Movants can tell, has never been cited in another reported decision. Whatever the facts and issues were (it is nearly impossible to determine), the court did not hold or imply that transfer of title could be delayed beyond delivery.

In *U.S. v. Chowaiki*, 369 F. Supp. 3d 565, 575 (S.D.N.Y. 2019), the court held that, where an agreement is silent on the passage of title, the default rule applies, finding that the purchaser who attempted to reserve title after delivery was left with an unperfected security interest.

Finally, in *Staaldam Beheer B.V. v. ASAP Installations, LLC*, No. 8:09-CV-02226-T-17EAJ, 2010 WL 1730780, at *5–6 (M.D. Fla. Apr. 28, 2010), the court did not hold that in an ordinary purchase and sale transaction, transfer of title could be delayed beyond delivery. In that case, the equipment at issue was already in the possession of the putative purchaser as a result of a prior lease agreement. *Id.* at *2, 5. The court denied the defendant's motion to dismiss because it was unclear whether there was even a purchase and sale contract. *Id.* at *6.

However, even if title transfer could be delayed beyond delivery, the Contract Customers' arguments would still fail as a matter of law because there is no language in the Premier, Yamana or Minas de Oroco agreements whatsoever stating when title transfers.[31] And while the Coeur Agreements provide that title shall pass upon completion of the "Purchaser Obligations," as discussed in Section I.A.4 above, that does not require payment to be made before title can transfer.

---

[31] Under Canadian law, title generally passes to the buyer at the time intended by the parties. If not specified by the parties in the contract, the various provincial Sale of Goods Acts provide default rules for determining the intention of the parties. In the case of a contract for the sale of future goods, title passes to the buyer when the goods are "unconditionally appropriated" to the contract (akin to the UCC's "identification" concept). Further, where the seller delivers the goods to the buyer or to a carrier for delivery to the buyer and there is no retention of title clause, the seller is deemed to have unconditionally appropriated the goods to the contract at the time of delivery. *See, e.g.,* British Columbia Sale of Goods Act, R.S.B.C. 1996, c. 410, §§ 22, 23; Ontario Sale of Goods Act, R.S.O. 1990, c. S.1, §§ 17, 18. Accordingly, applicable Canadian law is substantively identical to the UCC. (*See* Exhibits C and D.)

Indeed, as Coeur concedes, Coeur contracted with the Debtors to sell doré "on credit."  [ECF No. 124, Exs. A-1, A-2.]  The Purchaser Obligations require RMC to "purchase the Material and/or perform the services required to be performed by Purchaser pursuant to this Agreement in order to determine the final purchase price for the Material."  (Coeur Mexicana Agreement § 1.4.)  There is no dispute that the doré delivered by Coeur was weighed and assayed and that the price could be determined.  Title has passed.

## II.    NO CONTRACT CUSTOMER CAN ESTABLISH A BAILMENT

### A.    The Proper Test for Determining Sale or Bailment Is Whether the Identical Article Delivered Is to Be Returned in the Same or Some Altered Form

As the Contract Customers agree, a bailment is defined as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be."  *Monroe Sys. for Bus., Inc. v. Intertrans Corp.*, 650 So. 2d 72, 75 (Fla. 3d DCA 1994) (quoting *Dunham v. State*, 192 So. 324, 326 (Fla. 1939)); *see Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001) (quoting *Mays v. New York, N.H. & H.R. Co.*, 197 Misc. 1062, 1063–64 (App. Term 1st Dep't 1950)); ECF No. 1119 at 13.

In distinguishing a bailment from a sale, the Supreme Court explained over a century ago:

> The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed.  On the other hand, when there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed.  The transaction is a sale.

*Sturm v. Boker*, 150 U.S. 312, 329 (1893).

This rule applies even where the thing delivered is changed or transformed in some manner:

> [W]here logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be sale or a loan, and the title to the thing delivered vests in the manufacturer. We understand this to be a correct exposition of the law.

*Powder Company v. Burkhardt*, 97 U.S. 110, 116 (1878).

This type of bailment is referred to as "'a bailment . . . *locatio operis faciendi* [*i.e.*] a bailment where work and labor . . . are to be performed upon the thing delivered to the bailee.'" *B.A. Ballou and Company, Inc. v. Citytrust*, 591 A.2d 126, 130 (Conn. 1991) (quoting *Douglass v. Hart*, 131 A. 401, 402 (Conn. 1925)). A bailment of this character is formed when the parties "enter into a contract, express or implied, or both, by which the bailee engages to perform the agreed services and return the thing bailed in its altered or repaired form and the bailor in return for the services of the bailee agrees to pay him the agreed upon compensation." *Id.*[32]

Accordingly, in distinguishing bailments from sales, the test of a bailment is that the **identical** thing is to be returned in the same or some altered form; if another thing of equal value is to be returned, the transaction is a sale. *C.W.B. Enterprises, Inc. v. K.A.T. Equipment Corp.*, 449 So. 2d 354, 355 (Fla. 3d DCA 1984) (noting that "every bailment contract contemplates return of the property bailed, either in the same or altered form" (citing *D & D Associates, Inc. v. Sierra Plastics, Inc.*, 570 S.W.2d 205, 206 (Tex. Civ. App. 1978))); *Delta Smelting & Refining Co. (Re)*, [1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383 ("A bailment arises only where there is a delivery

---

[32] The Contract Customers contend that the test for a bailment is the "intent of the parties" without elaborating the requisite intent – *i.e.*, to return the same thing in the same or some altered form. [ECF No. 1119 at 17.] Where, as here, a contract contains clear and unambiguous language, the court must determine the parties' intent from the four corners of the governing agreement. (*See* Legal Standard and Governing Law § C, *supra*.) The Contract Customer Agreements are clear that none of parties intended that the Contract Customers would receive back the same raw materials in the same or some altered form.

49262387;1

of property on the basis that the same property will be returned. Its form may be altered, but it must be the same property.  Thus where the material delivered is mixed with other material, on the basis that an equivalent quantity of the same type of material will be returned, the contract is one of sale, not bailment.").[33]

Courts have applied this test consistently in the refining context, and where the identical product is not returned, courts routinely conclude the transaction is a sale and not a bailment. *See, e.g.*, *Chisholm v. Eagle Ore Sampling Co.*, 144 F. 670, 671−72 (8th Cir. 1906) ("[I]t seems clear to us that the parties acted under the contract as though the transactions were sales of the ore upon the basis of the assay values of samples"); *Welding Metals Inc. v. Foothill Capital Corp.*, No. 3:92 CV 00607 (WWE), 1997 WL 289671, at *9 (D. Conn. Apr. 14, 1997) ("because there is no evidence that the metal returned to [the customer] was the product of the metal originally delivered, except 'solely by chance,' the arrangement between [the debtor and the customer] could not constitute a bailment"); *Ballou*, 591 A.2d at 130 (rejecting bailment claim where scrap metal was "commingled" and "there was no understanding or agreement that the precise thing bailed would be returned"); *WESGO Division of GTE Products Corp. v. Harrison (In re Sitkin Smelting & Refining, Inc.)*, 648 F.2d 252, 254 (5th Cir. 1981) (finding no bailment where scrap material was commingled during refining and could not be returned and refiner "agreed to either purchase the precious metals recovered upon processing or return metals of like kind and quality less a processing fee"); *Sitkin v. R-One Alloys, Inc.*, No. PB 04-0495, 2006 WL 625273, at *4, 6 (R.I. Super. Ct. Mar. 13, 2006) (holding that a toll account transaction with a customer was a sale and not a bailment because the customer could not "claim control over" the raw materials once it

---

[33] A copy of *Delta Smelting & Refining Co. (Re)*, [1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383 is attached to this brief as **Exhibit E**.

entered the refining process and became commingled; because the customer "did not require that the identical metal contained in the material be returned, a sale resulted"); *Delta Smelting & Refining Co. (Re)*, B.C.J. No. 2532, 33 B.C.L.R. (2d) 383 (dismissing bailment claim where "refining process necessarily involved the intermixing of metal derived from various customers together with Delta's own metal" and "final product was indistinguishable as to source"); *see also General Motors Corp. v. Bristol Indus. Corp. (In re Bristol Indus. Corp.)*, No. 2-81-0512, 1981 Bankr. LEXIS 5204, at *21−24 (Bankr. D. Conn. Dec. 14, 1981) ("Here, the finished produced delivered to General Motors after completion of the conversion process is a new product dissimilar from the original raw scrap shipped to Bristol.  The agreement does not provide for, and the parties did not contemplate, that the delivered scrap metals would remain separate and identified."), *rev'd on other grounds*, 690 F.2d 26 (2d Cir. 1982).

> **B.**     **The Debtors Were Not Required to Return the Identical Article Delivered by the Contract Customers in the Same or Some Altered Form and Did Not Do So**

Doré delivered by the Contract Customers to the Debtors was commingled and became unidentifiable once it entered the refining process.  (Avila Decl. ¶¶ 8, 9, 13.)  There is nothing in the Contract Customers' agreements stating or even implying that the precious metals extracted from the Contract Customers' doré would be returned to them upon the completion of the refining process.  To the contrary, as discussed above, each of the Contract Customer Agreements made clear that the doré were being purchased by the Debtors and each customer could decide how it wanted to be paid for the "value" of those raw materials based upon their precious metal content: in cash or in Loco London metal credits.  Receiving payment in Loco London metal credits is antithetical to the return of the same metal the Contract Customers delivered to the Debtors.  Metal credit transfers are like currency or wire transfers; they are not physical transfers of metal kept in the vault.

*R-One Alloys, Inc.*, 2006 WL 625273, *Delta Smelting & Refining Co. (Re)*, [1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383, and *WESGO*, 648 F.2d 252, are all instructive.

In *R-One Alloys*, the customer provided scrap to the refiner (R-One) for refining and processing. 2006 WL 625273, at *1. Upon delivery, the scrap was weighed and sampled to determine its value. *Id.* at *4. R-One then commingled the scrap with material received from other customers and refined the scrap to produce a finished product. *Id.* In exchange, the customer received either a cash payment (net of processing fees) or a credit to its toll account that was denominated in quantities of precious metals. *Id.* Based on these facts, the court concluded that the customer could have had no expectation that the identical metal would be returned. *Id.* at *2. Instead, the court reasoned, the customer expected to "receive equal value or an equal amount of gold that was equivalent to the sampled and quantified amount contained in the pre-refined raw material." *Id.* at *4. Thus, the court held, the transaction was a sale and not a bailment. *Id.* at *6.

In *Delta Smelting*, the British Columbia Supreme Court considered and rejected the arguments now pressed by the Contract Customers on facts virtually identical to the current dispute. B.C.J. No. 2532, 33 B.C.L.R. (2d) 383.[34] In *Delta Smelting*, certain of the customers delivered doré to the debtor for refining. Initially, the customers' metals remained segregated while Delta assayed each customers' raw materials to determine the precious metal content. However, after assay, the raw materials were commingled with material delivered by other customers and with Delta's own metal. At the end of the refining process, the refined gold was placed in the vault. However, there was no attempt made to identify the metal attributable to any

---

[34] The Nusantara and Pretium Agreements purport to be governed by British Columbia law. The Compania Minera Pitalla, Minera Real de Oro, Premier Gold Mines, Yamana and Minas de Oroco purport to be governed by Ontario law. (*See* Legal Standard and Governing Law § B *supra*.) However, as noted above, these parties all concede that Canadian law is substantially identical to New York and Florida law.

customer.  Rather, the customer was entitled to an equivalent quantity of gold.  The court held that

on those facts, no bailment could exist.  The court explained:

> A bailment arises only where there is a delivery of property on the basis that the same property will be returned. Its form may be altered, but it must be the same property. **Thus where the material delivered is mixed with other material, on the basis that an equivalent quantity of the same type of material will be returned, the contract is one of sale, not bailment:** Crawford v. Kingston and Johnston (1952) O.R. 714; South Australian Ins. Co. v. Randell, [1886] 3 L.R.P.C. 101. (The facts are distinguishable from those in Busse v. Edmonton Grain & Hav Co. Ltd., *[1932] 1 W.W.R. 296* (B.C.c.A.), where no intermixing was contemplated and there was a right to return the identical grain and, the grain was not to be consumed).
>
> These principles negate the claim that Delta was merely a bailee with property remaining with the creditors. **The refining process necessarily involved the intermixing of metal derived from various customers together with Delta's own metal. The final product was indistinguishable as to source, and was treated as such in Delta's accounting and inventory systems. All the ROM and CC customers bargained for was the return of a certain amount of equivalent metal in kind - not the same property they turned over to Delta**.

*Id.* (emphasis added).

Finally, in *WESGO*, the debtor had a contract with its customer whereby the debtor refined

scrap material for WESGO.  The bankruptcy court found that the contact was for the sale of goods,

and the Fifth Circuit affirmed.  648 F.2d at 253.  The court found that the parties' agreement was

"essentially a contract for the sale of future goods[,] . . . with payment in the form of a purchase

price established by an agreed-upon formula or in refined metals of like kind and quality less a

processing fee."  *Id.* at 253, 254.  The court observed that, "[a]t WESGO's option, Sitkin agreed

to either purchase the precious metals recovered upon processing or return metals of like kind and

quality less a processing fee."  *Id.* at 253.  However, "the metals actually recovered from WESGO's

scrap could not be returned, because during the refining process the metals from one client's scrap

were commingled with those from other scrap."  *Id.*

52

The facts before the Court are identical in all material aspect to the facts before the courts in *R-One Alloys*, *Delta Smelting*, and *WESGO*. The Contract Customers could have had no expectation that they would receive back the identical metal they delivered to the Debtors. The raw materials delivered by the Contract Customers was commingled with raw materials delivered by other Customers and with the Debtors' own precious metals. Once the doré entered the refining process, the Contract Customers had no ability to claim control over it. The Debtors had no ability to trace the gold extracted from the Customers' doré to the Refined Metals and did not in fact do so. After refining, the Contract Customers were entitled to "receive equal value or an equal amount of [metal credits] that was equivalent to the sampled and quantified amount contained in the pre-refined raw material." *R-One Alloys, Inc.*, 2006 WL 625273, at *4. To the extent any Contract Customer received back refined metal that was the product of doré originally delivered by it to the Debtors, it was "solely by chance." *See Ballou*, 591 A.2d at 130; *Welding Metals*, 1997 WL 289671, at *9.

Under these circumstances, there can be no bailment.

### C.    Article 7 of the Uniform Commercial Code Is Inapplicable

In their opposition brief to the Debtors and the Senior Lenders' motion for summary judgment as to the Bucket 1 Customers, the Contract Customers suggest that Article 7 of the UCC supports their claim to a bailment. [ECF No. 1119 at 18–19.] This claim fails for at least three reasons.

First, Section 7-207, by its terms, applies to "warehouse receipts." N.Y. UCC § 7-207. A "warehouse receipt" is a "document of title issued by a person engaged in the business of storing goods for hire." N.Y. UCC § 1-201(42). The Debtors were not engaged in the business of storing goods for hire; they were refiners of precious metals. (Avila Decl. ¶ 5.)

Second, even if the Debtors were engaged in the business of storing goods for hire, the "metal reports" and other documents issued by the Debtors could not be warehouse receipts (or any other form of document of title) because they were not issued by a "bailee" (*i.e.*, a person that "acknowledges possession of goods and contracts to deliver them"). N.Y. UCC § 1-201(16).

Finally, even if the Contract Customers could overcome these threshold issues, Section 7-207 would have no applicability here because there are no "fungible portions of an identifiable mass." The doré delivered by the Contract Customers, like the raw materials delivered by all other Customers, was not fungible. The raw materials consisted of, among other things, doré (crude and impure gold or silver bars from mining customers), old jewelry, scrap metal, polishing sweeps, and impurities (slag) from various sources, each of which contained different metals of different quality and value that had to be assayed and then chemically processed to separate and refine the various metals. (*See, e.g.*, ECF No. 463 (scrap metal and polishing sweeps); ECF Nos. 464, 470, & 485 (doré); ECF No. 1090 (jewelry and scrap metal).) As the Contract Customers' individual contracts with the Debtors make clear, the gold and silver doré bars delivered to the Debtors from a single mine were not uniform nor fungible. They contained different precious and non-precious metals in various percentages. (*E.g.*, Compania Minera Pitalla § 1 (Gold "in the range of 20% - 25%"; Silver "in the range of 70% - 75%"; Copper "in the range of 15% - 25%"); Coeur Mexicana § 1.1 ("Gold - in the range of 0.9% to 2.5%"; "Silver - in the range of 73% to 99%"; "Balance – other non deleterious metals"). Far from being fungible or equal, the raw materials delivered by the Contract Customers consisted of a heterogeneous mix of doré bars containing different metals in various percentages, which were then combined with scrap metal, jewelry and other raw materials containing precious metals content.

49262387;1

The process of refining metals from nonfungible raw materials is not akin to the delivery of fungible commodities to a warehouse for mere storage (such as the case of grain delivered by a farmer to an elevator), the type of bailor/bailee relationship that Section 7-207 of the UCC is meant to govern.  A more apt analogy would be to a slaughterhouse that receives sides of beef from a customer, which it breaks down into steaks and chops, combines with beef delivered from other ranches, and then grinds up to produce hamburger patties and sausages for sale to third parties. *Cf. In re Landy Beef Co.*, 30 B.R. 19, 21 (Bankr. D. Mass. 1983) (denying reclamation demand where beef delivered to meat distributor was commingled, boned, processed into beef products, and packaged).  What the Contract Customers provided to the Debtors was commingled with raw materials from various sources, dissolved, and chemically altered.  What came out were new goods that are no longer identifiable or recognizable and cannot be traced to the raw materials that were delivered to the Debtors by any of the Debtors' customers.

### D.     None of the Cases Cited by the Contract Customers Requires a Different Result

The cases cited by the Contract Customers either in their individual Customer Statements or in their brief in opposition to the Movants' Bucket 1 summary judgment motion are legally and factually distinguishable.

In *Public Service Electric & Gas Co. v. Federal Power Commission*, 371 F.2d 1 (3d Cir. 1967), a utility arranged to have fungible natural gas transported through a pipeline.  The court found that a bailment existed even though the defendant was not required to return the identical gas back to the utility, reasoning that, because the gas was merely transported and not altered in any manner, commingling of a fungible commodity did not necessarily defeat an otherwise valid bailment.  *Id.* at 4–5.  However, that decision is limited to relationships involving the commingling of unaltered fungible commodities and is inapposite to the current situation.  *See R-One Alloys, Inc.*, 2006 WL 625273, at *3 n.6 (noting that *Public Service* "stands only for the limited rule that

commingling alone does not defeat a bailment"); *Ballou*, 591 A.2d at 129 n.3 (same).  While the

refined gold and silver produced by the Debtors are fungible commodities, the doré bars sold to

the Debtors by Contract Customers are not.  The raw materials are comprised of scrap, doré, and

other unrefined materials containing different amounts of different metals of different quality and

value that must be assayed.  The raw materials are then commingled with the raw materials

delivered by other customers and residual precious metals within the Debtors' refining equipment

and refined together.  There was no requirement that the Debtors return the exact doré the Contract

Customers originally delivered or an equal amount of commingled doré.  Instead, the Contract

Customers could elect to receive payment in cash or Loco London metal credits.  Where, as here,

an object is altered, transformed, or remanufactured, and the identical thing is not returned, a

bailment cannot exist.

The facts in *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2262 (Bankr.

S.D.N.Y. 2003), are nearly identical to the facts in *Public Service*.  In *Enron*, the court, relying in

part on *Public Service*, found that a bailment existed with respect to fungible natural gas where the

gas was stored and not altered in any manner, even though it was commingled, because the parties'

contract made clear that they intended a bailment and not a purchase and sale.  *Id.* at \*7–11, \*14–

22.  Here, the opposite is true.  As discussed above, the doré delivered by the Customers was not

a fungible commodity.  Indeed, two doré bars in a single shipment might contain various metals

in various percentages.  And even if the doré bars were fungible, the Contract Customer

agreements evidence purchase and sale contracts, not bailments.  The raw materials received from

the Contract Customers were commingled with other non-fungible raw materials and became

unidentifiable.  The commingled materials were then refined, and it is undisputed that no raw

materials delivered by any Contract Customer can be traced into any Refined Product or Minted Product.

In *In re Medomak Canning Co.*, No. BK 75-936, 1977 Bankr. LEXIS 11, at *4 (Bankr. D. Me. 1977), *aff'd*, 588 F.2d 818 (1st Cir. 1978), a supplier contracted with the debtor to process canned baked pork and beans.  Under the parties' agreement, the supplier sent ingredients and packaging and shipping supplies to the debtor who then processed the pork and beans and canned and shipped them directly to the supplier's customers. *Id.* at *4, 21.  Based on these facts and the lack of a purchase price (an indispensable contract term under the Maine UCC), the court concluded that no sale was intended or occurred. *Id.* at *20–21.  Here, the raw materials delivered by each Contract Customer were commingled shortly after it arrived at the Debtors' refinery and each of the Agreements provides a clear purchase price mechanism for metals sold to the Debtors.

In *Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Refining, Inc.)*, 639 F.2d 1213 (5th Cir. 1981), the Fifth Circuit found that a bailment existed where Kodak delivered film waste to the debtor for processing and extraction of silver.  The parties' contract provided that Kodak's "ownership of the film waste would cease only upon its 'destruction or change in identity.'" *Id.* at 1214.  The Court explained, however, that "[p]rocessing [of the film waste], of course, would result in the sale of the silver content to [the debtor]." *Id.* at 1217.  In that case, unlike here, the film waste was never commingled with the debtor's other inventory or processed. *Id.*  It was labeled, segregated and identified at every stage of the process. *Id.*  Thus, even under the *Kodak* reasoning, the current transactions would be sales.  The doré delivered by the Contract Customers has been commingled and processed.  It has lost its "identity" and cannot be returned.  Notably, in *WESGO*, 648 F.2d at 254 (discussed above), a case involving the same debtor, the Fifth Circuit, in an opinion authored by the same judge who wrote the majority decision in *Kodak*, distinguished

the contract in *Kodak* as "somewhat unique," and affirmed the bankruptcy court's conclusion that the parties' contract was a sale contract rather than a bailment contract. *Id.*  The facts in this case are more like *WESGO* than *Kodak* and support a finding that the relationship between the Debtors and the Contract Customers is as buyer and seller.[35]

In *General Motors Corp. v. Bristol Indus. Corp. (In re Bristol Indus. Corp.)*, 690 F.2d 26, 31 (2d Cir. 1982), the non-binding concurring opinion suggested that a bailment existed where a supplier shipped scrap metal to the debtor for processing into alloy strips under a tolling arrangement.  The concurring opinion, relying on *Public Service*, noted that "[w]hen commingling is required by the needs of the trade and is done with the consent of the parties a bailment is established *if that is the intent of the parties*." *Id.* at 30 (emphasis added).  Here, as discussed above, the parties' intent is reflected unambiguously in their agreements, which reflect purchase and sale transactions, not bailments.[36]

In *United States v. Fleet Nat'l Bank*, 271 B.R. at 737, in denying summary judgment, the bankruptcy court found that the parties' contract was ambiguous because it contained "both language of bailment and sale."  As discussed above, the Contract Customer Agreements do not contain any bailment language or any other language suggesting that a bailment existed.

Finally, in *Coro (Canada) Inc. (Trustee of) v. Enthone-OMI (Canada) Inc.*, [1997] O.J. No. 4704, 36 O.R. (3d) 563 (Ont. Gen. Div.), the Ontario Court (General Division) found a bailment

---

[35] Notably, the *Kodak* court did not purport to announce a five-factor test, as has been suggested by some Customers in this case.  [ECF No. 1080 at 17; ECF No. 1119 at 14.]  To the contrary, in *Kodak*, the Court considered certain extrinsic evidence because the Court determined the contract contemplated both a bailment and a sale.  639 F.2d at 1215; *see also United States v. Fleet Nat'l Bank (In re Handy and Harman Refining Group, Inc.)*, 271 B.R. 732, 737 (Bankr. D. Conn. 2001), discussed *infra*.

[36] The concurring opinion has been subsequently criticized for its reliance on *Public Service* and distinguished.  *R-One Alloys, Inc.*, 2006 WL 625273, at *3, n.6 ("The precedent, however, to which the court in *Bristol* cites in support of this maxim, is misplaced."); *GMAC Bus. Credit L.L.C. v. Ford Motor Co.*, 100 Fed. App'x 404, 409 n.3 (6th Cir. 2004) ("We respectfully disagree with the concurring judge in [*Bristol*]"); *Ballou*, 591 A.2d at 129, n.3 ("[*Public Service*] stands only for the proposition that commingling alone does not defeat a bailment.").

existed where the debtor jewelry manufacturer leased fungible liquid gold solution from a single lessor, kept the gold segregated and identifiable in a separate tank, did not mix the gold with gold delivered by other customers, could only use the gold for a limited defined purpose, was required to maintain a minimum level of ounces, and was obligated to return the gold at the termination of the lease.[37]  In reaching its conclusion, the court distinguished *Delta Smelting*, discussed *supra*, on its facts.  The facts in *Delta Smelting* are on all fours with the current situation.

## III.    THE CONTRACT CUSTOMERS' OTHER CLAIMS FAIL AS A MATTER OF LAW

### A.    The Contract Customers' Conversion Claims Fail as a Matter of Law

Yamana asserts a conversion claim under Florida law.  [ECF No. 485 ¶¶ 18–22.]  "Under Florida law, '[a] conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion.'"  *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1258 (11th Cir. 2015) (quoting *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So. 2d 858, 860 (Fla. 1948)).  However, as discussed more fully in Section I.D. above, title to the raw materials delivered by the Yamana passed to the Debtors no later than delivery.  Accordingly, no claim for conversion can lie.

### B.    There Is No Basis to Impose a Constructive Trust

Finally, several of the Contract Customers seek (or purport to reserve the right to seek) imposition of a constructive trust on the raw materials each delivered to the Debtors and the proceeds derived from the sale of any resulting refined precious metals.[38]  The remedy of a constructive trust requires the Customers to establish, by clear and convincing evidence, the

---

[37] A copy of *Coro (Canada) Inc. (Trustee of) v. Enthone-OMI (Canada) Inc.*, [1997] O.J. No. 4704, 36 O.R. (3d) 563 (Ont. Gen. Div.), is attached to this brief as **Exhibit F**.

[38] ECF No. 447 at 6 (Minas de Oroco); ECF No. 460 ¶¶ 20–21; (First Majestic); ECF No. 471 ¶¶ 18–19 (Argonaut); ECF No. 485 ¶ 22 (Yamana); ECF No. 756 ¶¶ 17, 21 (Pretium).

following four elements: (i) a promise, express or implied; (ii) a transfer of property and reliance thereon; (iii) a confidential relationship; and (iv) unjust enrichment. *See, e.g.*, *Castetter v. Henderson*, 113 So. 3d 153, 155 (Fla. 5th DCA 2013); *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 212 (2d Cir. 2004). However, under both Florida and New York law, a party may not pursue a constructive trust – a quasi-contractual remedy – where there is an agreement governing the parties' relationship. *See, e.g.*, *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008) (affirming dismissal of request for imposition of a constructive trust where there was an express contract between the parties governing the subject matter); *In re First Cent. Fin. Corp.*, 377 F.3d at 212 (holding that the existence of a controlling agreement precludes imposition of a constructive trust); *Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000) (dismissing constructive trust claim where relationship was governed by contract).

As discussed more fully above, each of the Contract Customers is bound by its own agreement with the Debtors, all of which clearly and unambiguously provide for the purchase and sale of doré. Because the Contract Customers' claims are governed by their individual contracts, their attempts to impose a constructive trust fail as a matter of law.

Moreover, even if the Contract Customers could overcome these well-established principles, the Contract Customer cannot trace the raw materials they delivered to the bars, grains, coins and ingots that were in the Debtors' vault on the petition date or to the proceeds of the sales of any such Refined Product. It is undisputed that the doré received from the Contract Customers was commingled with raw materials received from all of the Debtors' Customers and with the Debtors' own materials. There is no way to determine whether the doré delivered by any Contract Customer was turned into bars, grains or ingots, let alone which specific bar, grain or ingot. Nor

is there any way to determine where the proceeds from the sales of Refined Product ended up. Tracing is impossible and any attempt to impose a constructive trust must, therefore, fail. *See, e.g.*, *In re Handy & Harman Ref. Group, Inc.*, 266 B.R. 24, 27 (Bankr. D. Conn. 2001) ("It is hornbook law before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his property into a product in the hands of the wrongdoer."); *In re Delta Smelting & Refining Alaska, Inc.*, 53 B.R. 877, 882 (Bankr. D. Alaska 1985) (holding that "[e]ven where property subject to a bailment is sold, if the proceeds are not segregated or traceable, it is clear that the claimant is relegated to the status of a general unsecured creditor" where silver bars delivered by a customer to the debtor precious metals refiner were commingled and unidentifiable as of the petition date).

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, the Movants respectfully request that the Court (i) find that:  (a) the Disputed Assets constitute property of the Debtors' bankruptcy estates; and (b) the Contract Customers have no ownership interests or any other rights in the Disputed Assets; (ii) overrule the Contract Customers' objections to the Cash Collateral Motion; (iii) dismiss all Contract Customer ownership claims with prejudice; and (iv) grant such other and further relief as the Court deems just and proper.

49262387;1

Dated:  New York, New York
       June 21, 2019

**LUSKIN, STERN & EISLER LLP**

_/s/ Michael Luskin_
Michael Luskin
Stephan E. Hornung
Alex Talesnick
Eleven Times Square
New York, New York 10036
Tel.:  (212) 597-8200
Fax:  (212) 974-3205

_Counsel for the Senior Lenders_

Respectfully submitted,

**AKERMAN LLP**

_/s/ Joanne Gelfand_
John E. Mitchell (_Admitted Pro Hac_)
Yelena Archiyan (_Admitted in New York_)
2001 Ross Avenue, Suite 3600
Dallas, TX  75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (_Admitted Pro Hac_)
Joanne Gelfand (_Admitted in New York_)
Katherine C. Fackler (_Admitted Pro Hac_)
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel.:  (305) 374-5600
Fax:  (305) 374-5095

_Counsel for Debtors and Debtors-in-Possession_

# EXHIBIT A

## *Eli Lilly & Co. v. Novopharm Ltd.*

**[1998] 2 S.C.R. 129 (Can.)**

⚠️ *Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129*

Supreme Court Reports

Supreme Court of Canada

Present: L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major and Bastarache JJ.

1998: January 21 / 1998: July 9.

File Nos.: 25402, 25348.

**[1998] 2 S.C.R. 129**  |  *[1998] 2 R.C.S. 129*  |  *[1998] S.C.J. No. 59*  |  *[1998] A.C.S. no 59*

Novopharm Limited, appellant; v. Eli Lilly and Company and Eli Lilly Canada Inc., respondents, and The Minister of National Health and Welfare, respondent. And between Apotex Inc., appellant; v. Eli Lilly and Company and Eli Lilly Canada Inc., respondents, and The Minister of National Health and Welfare, respondent.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

## Case Summary

**Patents — Infringement — Sublicensing — Licensee agreeing to supply patented medicine to unlicensed third party — Licence expressly prohibiting sublicensing — Breach of licence terms grounds for termination of licence — Whether supply agreement between licence holder and third party a sublicence or having legal effect of creating a sublicence.**

**Agency — Supply agreement — Licensed party to obtain patented bulk medicine for unlicensed party — Whether licensed party acting as agent of unlicensed party in carrying out contractual obligations.**

**Patents — Notice of allegation (NOA) — Proper date for assessing NOA.**

**Jurisdiction — Declaratory relief — Whether declaration should issue as to patent holder's failure to show notice of allegation unjustified or that it was entitled to terminate compulsory licence — Whether appropriate to declare that supply agreement not constituting sublicence or transfer of compulsory licence.**

**Patents — Medicine — Reformulation of patented product — Bulk medicine reformulated into final-dosage form — Whether reformulation of patented product amounting to infringement of patent.**

Eli Lilly and Co. ("Eli Lilly") owned the Canadian patents for nizatidine and for its manufacturing process. It alone held a notice of compliance (NOC) to produce and market certain final-dosage forms of the medicine. Novopharm held a

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

compulsory licence, obtained under the Patent Act (the "Act") as it existed prior to February, 1993, which permitted it to use the patented process to make nizatidine for the preparation or production of medicine and to import and/or sell medicine made by the process. The licence stipulated that it was non-transferable, prohibited Novopharm from granting any sublicence, and provided Eli Lilly with the option to terminate the licence upon any breach of its terms.

In anticipation of the 1993 amendments to the Act, which radically altered the procedures for the issuance of NOCs and eliminated the compulsory licensing regime entirely, Novopharm and Apotex entered a "supply agreement" in November, 1992. The agreement provided that, where one party held a licence for a patented medicine for which the other did not, the licensed party would obtain, at the request and direction of the unlicensed party, specified quantities of that medicine, and supply it to the unlicensed party at cost plus a four per cent royalty. In April, 1993, Apotex commenced efforts to obtain a NOC for certain final-dosage forms of nizatidine, and issued a notice of allegation ("NOA") alleging that no claim for nizatidine or for its use would be infringed. In support of this allegation, Apotex relied upon the licence issued to Novopharm and the "mutual understanding" with Novopharm. On the same date, Apotex notified Novopharm of its intention to request Novopharm to supply it with nizatidine. However, Apotex also indicated that, because it did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

Eli Lilly and Eli Lilly Canada Inc. ("Eli Lilly Canada") brought an application (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348 (Apotex #1)), under s. 6(1) of the Patented Medicines (Notice of Compliance) Regulations (the "Regulations"), for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under the amended Patent Act, would be the first date on which Apotex, without a NOC, would be entitled to import nizatidine for consumption in Canada. On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence, alleging that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. The Federal Court --Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence but nonetheless granted the prohibition order on the grounds that, because the reformulation of nizatidine for consumption in Canada would infringe Eli Lilly's patent, the NOA was not justified. The Federal Court of Appeal dismissed Apotex's appeal, but on the grounds that the agreement did constitute a sublicence.

In July 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to nizatidine and relied on its own compulsory licence as the basis for the non-infringement of the patents. Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402 (the Novopharm proceeding)), requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way. The application was dismissed at trial but this decision was reversed by the Federal Court of Appeal.

The issue common to both appeals is whether the agreement between Apotex and Novopharm constituted a sublicence, such as to justify Eli Lilly's purported termination of Novopharm's compulsory licence. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. Each appeal also raises other discrete issues. Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which the NOA proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

Held:      The appeals should be allowed.

A sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. By the grant of a

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. Thus, for Novopharm to have granted a sublicence to Apotex, it must have granted, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence. This may have been accomplished either by virtue of some express provision or provisions of the agreement, or by virtue of its actual legal effect (even if this runs contrary to the subjective intentions of the parties).

The ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination. It is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. Here, there was no ambiguity to the contract entered into between Apotex and Novopharm and further interpretive aids were therefore unnecessary. The evidence as to the subjective intentions of the principals at the time of drafting was thus inadmissible by virtue of the parol evidence rule especially since it did not go to the circumstances surrounding the making of the contract.

Nothing in the wording of the document suggested that the parties intended to grant sublicences to each other. Rather, every indication was that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. While no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But there was no indication that Apotex acquired any other independent rights under the compulsory licence. In fact, such an interpretation would be inconsistent with the combined effect of certain express provisions of the agreement.

To prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed. The sale of a licensed article, while it does transfer to the purchaser the rights of use and alienation, does not have the automatic effect of constituting the purchaser a sublicensee; thus, the fact that a third party enjoys these rights cannot alone be indicative of the existence of a sublicence. Any number of ways exist in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. The rights of use and alienation can only be determinative of the existence of a sublicence where there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type. Where the rights of the unlicensed party are derived from a sale of licensed material, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted. This situation was plainly contemplated by the supply agreement here, under which the only way Apotex could acquire bulk nizatidine was by purchasing it from Novopharm, not directly from Novopharm's supplier.

Further, because legitimate transfers were to take place between separate entities, dealing at arm's length, the contemplated transactions could not be characterized, ex ante, as shams. While it was theoretically possible that the agreement could be implemented in an infringing way, it had not yet been implemented at all and thus any suggestion of infringement was speculative. The agreement did not, on its face or in its actual legal effect, amount to a sublicence.

The degree of control likely to be exercised by Apotex over the acquisition of nizatidine would not result in a situation where Novopharm in reality would be acting as Apotex's agent. Nor would Novopharm, because of its allegedly standing in the shoes of Apotex, become an unlicensed entity. Under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations.

Given that the agreement was properly characterized as a supply agreement and given that the agreement had not been implemented at the material time, it was not necessary to decide if the Federal Court of Appeal erred in applying its decision in Apotex #1 to its decision in Novopharm.

Since the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

and not the date on which the NOA was issued (see Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare, S.C.C., No. 25419 (Apotex #2)), Novopharm's NOA was not premature and therefore unjustified. Pursuant to s. 39.14 of the Patent Act, it was entitled to manufacture the medicine itself or through Canadian agents seven years after the date of the issue of the first NOC to Eli Lilly Canada. As this seven-year period had expired before the date the application was heard, Novopharm was entitled, as of the date of hearing, to manufacture or have made the drug for its own use, for sale for consumption in Canada. The NOA did not specify that the nizatidine was to be imported and not produced in Canada, and so, at the date of hearing, there existed at least one non-infringing way for Apotex to obtain the necessary medicine.

In light of its other findings, it was not necessary for the Court to grant declaratory relief to the effect that Eli Lilly failed to show either that the NOA was not justified, or that it was entitled to terminate the compulsory licence. Moreover, in light of the limited nature of these judicial review proceedings, it would be inappropriate for this Court to declare conclusively, and for purposes other than those of these appeals, that the supply agreement did not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex. Accordingly, the requested declaratory relief was denied.

Absent express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he or she sees fit, so long as such dealings do not infringe the rights conferred by the patent. The reformulation of nizatidine into final-dosage form would not have the effect of creating a new article, such as to infringe Eli Lilly's patent. Rather, reformulation is more akin to repackaging the substance into a commercially usable form, which is not a violation of any rights under the patents. The right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, encompasses the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. This is, in reality, the only practical use of bulk medicine in the hands of a purchaser, which may explain why reformulation was implicitly contemplated by the compulsory licence held by Novopharm. Apotex therefore would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right. Thus, in the absence of some express prohibition in the compulsory licence, the right to reformulate should be seen as inherent to the purchaser's right to deal with licensed material as he or she sees fit. Eli Lilly accordingly failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

# Cases Cited

Distinguished:  E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985); referred to: Apotex Inc. v. Merck Frosst Canada Inc., *[1998] 2 S.C.R. 193*; Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) *(1997), 75 C.P.R. (3d) 129*; David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., *[1995] 1 F.C. 588*; Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., *[1980] 1 S.C.R. 888*; Merck & Co. v. Apotex Inc. *(1994), 59 C.P.R. (3d) 133*, rev'd in part *[1995] 2 F.C. 723*; Carey v. United States, 326 F.2d 975 (1964); Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519; Lampson v. City of Quebec (1920), 54 D.L.R. 344; Joy Oil Co. v. The King, *[1951] S.C.R. 624*; Indian Molybdenum Ltd. v. The King, *[1951] 3 D.L.R. 497*; Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605; Gillette v. Rea (1909), 1 O.W.N. 448; Betts v. Willmott (1871), L.R. 6 Ch. App. 245; Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (1993); Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (1996); Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) *(1994), 55 C.P.R. (3d) 302*; National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336; Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., *[1970] S.C.R. 833*, aff'g *[1969] 1 Ex. C.R. 529*; Rucker Co. v. Gavel's Vulcanizing Co. *(1985), 7 C.P.R. (3d) 294*.

# Statutes and Regulations Cited

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

Food and Drug Regulations, *C.R.C., c. 870, s. C.08.004*.
Patent Act, R.S.C., 1985, c. P-4, s. 39(4), 39.11 [ad. c. 33 (3rd Supp.), s. 15], 39.14 [idem].
Patent Act Amendment Act, 1992, S.C. 1993, c. 2, s. 11(1).
Patented Medicines (Notice of Compliance) Regulations, *SOR/93-133, ss. 4*(1), 5, 6, 7.


## Authors Cited

Fox, Harold G.   The Canadian Law and Practice Relating to Letters Patent for Inventions, 4th ed. Toronto: Carswell, 1969.
Fridman, G. H. L.  The Law of Contract in Canada, 3rd ed. Scarborough, Ont.: Carswell, 1994.
Melville, Leslie W.  Forms and Agreements on Intellectual Property and International Licensing, vol. 1, 3rd ed. rev.  New York:  West Group, 1997 (loose-leaf updated August 1997, release 29).

---

APPEAL (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402) from a judgment of the Federal Court of Appeal *(1996), 67 C.P.R. (3d) 377*, *197 N.R. 291*, *[1996] F.C.J. No. 576* (QL), allowing an appeal from a judgment of McGillis J. *(1995), 60 C.P.R. (3d) 181*, *91 F.T.R. 161*, *[1995] F.C.J. No. 238* (QL), granting an application for judicial review and prohibiting the Minister from issuing a notice of compliance. Appeal allowed.

APPEAL (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348) from a judgment of the Federal Court of Appeal *(1996), 66 C.P.R. (3d) 329*, *195 N.R. 378*, *[1996] F.C.J. No. 425* (QL), dismissing an appeal from a judgment of McGillis J. *(1995), 60 C.P.R. (3d) 206*, *91 F.T.R. 181*, *[1995] F.C.J. No. 237* (QL), dismissing an application for judicial review. Appeal allowed.

---

Harry B. Radomski, Richard Naiberg and David Scrimger, for the appellant Apotex Inc. Donald N. Plumley, Q.C., Mark Mitchell and Stephanie Chong, for the appellant Novopharm Limited. Anthony G. Creber and David Watson, Q.C., for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Solicitors for the appellant Apotex Inc.: Goodman, Phillips & Vineberg, Toronto. Solicitors for the appellant Novopharm Limited: Ridout & Maybee, Toronto. Solicitors for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.

---

The judgment of the Court was delivered by

## IACOBUCCI J.

**1**   A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "Novopharm" and "Apotex #1", reasons in Apotex Inc. v. Merck Frosst Canada Inc., *[1998] 2 S.C.R. 193* ("Apotex #2"), are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

**2**  Owing to the intertwining nature of the lower court decisions in Novopharm and Apotex #1, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

I.  Background

A. The Patents and the Compulsory Licence

**3**  Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the Patent Act, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> 39.... (4)... (a) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or
>
> (b) where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of medicine. . . .

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

**4**  These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the Food and Drug Regulations, *C.R.C., c. 870*, thereby permitting Eli Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

**5**  On January 17, 1990, Novopharm applied under s. 39(4) of the Patent Act for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final-dosage form is fixed at six percent of the selling price. The Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence".

**6** Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final-dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final-dosage form, and any subsequent non-arm's length purchasers from the latter.

**7** Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence".

### B. The Supply Agreement Between Novopharm and Apotex

**8** On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the Patent Act, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

> WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,
>
> AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,
>
> AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,
>
> AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,
>
> AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,
>
> NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:
>
> 1. At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

2.  In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3.  In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4.  In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5.  In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6.  The licensed party shall comply with the terms of the licence.

7.  The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence has remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8.  For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9.  The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessability [sic] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

which a licence was issued to any one or more licence [sic] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994, advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

**9**  On February 15, 1993, most of the provisions of the Patent Act Amendment Act, 1992, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the Patented Medicines (Notice of Compliance) Regulations, *SOR/93-133* (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) *(1997), 75 C.P.R. (3d) 129* (F.C.T.D.), at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the Food and Drug Regulations, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the Patent Act Amendment Act, 1992, ... (the "Patent Act") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the Regulations.

...

In effect, under Subsection 5(3) of the Regulations, in a "Notice of Allegation", the generic drug manufacturer, "the second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the Regulations, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the Regulations, the Minister compiles the patent lists into a public document called the "Patent Register".

**10**  As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

**11**  Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(b) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding"

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

**12**  The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

**13**  Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the Patent Act, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in Apotex #1, upon which I shall elaborate shortly.

**14**  On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

C. The Novopharm Proceeding

**15**  On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

**16**  Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court--Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

**17**  On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licences". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

**18** Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the Patent Act which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

**19** McGillis J. of the Federal Court--Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in Apotex #1, infra, held that a sublicence had in fact been conferred by virtue of the supply agreement.

### D. The Apotex #1 Proceeding

**20** In cross-examination on the hearing of the application for a prohibition order in Apotex #1, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

**21** Relying on her analysis in Novopharm, McGillis J. of the Federal Court--Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

**22** The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final-dosage form

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

would not have infringed the patents.

## II.   Relevant Statutory Provisions

**23**  Patent Act, R.S.C., 1985, c. P-4

> 39.11 (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,
>
> > (a)  where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or
> >
> > (b)  where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.
>
> (2) The prohibition under subsection (1) expires in respect of a medicine
>
> ...
>
> > (c)  ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.
>
> 39.14 (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,
>
> > (a)  where the invention is a process, to use the invention for the preparation or production of medicine, or
> >
> > (b)  where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine
>
> for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

Patented Medicines (Notice of Compliance) Regulations, *SOR/93-133*

> 5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,
>
> > (a)  state that the person accepts that the notice of compliance will not issue until the patent expires; or
> >
> > (b)  allege that
> >
> > > (i)  the statement made by the first person pursuant to paragraph 4(2)(b) is false,

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

(ii)  the patent has expired,

(iii) the patent is not valid, or

(iv) no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(b) or subsection (2) the person shall

(a)  provide a detailed statement of the legal and factual basis for the allegation; and

(b)  serve a notice of the allegation on the first person and proof of such service on the Minister.

6. (1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(b), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2) The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(a)  the expiration of 30 days after the coming into force of these Regulations,

(b)  the day on which the second person complies with section 5,

(c)  subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(d)  subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(e)  subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(f)  the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(e) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(a)  the patent has expired; or

(b)  the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

(3) Paragraphs (1)(c), (d) and (e) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(e) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(e) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

III. Judicial History

A.  Novopharm Ltd. v. Eli Lilly and Co.

(1)  Federal Court--Trial Division *(1995), 60 C.P.R. (3d) 181*

**24** As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the Regulations is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., *[1995] 1 F.C. 588* (C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

**25** Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novopharm's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

**26** Relying on the decision of this Court in Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., *[1980] 1 S.C.R. 888*, McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract". She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted, was inadmissible on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

**27** With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex". In her view, at p. 199, the true nature of the agreement was that of "a supply agreement dressed up to look like a sublicence". In other words, despite the presence in the supply agreement of wording which might tend to

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

**28**   In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

**29**   Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on Consolidated-Bathurst, supra. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

**30**   As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in David Bull Laboratories, supra, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

   (2)   Federal Court of Appeal *(1996), 67 C.P.R. (3d) 377*

**31**   In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in Apotex #1, infra, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

**32**   The court held that, while the previous decision was not res judicata, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in Apotex #1 was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

unique to its own record, the analysis of the supply agreement in Apotex #1 could therefore be applied to Novopharm. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

   B.  Apotex Inc. v. Eli Lilly and Co.

      (1)  Federal Court--Trial Division *(1995), 60 C.P.R. (3d) 206*

**33**  In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

**34**  In concluding in Novopharm, supra, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in Novopharm that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in Novopharm applied equally to the case at bar.

**35**  Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in Merck & Co. v. Apotex Inc. *(1994), 59 C.P.R. (3d) 133* (F.C.T.D.), and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier" (p. 218).

**36**  Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

      (2) Federal Court of Appeal *(1996), 66 C.P.R. (3d) 329*

      (a)  MacGuigan J.A. (Robertson J.A. concurring)

**37**  In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

**38**  MacGuigan J.A. noted that the conclusion of McGillis J. in Novopharm as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: see Consolidated-Bathurst, supra.

**39**  MacGuigan J.A. relied on the decision of the Delaware Supreme Court in E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985) ("du Pont"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on Carey v. United States, 326 F.2d 975 (Ct. Cl. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

**40**  In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement" (p. 338). While he recognized that the subjective intention of the parties was to avoid creating a sublicence, he found that this was at odds with the objective intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

**41**  MacGuigan J.A. also found that, in accordance with his reading of Consolidated-Bathurst, supra, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the contra proferentum doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

**42**  Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

    (b)  Pratte J.A., dissenting

**43**  Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement". In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

**44** Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it". He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

## IV.  Issues

**45** As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

**46** Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

## V.  Analysis

### A.  The Agreement Between Apotex and Novopharm

**47** The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

(1)  The Nature of a Sublicence

**48** Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, Forms and Agreements on Intellectual Property and International Licensing, vol. 1 (3rd ed. rev. 1997 (loose-leaf)), at sec. 3.18.

**49** To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

**50** Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519, at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

**51** For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

examine each of these possibilities in turn.

### (2)  Contractual Interpretation and the Intentions of the Parties

**52**  In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In Consolidated-Bathurst, supra, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of contra proferentem as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

**53**  From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of contra proferentem. Contra proferentem operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that contra proferentem should be applied to interpret the contract against both contracting parties. Indeed, a third party has no basis at all upon which to rely upon contra proferentem: see G. H. L. Fridman, The Law of Contract in Canada (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

**54**  The trial judge appeared to take Consolidated-Bathurst to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

**55**  Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in Lampson v. City of Quebec (1920), 54 D.L.R. 344 (P.C.), at p. 350:

> . . . the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it,

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

> while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses. . . ."

**56**  When there is no ambiguity in the wording of the document, the notion in Consolidated-Bathurst that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in Joy Oil Co. v. The King, *[1951] S.C.R. 624*, at p. 641:

> . . . in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

**57**  In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the Patent Act, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

**58**  More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see Indian Molybdenum Ltd. v. The King, *[1951] 3 D.L.R. 497* (S.C.C.), at pp. 502-3.

**59**  Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

**60**  Therefore, I am of the opinion that the trial judge erred, in the Novopharm proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in Apotex #1, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

**61**  Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to act pursuant to the licence.

**62**  Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: four percent of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

**63**  It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention not to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

**64**  Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... on the grounds that there is doubt as to whether or not the licence ... permits the requested acts" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

**65**  Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim.

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only indirect enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

**66**  In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

    (3)  The Legal Effect of the Supply Agreement

**67**  Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

    (i)  Sublicence Versus Purchase and Sale

**68**  By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the Patent Act, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

**69**  As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605, at p. 610; see also Gillette v. Rea (1909), 1 O.W.N. 448 (H.C.); Betts v. Willmott (1871), L.R. 6 Ch. App. 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

**70** But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (Fed. Cir. 1993).

**71** Thus, practically speaking, the rights of use and alienation can only be determinative of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

**72** In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

**73** A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in Intel, supra, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

**74** In the instant appeals, the Federal Court of Appeal relied on du Pont, supra, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view du Pont as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal principle propounded. In du Pont, it was more significant that the unlicensed party actually manufactured the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

**75**  But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal personnæ, and legitimate transfers of property do, in fact, take place. In Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished du Pont, supra, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

**76**  In my view, Cyrix is much more closely analogous than du Pont to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in Cyrix the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed four percent royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

**77**  Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in du Pont. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, inter alia, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

**78**  Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and de facto transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would necessarily render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of

licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

**79**  As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

### (4)  The Agency Argument

**80**  In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

**81**  To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

### (5)  Conclusion as to the Nature of the Supply Agreement

**82**  The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

**83**  That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in du Pont, supra. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the Patent Act or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

**84**  Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

### B.  Other Issues in the Novopharm Appeal

#### (1)  Did the Federal Court of Appeal Err in Applying its Decision in Apotex #1 to its Decision in Novopharm?

**85**  Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the Novopharm appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and, whereas the conclusion of the court in Apotex #1 may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in Apotex #1 if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in Novopharm and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

**86**  It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as res judicata or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement, together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

#### (2)  Was Novopharm's Notice of Allegation Premature and Therefore not Justified?

**87**  Even the unequivocal conclusion as to the character of the supply agreement does not put the

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

Novopharm matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

**88**    Pursuant to s. 39.11(2)(c) of the Patent Act, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the Patent Act Amendment Act, 1992, s. 11(1) of that Act provides that licences granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

**89**    A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

**90**    However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the Patent Act. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

**91**    Pursuant to s. 39.14 of the Patent Act, Novopharm was entitled to use the patented invention for the preparation or production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

**92**    In Apotex #2, supra, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the Patent Act by obtaining the medicine either from a Canadian supplier or not at all.

>    (3)   Jurisdiction to Grant Declaratory Relief

**93**    The final issue to be determined with respect to the Novopharm appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

**94**  In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

**95**  As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) *(1994), 55 C.P.R. (3d) 302* (F.C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(b) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding. [Emphasis added.]

**96**  This point was reinforced more recently by Strayer J.A. in David Bull Laboratories, supra, at p. 600:

> If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

**97**  While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

believe that the reasoning involved is also applicable to the Novopharm appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

C. Other Issues in the Apotex #1 Appeal

(1) Would the Reformulation of Nizatidine by Apotex into Final-dosage Form Infringe the Patent Held by Eli Lilly?

**98** Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

**99** In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions. It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

**100** Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, supra, at p. 610. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive

Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc., [1998] 2 S.C.R. 129

conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336 (P.C.).

**101** Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

**102** No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in Merck & Co. v. Apotex Inc., supra, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the Patent Act, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

**103** However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at *[1995] 2 F.C. 723*. At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: any form of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following statement of Hall J. in Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., *[1970] S.C.R. 833*, at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at *[1969] 1 Ex. C.R. 529*):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] if the owner could not put it to the only use for which it is usable without being liable for infringement. [Emphasis added.]

**104** Accordingly, MacGuigan J.A. concluded, at p. 741, that:

> The use and sale of the product of a machine, particularly if production is the only possible use of the machine, is accorded protection under section 56 as a use of the machine itself. . . . In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

**105**  The Merck & Co. v. Apotex Inc. decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right.

**106**  Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final-dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final-dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

**107**  Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

**108**  I would emphasize, however, that this conclusion is in no way premised upon, and should not be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, Rucker Co. v. Gavel's Vulcanizing Ltd. *(1985), 7 C.P.R. (3d) 294* (F.C.T.D.). Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

**109**  In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to

establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.


VI. Disposition

A.  Novopharm Ltd. v. Eli Lilly and Co.


**110**  For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court--Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.


B.  Apotex Inc. v. Eli Lilly and Co.


**111**  Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

---

**End of Document**

# EXHIBIT B

## *BG Checo Int'l Ltd. v. British Columbia Hydro and Power Auth.*

### [1993] 1 S.C.R. 12 (Can.)

⚠️ **_BG Checo International Ltd. v. British Columbia Hydro and Power Authority,_**
**_[1993] 1 S.C.R. 12_**

Supreme Court Reports

Supreme Court of Canada

Present: La Forest, L'Heureux-Dubé, Sopinka, Gonthier, McLachlin, Stevenson* and Iacobucci JJ.

1992: January 28 / 1993: January 21.

File Nos.: 21939, 21955.

**[1993] 1 S.C.R. 12**    |    _[1993] 1 R.C.S. 12_    |    _[1993] S.C.J. No. 1_    |    _[1993] A.C.S. no 1_

British Columbia Hydro and Power Authority, appellant; v. BG Checo International Limited, respondent. And between BG Checo International Limited, appellant; v. British Columbia Hydro and Power Authority, respondent.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA (147 paras.)

* Stevenson J. took no part in the judgment.

## Case Summary

**Torts — Negligence — Negligent misrepresentation — Concurrent liability in tort and contract — Hydro calling for tenders to erect transmission towers and string transmission lines — Tender documents stating that right-of-way would be cleared by others — Parties incorporating tender documents into contract — Right-of-way not properly cleared — Whether plaintiff can sue in tort if duty relied on is also made a contractual duty by an express term of the contract — If so, whether terms of contract excluded Hydro's potential liability for misrepresentation.**

**Contracts — Breach of contract — Hydro awarding contract to erect transmission towers and string transmission lines — Contract stating that right-of-way would be cleared by others — Right-of-way not properly cleared — Hydro liable for damages for breach of contract.**

[page13]

Hydro called for tenders to erect transmission towers and string transmission lines. Checo had a representative inspect the area by helicopter before its tender was submitted. The representative noted that the right-of-way had been partially cleared, and also noted evidence of ongoing clearing activity. He assumed that there would be further clearing prior to the commencement of Checo's work. Hydro accepted Checo's tender and the parties entered into a written contract. The tender documents, which were subsequently incorporated in the contract, stated that clearing of the right-of-way would be done by others and formed no part of the work to be performed by Checo. They also stated that it was Checo's responsibility to inform itself of all aspects of the work and that should any errors appear in the tender documents, or should Checo note any conditions conflicting with the letter or spirit of the tender documents, it was Checo's responsibility to obtain clarification before submitting its tender. The tender documents also provided that Checo would satisfy itself of all site conditions and the correctness and sufficiency of the tender for the work and the stipulated prices. In fact, no further clearing of the right-of-way ever took place, and the improper clearing caused Checo a number of difficulties in completing its work.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

Checo sued Hydro seeking damages for negligent misrepresentation, or, in the alternative, for breach of contract. The evidence at trial indicated that Hydro had contracted the clearing out to another company, and that, to Hydro's knowledge, the work was not done adequately. There was no direct discussion between the representatives of Checo and Hydro concerning this issue. During the trial Checo amended its statement of claim to include a claim in fraud. The trial judge found that Hydro had acted fraudulently in its dealings with Checo and awarded damages to Checo. Hydro appealed to the Court of Appeal, which rejected the finding of fraud, but found that there had been a negligent misrepresentation which induced Checo to enter into the contract. The Court of Appeal awarded damages for the misrepresentation, but reduced the trial judge's damage award, and referred the question of breach of contract and damages flowing therefrom back to the trial court.

The issues raised by Hydro's appeal are (1) whether a pre-contractual representation which becomes a contractual term can found liability in negligent misrepresentation; (2) if so, whether the terms of the contract operate to exclude Hydro's potential liability for any misrepresentations; [page14] (3) if not, whether Hydro is liable for negligent misrepresentation; and (4) whether there was a breach of contract. Checo's cross-appeal is to determine (1) whether Hydro should be liable for fraudulent misrepresentation and (2) whether the Court of Appeal correctly assessed Checo's damages for negligent misrepresentation.

Held (Sopinka and Iacobucci JJ. dissenting in part): The appeal should be dismissed and the cross-appeal allowed in part.

Per La Forest, L'Heureux-Dubé, Gonthier and McLachlin JJ.: Hydro is liable to Checo for breach of contract. The contract required Hydro to clear the right-of-way as specified and that duty was not negated by the more general clauses relating to errors and misunderstandings in tendering, site conditions and contingencies. Since Hydro did not remove the logs and debris from the right-of-way, it is liable for breach of contract.

The contract does not preclude Checo from suing in tort. The general rule emerging from this Court's decision in Central Trust Co. v. Rafuse is that where a given wrong prima facie supports an action in contract and in tort, the party may sue in either or both, subject to any limit the parties themselves have placed on that right by their contract. This limitation on the general rule of concurrency arises because it is always open to parties to limit or waive the duties which the common law would impose on them for negligence. The mere fact that the parties have dealt with a matter expressly in their contract does not mean that they intended to exclude the right to sue in tort. It all depends on how they have dealt with it. In so far as the tort duty is not contradicted by the contract, it remains intact and may be sued upon.

This principle is illustrated by consideration of the three situations that may arise when contract and tort are applied to the same wrong. The first class of case arises where the contract stipulates a more stringent obligation than the general law of tort would impose. In that case, the parties are hardly likely to sue in tort, since they [page15] could not recover in tort for the higher contractual duty. The vast majority of commercial transactions fall into this class. The right to sue in tort is not extinguished, however, and may remain important, as where suit in contract is barred by expiry of a limitation period. The second class of case arises where the contract stipulates a lower duty than that which would be presumed by the law of tort in similar circumstances. This occurs when the parties by their contract indicate their intention that the usual liability imposed by the law of tort is not to bind them. The most common means by which such an intention is indicated is the inclusion of a clause of exemption or exclusion of liability in the contract. Generally, the duty imposed by the law of tort can be nullified only by clear terms. The third class of case arises where the duty in contract and the common law duty in tort are co-extensive. In this class of case, like the others, the plaintiff may seek to sue concurrently or alternatively in tort to secure some advantage peculiar to the law of tort, such as a more generous limitation period. The case at bar falls into this third category. Hydro's common law duty not to negligently misrepresent that it would have the right-of-way cleared by others is not excluded by the contract, which confirmed Hydro's obligation to clear the right-of-way.

The availability of concurrent liability in contract and tort should not be predicated on whether the contractual term is express or implied. Using the express-implied distinction as a basis for determining whether there is a right to sue in tort poses a number of problems. The law has always treated express and implied terms as being equivalent in effect, and it is difficult to distinguish between them in some cases. It is not evident that if parties to a contract choose to include an express term in the contract dealing with a particular duty relevant to the contract, they intended to oust the availability of tort remedies in respect of that duty. Finally, the test will be difficult to apply in situations where the express contractual term does not exactly overlap the tort duty. Neither principle, the authorities nor the needs of contracting parties support the conclusion that dealing with [page16] a matter by an express contract term will, in itself, categorically exclude the right to

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

sue in tort.

The contract did not limit the duty of care owed by Hydro to Checo, nor did Checo waive its common law right to bring such tort actions as might be open to it. Checo is thus entitled to claim against Hydro in tort.

In situations of concurrent liability in tort and contract it would seem anomalous to award a different level of damages for what is essentially the same wrong on the sole basis of the form of action chosen, though particular circumstances or policy may dictate such a course.

Checo is entitled to be compensated for all reasonably foreseeable loss caused by the tort. The Court of Appeal was justified in finding that had the misrepresentation not been made, Checo would have entered into the contract, but with a higher bid. It was of the view that Checo would have increased its bid by an amount equal to the cost of the extra work made necessary by the improperly cleared work site plus profit and overhead. To compensate only for the direct costs of clearing, however, is to suggest that the only tort was the failure to clear. The real fault is that Hydro misrepresented the situation and Checo may have relied on that representation in performing its other obligations under the contract. Having to devote its resources to that extra work might have prevented Checo from meeting its original schedule, thereby resulting in Checo incurring acceleration costs in order to meet the contract completion date. Such costs would also arguably be reasonably foreseeable. The matter should be referred back to the trial court for determination of whether any such indirect losses were the foreseeable result of the misrepresentation.

The breach of contract claims should be referred to the trial court for determination. Checo is to be put in the position it would be in had the work site been cleared properly, and is therefore to be reimbursed for all expenses incurred as a result of the breach of contract, [page17] whether expected or not, except to the extent that those expenses may have been so unexpected that they are too remote to be compensable for breach of contract. The damages in contract would thus include not only the costs flowing directly from the improperly cleared work site, but also consequent indirect costs such as acceleration costs due to delays in construction.

There was no evidence of an intention on the part of Hydro to deceive, and the Court of Appeal therefore correctly concluded that Hydro should not be liable for fraudulent misrepresentation.

Per Sopinka and Iacobucci JJ. (dissenting in part): In the circumstances of the case, Hydro may be liable in contract for the representations which Checo complains of, but it cannot be liable in tort. While as a general rule, the existence of a contract between two parties does not preclude the existence of a common law duty of care, contractual exclusion or limitation clauses can operate either to exclude or limit liability, or to limit the duty owed by one party to the other, whether in contract or in tort. In neither case will the plaintiff be permitted to use an action in tort to circumvent the limitation of liability or of duty in the contract. The contractual relationship can bring the parties into sufficient proximity to give rise to a duty of care, but no duty of care in tort can be concurrent with a duty of care created by an express term of the contract. If the duty is defined by an express term of the contract, the plaintiff will be confined to whatever remedies are available in the law of contract. A claim in tort is not foreclosed in all circumstances, however. A contextual approach should be adopted which takes into account the context in which the contract is made, and the position of the parties with respect to one another. The policy reasons in favour of the rule are strongest where the contractual context is commercial and the parties are of equal bargaining power. Here there is no question of unconscionability or inequality of bargaining power. If such issues, or others analogous to them, were to arise, however, a court should be wary not to exclude too rapidly a duty of care in tort on the basis of an express term of the contract, especially if the end result for the plaintiff would be a wrong without a remedy.

[page18]

An action for negligent misrepresentation will survive the making of a contract between the parties. As in other areas of negligence, the plaintiff may have the option of concurrent actions in tort and contract. Here, however, the duty imposed in tort on Hydro by the clause in the tender documents is co-extensive with the duty imposed in contract by the express clause in the contract. Consequently, subject to any overriding considerations arising from the context in which the transaction occurred, Checo is limited to whatever remedies may be available to it in contract for Hydro's breach of the contract. An assessment of the context strengthens the conclusion that Checo should be limited to any remedies that might be available to it under the contract. This transaction occurred in a commercial context. The parties are both large corporations, and there is no allegation or indication of any inequality of bargaining power or unconscionability. As well, the contract which was concluded by the parties was included as part of the tender documents. Checo knew when it was preparing its bid that if its bid were accepted, the representation as to the condition of the right-of-way would be a term of the contract. Checo knew, or

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

ought to have known, that disputes as to the condition of the right-of-way would potentially be governed by the contract.

There is no clause in the contract or in the tender documents which serves either to limit or exclude Hydro's liability for the representation the contract contained. Hydro breached the express term of the contract that the right-of-way would be cleared and is accordingly liable for damages, which should be assessed at the new trial.

There was insufficient evidence to support a finding of deceit. The Court of Appeal properly concluded that Hydro should not be liable for fraudulent misrepresentation.

## Cases Cited

By La Forest and McLachlin JJ.

Considered:  Central Trust Co. v. Rafuse, *[1986] 2 S.C.R. 147*; referred to:  Forbes v. Git, [1922] 1 A.C. 256 (P.C.), rev'g *(1921), 62 S.C.R. 1*; Hassard v. Peace River Co-operative Seed Growers Association Ltd., *[1954] 2 D.L.R. 50*; Cotter v. General Petroleums Ltd., *[1951] S.C.R. 154*; Dyck v. Manitoba Snowmobile Association Inc., *[1985] 1 S.C.R. 589*; Elder, Dempster & Co. v. Paterson, Zochonis & Co., [1924] A.C. 522; Lister v. Romford Ice and Cold Storage Co., [1957] A.C. 555; Canadian Indemnity Co. v. Andrews & George Co., *[1953] 1 S.C.R. 19*; [page19] Dominion Chain Co. v. Eastern Construction Co. *(1976), 68 D.L.R. (3d) 385* (Ont. C.A.), aff'd sub nom. Giffels Associates Ltd. v. Eastern Construction Co., *[1978] 2 S.C.R. 1346*; Batty v. Metropolitan Property Realisations Ltd., [1978] Q.B. 554; Jarvis v. Moy, Davies, Smith, Vandervell & Co., [1936] 1 K.B. 399; Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co., *[1991] 3 S.C.R. 3*; Asamera Oil Corp. v. Sea Oil & General Corp., *[1979] 1 S.C.R. 633*; B.D.C. Ltd. v. Hofstrand Farms Ltd., *[1986] 1 S.C.R. 228*.

By Iacobucci J. (dissenting in part)

Considered:  Central Trust Co. v. Rafuse, *[1986] 2 S.C.R. 147*; referred to:  K.R.M. Construction Ltd. v. British Columbia Railway Co. *(1981), 18 C.L.R. 159* (B.C.S.C.), aff'd in part *(1982), 18 C.L.R. 159* (B.C.C.A.); Donoghue v. Stevenson, [1932] A.C. 562; Hedley Byrne & Co. v. Heller & Partners Ltd., [1964] A.C. 465; Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co. *(1988), 30 B.C.L.R. (2d) 273*; Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co. *(1990), 43 B.C.L.R. (2d) 1*, aff'd *[1991] 3 S.C.R. 3*; Catre Industries Ltd. v. Alberta *(1989), 99 A.R. 321* (C.A.), leave to appeal refused, *[1990] 1 S.C.R. vi*; University of Regina v. Pettick *(1991), 90 Sask. R. 241*; Fletcher v. Manitoba Public Insurance Co. *(1989), 68 O.R. (2d) 193*; Pittman v. Manufacturers Life Insurance Co. *(1990), 76 D.L.R. (4th) 320*; Clark v. Naqvi *(1989), 99 N.B.R. (2d) 271*; Esso Petroleum Co. v. Mardon, [1976] 2 All E.R. 5; Leame v. Bray (1803), 3 East 593, 102 E.R. 724; Bretherton v. Wood (1821), 3 Brod. & B. 54, 129 E.R. 1203; Boorman v. Brown (1842), 3 Q.B. 511 (Ex. Ch.), 114 E.R. 603, aff'd sub nom. Brown v. Boorman (1844), 11 Cl. & Fin. 1 (H.L.), 8 E.R. 1003; Jarvis v. Moy, Davies, Smith, Vandervell & Co., [1936] 1 K.B. 399; Groom v. Crocker, [1939] 1 K.B. 194; Bagot v. Stevens Scanlan & Co., [1966] 1 Q.B. 197; Williamson v. Allison (1802), 2 East. 446, 102 E.R. 432; Legge v. Tucker (1856), H. & N. 500, 156 E.R. 1298; Turner v. Stallibrass, [1898] 1 Q.B. 56; Edwards v. Mallan, [1908] 1 K.B. 1002; Elder, Dempster & Co. v. Paterson, Zochonis & Co., [1924] A.C. 522; J. Nunes Diamonds Ltd. v. Dominion Electric Protection Co., *[1972] S.C.R. 769*; Dominion Chain Co. v. Eastern Construction Co. *(1976), 68 D.L.R. (3d) 385*; Batty v. Metropolitan Property Realisations Ltd., [1978] Q.B. 554; Anns v. London Borough of Merton, [1977] 2 All E.R. 492; New Brunswick Telephone Co. v. John Maryon International Ltd. *(1982), 43 N.B.R. (2d) 469*; V.K. Mason Construction Ltd. v. Bank of Nova Scotia, *[1985] 1 S.C.R.*

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

*271*; ITO--International Terminal [page20] Operators Ltd. v. Miida Electronics Inc., *[1986] 1 S.C.R. 752*; London Drugs Ltd. v. Kuehne & Nagel International Ltd., *[1992] 3 S.C.R. 299*; Hall v. Brooklands Auto Racing Club, [1933] 1 K.B. 205; Peters v. Parkway Mercury Sales Ltd. *(1975), 10 N.B.R. (2d) 703*; Carman Construction Ltd. v. Canadian Pacific Railway Co., *[1982] 1 S.C.R. 958*; Queen v. Cognos Inc., *[1993] 1 S.C.R. 87*; Derry v. Peek (1889), 14 App. Cas. 337; Nocton v. Lord Ashburton, [1914] A.C. 932; Heilbut, Symons & Co. v. Buckleton, [1913] A.C. 30; De Vall v. Gorman, Clancey & Grindley Ltd. *(1919), 58 S.C.R. 259*; Kinsman v. Kinsman *(1912), 3 O.W.N. 966*; Howse v. Quinnell Motors Ltd., [1952] 2 D.L.R. 425; Chapman v. Warren, *[1936] O.R. 145*; Gardner v. Merker *(1918), 43 O.L.R. 411*; Kennedy v. Anderson (1919), 50 D.L.R. 105; Gilmour v. Trustee Co. of Winnipeg, *[1923] 3 W.W.R. 177*; Thurston v. Streilen *(1950), 59 Man. R. 55*; Scholte v. Richardson, *[1951] O.R. 58*; Candler v. Crane Christmas & Co., [1951] 1 All E.R. 426; Cann v. Willson (1888), 39 Ch. D. 39; Heaven v. Pender (1883), 11 Q.B.D. 503; George v. Skivington (1869), L.R. 5 Ex. 1; Clark v. Kirby-Smith, [1964] 2 All E.R. 835; Kingu v. Walmar Ventures Ltd. *(1986), 38 C.C.L.T. 51*.

## Authors Cited

Baker, J.H.  An Introduction to English Legal History. London:  Butterworths, 1979.
Blom, Joost.  "Remedies in Tort and Contract:  Where is the Difference?".  In Jeffrey Berryman, ed., Remedies:  Issues and Perspectives. Scarborough, Ont.:  Carswell, 1991, 395.
Chitty on Contracts, vol. 1, 26th ed.  By A.G. Guest. London:  Sweet & Maxwell, 1989.
Fifoot, C.H.S.  History and Sources of the Common Law: Tort and Contract.  London:  Stevens & Sons, 1949.
French, Christine.  "The Contract/Tort Dilemma" (1983), 5 Otago L. Rev. 236.
Fuller, L.L., and W.R. Purdue, "The Reliance Interest in Contract Damages" (1936-37), 46 Yale L. J. 52 and 373.
Johnson, Howard.  "Contract and Tort:  Orthodoxy Reasserted!" (1990), 9 Int'l Banking L. 306.
Lewison, Kim.  The Interpretation of Contracts.  London: Sweet & Maxwell, 1989.
McLachlin, Beverley M., and Wilfred J. Wallace.  The Canadian Law of Architecture and Engineering. Toronto:  Butterworths, 1987.

[page21]

McLauchlan, D.W.  "Assessment of Damages for Misrepresentations Inducing Contracts" (1987), 6 Otago L. Rev. 370.
McLauchlan, D.W.  "Pre-Contract Negligent Misrepresentation" (1977), 4 Otago L. Rev. 23.

---

APPEAL and CROSS-APPEAL from a judgment of the British Columbia Court of Appeal *(1990), 44 B.C.L.R. (2d) 145*, *4 C.C.L.T. (2d) 161*, *41 C.L.R. 1*, *[1990] 3 W.W.R. 690*, reversing in part a judgment of Cohen J. (1988), 10 A.C.W.S. (3d) 312, [1988] B.C.D. Civ. 971-01, [1988] B.C.W.L.D. 2324, awarding damages for fraudulent misrepresentation. Appeal dismissed and cross-appeal allowed in part, Sopinka and Iacobucci JJ. dissenting in part.

---

Glenn A. Urquhart, Arthur M. Grant and Gordon D. Phillips, for the British Columbia Hydro and Power Authority. Donald J. Sorochan, Q.C., Meredith A. Quartermain and Mari A. Worfolk, for BG Checo International Ltd.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

Solicitors for the British Columbia Hydro and Power Authority: Singleton, Urquhart, MacDonald, Vancouver. Solicitors for BG Checo International Ltd.: Swinton & Company, Vancouver.

---

The judgment of La Forest, L'Heureux-Dubé, Gonthier and McLachlin JJ. was delivered by

## LA FOREST and McLACHLIN JJ.

**1**  We have had the advantage of reading the reasons of our colleague Justice Iacobucci. We agree with his conclusion that Hydro is liable to Checo for breach of contract. We disagree, however, with his conclusion that the contract precludes Checo from suing in tort. In our view, our colleague's approach would have the effect of eliminating much of the rationalizing thrust behind the movement towards concurrency in tort and contract. Rather than attempting to establish new barriers to tort liability in contractual contexts, the law should move towards the elimination of unjustified differences between the remedial rules applicable to the two actions, thereby reducing the significance of the existence of the two different forms of action and [page22] allowing a person who has suffered a wrong full access to all relevant legal remedies.

**2**  The facts have been fully set out by our colleague and need not be repeated. The tender documents (subsequently incorporated in the contract) stated that clearing of the right-of-way would be done by others and formed no part of the work to be performed by Checo. The tender documents and contract documents also stated that it was Checo's responsibility to inform itself of all aspects of the work and that should any errors appear in the tender documents, or should Checo note any conditions conflicting with the letter or spirit of the tender documents, it was the responsibility of Checo to obtain clarification before submitting its tender. The tender documents also provided that Checo would satisfy itself of all site conditions and the correctness and sufficiency of the tender for the work and the stipulated prices.

**3**  Checo argues that the right-of-way was not properly cleared and that the statement in the tender documents and the contract that it had been cleared constituted a breach of contract and negligent misrepresentation.

**4**  Hydro argues first that it carried out the clearing required by clause 6.01.03 of the contract, and second, that in any event it was up to Checo to satisfy itself that the site was adequately cleared before tendering. In other words, if there was ambiguity as to what was meant by "cleared" Checo had assumed the risk of clearing which might not meet its expectations.

**5**  The trial judge found Hydro liable for the tort of deceit. The Court of Appeal found that the evidence fell short of supporting that finding, there being no evidence of intention to deceive. That conclusion cannot seriously be contested and Checo's cross-appeal on the issue of fraudulent misrepresentation must accordingly be dismissed. The only issues therefore are whether claims lie in [page23] contract and tort and if so, what is the measure of damages.

The Claim in Contract

**6**  The parties chose to set out their respective rights and obligations in the contract they signed. They

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

chose to incorporate the tender documents into the contract. Thus all rights and obligations flowing from the tender documents onward are set by the parties' own agreement.

**7**  It follows that a court, in assessing the rights and obligations of the parties, must commence with the contract. It must look to what the parties themselves had to say about those rights and obligations.

**8**  This brings us to construction of the contract. The problem is that of reconciling provisions in the contract which are said to be inconsistent. One, the provision that placed on Hydro the obligation of clearing the right-of-way, was specific. Clause 6.01.03 stated that "[c]learing of the right-of-way and foundation installation has been carried out by others and will not form part of this Contract." It went on to state a limited exception for two areas, again drafted in specific terms: "Standing trees and brush have not been removed from the right-of-way in certain valley and gully crossings." The other relevant provisions are the general provisions placing on Checo the responsibility for any misunderstandings as to the conditions of the work or errors in the tender documents (clause 2.03), and for satisfying itself before bidding as to site conditions, quantities of work, etc., and requiring it to "obtain all necessary information as to risks, contingencies, and other circumstances which may influence or affect [its] Tender" (clause 4.04).

**9**  It is a cardinal rule of the construction of contracts that the various parts of the contract are to be interpreted in the context of the intentions of the [page24] parties as evident from the contract as a whole: K. Lewison, The Interpretation of Contracts (1989), at p. 124; Chitty on Contracts (26th ed. 1989), vol. 1, at p. 520. Where there are apparent inconsistencies between different terms of a contract, the court should attempt to find an interpretation which can reasonably give meaning to each of the terms in question. Only if an interpretation giving reasonable consistency to the terms in question cannot be found will the court rule one clause or the other ineffective: Chitty on Contracts, supra, at p. 526; Lewison, supra, at p. 206; Git v. Forbes *(1921), 62 S.C.R. 1*, per Duff J. (as he then was), dissenting, at p. 10, rev'd [1922] 1 A.C. 256; Hassard v. Peace River Co-operative Seed Growers Association Ltd., *[1954] 2 D.L.R. 50* (S.C.C.), at p. 54. In this process, the terms will, if reasonably possible, be reconciled by construing one term as a qualification of the other term: Forbes v. Git, [1922] 1 A.C. 256; Cotter v. General Petroleums Ltd., *[1951] S.C.R. 154*. A frequent result of this kind of analysis will be that general terms of a contract will be seen to be qualified by specific terms -- or, to put it another way, where there is apparent conflict between a general term and a specific term, the terms may be reconciled by taking the parties to have intended the scope of the general term to not extend to the subject-matter of the specific term.

**10**  Approaching the matter in this way, the provisions referred to above are capable of reconciliation. The parties agreed that Hydro should bear the responsibility of clearing the right-of-way. The only exception was as to the removal of trees and debris in certain valley and gully crossings. The general obligation of Checo for misunderstandings and errors in the tender documents and for satisfying itself as to the site, the work and all contingencies must not have been intended to negate the specific obligation for clearing which the contract placed squarely on the shoulders of Hydro. The failure to discharge that responsibility was not a "misunderstanding" or "error" in the tender documents within clause 2.03. Nor was it relevant to the tenderer's inspection of the site or responsibility [page25] for risks and contingencies that might affect the bid within clause 4.04. Given the specific nature of Hydro's obligation to clear the right-of-way, the site inspection and contingencies referred to can reasonably be read as relating to matters other than clearing, which was a clearly assigned obligation and thus not a contingency. The same applies to the provision for preparation of the site (clause 7.01.02). In this way, the clause placing on Hydro the obligation to clear the right-of-way can be reconciled with the clauses placing on Checo the consequences of errors and misunderstandings in the tender documents and the obligation to satisfy itself as to the site, the work and contingencies.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**11**  We thus conclude that the contract required Hydro to clear the right-of-way as specified in clause 6.01.03 of the contract and that duty was not negated by the more general clauses relating to errors and misunderstandings in tendering, site conditions and contingencies. This was the view of the trial judge and the majority in the Court of Appeal. The trial judge, based on the evidence he heard, went on to define what "clearing" meant in the contract; it meant that "the right-of-way would be free of logs and debris." The majority of the Court of Appeal accepted this conclusion. So must we. Since it is not seriously contended that Hydro cleared the right-of-way to this standard, Hydro's breach of contract is established.

**12**  The plaintiff suing for breach of contract is to be put in the position it would have been in had the contract been performed as agreed. The measure of damages is what is required to put Checo in the position it would have been in had the contract been performed as agreed. If the contract had been performed as agreed, Hydro would have removed the logs and debris from the right-of-way. Checo would not have been required to do the additional work that was necessitated by reason of the work site being improperly cleared. It might also have [page26] avoided certain overhead. The contract stipulated 15 percent for overhead and profit on extra work. Checo may be entitled to a portion of this sum for overhead. It would not be entitled to profit on the cost of clearing the right-of-way, since that would put Checo in a better position than it would have been had Hydro performed its contract; Checo never bargained for profit on this work, which was totally outside the parties' expectations. As will be explained in greater detail later in these reasons, we share Iacobucci J.'s view that if damages are to be assessed for breach of contract regarding the improper clearing of the work site, the case should be returned to trial for that to be done.

The Claim in Tort

The Theory of Concurrency

**13**  The first question is whether the contract precludes Checo from suing in tort.

**14**  Iacobucci J. concludes that a contract between the parties may preclude the possibility of suing in tort for a given wrong where there is an express term in the contract dealing with the matter. We would phrase the applicable principle somewhat more narrowly. As we see it, the right to sue in tort is not taken away by the contract in such a case, although the contract, by limiting the scope of the tort duty or waiving the right to sue in tort, may limit or negate tort liability.

**15**  In our view, the general rule emerging from this Court's decision in Central Trust Co. v. Rafuse, *[1986] 2 S.C.R. 147*, is that where a given wrong prima facie supports an action in contract and in tort, the party may sue in either or both, except where the contract indicates that the parties intended to limit or negative the right to sue in tort. This limitation on the general rule of concurrency arises because it is always open to parties to limit [page27] or waive the duties which the common law would impose on them for negligence. This principle is of great importance in preserving a sphere of individual liberty and commercial flexibility. Thus if a person wishes to engage in a dangerous sport, the person may stipulate in advance that he or she waives any right of action against the person who operates the sport facility: Dyck v. Manitoba Snowmobile Association Inc., *[1985] 1 S.C.R. 589*. Similarly, if two business firms agree that a particular risk should lie on a party who would not ordinarily bear that risk at common law, they may do so. So a plaintiff may sue either in contract or in tort, subject to any limit the parties themselves have placed on that right by their contract. The mere fact that the parties have dealt with a matter expressly in their contract does not mean that they intended to exclude the right to sue in tort. It all depends on how they have dealt with it.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**16** Viewed thus, the only limit on the right to choose one's action is the principle of primacy of private ordering -- the right of individuals to arrange their affairs and assume risks in a different way than would be done by the law of tort. It is only to the extent that this private ordering contradicts the tort duty that the tort duty is diminished. The rule is not that one cannot sue concurrently in contract and tort where the contract limits or contradicts the tort duty. It is rather that the tort duty, a general duty imputed by the law in all the relevant circumstances, must yield to the parties' superior right to arrange their rights and duties in a different way. In so far as the tort duty is not contradicted by the contract, it remains intact and may be sued upon. For example, where the contractual limitation on the tort duty is partial, a tort action founded on the modified duty might lie. The tort duty as modified by the contractual agreement between the parties might be raised in a case where the limitation period for an action for breach of contract has expired but the limitation period for a tort action [page28] has not. If one says categorically, as we understand Iacobucci J. to say, that where the contract deals with a matter expressly, the right to sue in tort vanishes altogether, then the latter two possibilities vanish.

**17** This is illustrated by consideration of the three situations that may arise when contract and tort are applied to the same wrong. The first class of case arises where the contract stipulates a more stringent obligation than the general law of tort would impose. In that case, the parties are hardly likely to sue in tort, since they could not recover in tort for the higher contractual duty. The vast majority of commercial transactions fall into this class. The right to sue in tort is not extinguished, however, and may remain important, as where suit in contract is barred by expiry of a limitation period.

**18** The second class of case arises where the contract stipulates a lower duty than that which would be presumed by the law of tort in similar circumstances. This occurs when the parties by their contract indicate their intention that the usual liability imposed by the law of tort is not to bind them. The most common means by which such an intention is indicated is the inclusion of a clause of exemption or exclusion of liability in the contract. Generally, the duty imposed by the law of tort can be nullified only by clear terms. We do not rule out, however, the possibility that cases may arise in which merely inconsistent contract terms could negative or limit a duty in tort, an issue that may be left to a [page29] case in which it arises. The issue raises difficult policy considerations, viz. an assessment of the circumstances in which contracting parties should be permitted to agree to contractual duties that would subtract from their general obligations under the law of tort. These important questions are best left to a case in which the proper factual foundation is available, so as to provide an appropriate context for the decision. In the second class of case, as in the first, there is usually little point in suing in tort since the duty in tort and consequently any tort liability is limited by the specific limitation to which the parties have agreed. An exception might arise where the contract does not entirely negate tort liability (e.g., the exemption clause applies only above a certain amount) and the plaintiff wishes to sue in tort to avail itself of a more generous limitation period or some other procedural advantage offered by tort.

**19** The third class of case arises where the duty in contract and the common law duty in tort are co-extensive. In this class of case, like the others, the plaintiff may seek to sue concurrently or alternatively in tort to secure some advantage peculiar to the law of tort, such as a more generous limitation period. The contract may expressly provide for a duty that is the same as that imposed by the common law. Or the contractual duty may be implied. The common calling cases, which have long permitted concurrent actions in contract and tort, generally fall into this class. There is a contract. But the obligation under that contract is typically defined by implied terms, i.e., by the courts. Thus there is no issue of private ordering as opposed to publicly imposed liability. Whether the action is styled in contract or tort, its source is an objective [page30] expectation, defined by the courts, of the appropriate obligation and the correlative right.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

20 The case at bar, as we see it, falls into this third category of case. The contract, read as we have proposed, did not negate Hydro's common law duty not to negligently misrepresent that it would have the right-of-way cleared by others. Had Checo known the truth, it would have bid for a higher amount. That duty is not excluded by the contract, which confirmed Hydro's obligation to clear the right-of-way. Accordingly, Checo may sue in tort.

21 We conclude that actions in contract and tort may be concurrently pursued unless the parties by a valid contractual provision indicate that they intended otherwise. This excludes, of course, cases where the contractual limitation is invalid, as by fraud, mistake or unconscionability. Similarly, a contractual limitation may not apply where the tort is independent of the contract in the sense of falling outside the scope of the contract, as the example given in Elder, Dempster & Co. v. Paterson, Zochonis & Co., [1924] A.C. 522 (H.L.), of the captain of a vessel falling asleep and starting a fire in relation to a claim for cargo damage.

The Express-Implied Distinction

22 Our colleague asserts that where the parties deal with a matter expressly in their contract, all right to sue in tort is lost. We have suggested, with great respect, that this proposition is unnecessarily draconian. The converse of this proposition is that implied terms of contracts do not oust tort liability.

[page31]

23 Although Iacobucci J. states at p. 68 of his reasons that he is leaving open the question of "[w]hether or not an implied term of a contract can define a duty of care in such a way that a plaintiff is confined to a remedy in contract", the distinction between implied and express terms figures in his discussion of the effect of contract terms on tort liability. For example, at p. 67 of his reasons, our colleague states:

> The compromise position adopted by Le Dain J. was that any duty arising in tort will be concurrent with duties arising under the contract, unless the duty which the plaintiff seeks to rely on in tort is also a duty defined by an express term of the contract. [The emphasis is Iacobucci J.'s.]

It would seem to follow from this statement that concurrent duties in contract and tort would lie where the contract duty is defined by an implied term of the contract, but not where the term is express. In these circumstances, it is not amiss to consider the utility of the distinction between express and implied terms of the contract as a basis for determining when a contract term may affect tort liability.

24 In our view, using the express-implied distinction as a basis for determining whether there is a right to sue in tort poses a number of problems. The law has always treated express and implied contract terms as being equivalent in effect. Breach of an implied term is just as serious as breach of an express term. Moreover, it is difficult to distinguish between them in some cases. Implied terms may arise from custom, for example, or from the conduct of the parties. In some cases words and conduct intermingle. Why should parties who were so certain in their obligations that they did not take the trouble to spell them out find themselves able to sue in tort, while parties who put the same matters in writing cannot?

[page32]

25 Nor is it evident to us that if parties to a contract choose to include an express term in the contract dealing with a particular duty relevant to the contract, they intended to oust the availability of tort

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

remedies in respect of that duty. In such cases, the intention may more likely be:

    (a)  To make it clear that the parties understand particular contractual duties to exist as between them, rather than having the more uncertain situation of not knowing whether a court will imply a particular duty under the contract; and/or

    (b)  To prevent litigation (for breach of contract) in the event of disputes arising -- the more certain the parties' respective rights and obligations (as is usually the case when those rights and obligations are set out in express contractual terms), the more likely it will be that disputes between the parties can be settled.

**26**  While the tort duty may be limited by the contractual terms so as to be no broader than the contract duty, there is no reason to suppose that merely by stipulating a duty in the contract, the parties intended to negate all possibility of suing in tort.

**27**  Indeed, a little further on in his reasons, our colleague appears to concede that the ouster of recourse to tort law must depend on more than the fact the contract has expressly dealt with the matter. He indicates at p. 69 of his reasons that whether the parties will be held to have intended to oust tort remedies in favour of contract remedies will depend on the context, including:

    (a)  whether the contract is commercial or non-commercial;

    (b)  whether the parties were of equal bargaining power;

[page33]

    (c)  whether the court is of the view that to find such an intention will lead to an unjust result in the court action.

**28**  Thus the question of whether a concurrent action in tort lies would depend not only on whether the contract expressly deals with the matter, but also on the elastic distinctions between commercial and non-commercial contracts, the court's perception of relative bargaining power, and finally, whether the court sees the result as just or unjust. We do not agree that parties contracting in a commercial context should be presumed to be more desirous of ousting the availability of tort remedies than parties contracting in a non-commercial context. If there are particular commercial relationships in which the parties wish remedies for disputes between them to be in contract only, then they may be expected to indicate this intention by including an express clause in the contract waiving the right to sue in tort. As for equality of bargaining power and the court's view of whether the result would be just or unjust, we fear they would introduce too great a measure of uncertainty. Parties should be able to predict in advance whether their remedies are confined to contract or whether they can sue concurrently in tort and contract. Finally, it seems to us that Iacobucci J.'s test for determining when concurrent liability is precluded will be difficult to apply in situations where the express contractual term does not exactly overlap a tort duty. In the present case, the contractual term was identical to the negligent misrepresentation, but that is not often to be expected.

The Authorities

**29**  The authorities, as we read them, do not support the conclusion that the express mention of a matter in the contract, and only its express mention in the contract, ousts any possibility of suing in tort. The opposing schools of thought on the concurrent liability [page34] issue have not been divided along such

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

lines. Instead, the issue has been whether there should be concurrent liability where any term of a contract, either express or implied, deals with the same duty imposed by tort law. For example, in Lister v. Romford Ice and Cold Storage Co., [1957] A.C. 555 (H.L.), Viscount Simonds noted (at p. 573):

> It is trite law that a single act of negligence may give rise to a claim either in tort or for breach of a term express or implied in a contract. [Emphasis added.]

**30**  Similarly, in Canadian Indemnity Co. v. Andrews & George Co., *[1953] 1 S.C.R. 19*, Rand J. stated (at p. 26):

> Where a contract expressly or by implication of fact provides for a performance with care, as in the case of carriers, the general duty is clearly not displaced and the person injured or damaged in property may sue either in contract or tort. [Emphasis added.]

**31**  On the other side of the concurrent liability debate, Wilson J.A. (as she then was), arguing in favour of liability lying in contract only, stated at p. 408 in her dissenting opinion in the Ontario Court of Appeal decision of Dominion Chain Co. v. Eastern Construction Co. *(1976), 68 D.L.R. (3d) 385*, aff'd sub nom. Giffels Associates Ltd. v. Eastern Construction Co., *[1978] 2 S.C.R. 1346*:

> The borderline of contract and tort in my opinion exists where a contract either expressly or impliedly imposes on A a duty of care vis-à-vis B, the other party to the contract, to do the things undertaken by the contract without negligence and there is also coincidental with, but independent of, the contract a duty of care upon A in tort .... [W]here the person to whom the duty is owed, the scope of the duty and the standard of care have all been expressly or impliedly agreed upon by the parties, it appears to me somewhat artificial to rely upon Lord Atkin's "neighbour" test to determine whether or not the duty is owed to the particular plaintiff and as to [page35] the requisite standard of care the defendant must attain. [Emphasis added.]

**32**  It is perhaps a source of some confusion that in the course of his judgment in Central Trust Co. v. Rafuse, supra, Le Dain J. stated (at p. 205):

> Where the common law duty of care is co-extensive with that which arises as an implied term of the contract it obviously does not depend on the terms of the contract, and there is nothing flowing from contractual intention which should preclude reliance on a concurrent or alternative liability in tort.

**33**  In our view, this passage should not be read as predicating the availability of concurrent liability in contract and tort on whether the contractual term is express or implied. Le Dain J. is simply stating that tort liability lies where the contractual term is implied. He does not go on to state that tort liability is always excluded by an express contractual term. This happens only when the express contractual term negates the tort duty. Thus in his summary of the applicable rules, Le Dain J. refers to exclusion clauses -- express contract terms that negate general liability -- as the kind of contract clause that may oust tort liability.

**34**  Our colleague relies on a second passage from Central Trust Co. v. Rafuse, supra, at p. 205, for the proposition that an express contractual term always ousts tort liability:

> What is undertaken by the contract will indicate the nature of the relationship that gives rise to the common law duty of care, but the nature and scope of the duty of care that is asserted as the foundation of the tortious liability must not depend on specific obligations or duties created by the

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

express terms of the contract. It is in that sense that the common law duty of care must be independent of the contract. ... A claim cannot be said to be in tort if it depends for the nature and scope of the asserted duty of care on the manner in which an obligation [page36] or duty has been expressly and specifically defined by a contract.

Again, with respect, our understanding of the passage is different. In our view, Le Dain J.'s use of the words "created" and "depends" indicates the meaning of this passage is simply that for concurrent tort liability to be available there must be a duty of care in tort that would exist even in the absence of the specific contractual term which created the corresponding contractual obligation.

**35**  This interpretation of Rafuse accords with the view taken in other cases that concurrent liability in tort and contract is available where the contractual obligation in question arises from an express term of the contract. For example, in Batty v. Metropolitan Property Realisations Ltd., [1978] Q.B. 554, the English Court of Appeal ruled that the plaintiffs were entitled to judgment against the defendant developers in either contract or tort where a house leased to the plaintiffs on a 999-year lease was gradually becoming uninhabitable due to instability of the land on which the house was built. The contractual obligation owed to the plaintiffs by the developers arose from an express warranty in the contract between the plaintiffs and the developers that the house had been built "in an efficient and workmanlike manner and of proper materials and so as to be fit for habitation ..." (p. 563). This contractual obligation in effect corresponded with a tort duty "to examine with reasonable care the land, which in this case would include adjoining land, in order to see whether the site was one on which a house fit for habitation could safely be built" (p. 567).

**36**  Nor do we see the reference by Le Dain J. in Rafuse to Jarvis v. Moy, Davies, Smith, Vandervell & Co., [1936] 1 K.B. 399 (C.A.), and other related English case law differentiating tort and contract, as supportive of a distinction between express and implied contractual terms. The issue in those cases was one of classifying the causes of action as [page37] either tort or contract for procedural purposes under the successive County Courts Acts. Indeed, they may be seen as resting on the assumption that, apart from statutory prescription, concurrent actions may lie.

Summary

**37**  We conclude that neither principle, the authorities nor the needs of contracting parties support the conclusion that dealing with a matter by an express contract term will, in itself, categorically exclude the right to sue in tort. The parties may by their contract limit the duty one owes to the other or waive the right to sue in tort. But subject to this, the right to sue concurrently in tort and contract remains.

**38**  In the case at bar, the contract did not limit the duty of care owed by Hydro to Checo. Nor did Checo waive its common law right to bring such tort actions as might be open to it. It follows that Checo was entitled to claim against Hydro in tort.

Damages in Tort and Contract in this Case

**39**  The measure of damages in contract and for the tort of negligent misrepresentation are:

> Contract: the plaintiff is to be put in the position it would have been in had the contract been performed as agreed.

> Tort: the plaintiff is to be put in the position it would have been in had the misrepresentation not been made.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

[page38]

**40**  At trial the plaintiff relied primarily on fraudulent misrepresentation, with its claim in contract being in the alternative to the claim in tort. The apparent reason for this approach was that the plaintiff had calculated its damages in tort as exceeding the damages in contract. In situations of concurrent liability in tort and contract, however, it would seem anomalous to award a different level of damages for what is essentially the same wrong on the sole basis of the form of action chosen, though, of course, particular circumstances or policy may dictate such a course.

**41**  The trial judge found for the plaintiff in fraudulent misrepresentation, and seems at some points in his judgment to have accepted the argument of the plaintiff that but for the misrepresentation the plaintiff would not have entered into the contract with Hydro. Accordingly, Checo's damages were calculated on the basis of what Checo lost overall on the contract. The trial judge also awarded the plaintiff a 15 percent markup for overhead and profit. With respect, while including an amount for overhead is appropriate where the damages are assessed as equalling the costs to the plaintiff of entering a contract it would not otherwise have entered, including as well something for profit is not appropriate. The trial judge's purported justification for this part of the damage award is not convincing. To fit this part of the award within a tort analysis, one would have to assume that but for the misrepresentation the plaintiff would have increased its bid by exactly the amount of the loss, plus overhead and profit (and would have been awarded the contract). This assumption contradicts the apparent assumption by the trial judge at other points of his judgment that Checo would not have [page39] entered the contract had it known the true state of affairs.

**42**  The trial judge did not assess damages for breach of contract, whether for failure to clear the right-of-way or other contractual breaches (i.e., claims related to the costs of returned conductor material and fire-fighting costs that Hydro failed to pay). Although the trial judge did not clearly state why he was not awarding damages for breach of contract regarding the conductor material and fire-fighting costs, this result seems to be consistent with an assumption that but for the misrepresentation the plaintiff would not have entered into the contract with Hydro. Once damages in tort are awarded on that basis (taking into account the plaintiff's overall loss on the project), to also award the plaintiff damages for breach of contract regarding part of the plaintiff's losses on the contract would be to allow the plaintiff double recovery.

**43**  The majority in the Court of Appeal not only substituted a finding of negligent misrepresentation for a finding of fraudulent misrepresentation, but also made an express finding regarding what the plaintiff would have done had the misrepresentation not been made; contrary to the trial judge's apparent assumption, the plaintiff would have entered the contract but at a higher price. As Hinkson J.A., put it, writing for the majority:

> The effect of [the] negligent misrepresentation was to induce the plaintiff to enter into a contract at a price less than it would have had it known the true facts.
>
> (*(1990), 44 B.C.L.R. (2d) 145*, at p. 158.)

Hinkson J.A. went on to find that the increase in Checo's bid had it known the true facts would [page40] have equalled the cost of the extra work made necessary by the improperly cleared work site, plus a 15 percent margin for overhead and profit.

**44**  As for breach of contract, the majority of the Court of Appeal referred the case back to trial for

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

assessment of whether there was a breach of contract, and if so what is the proper assessment of damages. This referral back to trial was not stated to be limited to consideration of breaches of contract other than the failure to clear the right-of-way.

**45**  In the situation of concurrency, the main reason to expect a difference between tort and contract damages is the exclusion of the bargain elements in standard tort compensation. In the terminology of L. L. Fuller and W. R. Purdue, as set out in their article, "The Reliance Interest in Contract Damages" (1936-37), 46 Yale L.J. 52 and 373, contract is normally concerned with "expectation" damages while tort is concerned with "reliance" damages. The denial of "expectation" or "loss of bargain" damages in a misrepresentation case like the present will occur when it is concluded, for example, that but for the misrepresentation, no contract would have been entered at all; this was the situation that the Court found in Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co., *[1991] 3 S.C.R. 3*. The Rainbow assessment of damages can obviously lead to a different quantum of damages because this method frees the parties from the burden or benefit of the rest of their bargain. The assessment of damages in a Rainbow situation could be lower or higher than the contract damages depending on whether the contract was a good or bad bargain; see D. W. McLauchlan, "Assessment of Damages for Misrepresentations Inducing Contracts" (1987), 6 Otago L. Rev. 370, at pp. 375-78. We note that a tendency towards similar damages in tort and contract can be identified even in Rainbow situations; see J. Blom, "Remedies in Tort and Contract: Where is the Difference?" [page41] in J. Berryman, ed., Remedies: Issues and Perspectives (1991), 395, at pp. 401-2.

**46**  This is not a case like Rainbow. Here the evidence at trial concerning Checo's desire to break into the B.C. market already provides solid support for the conclusion reached by the Court of Appeal. On the basis of that evidence, and in light of the absence in the trial judge's reasons of a clear conclusion as to what Checo would have done had the misrepresentation not been made, the Court of Appeal was in our view justified in making its own finding that Checo would have entered the contract in any event, albeit at a higher bid. This conclusion having been reached, one would expect that the quantum of damages in tort and contract would be similar because the elements of the bargain unrelated to the misrepresentation are reintroduced. This means not giving the plaintiff compensation for any losses not related to the misrepresentation, but resulting from such factors as the plaintiff's own poor performance, or market or other forces that are a normal part of business transactions.

**47**  In tort, Checo is entitled to be compensated for all reasonably foreseeable loss caused by the tort. The Court of Appeal was of the view that Checo, had it known the true facts (i.e., had the tort not been committed) would have increased its bid by an amount equal to the cost of the extra work made necessary by the improperly cleared work site plus profit and overhead. Such loss was not too remote, being reasonably foreseeable. But to compensate only for the direct costs of clearing is to suggest that the only tort was the failure to clear. The real fault is that Hydro misrepresented the situation and Checo may have relied on that representation in [page42] performing its other obligations under the contract. For example, having to devote its resources to that extra work might have prevented Checo from meeting its original schedule, thereby resulting in Checo incurring acceleration costs in order to meet the contract completion date. Such costs would also arguably be reasonably foreseeable. In our view, the matter should be referred back to the trial division for determination of whether any such indirect losses were the foreseeable results of the misrepresentation.

**48**  There remains the issue of assessment of damages for breach of contract. As implied above, it appears that the majority of the Court of Appeal intended to remit all breach of contract claims to trial, including the breach of contract claim related to the obligation of Hydro to have the work site cleared by others. We agree that this is the most appropriate disposition with respect to the breach of contract claims. On the claim for breach of contract Checo is to be put in the position it would be in had the work site been

cleared properly, and is therefore to be reimbursed for all expenses incurred as a result of the breach of contract, whether expected or not, except, of course, to the extent that those expenses may have been so unexpected that they are too remote to be compensable for breach of contract. We note that in this respect the test for remoteness in contract may be of no practical difference from the test of reasonable foreseeability applicable in tort: see Asamera Oil Corp. v. Sea Oil & General Corp., *[1979] 1 S.C.R. 633*, at p. 673, and B.D.C. Ltd. v. Hofstrand Farms Ltd., *[1986] 1 S.C.R. 228*, at pp. 243-44. Viewed thus, the damages in contract would include not only the costs flowing directly from the improperly cleared work site, but also consequent indirect [page43] costs such as acceleration costs due to delays in construction.

Conclusion

**49**  We would dismiss the appeal, allow the cross-appeal in part and refer the question of damages in tort and contract to the trial division to be reassessed in accordance with the principles set forth in these reasons.

The reasons of Sopinka and Iacobucci JJ. were delivered by

## IACOBUCCI J. (dissenting in part)

**50**  The narrow question raised by this appeal is what remedy should be available for pre-contractual representations made during the tendering process. This question also raises a more general and more important issue. In light of the decision of this Court in Central Trust Co. v. Rafuse, *[1986] 2 S.C.R. 147*, can a plaintiff who is in a contractual relationship with the defendant sue the defendant in tort if the duty relied upon by the plaintiff in tort is also made a contractual duty by an express term of the contract?

I.  Facts

**51**  The appellant and respondent on the cross-appeal, B.C. Hydro and Power Authority, is a British Columbia Crown corporation. The respondent and appellant on the cross-appeal, BG Checo International Ltd., is a large corporation in the business of constructing electrical transmission lines and distribution systems. I will refer to the parties as "Hydro" and "Checo", respectively.

**52**  In November of 1982, Hydro called for tenders to erect transmission towers and to string transmission lines. In December 1982, prior to submitting its tender for the contract, Checo's representative inspected the area by helicopter. He noted that the right-of-way had been partially cleared, and also noted evidence of ongoing clearing activity. The [page44] representative assumed that the right-of-way would be further cleared prior to the commencement of Checo's work. On January 2, 1983, Checo submitted its tender, and on February 15, 1983, Hydro accepted Checo's tender and the parties entered into a written contract. Checo contracted to construct 130 towers and install insulators, hardware and conductors over 42 kilometres of right-of-way near Sechelt, British Columbia.

**53**  In fact, no further clearing of the right-of-way ever took place. The "dirty" condition of the right-of-way caused Checo a number of difficulties in completing its work. Checo sued Hydro seeking damages for negligent misrepresentation, or, in the alternative, for breach of contract.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**54**  The evidence at trial indicated that Hydro had contracted the clearing out to another company, and that, to Hydro's knowledge, the work was not done adequately. There was no direct discussion between the representatives of Checo and Hydro concerning this issue. There was evidence led at trial that the contract between the parties did not specify clearing standards with the same degree of detail as was present in similar contracts entered into by Hydro.

**55**  During the trial, Hydro tendered documents in evidence which Checo had unsuccessfully attempted to discover. These documents indicated that Hydro was aware of the problem with the clearing and of the impact that these problems would have on the successful tenderer. As a result, Checo amended its statement of claim to include a claim in fraud.

**56**  The trial judge found that Hydro had acted fraudulently in its dealings with Checo and awarded Checo $2,591,580.56, being "the total loss suffered by [Checo] as a result of being fraudulently induced to enter into this contract". Hydro appealed to the Court of Appeal for British Columbia, which rejected the finding of fraud, but found that there had been a negligent misrepresentation which induced Checo to enter into the contract. [page45] The Court of Appeal awarded the sum of $1,087,729.81, for the misrepresentation, and referred the question of breach of contract and damages flowing therefrom to the British Columbia Supreme Court. Checo's cross-appeal for punitive damages and for a higher scale of costs was dismissed: *(1990), 44 B.C.L.R. (2d) 145*, *4 C.C.L.T. (2d) 161*, *41 C.L.R. 1*, *[1990] 3 W.W.R. 690*.

**57**  It will be helpful to set out the relevant provisions of the contract. The terms of the contract, No. HA-8071, are identical to the tender documents. The critical clauses are 2.03, 4.04 and 6.01.03. I have highlighted that portion of clause 6.01.03 which Checo alleges founds the misrepresentation by Hydro.


2.03              TENDERER'S RESPONSIBILITY


It shall be the Tenderer's responsibility to inform himself of all aspects of the Work and no claim will be considered at any time for reimbursement for any expenses incurred as a result of any misunderstanding in regard to the conditions of the Work. Should any details necessary for a clear and comprehensive understanding be omitted or any error appear in the Tender Documents or should the Tenderer note facts or conditions which in any way conflict with the letter or spirit of the Tender Documents, it shall be the responsibility of the Tenderer to obtain clarifications before submitting his Tender. [There follows some technical details.]

Neither B.C. Hydro nor the Engineer shall be responsible for any instructions or information given to any Tenderer other than by the Purchasing Agent, in accordance with this Clause.


4.04              INSPECTION OF SITE AND SUFFICIENCY OF TENDER

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

The Contractor shall inspect and examine the Site and its surroundings and shall satisfy himself before submitting his Tender as to the nature of the ground and sub-soil, the form and nature of the Site, the quantities and nature of work and materials necessary for completion of the Work, the means of access to the Site, the accommodation and facilities he may require, and in general [page46] shall himself obtain all necessary information as to risks, contingencies, and other circumstances which may influence or affect his Tender. Without limiting the generality of the foregoing, the Contractor shall satisfy himself of any special risks, contingencies, regulations, safety requirements, and other circumstances which may be encountered.

The Contractor shall be deemed to have satisfied himself before tendering as to the correctness and sufficiency of his Tender for the Work and of the prices stated in the Schedule of Prices which prices shall (except insofar as it is otherwise provided in the Contract) cover all his obligations under the Contract and all matters and things necessary for the proper execution of the Work.

6.01.03        WORK DONE BY OTHERS

Clearing of the right-of-way and foundation installation has been carried out by others and will not form part of this Contract.

Standing trees and brush have not been removed from the right-of-way in certain valley and gully crossings. The Contractor shall be responsible for such further site preparation as required by Section 7.01. [Emphasis added.]

7.01.02        PREPARATION OF THE SITE

The Contractor shall carry out any preparation of the Site, including removal of logs, stumps and boulders, as is necessary to perform his operations.

The Contractor shall ensure that the transmission line is protected from possible slides, washouts or other hazards resulting from his road construction, grading, benching, and other site preparation work and operations. Surface drainage shall be directed away from any structure foundations and guy anchors.

Any condition resulting from the Contractor's work and which, in the opinion of the Engineer constitutes a hazard to the transmission line shall be corrected to the satisfaction of the Engineer.

II.  Judgments in the Courts Below

A.  Supreme Court of British Columbia (Vancouver Reg. No. C864116, June 10, 1988)

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

[page47]

**58** The trial began in November of 1987 and ended in April of 1988, taking 28 days in total. Cohen J. delivered his reasons on June 10, 1988. Checo's original claim was for breach of contract or, in the alternative, negligent misrepresentation. In the middle of the trial, Checo amended its statement of claim to advance a claim of fraudulent misrepresentation.

**59** The trial judge found that Hydro knew and failed to disclose to Checo the problems with the clearing contractors, that the right-of-way was improperly cleared, and that merchantable logs, which Hydro intended to salvage, remained on the right-of-way. The trial judge also found that Hydro knew that the effect of the inadequate clearing would be to increase the costs of construction. He then turned to a consideration of the issue of fraud. Citing the principles set out in K.R.M. Construction Ltd. v. British Columbia Railway Co. *(1981), 18 C.L.R. 159* (B.C.S.C.), at p. 169; *(1982), 18 C.L.R. 159* (B.C.C.A.), at p. 277, Cohen J. was satisfied that Hydro was guilty of fraudulent misrepresentation.

**60** It was significant to him that, in another contract for similar installations, Hydro included, in a paragraph "virtually identical" to s. 6.01.03, the words "logs and old logging slash will be on the right-of-way in some areas". Cohen J. concluded (at pp. 61-62):

> ... the decision to remove any reference in clause 6.01.03 of [Checo's] contract to logs remaining on the right-of-way was deliberate. Foxall [an employee of Hydro] insisted that it was not necessary to include any words of warning in [Checo's] contract because the existence of logs on the right-of-way would be obvious to a tenderer viewing the right-of-way. However, when I consider that words warning of logs remaining on the right-of-way were excluded when [Hydro's] clearing standards allowed for logs to be left on the right-of-way, a fact not disclosed in the tender documents, [Hydro] knew merchantable logs were left on the right-of-way, knew of problems with clearing contractors not clearing to specifications, and knew of the delays and extra costs [page48] experienced by [another contractor] due to logs on the right-of-way obstructing construction activities, the deliberate omission of these words in the tender documents amounted, in my opinion, to a form of tender by ambush.

**61** The trial judge held that Hydro had a duty to be accurate in the information that it gave in its tender, and it was not open to it to say that Checo should not have assumed that the right-of-way would be cleared further, or that Checo should have made inquiries. Here, the "ordinary meaning" of the words used in clause 6.01.03 supported Checo's conclusion that the clearing was not yet complete. This representation in clause 6.01.03 was a false one, and was a representation that Checo relied upon. Cohen J. found that Checo would not have contracted on the basis that it did in the absence of the representation, and held Hydro liable for the "actual damages directly flowing from [its] fraud" (p. 72).

**62** Cohen J. did not consider Checo's claim in breach of contract. He declined to make an award of punitive damages.

   B. Court of Appeal of British Columbia *(1990), 44 B.C.L.R. (2d) 145*

**63** Hydro appealed from the judgment of Cohen J. Checo cross-appealed seeking punitive damages and costs to be taxed on a higher scale.

**64** The Court of Appeal considered the issues of fraudulent misrepresentation, negligent

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

misrepresentation and breach of contract. Writing for the majority, Hinkson J.A. (Lambert, Toy and Cumming JJ.A. concurring) allowed Hydro's appeal on the issue of fraudulent misrepresentation. However, Hinkson J.A. found Hydro liable for negligent misrepresentation (which had not been considered in the judgment at trial). Hinkson J.A. remitted Checo's action for breach of contract back to the British Columbia Supreme Court. Hinkson J.A. dismissed Checo's cross-appeal. [page49] Southin J.A., writing for herself, dissented in the result. While she agreed with Hinkson J.A. on the questions of fraudulent misrepresentation and breach of contract, she would have held that Hydro was not liable for negligent misrepresentation.

**65**  In the result, Hydro's appeal was allowed in part, in that the Court of Appeal held unanimously that Hydro was not liable for fraudulent misrepresentation. However, the Court of Appeal awarded damages against Hydro for negligent misrepresentation, but reduced the trial judge's damage award to $1,087,729.81. Checo's cross-appeal was dismissed.

        (1)  Reasons of Hinkson J.A.

**66**  Hinkson J.A. considered that the omission of the reference to logs and logging slash in clause 6.01.03 left "the meaning of 'clearing' unqualified" (p. 153). The majority of the Court held that the representation in clause 6.01.03 as to clearing "meant that logs and slash would be cleared from the right-of-way" (p. 155), and that the state of the right-of-way in November 1982 was not the state that the right-of-way would be in at the commencement of the contract. The majority concluded that "on the date of the contract [Hydro], while having represented that the right-of-way would have been cleared, knew that it had not been done" (p. 156), and held that this was, therefore, a misrepresentation.

**67**  Hinkson J.A. then turned to a consideration of the issue of negligent misrepresentation, which had not been considered by the trial judge. Hydro had a duty to advise Checo about the amount of clearing which would in fact be carried out. Hydro having failed to discharge this duty, it made a negligent misrepresentation, the effect of which "was to induce [Checo] to enter into a contract at a price less than it would have had it known the true facts" (p. 158). Hinkson J.A. held that Checo had established a claim for negligent misrepresentation [page50] based on Donoghue v. Stevenson, [1932] A.C. 562 (H.L.), and Hedley Byrne & Co. v. Heller & Partners Ltd., [1964] A.C. 465 (H.L.).

**68**  In considering whether there was also liability for fraudulent misrepresentation, as the trial judge had found, Hinkson J.A. traced the development of the law of the tort of deceit. He noted that although deceit, as it applies to corporations, is an evolving tort, fundamentally, "the plaintiff must establish an intention to deceive on the part of the defendant" (p. 161) and referred to the principles enunciated in *Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co.* *(1988), 30 B.C.L.R. (2d) 273* (C.A.). On the facts of this case, the majority concluded that the "evidence fell short of establishing the necessary basis for a finding of fraud" because there was no evidence of a dishonest intention (at pp. 161-62):

>        In the present case, a committee of 12 prepared the specifications. The evidence does not reveal that any members of the committee were dishonest in the preparation of the specifications for this contract. Rather, it is possible to conclude that they mistakenly and negligently believed that the requirement that a tenderer should take a view of the site would remedy any shortcomings in the specifications included in the terms of the contract.

Hydro's appeal was accordingly allowed on the issue of fraudulent misrepresentation.

**69**  On the question of damages, the majority held that Checo was not entitled to recover the entire loss it

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

suffered as a result of performing the contract. The majority held that the decision of the Court of Appeal, affirming the trial judgment in Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co. *(1990), 43 B.C.L.R. (2d) 1*, affirmed on appeal to the Supreme Court of Canada, *[1991] 3 S.C.R. 3*, could be distinguished [page51] from the case at bar, on the grounds that in the present case it was clear that Checo "would have entered into a contract if it had known the true state of affairs but would have adjusted the price of doing the work to reflect that state of affairs" (pp. 163-64). The majority held that on the basis of the statement of claim and the evidence, the extra work attributable to an improperly cleared work-site cost Checo $945,852,01. The majority allowed an additional 15 percent for overhead and profit, making a total damage award of $1,087,729.81.

**70**  Hinkson J.A. ordered a new trial on the breach of contract issue (at p. 164):

> ... I would remit the action to the Supreme Court for determination as to whether or not a breach of contract occurred and, in the event that the defendant is found to have been in breach of contract, what damages flowed from such breach. As the parties led evidence at trial in respect of this issue and with respect to the claim of the plaintiff for damages asserted to flow from breach of contract, the trial judge will be in a position on the basis of the record at trial to determine the issue of breach of contract and to assess damages if he finds a breach of contract occurred. The question of whether further evidence should be permitted on this issue should be determined by the trial judge.

**71**  Checo's cross-appeal was dismissed, punitive damages being inappropriate in view of the conclusion of the majority that the trial judge's finding of fraud was in error.

(2)  Dissenting Reasons of Southin J.A.

**72**  Southin J.A. was in agreement with the majority on the issue of fraud, and the disposition of the cross-appeal, but would not have awarded damages for negligent misrepresentation.

**73**  With respect to the issue of fraudulent misstatement, Southin J.A. noted that, in her view, "[b]ecause a conscious intention to deceive, i.e., mens rea, is a necessary ingredient of the tort of deceit, it follows that a corporation cannot be liable for this tort except upon the principle respondeat [page52] superior" (p. 183). In this context, Southin J.A. looked to evidence of the intent of Mr. Foxall, who was the Hydro employee in charge of the project. For there to have been a fraudulent misrepresentation, Foxall would have to be shown to have consciously intended to deceive Checo. Southin J.A. held that the trial judge had not asked himself the right questions and that there was no finding of the required fraudulent intent, and that therefore the claim in fraud could not stand.

**74**  Southin J.A. then considered the issue of negligent misstatement. After reviewing the case law, she concluded on the facts of this case that clause 6.01.03 did "not impart the information that between the date of the tender call and the date of commencement of work [Hydro would] clear the right of way to a standard thought suitable either by [Checo] or by a reasonable man" (pp. 200-1). Further, clauses 2.03 and 4.04 were evidence of Hydro's intention not to assume any duty to Checo (at p. 201): "In my opinion, by cls. 2.03 and 4.04, [Hydro] was declaring that it was not assuming any duty of care to [Checo]." Southin J.A. stated she was reinforced in her conclusion by the decision of the Alberta Court of Appeal in Catre Industries Ltd. v. Alberta *(1989), 99 A.R. 321* (C.A.), leave to appeal to the Supreme Court of Canada refused on March 8, 1990, *[1990] 1 S.C.R. vi*.

**75**  She did not agree with the majority that the measure of damages in this type of case is different depending on whether liability is founded in contract or in tort.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**76** As the trial judge had made no findings as to breach of contract, Southin J.A. agreed with Hinkson J.A. that there should be a new trial on the claim for breach of contract.

[page53]

III.  Issues

**77** I would characterize the issues raised by Hydro's appeal as follows:

(1) Can a pre-contractual representation which becomes a contractual term found liability in negligent misrepresentation?

(2) If the answer to the first question is in the affirmative, did the terms of the contract nonetheless operate to exclude Hydro's potential liability for any misrepresentations?

(3) If the terms of the contract did not exclude Hydro's potential liability for any misrepresentations, is Hydro liable for negligent misrepresentation?

(4) Was there a breach of contract?

**78** I would characterize the issues raised by Checo's cross-appeal as follows:

(1) Should Hydro be liable for fraudulent misrepresentation?

(2) Did the Court of Appeal correctly assess Checo's damages for negligent misrepresentation?

IV.  Analysis

**79** In the interests of simplicity and brevity, I will deal with the issues raised by the appeal and cross-appeal somewhat out of order. Because the issue of fraudulent misrepresentation can and should be resolved quickly, I will deal with it first. Then I will examine, following Central Trust v. Rafuse, supra, the scope of the right of a party to a contract to sue the other party in tort (the tort-contract concurrency problem). It will also be necessary for me to review the law of negligent misrepresentation (which was not at issue in Central Trust v. Rafuse), in order to determine the applicability of the principles [page54] in Central Trust v. Rafuse to pre-contractual representations.

**80** Because of my conclusions on these issues, it will not be necessary for me to decide whether there was a negligent misrepresentation, or whether the Court of Appeal's assessment of Checo's damages for negligent misrepresentation was correct. It will, however, be necessary for me to consider the issue of breach of contract.

A.  Fraudulent Misrepresentation

**81** The trial judge found Hydro liable in deceit. The Court of Appeal allowed Hydro's appeal on this issue. In argument before us, Checo submitted that the trial judge's ruling on the question of deceit should be upheld. At the hearing of the appeal, we indicated that we did not find it necessary to hear Hydro's response on the issue of deceit.

**82** In my view, there was insufficient evidence to support a finding of deceit (i.e. of fraudulent intention, as discussed further in these reasons) against Hydro, and the Court of Appeal correctly intervened to

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

reverse the trial judge on this point. As Hinkson J.A. noted (at pp. 161-62):

> [A] committee of 12 prepared the specifications. The evidence does not reveal that any members of the committee were dishonest in the preparation of the specifications for this contract. Rather, it is possible to conclude that they mistakenly and negligently believed that the requirement that a tenderer should take a view of the site would remedy any shortcomings in the specifications included in the terms of the contract.

Consequently, Checo's cross-appeal on this point should be dismissed.

### B.   Concurrent Liability in Tort and Contract

#### (1)   Introduction

**83**  It was Hydro's submission on this appeal that it ought to be liable, if at all, in contract and not in [page55] tort. For the reasons which I will set out, I agree that in the circumstances of the case, while Hydro may be liable in contract for the representations which Checo complains of, Hydro cannot be liable in tort. Given the importance of the general issue of tort-contract concurrency, I propose to explore it in some detail.

**84**  As a general rule, the existence of a contract between two parties does not preclude the existence of a common law duty of care. Subject to the substantive and procedural differences that exist between an action in contract and an action in tort, both the duty of care and the liability may be concurrent in contract and tort. In such circumstances, it is for the plaintiff to select the cause of action most advantageous to him or her. That was the position adopted by Le Dain J. in Central Trust v. Rafuse, supra. At pages 204-5, Le Dain J. said the following:

> The common law duty of care that is created by a relationship of sufficient proximity, in accordance with the general principle affirmed by Lord Wilberforce in Anns v. Merton London Borough Council, is not confined to relationships that arise apart from contract. Although the relationships in Donoghue v. Stevenson, Hedley Byrne and Anns were all of a non-contractual nature and there was necessarily reference in the judgments to a duty of care that exists apart from or independently of contract, I find nothing in the statements of general principle in those cases to suggest that the principle was intended to be confined to relationships that arise apart from contract. ... [T]he question is whether there is a relationship of sufficient proximity, not how it arose. The principle of tortious liability is for reasons of public policy a general one.

**85**  Le Dain J.'s conclusion that a plaintiff is generally entitled to choose, as between contract and tort, the cause of action most favourable to him or her was supported by a long line of Canadian and English authority, some of which I will consider below. Central Trust v. Rafuse, supra, has since met with wide acceptance, and has been applied by [page56] a number of provincial Courts of Appeal. See University of Regina v. Pettick *(1991), 90 Sask. R. 241* (C.A.); Fletcher v. Manitoba Public Insurance Co. *(1989), 68 O.R. (2d) 193* (C.A.); Pittman v. Manufacturers Life Insurance Co. *(1990), 76 D.L.R. (4th) 320* (Nfld. C.A.); Clark v. Naqvi *(1989), 99 N.B.R. (2d) 271* (C.A.), and Catre Industries Ltd. v. Alberta, supra.

**86**  In Central Trust v. Rafuse, supra, Le Dain J. recognized two situations in which, notwithstanding what would otherwise be a breach of the duty of care in tort, a plaintiff's ability to sue in tort will be limited by the terms of the contract. In one situation it is the liability in tort which is avoided or modified; in the other it is the duty in tort which is affected.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**87** Le Dain J. recognized that liability in tort can be limited or excluded by the terms of a contract. A plaintiff will not be permitted to plead in tort in order to circumvent a contractual clause which excludes or limits the defendant's liability (at p. 206):

> A concurrent or alternative liability in tort will not be admitted if its effect would be to permit the plaintiff to circumvent or escape a contractual exclusion or limitation of liability for the act or omission that would constitute the tort.

In this case, Hydro argues that the terms of the contract operated to exclude its liability for the conduct of which Checo complains. If Hydro were correct, then Checo would no more be able to recover in tort than in contract. As I will discuss below, I am of the opinion that the contract does not exclude Hydro's liability.

**88** As mentioned, Le Dain J. also recognized that the defendant's duty in tort could be affected by the terms of the contract. If the duty of care alleged in tort is also defined by a specific term of the contract, then the plaintiff will be entitled only to [page57] those remedies which may be available pursuant to the contract. The contractual relationship can bring the parties into sufficient proximity to give rise to a duty of care. However, no duty of care in tort can be concurrent with a duty of care created by an express term of the contract. In the words of Le Dain J. (at p. 205):

> What is undertaken by the contract will indicate the nature of the relationship that gives rise to the common law duty of care, but the nature and scope of the duty of care that is asserted as the foundation of the tortious liability must not depend on specific obligations or duties created by the express terms of the contract. It is in that sense that the common law duty of care must be independent of the contract. ... A claim cannot be said to be in tort if it depends for the nature and scope of the asserted duty of care on the manner in which an obligation or duty has been expressly and specifically defined by a contract.

**89** On the facts of Central Trust v. Rafuse, supra, Le Dain J. concluded that the defendant solicitors had concurrent duties of care in contract and in tort. The contract between the parties was a general retainer. Le Dain J. held that it was an implied term of the contract between solicitor and client that the solicitor perform his or her professional duties with "reasonable care, skill and knowledge" (p. 208). The duty of care imposed on a solicitor at common law was the same as, and concurrent with, that imposed as an implied term of the contract (at p. 210):

> While the solicitor's duty of care has generally been stated ... as arising as an implied term of the contract or retainer, the same duty arises as a matter of common law from the relationship of proximity created by the retainer. In the absence of special terms in the contract determining the nature and scope of the duty of care in a particular case, the duties of care in contract and tort are the same.

[page58]

**90** Given the nature of a solicitor's duties in contract and in tort, and given the particular contractual relationship between the parties, Le Dain J. concluded that the duty of care of the solicitors ran concurrently in tort and contract. Moreover, there was no clause in the contract excluding or limiting the solicitors' liability which could affect the solicitors' liability in tort.

**91** In Central Trust v. Rafuse, supra, it was not necessary for Le Dain J. to test the boundaries of the

situations he described in which a plaintiff's right to recover in tort would be limited. As I mentioned, the contract before him had no clauses excluding or limiting the liability of the solicitors. Moreover, the contract contained no express terms creating specific obligations or duties which might have excluded the solicitors' duty of care in tort.

**92**  The facts of this case require me to do what it was not necessary for Le Dain J. to do in *Central Trust v. Rafuse*, supra: I must interpret and apply the principles to a contractual relationship in which there are exclusion or limitation of liability clauses which may exclude or limit liability in tort, as well as in contract, and in which there are clauses which may operate to exclude some parts of the duty of care in tort entirely. To interpret and apply the principles in *Central Trust v. Rafuse* in the circumstances of this case, it will be necessary for me to review the authorities governing concurrency of obligations in tort and contract. It will also be necessary for me to review the law governing clauses which exclude or limit liability.

### (2)  Concurrency of Tort and Contract

**93**  The recent history of concurrency in tort and contract can be characterized as the development of a single regime of concurrency from two sets of [page59] rules governing concurrency in distinct circumstances. Until *Esso Petroleum Co. v. Mardon*, [1976] 2 All E.R. 5 (C.A.), there was one set of rules governing obligations in tort and contract for the so-called "status relationships" and another set of rules governing obligations in tort and contract for all other relationships. Since *Esso Petroleum*, supra, these two sets of rules have been assimilated into a single regime governing obligations in tort and contract for all relationships. The principles set out by Le Dain J. in *Central Trust v. Rafuse*, supra, are representative of that single regime. To understand better the principles articulated by Le Dain J. in *Central Trust v. Rafuse*, it will be helpful to review the process of development which preceded and informed the judgment of Le Dain J.

### (a)  The Two Strands of Concurrent Liability in Tort and Contract

**94**  The modern conception of a distinct tort of negligence is relatively recent. It has been argued that the genesis of negligence is to be found in the long series of "running down" cases in the eighteenth and nineteenth centuries, as ever increasing numbers of horses, carts and ships meant increasing numbers of accidents. See J. H. Baker, *An Introduction to English Legal History* (1979), at pp. 342-45. But it was not until the famous case of *Donoghue v. Stevenson*, supra, that a general tort of negligence was finally recognized.

**95**  Negligence was not, however, unknown to the law before *Donoghue v. Stevenson*, or even before such running down cases as *Leame v. Bray* (1803), 3 East 593 (K.B.), 102 E.R. 724. Beginning in a much earlier time, negligence was actionable if the defendant's status imposed upon him or her a duty to take care in the exercise of his or her profession. Persons with such status included bailees and those who practised a "common calling", including those of innkeeper and common carrier. The liability [page60] of such persons arose independently of contract. To quote Baker, supra, at pp. 277-78:

> Many callings were, in any case, controlled by the common law or custom independently of contract; an innkeeper, for instance, was liable under the 'custom of the realm' for his failure to look after a guest's goods or for refusing to accommodate a traveller. ... [S]imilar duties could be imposed on professional men. ... Another kind of status was that of bailee or custodian of property; it was held in 1487 that a shepherd having the custody of sheep was liable in assumpsit for failing to look after them, so that they were killed.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**96**  That a defendant who owed a duty to take care because of his or her status was liable in negligence even if there also existed a contract between the parties is confirmed by the judgment of Dallas C.J. in Bretherton v. Wood (1821), 3 Brod. & B. 54 (Ex. Ch.), 129 E.R. 1203, at p. 1206 E.R.:

> This action is on the case [i.e. in negligence] against a common carrier, upon whom a duty is imposed by the custom of the realm, or in other words, by the common law, to carry and convey their goods or passengers safely and securely, so that, by their negligence or default, no injury or damage happen. A breach of this duty is a breach of the law, and for this breach an action lies, founded on the common law, which action wants not the aid of a contract to support it.
>
> ...
>
> Nor is it material, whether redress might or might not have been had in an action of assumpsit [i.e. in contract]; that must depend on circumstances of which this Court has no knowledge; but, whether an action of assumpsit might or might not have been maintained, still this action on the case may be maintained. The action of assumpsit, as applied to cases of this kind, is of modern use. The action on the case is as early as the existence of the custom or common law as to common carriers. [Emphasis added.]

**97**  There has been some debate as to the extent of these status relationships. See Central Trust v. Rafuse, supra, at pp. 176-78; C. French, "The Contract/Tort [page61] Dilemma" (1983), 5 Otago L. Rev. 236, at pp. 273-78; and C. H. S. Fifoot, History and Sources of the Common Law: Tort and Contract (1949), at pp. 157-59. On what French calls the "traditional view", status relationships included carriers, innkeepers, surgeons, apothecaries, attorneys, veterinary surgeons, smiths, and barbers, together with the relationships of bailor/bailee and master/servant (at pp. 274-78). Whatever the proper scope of the status relationships might have been, it is clear that they attracted concurrent liability in contract and in tort. As Tindal C.J. expressed it in Boorman v. Brown (1842), 3 Q.B. 511 (Ex. Ch.), 114 E.R. 603, at pp. 608-9 E.R., aff'd sub nom. Brown v. Boorman (1844), 11 Cl. & Fin. 1 (H.L.), 8 E.R. 1003:

> That there is a large class of cases in which the foundation of the action springs out of privity of contract between the parties, but in which, nevertheless, the remedy for the breach, or non-performance, is indifferently either assumpsit or case upon tort, is not disputed. Such are actions against attorneys, surgeons, and other professional men, for want of competent skill or proper care in the service they undertake to render: actions against common carriers, against ship owners on bills of lading, against bailees of different descriptions: and numerous other instances occur in which the action is brought in tort or contract at the election of the plaintiff.
>
> ...
>
> The principle in all these cases would seem to be that the contract creates a duty, and the neglect to perform that duty, or the nonfeasance, is a ground of action upon a tort.

**98**  As the judgment of Tindal C.J. in Boorman, supra, indicates, the range of status relationships was seen in the nineteenth century as extensive (the profession at issue in Boorman was that of commodities broker). In fact, in the judgment of the House of Lords upholding the judgment of Tindal C.J., concurrency of tort and contract is stated as a general principle, without reference to [page62] status relationships at all (at pp. 1018-19 E.R., per Lord Campbell):

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

... wherever there is a contract, and something to be done in the course of the employment which is the subject of that contract, if there is a breach of a duty in the course of that employment, the plaintiff may either recover in tort or in contract.

**99** However, in the twentieth century, there was a noticeable trend towards limiting the range of the status relationships. In Jarvis v. Moy, Davies, Smith, Vandervell & Co., [1936] 1 K.B. 399 (C.A.), Slesser L.J. found that a broker did not exercise a "common calling" (at pp. 406-7):

In reference to the suggestion that a broker might be regarded as exercising a common calling in the same way as, for example, a carrier, in respect of whom it has been held that his duties to the public are imported so that a breach of these is necessarily a tort, I desire to add that no authority was cited to establish that a stockbroker is in such a position. ... In my opinion a stockbroker does not exercise a "public calling" in the sense in which that term is used as applied to carriers and certain other occupations. In this case a personal relationship existed between the parties, and in my view the breach complained of was a breach of contract.

In Groom v. Crocker, [1939] 1 K.B. 194, the Court of Appeal held that the profession of solicitor was not among the status relationships, as those of doctor, architect and stockbroker also were not (at p. 222 per Scott L.J.):

A solicitor, as a professional man, is employed by a client just as much as a doctor, an architect, or a stockbroker, and the mutual rights and duties of the two are regulated entirely by the contract of employment. ... The retainer when given puts into operation the normal terms of the contractual relationship, including in particular the duty of the solicitor to protect the client's interest and carry out his instructions in the matters in which the retainer relates, by all proper means. ... But in all these aspects the tie between the two is contractual. [page63] There is to-day no common-law duty similar to that which survives in the case of a bailee or carrier, and no action lies in tort for the breach of the above duties. ...

The judgment of Diplock L.J. in Bagot v. Stevens Scanlan & Co., [1966] 1 Q.B. 197, was to a similar effect. Diplock L.J. held that the relationship of architect and client was not a "status relationship" (at p. 206):

... I can see nothing in the relationship of architect and client which can be said to give rise to the kind of status obligation which arises from the origins of the common law in the case of master and servant, common carrier, innkeeper, bailor and bailee.

**100** For those who were not in one of the status relationships, on the other hand, a different regime governed the tort liabilities of parties to a contract. For all those who were not in status relationships, an action in negligence lay only if the duty relied upon in negligence was "independent" of the duty imposed by contract. Before the causes of action were abolished by the Judicature Act, the principle was stated to be that if no cause of action remained if the allegation of a contract were struck out, then the action was founded on contract alone: Williamson v. Allison (1802), 2 East. 446 (K.B.), 102 E.R. 439. In Legge v. Tucker (1856), H. & N. 500 (Ex.), 156 E.R. 1298, all the judges were unanimously of the opinion that an action in tort would lie only if there was a duty existing apart from the contract. In the words of Pollock C.B. (at p. 1299 E.R.): "Where the foundation of the action is a contract, in whatever way the declaration is framed, it is an action of assumpsit; but where there is a duty ultra the contract, the plaintiff may declare in case." In the words of Watson B. (at p. 1299 E.R.): "[T]he true question is, whether, if [the allegation of a contract] were struck out, any ground of action would remain. ... There is no duty independently of the contract, and therefore it is an action of assumpsit." The judgment of Smith L.J. in Turner [page64] v.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

Stallibrass, [1898] 1 Q.B. 56 (C.A.), is to the same effect (at p. 58):

> The rule of law on the subject, as I understand it, is that, if in order to make out a cause of action it is not necessary for the plaintiff to rely on a contract, the action is one founded on tort; but, on the other hand, if, in order successfully to maintain his action, it is necessary for him to rely upon and prove a contract, the action is one founded upon contract.

See also Edwards v. Mallan, [1908] 1 K.B. 1002 (C.A.), per Vaughan Williams L.J.

**101** The "independent tort" requirement was applied and refined in more modern cases. In Elder, Dempster & Co. v. Paterson, Zochonis & Co., [1924] A.C. 522 (H.L.), Viscount Finlay stated, at p. 548, that for an action in tort to lie in a contractual setting, there must be "an independent tort unconnected with the performance of the contract". In this Court, Pigeon J. said in J. Nunes Diamonds Ltd. v. Dominion Electric Protection Co., *[1972] S.C.R. 769*, at pp. 777-78, relying on Elder, Dempster & Co., supra, that no action for negligent misrepresentation would lie in "any case where the relationship between the parties is governed by a contract, unless the negligence relied on can properly be considered as 'an independent tort' unconnected with the performance of that contract ...". In Dominion Chain Co. v. Eastern Construction Co. *(1976), 68 D.L.R. (3d) 385* (Ont. C.A.), Wilson J.A. (as she then was), dissenting in part, held that no action in tort would lie where the acts complained [page65] of by the plaintiff were in relation to the "very matters covered by the contract" (at p. 408):

> ... where the person to whom the duty is owed, the scope of the duty and the standard of care have all been expressly or impliedly agreed upon by the parties, it appears to me somewhat artificial to rely upon Lord Atkin's "neighbour" test [as set out in Donoghue v. Stevenson, supra] to determine whether or not the duty is owed to the particular plaintiff and as to the requisite standard of care the defendant must attain. In other words, it would appear that if the acts or omissions complained of by the plaintiff are in relation to the very matters covered by the contract, the essence of the plaintiff's action is breach of the contractual duty of care rather than breach of the general duty of care owed to one's "neighbour" in tort.

    (b)  The Emergence of a Single Theory of Concurrent Liability

**102** Since Esso Petroleum, supra, the law in England and in Canada has ceased to apply a rule of concurrency for status relationships different from that in other relationships, although in Esso Petroleum it was not clear that this was the case. In finding that an architect was concurrently liable in contract and in tort, Lord Denning M.R. relied on the decision of Tindal C.J. in Boorman v. Brown, supra, a case based on status. However, any ambiguity was resolved by the judgment of Megaw L.J. in Batty v. Metropolitan Property Realisations Ltd., [1978] Q.B. 554 (C.A.). Megaw L.J. held that the rule in Esso Petroleum was not limited to "common callings", but was a rule of general application (at p. 566):

> The distinction to which I have referred which Mr. Brown seeks to make is this: that the right of a plaintiff who sues in contract, where the facts giving rise to the breach of contract would also constitute a breach of common law duty apart from contract, to have the judgment entered on both heads is limited to cases where the common law duty is owed by one who conducts a common calling and thus is under a special type of legal liability, and to cases where the duty is owed by a professional man in respect of his professional skill. Mr. Brown contends that, though there is no affirmative authority for limiting the right in that way, it ought to be treated as being so limited because there is no case in the English books, going back over many years, which shows that the right has been allowed, or possibly even claimed, in cases other than the special types of case to which he referred, and in particular the professional skill types of case. In Esso Petroleum Co. Ltd.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

v. Mardon [1976] Q.B. 801 the right was held to arise in a case where the breach of duty was a breach of an expert in siting filling stations involving his professional skill. I see no reason, in logic or on practical grounds, for putting any such limitation on the scope of the right. It [page66] would, I think, be an undesirable development in the law if such an artificial distinction, for which no sound reason can be put forward, were to be held to exist.

**103** More generally, in Anns v. London Borough of Merton, [1977] 2 All E.R. 492 (H.L.), Lord Wilberforce acknowledged that the duty of care in tort is now a general one, arising as a result of proximity, and not of the particular class of relationship between the parties (at p. 498):

> Through the trilogy of cases in this House, Donoghue v Stevenson, Hedley Byrne & Co Ltd v Heller & Partners Ltd and Home Office v Dorset Yacht Co Ltd, the position has now been reached that in order to establish that a duty of care arises in a particular situation, it is not necessary to bring the facts of that situation within those of previous situations in which a duty of care has been held to exist. Rather the question has to be approached in two stages. First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter, in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise ... .

**104** This trend towards a single theory of concurrent liability in tort and contract was recognized in Canada by La Forest J.A. (as he then was) in New Brunswick Telephone Co. v. John Maryon International Ltd. *(1982), 43 N.B.R. (2d) 469* (C.A.). After an extensive review of the case law, La Forest J.A. concluded that an architect was concurrently liable in contract and in tort. La Forest J.A. based his conclusion on the concept of a general tort of negligence (at p. 520): "[W]hile I could dispose of this case by simply adding the profession of structural engineer to the list of common [page67] callings and skilled professions, I prefer to base my judgment on the generalized tort of negligence".

**105** In Central Trust v. Rafuse, supra, Le Dain J. also rejected any distinction between status relationships and other relationships in determining whether parties to a contract can also recover in tort. Instead, Le Dain J. found that a single rule applied to all relationships (at p. 205): "[T]he question is whether there is a relationship of sufficient proximity, not how it arose." The rule of concurrency which Le Dain J. adopted was a compromise between two strands of authority.

**106** In one strand of authority, that governing the status relationships, any duty arising in tort had always been concurrent with duties arising under the contract: Brown v. Boorman, supra. In the other strand of authority, the duty in tort was only concurrent with the duty in contract if the negligence complained of was unconnected with the performance of the contract: J. Nunes Diamonds, supra. The compromise position adopted by Le Dain J. was that any duty arising in tort will be concurrent with duties arising under the contract, unless the duty which the plaintiff seeks to rely on in tort is also a duty defined by an express term of the contract. If the duty is defined by an express term of the contract, the plaintiff will be confined to whatever remedies are available in the law of contract (at p. 205):

> ... the nature and scope of the duty of care that is asserted as the foundation of the tortious liability must not depend on specific obligations or duties created by express terms of the contract. ... Where the common law duty of care is co-extensive with that which arises as an implied term of the contract it obviously does not depend on the terms of the contract. ... The same is also true

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

ofreliance on a common law duty of care that falls short of a specific obligation or duty imposed by the express terms of a contract.

**107**  In my opinion, the compromise struck by Le Dain J. is an appropriate one. If the parties to a [page68] contract choose to define a specific duty as an express term of the contract, then the consequences of a breach of that duty ought to be determined by the law of contract, not by tort law. Whether or not an implied term of a contract can define a duty of care in such a way that a plaintiff is confined to a remedy in contract is not at issue in this case. I leave that determination to another day. While the rule articulated by Le Dain J. is a rule of law which does not depend on the presumed or actual intention of the parties, the intention which can be inferred from the fact that the parties have made the duty an express term of the contract provides policy support for the rule. If a duty is an express term of the contract, it can be inferred that the parties wish the law of the contract to govern with respect to that duty. This is of particular significance given that the result of a breach of a contractual duty may be different from that of a breach of a duty in tort. As Wilson J.A. noted in Dominion Chain Co., supra, a plaintiff's substantive rights may be different in contract and in tort (at p. 409):

> His cause of action may arise later in tort resulting in a later expiry of the limitation period. His damage may be greater in quantum and different in kind if he sues in tort. On the other hand his action in contract may survive him or be the subject of a set-off or counterclaim, neither of which would be so if his action were framed in tort.

The fact that damages may be assessed differently in contract from in tort was recently affirmed by this Court in Rainbow Industrial Caterers Ltd. v. Canadian National Railway Co., *[1991] 3 S.C.R. 3*.

**108**  A further policy rationale for the rule advanced by Le Dain J. is that contracts have become, particularly in commercial contexts, increasingly complex. Commercial contracts allocate risks and fix the mutual duties and obligations of the parties. Where there is an express term creating a contractual [page69] duty, it is appropriate that the parties be held to the bargain which they have made. Tort duties are of "uncertain definition and scope": H. Johnson, "Contract and Tort: Orthodoxy Reasserted!" (1990), 9 Int'l Banking L. 306. Commercial parties ought to be able to fix their respective rights and obligations in a particular transaction with certainty. Contractual certainty is a sine qua non without which reliance and the execution of obligations are seriously impaired. Moreover, without certainty, the transaction costs associated with a given commercial arrangement would most likely increase, perhaps drastically. In V.K. Mason Construction Ltd. v. Bank of Nova Scotia, *[1985] 1 S.C.R. 271*, Wilson J. alluded to these considerations stating, at p. 282, that "much of the value of commercial contracts lies in their ability to produce certainty. Parties are enabled to regulate their relationship by means of words rather than by means of their understanding of what each other's actions are intended to imply."

**109**  However, I do not believe that the rule advanced by Le Dain J. that forecloses a claim in tort is absolute in all circumstances. In this respect, I would favour a contextual approach which takes into account the context in which the contract is made, and the position of the parties with respect to one another, in assessing whether a claim in tort is foreclosed by the terms of a contract. The policy reasons in favour of the rule advanced by Le Dain J. are strongest where the contractual context is commercial and the parties are of equal bargaining power. There was no question of unconscionability or inequality of bargaining power in Central Trust v. Rafuse, supra, as there is no such question in this case. If such issues, or others analogous to them, were to arise, however, a court should be wary not to exclude too rapidly a duty of care in tort on the basis of an express term of the contract, especially if the end result for the plaintiff would be a wrong without a remedy.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

[page70]

### (3)  Contractual Terms Excluding or Limiting Liability or Duty

**110**  As noted above, contractual exclusion or limitation clauses can operate either to exclude or limit liability, or to limit the duty owed by one party to the other. In neither case will the plaintiff be permitted to use an action in tort to circumvent the limitation of liability or of duty in the contract. Terms going to duty are of particular importance where one party is alleging negligent misrepresentation, as Checo is in this case.

**111**  It is well-settled that a clause limiting liability in contract can, in appropriate circumstances, also have the effect of limiting liability in tort: see, for example, ITO--International Terminal Operators Ltd. v. Miida Electronics Inc., *[1986] 1 S.C.R. 752*, and London Drugs Ltd. v. Kuehne & Nagel International Ltd., *[1992] 3 S.C.R. 299*. In the words of Scrutton L.J. in Hall v. Brooklands Auto Racing Club, [1933] 1 K.B. 205 (C.A.), at p. 213:

> ... where the defendant has protection under a contract, it is not permissible to disregard the contract and allege a wider liability in tort: Elder, Dempster & Co. v. Paterson, Zochonis & Co., per Lord Cave, Lord Finlay and Lord Sumner.

**112**  The rule that liability in tort cannot be used to circumvent a contractual limitation of liability is supported by recent Canadian authority, including Central Trust v. Rafuse, supra, itself. In New Brunswick Telephone Co. v. John Maryon International Ltd., supra, La Forest J.A. stated that (at p. 506):

> ... the law of negligence will not be used to give a remedy to a person for a breach of contract for which he is absolved under the contract. ... Parties are free to contract [page71] out of liabilities, tortious or otherwise, and the courts should not interfere with their agreements.

The point was reiterated by Le Dain J. in Central Trust v. Rafuse (at p. 206):

> A concurrent or alternative liability in tort will not be admitted if its effect would be to permit the plaintiff to circumvent or escape a contractual exclusion or limitation of liability for the act or omission that would constitute the tort.

See, on this question, London Drugs Ltd., supra, where I deduce from this principle one of many reasons for permitting employees, in certain circumstances, to obtain directly the benefit of their employer's contractual limitation of liability clause so as to limit their liability for the breach of a common law duty of care. See also Peters v. Parkway Mercury Sales Ltd. *(1975), 10 N.B.R. (2d) 703* (C.A.).

**113**  Contractual terms may also operate to limit the duty (as distinct from the liability ensuing from a breach of duty), tortious or otherwise, owed by one party to the other. To quote B. M. McLachlin and W. J. Wallace, The Canadian Law of Architecture and Engineering (1987), at p. 134:

> ... it may now be said that courts have come to accept the concurrency of obligations imposed by tort law and obligations imposed by contract. However, this is subject to an important limitation. Where the parties have defined their duties by contract, the court will not impose contrary obligations on them. A contract defining the parties' rights and responsibilities will be a factor limiting the scope of the duty in tort.

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

**114** Clauses limiting the duty owed by one party to the other are often important in cases where negligent misrepresentation is alleged. Such disclaimers or "non-reliance clauses", as they are sometimes described, may be contractual or extra-contractual. It should not be forgotten that in the leading case, Hedley Byrne, supra, the defendant bank was found not liable because the representation had been accompanied by the following disclaimer: [page72] "Confidential. For your private use and without responsibility on the part of this bank or its officials." There was no contract between the parties. Lord Morris found that the effect of the disclaimer was to negate any duty of care which would otherwise have been owed by the defendant (at p. 504):

> ... in my judgment, the bank in the present case, by the words which they employed, effectively disclaimed any assumption of a duty of care. They stated that they only responded to the inquiry on the basis that their reply was without responsibility. If the inquirers chose to receive and act upon the reply they cannot disregard the definite terms upon which it was given.

**115** Disclaimers or "non-reliance clauses" may also be contractual. In Carman Construction Ltd. v. Canadian Pacific Railway Co., *[1982] 1 S.C.R. 958*, the defendant successfully raised a contractual disclaimer clause as a defence to an action for negligent misrepresentation. The relevant clause of the contract was in the following terms (at p. 961):

> 3.1. It is hereby declared and agreed by the Contractor that this Agreement has been entered into by him on his own knowledge respecting the nature and conformation of the ground upon which the work is to be done, the location, character, quality and quantities of the material to be removed, the character of the equipment and facilities needed, the general and local conditions and all other matters which can in any way affect the work under this Agreement, and the Contractor does not rely upon any information given or statement made to him in relation to the work by the Company. [Emphasis added.]

Martland J. was careful to characterize the clause as a "non-reliance provision" negating the existence of a duty of care, as distinct from a clause limiting liability for the breach of a duty (at p. 973):

[page73]

> ... I do not regard s. 3.1 as being a clause exempting from liability. It is what the Court of Appeal described as a non-reliance provision, the effect of which was to prevent liability arising on the part of C.P.R. in respect of statements made or information given by its employees.

**116** To summarize, if the liability of a party to a contract is limited or excluded by a term of the contract, or if a contractual term limits or negates the duty owed by one party to the other (whether in contract or in tort), the other party to the contract may not use an action in tort to impose a wider liability on the first party than would be available under the contract.

C. Negligent Misrepresentation

**117** Checo alleges that Hydro negligently misrepresented the state of the right-of-way. The majority of the British Columbia Court of Appeal agreed. In Queen v. Cognos Inc., *[1993] 1 S.C.R. 87*, a case involving issues somewhat similar to those in the present appeal, I reviewed many aspects of the tort of negligent misrepresentation including the required elements for such an action. The specific question I

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

should like to address in this case is: if the parties are in a contractual relationship, under what circumstances will it be open to one of the parties to allege that the other was guilty of negligent misrepresentation? In other words, when will the existence of a contract preclude a tort action for negligent misrepresentation?

**118**  The action for negligent misrepresentation was first recognized by the decision of the House of Lords in Hedley Byrne, supra. The ingredients of a negligent misrepresentation set out in that case remain good law today. To quote from the speech of Lord Morris (at pp. 502-3):

> My Lords, I consider that it follows and that it should now be regarded as settled that if someone possessed of a special skill undertakes, quite irrespective of contract, [page74] to apply that skill for the assistance of another person who relies upon such skill, a duty of care will arise. The fact that the service is to be given by means of or by the instrumentality of words can make no difference. Furthermore, if in a sphere in which a person is so placed that others could reasonably rely upon his judgment or his skill or upon his ability to make careful inquiry, a person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to, another person who, as he knows or should know, will place reliance upon it, then a duty of care will arise.

**119**  The rule in Hedley Byrne, supra, has been adopted in numerous Canadian cases, some of which will be discussed below. Although Hedley Byrne was considered revolutionary when it was decided, the case was in fact the culmination of a series of majority and dissenting judgments extending back into the last century. Like Donoghue v. Stevenson, supra, Hedley Byrne needs to be understood in its context. An understanding of this context is particularly important to assessing the role of negligent misrepresentation where the parties are in a contractual relationship.

**120**  Before Hedley Byrne, supra, it was settled law that a misrepresentation could give rise to damages only if it was fraudulent, or if the representation was a collateral warranty to a contract. An "innocent" misrepresentation (which included what would now, since Hedley Byrne, be characterized as a negligent misrepresentation) was not actionable in itself, but only if it formed part of a valid contract.

**121**  The leading case in fraudulent misrepresentation was Derry v. Peek (1889), 14 App. Cas. 337 (H.L.). In Derry v. Peek, the Court of Appeal held that a negligent misrepresentation -- one made without due care as to its truth or falsehood -- gave rise to an action in damages for deceit for anyone to whom the statement was directed and who relied on the statement to his or her detriment. The House of Lords rejected the suggestion that a false statement [page75] made negligently was actionable. In the words of Lord Herschell, "making a false statement through want of care falls far short of, and is a very different thing from, fraud, and the same may be said of a false representation honestly believed though on insufficient grounds" (p. 375). The House held that for an action in deceit or fraud to lie, the person making the statement must either know the statement to be false, or be reckless as to its truth or falsehood. This principle was reaffirmed by the House in Nocton v. Lord Ashburton, [1914] A.C. 932, where Viscount Haldane L.C. said this (at pp. 953-54): "It must now be taken to be settled that nothing short of proof of a fraudulent intention in the strict sense will suffice for an action of deceit."

**122**  Although actions on warranties were originally actions in tort, actions for breach of warranty had become, by the nineteenth century, actions in contract. See Baker, supra, at pp. 293-95. The leading case of Heilbut, Symons & Co. v. Buckleton, [1913] A.C. 30 (H.L.), settled the rule that for a representation to be actionable as a warranty, it must have been made with promissory intent.

**123**  The appellants in Heilbut, Symons were rubber merchants, who were promoting shares in what they

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

represented was a rubber company. The respondent bought a large number of shares. The company turned out to be other than as it had been described, and the respondent brought an action in fraud and for breach of warranty. At trial, the jury found that the company had not been correctly represented by the appellants, but that the misrepresentation was not fraudulent. The jury did, however, find that the appellants had warranted that the company was a rubber company. The House of Lords allowed the appeal. In his speech, Lord Moulton held that no liability can flow from a representation [page76] which is not fraudulent, unless it is made with promissory intent (at p. 51):

> It is, my Lords, of the greatest importance, in my opinion, that this House should maintain in its full integrity the principle that a person is not liable in damages for an innocent misrepresentation, no matter in what way or under what form the attack is made. In the present case the statement was made in answer to an inquiry for information. There is nothing which can by any possibility be taken as evidence of an intention on the part of either or both of the parties that there should be a contractual liability in respect of the accuracy of the statement. It is a representation as to a specific thing and nothing more.

**124**  Between Derry v. Peek and Heilbut, Symons, supra, it was settled that a negligent misrepresentation which was not made with promissory intent was not actionable, as it fell between deceit and warranty. To succeed, a plaintiff was required to prove fraud or a collateral warranty. As Lord Denning M.R. observed in Esso Petroleum, supra, at p. 13:

> Ever since Heilbut Symons & Co v Buckleton we have had to contend with the law as laid down by the House of Lords that an innocent misrepresentation gives no right to damages. In order to escape from that rule, the pleader used to allege -- I often did it myself -- that the misrepresentation was fraudulent, or alternatively a collateral warranty.

**125**  Heilbut, Symons and Derry v. Peek, supra, were equally the law in Canada. The rule in Derry v. Peek that misrepresentations must be made with intent to deceive in order to be actionable in deceit was applied by this Court in De Vall v. Gorman, Clancey & Grindley Ltd. *(1919), 58 S.C.R. 259*. Similarly, in Kinsman v. Kinsman *(1912), 3 O.W.N. 966* (H.C.), Riddell J. noted at p. 968 that, "[o]f course, fraud -- fraudulent intent -- must be proved in an action for deceit: Derry v. Peek ... ." See also Howse v. Quinnell Motors Ltd., [1952] 2 D.L.R. 425 (B.C.C.A.), and Chapman v. Warren, *[1936] O.R. 145* (H.C.). The rule in Heilbut, Symons that a misrepresentation which falls short of being fraudulent is not actionable [page77] unless it is incorporated into a contract as a warranty was applied inter alia in Gardner v. Merker *(1918), 43 O.L.R. 411* (C.A.); Kennedy v. Anderson (1919), 50 D.L.R. 105 (Sask. C.A.); Gilmour v. Trustee Co. of Winnipeg, *[1923] 3 W.W.R. 177* (Man. C.A.); Thurston v. Streilen *(1950), 59 Man. R. 55* (K.B.); and in Scholte v. Richardson, *[1951] O.R. 58* (H.C.).

**126**  It was against this backdrop that the House of Lords decided Hedley Byrne, supra. Through their bank, the appellants had obtained the opinion of the respondent merchant bankers as to the creditworthiness of E. Ltd. There was no contract between the appellants and the respondent. E. Ltd. subsequently went bankrupt, and it was found at trial that the respondent had been negligent in giving the opinion. Their Lordships, expressly distinguishing Derry v. Peek, supra, and implicitly distinguishing Heilbut, Symons, supra, held that a negligent misrepresentation may, even if not made with promissory intent, give rise to liability for damages. Lord Reid described those relationships in which a duty to take care in the making of representations will arise as follows (at p. 486):

> ... all those relationships where it is plain that the party seeking information or advice was trusting the other to exercise such a degree of care as the circumstances required, where it was reasonable for him to do that, and where the other gave the information or advice when he knew or ought to

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

have known that the inquirer was relying on him. I say "ought to have known" because in questions of negligence we now apply the objective standard of what the reasonable man would have done.

**127**  In reaching this result, their Lordships relied on an alternate line of authority reaching back through the dissenting judgment of Denning L.J. in Candler v. Crane Christmas & Co., [1951] 1 All E.R. 426 (C.A.), and the decisions of the House of Lords in Donoghue v. Stevenson, supra, and Nocton v. Lord Ashburton, supra, to the nineteenth [page78] century decisions of Cann v. Willson (1888), 39 Ch. D. 39; Heaven v. Pender (1883), 11 Q.B.D. 503 (C.A.); and George v. Skivington (1869), L.R. 5 Ex. 1.

**128**  With the exception of Nocton v. Lord Ashburton, supra, the cases relied upon by their Lordships were all cases in which the relationship between the plaintiff and the defendant was not contractual, but the court (or the dissenting judge) nonetheless held that the defendant owed a duty of care to the plaintiff. That is, in each case, no contractual remedy was available to the plaintiff, but the action was allowed in tort. Nocton v. Lord Ashburton is the exception: in that case there was a contract between the plaintiff and the defendant (who was his solicitor). However, Nocton v. Lord Ashburton is readily distinguishable. In that case, an action for breach of contract was barred by the Statute of Limitation. Moreover, the plaintiff succeeded not in tort but for breach of fiduciary duty.

**129**  It was not clear from Hedley Byrne, supra, that an action for negligent misrepresentation would lie where the parties subsequently entered into a contract. In Hedley Byrne and in the cases upon which it relied (with the exception of Nocton v. Lord Ashburton, supra) there was no contract between the parties. A dictum of Lord Reid in Hedley Byrne hinted that if the parties were in a contractual relationship, the proper remedy was an action for breach of warranty (at p. 483): "Where there is a contract there is no difficulty as regards the contracting parties: the question is whether there is a warranty." The cases decided immediately after Hedley Byrne held that an action for negligent misrepresentation was barred if the parties were in a contractual relationship: Bagot v. Stevens Scanlan & Co., supra, and Clark v. Kirby-Smith, [1964] 2 All E.R. 835 (Ch. D.). See also D. W. McLauchlan, "Pre-Contract Negligent Misrepresentation" (1977), 4 Otago L. Rev. 23.

[page79]

**130**  However, it was settled by Esso Petroleum, supra, that the existence of a contract is not a bar to a remedy for negligent misrepresentation. In the words of Shaw L.J. (at p. 26):

It is difficult to see why, in principle, a right to claim damages for negligent misrepresentation which has arisen in favour of a party to a negotiation should not survive the event of the making of a contract as the outcome of that negotiation. It may, of course, be that the contract ultimately made either expressly or by implication shows that, once it has been entered into, the rights and liabilities of the parties are to be those and only those which have their origin in the contract itself.

For a list of Canadian cases applying Esso Petroleum, see Kingu v. Walmar Ventures Ltd. *(1986), 38 C.C.L.T. 51* (B.C.C.A.), at p. 59.

**131**  The principle that an action for negligent misrepresentation will survive the making of a contract between the parties was affirmed in this Court in Carman Construction, supra. Martland J., writing for the Court, held that the respondent was not liable on the basis of negligent misrepresentation because the contract that was made between the parties contained a "non-reliance provision" or disclaimer which had the effect that the respondent did not assume any duty of care. It is clear from Martland J.'s reasons that the fact that the alleged negligent misrepresentation had induced the contract would not have been a

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

reason for disallowing the claim in negligence. The same proposition can be deduced from the recent decision of this Court in Rainbow Industrial Caterers Ltd., supra. Although the narrow issue was the appropriate measure of damages where a plaintiff is induced to enter into a contract with the defendant by the defendant's negligent misrepresentation, both Sopinka J. (for the majority) and McLachlin J. (dissenting), agreed that damages for negligent misrepresentation could be awarded where the misrepresentation induces a contract.

[page80]

**132**  It is clear that the fact that the parties are in a contractual relationship is not in itself a bar to an action in tort for negligent misrepresentation. As in other areas of negligence, the plaintiff may have the option of concurrent actions in tort and contract. However, concurrency must be viewed in light of the principles articulated above. Where a duty arising in tort is co-extensive with a duty created by an express term of the contract, the plaintiff will be limited to whatever remedies are available under the contract. Moreover, if the liability or duty of the defendant is excluded or limited by the terms of the contract, the plaintiff may not allege a wider liability in tort in order to circumvent the terms of the contract.

   D.  Application of the Law to the Facts of this Case

**133**  Checo alleges that Hydro negligently misrepresented the state of the right-of-way, and that Checo suffered damages as a result of this misrepresentation. In the alternative, Checo has alleged that Hydro was in breach of its contractual duties.

   (1)  The Claim for Negligent Misrepresentation

**134**  I will assess Checo's claim in tort for negligent misrepresentation first. Because Checo and Hydro are in a contractual relationship, Checo's claim in tort immediately raises two issues. First, is there a specific contractual duty created by an express term of the contract which is co-extensive with the common law duty of care which Checo alleges Hydro has breached? If there is such a contractual duty, then Checo is precluded from bringing an action in tort against Hydro for breach of the common law duty of care. In such a case, Checo would be confined to whatever remedies are available under the law of contract. Second, if the answer to the first question is negative, is Hydro's liability or duty in tort limited or excluded by the terms of the contract?

[page81]

   (a)  Is there a Contractual Duty Excluding a Common Law Duty of Care?

**135**  The question whether there is a contractual duty defined by an express term of the contract which would operate to exclude the common law duty of care upon which Checo relies in its action for negligent misrepresentation is shortly answered: there is such a duty. Checo bases its claim for negligent misrepresentation on the alleged representation made in clause 6.01.03 of the tender documents. Clause 6.01.03 of the tender documents was incorporated verbatim as an express term (also numbered 6.01.03) of the contract between Hydro and Checo after Hydro accepted Checo's tender. On Checo's interpretation of clause 6.01.03 of the tender documents, it is a representation as to the state of the right-of-way. If clause 6.01.03 of the tender documents is such a representation (and I am of the opinion that it is, as I will discuss below), then clause 6.01.03 of the contract is an express warranty as to the state of the right-of-way. Whatever duty is imposed in tort on Hydro by the clause in the tender documents is co-extensive

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

with the duty imposed in contract by the express clause in the contract. In consequence, subject to any overriding considerations arising from the context in which the transaction occurred, Checo is limited to whatever remedies may be available to it in contract for Hydro's breach of clause 6.01.03 of the contract. Checo cannot rely on a breach by Hydro of any duty created by clause 6.01.03 of the tender documents to found an action in tort.

**136**  As I indicated, context is important in assessing whether a claim in tort is foreclosed by the terms of the contract. This transaction occurred in a commercial context. The parties are both large corporations, and there is no allegation or indication of any inequality of bargaining power or unconscionability. I would also note that the contract which was concluded by the parties was included as part of the tender documents. That is, Checo knew when it was preparing its bid that if its bid were accepted, the representation as to the condition of [page82] the right-of-way would be a term of the contract. Checo knew, or ought to have known, that disputes as to the condition of the right-of-way would potentially be governed by the contract. Knowing this, Checo decided to make a bid, hoping that its bid would be accepted. I would conclude that an assessment of the context strengthens my initial conclusion that Checo should be limited to any remedies which might be available to it under the contract.

(b)  Is Hydro's Liability or Duty Limited or Excluded?

**137**  In light of my answer to the first question, it is unnecessary for the purposes of this appeal to consider whether Hydro's liability or duty in tort is limited or excluded by a term of the contract. Simply put, Checo's claim in tort is barred by the contract. However, I shall proceed at this stage to consider the effect of clauses 2.03 and 4.04 of the tender documents, which were incorporated into the contract, on Checo's rights under the contract.

**138**  In argument before this Court, Hydro submitted that clauses 2.03 and 4.04 operated to exempt Hydro from contractual liability for its representations. The representation relied upon by Checo is contained in clause 6.01.03, which is in the following language:

6.01.03        WORK DONE BY OTHERS

Clearing of the right-of-way and foundation installation has been carried out by others and will not form part of this Contract.

**139**  The two clauses which Hydro argues exclude its liability are as follows:

2.03        TENDERER'S RESPONSIBILITY

It shall be the Tenderer's responsibility to inform himself of all aspects of the Work and no claim will be considered at any time for reimbursement for any expenses incurred as a result of any misunderstanding in regard to the conditions of the Work. Should any details

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

necessary for a clear [page83] and comprehensive understanding be omitted or any error appear in the Tender Documents or should the Tenderer note facts or conditions which in any way conflict with the letter or spirit of the Tender Documents, it shall be the responsibility of the Tenderer to obtain clarifications before submitting his Tender. ...

Neither B.C. Hydro nor the Engineer shall be responsible for any instructions or information given to any Tenderer other than by the Purchasing Agent, in accordance with this Clause.

4.04        INSPECTION OF SITE AND SUFFICIENCY OF TENDER

The Contractor shall inspect and examine the Site and its surroundings and shall satisfy himself before submitting his Tender as to the nature of the ground and sub-soil, the form and nature of the Site, the quantities and nature of work and materials necessary for completion of the Work, the means of access to the Site, the accommodation and facilities he may require, and in general shall himself obtain all necessary information as to risks, contingencies, and other circumstances which may influence or affect his Tender. Without limiting the generality of the foregoing, the Contractor shall satisfy himself of any special risks, contingencies, regulations, safety requirements, and other circumstances which may be encountered.

The Contractor shall be deemed to have satisfied himself before tendering as to the correctness and sufficiency of his Tender for the Work and of the prices stated in the Schedule of Prices which prices shall (except insofar as it is otherwise provided in the Contract) cover all his obligations under the Contract and all matters and things necessary for the proper execution of the Work.

**140** Clause 6.01.03 is a representation that the site would be cleared as of the date of the contract. It is an express contractual warranty as to the state of the right-of-way. The trial judge found that, in all the circumstances, "clearing" meant the right-of-way would be clear of logs and debris. Cohen J. stated (at p. 67):

[page84]

Kosty acknowledged that tenderers rely on information contained in the tender documents and the defendant intended that the plaintiff would prepare its bid based on the representations contained in the tender documents. Clause 6.01.03 does not define the word "clearing" and the tender documents do not contain the defendant's clearing standards or clearing contracts. In my opinion, based on what they observed and their past experience, the natural and ordinary meaning to be given to the word "clearing" in clause 6.01.03 was the one understood by Lemieux and Campeau, that the right-of-way would be free of logs and debris. I accept the evidence of Lemieux and Campeau, who I found to be honest and forthright, that they formed an honest belief in December 1982, after reading the tender documents and viewing the right-of-way, that clearing was not yet complete.

The trial judge also found as a fact that the right-of-way was incompletely and improperly cleared as of

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

the date of the contract. In my opinion, clauses 4.04 and 2.03 do not limit or exclude Hydro's liability flowing from clause 6.01.03 of the contract and of the tender documents. Clause 6.01.03 is a specific provision which is not displaced by clauses 4.04 and 2.03.

**141**  Clauses 2.03 and 4.04 do not operate to limit Hydro's liability in contract for the representation relied on. Clause 4.04 required Checo to inspect the contract "Site", and specified that the contract price would cover all Checo's obligations under the contract. "Site" is defined by clause 4.01 of the contract as "the land upon which the Work is to be done [by the Contractor -- Checo] and any area or areas adjacent thereto used in connection with the Work and, unless the context otherwise requires, shall include all materials, supplies, tools, equipment and structures thereon" (emphasis added). The representation relied on by Checo, however, is that clearing of the right-of-way "has been carried out by others and will not form part of this Contract" (emphasis added). The ordinary meaning of the emphasized words suggests that the "Site" referred to in clause 4.04 of the contract does not encompass the right-of-way, which is the subject matter of the representation at issue. Thus, clause [page85] 4.04 is not relevant to Checo's action in tort or to its action for breach of contract.

**142**  The key phrase in clause 2.03 is, "should the Tenderer note facts or conditions which in any way conflict with the letter or spirit of the Tender Documents, it shall be the responsibility of the Tenderer to obtain clarifications before submitting his Tender." The representation made in clause 6.01.03 was that the right-of-way would be cleared as of the date of the contract. Accordingly, although Checo did note the "dirty" condition of the right-of-way at the time it was carrying out the inspection mandated by clause 2.03, the condition of the "Site" was not in conflict with the representation that the right-of-way would be cleared as of the date of the contract, and Checo's obligation under clause 2.03 to obtain clarification from Hydro on this point was not triggered. Moreover, the well-known principles governing the interpretation of contractual exclusion and limitation of liability clauses suggest that neither clause 2.03 nor clause 4.04 is sufficiently clear to limit or exclude Hydro's liability in contract for the representation relied on.

**143**  I would accordingly conclude that there is no clause in the contract or in the tender documents which serves either to limit or exclude Hydro's liability for the representation contained in clause 6.01.03.

    (2)  The Claim for Breach of Contract

**144**  I have found that it was an express term of the contract that the right-of-way would be cleared. As found by the trial judge, the right-of-way was not cleared. Therefore, Hydro breached the contract. I have also found that there is no exclusion or limitation clause that would affect Hydro's liability in contract. Given that he found Hydro liable for fraudulent misrepresentation, the trial judge did not consider the question of damages for breach of [page86] contract. I would return the matter to trial on the question of damages for the breach of contract.

**145**  At the original trial, Checo also claimed damages for breach of contract for items which would appear to be unconnected with the failure to clear the right-of-way. As the trial judge did not consider the issue of breach of contract, there are no findings of fact with respect to these items. Accordingly, if Checo establishes at the new trial that Hydro breached its contract in any other respect, unconnected with the failure to clear the right-of-way, and that Checo suffered damages therefrom, Checo is entitled to recover damages for these items in accordance with the applicable law of damages.

  V.  Disposition

**146**  I would accordingly allow Hydro's appeal in part and dismiss Checo's cross-appeal. I would order a

BG Checo International Ltd. v. British Columbia Hydro and Power Authority, [1993] 1 S.C.R. 12

new trial on the issue of breach of contract. I have found that Hydro breached the contract in that the right-of-way was not properly cleared. Damages for this breach should be assessed at the new trial. In addition, Checo is entitled to recover for any breaches of the contract unconnected with the condition of the right-of-way which it may establish at the new trial.

**147** Under the circumstances, each party should bear its own costs, here and in the courts below.

---

End of Document

# EXHIBIT C

## _British Columbia Sale of Goods Act_

**R.S.B.C. 1996, c. 410, §§ 22, 23**

# **L** *SALE OF GOODS ACT, R.S.B.C. 1996, c. 410, s. 22*

British Columbia Statutes

**R.S.B.C. 1996, c. 410, s. 22**

*British Columbia Statutes  >  SALE OF GOODS ACT  >  Part 3 -- Effect of the Contract*

## Notice

⚑  Current Version: Effective 21-04-1997

**SECTION 22**

*Property passes according to intent of parties*

22 (1) If there is a contract for the sale of specific or ascertained goods, the property in them is transferred to the buyer at the time the parties to the contract intend it to be transferred.

(2) For ascertaining the intention of the parties, regard must be had to the terms of the contract, the conduct of the parties and the circumstances of the case.

**End of Document**

### SALE OF GOODS ACT, R.S.B.C. 1996, c. 410, s. 23

British Columbia Statutes

**R.S.B.C. 1996, c. 410, s. 23**

*British Columbia Statutes  >  SALE OF GOODS ACT  >  Part 3 -- Effect of the Contract*

## Notice

⚑  Current Version: Effective 21-04-1997

## SECTION 23

*Intention of the parties as to the passing of the property in the goods*

23 (1) Unless a different intention appears, the intention of the parties as to the time at which the property in the goods is to pass to the buyer is governed by the rules set out in this section.

(2) If there is an unconditional contract for the sale of specific goods in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment or the time of delivery, or both, are postponed.

(3) If there is a contract for the sale of specific goods, and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the property does not pass until that thing is done and the buyer has notice of it.

(4) If there is a contract for the sale of specific goods in a deliverable state, but the seller is bound to weigh, measure, test or do some other act or thing with reference to the goods for the purpose of ascertaining the price, the property does not pass until that act or thing is done and the buyer has notice of it.

(5) When goods are delivered to the buyer on approval or "on sale or return", or other similar terms, the property passes to the buyer as follows:

(a) when the buyer signifies approval or acceptance to the seller or does any other act adopting the transaction;

(b) if the buyer does not signify approval or acceptance to the seller, but retains the goods without giving notice of rejection, then, if a time has been set for returning the goods, at the end of that time, and, if no time has been set, at the end of a reasonable time.

(6) For the purposes of subsection (5), what is a reasonable time is a question of fact.

(7) If there is a contract for the sale of unascertained or future goods by description, the property in the goods passes to the buyer when goods of that description and in a deliverable state are unconditionally appropriated to the contract

SALE OF GOODS ACT, R.S.B.C. 1996, c. 410, s. 23

    (a) by the seller with the assent of the buyer, or

    (b) by the buyer with the assent of the seller.

(8) For the purposes of subsection (7), the assent may be express or implied, and may be given either before or after the appropriation is made.

(9) If, in pursuance of the contract, the seller delivers the goods to the buyer or to a carrier or other bailee, whether named by the buyer or not, for transmission to the buyer, and does not reserve the right of disposal, the seller is deemed to have unconditionally appropriated the goods to the contract.

---

**End of Document**

# EXHIBIT D

## *Ontario Sale of Goods Act*

**R.S.O. 1990, c. S.1, §§ 17-19**



## *Sale of Goods Act, R.S.O. 1990, c. S.1, s. 17*

Ontario Statutes

**R.S.O. 1990, c. S.1, s. 17**

*Ontario Statutes  >  Sale of Goods Act  >  PART II EFFECTS OF THE CONTRACT*

## Notice

Current Version: Effective 31-12-1991

**PART II**

**EFFECTS OF THE CONTRACT**

**SECTION 17**

*Goods must be ascertained*

17. Where there is a contract for the sale of unascertained goods, no property in the goods is transferred to the buyer until the goods are ascertained.

---

**End of Document**

## Sale of Goods Act, R.S.O. 1990, c. S.1, s. 18

Ontario Statutes

**R.S.O. 1990, c. S.1, s. 18**

*Ontario Statutes  >  Sale of Goods Act  >  PART II EFFECTS OF THE CONTRACT*

## Notice

Current Version: Effective 31-12-1991

**SECTION 18**

*Property passes where intended to pass*

18.--(1) Where there is a contract for the sale of specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

*Ascertaining intention*

(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties and the circumstances of the case.

End of Document

*Sale of Goods Act, R.S.O. 1990, c. S.1, s. 19*

Ontario Statutes

**R.S.O. 1990, c. S.1, s. 19**

*Ontario Statutes  >  Sale of Goods Act  >  PART II EFFECTS OF THE CONTRACT*

## Notice

Current Version: Effective 02-12-1993

**SECTION 19**

*Rules for ascertaining intention*

19. Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

Rule 1.--Where there is an unconditional contract for the  sale of specific goods in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment or the time of delivery or both is postponed.

Rule 2.--Where there is a contract for the sale of specific goods and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the property does not pass until such thing is done and the buyer has notice thereof.

Rule 3.--Where there is a contract for the sale of specific goods in a deliverable state but the seller is bound to weigh, measure, test or do some other act or thing with reference to the goods for the purpose of ascertaining the price, the property does not pass until such act or thing is done and the buyer has notice thereof.

Rule 4.--When goods are delivered to the buyer on approval or "on sale or return" or other similar terms, the property therein passes to the buyer;

(i) when the buyer signifies approval or acceptance to the seller or does any other act adopting the transaction;

(ii) if the buyer does not signify approval or acceptance to the seller but retains the goods without giving notice of rejection, then if a time has been fixed for the return of the goods, on the expiration of such time, and, if no time has been fixed, on the expiration of a reasonable time, and what is a reasonable time is a question of fact.

Rule 5.--

(i) Where there is a contract for the sale of unascertained or future goods by description and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer, and such assent may be expressed or implied and may be given either before or after the appropriation is made.

Sale of Goods Act, R.S.O. 1990, c. S.1, s. 19

(ii) Where in pursuance of the contract the seller delivers the goods to the buyer or to a carrier or other bailee (whether named by the buyer or not) for the purpose of transmission to the buyer and does not reserve the right of disposal, the seller shall be deemed to have unconditionally appropriated the goods to the contract. *R.S.O. 1990, c. S.1, s. 19*; *S.O. 1993, c. 27*, Sched.

---

**End of Document**

# EXHIBIT E

## _Delta Smelting & Refining Co. (Re)_

**[1988] B.C.J. No. 2532, 33 B.C.L.R. (2d) 383**

## ⚠ *Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532*

British Columbia and Yukon Judgments

British Columbia Supreme Court

Vancouver, British Columbia

McLachlin C.J.S.C.

Heard: November 7 and 8, 1988

Judgment: December 12, 1988

Vancouver Registry No. 01982 and 660/83

[1988] B.C.J. No. 2532  |  33 B.C.L.R. (2d) 383  |  72 C.B.R. (N.S.) 295  |  *13 A.C.W.S. (3d) 160*

In the Matter of the Bankruptcy of Delta Smelting & Refining Co. Ltd.

## Case Summary

**Bankruptcy — Priorities among creditors — Bankrupt metal refiner doing business with suppliers in five different ways — None of five classes of creditors having direct proprietary interest — All creditors receiving pro rata distribution.**

This was an application by five classes of creditors for a share in the proceeds of certain precious metals held by the debtor's receiver. All claimant creditors had supplied the bankrupt with precious metals. The bankrupt had dealt with each of the five creditors differently: pay by cheque; credit accounts receivable; hold on deposit; return of metal; and, consignment metal creditors. Once the bankrupt had received the metals from the various creditors, it was refined and combined so that the metals supplied were indistinguishable from each other.

HELD: The application was allowed.

There was no legal basis upon which to distinguish between the various classes of creditors and consequently, the proceeds from the metals should be distributed pro rata between them. The pay by cheque and credit accounts receivable claimants both clearly had contracts for the sale of goods. The property had passed to the bankrupt and these claimants had no direct proprietary interest in the fund. The transaction between the hold on deposit claimant and the bankrupt was properly characterized as a loan. The property therefore also passed to the bankrupt and the creditor had no direct proprietary interest in the fund. With respect to the return of metal and consignment creditors, their characterization of the transaction as either a bailment or creating a trust was not made out. The metals supplied by them were intermingled with the metals supplied by others and therefore no bailment could exist. With respect to the claim that a trust was created, the bankrupt did not have a fiduciary duty to the claimant so as to give rise to a trust relationship. In any event, a trust was not enforceable if the property was not traceable.

Counsel for the Consignment Metal Claimants: G. Holeksa. Counsel for the Return of Metal Claimants: R. Dresser. Counsel for Trustee, Pannell, Kerr, MacGillivray Inc.: T.J. Maledy. Counsel for the Pay by Cheque and Credit Accounts Receivable Claimants: Ellen M. McDonald. Counsel for the Hold on Deposit Claimants: J.I. McLean.

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

---

## McLACHLIN C.J.S.C.

### I.  Introduction

Delta Smelting & Refining Co. Ltd., now bankrupt carried on the business of refining and storing precious metal. Unfortunately as matters turned out, it used some of the metal in its possession for speculation on the commodities market. The crash of the silver market in 1981 plunged Delta into financial difficulty from which it never recovered.

The Trustee in Bankruptcy recovered $543,738 worth of precious metal, including $541,326 in gold and silver, which he still retains. By order of this Court, a receiver was appointed to hold the metal, and the ownership of the metal was directed to be tried by way of interpleader.

Five classes of creditors seek to share the proceeds of the metal held by the receiver. They represent the creditors who had dealings with Delta in metal and ore. The five classes of claimants arise from the five different ways Delta recorded these transactions. Upon delivery to Delta, each customer's material was tagged by a receipt recording customer information. The official receipt contained four boxes which could be checked off to indicate classification of the transaction as one of accounts receivable, pay by cheque, hold on deposit or return of metal. The document also contained space for special instructions, which was used, among other things, to record the fifth category, consignment transactions.

Initially, each customer's material was kept separate and discrete. After being treated to remove impurities, the resulting product was tested to determine the percentage of precious metal. The assay results were recorded on the receipt, the pricing formula determined, and the customer's credit calculated.

Up to this point each customer's material could be identified. But this changed in the refining process which pooled material from various customers together with metal Delta considered its own.

Gold and silver were refined by different processes. Gold was refined in small batches, normally representing the accumulation of metal over one week. The silver batch process continued for approximately four to six months. During the course of the batch, silver was continually added and removed from the batch.

At the end of a batch, the refined bars of gold or silver were placed in the vault. No attempt was made by Delta to identify proportions of a batch as being attributable to any particular customer. Metal was withdrawn from the vault for Delta's own purposes (including trading and speculation on the metal market) as well as for return or sale to customers, generally on a "last-in, first-out" basis. As a consequence of this policy none of the metal in the vault is specifically identifiable as coming from any of the particular claimants in this proceeding.

The metal which the receiver now holds came in part from the vault and in part from "clean-up". "clean-up metal" is metal which the Trustee recovered after bankruptcy by cleaning out furnaces and ducts, burning carpets, re-running slag, collecting drillings and collecting metal content from the silver bath solutions.

### II.  The Issue

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

There are five categories of claimants to the Fund: Pay by Cheque ("PBC"), Credit Accounts Receivable ("CAR"), Hold on Deposit ("HOD"), Return of Metal ("ROM") and Consignment Metal Creditors (CC) . The main issue is what interest if any each class of claimant possesses in the metal held by the Trustee. On the answer to that question hangs the respective entitlement of the five categories of claimants.

III. Discussion

A. The "Pay by Cheque" (PBC) and "Credit Accounts Receivable Claimants" (CAR)

The Pay by Cheque and Credit Accounts Receivable claimants may be treated together. In both cases, their transactions with Delta involved the sale of material containing a content of precious metal, for a price to be determined at a later date based on the results of an assay.

The contracts were clearly for the sale of goods, conveying property in the metal to Delta. That conveyance occurred when the contract was made: s. 23(2) of the Sale of Goods Act. Property in the metal containing materials having passed to Delta, the PBC and CAR claimants can claim no direct proprietary interest in the Fund.

B. The "Hold on Deposit" Creditors

The Hold on Deposit creditors assert that under the terms of their contract with Delta property in the metal was retained in the depositor and did not pass to Delta. These creditors each purchased a "hold on deposit" contract for gold or silver from Delta. At the end of the contract they were to receive the metal back, together with interest. Although the contract purported to reserve property in the depositor, Delta was free to use, deal in or trade the metal as it saw fit for a certain period of time, and was not required to account to the depositor for the type of use to which the metal was put nor for any profits made. These facts are inconsistent with either bailment or trust, which would permit the property to remain in the creditors. The correct legal characterization is that the customers loaned their metal to Delta, at which time property passed to Delta.

The position of these creditors is indistinguishable from that of depositors at a bank. The relationship between banker and depositing customer is viewed as a contract of loan, under which property in the money loaned passes to the bank. Baxter, in The Law of Banking. (3d) 1981, at p. 2 states:

> ... But the ordinary business meeting of a bank deposit is not to create the banker a bailee, an agent, or a trustee for the money. It is not the purpose that the identical res should be returned, nor that the banker shall account to the customer for any profit made by the use of the money, or be subject to the law of relating to trusts and trustees in the manner in which he invests or otherwise employs the money. The basic meaning of a bank deposit is that it is a loan of money by the depositor to the bank. When the money is lodged it becomes the property of the bank to use as it sees fit, within the score of its legal powers. The customer thereafter has no juus in re in the money, and the bank is under no duty to account to the customer for the way in which it uses the money or for any profits earned upon it. The bank's main obligation is to repay the deposit according to the contract. Repayment means return of an equivalent amount of currency. It is misleading to regard the customer as having any rights of property in money after it has been deposited and has passed into the hands of the Bank.

(Emphasis added)

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

It follows that the HOD claimants can claim no proprietary interest in the property of the metal remaining in the Fund.

### C.   The "Return of Metal" and "Consignment" Creditors

The return of metal and consignment creditors delivered metal to Delta for refining. After refining, Delta was obliged to return either the specific quantity of purified metal contained within the material delivered, or alternatively, a proportionate share of the specific bulk of pure metal into which the raw material was refined, less charges for the refining process.

These creditors assert that property in the metal which they delivered to Delta never passed to Delta. Delta obtained possession of the material, they contend, only so far as necessary to refine it to a pure product. The relationship, they submit, was one of bailment or trust. If this submission is correct, the ROM and CC claimants would be entitled to priority to the metal held by the receiver over the PCB, CAR and HOD creditors.

A bailment arises only where there is a delivery of property on the basis that the same property will be returned. Its form may be altered, but it must be the same property. Thus where the material delivered is mixed with other material, on the basis that an equivalent quantity of the same type of material will be returned, the contract is one of sale, not bailment: Crawford v. Kingston and Johnston (1952) O.R. 714; South Australian Ins. Co. v. Randell, [1886] 3 L.R.P.C. 101. (The facts are distinguishable from those in Busse v. Edmonton Grain & Hav Co. Ltd., *[1932] 1 W.W.R. 296* (B.C.c.A.), where no intermixing was contemplated and there was a right to return the identical grain and, the grain was not to be consumed).

These principles negate the claim that Delta was merely a bailee with property remaining with the creditors. The refining process necessarily involved the intermixing of metal derived from various customers together with Delta's own metal. The final product was indistinguishable as to source, and was treated as such in Delta's accounting and inventory systems. All the ROM and CC customers bargained for was the return of a certain amount of equivalent metal in kind - not the same property they turned over to Delta.

In the alternative, the Return of Metal and Consignment creditors claim metal from the Fund on the ground that it is impressed by a trust in their favour.

In order for a trust to arise, Delta must be found to have stood in the position of fiduciary to the ROM and CC creditors (Waters, The Law of Trusts, (2ed) (1984) at p. 10). The concept of fiduciary duty does not lend itself to a simple definition because of the diversity of situations in which such a relationship may be found. As Dickson, J. (as he then was) stated in Guerin v. The Queen (1984) 13 D.L.R. (4th) at p. 341:

> It is the nature of the relationship, not the specific category of action involved that gives rise to the fiduciary duty. The categories of fiduciary, like those of negligence should not be considered closed: see Laskin v. Bache & Co. Inc. (1971), 23 D.L.R. (3d) 785 at 392, *[1972] 1 O.R. 465* (C.A.); Goldex Mines Ltd. v. Revill et al. *(1974), 54 D.L.R. (3d) 672* at 680, 7 O.R. 216 (C.A.) at 224.

Although it may be impossible to achieve a definition of fiduciary duty which is at once precise and universally applicable, certain concepts are fundamental in determining whether a fiduciary relationship exists in a given case. First, a fiduciary has a duty to act in the best interests of another, and not in his own: (Midcon Oil & Gas v. New Br. Dom. Oil Co. *(1958), 12 D.L.R. (2d) 705* (S.C.C.); Evans v. Anderson *[1977] 2 W.W.R. 385* (Alta. C.A.); Can. Aero. Service Ltd. v. O'Malley *(1974), 40 D.L.R. (3d)*

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

*371* (S.C.C.)). Second, the term "fiduciary" imports a duty of loyalty: Waters, The Law of Trusts in Canada, (2ed) (1984) at 33; see also Shepherd, The Law of Fiduciaries (1981), at p. 45 et seq. Third, a fiduciary relationship involves scope for the fiduciary's unilateral exercise of power or discretion effecting the beneficiary's legal or practical interest, as a consequence of which the beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary: see Frame v. Smith *(1987) 42 D.L.R. (4th) 81*, per Wilson, J. dissenting.

Finally, an arms-length commercial contractual relationship generally does not give rise to a fiduciary duty. Although certain categories of contractual relationship have historically been regarded in law as being of fiduciary character (such as solicitor/client, principal/agent, partner-to-partner, etc.), the courts have not ordinarily found a fiduciary relationship between businessmen who enter into cormercial dealings at arms length, even if the contract creates continuing obligations between them, including a duty to act in a certain manner: Jirna Ltd. v. Mister Donut of Canada Ltd. *(1972), 22 D.L.R. (3d) 639* (Ont. C.A.), aff'd *(1973) 40 D.L.R. (3d) 303* (S.C.C); Hospital Products231 Ltd. v. U.S. Surgical Corporation (1984), 58 A.L.J.R. 587 (High Ct. of Aust.); International Corona Resources Ltd. v. Lac Minerals Ltd. *(1987), 62 O.R. (2d) 1*. Gibbs, C.J. Australia in Hospital Products, supra, at p. 597 put this proposition as follows:

> On the other hand, the fact that the arrangement between the parties was of a purely commercial kind and that they had dealt at arm's length and on an equal footing has consistently been regarded by the court as important, if not decisive, in indicating no fiduciary duty arose.

In the case at bar, Delta gave no undertaking to act in the best interests of the creditors who delivered metal to it for refining. It owed them no duty of loyalty. It was entitled to use the metal as it chose without accounting to the creditors, its only obligation being to ultimately deliver a specific quantity of metal to them pursuant to its contract with them. Delta's relationship with these creditors was defined by an arm's length commercial contract. The relationship did not fall within any of the classes of special contracts to which the law assigns a higher duty. The relationship was simply one of contract for the sale or exchange of goods. Delta assumed no higher duty than the commercial duty set out in the contract.

I conclude that Delta was not the fiduciary of the Return of Metal and Consignment creditors, and that their claim in trust must fail. But if were wrong in that conclusion there is a further bar to the claim of the Return of Metal and Consignment creditors. For a trust to be enforceable, the property originally impressed with the trust must be traceable. Courts of equity have always been acute to distinguish trust funds and will trace them however much their character or nature may be altered, provided the property which is claimed can be clearly identified as the fruit of the trust property. Conversely, no trust can be enforced if the trust property cannot be identified or traced into some specific fund or thing: Re: C.A. Macdonald and Company Limited (in Bankruptcy (1958), 26 W.W.R. 116 at p. 12 (Alta. S.C.). When a beneficiary seeks to trace his property, he must be able to follow step by step the course of the property through whatever transformation occurred: Br. Can. Securities Ltd. v. Martin, *[1917] 1 W.W.R. 1313*, *27 Man. R. 423*. It is essential that he show that his property is actually or notionally part of the property he seeks to trace. Thus if he seeks to trace funds into purchases, the claimant must show that his monies were in the account when the purchase was made: Br. Can. Securities v. Martin, supra.

The return of metal and consignment creditors can establish that their metal went into Delta's operations. Thereafter, however, their metal lost its identity. it is impossible to say that the metal which the receiver now holds - the bars found in the vault and the proceeds of clean-up contain, actually or notionally, any particular customer's metal. It is equally possible that a particular customer's metal was incorporated in bars that were sold or used in speculation, as in the bars which remained in the vault. In short, the customers who brought their metal to Delta for refining cannot trace their metal to the metal which the receiver now holds. It follows that the principles of trust law cannot assist it.

Delta Smelting & Refining Co. (Re), [1988] B.C.J. No. 2532

IV. Conclusion

   None of the five categories of claimants are able to assert a proprietory right in the metal held by the receiver. There is thus no legal basis on which to distinguish the various categories of claimants from each other. The fund of precious metal on hand should be distributed o rata amongst the five categories of claimants.

McLACHLIN C.J.S.C.

---

**End of Document**

# EXHIBIT F

## _Coro (Canada) Inc. (Trustee of) v. Enthone-OMI (Canada) Inc._

**[1997] O.J. No. 4704, 36 O.R. (3d) 563 (Ont. Gen. Div.)**

⚠️ *Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563*

Ontario Reports

Ontario Court (General Division)

Registrar Ferron

October 21, 1997

Court File No. 31-326688

**36 O.R. (3d) 563**  |  *[1997] O.J. No. 4704*

# Case Summary

**Bankruptcy — Property of bankrupt — Bailment of precious metal for use in manufacturing process — Electro-plating business using gold for its manufacturing process — Gold stored in tanks — Gold in tanks being leased from single gold supplier — Lease agreement with supplier requiring electro-plating business to maintain defined level of gold and to replenish any gold used during manufacturing — Gold to be returned to supplier on termination of lease — Lease a bailment — Lease not required to be registered under Personal Property Security Act — Personal Property Security Act, R.S.O. 1990, c. P.10.**

**Personal property security — Security interests — Bailment — Lease — Bailment of precious metal for use in manufacturing process — Electro-plating business using gold for its manufacturing process — Gold stored in tanks — Gold in tanks being leased from a single gold supplier — Lease agreement with supplier requiring electro-plating business to maintain defined level of gold and to replenish any gold used during manufacturing — Gold to be returned to supplier on termination of lease — Lease a bailment — Lease not required to be registered under the Personal Property Security Act — Personal Property Security Act, R.S.O. 1990, c. P.10.**

Prior to its bankruptcy, C Inc. was engaged in the business of electro-plating jewellery. It used tanks containing various metals, and one of the tanks contained the gold required for its processes. The gold was owned by E-OMI, and it had an agreement with C Inc. to lease it 152 troy ounces of gold. The value of the gold in the tank would vary depending on the price of gold in the world market. The lease fee was 5 per cent per annum of the daily value of the leased gold. Under the lease, C Inc. was obliged to maintain 129.4 troy ounces of gold in its tank and to purchase replacement gold from E-OMI. C Ltd. was obliged to insure the gold leased to it. Over the life of the lease of gold, that is, up until C Inc.'s bankruptcy, E-OMI sold 111 troy ounces of gold to C Inc., and this gold replenished the gold in the tanks.

The lease of gold was for a term of one year with a provision for automatic renewal from year to year subject to a right of termination on 30 days' notice. Under the agreement, upon termination, C Inc. was to return 152 troy ounces of gold.

On an appeal to the Registrar in Bankruptcy, the main issues were whether the lease required perfection under the Personal Property Security Act ("PPSA") or whether the lease transaction was in fact a sale of gold.

Held, the lease was a bailment lease and did not require registration under the PPSA.

The lease was not a guise for a conditional sale. C Inc. could use the leased gold and end the contract having paid for the use of the gold not for its purchase. The lease did not have the indicia of a lease that would require registration under the PPSA.

The lease was a bailment lease and not a sale of the gold to C Inc. notwithstanding the trustee in bankruptcy's argument that the transaction was a sale because, for a bailment, the identical subject-matter normally would have to be returned.

Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563

However, in this case, although replenished, E-OMI's gold always remained in the tank. The E-OMI gold was not mixed in a common mass with the gold of others. C Inc.'s use of the gold was clearly defined and limited to the plating process. C Inc. had no right to deal with the gold in trade or as a pledge. It was required to monitor the gold level and was subject to audit. The agreement nowhere contemplated that C Inc. would become the owner of the gold without paying for it and there was a specific provision for the payment and purchase of the gold for cash rather than its return in specie. The parties made their contract one of bailment and not of sale. The lease was a bailment lease and, having been terminated, E-OMI was entitled to the return of its gold.

Cases referred to

Busse v. Edmonton Grain & Hay Co. *(1932), 26 Alta. L.R. 83*; Crawford v. Kingston, *[1952] O.R. 714*, *[1952] 4 D.L.R. 37* (C.A.); Delta Smelting & Refining Co. (Re) *(1988), 72 C.B.R. (N.S.) 295*, *33 B.C.L.R. (2d) 383* (S.C.); Gatx Corporate Leasing Inc. v. William Day Construction Ltd. *(1986), 6 P.P.S.A.C. 188*, 60 C.B.R. (N.S.) 319 (Ont. H.C.J.); Lawlor v. Nicol (1898), 12 Man. R. 224 (C.A.); Ontario Equipment (1976) Ltd. (Re) *(1982), 33 O.R. (2d) 648*, *38 C.B.R. (N.S.) 180*, *125 D.L.R. (3d) 321*, *1 P.P.S.A.C. 303*, *14 B.L.R. 113* (C.A.); Speedrack Ltd. (Re) *(1980), 33 C.B.R. (N.S.) 209*, *11 B.L.R. 220*, *1 P.P.S.A.C. 109* (Ont. S.C.)

Statutes referred to

Personal Property Security Act, *R.S.O. 1990, c. P.10*

Authorities referred to

Halsbury's Laws of England, 4th ed., vol. 2, p. 1801

APPEAL to the Registrar in Bankruptcy.

Harvey G. Chaiton, for trustee. Douglas F. Harrison, Katherine L. Kay and Nicholas P. McHaffie, for claimant and appellant, Enthone-OMI (Canada) Inc.

REGISTRAR FERRON: -- There are three issues in this appeal:

1. Is the lease made between the bankrupt, Coro (Canada) Inc., and Enthone-OMI (Canada) Inc., a "true" or "real" lease which does not require perfection under the Personal Property Security Act, *R.S.O. 1990, c. P.10*, or is it a financing vehicle which is subordinate to the trustee's interest in the assets leased unless perfected?

2. Is the transaction which resulted in the lease in fact a sale of the gold? and, finally,

3. Does the assignment of the security interest in the collateral of Coro in fact secure Enthone-OMI and, if so, to what extent?

Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563

Coro, the bankrupt, was engaged in the business of electroplating jewellery and other metallic products. In connection with this process, the company operated tanks containing various metals, some precious and some base, in which the products to be coated were immersed.

Originally, before the events leading up to the lease in issue, Coro purchased its gold requirements for its processes from a company called Engelhard Canada Limited for which it paid or was supposed to pay cash. Coro was at that time, and at all times, up to the transaction involved in this proceeding, the owner of the gold in its tanks which is the subject of the lease in question.

In January 1996, Engelhard demanded payment of its account with Coro which was then in arrears. Coro did not have the funds to retire the indebtedness and turned to Enthone, which is in the same type of business as Engelhard, for financial assistance.

The negotiations which followed the demand and the request for financial assistance resulted in Enthone turning over

to Engelhard 152 troy ounces of gold which was the amount necessary to pay off Coro's indebtedness to that company.

At the relevant time Coro owned 129.4 troy ounces of gold which was in its plating tanks and this was transferred to Enthone as part of the financial transaction involving Engelhard. Enthone then became the owner of the gold which Coro had in its tanks and which it used in its plating process.

In order that Coro, which required the gold for its operation, could remain in business Enthone entered into a lease agreement whereby it leased 152 ounces of gold to Coro including the 129.4 ounces which was then in Coro's inventory at the date of the transaction and which, as I have mentioned, was transferred to the ownership of Enthone. Nothing turns on the amount of gold which Coro had in inventory. The lease is for 152 ounces of gold which was the amount transferred by Enthone to Engelhard on Coro's account. That the full 152 ounces of gold was not, at any time, in Coro's processes is of no significance.

It was part of the transaction that Enthone became the supplier to Coro of its replacement gold required to maintain the gold solution in the tanks at an agreed level necessary for the plating process.

As part of the transaction, Coro was also required to give Enthone security over its silver and palladium inventory in order to secure the sale of replacement gold to Coro. This, of course, parallels the arrangement under which Coro had operated when Engelhard was its supplier (Section 1, paragraph G).

Finally, Coro was required to give an irrevocable letter of credit in the final amount of $25,000 to secure Enthone in its sale of replacement gold and other plating products to Coro. It should be noted that over the life of the lease, that is, from the inception of the lease until Coro's bankruptcy, Enthone sold 111 troy ounces of gold to Coro with which Coro "topped up" the leased gold in its tanks. At bankruptcy the letter of credit was paid which reduced the balance owing by Coro on Enthone's account. (See para. 10, affidavit of Nazir Noormohamed -- May 13, 1997.)

The lease in question is different from the leases usually dealt with by the court in that the subject of the lease is a gold solution which does not over time depreciate in value in the usual sense but which may appreciate or depreciate in value with the price of gold on the world market as fixed daily in London, England. Moreover, the quality of the gold under lease is constant although through its use by Coro in its plating process the quantity of gold in the tank decreases and had to be replaced by the lessee's own gold from its supplier, Enthone. Accordingly, it was inevitable that the original subject of the lease was replaced at least in part by gold supplied by the lessee.

Henry J. in Re Speedrack Ltd. *(1980), 33 C.B.R. (N.S.) 209*, *11 B.L.R. 220* (Ont. S.C.), Re Ontario Equipment (1976) Ltd. *(1982), 33 O.R. (2d) 648*, *38 C.B.R. (N.S.) 180* (C.A.), and Gatx Corporate Leasing Inc. v. William Day Construction Ltd. *(1986), 6 P.P.S.A.C. 188*, 60 C.B.R. (N.S.) 319 (Ont. H.C.J.), discusses the indices which determine whether a lease is what it purports to be, on the one hand,

Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563

or, whether it is a financing arrangement on the other. I discuss this appeal using the tests set out in those cases.

The cases focus on the rental aspect of the lease transaction. In Re Ontario Equipment (1976) Ltd., the court said at pp. 650-51 in setting out the test:

> It is of the essence of a lease intended as security within the meaning of the Personal Property Security Act that the property in the subject of the lease is to pass ultimately to the lessee, who is obliged to pay the lessor what might be reasonably regarded as the purchase price with interest and carrying charges over the life of the lease. In such a case the transaction is not unlike a conditional sale agreement or a hire purchase agreement.

In other words, while it is entirely possible to hire out property at a reasonable price for its use, and give the lessee an option to purchase, if the so-called rental payments are in reality payments towards the purchase price of the goods, the court will pierce the shell of words with which the parties have hidden their true intention, and give the contract its true character as a financing vehicle for a conditional sale. Here, in this proceeding, no one could reasonably regard the lease fee as approaching the purchase price of the subject of the lease even if the lease itself were for a definite term. The rental or lease fee, as it is called, is 5 per cent per annum of the daily value of the leased gold, a figure which represents the equivalent amount of money which Enthone would earn if it had the value of the leased gold in its bank account at interest. From the commencement of the lease to the date of bankruptcy in January 1997, the lease returned about $4,500 to Enthone. When one considers that the value of the gold leased is well in excess of $60,000, the rental provision calculated over any reasonable period bears no relationship to the price of the gold, and is, rather, purely nominal.

The lease was for a term of one year with a provision for its renewal automatically from year to year subject to a right of termination in either party on 30 days' notice. There is no fixed payment date in the usual sense. When, however, the lease is terminated in the way provided by the agreement, Coro was required to return the leased gold to Enthone. There was no requirement in Coro to purchase the gold although it had an option of buying the gold at market price as fixed in London without credit for rental payments made over the life of the lease. It is clear that none of the indices said by Henry J. to point to the lease, as a guise for a conditional sales agreement is present. Coro can use the leased gold and walk away from the contract having paid, not towards its purchase, but for its use only. I find, accordingly, that the lease is not one which secures the performance of an obligation and hence document did not require to be perfected under the Personal Property Security Act.

I now turn to deal with the more substantial position put forth by counsel for the trustee. The leased gold in the tank is used up in Coro's plating process. Under the lease Coro is under a contractual obligation to maintain 129.4 troy ounces of gold in its tanks at all times. To do so Coro is required to purchase replacement gold from Enthone to replenish the gold as it uses it up in its own processes.

On the termination of the lease either by agreement or by reason of default, Coro is required by the terms of the agreement to return to Enthone 152 troy ounces of gold comprising, in part, the gold in its plating tanks. In a technical sense, Coro could not and was not expected to return the identical subject leased to it, the original gold having been mixed with Coro's own gold purchased to replenish the gold in the tanks, as I have mentioned. The delivery then, of a product which answers the generic description of the product leased will satisfy the terms of the obligation.

On those facts the trustee alleges that the transaction called the lease is, in reality, a sale because under bailment law the identical subject-matter cannot be returned by the lessee to the lessor.

Halsbury's Laws of England, 4th ed., vol. 2, p. 1801 sets this out in a statement which is universally accepted:

Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563

A bailment, traditionally defined, is a delivery of personal chattels on trust, usually in a contract expressed or implied, that the trust shall be duly executed, and the chattels re-delivered in either their original or altered form, as soon as the time or use for, or condition on, which they were bailed shall have elapsed or been performed.

In Crawford v. Kingston, *[1952] O.R. 714*, *[1952] 4 D.L.R. 37*, cited by trustee's counsel, the Ontario Court of Appeal used much the same words [at p. 717]:

> Whenever there is a delivery of property on a contract for an equivalent in money or some other valuable commodity, and not for the return of the identical subject-matter in its original or altered form, this is a transfer of property for value -- it is a sale and not a bailment . . .

A great deal of the law in this respect was developed in connection with the grain trade. In the usual case, wheat is deposited by the farmer (bailor) with a depository, grain elevator (bailee) and mixed in a common mass with the wheat of perhaps hundreds of other depositors. The depositor has the right of receiving on demand a similar quantity and quality of wheat to that delivered, but, obviously, not the product identical to that delivered. In the event of a bankruptcy or a loss of the wheat by the grain elevator some of the cases, but by no means all, have called the transaction a sale and not a bailment: see Lawlor v. Nicol (1898), 12 Man. R. 224 (C.A.). That is, if the identical product to that deposited with the bailee cannot be recovered the transaction cannot, by definition, be a bailment and must be a sale.

In Re Delta Smelting & Refining Co. *(1988), 72 C.B.R. (N.S.) 295*, *33 B.C.L.R. (2d) 383* (S.C.), the bankrupt was a smelter and refiner of gold. Its customers turned over gold ore to it to be smelted and refined and the resulting gold was pooled together in a common mass, and each customer had the right to the return of an amount of gold equal to that deposited with the company. The court in describing the process said at p. 298:

> At the end of a batch, the refined bars of gold or silver were placed in the vault. No attempt was made by Delta to identify proportions of a batch as being attributable to any particular customer. Metal was withdrawn from the vault for Delta's own purposes (including trading and speculation on the metal market) as well as for return or sale to customers, generally on a "last in, first out" basis. As a consequence of this policy none of the metal in the vault is specifically identifiable as coming from any of the particular claimants in this proceeding.

It was held that since the creditors' metal was mixed together with the metal of many other customers in a common mass, "on the basis that an equivalent quantity of the same type of material, will be returned, the contract is one of sale, not bailment".

In this appeal, Enthone's gold is not deposited in a common mass. No other person's gold, save that of Coro's replacement gold, goes into Coro's tanks. There is not the mingling of Enthone's gold with the gold of many other depositors as in the wheat cases and in the Delta case. The leased gold is always identifiable and kept separate. The gold which Coro adds merely replaces the gold which it uses up in its plating processes. In a sense, Coro uses its own gold in its own plating processes so that Enthone's gold always remains in the tank.

Moreover, the court has always placed great emphasis on whether the bailee had, under the deposit agreement the right to deal with the bailed goods. In both Delta and Crawford, the bailees were at liberty to deal with the bailor's products as it saw fit. In Delta, the court said at p. 299:

> Although the contract purported to reserve property in the depositor, Delta was free to use, deal in or trade the metal as it saw fit for a certain period of time, and was not required to account to the depositor for the type of use to which the metal was put nor for any profits made. These facts are

Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563

inconsistent with either bailment or trust, which would permit the property to remain in the creditors. The correct legal characterization is that the customer loaned their metal to Delta, at which time property passed to Delta.

In the Crawford case the court pointed out that the bailee, Murray, was, under the contract, required to return a certain number of cattle to the plaintiff and that, "from 1944 . . . was at liberty to sell or dispose of any or all of the stock and to make a profit by means of increase in the stock or otherwise".

Clearly, if the bailee has under the contract the right to dispose of the bailed subject as it had both in the Delta case and the Crawford case the "locus of the title" must be in the bailee and the transaction is a sale.

Those cases are distinguishable from the facts of the case in this appeal. Here, Coro's use of the gold was clearly defined and limited to its plating processes. It had no right to deal with the gold in trade or as a pledge, or in any way. It had to account for the use of the gold (s. 3, para. D). It was required to monitor the gold level at 129.4 troy ounces and was subject to audit (s. 1, para. H, "report"). In this respect Coro's situation is closer to the facts in Busse v. Edmonton Grain & Hay Co. *(1932), 26 Alta. L.R. 83*, a case cited by the Ontario Court of Appeal in the Crawford case. There the plaintiff stored grain with the defendant storage company. The plaintiff's grain was put in a particular bin by itself and not mixed with the common mass. The agreement between the plaintiff and the defendant was that the defendant was bound to deliver it or its equivalent in quality and quantity whenever required by the plaintiff and not necessarily the identical grain as deposited with the defendant. Afterwards, the plaintiff and defendant agreed that the plaintiff would sell the grain to the depositor, defendant, at any time the plaintiff elected to do so at an agreed price. The trial judge held that the agreement was a sale. On appeal, the court reversed that finding and put great stress on the fact that the defendant had no right to deal with the grain. At p. 188, the court said:

> The defendant has no right to deal with it other than in accordance with the contract. It was there for storage and storage only. It was not put into a consumable stock as in the Miller's case. The defendant was bound at all time to deliver it or its equivalent in quantity and quality whenever required by the plaintiff. It had no right to treat it as it saw fit . . .

The court in the Busse case also thought the insurance to be a factor. It said "then there is still the more important fact that by the terms of the contract . . . the defendant was required to insure the grain and the cost of that insurance was borne by the plaintiff showing that it was intended for his benefit".

Under the terms of the contract between Coro and Enthone, Coro was obliged to insure the gold leased to it. The contract states in s. 3, para. D:

> Upon request by Enthone, the company shall provide evidence that it has fully paid up insurance coverage which is sufficient to cover the current market value of all gold leased to the company by Enthone and all silver and palladium for which a security interest has been granted to Enthone and which names Enthone as additional insured.

Further, the parties to the lease have always recognized that the gold leased to Coro will, in a technical sense, vary or change by reason of Coro's own processes, but that essentially the same quality of gold will be returned at the termination of the lease. The parties by contract have provided for this. The lease confirms the title of the gold in Enthone and Coro specifically agrees not to deal with the gold in any way adverse to Enthone's title. The agreement nowhere contemplates that Coro would become the owner of the leased gold without paying for it and there is a specific provision in the lease for the payment and purchase of the gold for cash rather than its return in specie. The parties by their contract have gone to some trouble to make their contract one of bailment and not of sale. There is no reason why the parties cannot make a contract of bailment and not sale regardless of the form of the transaction and they have done so here.

Coro (Canada) Inc.[Indexed as: Coro (Canada) Inc. (Re)], 36 O.R. (3d) 563

Accordingly, I find that the lease is a true lease and one which is not required to be perfected by any of the methods set out in the Personal Property Security Act. Moreover, I find that the parties have entered into a bailment lease and that the lease having been terminated, Enthone, the lessor, is entitled to the return of its gold or so much as was in Coro's inventory at the day of bankruptcy.

Security Agreement

Coro was, under the lease agreement, required to supply a security interest over its silver and palladium inventory. This did not happen. Rather, on the pay out of Engelhard, that company assigned its general security agreement to a company called Place Vendome which had advanced funds to Coro. Place Vendome then hived off and assigned to Enthone an interest in Coro's assets. That interest unfortunately does not include the contents of the tanks listed as collateral. In other words, while the assignment from Engelhard of its G.S.A. to Place Vendome includes as collateral Coro's inventory, the assignment from Place Vendome to Enthone, gives Enthone only Place Vendome's "interest as the secured party in, to and under the collateral described in Schedule 'A'". A reference to Sch. "A" indicates that it speaks of security in the tanks and not in inventory. Presumably, the inventory, that is, the silver and palladium solution remains in Place Vendome.

The parties could have, of course, amended the assignment or Enthone could have moved for its rectification.

However, once the trustee's interest appears it is too late to take either of those steps.

The assignment of security from Place Vendome to Enthone as registered is unsigned and it appears that despite diligent searches a signed copy of the assignment cannot be found. The trustee's position is that no such assignment exists and no effect can be given to it. However, it appears clear from the examination of Blair Jewell, Enthone's manager of finance, and from his affidavit that the assignment was in fact signed and this contention is supported by the fact that the assignment was registered and that the financing statement was signed by the solicitor for the assignor. In the circumstances it seems to me that the inability to produce a signed copy of the assignment is not fatal to the validity of that assignment.

In the end result I find that the only collateral secured by this assignment from Place Vendome to Enthone were the tanks belonging to Coro described in Schedule "A" of the assignment.

The question of costs may be spoken to.

Order accordingly.