John E. Mitchell (*Admitted Pro Hac*)
Yelena Archiyan (*Admitted in New York*)
AKERMAN LLP
2001 Ross Avenue, Ste. 3600
Dallas, TX 75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Admitted Pro Hac*)
Joanne Gelfand (*Admitted in New York*)
Katherine C. Fackler (*Admitted Pro Hac*)
AKERMAN LLP
98 Southeast Seventh Street, Ste. 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

*Counsel for Debtors and Debtors in Possession*

Michael Luskin
Stephan E. Hornung
Alex Talesnick
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel.: (212) 597-8200
Fax: (212) 974-3205

*Counsel for the Senior Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| MIAMI METALS I, INC., *et al.*,[1] ) | Case No. 18-13359 (SHL) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| ) | |

**DEBTORS AND THE SENIOR LENDERS' JOINT STATEMENT OF MUTUAL**
**UNDISPUTED FACTS PURSUANT TO S.D.N.Y. LOCAL BANKR. RULE 7056-1**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38 Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

49261802;1

Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation) and its affiliated debtors and debtors-in-possession as defined below (collectively, the "Debtors") in the above-captioned chapter 11 cases and Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest") and Bank Leumi USA ("Leumi" and, together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet and Woodforest, the "Senior Lenders"), submit this joint statement of mutual undisputed facts pursuant to S.D.N.Y. Local Bankruptcy Rule 7056-1 in support of their Joint Motion for Summary Judgment as to Bucket 3, 4 and 5 Customers ("Motion").

**A.     The Chapter 11 Cases**

1.     On November 2, 2018, Debtors Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), Miami Metals II, Inc. (f/k/a Republic Metals Corporation), and Miami Metals III LLC (f/k/a Republic Carbon Company, LLC) each filed voluntarily petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), initiating these Chapter 11 Cases. [ECF No. 1]. On November 21, 2018, Miami Metals VIII LLC (f/k/a Republic High Tech Metals, LLC), Miami Metals VI LLC (f/k/a RMC Diamonds, LLC), Miami Metals VII LLC (f/k/a RMC2, LLC), Miami Metals IV LLC (f/k/a J & L Republic LLC), Miami Metals V LLC (f/k/a R & R Metals, LLC), Republic Trans Mexico Metals, S.R.L., and Republic Metals Trading (Shanghai) Co., Ltd. filed voluntarily petitions for relief under the Bankruptcy Code, initiating their Chapter 11 Cases. (The petition dates of November 2, 2018 and November 21, 2018 shall be collectively referred to hereafter as the "Petition Date").

2.     The Debtors are debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

2

49261802;1

3.      On November 19, 2018, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors in these cases. [ECF No. 113].

4.      On March 7, 2019, the Debtors closed on the sale of substantially all of their assets to Asahi Holdings, Inc. ("Asahi"). [ECF No. 713]. The Debtors are continuing to liquidate their remaining physical assets. [ECF Nos. 219, 286, 358, and 563].

**B.     The Senior Lenders' Relationship with the Debtors**

5.      As of the Petition Date, the Senior Lenders were collectively owed (and continue to be owed) over $177 million by the Debtors under certain credit agreements, master netting agreements and lease agreements (collectively, the "Credit and Lease Agreements").[2] First Interim Order (as defined below), ECF No. 54 at Schedule 2. The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including the Debtors' inventory and the proceeds thereof (other than Debtors Republic Metals Trading (Shanghai) Co., Ltd. and Republic Trans Mexico Metals, S.R.L.). (*Id.* ¶ F(vi).)

6.      The Senior Lenders are parties to that certain Second Amended and Restated Intercreditor Agreement, dated February 19, 2016 (as amended from time to time the "Intercreditor Agreement"), which governs the respective rights and interests of the Senior Lenders in the assets of Debtor Miami Metals II, Inc. (f/k/a Republic Metals Corporation ("RMC"). (*Id.* ¶ F(iii).) RMC executed the Intercreditor Agreement. (*Id.*)

**C.     The Interim Cash Collateral Orders and the Ownership Disputes**

7.      On the Petition Date, the Debtors filed the *Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to*

---

[2] The Credit and Lease Documents are listed on Schedule 1 to the Initial Cash Collateral Motion (as defined below).

*the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "Initial Cash Collateral Motion") [ECF No. 10].

8.  On November 8, 2018, the Court entered its first *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503 and 507 (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "First Interim Order") [ECF No. 54].

9.  Pursuant to the First Interim Order, among other things, the Senior Lenders consented to the Debtors' use of their cash collateral to fund the costs and expenses of administering the chapter 11 cases, and the Senior Lenders were granted superpriority claims and adequate protection liens on substantially all of the Debtors' assets to protect against any diminution in value of their collateral. (*Id.* ¶ 8(b).)

10. On November 13, 2018, the Debtors and the Senior Lenders filed the *Joint Supplement of the Debtors and the Senior Lenders to the Cash Collateral Motion* (together with the Initial Cash Collateral Motion, the "Cash Collateral Motion") [ECF No. 78]. The Court subsequently entered seven additional interim cash collateral orders (collectively, the "Interim Cash Collateral Orders") [ECF Nos. 277, 373, 538, 675, 864, 987 and 1160].

11. Numerous customers and/or suppliers of the Debtors (the "Customers") objected to the Cash Collateral Motion and the Inventory Payments on the basis that the Debtors' inventory and its cash proceeds (the "Disputed Assets") belonged to the Customers and were not property of the Debtors' bankruptcy estates, giving rise to the current disputes concerning the ownership of the Disputed Assets (the "Ownership Disputes"). Following extensive negotiations among the Debtors, the Senior Lenders, and the Customers, the Court entered an Order Approving Uniform

4

Procedures for Resolution of Ownership Disputes [as amended, ECF No. 1196].[3]

**D.    The Uniform Procedures**

12.    The Debtors reviewed more than 50 Statements of Claimed Ownership and Claims ("Customer Statements") filed by the Customers pursuant to the Uniform Procedures Order. The Senior Lenders and the Debtors filed their responses to the Customer Statements on February 18, 2019 and February 19, 2019, respectively [ECF Nos. 637, 648], after which more than 20 Customers filed an amendment and/or supplement to their Customer Statement.

13.    At the March 21, 2019 status conference, the Debtors and the Senior Lenders identified several buckets of customers and legal issues that can be adjudicated as a matter of law. The Debtors and the Senior Lenders filed a joint motion for summary judgment as to the Bucket 1 Customers.[4] [ECF No. 938.] All parties had an opportunity to brief the legal issues and the Court heard oral argument as to the Bucket 1 Customers on June 10, 2019. In accordance with the Second Amended Uniform Procedures Order, the Debtors and the Senior Lenders are filing simultaneously herewith their Motion as to the Bucket 3, 4 and 5 Customers. A status conference on the brief as to the Bucket 3, 4 and 5 Customers is set for July 2, 2019.

14.    Discovery is ongoing under the Second Amended Uniform Procedures Order.

**E.    The Debtors' Refining Process**

15.    Prior to the Petition Date, the Debtors refined precious metals, primarily gold and silver. Customers from all over the United States and the Western Hemisphere shipped unrefined, nonidentical and nonfungible material, primarily containing gold and silver, to the Debtors for refining. The Debtors refined this material and produced refined silver and gold bars and casting

---

[3] On June 14, 2019, the Court entered a Second Amended Order Approving Uniform Procedures for Resolution of Ownership Disputes ("Second Amended Uniform Procedures Order").

[4] The Debtors and the Senior Lenders have resolved all but one claim of the Bucket 2 Customer which is less than $20,000.

grains. Based on demand, the refined gold and silver was either sold or sent to the mint for the production of "value added" minted and casted products of various designs and sizes. The Debtors were not engaged in the business of storing goods for hire. (Declaration of Scott Avila, as Chief Restructuring Officer, in Support of Joint Motion for Summary Judgment as to Bucket 3, 4 and 5 Customers (the "Avila Declaration" or "Avila Decl.") ¶ 5.)

16.     After raw materials were received by the Debtors, the shipment was divided into separate lots and assigned lot numbers based upon the overall weight of the shipment. These lots were subsequently weighed and melted to obtain a homogenous sample for assay testing (determining the metal content of the respective lot), generally on the same day. Customers had the right to be present to witness the weigh and assay processes. The preliminary assay results of materials provided RMC with an estimated amount of the precious metals contained in the respective lot(s) received from a customer. The final settlement occurred when RMC and the customer agreed on the metal content in a respective lot. (*Id.* ¶ 6.)

17.     Prior to the final settlement, a customer, including the Contract Customers, could request that RMC make an "advance" payment to the customer of up to approximately 95% to 99% of the estimated metal value of the applicable lot based on the preliminary assay. These payments could be in the form of USD wire transfer to the customer's designated bank account or "metal credit" transfer to the customer's designated "Loco London" metal account.[5] When a customer elected that metal credit be paid to its Loco London metal account, RMC did not transfer

---

[5] Customer Pool Accounts represent a ledger account reflecting RMC's obligations to its customers denominated in ounces of a specific type of metal. When a customer requested an advance payment in dollars, RMC created an account receivable due from the customer. When the final settlement was agreed upon between the parties, the customer's pool account was increased in the amount of the payable ounces for the metals for that specific lot or shipment. Thereafter, if the customer elected payment in cash, RMC generated a "settlement invoice" showing the dollar amount due from RMC to the customer adjusting for customer advances and all charges incurred by the customer relating to the lot or shipment, including for refining. Then, RMC remitted the net cash payment to the customer and reduced the customer's pool account and the "AR" account for those customers that were given advances. (Avila Decl. ¶ 7 n.2.).

actual physical metals, but rather generic metal credits from the Debtors' unallocated metal account with ICBCS.[6] In certain instances, customers provided the Debtors with payment instructions to transfer metal credits otherwise payable to such customers to third parties. (*Id.* ¶ 7.)

18. After the melting/sampling phase, the raw materials entered the refining process. With the exception of the "Peace of Mined" metal (discussed below), during the refining process, individual customer lots were commingled with other customer lots, various clean up material and residue material (sometimes referred to as "clean up bars"). During the refining process, the silver and gold that was contained in the commingled material was dissolved in acid to create a solution, analogous to dissolving sugar in hot water (the "Dissolution Process"). The refining process produced metal billets, bars, and sacks of grain (the "Refined Product"). The Refined Product was then transferred to the Debtors' vault and then sold to third parties or transferred to the Debtors' mint for the production of various minted products, coins, cast bars, etc. (the "Minted Product"). (*Id.* ¶ 8.)

19. With the exception of the "Peace of Mined" metal, the Debtors could not identify the raw materials delivered by customers after they were commingled with other lots for refining and during and after the Dissolution Process. The Debtors commingled the raw materials delivered by all of the Contract Customers in the ordinary course of business and none of the raw materials delivered by the Contract Customers were segregated or identifiable during the refining process. Thus, it was impossible for the Debtors to identify what raw materials or lots were included in Refined Product or Minted Product. The Debtors had no obligation to return to any of the Contract Customers the raw materials delivered to the Debtors by the Contract Customers in the same or

---

[6] Like a USD wire transfer between two bank accounts, a payment of Loco London metal credits was reflected as a credit in the customer's Loco London metal account and as a corresponding debit in RMC's Loco London account. (Avila Decl. ¶ 7 n.3.)

some altered form.  (*Id.* ¶ 9.)

F.  **The Debtors' Peace of Mined<sup>TM</sup> Program**

20.    As advertised on the Debtors' website, the Debtors offered a "Peace of Mined" service to customers.[7]  Peace of Mined was available to downstream customers (*i.e.*, buyers of Refined Product) who, upon paying a premium for the service, could choose the source of the metals in the Refined Products they purchased from an approved mine list, sorted by country and location of origin.  If utilized, the Debtors would then refine the raw materials in a proprietary single-batch closed circuit, ensuring that the materials were always traceable and never commingled at any point during the refining process.  The purpose of the program was to ensure the exact origin of the metals that the downstream customers purchased.  (*Id.* ¶ 10.)

21.    The Peace of Mined Terms provide, in pertinent part:

> In order to create a 100% traceable product, Republic Metals' Peace of Mined™ refining circuit uses a proprietary process that allows for batch refining.  Unlike electrolytic refining, batch refining allows for material to freshly enter a clean circuit during the refining process, and at no point come in contact with any other-sourced metal.  In the Peace of Mined<sup>TM</sup> refining circuit, the designated material is the only material present, and all of that material is removed at termination of the process, so there are no leftovers in the circuit−it can in no way be commingled with metal originating from other sources.

(*Id.* ¶ 11, Ex. A.)

22.    RMC's upstream customers (*i.e.*, mining companies) could become certified Peace of Mined suppliers.  Thereafter, if a downstream customer utilized the service and selected raw materials sourced from the upstream customer, RMC would pay the upstream customer a premium for its raw materials and refine the materials through the single-batch closed circuit for the downstream customer.  The downstream customer would then receive traceable Refined Product

---

[7] Following the closing of the sale of substantially all of the Debtors' assets to Asahi, the former RMC website is no longer available.  A copy of the Peace of Mined Terms is attached the Avila Declaration as **Exhibit A**.

8

49261802;1

with a certificate guaranteeing its authenticity and source of origin. Raw materials were not refined through the Peace of Mined program unless both upstream and downstream customers were present. (*Id.* ¶ 12.)

23.     Only two Contract Customers – Nusantara de Mexico S.A. de C.V., a subsidiary of First Majestic Silver Corp., and Pretium Exploration Inc. – were included on the Debtors' list of certified Peace of Mined suppliers. None of the Contract Customers was a downstream customer purchasing Refined Product or otherwise paid to utilize the Peace of Mined single-batch closed circuit to ensure that its raw materials were refined separately and returned as traceable Refined Product. Accordingly, no Contract Customer received back, or was entitled to receive back, the identical raw materials that it delivered to the Debtors as a finished product. (*Id.* ¶ 13.)

**G.     The Contract Customer Agreements**

24.     The Contract Customers reside in Buckets 3, 4 and 5. Each Contract Customer entered into a separate agreement with RMC. (*Id.* ¶ 14.) Each "bucket" is described below:

**The Bucket 3 Agreements**

25.     The Bucket 3 Agreements (defined below) provide for the passage of title to RMC upon delivery of a Bucket 3 Customer's doré to a secure carrier or upon delivery to RMC's refinery. (*Id.* ¶ 15.) The Bucket 3 Customers and their agreements consist of:

   i.     **Argonaut Gold Inc.** (a) Letter Agreement between RMC and Compania Minera Pitalla, S.A. de C.V. ("Compania Minera Pitalla") dated December 23, 2016, relating to the refining and forward/spot sales of precious metal produced by Compania Minera Pitalla's La Colorada Mine (the "Compania Minera Pitalla Agreement"); and (b) Letter Agreement between RMC and Minera Real de Oro S.A. de C.V. ("Minera Real de Oro" and together with Compania Minera Pitalla, "Argonaut") dated January 3, 2017, relating to the refining and forward/spot sales of precious metal produced by Minera Real

9

49261802;1

del Oro's El Castillo mine (the "Minera Real de Oro Agreement," and together with the Compania Minera Pitalla Agreement, the "Argonaut Agreements");[8]

ii. **First Majestic**. (a) Agreement between RMC and Nusantara de Mexico S.A. de C.V. ("Nusantara") dated July 21, 2017, relating to the refining and forward/spot sales of precious metal from Nusanatara's Santa Elena mine (as amended by the First Amendment dated June 6, 2018, the "Nusantara Agreement"); and (b) Agreement between RMC and Primero Empresa Minera S.A. de C.V. ("Primero," and together with Nusantara, "First Majestic") dated June 27, 2018, relating to the refining and forward/spot sales of precious metal from Primero's San Dimas mine (the "Primero Agreement," and together with the "Nusantara Agreement," the "First Majestic Agreements");[9] and

iii. **Pretium Exploration Inc.** Agreement between RMC and Pretium Exploration Inc. ("Pretium") deemed effective as of June 1, 2018, relating to the refining and forward/spot sales of precious metal (the "Pretium Agreement," and together with the Argonaut Agreements and First Majestic Agreements, the "Bucket 3 Agreements").[10]

(*Id.*)

## The Bucket 4 Agreements

26. The Bucket 4 Agreements (defined below) are between RMC and two affiliates of Coeur Mining, Inc. (together, "Coeur"). The Bucket 4 Agreements provide that title passes to

---

[8] True and correct copies of the Argonaut Agreements are attached to the Avila Declaration as **Composite Exhibit B**, **Tab 1**.

[9] True and correct copies of the First Majestic Agreements are attached to the Avila Declaration as **Composite Exhibit B**, **Tab 2**.

[10] A true and correct copy of the Pretium Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 3**.

RMC upon the completion of certain defined "Purchaser Obligations."  (*Id.* ¶ 16.)  These agreements are:

    i.    Agreement between RMC and Coeur Mexicana S.A. de C.V. ("Coeur Mexicana") dated January 1, 2017 ("Coeur Mexicana Agreement"); and

    ii.    Agreement between RMC and Coeur Rochester, Inc. ("Coeur Rochester") dated January 1, 2017, relating to the refining and forward/spot sales of precious metal produced by Coeur Rochester's Rochester mine ("Coeur Rochester Agreement," and together with the Coeur Mexicana Agreement, the "Coeur Agreements" or the "Bucket 4 Agreements").[11]

(*Id.*)

### The Bucket 5 Agreements

27.    The Bucket 5 Agreements (defined below) are silent as to when title passed from each Bucket 5 Customer to RMC.  (*Id.* ¶ 17.)  Those agreements are:

    i.    **Premier Gold Mines Limited**.  Letter Agreement between RMC and Premier Gold Mines Limited ("Premier Gold") dated September 30, 2016, relating to the refining and forward/spot sales of precious metal produced by Premier Gold's Mercedes mine ("Premier Gold Agreement");[12]

    ii.    **Yamana Gold Inc**.  (a) Letter Agreement between RMC and Yamana Gold Inc. ("Yamana") dated October 26, 2016, relating to the refining and forward/spot sales of precious metal produced by Yamana's Jacobina Mine (the "Jacobina Agreement"); and (b) Letter Agreement between RMC and Yamana dated May 17, 2018, relating to the refining

---

[11] True and correct copies of the Coeur Agreements are attached to the Avila Declaration as **Composite Exhibit B**, **Tab 4**.

[12] A true and correct copy of the Premier Gold Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 5**.

49261802;1

and forward/spot sales of precious metal produced by Yamana Gold Inc.'s Cerro Moro mine (the "Cerro Moro Agreement," and together with the Jacobina Agreement, "Yamana Gold Agreements");[13] and

      iii.    **Minas de Oroco**. Letter Agreement between RMC and Minas de Oroco Resources ("Minas de Oroco") dated August 21, 2017, relating to the refining and forward/spot sales of precious metal produced by Minas De Oroco's Cerro Colorado mine ("Minas de Oroco Agreement," and collectively with the Premier Gold Agreement, and the Yamana Gold Agreements, the "Bucket 5 Agreements").[14]

(*Id.*)

## H. The RMC Standard Terms

28. Three Contract Customers also executed the Debtors' Standard Terms and General Operating Conditions ("Standard Terms") at approximately the same time each executed its respective agreement with RMC. Those Contract Customers are (i) Premier Gold, (ii) Primero, and (iii) Pretium.[15] (*Id.* ¶ 18.)

---

[13] True and correct copies of the Yamana Agreements are attached to the Avila Declaration as **Composite Exhibit B**, **Tab 6**.

[14] A true and correct copy of the Minas de Oroco Agreement is attached to the Avila Declaration as **Composite Exhibit B**, **Tab 7**.

[15] True and correct copies of the Standard Terms executed by each of these Customers are attached to the Avila Declaration as **Composite Exhibit C**. For the convenience of the Court, the most recent Standard Terms are attached to the Avila Declaration as **Exhibit D**.

Dated:  New York, New York
       June 21, 2019

Respectfully submitted,

**LUSKIN, STERN & EISLER LLP**

**AKERMAN LLP**

*/s/ Michael Luskin*
Michael Luskin
Stephan E. Hornung
Alex Talesnick
Eleven Times Square
New York, New York 10036
Tel.:  (212) 597-8200
Fax:  (212) 974-3205

*Counsel for the Senior Lenders*

*/s/ Joanne Gelfand*
John E. Mitchell (*Admitted Pro Hac*)
Yelena Archiyan (*Admitted in New York*)
2001 Ross Avenue, Suite 3600
Dallas, TX  75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Admitted Pro Hac*)
Joanne Gelfand (*Admitted in New York*)
Katherine C. Fackler (*Admitted Pro Hac*)
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel.:  (305) 374-5600
Fax:  (305) 374-5095

*Counsel for Debtors and Debtors-in-Possession*