**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIAMI METALS I, INC., *et al.*[1] | ) | Case No. 18-13359 (shl) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

## JOINT DISCLOSURE STATEMENT FOR
## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF DEBTORS

John E. Mitchell (*Admitted Pro Hac Vice*)
Yelena Archiyan (*Admitted in New York*)
AKERMAN LLP
2001 Ross Avenue, Ste. 3600
Dallas, TX 75201
Tel.: (214) 720-4300
Fax: (214) 981-9339

Andrea S. Hartley (*Admitted Pro Hac Vice*)
Joanne Gelfand (*Admitted in New York*)
Esther A. McKean *(Admitted Pro Hac Vice)*
Katherine C. Fackler (*Admitted Pro Hac Vice*)
AKERMAN LLP
98 Southeast Seventh Street, Ste. 1100
Miami, FL 33131
Tel.: (305) 374-5600
Fax: (305) 374-5095

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38 Avenue, Miami, FL 33054 (6102), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

### DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION (THE "PLAN") PROPOSED BY THE DEBTORS, MIAMI METALS I, INC., FKA REPUBLIC METALS REFINING CORPORATION ("MIAMI METALS I") AND ITS DEBTOR SUBSIDIARIES AND AFFILIATES (COLLECTIVELY WITH MIAMI METALS, THE "DEBTORS") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTAN-CES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

FURTHER, TO THE EXTENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS INCONSISTENT WITH THE PLAN, THE PLAN SHALL CONTROL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, OR OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

48739617;6

**THE DEBTORS INTEND TO SEEK APPROVAL OF THIS DISCLOSURE STATEMENT AT THE HEARING ON AUGUST 29, 2019 AT 11:00 A.M. EDT (THE "AUGUST 29 HEARING") ONLY IF THE COURT ENTERS ORDERS GRANTING THE MOTIONS AT ECF NOS. 1121 AND 1122 (THE "PLAN-RELATED MOTIONS") PRIOR TO THE AUGUST 29 HEARING.  IF THE PLAN-RELATED MOTIONS ARE NOT GRANTED PRIOR TO THE AUGUST 29 HEARING, THE DEBTORS INTEND TO TREAT THE AUGUST 29 HEARING AS A STATUS CONFERENCE.**

48739617;6

## Table of Contents

I.      INTRODUCTION ........................................................................................................ 1

II.     PLAN VOTING INSTRUCTIONS AND PROCEDURES ............................................ 2
        1.      Notice to Holders of Claims and Interests ........................................... 2
        2.      Holders of Claims Entitled to Vote ...................................................... 3
        3.      Solicitation Package ............................................................................. 4
        4.      Voting Procedures, Ballots and Voting Deadline ................................. 4
        5.      Confirmation Hearing and Deadline for Objections to Confirmation ................... 5

III.    HISTORY AND STRUCTURE OF THE DEBTORS ...................................................... 6
        6.      Overview of Business and Operations. ................................................. 6
                A.      Description of the Debtors' Business ......................................... 6
                B.      Pre-Petition Financing .............................................................. 7
                C.      History and Events Leading to Filing of the Chapter 11 Cases ................. 8
                D.      Financial Results ....................................................................... 9
        7.      Capital Structure of the Debtors. ........................................................ 10
        8.      Corporate Structure of the Company. ................................................. 10
                A.      Current Corporate Structure ..................................................... 10
                B.      Executive Officers .................................................................... 10
        9.      The Rubin Family ................................................................................ 11

IV.     CHAPTER 11 CASE ................................................................................................. 11
        10.     Continuation of Business; Stay of Litigation. ..................................... 11
        11.     Cash Collateral Orders. ....................................................................... 12
        12.     The Sale of the Debtors' Assets to Asahi. ........................................... 12
        13.     Uniform Procedures Order and Customer Litigation. .......................... 13
        14.     Other Material Relief Obtained During the Chapter 11 Case. .............. 14
                A.      Retention of Professionals ........................................................ 14
        15.     Summary of Claims Process and Bar Date. .......................................... 14
                A.      Schedules and Statements of Financial Affairs ........................ 14
                B.      Claims Bar Date and Proofs of Claim ....................................... 14
        16.     The 9019 Settlement Agreement. ........................................................ 15
        17.     Development and Summary of the Plan Support Agreement. ............... 17

V.      SUMMARY OF THE PLAN OF LIQUIDATION ........................................................ 18
        18.     Purpose and Effect of the Plan. ........................................................... 18
        19.     Substantive Consolidation. .................................................................. 19
        20.     The Litigation Trust. ............................................................................ 20
        21.     Treatment of Unclassified Claims Under the Plan. .............................. 21
                A.      Administrative Claims .............................................................. 21
                B.      Priority Tax Claims ................................................................... 21
                C.      503(b)(9) Claims ...................................................................... 22
                D.      Title Property Claims ............................................................... 22

E.      Treatment of Classified Claims Class Description Proposed
        Treatment Projected Recovery  Class 1: Secured claims other than
        the Claims of the Secured Parties (a ........................................................ 24
22.    Classification and Treatment of Claims and Interests. ........................................ 26
23.    Reservation of Rights Regarding Claims and Causes of Action. ......................... 27
24.    Distributions Under the Plan .............................................................................. 28
25.    Distributions for Claims Allowed as of the Effective Date ................................. 28
26.    Resolution and Treatment of Disputed, Contingent, and Unliquidated
       Claims and Disputed Interests ............................................................................ 29
       A.      Objections to Claims ............................................................................ 29
       B.      Authority to Prosecute Objections ........................................................ 29
       C.      Treatment of Disputed Claims .............................................................. 29
       D.      Disputed Claim Reserve ....................................................................... 29
       E.      Distributions on Account of Disputed Claims Once They Are
               Allowed and Additional Distributions on Account of Previously
               Allowed Claims ................................................................................... 29
27.    Post-Consummation Operations of the Debtors ................................................... 30
       A.      Continued Corporate Existence ............................................................ 30
28.    Summary of Releases and Exculpations Under the Plan ...................................... 30
29.    Directors and Officers of the Reorganized Debtors ............................................. 32
30.    Vesting of Assets of the Debtors Upon Confirmation ......................................... 32
31.    Other Matters ..................................................................................................... 32
       A.      Treatment of Executory Contracts and Unexpired Leases ..................... 32
       B.      Administrative Claims Except 503(b)(9) Claims ................................... 32
       C.      Professional Fee Claims ........................................................................ 33
       D.      Withholding and Reporting Requirements ............................................. 33
       E.      Setoffs ................................................................................................. 33
       F.      Dismissal of Bankruptcy Cases of RTMM and Republic Shanghai ........ 34
32.    Confirmation and/or Consummation. ................................................................. 34
       A.      Requirements for Confirmation of the Plan ........................................... 34
       B.      Condition to Confirmation .................................................................... 35
       C.      Conditions to Effective Date ................................................................. 35
33.    Effects of Confirmation ..................................................................................... 36
       A.      Binding Effect ...................................................................................... 36
       B.      Permanent Injunction ........................................................................... 36

VI.    CERTAIN FACTORS TO BE CONSIDERED ............................................................... 37
34.    General Considerations ...................................................................................... 37
35.    Certain Bankruptcy Considerations – Failure to Confirm or Consummate
       the Plan ............................................................................................................... 37

VII.   CERTAIN MATERIAL UNITED STATES FEDERAL  INCOME TAX
       CONSEQUENCES OF THE PLAN ............................................................................... 37

VIII.  FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ................. 42
36.    Feasibility ........................................................................................................... 42
37.    Best Interests Test/Liquidation Analysis ............................................................ 42

IX.    ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS ................................. 43
       38.    Dismissal ........................................................................................................... 43
       39.    Chapter 7 Liquidation ...................................................................................... 44
       40.    Alternative Plan ................................................................................................ 44

X.     THE SOLICITATION; VOTING PROCEDURE ........................................................... 44
       41.    Parties in Interest Entitled to Vote .................................................................. 44
       42.    Classes Impaired under the Plan ...................................................................... 45
       43.    Waivers of Defects, Irregularities, Etc. ........................................................... 45
       44.    Withdrawal of Ballots; Revocation .................................................................. 46
       45.    Further Information; Additional Copies ........................................................... 46
       46.    Plan Supplement ............................................................................................... 46
       47.    Internet Access to Bankruptcy Court Documents ............................................. 47

XI.    RECOMMENDATION AND CONCLUSION ............................................................. 48

**Table of Exhibits**

| Exhibit | Name |
|---------|------|
| A | Joint Plan of Liquidation of Debtors |

48739617;6

# I.    INTRODUCTION

Miami Metals I, Inc., *et al.*, formerly known as Republic Metals Refining Corporation, as debtors and debtors-in-possession in the above-referenced jointly-administered Chapter 11 Cases, submit this Joint Disclosure Statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Joint Plan of Liquidation (the "Plan") proposed by the Debtors dated as of August 1, 2019 and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  A copy of the Plan is annexed as **<u>Exhibit A</u>** to this Disclosure Statement.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

The Official Committee of Unsecured Creditors, the Secured Parties, Bayside Metal Exchange, Coeur Rochester, Inc. c/o Coeur Mining, Inc., Cyber-Fox Trading, Inc., Minera Real de Oro S.A. de C.V., Pyropure, Inc., and So Accurate Group, Inc. support approval of this Disclosure Statement and confirmation of the Plan, as set forth in more detail in the Plan-Related Motions.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during these Chapter 11 Cases, and the anticipated prosecution and liquidation of certain Litigation Claims by a Litigation Trustee appointed pursuant to the Litigation Trust Agreement.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests entitled to vote under the Plan must follow for their votes to be counted.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AND INTERESTS, PLEASE SEE ARTICLE V OF THE DISCLOSURE STATEMENT, ENTITLED **"SUMMARY OF THE PLAN OF LIQUIDATION,"** AND ARTICLE VI OF THE DISCLOSURE STATEMENT, ENTITLED **"CERTAIN FACTORS TO BE CONSIDERED."**

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION (OTHER THAN THE SUMMARIES OF THE PLAN) CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT

WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THE HOLDERS OF ALL CLAIMS AND INTERESTS.  THE DEBTORS URGE HOLDERS OF CLAIMS AND INTERESTS IN CLASSES 3, 4, AND 5 TO VOTE TO ACCEPT THE PLAN.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE X OF THE DISCLOSURE STATEMENT, ENTITLED **"THE SOLICITATION; VOTING PROCEDURE."**

## II.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

**1.    Notice to Holders of Claims and Interests**

This Disclosure Statement will be transmitted to holders of Claims and Interests that are entitled under the Bankruptcy Code to vote on the Plan.  A discussion and listing of those holders of Claims and Interests that are entitled to vote on the Plan and those holders of Claims and Interests that are not entitled to vote on the Plan is provided herein.  The purpose of this Disclosure Statement is to provide adequate information to enable such Claim and Interest holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court has been asked to approve this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such Claim and Interest holders to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY AND IN ITS ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN.  This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

48739617;6

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

**EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

## 2.    Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are in a class that will receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests that receive no distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Under the Plan, holders of Secured Party Claims in Class 3, General Unsecured Claims in Class 4, and Convenience Claims in Class 5 are impaired. Therefore, the votes of holders of Secured Party Claims in Class 3, General Unsecured Claims in Class 4, and Convenience Claims in Class 5 will be solicited. Under the Plan, holders of Miscellaneous Secured Claims in Class 1 and Priority Non-Tax Claims in Class 2, are not impaired. Therefore, votes of holders of Miscellaneous Secured Claims in Class 1 and Priority Non-Tax Claims in Class 2 will not be solicited. Votes of holders of Class 6 Intercompany Interests, Class 7 Subordinated Claims, and Class 8 Intercompany Interests and Interest in Miami Metals I, Inc. and Miami Metals II, Inc. will not be solicited because those Claims and Interests shall be cancelled, eliminated, and/or extinguished on the Effective Date of the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. Acceptance of a plan by a class of interests requires acceptance by at least two-thirds of the number of shares in such class that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article 14 entitled **"Acceptance or Rejection of the Plan."**

If any impaired class of claims objects to confirmation of the Plan, the Debtors intend to seek to cram down that class of claims pursuant to 11 U.S.C. § 1129(b)(1).

3

3.      **Solicitation Package**

Along with the mailing of this Disclosure Statement, as part of the solicitation of acceptances of the Plan, the Debtors will send copies of (1) the Plan; (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider confirmation of the Plan and related matters (the "Confirmation Hearing"), and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"); (3) if you are the holder of a Claim or Interest entitled to vote on the Plan, one or more Ballots to be used by you in voting to accept or to reject the Plan; and (4) the Order entered by the Bankruptcy Court approving the Disclosure Statement and procedures to be utilized in soliciting acceptances of the Plan (the "Solicitation Procedures Order").

4.      **Voting Procedures, Ballots and Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement and its exhibit(s), each holder of a Claim or Interest which has been impaired under the Plan may vote on acceptance or rejection of the Plan by completing, dating and signing the ballot, which will be mailed to them after the Court approves this Disclosure Statement. Ballots may be filed electronically by registered users or conventionally via United States mail addressed as follows:

Donlin, Recano & Company, Inc.
Re: Miami Metals I, Inc., et al.
P.O. Box 199043
Blythebourne Station
Brooklyn, NY 11219

In order to be counted, ballots must be received by Donlin Recano no later than 5:00 p.m. Eastern Time on October 4, 2019.

Completed ballots for holders of all Claims and Interests should be returned and MUST BE RECEIVED BY THE BANKRUPTCY CLERK BY THE DEADLINE SET FORTH IN THE BANKRUPTCY COURT ORDER APPROVING THIS DISCLOSURE STATEMENT.  If you have Claims or Interests in more than one Class under the Plan, you will receive multiple ballots.

IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, CALL OR EMAIL:

Donlin, Recano & Company, Inc.
Re: Miami Metals I, Inc., et al.
Attn: Voting Department
P.O. Box 199043
Blythebourne Station
Brooklyn, NY 11219
Email: drcvote@donlinrecano.com
Phone: 212.771.1128

5.       **Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held at _____ a.m./p.m., prevailing Eastern Time, on **October 15, 2019**, before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 701, New York, New York 10004.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are actually received on or before **October 4, 2019, at 5:00 p.m.**, prevailing Eastern Time, in the manner set forth in the Solicitation Procedures Order.  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

48739617;6

### III.    HISTORY AND STRUCTURE OF THE DEBTORS

**6.    Overview of Business and Operations.**

**A.    Description of the Debtors' Business.**

Founded in 1980 by Richard Rubin, the Debtors were an internationally-recognized "Good Delivery" refiner of precious metals with a primary focus on gold and silver. Products included delivery of refined bars of both gold and silver, grains, and minted and casted investment grade coins and bars in gold and silver of various designs and sizes. Prior to the Petition Date and Asahi Sale (as defined below), the Debtors had the capacity to produce approximately 80 million ounces of silver and 350 tons of gold, along with over 55 million pieces of minted products, per annum. Contract counterparties shipped unrefined gold and silver to the Debtors for refining from all over the United States and the Western Hemisphere. Precious metal was refined and, depending on the arrangement with the applicable contract counterparty, the Debtors paid for unrefined metal by either check, wire transfer, or delivery of refined product (physical metal) in "metals credit" on the London metals exchange, commonly referred to as "Loco London." Most often, contract counterparties requested payment "Loco London." The contract counterparties dispute that the Debtors always purchased metal shipped to them.

The principal office Debtor Miami Metals II, Inc., f/k/a Republic Metals Corporation ("Miami Metals II") was located at 12900 NW 38th Avenue, Miami, Florida 33054, where it ran fully integrated gold and silver refineries (the "Refinery"). The Debtors' books and records were primarily held at this location. Debtor Miami Metals I's principal office and operations were located at 15 West 47th Street, Suites 206 and 209, New York, New York 10036. In New York, Miami Metals I serviced smaller customers in the New York metropolitan area, such as jewelry manufacturers, precious metal recyclers, and pawnshops, by purchasing metal from those suppliers, melting it, and sending the melted metals to the Refinery in Florida. The principal business office of Debtor Miami Metals III, Inc. ("Miami Metals III") was located at 5295 NW 163rd Street, Miami Gardens, Florida 33014, where Miami Metals III processed spent carbon from metals mines by drying, homogenizing, sampling, analyzing, and sending to a third party low grade smelter for further processing. The Debtors also maintained offices at leased premises in Los Angeles, Toronto, Shanghai, and Mexico.

Collectively, from its two Debtor locations (Miami and New York), as well as through non-debtor subsidiaries, the Debtors provided numerous products and services to a diverse base of global mining corporations, financial institutions and jewelry manufacturers, in addition to refining and minting, vaulting, assaying and risk management / hedging services. The Debtors also had a state of the art carbon sampling / processing facility and, prior to the Chapter 11 filing, looked to further develop their market-leading position through new growth opportunities in high technology precious metals products and services.

At the Refinery, the Debtors also maintained an ISO9001 and LBMA approved laboratory, as well as a fully-integrated fabricated products division including die design and production, extrusion, flameless casting, machining, and minting of precious metals investment grade products. The Debtors purchased raw metal and scrap from various sources and refined it, and also provided numerous related products and services. The Debtors had a segregated small

48739617;6

batch refinery within the Refinery where materials with diamonds and other precious stones were treated chemically, thus freeing the precious stones unharmed. The precious metals were refined and recooperated in this circuit as well.

The Debtors also maintained a leased sales office in Shanghai, China for RMC's wholly-owned subsidiary, Debtor Republic Metals Trading (Shanghai) Co., Ltd. ("Republic Shanghai") with two representatives who maintained direct contact with the Chinese banks in regards to the bar supply and sales, as well as sourcing consumables (chemicals, supplies, etc.) for the Refinery.

Debtor Republic Trans Mexico Metals ("RTMM"), an indirect, wholly-owned subsidiary of Miami Metals II, leases an office and melt facility in Mexico City (Madero district) where its 15 independent contractors melted/assayed and financed the purchase of precious metals scrap that were sent to the Refinery weekly.

In the period prior to the Petition Date, there were approximately two hundred (200) salaried and hourly employees of Debtor Miami Metals II, approximately four (4) salaried and hourly employees of Debtor Miami Metals I, and approximately ten (10) salaried and hourly employees of Debtor Miami Metals III.

### B.    Pre-Petition Financing.

As of the Petition Date, Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), Brown Brothers Harriman & Co. ("BBH"), Bank Hapoalim B.M. ("Hapoalim"), Mitsubishi International Corporation ("Mitsubishi"), ICBC Standard Bank Plc ("ICBCS"), Techemet Metal Trading LLC ("Techemet"), Woodforest National Bank ("Woodforest"), and Hain Capital Investors Master Fund, Ltd., as successor-in-interest to Bank Leumi USA ("Hain," and together with Rabobank, BBH, Hapoalim, Mitsubishi, ICBCS, Techemet, and Woodforest, the "Secured Parties") were collectively owed (and continue to be owed) more than $177 million by the Debtors under certain credit agreements, master netting agreements, and lease agreements (collectively, the "Credit and Lease Agreements").

With the exception of Mitsubishi and ICBCS, each of the Secured Parties first entered into Credit and Lease Agreements with the Debtors between January 2016 and October 2017. Mitsubishi and ICBCS first entered into Credit and Lease Agreements with RMC in December 2008 and January 2011, respectively.

The obligations under the Credit and Lease Agreements are secured by valid and perfected liens on substantially all of the Debtors' assets, including all personal and real property, instruments and intangibles and the proceeds thereof (except for RTMM and Republic Shanghai).

The Secured Parties are parties to a certain Second Amended and Restated Intercreditor Agreement, dated as of February 19, 2016 (as amended from time to time, the "Intercreditor Agreement"), which governs the respective rights and interests of the Senior Lenders in the assets of Miami Metals II.  Miami Metals II executed the Intercreditor Agreement.

48739617;6

In addition to the foregoing, ICBCS and Miami Metals II are parties to a certain Unallocated Precious Metals Accounts Agreement dated May 28, 2015 (as amended, the "UPMAA"). Pursuant to the UPMAA, ICBCS maintained RMC's "Loco London" clearing account (the "London Clearing Account"). In the ordinary course of its business, Miami Metals II used the London Clearing Account to settle transactions with customers via Loco London metal credit. The UPMAA and the London Clearing Account services provided by ICBCS to Miami Metals II thereunder were separate and independent of ICBCS' Credit and Lease Agreement with Miami Metals II.

### C.        History and Events Leading to Filing of the Chapter 11 Cases.

In the spring of 2018, the Debtors discovered a significant discrepancy in their inventory accounting as part of preparation of their 2017 year-end financials and quarterly financials for the first quarter, 2018. This led to the Debtors retaining the accounting firm of EisnerAmper LLP ("EisnerAmper") to conduct a physical inventory. On June 8, 2018, EisnerAmper conducted the physical inventory and, thereafter, on June 20, 2018, delivered a report that confirmed inventory discrepancies in the Debtors' books and records.

Shortly after receiving EisnerAmper's June 20 report, the Debtors retained Scott Avila and Paladin Management Group, LLC ("Paladin")[2] to identify various operational, managerial, financial, and strategic restructuring alternatives, and under the business and financial impacts of the same.

As a result of the inventory issues, numerous defaults were triggered under the Credit and Lease Agreements. On June 24, 2018, the Debtors organized a meeting of the Senior Lenders in Miami to discuss the inventory issues. On July 10, 2018, the Secured Parties served termination, default and demand notices on the Debtors that among other things, accelerated all debt obligations and terminated and liquidated lease obligations under the Credit and Lease Agreements.

At or about that same time, the Debtors contacted Valcambi, SA ("Valcambi"), a major, strategic metals refiner, about the possible acquisition of the Debtors as a going concern. Shortly thereafter, Valcambi produced a letter of intent to acquire the Debtors' business. As a result of the letter and other discussions, among other reasons, the Secured Parties agreed to forbear, temporarily, and allow the Debtors to operate in the ordinary course, pending negotiation of a more formal forbearance arrangement to allow the Debtors to pursue a sale with Valcambi, or otherwise to pursue a sale on a broader scale.

Substantial, extensive negotiations ensued which ultimately resulted in the execution of a Forbearance Agreement on August 7, 2018 (the "Forbearance Agreement"), which then became effective on August 17, 2018. Pursuant to the Forbearance Agreement, the Secured Parties agreed, among other things, to forbear from exercising their respective rights and remedies under

---

[2] On June 24, 2018, the Debtors retained Armory Strategic Services ("Armory") as financial advisor. Shortly thereafter, Avila and his professional team left Armory and formed Paladin. The Debtors retained Avila as CRO and Paladin as financial advisor effective July 21, 2018, and terminated Armory the same day.

the Credit and Lease Agreements and the Intercreditor Agreement in connection with the existing defaults.

With the Forbearance Agreement in place, the Debtors immediately retained SSG Capital Advisors LLC ("SSG") as their investment banker to assist with the sale of the Debtors' business to Valcambi, or otherwise market the Debtors' business on a broader scale.

Intense and good faith negotiations with Valcambi continued for over three (3) months. Despite numerous, lengthy telephone calls, an in-person meeting in New York City, and multiple exchanges of term sheets and offers, the Debtors and the Secured Parties were unable to reach terms with Valcambi.

On or about October 18, 2018, ICBCS exercised its right to suspend the Debtors' access to the London Clearing Account.  Thereafter, the Secured Parties informed the Debtors that the Secured Parties were ceasing negotiations with Valcambi.  The Forbearance Agreement also terminated in or around the same time.

Notwithstanding the foregoing, and concurrently during the Debtors' preparations for Chapter 11, the Debtors, Secured Parties and Valcambi continued to discuss what, if any, acquisition prior to and outside of a Chapter 11 might be possible.  By October 26, 2018, the parties were extremely close to finalizing the material terms of an immediate, going concern acquisition of the Debtors by Valcambi, with the last open diligence items to be resolved by October 31, 2018.

Unfortunately, Valcambi, the Debtors, and Secured Parties were unable to finalize the terms of an acquisition by the end of the day, October 31.  With limited cash, and the inability to trade metals or deliver refined goods, the Debtors commenced these proceedings on November 2, 2018, to explore an orderly sale process of their assets and operations.

D.    **Financial Results.**

As of the date of this Disclosure Statement, the Debtors have filed Monthly Operating Reports detailing their financial performance for the months of November 2018 [ECF No. 360], December 2018 [ECF No. 562], January 2019 [ECF No. 693], February 2019 [ECF No. 857], March 2019 [ECF No. 950], April 2019 [ECF Nos. 1125 and 1129], May 2019 [ECF No. 1207], and June 2019 [ECF No. 1266] (collectively, the "MORs").

The MORs are incorporated by reference and will be provided in PDF format upon request to katherine.fackler@akerman.com.

7.     **Capital Structure of the Debtors.**

Miami Metals I and Miami Metals II are each owned 100% by the Amended and Restated Richard Rubin Revocable Trust u/a/d 12/8/2008 (the "Rubin Trust"). Miami Metals II owns 100% of Miami Metals III.

Miami Metals II owns 100% of each of Republic Shanghai, Miami Metals IV LLC ("Miami Metals IV"), Miami Metals V LLC ("Miami Metals V"), Miami Metals VI LLC ("Miami Metals VI"), Miami Metals VII LLC ("Miami Metals VII"), and Miami Metals VIII, LLC ("Miami Metals VIII"). Miami Metals IV and Miami Metals V each own 50% of RTMM.

8.     **Corporate Structure of the Company.**

A.     **Current Corporate Structure.**

Miami Metals I is a New York corporation. Miami Metals II and III are Florida corporations. Miami Metals IV, V, VI, VII, and VIII are Florida limited liability companies. Republic Shanghai is a wholly foreign owned entity. RTMM is a Mexican entity.

B.     **Executive Officers.**

Prior to the Petition Date, the Debtors' senior management team was composed of:

   a.   Jason Rubin, President and Chief Executive Officer;

   b.   David Comite, Treasurer and Chief Financial Officer;

   c.   Zachary Shair, Refinery Operations Director;

   d.   James Gavilan, Senior Vice President of Business Development;

   e.   Luis Pena, Head of Global Sales;

   f.   Alan Silverstein, General Counsel;

   g.   Richard Lani, Chief Compliance Officer;

   h.   JR Rao, Vice President of Environmental Health & Safety;

   i.   Lindsey Rubin, Corporate Secretary; and

   j.   Rafael Carbonell, Chief Operating Officer.

After the sale of the Debtors' assets to Asahi Holdings Corp., the Debtors did not retain the services of any of the foregoing individuals except Jason Rubin, solely in his capacity as Chief Executive Officer, and David Comite, but only as an employee and not as Chief Financial Officer or Treasurer.

Prior to the Petition Date, the Board of Directors of Miami Metals I, including Jason Rubin, Rose Rubin, and Lindsey Rubin, approved the retention of Scott Avila as Chief Restructuring Officer ("CRO") of the Debtors and Paladin. After the Petition Date, the

10

Bankruptcy Court approved Mr. Avila's retention as CRO at ECF No. 245.  Mr. Avila is also a member of the Debtors' Board of Directors.

**9.      The Rubin Family**

As listed above, prior to the Petition Date, Jason Rubin was the President and Chief Executive Officer of the Debtors, Lindsey Rubin, his sister, was the Corporate Secretary, and their mother, Rose Rubin, was a member of the Board of Directors.  The sole shareholder of Republic Metals Company is the Rubin Trust, of which Rose Rubin is the sole trustee and sole beneficiary.

The Rubin family and their related entities, including the Rubin Trust, Republic Metals Warehouse LLC, Richard Rubin Lindjay Investments, LLC, Jason Ross Rubin Enterprises, LLC, and RRLJ12, LLC are the subject of investigations by the Secured Parties and the Committee with respect to possible fraud, breach of fiduciary duty, and fraudulent transfer claims.

**10.     Secured Party Lawsuits**

The Secured Parties have filed two lawsuits as of the filing of this Disclosure Statement: (i) *Cooperative Rabobank U.A., New York Branch, et al. v. Lindsey Rubin*, Case No. 19-20429-cv-Williams, in the United States District Court for the Southern District of Florida (the "L. Rubin Lawsuit"), and (ii) *Cooperative Rabobank U.A., New York Branch, et al. v. Crowe LLP*, Case No. 2019-018945-CA-01, pending in the 11th Judicial Circuit Court in and for Miami-Dade County, Florida (the "Crowe Lawsuit").

The L. Rubin Lawsuit has been dismissed without prejudice.

On July 25, 2019, Crowe filed a motion to remove the Crowe Lawsuit to the United States District Court for the Southern District of Florida.  The motion to remove indicates that Crowe intends to file a motion to transfer the case to the United States District Court for the Southern District of New York.  The proceeds of the Crowe Lawsuit are the subject of the Settlement Agreement (as set forth below).

## IV.      CHAPTER 11 CASE

**11.     Continuation of Business; Stay of Litigation.**

On November 2, 2018 (the "Petition Date"), Miami Metals I, II, and III filed petitions for relief under chapter 11 of the Bankruptcy Code. On November 8, 2018, the Bankruptcy Court entered an Order [ECF No. 44] directing joint administration of the cases of those three Debtors, and designated Case No. 18-13359 (SHL) as the lead case (the "Lead Case").  On November 21, 2018, Miami Metals IV, V, VI, VII, VIII, Republic Shanghai, and RTMM filed voluntary petitions for relief.   On December 21, 2019, the Bankruptcy Court entered a Final Order consolidating those Debtors' cases with the Lead Case [ECF No. 349].

11

Since the Petition Date, the Debtors have continued as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. Under the Bankruptcy Code, the Debtors are required to comply with certain statutory reporting requirements, including the filing of monthly operating reports. As of the date hereof, the Debtors have complied, and will continue to comply, with such requirements. The Debtors are authorized to operate their business in the ordinary course of business, with transactions out of the ordinary course of business requiring Bankruptcy Court approval, however, as of the Petition Date the Debtors ceased operations and began liquidating their assets and winding down their affairs.

An immediate effect of the filing of the Debtors' bankruptcy petitions is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. This relief provides the Debtors with the "breathing room" necessary to assess and reorganize their business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a chapter 11 plan.

## 12.    Cash Collateral Orders.

With the consent of the Secured Parties, the Court entered nine (9) orders authorizing the Debtors to use the Secured Parties' cash collateral on an interim basis, at ECF Nos. 54, 277, 372, 538, 675, 864, 987, 1160, and 1237 (collectively, the "Interim Cash Collateral Orders") in accordance with the budgets attached to each Interim Cash Collateral Order.

The Debtors and the Secured Parties have sought entry of a Final Order authorizing the use of cash collateral in connection with Court approval of the 9019 Motion, the Settlement Agreement and the Plan Support Agreement.

Pursuant to the Cash Collateral Orders, the Secured Parties assert an Adequate Protection Superpriority Claim in excess of $23,950,000 on account of the postpetition diminution in value of their collateral.

Pursuant to the Settlement Agreement and the Plan Support Agreement, on the Plan Effective Date, the Secured Parties' Adequate Protection Superpriority Claims and Adequate Protection Liens will be disallowed, waived, and automatically cancelled.

## 13.    The Sale of the Debtors' Assets to Asahi.

On December 21, 2018, the Debtors filed a Motion for Order (i) Authorizing and Approving Procedures for the Sale of the Debtors' Assets; (ii) Scheduling a Sale Hearing; (iii) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale; (iv) Approving Sale of Property Free and Clear of Interest; and (v) Approving Form of Notice of Sale (the "Sale Motion") [ECF No. 358].

Through the Sale Motion, the Debtors proposed Bid Procedures (as defined in the Sale Motion), whereby the Debtors and their professionals would determine whether any person was

12

eligible to bid, coordinate the efforts of those potential bidders in conducting their respective due diligence investigations regarding the Debtors' assets, receive offers from bidders deemed qualified, and negotiate any offer made to purchase the Debtors' assets, which did not include any of the Debtors' precious metal inventory.

On January 8, 2019, the Debtors filed a Notice of Selection of Stalking Horse Bidder [ECF No. 380], designating Valcambi as the stalking horse bidder with a bid of $16,000,000 (the "Stalking Horse Bid").

Following a hearing on January 9, 2019 during which the Bankruptcy Court approved the Bid Procedures, on January 11, 2019, the Bankruptcy Court entered an Order, *inter alia*, approving the Bid Procedures (the "Bid Procedures Order") [ECF No. 399]. On January 31, 2019, the Debtors conducted an auction at Akerman's New York office (the "Auction"). The Auction lasted several hours and included five (5) bidders. There were twenty-eight (28) rounds of bidding at the Auction, and Asahi Holdings Corp. ("Asahi") ultimately prevailed with a high bid of $25,500,000 (the "Winning Bid").

On February 13, 2019, the Bankruptcy Court approved the sale to Asahi (the "Asahi Sale") on a final basis. On February 21, 2019, the Bankruptcy Court entered an Order (a) Approving Sale of Substantially All of Debtors' Assets "Free and Clear" of All Liens, Claims, Encumbrances, and Other Interests, (b) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief (the "Final Sale Order") [ECF No. 658]. On March 7, 2019, the Debtors closed the Asahi Sale for $25,500,000.

**14.    Uniform Procedures Order and Customer Litigation.**

Early in these Chapter 11 Cases, numerous contract counterparties (the "Customers")[3] of the Debtors filed objections to the Debtors' request to use the Secured Parties' cash collateral which the Secured Parties assert includes certain materials, products, goods held in tolling accounts, pool accounts, and the proceeds and profits thereof (collectively, the "Materials") [ECF No. 10]. The Customers dispute that the materials are property of the Debtors or part of the Secured Parties' collateral. The Customers' objections made clear that ownership of the Materials would be a key issue (the "Ownership Disputes"). To streamline and attempt to expedite resolution of the Ownership Disputes, the Debtors, Secured Parties, Committee, and Customers negotiated certain procedures for the litigation and resolution of the Ownership Disputes, which the Court memorialized in its Order Approving Uniform Procedures for Resolution of Ownership Disputes (the "Uniform Procedures Order" [ECF No. 395], as amended by ECF No. 1196. Pursuant to the Uniform Procedures Order, more than fifty (50) Customers of the Debtors have asserted various claims related to the Ownership Disputes. On February 19, 2019, the Debtors filed their Omnibus Response to the Customer Statements [ECF No. 648].

---

[3] Nothing in this Section 14 is intended to impair any Customer's rights and remedies in the Ownership Disputes and under the Uniform Procedures Order. Statements made in this Disclosure Statement are made for purposes of solicitation only, and are not binding on the Debtors or admissible as evidence on any other matter including but not limited to, the Ownership Disputes. Further, to the extent any Customer votes on the Plan, such vote shall not impact or impair the Customer's rights and remedies in the Ownership Dispute.

Pursuant to the Uniform Procedures Order, discovery is ongoing, and motions for summary judgment with respect to several customers have been filed. The parties expect this process to continue through the Fall of 2019, and post-Confirmation of the Plan. At this point, the Debtors are unable to predict the outcome of this litigation.

**15.     Other Material Relief Obtained During the Chapter 11 Case.**

**A.     Retention of Professionals.**

On November 8, 2018, Akerman filed an Application to Employ Akerman LLP as Counsel for the Debtors *Nunc Pro Tunc* to Petition Date [ECF No. 59] and the Court approved that Application at ECF No. 278.

The Court also approved the Debtors' retention of: (i) Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtors [ECF Nos. 11, 24, 29, 50] and as Administrative Agent for the Debtors [ECF Nos. 339, 536]; (ii) Paladin Management Group, LLC as financial advisors for the Debtors, and Scott Avila as Chief Restructuring Officer [ECF Nos. 58, 245]; and (iii) SSG Advisors, LLC as investment banker [ECF Nos. 60, 90, 149, 246].

The Court approved the Committee's retention and employment of Cooley LLP as its counsel [ECF No. 421] and CBIZ Accounting, Tax, & Advisory of New York, LLC and CBIZ, Inc. as its financial advisor [ECF No. 422].

**16.     Summary of Claims Process and Bar Date.**

**A.     Schedules and Statements of Financial Affairs.**

On January 18, 2019, each of the Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs in their respective cases (collectively, the "Schedules and Statements") with the Bankruptcy Court. The Schedules and Statements are available on Donlin's website at https://www.donlinrecano.com/Clients/rmetals/Static/SOALS.

Among other things, the Schedules and Statements set forth the Claims of known creditors of the Debtors as of the Petition Date, based upon the Debtors' books and records.

**B.     Claims Bar Date and Proofs of Claim.**

On February 28, 2019, the Bankruptcy Court entered an Order (I) Setting Bar Date for Submitting Proofs of Claim Asserted Pursuant to 11 U.S.C. § 503(b)(9), (II) Approving Procedures for the Assertion, Resolution, and Satisfaction of 503(b)(9) Claims, and (III) Approving Notice Thereof [ECF No. 690], establishing April 12, 2019 at 5:00 p.m. Eastern Time as the deadline for filing proofs of claim pursuant to section 503(b)(9) Of the Bankruptcy Code (the "503(b)(9) Bar Date").

As of the 503(b)(9) Bar Date, the total amount of filed claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code was approximately $54.5 million. The deadline for the Debtors to object to 503(b)(9) claims was July 11, 2019, however, the Debtors filed a Motion

[ECF No. 1216] to extend that deadline by 90 days.  The Court orally granted the Motion at the hearings on August 1, 2019.

On July 19, 2019, the Bankruptcy Court entered an Order [Doc. No. 1266] sustaining the Debtors' First Omnibus Objection to Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9) [ECF No. 1120], which, together with an Agreed Order on that Objection which has been submitted to the Bankruptcy Court for entry, reduced the amount of claims asserted pursuant to section 503(b)(9) by approximately $4 million.

On March 1, 2019, the Bankruptcy Court entered an Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof [ECF No. 694], establishing April 12, 2019 at 5:00 p.m. Eastern Time as the deadline for filing general unsecured proofs of claim (the "General Claims Bar Date") and May 20, 2019 at 5:00 p.m. Eastern Time as the deadline for governmental units to file proofs of claim.

**17.    The 9019 Settlement Agreement.**

On May 23, 2019, the Debtors filed a Joint Motion for Approval of a Settlement Agreement by and among the Debtors, Secured Parties, and Committee, pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Settlement Motion") [ECF No. 1122].  Through the Settlement Motion, the moving parties sought approval of a settlement agreement (the "Settlement Agreement") which, among other things,[4] resolved potential challenges to the validity, extent, perfection, and enforceability of the Secured Parties' claims and liens, provided for litigation and claim funding by the Secured Parties, as well as the assignment of certain claims, and provided for a Plan Support Agreement (as defined and described in more detail below).  The Settlement Agreement and the Plan Support Agreement preserve the Customers' rights in the Ownership Disputes and under the Uniform Procedures Order.

Specifically, pursuant to the Settlement Agreement, the Secured Parties agreed to increase the Carve-Out (as defined in the Interim Cash Collateral Orders) by $7,500,000 (the "Settlement Payment") to include the following:  (i) $5,500,000 for the funding of a litigation reserve for the prosecution of claims against the Debtors' insiders, auditors and other third parties and the administration of the Litigation Trust (the "Estate Litigation Fund") effective on the effective date of the Settlement Agreement, and (ii) $2,000,000 for the funding of a reserve for allowed section 503(b)(9) claims (the "503(b)(9) Fund") effective on the Plan Effective Date.

The Debtors will fund (i) the Estate Litigation Fund from Cash Collateral on the Settlement Agreement effective date and (ii) the 503(b)(9) Fund from Cash Collateral on the Plan Effective Date.  Upon the Debtors' funding of the Estate Litigation Fund and the 503(b)(9) Fund in accordance with the preceding sentence, the Secured Parties shall have no further funding obligations in connection with the Plan.

Pursuant to the Settlement Agreement, in the event that it is determined that the Secured Parties did not have an interest in all or some part of the Cash Collateral (as defined in the

---

[4] Interested parties should refer to the Settlement Motion and Settlement Agreement attached thereto for a complete recitation of the terms and conditions of the Settlement Agreement.

48739617;6

Interim Cash Collateral Orders) used to fund the Settlement Payment by a final non-appealable order by a court of competent jurisdiction, the Secured Parties shall promptly disgorge to the Debtors or Litigation Trust, as applicable (or otherwise satisfy with equivalent funds), an amount equal to the Settlement Payment (or if lesser, an amount equal to the portion, in the aggregate, of the Cash Collateral in which the Secured Parties were determined to not have an interest). The Debtors or the Litigation Trust, as applicable, shall be responsible for distributing such disgorged or other applicable funds to holders of Allowed Title Property Claims (as defined in the Plan Support Agreement) on a *pro rata* basis.

Further, unless otherwise agreed by the Committee and the Secured Parties, on the Settlement Agreement effective date, the Secured Parties will assign the following to the Debtors' Estates (the "Assigned Claims"):  any rights, including causes of action or claims, that any Secured Party may have against any employee, director, officer, agent, auditor, accountant, "insider" (as defined in Section 101(31) of the Bankruptcy Code) or any other person or entity that was employed by or provided professional services to the Debtors, arising out of or relating in any way to the Secured Parties' relationship or transactions with the Debtors, including, without limitation, the Secured Parties' respective:

    i.  claims asserted in the L. Rubin Lawsuit; and

    ii.  proceeds of rights, claims, and causes of action against Maria I. Machado, P.A., Maria Machado, Crowe LLP and EisnerAmper LLP (the rights, claims, and causes of action referred to in this clause (ii) being referred to herein as the "Assigned Proceeds of Auditor Claims"),

provided that the Assigned Claims shall not include any claims of the Secured Parties against Rose Rubin under (i) that certain Limited Guaranty Agreement, dated as of August 31, 2018, made by Rose Rubin in favor of the Secured Parties or (ii) that certain Forbearance Agreement, dated as of August 7, 2018, among the Secured Parties and Republic Metals Corporation, as amended.

Subject to any reasonable agreement among the Debtors, Secured Parties, and Committee with respect to a contingency fee, the proceeds of the Secured Parties' claims against the Debtors' auditors will be distributed as follows: (i) first, 100% to the Secured Parties until the Secured Parties receive $2,000,000; (ii) second, 50% to the Secured Parties and 50% to the Debtors' Estates until the Secured Parties receive an additional $5,500,000; and (iii) third, 100% to the Debtors' Estates; provided that Secured Parties shall share in such proceeds on account of any allowed deficiency claims *pari passu* with general unsecured creditors (the "Auditor Claim Waterfall").

Further, on the effective date of the Settlement Agreement, the Secured Parties shall receive a distribution from Cash Collateral consisting of the proceeds of the following (the "Undisputed Collateral"):

    (a)  the 363 asset sale to Asahi pursuant to the Asahi Sale Order;

    (b)  the sale of the Debtors' carbon pursuant to the Carbon Orders;

(c)   the sale of the Debtors' prepaid minted product pursuant to the Prepaid Orders (leaving a reserve for 100% of the one unresolved prepaid claim asserted by Jewelry Quarter Bullion Limited);

(d)   the liquidation of the Debtors' commodities brokerage accounts;

(e)   the sale of the Debtors' diamond and jewelry inventory pursuant to the Remnant Asset Orders; and

(f)   the sale of the Debtors' miscellaneous non-inventory assets, including equipment, vehicles and rolling stock, pursuant to the Remnant Asset Orders.

**18.    Development and Summary of the Plan Support Agreement.**

On May 23, 2019, the Debtors filed a Motion for Authority to Enter Into and Perform Under a Plan Support Agreement (the "Plan Support Agreement") with the Secured Parties, the Committee, and six committee members (the "Committee Members") in their individual capacities (the "PSA Motion") [ECF No. 1121].[5]  In connection with the Settlement Agreement, the parties to the Plan Support Agreement agreed to certain Plan-related terms memorialized in the Plan Term Sheet attached to the Plan Support Agreement, which sets forth the principal terms of an orderly liquidation of the remaining assets of the Debtors and satisfaction of existing debt and other obligations of the Debtors, which will be effected through the Plan.

The Plan Support Agreement allows the Secured Parties to terminate their rights and obligations thereunder upon the occurrence of various events, including, *inter alia*, (i) the entry of an order in the Chapter 11 Cases modifying, staying, reversing or vacating the order approving the Plan Support Agreement or the order approving the Settlement Agreement, in each case without the prior consent of such Secured Party or such Committee Member, or (ii) that the Bankruptcy Court has not entered a Confirmation Order approving the Plan on or before August 31, 2019, provided that this date is automatically extended until October 15, 2019 if the Disclosure Statement is approved by August 31, 2019.

The Plan Support Agreement also permits the Debtors, the Committee and the other Supporting Parties to terminate their rights and obligations thereunder upon the occurrence of events similar to those set forth above.

The Plan Support Agreement provides, *inter alia*:

1)   The Estate Litigation Fund, the Assigned Claims, the 503(b)(9) Fund, the Priority Reserves (defined below) and all causes of action and other rights, title, and assets of the Debtors will be transferred to the Litigation Trust, including without limitation all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any derivative claims of the Debtors;

---

[5] Interested parties should refer to the PSA Motion and the Plan Support Agreement attached thereto for a complete recitation of the terms and conditions of the Plan Support Agreement.

2)    On the Plan Effective Date, the Secured Parties' Adequate Protection Liens and Adequate Protection Superpriority Claims (as such terms are defined in the Cash Collateral Order) shall be disallowed, waived, and automatically cancelled;

3)    On the Plan Effective Date, the Secured Parties shall release $2,000,000 of Cash Collateral (as defined in the Cash Collateral Order) to fund the 503(b)(9) Fund; and

4)    The Plan shall provide for the creation of a reserve comprised of the proceeds generated by the sale of precious-metal inventory other than any Undisputed Collateral (the "Ownership Reserve").

## V.    SUMMARY OF THE PLAN OF LIQUIDATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICA-TION, TREATMENT, AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE LITIGATION TRUSTEE, AND OTHER PARTIES IN INTEREST.

## 19.    Purpose and Effect of the Plan.

Chapter 11 is the principal business reorganization and liquidation chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of its creditors and shareholders.  Upon the filing of a petition for relief under Chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 case.

A plan of liquidation sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of liquidation by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

48739617;6

20.    **Substantive Consolidation.**

Solely in connection with Distributions to be made to the holders of Allowed Claims, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Court provide in the Confirmation Order for the substantive consolidation of the Estates of the Debtors into a single Estate for purposes of the Plan and the Distributions thereunder. To the extent a Claim (including any Disputed Claim) becomes an Allowed Claim, such Claim shall be satisfied in accordance with the provisions of the Plan.

Pursuant to the Confirmation Order, upon the Effective Date and without further order of the Court, except as expressly provided in the Plan, (i) all assets and liabilities of the substantively consolidated Debtors will be deemed to be merged solely for purposes of the Plan and Distributions to be made thereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the substantively consolidated Debtors solely for purposes of the Plan and Distributions thereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor hereunder will be deemed to be made by the substantively consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Notwithstanding the foregoing, such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors, (b) guarantees that are required to be maintained post-Effective Date in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, pursuant to the express terms of the Plan. The substantive consolidation proposed in the Plan shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until an order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates as set forth in the Plan. If no objection to substantive consolidation under the Plan is timely filed and served, then the holders of Claims will be deemed to have consented to substantive consolidation for the purpose of the Plan only and the Court may approve substantive consolidation of the Debtors' Estates in the Confirmation Order. If such objection to the substantive consolidation provided for in the Plan is timely filed and served, a hearing with respect to the substantive consolidation of the Estates and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

48739617;6

In the Second Circuit, substantive consolidation is appropriate when: (i) "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit;" or (ii) "the affairs of the debtors are so entangled that consolidation will benefit all creditors." *In re Augie/Restivo Baking Co.,* 860 F.2d 515, 518 (2d Cir. 1988) (*internal citations omitted*).    It is well accepted that substantive consolidation is a flexible concept and that a principal question is whether creditors are adversely affected by consolidation and, if so, whether the adverse effects can be eliminated.    *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 724 (Bankr. S.D.N.Y. 2011).    Further, the Bankruptcy Court retains the power to order less than complete consolidation.    *First National Bank v. Giller,* 962 F.2d 796, 799 (8th Cir. 1992).

The Debtors believe that substantive consolidation is warranted here because, among other reasons, the Debtors historically operated on a consolidated basis with respect to their cash management system and other books and records.    For purposes of the Debtors' negotiation of the Intercreditor Agreement and Credit and Lease Agreements with the Secured Parties as well as contracts and agreements with their other customers, the Debtors believe that the Secured Parties and such other customers treated the Debtors' operations, assets, and liabilities as unitary. Moreover, the majority of the assets in these Chapter 11 Cases are owned by Debtor Miami Metals II.

Indeed, given the nominal amount of assets held by Debtors other than Miami Metals II, and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in administering the Plan. Accordingly, the Debtors believe that substantive consolidation of the Debtors' Estates under the terms of the Plan will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of ten (10) separate Debtor's Estates, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the administration of the Plan.

## 21.    The Litigation Trust.

Upon the Effective Date of the Plan, there shall be established a Litigation Trust (the "Litigation Trust") pursuant to the terms of the Litigation Trust agreement (the "Trust Agreement") which will be filed as part of the Plan Supplement.

The Estate Litigation Fund, Assigned Claims, 503(b)(9) Fund, Priority Reserves, and all other rights, title, and assets of the Debtors will be transferred to the Litigation Trust, including without limitation all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any derivative claims of the Debtors.

The Litigation Trust shall resolve all Claims remaining against the Debtors as of the Effective Date of the Plan and shall make periodic distributions to holders of Claims that are deemed to be "allowed" by the Litigation Trust or the Bankruptcy Court in accordance with the terms of the Plan and Trust Agreement.

48739617;6

22.     **Treatment of Unclassified Claims Under the Plan.**

A.     **Administrative Claims.**

**FOR PURPOSES OF THE PLAN AND THIS DISCLOSURE STATEMENT, ADMINISTRATIVE CLAIMS DO NOT INCLUDE CLAIMS ASSERTED PURSUANT TO 11 U.S.C. § 503(b)(9).**

**503(b)(9) CLAIMS ARE BEING TREATED PURSUANT TO ARTICLE V, § 22(c) BELOW.**

Administrative Claims are Claims for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and are entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, (b) Professional Fee Claims, (c) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code, and (d) all Claims that the Debtors have agreed to grant treatment as an Allowed Administrative Claim, provided however, that for purposes of the Plan and this Disclosure Statement, Administrative Claims do not include claims asserted pursuant to 11 U.S.C. § 503(b)(9).

**Claims asserted pursuant to 11 U.S.C. § 503(b)(9) are being treated in Article V, § 22(C) below.**

On or as soon as reasonably practicable after the later of (i) the Effective Date of the Plan or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, a holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such allowed Administrative Claim, (a) cash equal to the unpaid portion of the face amount of such allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors or the Litigation Trust, as applicable, shall have agreed upon in writing.

B.     **Priority Tax Claims.**

Priority Tax Claims are Unsecured Claims asserted by federal, state, and local governmental authorities for taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes and excise taxes. These Unsecured Claims are given a statutory priority in right of payment.

On or as soon as reasonably practicable after the later of (i) the Plan Effective Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, a holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, (a) cash equal to the unpaid portion of the face Amount of such Allowed Priority Tax Claim or (b) such other treatment as to which

21

such holder and the Debtors or the Litigation Trust, as applicable, shall have agreed upon in writing.

### C.      503(b)(9) Claims.

On or as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such 503(b)(9) Claim becomes an Allowed 503(b)(9) Claim, a Holder of an Allowed 503(b)(9) Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed 503(b)(9) Claim, (i) a *pro rata* distribution from the 503(b)(9) Fund and (ii) subject to the GUC Sharing Formula, a *pro rata* distribution of Litigation Recoveries.

Once holders of Allowed 503(b)(9) Claims recover 75% on account of their Allowed 503(b)(9) Claim(s), then until all Allowed 503(b)(9) Claims are paid in full, 75% of Litigation Recoveries shall be made available for distribution to Holders of Allowed 503(b)(9) claims and 25% of Litigation Recoveries shall be made available for distribution to Holders of Allowed General Unsecured Claims (the "GUC Sharing Formula").

**The failure to object to confirmation of the Plan by a Holder of an Allowed 503(b)(9) Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.**

### D.      Title Property Claims.

Claims ("Title Property Claims") by entities to ownership of precious metal or the proceeds thereof in the possession of the Debtors ("Title Property") asserted pursuant the Uniform Procedures will be treated as follows:

1)      When a Holder of a Title Property Claim has also filed a Proof of Claim against the Debtors' Estates based on the same conduct or transaction(s) underlying their Title Property Claim(s) (a "Non-Title Property Claim"), no distribution will be made on account of such Holder's Non-Title Property Claim(s) until the Title Property Claim is withdrawn, adjudicated by Final Order of the Bankruptcy Court, or resolved by the agreement of the parties and the Non-Title Property Claim becomes an Allowed Claim.

2)      A Holder of a Title Property Claim may waive or withdraw its Title Property Claim(s) at any time prior to the Effective Date of the Plan, in which case it will recover on account of its Allowed Non-Title Property Claim(s), including any Allowed 503(b)(9) Claim or General Unsecured Claim, in the same manner and at the same time as other Holders of similarly-situated Allowed Claims.  If a Holder of a Title Property Claim elects to waive or withdraw its Title Property Claim(s) prior to the Effective Date of the Plan, all litigation with respect to its Title Property Claim (whether under the Uniform Procedures or otherwise) shall be deemed discontinued with prejudice, and the Secured Parties and the Debtors will waive any right they may have to seek to recover litigation expenses incurred by the Debtors and the Secured Parties in connection with such Title Property Claim.

3)      Upon entry of a Final Order determining that a Holder of a Title Property Claim holds title to all or a portion of such Title Property, or the agreement of the parties that a Holder

of a Title Property Claim holds title to all or a portion of such Title Property (in each case, with respect to the portion of the Title Property to which such entity is determined to hold title, an "Allowed Title Property Claim Holder"), the Allowed Title Property Claim Holder shall receive its Title Property from the Ownership Reserve; provided, however, that an appropriate portion of the Title Property will be withheld from such recovery so as to satisfy the Holdback Amount (defined below) until such time as (i) the amounts held in the Ownership Reserve exceed the aggregate face amount of the outstanding Title Property Claims, or (ii) all Title Ownership Claims have been resolved by the parties or adjudicated pursuant to a Final Order.

4)      In the event that, at any time, the Ownership Reserve does not exceed the aggregate face amount of the Allowed Title Property Claims plus the remaining outstanding Title Property Claims, then each Allowed Title Property Claim Holder shall recover only a portion of their Title Property such that a sufficient amount of assets remain in the Ownership Reserve to ensure a *pro rata* distribution to all Holders of outstanding Title Property Claims from the Ownership Reserve assuming that all outstanding Title Property Claims become Allowed Title Property Claims. The portion of any Title Property that is withheld from immediate distribution in accordance with the foregoing is defined as the "Holdback Amount" herein. A portion of the Holdback Amount will be distributed to Allowed Title Property Claim Holders on a periodic basis as Title Property disputes are resolved. Upon the final adjudication of all Title Property Claims, if the Ownership Reserve does not exceed the aggregate face amount of the Allowed Title Property Claims, then each Allowed Title Property Claim Holder shall recover their *pro rata* share of the Ownership Reserve.

5)      The Litigation Trust shall be granted standing to seek to surcharge the Title Property of an Allowed Title Property Claim Holder for the costs incurred by the Debtors' Estates in liquidating such Title Property for the benefit of such Holder (if any).

6)      Upon entry of a Final Order determining that a Holder of a Title Property Claim does not hold title to such Title Property, or if a Holder of a Title Property Claim elects at any time after the Plan Effective Date to waive or withdraw its Title Property Claim, such Holder will recover on account of any Allowed Non-Title Property Claim it may have against the Debtors' Estates in the same manner as other holders of similarly-situated Allowed Claims (retroactive to the Plan Effective Date).

### E.      Treatment of Classified Claims

| Class Description | Proposed Treatment | Projected Recovery |
|---|---|---|
| Class 1: Secured claims other than the Claims of the Secured Parties (a "Miscellaneous Secured Claim") | On or as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such Miscellaneous Secured Claim becomes an allowed Miscellaneous Secured Claim, a holder of an allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such allowed | 100% |

23

| Class Description | Proposed Treatment | Projected Recovery |
|---|---|---|
| | Miscellaneous Secured Claim, (a) cash equal to the value of such Allowed Miscellaneous Secured Claim, (b) a return of the holder's collateral securing the Miscellaneous Secured Claim, (c) such treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered unimpaired or (d) such other treatment as to which such Holder and the Debtors or the Litigation Trust, as applicable, shall have agreed upon in writing.<br><br>Not impaired; non-voting. | |
| Class 2: Priority Non-Tax Claims | On or as soon after the Effective Date as practicable, unless otherwise agreed to by the Debtors and the holder of an Allowed Priority Non-Tax Claim (a "Priority Non-Tax Claim") (in which event such other agreement will govern), each holder of an allowed Priority Non-Tax Claim against the Debtors shall receive on account of and in full and complete settlement, release and discharge of such claim, at the Debtors' or Litigation Trust's election, as applicable, (i) cash in the amount of such Allowed Priority Non-Tax Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such claim unimpaired pursuant to section 1124 of the Bankruptcy Code.<br><br>Not impaired; non-voting. | 100% |
| Class 3: Secured Party Claims | On or as soon after the Effective Date as practicable, the Secured Parties shall receive on account of and in full and complete settlement, release and discharge of, their Allowed Secured Party Claim, their pro rata share of (i) the consideration previously provided under the Settlement Agreement and the Cash Collateral Orders, (ii) funds in | The Debtors are unable to project recoveries to Holders of Class 3 Claims at this time. Recoveries are dependent upon multiple factors, including but not limited to: (i) the outcome of the Uniform Procedures Litigation, (ii) the outcome of the litigation of claims against |

24

| Class Description | Proposed Treatment | Projected Recovery |
|---|---|---|
| | the Ownership Reserve that exceed the aggregate face amount of outstanding Title Property Claims, and (iii) any unused portion of the Priority Reserves.<br><br>After giving effect to the foregoing distributions, any Allowed deficiency claim of the Secured Parties shall be treated as an Allowed General Unsecured Claim<br><br>Impaired; voting. | the Debtors' insiders, auditors, and other third parties, and (iii) the amount of the Secured Parties' deficiency claim. |
| Class 4: General Unsecured Claims | On the Effective Date, each holder of an allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, interests in the Litigation Trust ("Trust Units") commensurate with the dollar value of their Allowed General Unsecured Claims on a 1 Trust Unit per $1,000 in General Unsecured Claim amount. Fractional Trust Units shall not be issued, and allowed General Unsecured Claims will be rounded up or down to the nearest whole Trust Unit.<br><br>Holders of Allowed General Unsecured Claims shall receive their *pro rata* share of Litigation Recoveries available after the payment in full of all Allowed 503(b)(9) Claims, except as provided for in the GUC Sharing Formula.<br><br>Impaired; voting. | The Debtors are unable to project recoveries to Holders of Class 4 Claims at this time. Recoveries are dependent upon multiple factors, including but not limited to: (i) the outcome of the Uniform Procedures Litigation, (ii) the outcome of the litigation of claims against the Debtors' insiders, auditors, and other third parties, and (ii) the amount of the Secured Parties' deficiency claim. |
| Class 5: Convenience Claims (Claims (i) in an amount no greater than $2,500, or (ii) in an amount no greater than $20,000 which has been voluntarily reduced to $2,500 by the holder thereof | Each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim a distribution in cash equal to the lesser of (i) the amount of the Holder's Allowed Convenience Claim or (ii) $2,500,on the Initial Distribution Date for the Litigation Trust.<br><br>Impaired; voting. | $2,500 |

25

| Class Description | Proposed Treatment | Projected Recovery |
|---|---|---|
| pursuant to an election made on such holder's Ballot or any other agreement in writing) | | |
| Class 6: Intercompany Claims | On the Effective Date, all intercompany claims shall be deemed eliminated, cancelled and/or extinguished, except as otherwise provided for in the Plan. | 0% |
| Class 7: Subordinated Claims | On the Effective Date, all Subordinated Claims shall be deemed eliminated, cancelled and/or extinguished and each holder thereof shall not be entitled to, and shall not receive or retain, any property under the Plan on account of such Subordinated Claims. | 0% |
| Class 8: Intercompany Interests and Interests in Miami Metals I, Inc. and Miami Metals II, Inc. | On the Effective Date, all intercompany interests shall be cancelled except as otherwise provided in the Plan.<br><br>On the Effective Date, all interests in Miami Metals I, Inc. and Miami Metals II, Inc. shall be cancelled and each holder thereof shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan on account of such interests. | 0% |

**23.    Classification and Treatment of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan of liquidation must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122, the Plan divides claims and interests into classes and sets forth the treatment for each class (other than Administrative Claims and Priority Tax Claims which, pursuant to Section 1123(a)(1), do not need to be classified).  A plan proponent also is required, under Section 1122 of the Bankruptcy Code, to classify claims against and interests in the debtor into classes that contain claims and interests that are substantially similar to the other claims and interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors may, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, make such reasonable modifications of the classifications under the Plan to

48739617;6

permit confirmation and to use the Plan acceptances received in this Solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of the Debtors' assets to be distributed to holders of Allowed Claims and Interests after payment of Allowed Administrative and Priority Claims that are not classified, and the amount of any Impaired Claim that is classified or the aggregate amount of Impaired Claims in a class that ultimately are allowed by the Bankruptcy Court, may vary from the Plan Fund or allowed amount of such Claim or Claims.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely or favorably affected by the actual amount in which any Claim is ultimately allowed.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized above.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.

## 24.    Reservation of Rights Regarding Claims and Causes of Action.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Litigation Trustee's rights and defenses, both legal and equitable, with respect to any Claims and Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.  The Plan Supplement will include a list of all retained Causes of Action.

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, (i) any and all rights, Claims, demands, causes of action, defenses, and counterclaims accruing to the Debtors or the Estates (including, without limitation, any and all Litigation Claims) shall remain assets of and vest in the Litigation Trust, whether or not litigation relating thereto is pending on the Effective Date and whether or not any such rights, Claims, causes of action, defenses, and counterclaims have been listed in the Schedules or otherwise listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) neither the Debtors nor the Estates nor the Litigation Trustee waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, cause of action, defense, or counterclaim that constitutes property of the Estates, (a) whether or not such right, Claim, cause of action, defense or counterclaim has been listed or referred to in the Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such right, Claim, cause of action, defense, or counterclaim is currently known to the Debtors or Estates or the Litigation Trustee, and (c) whether or not a defendant in any litigation relating to such right, Claim, cause of action, defense, or counterclaim filed a Proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against this Plan, or received or retained any consideration under this Plan.  Without

27

in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, cause of action, defense, or counterclaim, or potential right, Claim, cause of action, defense, or counterclaim in the Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, shall in no manner waive, eliminate, modify, release, or alter the Litigation Trustee's right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, causes of action, defenses, or counterclaims that the Debtors or the Estates or the Litigation Trust have or may have as of the Confirmation Date.  The Litigation Trustee may commence, prosecute, defend against, recover on account of, and settle all rights, Claims, causes of action, defenses, and counterclaims in its sole discretion in accordance with what is in the best interests, and for the benefit, of the Litigation Trust, including through use of Federal Rule of Bankruptcy Procedure 2004.

**25.    Distributions Under the Plan**

The Effective Date is conditioned upon the occurrence of those events set forth in Article 11.2 of the Plan.  The Debtors anticipate that distributions contemplated by the Plan will occur as soon as reasonably practicable after the Effective Date in accordance with the terms of the Litigation Trust Agreement.  Except as set forth in the Plan, the Litigation Trustee shall make all distributions required under the Plan after the Effective Date.

Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and the payee, including by check or wire transfer, or, in the absence of an agreement, such commercially reasonable manner as the Litigation Trustee shall determine in its sole discretion.

**26.    Distributions for Claims Allowed as of the Effective Date**

Distributions to holders of Allowed Claims shall be made by the Litigation Trustee (a) at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors or Litigation Trustee after the date of any related Proof of Claim, or (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtors or the Litigation Trustee have not received a written notice of a change of address.  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Litigation Trustee is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts in respect of undeliverable distributions shall be returned to the Litigation Trustee until such distributions are claimed.  Nothing contained in the Plan shall require the Debtors or the Litigation Trustee to locate any holder of an Allowed Claim.

48739617;6

**27.    Resolution and Treatment of Disputed, Contingent, and Unliquidated Claims and Disputed Interests**

**A.    Objections to Claims.**

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Deadline, which is one (1) year after the Effective Date, unless such date is extended by the Bankruptcy Court upon request by the Debtors or the Litigation Trustee.  If an objection has not been filed relating to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.

**B.    Authority to Prosecute Objections.**

After the Effective Date, the Litigation Trustee will have the authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims.  Except as provided below, from and after the Effective Date, the Litigation Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**C.    Treatment of Disputed Claims.**

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of a Disputed Claim, or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is disputed, until such Claim becomes an Allowed Claim.

**D.    Disputed Claim Reserve.**

Prior to making any distributions to holders of Allowed 503(b)(9) Claims and Allowed Claims in Classes 1-5, the Litigation Trustee shall establish appropriate reserves for Disputed Claims in the Disputed Claim Reserve to withhold from any such distributions 100% of distributions to which holders of Disputed Claims in such Classes would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their Disputed Claim Amount, provided however, that (i) the Litigation Trustee may release funds to the Secured Parties to the extent the amount of the Disputed Claim Reserve exceeds the amount of Disputed Claims, and (ii) the Litigation Trustee may set off against the Dispute Claim Reserve claims of any nature whatsoever that the Litigation Trustee or Debtors may have against the holder of a Disputed Claim.

**E.    Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims.**

The Litigation Trustee will make distributions from the Disputed Claims Reserve (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims, of property that would have been distributed to such Claim holders on the dates distributions previously were made to holders of Allowed Claims had the Disputed Claims that have become Allowed Claims been Allowed on such dates.  Such distributions will be made pursuant to the provisions of the Plan governing the distribution to Allowed Claims or Interests.

48739617;6

28.    **Post-Consummation Operations of the Debtors**

A.    **Continued Corporate Existence.**

Under the Plan, subject to the provisions of Section 8.3 of Plan, the Debtors will be dissolved and cease to exist for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith. As soon as practicable after the Effective Date, the Liquidating Agent shall effectuate dissolution of the United States Debtors in accordance with applicable non-bankruptcy law.  Notwithstanding this provision, nothing herein shall affect the obligation of the Litigation Trustee to pay quarterly fees to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6).

29.    **Summary of Releases and Exculpations Under the Plan**

Under the Plan, the Debtors have agreed to the following releases, exculpations and injunctions:

- **The Plan shall provide certain customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors, the Secured Parties, the Committee, and the members of the Committee, and all of the foregoing parties' respective current officers, directors, members, employees, advisors, attorneys, professionals, and other representatives from any and all claims and causes of action arising after November 2, 2018 relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Settlement Agreement, PSA, Plan, Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, with the sole exception of the fraud, willful misconduct or gross negligence, as determined by a final order of a court of competent jurisdiction.**

- **Under the Plan, all Entities who have held, hold, or may hold Claims, rights, causes of action, liabilities, or any interests based on any act or omission, transaction or other activity of any kind or nature related to RTMM or any officer, director, or employee thereof in their respective capacities as such shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or continuation in any manner of any claim, action, or other proceeding of any kind under any law other than the Bankruptcy Code, including without limitation (i) the Mexican Political Constitution of the United Mexican States, (ii) the Mexican Criminal Code for Mexico City, and (iii) Private Aid Entities for the Federal District Act (collectively, "Mexican Laws") with respect to any Claim, Interest or any other right or claim against RTMM which is possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or other with respect to any Claim, Interest or any other right or claim against RTMM under any law other than the Bankruptcy Code, including without limitation**

30

the Mexican Laws, which such entity possessed or may possess prior to the Effective Date, (c) the creation, perfection or enforcement of any encumbrances of any kind with respect to any Claim, Interest or any other right or claim against RTMM under any law other than the Bankruptcy Code, including without limitation the Mexican Laws, which it possessed or may possess prior to the Effective Date, and (d) the assertion of any Claims under any law other than the Bankruptcy Code, including without limitation the Mexican Laws that are released, exculpated, settled or otherwise discharged hereby.

- Under the Plan, each Creditor and Interest Holder, including such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, shall be deemed to provide a full release to the Secured Parties and their respective predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, financial advisors, attorneys, accountants, consultants, representatives and other professionals (in their respective capacities as such) (the "Secured Party Releasees") and their respective property from any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date, in each case arising from or related in any way to the Debtors, the Chapter 11 Cases, the Debtors' liquidation, any postpetition financing, any sale of the Debtors' interests in property, the Plan or the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, including those that the Debtors would have been legally entitled to assert or that any Holder of a Claim against or Interest in the Debtors or any other entity could have been legally entitled to assert derivatively or on behalf of the Debtors or their estates, other than claims or causes of action arising out of or related to any act or omission of a Secured Party Releasee that constitutes fraud, gross negligence, or willful misconduct.

The Debtors have concluded that the third party releases to be provided to the Secured Party Releasees are justified in light of the substantial contributions that the Secured Parties have made to the administration of the Chapter 11 Cases, to facilitate confirmation of the Plan and to the conclusion of the Chapter 11 Cases. In connection with confirmation of the Plan, the Debtors will have to demonstrate that the releases fall within the standards set by the United States Court of Appeals for the Second Circuit in *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005). Under the *Metromedia* test, third party releases may be approved

31

**when the provisions are important to a debtor's plan; where the claims are "channeled" to a settlement fund, rather than extinguished; where the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; where the released party provides substantial consideration; where the plan otherwise provides for the full payment of the enjoined claims; or where the creditors consent.** *Metromedia*, **416 F.3d at 142.**

### 30.    Directors and Officers of the Reorganized Debtors

On the Effective Date, the Board of Directors shall be disbanded and relieved of any further duties, and the Litigation Trustee shall be appointed and authorized to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 31.    Vesting of Assets of the Debtors Upon Confirmation

All property of the Debtors' Estates, after giving effect to the transactions set forth in the Plan and the dismissal of the cases of Debtor RTMM and Debtor Republic Shanghai, shall revest in the Litigation Trust on the Plan Effective Date in accordance with Section 8.2 of the Plan.

### 32.    Other Matters

#### A.    Treatment of Executory Contracts and Unexpired Leases.

Upon confirmation of the Plan, all Executory Contracts and Unexpired Leases will be deemed rejected, except for (i) those executory contracts and unexpired leases set forth on Schedule 2 that are assumed pursuant to this Plan, (ii( those executory contracts and unexpired leases that are the subject of a motion to assume that is pending on the Confirmation Date, (3) those executory contracts and unexpired leases that are a contract, release, or other agreement or document entered into in connection with the Plan; or (4) those that are an insurance policy. Except with respect to the above-described assumed/assigned agreements, the Plan constitutes a motion of the Debtors to reject all other Executory Contracts and Unexpired Leases and the Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as applicable, as of the Confirmation Date.

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or the Litigation Trust unless a Proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Debtors and the Litigation Trustee, on or before the thirtieth (30th) day after the date such Executory Contract or Unexpired Lease is rejected.

#### B.    Administrative Claims Except 503(b)(9) Claims.

Unless otherwise ordered by the Bankruptcy Court, all requests for payment of an Administrative Claim must be filed with the Bankruptcy Court and served on counsel for the Litigation Trustee no later than thirty (30) days after the Effective Date.  Unless the Litigation

Trustee objects to an Administrative Claim within forty-five (45) Business Days after receipt, such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Litigation Trustee objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim, which is paid or payable by the Debtors or the Litigation Trustee, as the case may be, in the ordinary course of business.

### C.    Professional Fee Claims.

All final requests for compensation or reimbursement of Professional Fees pursuant to sections 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must be filed and served on the Litigation Trustee and his counsel no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.   Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Litigation Trustee and his counsel and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

### D.    Withholding and Reporting Requirements.

Under the Plan, the Litigation Trustee may withhold from the amount distributable from the Debtors at any time to any Person (except with respect to the Internal Revenue Service) such sum or sums as may be sufficient to pay any tax or taxes or other charge or charges that have been or may be imposed on such Person or upon the Debtors with respect to the amount distributable or to be distributed under the income tax laws of the United States or of any state or political subdivision or entity by reason of any distribution provided for in the Plan, whenever such withholding is determined by the Litigation Trustee in its discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement, and the Litigation Trustee, in the exercise of his discretion and judgment, may enter into agreements, on behalf of the Debtors, with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of the Plan.  Further, if any Person fails to respond to a request from the Litigation Trustee for information necessary for the Litigation Trustee to make a distribution to such Person within 90 days of the request, the Litigation Trustee may treat such Person's distribution as undeliverable.  Notwithstanding the foregoing but without prejudice to the Litigation Trustee's rights hereunder, such Person shall have the right with respect to the United States, or any state, or any political subdivision of either, to contest the imposition of any tax or other charge by reason of any distribution hereunder.

### E.    Setoffs.

The Litigation Trustee may, but shall not be required to, set off against any Claim not deemed an Allowed Claim under the Plan, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Litigation Trustee or Debtors may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim not deemed an Allowed Claim hereunder

shall constitute a waiver or release by the Litigation Trustee or the Debtors of any such claim that the Litigation Trustee or the Debtors may have against such holder.

### F.    Dismissal of Bankruptcy Cases of RTMM and Republic Shanghai.

Pursuant to any Final Order confirming the Plan, the Chapter 11 Cases of Debtors RTMM and Republic Shanghai shall be dismissed one (1) business day after the Effective Date, and the equity interests in those entities shall be deemed abandoned.

RTMM's only remaining assets are approximately $70,000 of equipment which RTMM intends to sell to a third party buyer.  The Debtors submit that it is in the best interests of creditors of RTMM and creditors of the remaining Debtors (not including Republic Shanghai) that RTMM's Chapter 11 Case be dismissed and the equity interests abandoned.

Republic Shanghai served as a broker to Miami Metals II for purposes of finding refinery chemicals at discounted prices.  It does not own any assets, nor does it have any affairs or operations which would require winding down, such that it is appropriate to abandon any equity interest in Republic Shanghai.

## 33.    Confirmation and/or Consummation.

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### A.    Requirements for Confirmation of the Plan.

The Bankruptcy Court will determine at the hearing on confirmation of the Plan (the "Confirmation Hearing") whether the following requirements for confirmation, set forth in Section 1129 of the Bankruptcy Code, have been satisfied, with respect to the Plan:

a)    The Plan complies with the applicable provisions of the Bankruptcy Code.

b)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

c)    The Plan has been proposed in good faith and not by any means forbidden by law.

d)    Any payment made or promised by the Debtors under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

e)    The Debtors have disclosed (i) the identity and affiliations of (x) any individual proposed to serve, after confirmation of the Plan, as a director, officer, or Litigation Trustee of the Debtors, (y) any affiliate of the Debtors participating in a

34

joint plan with the Debtors, or (z) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Creditors and Interest holders and with public policy), and (ii) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

f)    With respect to each Class of Claims or Interests, each Impaired Creditor and Impaired Interest holder either has accepted the Plan or will receive or retain under the Plan on account of the Claims or Interests held by such Impaired Creditor or Impaired Interest holder, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.

g)    The Plan provides that Administrative Claims and Priority Tax Claims will be paid in full on the Effective Date, except to the extent that the holder of any such Claim has agreed to a different treatment.

h)    Holders of 503(b)(9) Claims have not objected to treatment of their Claims under the Plan, or such objections have been overruled, or otherwise resolved.

i)    If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

j)    The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to Section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

As set forth in this Disclosure Statement, the Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of Chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith. There can be no assurance that the Bankruptcy Court will agree with the Debtors.

**B.    Condition to Confirmation.**

The entry of a Final Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

**C.    Conditions to Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing in accordance with Article 11 of the Plan:

48739617;6

a)    The Confirmation Order shall have been entered and become a Final Order, in form and substance reasonably satisfactory to the Debtors, the Secured Parties, and the Committee;

b)    all Plan Exhibits shall be in form and substance reasonably acceptable to the Debtors, the Secured Parties, and the Committee, and shall have been executed and delivered by all parties' signatory thereto;

c)    the Debtors or the Litigation Trustee, as the case may be, shall be authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, leases, and the agreements or documents created in connection with the Plan; and

d)    all actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

## 34.    Effects of Confirmation

With respect to the Plan that is ultimately confirmed by the Bankruptcy Court, the following effects will take place:

### A.    Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Litigation Trustee, the Secured Parties, and all other parties-in-interest in these Chapter 11 Cases.

### B.    Permanent Injunction.

Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold or may hold Claims against or Interests in the Debtors are permanently enjoined from taking any of the following actions against the Estates, or any of their property on account of any such Claims or Interests:  (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

By voting in favor of, or accepting distributions pursuant to, the Plan, each holder of a Claim or Interest will be deemed to have specifically consented to the injunctions set forth in Section 11.4 of the Plan.

48739617;6

## VI.    CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against or Interest in any of the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### 35.    General Considerations

The Plan sets forth the means for satisfying the Claims and Interests against the Debtors. Certain Claims and Interests may receive no distributions pursuant to the Plan.  The Secured Parties are waiving their Adequate Protection Liens and Adequate Protection Superpriority Claims (as such terms are defined in the Cash Collateral Order) under the proposed Plan, which avoids the potentially adverse impact of a liquidation.

### 36.    Certain Bankruptcy Considerations – Failure to Confirm or Consummate the Plan

The Plan provides for certain conditions that must be fulfilled prior to confirmation of the Plan and the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to consummation, if any, will be satisfied.  Accordingly, even if the Bankruptcy Court confirms the Plan, there can be no assurance that the Plan will be consummated and the restructuring completed.  If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of the Debtors' Estates would be substantially eroded to the detriment of all stakeholders.

## VII.    CERTAIN MATERIAL UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States ("U.S." or "United States") federal income tax consequences of the implementation of the Plan to the Debtors, and the U.S. federal income tax consequences to certain holders of Claims or Interests entitled to vote on the Plan. It does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the IRC, persons liable for alternative

48739617;6

minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold any consideration received pursuant to the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the IRC). This summary also assumes that Claims will be treated in accordance with their form for U.S. federal income tax purposes. Additionally, this discussion does not address the "Medicare" tax on net investment income or the Foreign Account Tax Compliance Act.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). No disclosure is provided with respect to Non-U.S. Holders.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

### A.    Consequences to the Debtors.

Generally, the discharge of a debt obligation owed by a debtor for an amount less than the "adjusted issue price" (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income to the debtor under Section 61 of the IRC subject to certain rules and exceptions. However, when the discharge of indebtedness occurs pursuant to a plan confirmed by the Bankruptcy Court in a case under Title 11 of the Bankruptcy Code (e.g., a chapter 11 case), there is a special rule under Section 108 of the IRC which specifically excludes from the debtor's income the amount of such discharged indebtedness (the so-called "bankruptcy exception"). Instead, subject to certain exceptions and special rules, certain of the debtor's tax attributes otherwise available generally must be reduced by the amount of the COD income that is excluded from the debtor's income. It is not certain whether the Debtors will have COD income under the Plan although any such COD income should be excluded from the Debtor's income under the "bankruptcy exception" referenced above assuming that the Plan is confirmed with respect to the Debtors. The transfer of assets to the Litigation Trust by the Debtors may result in the recognition of gain or income by the Debtors, depending in part on the value of such assets and the Debtors' tax basis in those assets. Provided that each Debtor is treated as an S corporation or a disregarded entity for U.S. federal income tax purposes, any gain or income should not be taxable to the Debtors but rather pass through and be taxable to its owner.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote.**

In general, the Debtors expect that all holders of Claims will be treated as receiving their distribution under the Plan in a taxable exchange under Section 1001 of the IRC. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount ("OID")), a U.S. Holder of such a claim would recognize gain or loss equal to the difference between (a) the sum of the cash and the fair market value (or issue price, in the case of debt instruments) of the consideration received and (b) such U.S. Holder's adjusted basis in such Claim. Such U.S. Holder should obtain a tax basis in the non-cash consideration received, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), equal to the fair market value of the non-cash consideration as of the receipt of such property. The tax basis of any non-cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).

To the extent that a U.S. Holder receives distributions with respect to a Claim subsequent to the Plan Effective Date, such U.S. Holder may recognize additional gain (if such U.S. Holder is in a gain position), and a portion of such distribution may be treated as imputed interest income. In addition, it is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of any such account. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such U.S. Holders in respect of their Claims due to the receipt of property in a taxable year subsequent to the taxable year in which the Plan Effective Date occurs. The discussion herein assumes that the installment method does not apply.

The Plan provides that, among other things, that certain assets will be transferred by the Debtors to a Litigation Trust in order to facilitate the resolution of claims against the Debtors and the disposition of the proceeds thereof to holders of Claims. Such assets may either be subject to "liquidating trust" treatment or "disputed ownership fund" treatment, as described below.

### C.    Liquidating Trust Treatment of the Litigation Trust.

While the following discussion assumes that the Litigation Trust would be treated as a "liquidating trust" and "grantor trust" for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Litigation Trust and the holders of Claims could vary from those discussed herein.

Other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, the Litigation Trust may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the IRC. In such case, any beneficiaries of the Litigation Trust would be treated as grantors and deemed owners thereof and, for all United States federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of such Litigation Trust in a taxable exchange of their Claims and then contributed such undivided interest in such assets to the Litigation Trust. If this treatment applies, the person or persons responsible for administering the Litigation Trust shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of the Litigation Trust pursuant to the Plan and not unduly prolong its duration. The Litigation Trust would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the governing documents for the Litigation Trust. Other than with respect to any assets of the Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable holders of Claims as a result of the transfer of such assets to the Litigation Trust should generally be a taxable exchange of their Claims consistent with the treatment described above with respect to the receipt of the applicable assets directly.

Other than with respect to any assets of the Litigation Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on the Litigation Trust with respect to earnings generated by the assets held by it. Rather, each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Litigation Trust, even if no distributions are made. Allocations of taxable income with respect to the Litigation Trust shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, the trust had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from such Litigation Trust. Similarly, taxable losses of such Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets. The tax book value of

40

the assets for this purpose shall equal their respective fair market values on the Plan Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles prescribed by the applicable provisions of the IRC, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any holder of a beneficial interest in the Litigation Trust, and the ability of such holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in the Litigation Trust and not as income or loss with respect to such beneficiary's applicable Claim. In the event any tax is imposed on the Litigation Trust, the person or persons responsible for administering the Litigation Trust shall be responsible for payment, solely out of the assets of the Litigation Trust.

The person or persons responsible for administering the Litigation Trust shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. The person or persons responsible for administering the Litigation Trust will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that the Litigation Trust is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations, assuming the Litigation Trust qualifies for such treatment. As soon as reasonably practicable after the close of each calendar year, the person or persons responsible for administering the Litigation Trust will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

## D.    Disputed Ownership Fund Treatment.

With respect to any of the assets that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied, the Debtors intend that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Plan Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

48739617;6

E.      **Information Reporting and Backup Withholding.**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will also comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan, as well as future payments made with respect to consideration received under the Plan. The Debtors do not expect distributions or payments to U.S. Holders of Claims under the Plan to be subject to material withholding under the IRC.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules generally may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**EACH HOLDER IS URGED TO SEEK ADVICE FROM HIS, HER OR ITS OWN TAX ADVISOR WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND, IF APPLICABLE, STATE AND LOCAL TAX CONSEQUENCES.**

## VIII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

**37.      Feasibility**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  Because the Plan provides for the orderly liquidation of all of the assets of the Debtors and their Estates, the Debtors believe that the Plan satisfies this requirement to the extent it is applicable.

**38.      Best Interests Test/Liquidation Analysis**

With respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims and Interests of each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets, reduced by the amount of the costs and expense of the liquidation.

The Debtors believe that if the Chapter 11 Cases were to be converted to cases under chapter 7, the return to Creditors would be materially less than the Distributions contemplated pursuant to the Plan.  Conversion of these Cases to chapter 7 would be seriously disruptive to the Ownership Dispute litigation.   The Debtors' professionals, the Secured Parties, and the Committee have incurred significant time and expense in understanding the business and affairs of the Debtors and gathering and processing vast amounts documents and information related to the Ownership Disputes.  Conversion would risk a massive loss of information, institutional knowledge, dollars, and time as a chapter 7 trustee and its counsel attempted to understand and synthesize the information it has taken the Debtors' and Secured Parties' professionals nearly a year to compile.

Significantly, if these Chapter 11 Cases are converted to chapter 7, the $2 million 503(b)(9) Fund will no longer be available for payment of 503(b)(9) Claims.  Further, the Secured Parties will not waive their Adequate Protection Liens and Adequate Protection Superpriority Claims, which **THE SECURED PARTIES ASSERT** total approximately $23,950,000.  The losses to the Estates because of conversion to chapter 7 would be financially devastating to unsecured creditors.

Moreover, reduction in value in a liquidation would be caused by the interruption and delay in the wind-down of the Debtors that would be occasioned by the likely conversion of the cases to chapter 7 and by the increased administrative costs that would be incurred by a chapter 7 trustee and the trustee's professionals.  The Debtors believe that the Plan will provide a greater and more expedited return to holders of Allowed Claims and Interests than would a chapter 7 liquidation.   The recovery by Creditors would be decreased at least by the amount of commissions to be paid to a chapter 7 trustee.

Finally, absent the Plan**,** and in the event of a liquidation under chapter 7 of the Bankruptcy Code, Distributions to Creditors would be substantially delayed and assets would be consumed to pay the additional fees and expenses of a chapter 7 trustee and its professionals, which costs would not be incurred in the event of confirmation of the Plan.

## IX.   ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtors' chapter 11 bankruptcy cases, (b) the Debtors' chapter 11 bankruptcy cases could be converted to cases under chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of liquidation proposed by another party.

### 39.   Dismissal

If the Debtors' bankruptcy cases were dismissed, the Debtors would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.  The Debtors believe that dismissal would not serve the interests of the creditors as the orderly liquidation proposed under the Plan will result in a greater return to creditors than a liquidation outside of bankruptcy.

48739617;6

40.    **Chapter 7 Liquidation**

As set forth above, and as bears repeating, if these Cases are converted to chapter 7, the loss to the Estates will total at least $25,950,000, if not significantly more. The $2 million 503(b)(9) Fund will no longer be available for payment of 503(b)(9) Claims. Further, the Secured Parties will not waive their Adequate Protection Liens and Adequate Protection Superpriority Claims, which **THE SECURED PARTIES ASSERT** total approximately $23,950,000. The losses to the Estates as a result of conversion to chapter 7 would be financially devastating to unsecured creditors.

If the Plan is not confirmed, it is possible that the Debtors' Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under chapter 7 or chapter 11, secured creditors, Administrative Claims and Priority Claims are entitled to be paid in cash and in full before unsecured creditors receive any funds.

In a liquidation under chapter 7, the 503(b)(9) Fund would no longer be available to pay 503(b)(9) Claims upon conversion, and Administrative Claims, including 503(b)(9) Claims will have a priority lower than priority claims generated by the chapter 7 case, such as the chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to Claim and Interest holders than those provided for in the Plan. Conversion to chapter 7 would give rise to (a) additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee; and (b) additional expenses and Claims, some of which would be entitled to priority that would be generated during the liquidation. In a chapter 7 liquidation, it is likely that General Unsecured Creditors receive a diminished recovery (if any) on their claims or interests because, among other things, the Secured Parties will not waive their Adequate Protection Liens and Adequate Protection Superpriority Claims and will not contribute the 503(b)(9) Fund.

41.    **Alternative Plan**

The Debtors have filed the Plan within the "exclusive period." Accordingly, no alternative plan has been proposed, and if one were, it would more than likely be substantially similar to the Debtors' Plan in that it would propose a liquidation of the Debtors and the distribution of available Cash and Trust Units to Creditors and Interest holders. In comparison to the Debtors' Plan, an alternative plan would not likely provide any greater return to creditors and any return could even be less due to the additional time and expense necessary to obtain approval of any alternative plan.

## X.    THE SOLICITATION; VOTING PROCEDURE

42.    **Parties in Interest Entitled to Vote**

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and

44

contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### 43.    Classes Impaired under the Plan

By operation of law, each Unimpaired Class of Claims (in these cases, Classes 1 and 2) is deemed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject that Plan. Classes 3, 4, and 5 are Impaired and are therefore entitled to vote to accept or reject the Plan by operation of law. Classes 7 and 8 are not entitled to vote on the Plan because Equity Interests are being cancelled and there will be no distribution to holders of Equity Interests. Because Classes 3, 4, and 5 are entitled to vote to accept or reject the Plan, votes of the holders of Classes 3, 4, and 5 will be solicited. Votes of holders of Classes 7 and 8 will not be solicited because there will be no distribution to holders of such Interests and Claims, and Classes 7 and 8 are deemed to have rejected the Plan.

### 44.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors, in their sole discretion, which determination will be final and binding. As indicated below under **"Withdrawal of Ballots; Revocation,"** effective withdrawals of Ballots must be delivered to the Debtors prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to seek to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or

48739617;6

waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### 45.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Debtors at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Debtors in a timely manner at the address set forth below. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner by the Debtors will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Debtors prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Debtors prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the Requisite Acceptances have been received.

### 46.    Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of materials you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact counsel for the Debtors:

Donlin, Recano & Company, Inc.
Re: Miami Metals I, Inc., et al.
Attn: Voting Department
P.O. Box 199043
Blythebourne Station
Brooklyn, NY 11219
Email: drcvote@donlinrecano.com
Phone: 212.771.1128

### 47.    Plan Supplement

Forms of the Plan Supplement Documents (which may be in substantially final form), including the Litigation Trust Agreement, the identity of the members of the Trust Oversight Committee, Schedule of Retained Causes of Action, and such other documents as the Debtors

46

determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement which will be filed with the Clerk of the Court no later than fourteen (14) calendar days prior to the Confirmation Hearing.

**48.**    **Internet Access to Bankruptcy Court Documents**

Bankruptcy Court documents filed in these Chapter 11 Cases as well as the Bankruptcy Court's calendar and other administrative matters may be found, downloaded and printed from the Bankruptcy Court's website found at http://www.nysb.uscourts.gov or Donlin Recano & Company's website for these Chapter 11 Cases found at https://www.donlinrecano.com/Clients/rmetals/Dockets.

48739617;6

## XI.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Class 3 Claims, Class 4 Claims, and Class 5 Claims to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED by the Debtors on or before **October 4, 2019, at 5:00 p.m.** prevailing Eastern Time on the Voting Deadline.

Dated as of this 1st day of August, 2019.

MIAMI METALS I, INC.

By: */s/ Scott Avila*
     Scott Avila, Chief Restructuring Officer

MIAMI METALS II, INC.

By: */s/ Scott Avila*
     Scott Avila, Chief Restructuring Officer

MIAMI METALS III LLC

By: */s/ Scott Avila*
     Scott Avila, Chief Restructuring Officer

**SIGNATURES CONTINUE ON THE FOLLOWING PAGES**

48739617;6

MIAMI METALS IV LLC

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer


MIAMI METALS V LLC

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer


MIAMI METALS VI LLC

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer


MIAMI METALS VII LLC

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer


MIAMI METALS VIII LLC

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer


REPUBLIC TRANS MEXICO METALS, S.R.L.

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer


REPUBLIC METALS TRADING (SHANGHAI) CO., LTD.

By: _/s/ Scott Avila_____
   Scott Avila, Chief Restructuring Officer

48739617;6