# Exhibit A

# In Re:

*MIAMI METALS I, INC., et al.*
*Case No. 18-13359-shl*

---

*June 13, 2019*

---

*eScribers, LLC*
*(973) 406-2250*
*operations@escribers.net*
*www.escribers.net*

*To purchase copies of this transcript, please contact us by phone or email*

Min-U-Script® with Word Index

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  MIAMI METALS I, INC., et al.,          Main Case No.

8          Debtors.                       18-13359-shl

9

10  - - - - - - - - - - - - - - - - - - - -x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, New York

15

16              June 13, 2019

17              10:52 AM

18

19

20

21  B E F O R E:

22  HON. SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2  Omnibus hearing.

3  Case-status update.

4  Uniform-procedures order - discovery update.

5

6  Doc. #1126 (Telephone conference) Letter filed by Counsel to

7  the Rubin parties, regarding protective-order dispute.

8

9  Doc. #1111 Third motion to extend time within which the debtors

10  must assume or reject unexpired leases of nonresidential real

11  property.

12

13  Doc. #946 Omnibus motion to reject lease or executory contract

14  effective May 31, 2019.

15

16  Doc. #1041 Motion for protective order by Debtors to govern

17  production of certain confidential documents.

18

19  Doc. #899 Motion to allow and direct payment of administrative-

20  expense claim re: Pyropure, Inc. d/b/a Pyromet.

21

22  Doc. #1120 First motion for omnibus objection to claims

23  asserted pursuant to 11 U.S.C. Section 503(b)(9) [inconsistent

24  with Debtors' books and records

25

1

2   Doc. #1121 Motion to approve and authorize Debtors to enter

3   into and perform under plan-support agreement.

4

5   Doc. #1122 Motion to approve compromise / Joint motion of

6   Debtors, official committee of unsecured creditors, and secured

7   lenders for entry of an order approving settlement agreement

8   pursuant to Bankruptcy Rule 9019.

9

10   Doc. #1106 Third omnibus motion to reject lease or executory

11   contract by Debtors pursuant to 11 U.S.C. Sections 105(a) and

12   365(a) and Fed. R. Bankr. P. 6006, for entry of an order

13   authorizing rejection of certain unexpired leases effective

14   June 29, 2019.

15

16   Doc. #10 (Final) Motion to approve use of cash collateral, (ii)

17   granting adequate protection to the secured parties, and (iii)

18   scheduling a final hearing.

19

20   Transcribed by:  Clara Rubin

21   eScribers, LLC

22   352 Seventh Avenue, Suite #604

23   New York, NY 10001

24   (973)406-2250

25   operations@escribers.net

1

2   A P P E A R A N C E S:

3   AKERMAN LLP

4          Attorneys for Debtors

5          2001 Ross Avenue

6          Suite 3600

7          Dallas, TX 75201

8

9   BY:   JOHN E. MITCHELL, ESQ.

10

11

12   AKERMAN LLP

13          Attorneys for Debtors

14          98 Southeast Seventh Street

15          Suite 1100

16          Miami, FL 33131

17

18   BY:   ANDREA S. HARTLEY, ESQ.

19

20

21

22

23

24

25

1

2   AKERMAN LLP

3        Attorneys for Debtors

4        50 North Laura Street

5        Suite 3100

6        Jacksonville, FL 32202

7

8   BY:   MARY KATHERINE (KATIE) FACKLER, ESQ.

9

10

11  ARNOLD & PORTER KAYE SCHOLER LLP

12        Attorneys for Tiffany & Co.

13        250 West 55th Street

14        New York, NY 10019

15

16  BY:   BENJAMIN MINTZ, ESQ.

17

18

19  BAST AMRON LLP

20        Attorneys for Rubin Family and Rubin-Related Entities

21        One Southeast Third Street

22        Suite 1400

23        Miami, FL 33131

24

25  BY:   ZAKARIJ N. LAUX, ESQ.

1

2   BORGES & ASSOCIATES LLC

3        Attorneys for SCMI US Inc.

4        575 Underhill Boulevard

5        Suite 118

6        Syosset, NY 11791

7

8   BY:   WANDA BORGES, ESQ.

9

10

11   COOLEY LLP

12        Attorneys for Official Committee of Unsecured Creditors

13        1114 Avenue of the Americas

14        New York, NY 10036

15

16   BY:   SETH VAN AALTEN, ESQ.

17

18

19   COOLEY LLP

20        Attorneys for Official Committee of Unsecured Creditors

21        55 Hudson Yards

22        New York, NY 10001

23

24   BY:   ADRIANA LOFARO WIRTZ, ESQ.

25

1

2   DORSEY & WHITNEY LLP

3        Attorneys for Premier Gold Mines Limited

4        51 West 52nd Street

5        New York, NY 10019

6

7   BY:   JESSICA D. MIKHAILEVICH, ESQ.

8

9

10  FOLEY HOAG LLP

11       Attorneys for Alamos Gold Inc. and Its Subsidiaries

12       1301 Avenue of the Americas

13       New York, NY 10019

14

15  BY:   ALISON D. BAUER, ESQ.

16

17

18  FRIEDMAN KAPLAN SEILER & ADELMAN LLP

19       Attorneys for Pretium Exploration Inc.

20       7 Times Square

21       New York, NY 10036

22

23  BY:   JAMUNA D. KELLEY, ESQ. (TELEPHONICALLY)

24       JASON C. RUBINSTEIN, ESQ. (TELEPHONICALLY)

25

1

2   GARFUNKEL WILD, P.C.

3        Attorneys for Brink's Global Services USA, Inc.

4        111 Great Neck Road

5        Great Neck, NY 11021

6

7   BY:   BURTON S. WESTON, ESQ.

8

9

10  GIBSON, DUNN & CRUTCHER LLP

11       Attorneys for Coeur Mining, Inc.; Coeur Mexicana A.A.

12        de.C.V., Coeur Rochester, Inc., and Wharf Resources

13        (USA)

14       200 Park Avenue

15       New York, NY 10166

16

17  BY:   KEITH R. MARTORANA, ESQ.

18       JENNIFER L. CONN, ESQ.

19

20

21

22

23

24

25

1

2   GREEN & SKLARZ LLC

3          Attorneys for PPS, Inc. d/b/a Braswell & Sons, Deb

4           Schott, Inc., and FCP Diamonds, LLC

5          700 State Street

6          Suite 100

7          New Haven, CT 06511

8

9   BY:   ROBERT M. FLEISCHER, ESQ.

10

11

12   LUSKIN, STERN & EISLER LLP

13          Attorneys for Senior Lenders

14          Eleven Times Square

15          New York, NY 10036

16

17   BY:   MICHAEL LUSKIN, ESQ.

18          ALEX TALESNICK, ESQ.

19

20

21

22

23

24

25

1

2   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

3           Attorneys for Midwest Refineries

4           225 Liberty Street

5           36th Floor

6           New York, NY 10281

7

8   BY:   NICOLE A. LEONARD, ESQ.

9

10

11   SELENDY & GAY PLLC

12           Attorneys for Yamana Gold Inc.

13           1290 Avenue of the Americas

14           New York, New York 10104

15

16   BY:   DANIEL J. METZGER, ESQ.

17

18

19

20

21

22

23

24

25

1

2   SHUMAKER, LOOP & KENDRICK, LLP

3        Attorneys for Erie Management Partners, Mitch Levine, et

4         al.

5        101 East Kennedy Boulevard

6        Suite 2800

7        Tampa, FL 33602

8

9   BY:   STEVEN M. BERMAN, ESQ. (TELEPHONICALLY)

10

11

12  STAHL COWEN

13        Attorneys for Design Gold Group, Inc.

14        55 West Monroe Street

15        Suite 1200

16        Chicago, IL 60603

17

18  BY:   BRUCE C. DOPKE, ESQ. (TELEPHONICALLY)

19

20

21  ALSO PRESENT:

22        SCOTT AVILA, Chief Restructuring Officer

23        DAVID GREENBLATT, CBIZ, Financial Advisor to Committee

24

25

1              P R O C E E D I N G S

2              THE COURT:  So, Miami Metals.  Folks, come on up.

3              And again, consistent with past procedures, I'm happy

4    to get appearances from any microphone that's available and

5    hear from anybody from any microphone that is available.

6              MR. MITCHELL:  Did you want us to go ahead and start,

7    as we're getting set up --

8              THE COURT:  Yeah.  Please.

9              MR. MITCHELL:  -- make appearances?  Thank you, Your

10   Honor.  Your Honor, good morning.  John Mitchell, Andrea

11   Hartley, and Katie Fackler, for the debtors.  Also here today

12   is Mr. Scott Avila, the chief restructuring officer for the

13   debtors.

14             MR. LAUX:  Good morning, Your Honor.  Seth Van Aalten

15   from Cooley, counsel to the creditors' committee.  With me

16   today, my partner Adriana Wirtz Lofaro (sic), and Robin Lee.

17             MR. LUSKIN:  Good morning, Your Honor.  Michael Luskin

18   and Alex Talesnick, Luskin, Stern & Eisler, for the lenders.

19             THE COURT:  All right.  Good morning.

20             MR. LAUX:  Good morning, Judge.  Zakarij Laux with

21   Bast Amron, on behalf of the Rubin family and Rubin-related

22   entities.

23             MR. MINTZ:  Good morning, Your Honor.  Benjamin Mintz,

24   Arnold & Porter, counsel for Tiffany & Company.

25             MR. WESTON:  Good morning, Your Honor.  Burton Weston,

1   Garfunkel Wild, P.C., on behalf of the -- Brinks Global

2   Services USA, Inc.

3        MS. LEONARD:  Good morning, Your Honor.  Nicole

4   Leonard of McElroy, Deutsch, Mulvaney & Carpenter, on behalf of

5   Midwest Refineries.

6        MS. BAUER:  Good morning, Your Honor.  Alison Bauer

7   from Foley Hoag, on behalf of Alamos Gold and its subsidiaries.

8        MR. FLEISCHER:  Good morning, Your Honor.  Robert

9   Fleischer on behalf of PPS, Inc., Deb Schott, Inc., and FCP

10   Diamonds.

11        MR. MARTORANA:  Good morning, Your Honor.  Keith

12   Martorana and my colleague, Jennifer Conn, on behalf of Gibson,

13   Dunn & Crutcher, on behalf of Core Mining, Inc. and its

14   affiliates.

15        MS. MIKHAILEVICH:  Good morning, Your Honor.  Jessica

16   Mikhailevich, Dorsey & Whitney LLP, on behalf of Premier Gold

17   Mines Limited.

18        MR. METZGER:  Good morning, Your Honor.  Daniel

19   Metzger of Selendy Gay, on behalf of Yamana Inc.

20        MS. BORGES:  Good morning, Your Honor.  Wanda Borges,

21   Borges & Associates LLC, on behalf of SCMI US Inc.

22        THE COURT:  All right.  Good morning to you all.  So,

23   whenever I see two binders sitting for a case in chambers, I

24   always fervently hope that it's one binder with two copies.

25   Sometimes it doesn't turn out to be the case.  So that just

1   tells me that we have a few things to get through this morning.

2          With that, take it away and we'll see where we end up.

3          MR. MITCHELL:  Thank you, Your Honor.  Again, John

4   Mitchell for the debtors.  Good morning.

5          Your Honor, we did file an agenda at docket 1187.  I

6   don't know if the Court has a copy of that.

7          THE COURT:  I do have that.

8          MR. MITCHELL:  Okay.

9          THE COURT:  1187.  Correct.

10          MR. MITCHELL:  Thank you, Your Honor.  And we'll kind

11   of go through -- there's one thing I may ask to take out of

12   order -- or actually a couple of them.  I'll kind of start with

13   that.  What we'd like to do is have a little status conference,

14   although with respect to case-status update -- that's number 1,

15   A.1. -- case status is we're here on plan-support agreement,

16   settlement, and final cash-collateral order.  And so I really

17   think that's going to be our case status, Your Honor.

18          THE COURT: Right.

19          MR. MITCHELL:  So we may just defer an overall case

20   status to that.

21          THE COURT:  So let me ask -- I don't know if there're

22   any matters that are much more limited where folks might be

23   there just for those matters.  And if so, it would seem to me,

24   in the interest of compassion, we could address those first.

25   But it may be that all those folks are going to stick around

1    anyway.  But you tell me.

2         MR. MITCHELL:  Right.  I think that would be -- that

3    would be -- if we could do that, that would be great, Your

4    Honor, with the exception of number 3 on the status conference:

5    dispute-related proposed order on Rubins' motion for protective

6    order.  That's a discovery dispute.  We certainly are prepared

7    to take it up today; we would just ask to move that to the end

8    of the agenda.  It's very important for us -- I think

9    everything else is fairly uncontested, and we should be able to

10   get through it real quick.  But we propose the uncontested

11   matters, turn to the plan-support agreement, and then address

12   the issue on proposed order for the Rubins' motion, only

13   because I think it's -- that most of the people are sticking

14   around for the plan-support agreement, would be my presumption,

15   and we can move that to the end.  If we don't get to that

16   today, it's maybe something we could take up after you get

17   back, on a telephone conference.

18        THE COURT:  All right.  Well, any views -- I don't

19   want -- I don't want to spend more time talking about when

20   we're going to talk about it, than we're actually going to

21   spend talking about it.  But I also don't want you to sit

22   through a hearing and then realize that the debtors are going

23   to say, we should do it some other time.  That would cruel and

24   unusual.  So what -- you have any views?

25        MR. LAUX:  Thank you, Judge.  I don't believe, other

1    than that, that the Rubins have any interests in anything else

2    here today.  I am here in person.  I don't believe it should

3    take more than five minutes.

4              THE COURT:  All right.  So let's do that right now.

5    So why don't you stay at the podium and we'll just --

6              MR. MITCHELL:  That's fine, Your Honor.  I actually

7    think it's probably more the Rubins' motion to bring forward;

8    it's their motion for protective order, and dispute over the

9    form of order.  So if --

10             THE COURT:  All right.

11             MR. MITCHELL:  I'll actually, if it's all right, turn

12   it over --

13             THE COURT:  That's fine.

14             MR. MITCHELL:  -- to Rubins' counsel.  Thank you.

15             MR. LAUX:  Good morning again, Judge.  Just very

16   briefly.  It's not so much a dispute over the proposed order as

17   it is bringing to the Court's attention an issue that came to

18   light after the motion for protection was heard in May while we

19   were negotiating the order.  If the Court may recall, the Court

20   granted the Rubins' counsel an opportunity to review select

21   documents, debtor documents, that they believed were

22   nonresponsive or without the scope of Rule 2004 and therefore

23   should not be produced to both the committee and the customers,

24   in response to document requests and a 2004 subpoena.

25             We completed our review by the Court's deadline -- in

1   fact, in advance of the Court's May 28th deadline -- to review

2   approximately 90,000 documents.  And we also provided to

3   Debtors' counsel the proposed log of what we are terming

4   "proposed nonresponsive documents".  And those are documents

5   that contain the Rubins' or their related entities' personal

6   financial information and we don't believe are within the scope

7   of 2004 and shouldn't be wholesale-produced to parties, which

8   is what the debtor was proposing.

9           While we were negotiating the terms of this order, we

10  learned for the first time that the vast majority, if not all,

11  of the documents we were reviewing had already been produced to

12  the committee, as a part of the debtors' prior rolling

13  productions, meaning the work that we put in was largely futile

14  as it related to the committee.  It was time well spent as far

15  as not getting these types of documents to the customers, but

16  the committee already had them all.

17          THE COURT:  All right.

18          MR. LAUX:  So what we're seeking now is simply in

19  addition to the order that provides that any documents

20  identified by the Rubins' counsel as nonresponsive be clawed

21  back from the committee until such time that this Court rules

22  that they in fact are responsive or within the scope of the

23  committee's 2004 investigation, at which point they can be

24  reproduced to the committee.  Because the Court reserved ruling

25  on whether these particular documents were actually responsive,

1  it just gave us an opportunity to review them and advise the

2  debtors which one (sic) we thought were not responsive.

3           THE COURT:  All right.  So let me hear from the

4  committee.

5           MS. WIRTZ:  Thank you, Your Honor.  Adriana Wirtz for

6  the committee.

7           Your Honor, this all started because the debtors had a

8  concern that certain of the documents that they would be

9  producing to the committee may have been privileged under a

10  Florida accountant-privilege statute, and that's why they went

11  to the Rubins' counsel to inform them.  The Florida accountant-

12  privilege statute doesn't apply in a Rule 2004 examination.

13  And the Rubins aren't even claiming privilege here; what

14  they're claiming is that some of these documents may have their

15  personal financial information.

16           THE COURT:  Right.

17           MS. WIRTZ:  These documents belong to the debtors;

18  they were produced to the committee --

19           THE COURT:  No, I know.  We --

20           MS. WIRTZ:  -- months ago --

21           THE COURT:  And we went through this already,

22  though --

23           MS. WIRTZ:  -- and --

24           THE COURT:  -- and so I'm not going to relitigate

25  that, because I think the idea was I was going to give them a

1  chance to look at it and then, rather than talk about these

2  issues theoretically, that we would then actually have -- if we

3  need to have a relevancy discussion, somebody could say, here's

4  the document, and everybody could fight about it.

5       So what I think would make sense is for those

6  documents to be segregated, and direction that nobody look at

7  them, to the extent they haven't looked at them.  And so --

8       MS. WIRTZ:  We don't know what the documents are, yet.

9       THE COURT:  No, I think the idea is that they just

10  want the right to object.  And I thought we had sort of

11  addressed this -- and I'm looking at my notes from May 15th --

12  and that they had an ability to identify -- to review documents

13  on a tight timetable and identify anything they believe should

14  not be produced, and that folks would then communicate and, if

15  there's no agreement, they will select samples of each type of

16  contested document, present it to the Court for a relevancy

17  determination if necessary.

18       So I don't see any reason to, sort of, revisit that.

19  And so I think it's just a matter of mechanics of preserving

20  that as best we can, in light of the fact that they were

21  already shared.  And I don't think anybody's casting any

22  aspersions on that.  I think it's just a function of time and

23  how quickly things were going.  So we just sort of want to

24  preserve where we were.

25       So is there any reason those couldn't be set aside

 1  and, once they're identified -- obviously, you can't do it

 2  until you know what they are.  I don't think anybody expects

 3  you to be able to do that.

 4          MS. WIRTZ:  That's a question for the debtors.

 5          MR. MITCHELL:  Well, that's the issue, Your Honor, is

 6  that the Rubins created a very extensive log, I think 6,000

 7  emails --

 8          UNIDENTIFIED SPEAKER:  Two --

 9          MR. MITCHELL:  2,000?

10          I'm sorry.  Okay, I was off by two-thirds, but -- in

11  an Excel spreadsheet that I have, but we're not allowed to

12  share it with the committee.  So I'm not sure how we're going

13  to have this dialogue.

14          MR. LAUX:  We'd be happy to share it with the

15  committee; we didn't want to do so before we had the comfort

16  that it wasn't just providing them a roadmap to what we thought

17  was our most responsive --

18          THE COURT:  Yeah.  It seems fair and sensible if

19  that's where you have something that's identified, and they'll

20  just be segregated and people will not review them until such

21  time as that process plays itself out.  All right?

22          MR. MITCHELL:  We'll share it with the committee, Your

23  Honor; absolutely.

24          THE COURT:  All right.  Any tweaks to that

25  mechanically?

1          All right.

2          MR. LAUX:  And just to clarify, then, Judge; the

3    proposed order that I attached as Exhibit 3 -- C to my letter,

4    which basically includes a clawback provision along the lines

5    that Your Honor just mentioned --

6          THE COURT:  Yeah, I'll let you wordsmith that.  Again,

7    I'm trying to be practical and I don't want people to have to

8    jump through, sort of, formalistic hoops.  So I'm certainly

9    fine if the committee just puts them all in a box, puts a top

10   on the box, and nobody looks at them.  And everybody's an

11   officer of the court, and I've every reason to believe that

12   that should be fine, as opposed to reproducing them and going

13   back and forth; that may not be that useful.

14         But I trust you all can work that out.  If that's the

15   biggest problem that we come out of today with, then things

16   have gone very well.  So --

17         MR. LAUX:  Thank you, Judge.

18         THE COURT:  All right.  Thank you.

19         All right, so let's talk about any other one-off

20   issues.

21         MR. MITCHELL:  Certainly, Your Honor.  The next, I

22   guess, is also under the status conference:  A.2., uniform-

23   procedures order.  Your Honor, appreciate the work that the

24   customers have been working (sic) with my partner, Esther

25   McKean, as well as Lenders and the committee, on coming up with

1    a seconded amended uniform-procedures order.  It's kind of a

2    living, breathing order here.  But based off of discovery and

3    depositions and what's going on in the case, we filed a

4    proposed second amended order last night.  I know it received a

5    lot of input from a lot of the customers.  I don't know that I

6    can stand here today and say "unanimity".  It certainly is

7    supported by the lenders and the committee and a working group

8    of customers.  And I'm happy to hand up the redline right now

9    if the Court wants to see it.

10           THE COURT:  If you would.  And then --

11           MR. MITCHELL:  Certainly.

12           THE COURT:  -- that way, if anybody wants to be heard,

13   we might as well hash it out.

14           MR. MITCHELL:  Thank you, Your Honor.

15           THE COURT:  Thank you very much.

16           So what I have is a proposed seconded amended order

17   approving uniform procedures for resolution of partnership

18   disputes.  And as I think is consistent with our discussions

19   that these things are, sort of, changed over time as --

20           MR. MITCHELL:  Um-hum.

21           THE COURT:  -- as the need arises and as practical

22   problems have arisen -- and so it sounds like there's a

23   substantial consensus on it, but not uniform consensus.  Does

24   anybody wish to be heard in connection with it?

25           All right.  So I don't see anybody rising.  And as I

1    flip through it, it's basically changing dates --

2                 MR. MITCHELL:  Correct.

3                 THE COURT:  -- and then providing a few lines here,

4    there, about provisions.  So on page 8 of 15, talks about the

5    parties not being required to include privileged communications

6    with their counsel of record.  It talks about additional

7    discovery being served by email.  But it's -- and then there's,

8    on page 10, something about dispositive motions, consistent

9    with, I think, the briefing schedule --

10                MR. MITCHELL:  Correct.

11                THE COURT:  -- and the buckets that we've discussed.

12   And -- but a lot of it is dates.  So --

13                MR. MITCHELL:  It is pretty much all dates, Your

14   Honor.  And there're already some things that have been agreed

15   to but never made it into a second amended because other things

16   changed, so we held off asking you to enter -- we actually

17   submitted one and asked you to hold off.  This is kind of a new

18   second amended.  We never --

19                THE COURT:  All right.

20                MR. MITCHELL:  -- entered the first, as things were

21   fairly fluid in the case.

22                THE COURT:  Right.

23                MR. MITCHELL:  And --

24                THE COURT:  And that's fine.  That's to be expected in

25   these circumstances.

1          MR. MITCHELL:  Thank you, Your Honor.

2          THE COURT:  So I'm not seeing anybody rising to be

3    heard on this.  And with the representation that it represents

4    the work of the debtors, the lenders, the committee, and the

5    customer, sort of -- I'll call them the customer ad hoc group

6    or steering committee, however we want to refer to them, and I

7    do see a number of folks who've been very involved in that,

8    here in the courtroom -- I will enter it.  And if for some

9    reason something comes up, somebody'll raise it and then we can

10   have a third amended.

11         So it's -- as you say, it's sort of a living,

12   breathing document, so we won't let the perfect be the enemy of

13   the good.  So I'll get that entered.  All right.

14         MR. MITCHELL:  Thank you, Your Honor.

15         THE COURT:  Next up.

16         MR. MITCHELL:  That does it for the status

17   conferences.  If I might drop down to B.3. on "Uncontested

18   Matters", which is ECF 1041, Debtors' motion for entry of a

19   protective order to govern production of certain confidential

20   documents.

21         THE COURT:  All right.

22         MR. MITCHELL:  Your Honor, this is a motion for

23   protective order.  If the Court might recall, the debtor was

24   concerned that there was confidential information potentially

25   about either customers participating in the customer procedures

1     or, otherwise, customers -- former customers of the debtors

2     that aren't here today and aren't participating in the case.

3             So what we'd originally done -- and this is really

4     only related to internal emails of the debtors that we have

5     produced to the customers.  What we were concerned about was,

6     obviously, sharing confidential information of one customer

7     with another.  Not being able to work it out, we produced

8     everything on an attorneys'-eyes-only basis and filed a motion

9     for protective order.  Some of the customers had some concerns

10    with that and came up with the proposed order that we filed

11    yesterday evening, Your Honor -- or may have been two days ago;

12    my apologies.  But it's ECF 1184.

13            And essentially, we have received no objections from

14    any customer that isn't here today participating; if that makes

15    sense, Your Honor.  No former customer showed up.  We -- the

16    debtors actually did go into Navision, their accounting system,

17    and actually run a list of as many former customers as we had

18    information, last-known addresses on, and served this motion

19    not just on the customers participating in the master service

20    list but also any known former customers.  Have heard from

21    nobody other than our group that's engaged with us today.

22            And the agreement is essentially, Your Honor, that

23    customers can share the attorneys'-eyes-only-designated

24    documents with their clients.  They will -- and other parties

25    as defined in the nondisclosure agreements we have, such as

1    advisors and counsel and things of this nature.  And then if it

2    is determined that it needs to be used in court or in a

3    deposition, then the parties'll agree on whatever form that

4    needs to take, consistent with the procedures in the NDAs.

5             So we think this is a good solution, Your Honor; it

6    lets them get working with their clients right away, rather

7    than a bulky process.  And we ask the Court to enter the order

8    that we submitted two days ago.

9             THE COURT:  All right.  Anybody wish to be heard in

10   connection with this motion and the revised order?

11            All right.  Consistent with the principle of not

12   letting the perfect be the enemy of the good, and given all the

13   work that's been done on this, seems a sensible solution.  And

14   I -- is that -- I don't know that that's -- I don't think

15   that's the order I have in my binder.  I think that's a

16   separate order.

17            MR. MITCHELL:  Should have been, Your Honor, but

18   I'm -- I have copies I can hand up real quick if you'd like.

19   If it didn't make it to your binder, then I do have --

20            THE COURT:  Hold on a second.

21            MR. MITCHELL:  -- a copy if you'd like me to hand it

22   up.

23            THE COURT:  Let me see.  Yeah, I have an order

24   attached to it, but it's dated May 13th.

25            MR. MITCHELL:  No, Your Honor, that's an old --

1            THE COURT:  That's not -- right.

2            MR. MITCHELL:  -- order.  My apologies.  I knew I had

3    copies.

4            THE COURT:  Well, why don't we just -- in the interest

5    of time, I'll take a look at it.

6            MR. MITCHELL:  Okay.

7            THE COURT:  Oh.  Great.

8            MR. MITCHELL:  I've got them.

9            THE COURT:  All right, and it's just -- you said 1184?

10           MR. MITCHELL:  Yes, sir.

11           THE COURT:  And this proposed second amended that was

12   handed up, is that on the docket somewhere --

13           MR. MITCHELL:  Yes, it is.

14           THE COURT:  -- or not yet?

15           MR. MITCHELL:  We filed it last night.  I don't have

16   the docket number; I can get that for you if you'd like, Your

17   Honor.

18           THE COURT:  Okay.  So it's filed --

19           MR. MITCHELL:  We filed that yesterday.

20           THE COURT:  -- yesterday, 6:12 p.m.  All right --

21           MR. MITCHELL:  And the blackline, I --

22           THE COURT:  -- just so that my -- so we can find it in

23   chambers.

24           MR. MITCHELL:  Certainly.  And the blackline that I

25   handed up to you on the second amended is against what's

 1  already been entered as the first amended, by Your Honor.

 2            THE COURT:  All right.  Give me one second.

 3            All right.  I'm happy to enter that order.

 4            MR. MITCHELL:  Thank you.

 5            THE COURT:  All right, next up.

 6            MR. MITCHELL:  Next, Your Honor, we're going to turn

 7  to some uncontested matters, and I'm going to ask my partner,

 8  Ms. Fackler, to handle those for the balance of the uncontested

 9  matters.  And then at the very end what we'd like to do,

10  because they're all interrelated, is take up plan support,

11  settlement, and cash collateral, all as one hearing.

12            THE COURT:  The case conference as well; right.

13            MR. MITCHELL:  They all tie together, Your Honor.

14            THE COURT:  All right.

15            MR. MITCHELL:  Thank you very much.  And I'll ask Ms.

16  Fackler to proceed from here.  Thank you.

17            THE COURT:  All right.

18            MS. FACKLER:  Good morning, Your Honor.  May it please

19  the Court.

20            THE COURT:  Good morning.

21            MS. FACKLER:  Katie Fackler on behalf of the debtors

22  and debtors-in-possession.

23            Your Honor, the first item on the uncontested agenda

24  is the debtors' third motion for entry of an order extending

25  the time to assume or reject certain unexpired leases.  The

1  current deadline is June 29th.  The debtors still need some

2  warehouse space in Miami, as well as the leased space in

3  Mexico.  Both landlords have given prior written consent to the

4  extension, so we would ask the Court to extend our deadline for

5  ninety days, through and including September -- excuse me --

6  September 27th of this year.  And there are no objections to

7  the motion.

8      THE COURT:  All right.  Anybody wish to be heard on

9  that motion?

10     All right, I'm happy to grant that as consistent with

11 applicable law and appropriate under the facts and

12 circumstances of the case.  Next up.

13     MS. FACKLER:  Thank you, Your Honor.  The next item is

14 the debtors' third omnibus motion to reject certain leases,

15 effective as of June 29th.  This motion includes the lease of a

16 warehouse in Miami as well as an associated parking lot.  The

17 debtors no longer need these spaces, and rejection will

18 conserve estate resources.  Again there were no objections and

19 we would ask the Court grant the motion.

20     THE COURT:  All right.  Anybody wish to be heard on

21 this motion?

22     All right.  I'm happy to grant this motion as well, as

23 consistent with applicable law and appropriate under the facts

24 and circumstances of the case.

25     MS. FACKLER:  Thank you, Your Honor.  Skipping down to

1   item 4, the first contested matter is an application for an
2   administrative-expense claim made by Pyropure, at ECF number
3   899.   The debtors, together with the movant, are asking that
4   that matter be adjourned to August 1st for that omnibus-hearing
5   date.
6           THE COURT:  All right.   Anybody wish to be heard on
7   that?
8           All right, I'm happy to adjourn it to that date.
9           MS. FACKLER:  Thank you, Your Honor.   The next item,
10   item number 5, is the debtors' first omnibus objection to
11   claims asserted pursuant to Section 503(b)(9) of the Bankruptcy
12   Code, which claims are inconsistent with the debtors' books and
13   records.   That is at ECF number 1120.   We also filed a notice
14   of corrected claim numbers, at ECF number 1135.
15           Your Honor, following the April 12th claims bar date,
16   the debtors undertook the process of reviewing filed claims
17   and, in particular, 503(b)(9) claims, as part of our
18   preparation for putting together a Chapter 11 plan.   The first
19   tranche of claims that we've objected to are claims that are
20   inconsistent with the debtors' books and records.   Some appear
21   to have been asserted against the wrong debtor.   Your Honor may
22   recall we had two filing dates in this case, which changes the
23   twenty-day analysis and led to filing of some of these
24   objections.
25           We received both formal and informal responses to the

1   objection, which has resulted in different treatment for some

2   of the claims addressed in this objection.  And I will try to

3   categorize them for Your Honor in a way that makes sense.  The

4   first category is claims that were addressed in the objection

5   that will be allowed as 503(b)(9) claims.  The first of those

6   is claim number 137 of Regal-Brown and Rawson.  The second is

7   claim number 44 of Atlantic Gold & Silver.  And the third is

8   claim number 392 of PPS, Inc.

9          Your Honor, the second category is claims that will be

10  disallowed as 503(b)(9) claims but without prejudice to the

11  claimants' right to assert the claim under a different legal

12  theory.  The first of those is claim number 218 of David Allen

13  Fine Arts.  Second is claim number 165 of Jeffrey Sitkin.  And

14  the third is claim number 435 of Hialeah Pawn.

15         Your Honor, the final category is claims where there

16  were objections and we'd like continuances of a hearing on

17  those objections.  The first is Design Gold's claim number 385.

18  We would ask that that hearing be continued to July 2nd.  And

19  the next two are claims 362 and 358 of FCP Diamonds and Deb

20  Schott, respectively; also continued to July 2nd.  And for

21  August 1st, we would ask an adjournment for objections to claim

22  numbers 212 and 213 of Geib Refining.  And then with respect to

23  claim number 206 of Midwest Refineries, we are asking that that

24  objection be adjourned but set for an evidentiary hearing on

25  August 1st.

1          Your Honor, with respect to the remainder of the

2     claims for no -- for which no response was received, we'd ask

3     that the objection be sustained, those claims be disallowed and

4     expunged from the --

5          THE COURT:  So I'm trying to figure out which one of

6     the responses that you've received have been addressed and

7     which ones are live.

8          MS. FACKLER:  Okay.  Let me -- so are you looking at

9     the agenda?

10         THE COURT:  Yes.

11         MS. FACKLER:  Okay, so the first one, Regal-Brown,

12    that claim will be allowed.

13         THE COURT:  All right.

14         MS. FACKLER:  Geib Refining, we're asking for a

15    continuance to August 1st.  Midwest Refineries, we're asking

16    for an evidentiary hearing on August 1st.  FCP Diamonds, we're

17    asking for a continuance to July 2nd.  Atlantic Gold & Silver's

18    claim will be allowed.  Deb Schott, we're asking for a

19    continuance to July 2nd.  The claim of PPS, Inc. will be

20    allowed.  And then other than that, Your Honor, we had received

21    informal objections from David Allen Fine Arts, Jeffrey Sitkin,

22    and Hialeah Pawn, and each of those claims will be disallowed

23    as 503(b)(9) claims, without prejudice to the --

24         THE COURT:  Is that pursuant to an agreement or is

25    that the requested relief?

1           MS. FACKLER:  That's pursuant to an agreement.

2           THE COURT:  All right.

3           MS. FACKLER:  And we'll lay all that out in the

4    proposed order.

5           THE COURT:  All right.  All right, so it sounds

6    like -- so are there any other live issues to be addressed

7    today in Debtors' first omnibus objection to claims asserted

8    under 503(b)(9)?

9           MS. FACKLER:  No, Your Honor, we're not proceeding on

10   any objections today.

11          MR. FLEISCHER:  Your Honor, Robert Fleischer for FCP

12   Diamonds and Deb Schott.

13          My understanding, in my communications with Ms.

14   Fackler prior to today, was that today would be considered the

15   first hearing on the matters --

16          THE COURT:  Right.

17          MR. FLEISCHER:  -- and that we would be setting it

18   down for evidentiary hearing.  Doesn't sound like that's the

19   plan.  I don't know what the next step would be in this case.

20   I don't think we're coming back for the first hearing.  And I

21   also indicated that we probably should discuss what the scope

22   of that evidentiary hearing would be, see if we could limit it

23   in any way, on those two -- on those two objections.

24          MS. FACKLER:  Your Honor, I apologize if I wasn't

25   clear.  We're fine with setting those two objections for

1  evidentiary hearing.

2          THE COURT:  All right.  And that's -- those are ones

3  in July?

4          MS. FACKLER:  Yes, Your Honor.

5          THE COURT:  All right.  And we should talk about what

6  that means as an evidentiary hearing, in terms of the amount of

7  time required and what folks are going to do or not do.

8          MR. FLEISCHER:  Your Honor, my thought has been that

9  I -- there's a lot of -- a number of documents here that we

10 rely on, and I would think that we should be able to stipulate

11 at least in terms of all the documents.  Most of the documents

12 that were attached to the objection, in fact, are documents

13 that exist in the production made by the debtor to us.  I can't

14 imagine that we're going to be fighting over the authenticity

15 of documents.

16         And I think it really is going to turn largely on

17 documents.  I think it would be best if we could set this up so

18 that we're limiting the amount of time that we have to call

19 witnesses.  It just -- it would be a waste to spend that kind

20 of time on these objections, in my view.

21         THE COURT:  So what I'd like to do for both the ones

22 on July 2nd and August 1st is ask the parties to caucus and try

23 to come up with a procedure.  And you can communicate that to

24 me in any way you'd like, whether it's a stipulation or,

25 frankly, a less formal letter; just so we're all on the same

1   page.  It's always a bad thing to have people showing up for a

2   hearing and not quite know what it is they're supposed to be

3   doing or not doing.  So I want to avoid that.

4           And so it should address whether you have agreements

5   about authenticity, whether witnesses need to be called; if so,

6   who, how many people.  And I would imagine you should submit

7   something like that at least a week before the hearing.  If you

8   get it done earlier, fine.  But at least a week before.  Again,

9   no one likes surprises.

10          And so if there's an issue that comes up, you can get

11  everybody on the phone, call chambers, and ask for a call; I'm

12  happy to do that.

13          MR. FLEISCHER:  Thank you, Your Honor.

14          MS. FACKLER:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          MS. FACKLER:  Thank you, Your Honor.  That's all I

17  have.  I will turn the --

18          THE COURT:  All right.

19          MS. FACKLER:  -- podium back to Mr. Mitchell.

20          THE COURT:  Thank you very much.

21          MS. FACKLER:  Thank you.

22          THE COURT:  All right.  So --

23          MR. MITCHELL:  Your Honor, I believe that leaves the

24  motion to approve the plan-support agreement, the settlement,

25  as well as the motion to approve the entry into the final cash-

1  collateral order.

2          Your Honor, I actually do not intend to start today.

3  With leave of the Court, and in discussions with Lenders and

4  Committee, would ask that the committee be allowed to begin the

5  presentation on behalf -- it is a joint motion among all three.

6          THE COURT:  Right.

7          MR. MITCHELL:  And I believe Mr. Van Aalten would like

8  to take the lead in --

9          THE COURT:  That's fine.

10         MR. MITCHELL:  -- presenting the motion to the Court.

11         THE COURT:  Let me just propose to (sic) that, at

12 least before anybody starts, which is, there certainly seems to

13 be a significant timing element to all this, where people say,

14 well, if we have a settlement and then we don't have a plan and

15 the plan doesn't get approved -- and how're we going to do all

16 this.  Certainly there are times when people enter into plan --

17 I mean, I understand the notion of a plan-support agreement and

18 the notion of a path forward.  So that's one issue, which is

19 timing.  And there's certainly a level of elevated blood

20 pressure by various constituencies, understandably so, as to

21 what -- whether by the time you get to any confirmation

22 hearings, the things are a done deal.  And that's an issue.

23         Separately is the issue of whether there's any sort of

24 de facto valuation just by virtue of parsing out the money.

25 Right?  So, say, well, we have all sorts of procedures to talk

1    about buckets and who gets what, and who has what rights.  But

2    if the money is decided upon ahead of time, what really

3    matters?  Because what's left in the estates?  And that's sort

4    of a -- in a way -- and so I remember Mr. Luskin saying, our

5    settlement won't obviate the need to have all these hearings on

6    the buckets and who has what property.  But the question about

7    valuation and where the money's going is sort of a de facto way

8    to end up in the same place.

9          And certainly it has occurred to everybody in this

10   room that there may be a time and circumstances under which

11   it's appropriate to try to -- for people to say it's better to

12   make some determinations than try to have a global resolution

13   of these things, rather than litigate -- the enormous

14   litigation burn that's going to require -- be required for all

15   the buckets.  But it's one thing to make a decision to do that;

16   it's another to sort of have it happen indirectly.

17         So those are kind of my two things that occurred to me

18   without really much -- without even getting too far into the

19   papers.  And obviously there's a lot of other issues.  So --

20         MR. MITCHELL:  Okay.  Well, rather than get ahead of

21   Mr. Van Aalten, if it's all right with Your Honor, I'll cede

22   the podium to him.  And we'll certainly want to be heard on

23   behalf of the debtors --

24         THE COURT:  All right.

25         MR. MITCHELL:  -- at some point.  Thank you.

1           MR. VAN AALTEN:  Good morning again, Your Honor.  For

2    the record, Seth Van Aalten of Cooley, counsel to the

3    creditors' committee.  I think we've anticipated Your Honor's

4    two concerns that you just laid out, and we will collectively

5    address them today.

6           Your Honor, what we've put before you this morning, I

7    think, in its simplest terms, is a path forward to the

8    conclusion of these cases in Chapter 11.  It is an admittedly

9    imperfect plan path, and none of the proponents, not the

10   committee, not the lenders, not the debtors, stand before you

11   today and suggest otherwise.  But it's the best path and, from

12   our perspective, perhaps the only path to avoid what each of

13   the proponents believe is the worst-case scenario here for all

14   stakeholders, and that is, conversion to Chapter 7.

15          We said at the outset of these cases, Your Honor, that

16   the committee would not insert itself into the ownership

17   disputes, other than to ensure that they would be adjudicated

18   on a level playing field.  We've honored that commitment, I

19   think, time and again over the past seven months, and we're

20   continuing to honor it with this settlement, which we believe

21   is respectful of the ongoing ownership disputes.  But we do

22   have a mandate, Your Honor, and that is to maximize value for

23   unsecured creditors and to ensure that they, at the end of the

24   day here, are not left holding the bag.

25          And that's what this settlement is really all about.

1    It is no different than your typical committee-lender

2    settlement that is very typically approved in Chapter 11 cases,

3    where both sides, following arm's-length negotiations, reach

4    the conclusion that war is simply too costly and too risky.

5           And there remains, Your Honor, the distinct

6    possibility that some or all of the customers asserting

7    ownership claims may in fact be unsecured creditors here.  They

8    may be unsecured creditors entitled to priority under 503(b)(9)

9    of the Bankruptcy Code.  They may be simply general unsecured

10   creditors.  And many of them will be both.  These are creditors

11   who need a path to recovery, and that's what we've accomplished

12   here.

13          So, as to the terms of the settlement, Your Honor,

14   I'll begin with the lender side.  So, first, the lenders would

15   receive a release of potential estate claims concerning their

16   pre-petition liens, claims, and conduct.  And that release

17   includes certain potential causes of action that were

18   identified by the committee in the course of its investigation

19   and as we detailed in the motion.  And those releases, Your

20   Honor, take effect on the effective date of the settlement.

21          And these releases, Your Honor, as we would expect to

22   see in any global settlement between a creditors' committee and

23   a lender group, are limited to estate claims and third-party

24   claims that are derivative of estate claims.  These include

25   avoidance actions.  These include claims for

1    recharacterization, equitable subordination, and all the other

2    typical challenges we see to a lender's pre-petition liens and

3    claims and conduct that we see time and time again resolved

4    pre-confirmation in settlements between committees and lenders.

5            The settlement does not -- and this is a point raised

6    by the objectors, Your Honor -- provide the lenders with third-

7    party releases of any individual, or direct claims that

8    customers or creditors have against the lenders and which are

9    not derivative of estate claims.  That's not what's here.  This

10   is a release of claims that are typically subject to a

11   challenge period that in most cases runs from sixty to seventy-

12   five days from the petition date.  Here, parties-in-interest

13   have had seven months to bring these claims.  They have not.

14   And the committee is before you today, willing to compromise

15   its challenges.

16           Second, Your Honor, the lenders would receive a payout

17   on the settlement effective date, of approximately 31.5 million

18   dollars, and that represents cash and proceeds of assets of the

19   debtors that are separate and distinct from metal refined by

20   the debtors.  Mr. Mitchell will follow me this morning, Your

21   Honor, and I know he is prepared to walk Your Honor through

22   that analysis.

23           And so in exchange, Your Honor, the lenders --

24           THE COURT:  While we're talking about that --

25           MR. VAN AALTEN:  Yeah.

1          THE COURT:  -- when you say it's distinct, can you

2    give me at least a flavor of what it is?  I mean, it's not --

3    so it's not from the -- you said it's not from the refining of

4    metals.  And I'm assuming that means that in your view it's

5    distinct from whatever pool the customer claims --

6          MR. VAN AALTEN:  That --

7          THE COURT:  -- go to.  So is that right?

8          MR. VAN AALTEN:  That is correct.  And Mr. Mitchell's

9    going to take you --

10          THE COURT:  All right.

11          MR. VAN AALTEN:  -- through a full analysis of that.

12          So, in exchange for those concessions to the lenders,

13    Your Honor, what the lenders have agreed to here for the

14    benefit of the estate and creditors is as follows:  First, on

15    the effective date of the settlement, the lenders will fund

16    five-and-a-half million dollars into the professional-fee

17    carveout, as that term has been used throughout the case in our

18    interim cash-collateral orders and as it's used in the proposed

19    final cash-collateral order before you today.

20          That five-and-a-half million dollars, Your Honor, will

21    be used as follows:  first, to pay allowed fees and expenses of

22    committee professionals from April 1 through the end of the

23    case and then, second, the balance to fund the prosecution of

24    various potential causes of action ranging here from your

25    garden-variety Chapter 5s to the direct claims of the lenders

1  that are part of this settlement and which I'll discuss in a
2  moment.

3          But I want to pause there, Your Honor, to address an
4  important point that was raised in the opposition, because I do
5  think it requires some clarification.  The objectors argue that
6  the five-and-a-half-million-dollar estate litigation fund is
7  effectively worthless because, in the event a plan is not
8  confirmed, then the lenders' superpriority adequate-protection
9  claim -- and I'll address that in a minute -- would eat away at
10  all or most of the five-and-a-half million.  That's not the
11  case.  And it's not the case, Your Honor, because, as I
12  mentioned in the lead-in, the estate litigation fund is deemed
13  to be part of the carveout under the cash-collateral orders.
14  The carveout is, of course, not available to satisfy the
15  lenders' adequate-protection claims, and that's the typical
16  arrangement in Chapter 11.

17          So if this settlement is approved but the plan then
18  not confirmed such that the lenders do not waive their
19  adequate-protection claim, the estate litigation fund, net of
20  the payment of committee-professional fees, would then pass to
21  a Chapter 7 trustee to prosecute causes of action, without any
22  dilution from the lenders' adequate-protection claim.  So that
23  is real value coming in on the settlement date.

24          Second, Your Honor, on the effective date now of a
25  confirmed plan, the lenders will fund two million dollars

1  dedicated to the payment of allowed claims under Section

2  503(b)(9) of the Code.  And what we've done here to protect the

3  ownership disputes, Your Honor, is we've made both the five-

4  and-a-half-million-dollar estate litigation fund and the two-

5  million-dollar 503(b)(9) fund subject to disgorgement by the

6  lenders in the event they are ultimately determined by this

7  Court to have been funded with customer money, the seven-and-a-

8  half million dollars.  And to be clear, no one is waiving any

9  rights today to argue whether this seven-and-a-half million

10 does or does not constitute lender collateral or customer

11 property in the first instance.  And I'll preserve everyone's

12 rights for them on that.

13          Third, on the effective date of the settlement, the

14 lenders will share with creditors the net proceeds of any

15 recoveries in connection with certain direct claims of the

16 lenders against the debtors' pre-petition auditors.  And the

17 sharing formula works like this, Your Honor, as to net

18 recoveries:  The first two million goes to the lenders, and

19 then the lenders and creditors share fifty-fifty on additional

20 recoveries until the lenders receive an additional five-and-a-

21 half million.  And then all further upside goes to creditors.

22 So if you do the math, Your Honor, creditors stand to recover

23 five-and-a-half million dollars of the first thirteen million

24 dollars of net recoveries, and then they get all the upside

25 thereafter.

1        And so Your Honor may be wondering why we're talking

2    about an estate sharing in direct claims of the lenders against

3    the auditors, as opposed to estate -- the estate simply

4    pursuing these claims in its own name.  And the answer to that,

5    Your Honor, is that the potential estate claims against the

6    auditors here are subject -- or I should say may be subject to

7    numerous bars and defenses that simply don't apply, from our

8    view, to the lenders' direct claims.

9        And so while litigation recoveries are always

10   speculative -- we don't argue otherwise -- the fruits of the

11   sharing arrangement may result in millions of dollars of

12   distributable value for creditors that would not otherwise be

13   available outside of this settlement.

14       And then just to put one more fine point on this, Your

15   Honor.  Because the estate's rights to share in these

16   recoveries is (sic) triggered on the effective date of the

17   settlement, the sharing proceeds from the direct claims against

18   the auditors -- it's not contingent on subsequent plan

19   confirmation.  That happens when the settlement is approved.

20       Fourth, Your Honor, on the effective date of the

21   settlement, the lenders will assign to the estate direct claims

22   against insiders of the debtors, which include a 5.7-million-

23   dollar claim that has already been asserted by the lenders.

24   Again, potentially substantial value to creditors coming in on

25   the settlement date, not contingent on plan confirmation.

1          Fifth, Your Honor, on the effective date of a

2   confirmed plan, the lenders will waive their asserted 18.6-

3   million-dollar superpriority adequate-protection claim against

4   the estate.  And I'll put a fine point on this one as well,

5   Your Honor.  It's true, this adequate-protection waiver is not

6   effective on the settlement date, but what the lenders have

7   agreed to do here on the effective date of the settlement is to

8   carve out proceeds of avoidance actions from the assets that

9   could potentially be available to satisfy the adequate-

10   protection claim.  And that's meaningful, Your Honor, because

11   proceeds of avoidance actions are ultimately what will provide

12   a substantial portion of any meaningful return here to

13   creditors.  So we don't get the full adequate-protection waiver

14   on the settlement effective date, but we do narrow to, I think,

15   a very material degree the assets available to satisfy those

16   claims.

17          And finally, Your Honor, the lenders have entered into

18   a plan-support agreement with the debtors and the committee,

19   pursuant to which the parties have agreed to support

20   confirmation on the terms and conditions set forth in that

21   plan-support agreement.  And among other things, Your Honor,

22   the plan-support agreement requires the lenders to make

23   available, on the effective date of the plan, sufficient funds

24   to pay, or reserve, for allowed administrative-expense and

25   priority claims, of course other than those under Section

1   503(b)(9).  And that's a very meaningful part of the settlement

2   because it's a very meaningful part of our path to Chapter 11

3   confirmation.

4          Your Honor, the proponents filed two declarations in

5   support of the motion:  the first is the declaration of David

6   Greenblatt of CBIZ, financial advisor to the committee; the

7   second is the declaration of Scott Avila, the debtors' CRO.

8   I'll leave it to Mr. Mitchell to submit Mr. Avila's declaration

9   into evidence during his presentation.  As to Mr. Greenblatt's

10  declaration, Your Honor, I would ask Your Honor to take that

11  into evidence.  With Your Honor's permission, I'd like to make

12  a very brief proffer of his direct testimony.  Mr. Greenblatt

13  is in the courtroom today and available for cross-examination.

14         THE COURT:  All right.  Proceed.

15         MR. VAN AALTEN:  Thank you, Your Honor.

16         THE COURT:  Then I'll hear any objections after you

17  proceed.

18         MR. VAN AALTEN:  Your Honor, if called to testify

19  today, Mr. Greenblatt would testify as follows:  that he's a

20  senior manager of CBIZ Accounting, Tax & Advisory of New York,

21  serving in this case as financial advisor to the committee, and

22  that his testimony's based upon his personal knowledge,

23  including his discussions with his colleagues at CBIZ and

24  attorneys at Cooley.

25         Mr. Greenblatt would testify:

1              that the committee began its investigation of the

2      lenders' pre-petition liens, claims, and conduct, shortly

3      following its appointment in November of 2018;

4              that at the completion of the committee's

5      investigation of the lenders by end of April 2019, the

6      committee determined that the estate possessed certain

7      colorable claims and causes of action against the lenders,

8      relative to the validity, extent, perfection, and/or

9      enforceability of the asserted liens and claims, and as

10     accurately and comprehensively described in the motion to

11     approve the settlement presently before the Court and which Mr.

12     Greenblatt would incorporate into his testimony today;

13             that on April 23rd of this year, the committee and its

14     professionals met in person at Cooley's New York offices to

15     discuss, among other things:  potential challenges to the

16     lenders' pre-petition liens and claims; potential defenses that

17     could be asserted by the lenders thereto; the costs and risks

18     associated with prosecuting such challenges; theoretical

19     creditor-recovery scenarios, including with respect to Chapter

20     7 conversion; and the terms of a potential settlement with the

21     lenders that would be acceptable to the committee;

22             that the committee concluded, after extensive

23     deliberation and discussion, and in light of the concessions to

24     be made by the lenders, that the settlement presently before

25     the Court is fair, reasonable, and in the best interests of the

1  debtors' estates and creditors, and that the release to be

2  provided to the lenders therein is fair and appropriate under

3  the circumstances;

4          that the committee has concluded that, in the absence

5  of the settlement presently before the Court, these estates

6  face not only considerable litigation risk and expense in

7  prosecuting claims against the lenders, but also bear a

8  significant likelihood that the lenders will terminate

9  consensual use of cash collateral and seek to convert these

10  cases to cases under Chapter 7;

11          that the committee has concluded that the settlement

12  presently before the Court provides a path to a consensual

13  Chapter 11 plan designed to maximize recoveries for creditors.

14          That concludes Mr. Greenblatt's proffer, Your Honor.

15          THE COURT:  All right.  All right, anybody have -- so

16  does he have a declaration?  Remind me.  I see -- I'm looking

17  at 1121, docket number, which is the --

18          MR. VAN AALTEN:  May I approach?  I'll hand you the --

19          THE COURT:  Yeah, please.

20          MR. VAN AALTEN:  -- declaration.

21          THE COURT:  So is this on the -- this is 1122-4.  All

22  right.  I was just trying to find it in the binder.

23          MR. VAN AALTEN:  I don't know if anyone wishes to

24  cross-examine Mr. Greenblatt --

25          THE COURT:  All right.

1          MR. VAN AALTEN:  -- before --

2          THE COURT:  So does anybody wish to cross-examine --

3   well, does anybody object to the Court's receipt of the

4   declaration at 1122-4, declaration of David Greenblatt in

5   support of joint motion of Debtors, official committee of

6   unsecured creditors, and senior lenders, for entry of an order

7   approving settlement agreement pursuant to Rule 9019?  Anybody

8   object to me receiving that declaration?

9          All right, I don't see anybody rising.  I will accept

10  it.

11      (Declaration of David Greenblatt (docket 1122-4) was

12  hereby received into evidence as a Committee exhibit, as of

13  this date.)

14          THE COURT:  And I'll accept the proffer as well,

15  absent any objection.

16          MR. VAN AALTEN:  Thank you, Your Honor.

17          THE COURT:  All right.  Let me ask -- I don't know if

18  anybody has a desire to cross-examine Mr. Greenblatt, at any

19  point in these proceedings, on his testimony.

20          All right.  No one is identifying a desire to do that.

21          MR. VAN AALTEN:  Thank you.  Your Honor, it is our

22  view that the settlement before you today is respectful of the

23  ownership disputes and does nothing to impact the uniform

24  customer procedures that Your Honor previously approved.  And

25  as you'll hear from the debtors and Mr. Mitchell very shortly,

**MIAMI METALS I, INC., et al.** 50

1   the ownership reserve -- and I want to be clear when I use that

2   term.  When I refer to the ownership reserve, Your Honor, what

3   I'm saying is the cash left behind in the estate after

4   accounting for all sources and uses of the settlement, after

5   accounting for operational costs and the case-administration

6   costs through confirmation, and after accounting for the

7   implementation of a plan on the terms and conditions set forth

8   in the PSA.  After all that is accounted for, Your Honor, we

9   believe the ownership reserve will exceed by nearly ten million

10   dollars the amount of metal that's been refined by the debtors.

11        Your Honor, neither the settlement nor the plan-

12   support agreement constitutes a sub rosa plan.  With the

13   exception of certain committee members who have signed the PSA,

14   nothing in this settlement precludes customers from

15   subsequently taking off their ownership hats, putting on their

16   creditor hats, and filing objections to the plan.  They

17   maintain those rights today just as the other side reserves its

18   rights to argue that the customers don't get to wear both hats

19   for purposes of plan voting and confirmation.  But none of that

20   is for today, Your Honor, nor is the issue as to whether there

21   is some legal or equitable basis for the debtors to surcharge

22   customer property.  The customers vehemently dispute that

23   that's possible.  They may be right.  It's all for another day.

24   Today, reservation of rights, I think, suffice.

25        THE COURT:  Let me ask you to put some numbers.  You

 1  said that the ownership reserve, which is basically what's left

 2  after various funds that are identified and allocated for other

 3  purposes exceeds by nearly ten million dollars the amount of

 4  metal refined by the debtors --

 5          MR. VAN AALTEN:  Um-hum.

 6          THE COURT:  Can you provide more detail on what's

 7  behind that?

 8          MR. VAN AALTEN:  Yeah.  We have a whole presentation

 9  for you.

10          THE COURT:  All right.  So that's coming.

11          MR. VAN AALTEN:  But I don't want to steal Mr.

12  Mitchell's thunder.  He's been --

13          THE COURT:  All right.

14          MR. VAN AALTEN:  -- preparing very hard for this.

15          THE COURT:  All right.

16          MR. VAN AALTEN:  And I'll wrap it up, Your Honor.

17          This is how we avoid conversion.  And that's what the

18  focus of today should be on:  how do we put this very

19  difficult, very challenging case on track for a Chapter 11 --

20          THE COURT:  Does -- I don't know --

21          MR. VAN AALTEN:  -- conclusion.

22          THE COURT:  -- if I'm going to get that later or you

23  want to do it now, which is to talk about what conversion looks

24  like, meaning, the reasons -- some details as to why conversion

25  is a bad result in your view.

1          MR. VAN AALTEN:  Well, I'm happy to talk about that.

2     Number one, Your Honor, and I think first and foremost, we have

3     a lot of value that's coming into this settlement, whether it's

4     seed money to litigate causes of action, whether it's two

5     million dollars to start the funding of the 503(b)(9) reserve,

6     real valuable causes of action that don't belong to this

7     estate, not to mention what we think is the cost and expense of

8     delay to ownership procedures that could occur if the debtors

9     are sent home and a Chapter 7 trustee is sent in.  These are

10    all issues that the committee took very seriously and spent

11    hours discussing, with their professionals, different recovery

12    scenarios under 7 and under 11.

13          And I suspect that, when we're here before you, if

14    we're here before you, at confirmation, we will have a very

15    compelling best-interests-of-creditors-test showing for you.

16    Obviously, we did not file that today.  There is no formal plan

17    on file.  But I firmly believe that we will make a compelling

18    best-interests-test showing at confirmation.

19          Chapter 7, Your Honor, is not the desired result for

20    the lenders; they've made that clear.  And I have no doubt Mr.

21    Luskin will emphasize that point today.  And I think their view

22    is, one, there's a point of diminishing return for the lenders

23    in Chapter 11 and, two, we've reached it.  Nor is Chapter 7 a

24    desired result for the debtors.  It's not a result supported by

25    the committee.  And I don't believe, Your Honor, that it's

1  truly the desired result of the customers.  And so, Your Honor,

2  for all the reasons we've stated today in the declaration and

3  pleading, the proponents believe this settlement falls well

4  within the range for approval made out by the Second Circuit in

5  Iridium.

6          This is an extensively negotiated, good-faith, arm's-

7  length settlement among the debtors, the lenders, and the

8  committee, that absolutely no one is happy with.  But this, as

9  I said earlier, is an admittedly imperfect compromise, but it

10 is the one needed to move this forward.  And nowhere, Your

11 Honor, is that better exemplified, from my perspective, than

12 with two members of our committee.  And I'm going to call them

13 out.  They are Coeur Rochester and Argonaut, both of whom have

14 asserted substantial ownership claims, both of whom have

15 asserted substantial 503(b)(9) claims, and both of whom not

16 only support this settlement but went a step further and signed

17 the plan-support agreement.  They didn't do that, Your Honor,

18 because they're ecstatic with this result.  They did it because

19 it's the best result, it's the right result, under some very

20 challenging circumstances here.

21         And with that, Your Honor, I would cede the podium to

22 Mr. Mitchell, unless Your Honor has any questions --

23         THE COURT:  All right.

24         MR. VAN AALTEN:  -- for me.

25         THE COURT:  No.  Let me hear from Mr. Mitchell.

1          MR. VAN AALTEN:  Thank you.

2          MR. LUSKIN:  I'm going to interlope, if that's okay.

3     I'll be very short.  And then Mr. Mitchell will have some facts

4     on Your Honor's second question, which is, the reserve.

5          Your Honor, Michael Luskin, Luskin, Stern & Eisler,

6     for the lenders.  I do want to emphasize what you just heard

7     from the committee, that yes, we support this in full.  And

8     when I say "this", I mean the settlement agreement, the plan-

9     support agreement, and the final cash-collateral order that are

10    all being presented today.  I can confirm, to the extent it's

11    relevant, how unhappy my eight bank clients are.  But they do

12    recognize that this path is the better path forward.  The

13    alternative is conversion, which, for all the reasons that the

14    committee just laid out, is not the desired alternative.

15         I also want to emphasize that these motions -- cash

16    collateral, plan support, and settlement -- have the support of

17    both fiduciaries in these proceedings:  the debtor and the

18    committee.  I think that is very important.  You heard about

19    how seriously and in what detail the committee has analyzed

20    this and their expert has analyzed it, and I think that is an

21    important factor for the Court to consider in the 9019

22    analysis.

23         This is a settlement and it must be judged as such.

24    There are a tremendous number of moving parts.  There's been a

25    tremendous amount of give-and-take.  No one can dispute that

1 this was done over a great deal of time, among very

2 sophisticated parties, all well represented, and at arm's

3 length.

4          There is a lot of unhappiness, the sign of a good

5 compromise.  And Your Honor, I guess, is going to just keep

6 hearing your own words thrown back at you as to how we're

7 giving up the perfect in favor of the good.  It's frequently

8 said but always true in bankruptcy situations.  I think the

9 other day you reminded us that bankruptcy is hard.  This is a

10 hard case and this is a difficult settlement, but I think it's

11 exactly what Chapter 11 is designed to do, and urge the Court

12 to approve all that we're putting before you today.

13          On the -- a few specific points; one is that what you

14 heard about the settlement -- many of the features of the

15 settlement are incorporated into the proposed final cash-

16 collateral order.  When you look at the blackline of the

17 proposed order, you'll see that virtually all of the changes

18 are conforming changes to incorporate the settlement terms.

19 But the -- again, the three documents -- the orders that we

20 hope will approve the settlement, the plan-support agreement,

21 and final cash collateral -- are meant to be consistent with

22 one another.

23          The -- a few particulars.  First, the bank direct

24 claims that we are assigning -- or the proceeds of which we are

25 assigning immediately on approval of the settlement, this is

1   not speculative.  And I don't think I can attribute it to Mr.

2   Van Aalten's modesty, I don't know him as a modest guy, but the

3   committee has done a tremendous amount of work investigating

4   the bank's claims.  They've reviewed hundreds of thousands, if

5   not millions, of documents.  They've done hundreds of hours of

6   research.  And they've presented some of their results to the

7   bank group, to the lender group.  We haven't been privy to all

8   of their work, but we certainly do know how much has been spent

9   on it.

10         And again, these are not speculative claims.  These

11   are claims that will be asserted.  And we attribute -- we, the

12   lenders, attribute a great deal of value to them in the many,

13   many millions of dollars.  And I think that's an important

14   point for the Court to be aware of was that that value is being

15   assigned immediately.

16         Yes, there is a paydown.  And again, I'm not going to

17   steal the debtors' thunder here, but you did ask just what are

18   the sources.  And I think what we're talking about -- and

19   you'll hear more -- are the Asahi sale proceeds, the pre-paid-

20   metal proceeds, the settlements, and the carbon settlements.

21   And again, you'll get the analysis on that.

22         You heard about the releases were only being released

23   of estate claims and any claims that would be derivative

24   through the estate.  There are no releases of third-party

25   claims.  There are no -- none of the issues that typically

1   plague settlements or 363 sales or confirmation hearings, about

2   third-party releases.  You have none of that before you.

3           On the avoidance-action proceeds, again, that's

4   immediate; that's been carved out from the adequate-protection

5   lien.  I think that's an important and valuable concession or a

6   give-up by the banks there.  I just note again for

7   background -- no need to make findings on any of this now, but

8   there are tens of millions of dollars of preference --

9   potential preference claims.  About a third of the 503(b)(9)

10  claimants have a preference exposure that, in our view, would

11  wipe out their administrative claims even after giving effect

12  to any new value that they provided.  Again, this isn't a today

13  issue, but I guess what was a today issue is twenty of the

14  fifty-seven -- there are fifty-seven 503(b)(9) claims; twenty

15  of them were the subject of this morning's omnibus objection.

16  Some of those have already been disallowed, and I guess the

17  remaining will be tried over the summer.

18          But the preference actions and the preference

19  recoveries are a major asset of the estate.  That's really the

20  only point of my raising this.  And making it clear that the

21  proceeds will be for the benefit of the estate is important, I

22  think, again, in the Court's 9019 analysis.

23          The committee did mention that we are waiving our

24  adequate-protection claim; of course, not until -- not today

25  but at the end of the day on confirmation, obviously, if the

 1   case falls apart and there's no confirmation or there's

 2   conversion.  We're not willing today to give up a nineteen-

 3   million-dollar claim.

 4        I think the -- on cash collateral, I know that won't

 5   be the focus of the colloquy that we're currently engaged in

 6   and probably take the next few years, but I just do want to

 7   highlight that, again, cash collateral is one of the moving

 8   parts, and this deal requires a final cash-collateral order

 9   that we've submitted in clean and blackline to you.

10        And I would -- I recall the admonition you gave us at

11   the first day and, frankly, I've heard you say in other

12   contexts that sometimes these cash-collateral orders develop a

13   life of their own, the bells and whistles, and they look like

14   big, complicated DIP-financing orders or exit-financing orders.

15   And we've been very mindful of that over the course of the

16   case, and the interim orders have been the stripped-down order

17   that Your Honor was willing to approve.

18        But I think we're at a point in the case where things

19   have changed.  The final cash-collateral order that we're

20   presenting, as I said, incorporates, and is consistent with,

21   and is a key part of, the settlement and the plan-support

22   agreement, and I think it should be looked at more like exit

23   financing, for instance.  It does provide the means to

24   consummate the plan and to fund the plan, including carveouts

25   and reserves.  And that, I think, is a major distinction from

1  the first day and the series of interim cash-collateral orders.

2  And I hope that Your Honor will look favorably on a final cash-

3  collateral order that has some of the bells and whistles but

4  not all of them.  By any means, it will not look like a 350-

5  page, single-spaced, DIP-financing order.  But it does include

6  the waiver of claims and the termination of the challenge

7  period, which, as the committee pointed out, has been seven-

8  and-a-half months instead of seventy-five days or sixty days.

9  And it does include some of the other protections that you

10  normally see in a final cash-collateral order.  The

11  blackline -- we can go through it if there's time for that or

12  if the Court wants us to.

13       Importantly, it does reserve the customers' rights in

14  the ownership dispute; paragraph 4.a.  It does include the

15  expanded carveout, the five-and-a-half million that the

16  committee adverted to.  It does -- that's in -- and it does

17  provide for the two-million-dollar 503(b)(9) reserve, in

18  paragraph 10.  And it does say that -- no adequate-protection

19  liens on the avoidance actions of proceeds; that's in

20  paragraphs 13 and 15.  And it does say that the adequate-

21  protection liens and claims will be extinguished on the

22  confirmation of the plan, in paragraph 20.e.

23       So again, it's not a simple interim cash-collateral

24  order; it is a final cash-collateral order.  But it is integral

25  to what we're here for today.  And I guess, in conclusion, I

 1   would just emphasize again what you heard from the committee:

 2   that these motions provide an exit procedure, a path out for

 3   this case, that is much, much better than the alternative of

 4   conversion.  It does provide the groundwork for a plan.  It

 5   does allow for -- certainly it allows for the continuation and

 6   conclusion of the customer litigation, but it also allows

 7   enough time -- and I think this goes to Your Honor's very first

 8   question on timing; it certainly allows enough time for the

 9   committee, the debtors, and the lenders to sit down with the

10   customers, those that have not consented to this plan, to

11   negotiate a fully fleshed-out plan and disclosure statement and

12   move ahead to confirmation.

13           And I think, as you'll hear from Debtors' counsel,

14   substantial work has already been done on pulling together the

15   documents needed to proceed to confirmation:  drafting the

16   disclosure statement and fleshing out the plan.  And I think

17   that the time line that's laid out in the settlement is

18   realistic.  Yes, it means a lot of work and, yes, it means a

19   lot of work over the summer but, again, bankruptcy's hard.

20   So --

21           THE COURT:  What's the time line in the settlement?

22   Remind me again.

23           MR. LUSKIN:  Think it takes us through October --

24           When is the --

25           MR. MITCHELL:  On the procedures or on the plan?

MIAMI METALS I, INC., et al.                                      61

1            MR. LUSKIN:  Not on the procedures.  On the --

2            MR. MITCHELL:  The plan is --

3            MR. LUSKIN:  -- confirmation of --

4            MR. MITCHELL:  August 31st.

5            MR. LUSKIN:  It's August 31.  There is a -- it does

6    have an extension provision in it.  I think, if papers are

7    filed, it extends to -- I want to say mid-September.

8            UNIDENTIFIED SPEAKER:  Yes.

9            MR. LUSKIN:  Mid-September.  So if things are on

10   track, we're going to mid-September.  We're looking for

11   disclosure statement to be filed, I think, by early August, the

12   second week of August, the latest, and then confirmation

13   hearing in mid-September.

14           Clearly, we did all this without reference to Your

15   Honor's calendar; we recognize that.

16           THE COURT:  Don't worry.  People usually do.

17           MR. LUSKIN:  Okay.  But that's the thinking.  And we

18   think that it is doable.  And we also do think that there's

19   substantial benefit to doing this quickly.  We all know work

20   expands to the time allotted to it, and work here means money.

21   So we would like to keep this on a quick track but a realistic

22   track.

23           THE COURT:  All right.

24           MR. LUSKIN:  Clearly, just as we've done with the

25   customer-protocol procedures, if we get jammed up and we're

1  making progress, we can always make some changes.  So --

2           THE COURT:  All right.

3           MR. LUSKIN:  -- I'm not too worried about that.  So,

4  thank you, Your Honor.

5           THE COURT:  Thank you.

6           MR. LUSKIN:  Oh, I misspoke.  The outside date is

7  October 15 if the disclosure statement and solicitation package

8  have been approved by August 31.  Okay, so disclosure by August

9  31 would trigger confirmation August -- I'm sorry -- October

10  15.  And that's in 6.2 of the settlement, Your Honor.

11           THE COURT:  All right.  Thank you.

12           MR. LUSKIN:  Thank you, Your Honor.

13           MR. MITCHELL:  Your Honor, John Mitchell for the

14  debtors.  I won't regurgitate everything that the committee and

15  the lenders have stated with respect to terms of the

16  settlement.  I'll just say, to make it efficient, the debtors

17  certainly join in those statements, the reasoning why this

18  settlement should be approved, why the plan-support agreement's

19  in the best interest of the estate, as well as why the final

20  cash-collateral order should be entered by this Court.

21           So if I might, I might just turn to the evidence so

22  that we can complete at least the estate and lender's

23  evidentiary record here.  In reli -- excuse me -- in support of

24  the motion, the relief sought today, the debtor primarily

25  relies on two declarations of Mr. Scott Avila, the chief

MIAMI METALS I, INC., et al.                                          63

1    restructuring officer.  He is here in the courtroom today and

2    is available for cross-examination if warranted, or further

3    testimony if warranted.

4           Your Honor, in support of the settlement, the debtors

5    initially filed the declaration of Scott Avila, and that is at

6    docket number 1121, and that is in your binder, Your Honor.

7           THE COURT:  Right.

8           MR. MITCHELL:  And I won't read it word for word.  I

9    will be asking that the Court accept this as a proffer of Mr.

10   Avila's testimony.  But I would point out that in paragraph 6,

11   Mr. Avila testifies as to the good-faith and arm's-length basis

12   for this bargain -- this grand bargain that was achieved

13   between the committee and the lenders and the debtors.  I think

14   it's important for the Court to know that, in large part, this

15   was done separate from the debtors, but that's actually okay.

16   Let the parties that really represent the economic interests at

17   heart start the process and then bring the debtors into the

18   loop at the appropriate time, which they did.  We certainly had

19   our own concerns, issues, comments, suggestions, and we worked

20   very hard and certainly at arm's length, sometimes heated, to

21   get where we are today.

22          Additionally, Your Honor, I would call Your Honor's

23   attention to paragraphs 8 and 9 as well as 10 of his first

24   declaration -- again, 1121 on the docket -- attesting to the

25   fact that this is in the best interests -- his opinion, it's in

1   the best interests of the estates, it's a reasonable exercise

2   of the debtors' business judgment, and maximizes value for all

3   the major creditor constituencies.  Certainly, based off of the

4   number of claims, the legal disputes, the complexity, Mr.

5   Avila, in his declaration, suggests that this is in the best

6   interest of the estate, will maximize value, and should be

7   approved by this Court.

8         Additionally, Your Honor, yesterday we submitted the

9   supplemental declaration of Mr. Scott Avila; it's at docket

10  1190.  And that may not be in your binder.  I have copies if --

11        THE COURT:  No, I -- we pulled it this morning.

12        MR. MITCHELL:  Okay.  Thank you, Your Honor.  And I've

13  got extra copies if there's anybody in the courtroom who needs

14  one; the supplemental dec.

15        What I'd like to do right now, Your Honor, is walk the

16  Court through the supplemental declaration of Mr. Avila.

17  This -- your questions on Monday, for those who weren't here in

18  the courtroom on Monday for the bucket 1, was actually kind of

19  timely in light of the fact that we had this settlement and

20  plan-support agreement coming up today.  As I recall, Your

21  Honor said, what do we have by way of proceeds of the refining

22  operations --

23        THE COURT:  Right.

24        MR. MITCHELL:  -- and what are the claims against it?

25  And I said I'll come back with an accounting, and this is what

1  we've got.

2        THE COURT:  And this is it.  Right.

3        MR. MITCHELL:  This is it, Your Honor; correct.

4        If I might -- it's fairly straightforward.  If I might

5  start with page 1 of the -- there's a three-page --

6        THE COURT:  Attachment.

7        MR. MITCHELL:  -- attachment.  Yes, sir.  There's not

8  much in the dec to look at, other than --

9        THE COURT:  Right.

10        MR. MITCHELL:  -- foundation.  And page 1 is

11  essentially beginning cash, receipts, and expected receipts for

12  the estate since the petition date.  And pretty

13  straightforward, Your Honor.  We started it on the petition

14  date of 11/2 -- we had two petition dates, but the first

15  petition date was eight-and-a-half million dollars.

16        Wholesale minted refined metal:  Your Honor, this is

17  the proceeds of metal that the debtor refined, itself, refined

18  into a bar or refined into a bag of grain.  I think you've

19  heard testimony before about clean bars that have been refined

20  and are pure, of either gold or silver, or bags of grain of

21  either gold or silver, that the debtor refined, itself, and

22  then took and sold to a third party.  And during the case, the

23  debtor generated a little over seventy-five million dollars of

24  gold and silver in those forms, refined form, that it sold to a

25  third party and collected those proceeds.

1          Below that, the twenty million in what we're calling

2    impure third-party refining, the debtors did not refine that

3    metal and create receipts from its own refining.  This is based

4    off of -- and I believe we've had testimony to this; if not, we

5    can certainly adduce this, Your Honor.  But it's a refinery.

6    There's residue in the barrels, in the refining equipment;

7    gloves if the workers are burned.  It's precious metal and,

8    as -- like Mr. Avila likes to say, at 1,600 dollars an ounce,

9    1,800 dollars an ounce for gold, you get it all; you scrub the

10   walls, you have the water-filtration system, you have an air-

11   filtration system, you have sweeps off the floors.  You may get

12   such low-grade metal in, that you can't refine it, or it just

13   becomes impossible to refine.  Or alternatively, when you get

14   to the end of a refining process when you're shutting down a

15   refinery, you can only get so much and then you just can't

16   refine it anymore.

17          It all gets sent off to a third party:  hydroxides,

18   otherwise, residue, scrap, leftover; gets sent off to a third

19   party and we get a check back.  So this wasn't refined by the

20   debtor, this 20,413,000 --

21          THE COURT:  But it was refined?

22          MR. MITCHELL:  Don't know.  Presumably it was refined

23   by a third party, but not by us.  And we did not receive gold

24   or silver or precious metal back.

25          THE COURT:  But you received the 20,413,000 back?  Is

MIAMI METALS I, INC., et al.                    67

1  that --

2           MR. MITCHELL:  We did receive the cash back, yes, sir.

3           THE COURT:  Right.

4           MR. MITCHELL:  So if you just picture scrap, sweeps,

5  residue, sludge, all the different ways you can describe this,

6  very impure metal, metal that's so impure we can't refine it,

7  there are other parties that presumably refine it or do

8  something else with it, because it does --

9           THE COURT:  Right.

10          MR. MITCHELL:  -- have value.  Send it off to them.

11 We get a check back.

12          THE COURT:  But in other words --

13          MR. MITCHELL:  That's what --

14          THE COURT:  -- this isn't anybody's valuation of what

15 the scrap, residue, et cetera, is; it's the cash receivable

16 from what you got from all this bucket of --

17          MR. MITCHELL:  It's actually the cash that we already

18 received.

19          THE COURT:  Right.

20          MR. MITCHELL:  So it is value that way.  If you look

21 at it that way, it's what we received, but --

22          THE COURT:  No, but I'm saying it's been liquidated --

23          MR. MITCHELL:  Yes, sir.  That's correct.

24          THE COURT:  -- in the sense of -- right.

25          MR. MITCHELL:  It's been liquidated by selling it to a

 1 | third party --

 2 |         THE COURT:  There's no potential valuation dispute

 3 | about it; it exists --

 4 |         MR. MITCHELL:  No.

 5 |         THE COURT:  -- in a bank account somewhere?  All

 6 | right.

 7 |         MR. MITCHELL:  That's correct.  That's correct.  Now,

 8 | these are not segregated bank accounts, to be clear, Your

 9 | Honor.  The debtor has a complex cash accounting system.  But

10 | this is all of the cash that we received to date.  I'll get

11 | into our sources and uses of cash, where we stand today, on the

12 | next page; if that makes -- if that makes sense.

13 |         THE COURT:  All right.

14 |         MR. MITCHELL:  Okay.  Next is the Asahi sale proceeds:

15 | 24.541.  Court approved the sale of real estate, equipment, IP,

16 | to Asahi, from the auction, and we received the 24,541,000.

17 |         Pre-paid-package settlement:  Your Honor, if you'll

18 | recall, we had about a little over eight-and-a-half million

19 | dollars of metals in what we called "the vault", which was

20 | coins, bars, ingots.  We had about little over three million

21 | dollars in claims to those -- to some of those coins and minted

22 | product in our vault, that actually had been packaged -- pre-

23 | packaged, actually with a label on it, if the Court will

24 | recall.  There was an aggregate of thirteen million dollars in

25 | overall claims to the metals in the vault.  And at various

1   different times during the case, we settled, sold, subject

2   to -- and the net of the eight million -- little over eight

3   million we had in the vault -- so these are minted coins that

4   the debtor minted and put in a vault, some of which had -- were

5   minted specially for -- if the Court will recall, specially for

6   individual customers, that may not have --

7          THE COURT:  Right.

8          MR. MITCHELL:  -- been pulled off the shelf.  Others

9   were kind of identifiable; there may have been an order but

10  wasn't pulled.  The net result of all of the settlements

11  from -- all of the pre-paid settlements, I'll call it, is

12  generation of 5.1 million in proceeds.

13         THE COURT:  All right.

14         MR. MITCHELL:  263,000, Your Honor, consignment

15  settlements:  The debtor, at various different times, had

16  minted products out on consignment with third parties all over

17  the United States.  Those third parties claimed ownership,

18  ownership interest, various lien rights, things of this nature,

19  as a party in possession of gold and silver:  San Francisco,

20  Chicago, wherever a gold or silver store may be, a pawn shop,

21  something along these lines.  And we settled those and received

22  cash payments in settlement in return.

23        As the Court will recall, we had various different,

24  from the diamonds business, jewelry, gems, other miscellaneous

25  nonprecious metal, refined precious metal, that this Court

1  approved the sale on.  Received little over 700,000 dollars on

2  that.  And then miscellaneous assets, if the Court will recall,

3  are a couple cars and just some various different assets that

4  we sold, and other collections, in the 152- and 612- --

5  152,000, 612,000, for total cash receipts of 135.993 to date.

6          Below, Your Honor, you'll have what we project as our

7  expected future collections.  Some of this may move based off

8  of the price of commodities, but these are the expected

9  projections.

10         Sweeps:  Again, this is more of what's similar to the

11 impure third-party refining.  What we call sweeps is the

12 residue left over, hydroxides, things of this nature.  And we

13 actually have a little over twenty-six million in A/R that we

14 expect to receive in the next -- I think within the next thirty

15 to sixty days, Your Honor.

16         We have carbon proceeds from sale of carbon.  If the

17 Court will recall, we settled with a lot of our carbon

18 distributors, and we're expecting a little over 3.2 million in

19 receipts from sale of carbon.  And the Court will recall that

20 none of the customers that had a claim to carbon -- they may be

21 participating but with respect to gold and silver and other

22 precious metals, but not carbon.  Carbon is not part of the

23 customer process -- the customer-claims process.

24         THE COURT:  Right.

25         MR. MITCHELL:  That's separate and apart.  And no

1  carbon creditors are claiming any interest in that carbon

2  proceeds, either.

3           And then just other miscellaneous --

4           So all in, in the case, we expect to have, in the

5  aggregate, 165,639,000 in cash.

6           Where has or will the cash go, Your Honor?  And that

7  is on page 2; if I might.

8           THE COURT:  All right.

9           MR. MITCHELL:  So if we start out with, in the

10 aggregate, what we have, what we started with, what we

11 generated, and what we expect to receive, it'll be that same

12 165-million-dollar number.  Disbursements through approximately

13 June 7:  the numbers change just a little bit, but today

14 essentially, give or take a week.

15          Our operating costs for actually running the plant,

16 keeping the plant in cold shutdown, few of the employees that

17 we still have today, but general operating cost:  11.8 million.

18 Estate-admin costs; that's legal fees, advisor fees of us, the

19 committee, U.S. Trustee fees:  ten million.  And then lender

20 adequate protection that was paid under the cash-collateral

21 order's 7.1 million.  So we spent today 29.2 million.

22          That leaves us with a net of 136 million expected,

23 either collected today or expected to be received.  And if this

24 Court approves the settlement, there'll be a 31.5-million-

25 dollar paydown to the lenders.  The estate litigation fund of

1 | 5.5, as Mr. Van Aalten walked the Court through the terms,
2 | would be paid.  We're projecting little over a million in
3 | additional operating costs through August 31st, additional
4 | admin costs of 4.6 million through August 31st, and additional
5 | lender-adequate-protection payments of 2.4 million, which will
6 | leave us with a net of 91 million.
7 |      Down below is the funding obligations at plan
8 | confirmation:  an administrative reserve; a priority-claim
9 | reserve, as Mr. Van Aalten outlined; 503(b)(9) claim reserve;
10 | and an ownership reserve estimated at 84.6 million.
11 |      Lastly, Your Honor, you had asked what are the claims
12 | against -- what are the customer claims.  These numbers -- the
13 | claims were made, some in ounces, some in dollars.  And we're
14 | still reconciling, but generally these are the claim amounts,
15 | Your Honor.  We're not --
16 |      THE COURT:  All right.
17 |      MR. MITCHELL:  -- certainly not trying to bind anybody
18 | to this.
19 |      The buckets we've talked about.  Bucket 1 you're
20 | familiar with.  2 is essentially gone.  3 through 5 we're
21 | teeing up for summary judgment on the 21st, I believe, of
22 | this -- filing our papers on the 21st.  And then we have the
23 | remaining customers, for a total of 132 million.
24 |      THE COURT:  All right.
25 |      MR. MITCHELL:  So this is the -- essentially the

1   sources, what we expect, uses, and how it would be used.  Your

2   Honor, the debtor would take the position that, based off of --

3   I'm not trying to hold the customers to anything right now.

4   I'm not trying to argue any of the bucket issues today.  But if

5   you take the customers at their argument, bailments -- and I

6   won't regurgitate any of that -- the debtors take the position

7   that what the debtors -- what the customers would be entitled

8   to and which makes sense for this settlement is you send the

9   metals in, and their argument is the debtor has the obligation

10  to refine it; you don't own in, you refine it, you keep a

11  refining fee, and then you send it back to me or send it to

12  somebody else on my behalf.  That's generally what the argument

13  is.

14          What the debtors received refined and created into a

15  refined bar or gold that either would have gone back or gone to

16  somebody else at their direction is the 75,610,000.  That's

17  really what it is.  And without getting into the arguments, we

18  take the position that you can't really make a claim to metal

19  sitting in the bottom of a hydroxide barrel in a warehouse for

20  the last three years, or the gloves that were burned, or the

21  filters that were burned, or the impure metal that's been

22  sitting over in the corner for a long period of time, it was

23  sent to a third party, we don't know what happened to it, we

24  received the check in the mail.  Those types of receipts we

25  really don't believe need to be set aside for the customers as

1   part of this process and that, in fact, 75,610,000 would be a

2   fair funding amount of the customer reserve, as part of this

3   proposed settlement, to protect their interests.  Everybody

4   said it a gazillion times:  it's not perfect, but it certainly

5   is good and certainly is fair and probably is more than really

6   anybody expected or should have expected at the beginning of

7   this case.

8         That being said, we're setting aside an additional

9   almost 10 million -- 84.6 million in the customer reserve -- on

10  top of the 75.6 that we received to date.  That customer

11  reserve will be over there, all rights reserved to it

12  obviously, but for allocation, depending on what this Court's

13  ruling is.

14        I won't get into all the arguments already made by Mr.

15  Van Aalten and Mr. Luskin.  But again, it's a settlement that a

16  lot of people aren't happy with, which probably makes it pretty

17  good.  I've heard that a bunch in my career.  And it's a

18  balancing of the equities and the rights that allow this estate

19  to move forward, confirm the plan, and make a distribution to

20  its creditors on whatever basis this Court decides, under a

21  plan as well as under the customer procedures.

22        The other thing I'd just ask the Court to think about,

23  and then I'm going to ask to move the decs into evidence, is

24  the dispute is real, it's today, and it has to be resolved.

25  And it has to be resolved in some form, by some court, under

1   some procedure.  We can't just quit today and everything's

2   resolved and bars of gold are handed out, or checks.

3   Somebody's going to have to resolve this under some procedure,

4   and it's either a Chapter 11 plan, how we -- that the Court

5   isn't even taking up today, but at least this is the first step

6   in getting that process put in place, or something else:

7   Chapter 7; I don't know if it's an interpleader.  I don't know.

8   But standing here today, while it may not be perfect, at least

9   in the debtors' position it's the best thing that we've got in

10  light of the incredibly complex disputes that we have in front

11  of us.

12          Your Honor, I'd like to move the two declarations of

13  Mr. Avila into evidence, as well as -- we don't have a

14  declaration, my apologies.  We filed the debtors' proposed

15  budget for the final cash-collateral order last night.  I would

16  just like to make a quick proffer that Mr. Avila would attest,

17  with respect to the budget, it's fair, reasonable, represents

18  the expenses -- reasonable and necessary expenses needed to

19  carry this case through August 31st, plan confirmation.  And

20  with that proffer and the declarations, I'd ask that that be

21  admitted into evidence.

22          THE COURT:  All right.  Anybody wish to be heard on

23  that?

24          MR. MINTZ:  Your Honor, Benjamin Mintz, counsel for

25  Tiffany.

1        I don't have any objection to the admission of the

2    proffer for purposes of this hearing.  I just want to

3    reserve -- and I don't think it's the intention of the debtor,

4    that the facts related to the assertions in those declarations

5    would not be binding on the customers in connection with the

6    ownership procedures and the litigation related to that; for

7    example, the amounts that are set forth with respect to the

8    amount of the metals, and all of those things.

9        THE COURT:  I think what it's being offered for is in

10   connection with the settlement, and that it doesn't necessar --

11   I'm not even sure, and I suspect nobody is, quite exactly how

12   it might carry over, but I'm not hearing anybody suggest that

13   it does have carryover effect.

14       Am I missing something?

15       MR. MITCHELL:  Not at all, Your Honor; no.  It's

16   for --

17       THE COURT:  All right.

18       MR. MITCHELL:  -- purposes of this proceeding.

19       THE COURT:  So --

20       MR. MINTZ:  I'm just being careful, Your Honor.

21       THE COURT:  Yeah.  No, no, no, that's fair.  What I

22   thought would make sense is -- this was filed yesterday.  This

23   has a lot of information in it.  And there's been a lot of

24   information provided this morning.  So my thought is that it

25   makes sense to take a break now so that people can think about

1    what they've heard, and figure out what they want to say or not

2    say as we proceed.  We have time this afternoon.  We also have

3    time tomorrow.

4            So before we take a break --

5            MR. MINTZ:  I will say on the record, I'm not

6    intending to take cross-examination, subject to one question.

7    I want to confer with Mr. Mitchell, where he probably could

8    address through an update of the --

9            THE COURT:  All right --

10            MR. MINTZ:  -- through an additional proffer.

11            THE COURT:  -- do you -- well, so what I might do

12    is -- maybe we'll take a five-minute break now; you can have

13    that conversation.  And then maybe also the customers can think

14    about what they -- what best serves their needs -- I don't want

15    anyone to feel jammed more than they might otherwise, but in

16    terms of the process in court.  And certainly I know that you

17    can make a difficult situation worse, depending on how you

18    handle a hearing.

19            So we do have time set aside today.  We do have time

20    set aside tomorrow.  And so I'm open to reasonable suggestions.

21    But I thought that should come from folks after conversations,

22    rather than have people just throw stuff out.  Just not fair to

23    anybody and it's also not that efficient.

24            So let's take a five- to ten-minute break.  And what

25    I'd ask is just knock on the door when you think it makes sense

1  to come back out.  And people should think about what they --
2  what -- let me grab my calendar.

3          So just to let you know what my schedule is today; I
4  have a 2 o'clock Chapter 15 fight about how many of the
5  thousand pages in overseas proceedings should be sealed or not
6  sealed.  I think probably I'll only be able to stand that
7  discussion for about thirty minutes.  I don't imagine we're
8  going to spend a huge amount of time.  And then I have
9  something at 2:30, which is a -- is also a sealing question, in
10 a Chapter 11 case.  So I would think that my schedule should be
11 roughly clear by about 3 o'clock.  But I also did give folks
12 time tomorrow.  And so I'm -- so people should talk.  People
13 have other things to do in their life, in terms of schedules.
14 And so tomorrow -- let me give you an idea what that looks
15 like.

16         So I think tomorrow I set aside 2 o'clock on, for the
17 rest of the day.  I have other things in the morning:  10:30
18 and 1:30 and -- there may be some time there.  But 2 o'clock is
19 very safe.  And so I didn't want to have fifty million people
20 sitting in the courtroom as they wait to see other things and
21 figure out whether you can eek (ph.) in fifteen minutes in the
22 morning.  So 2 o'clock is safe.

23         So that's -- those are some of the options, just so
24 people can think about what's efficient and sensible, given
25 what we have to discuss.

1        So just knock on the door in a couple minutes, when

2   you think it makes sense to talk scheduling.  And thank you.

3        MR. MITCHELL:  Thank you.

4        (Recess from 12:28 p.m., until 12:47 p.m.)

5        THE COURT:  It makes sense for proceeding.  So,

6   several things factor in, right:  is there a need for cross-

7   examination; how much argument; what do people want to do.

8   So --

9        MR. MITCHELL:  Your Honor, I don't think there's going

10  to be much -- and we've conferred with a lot of people; I think

11  we might have resolved some of the objections.  But we'd like

12  to come back at 3 o'clock; I think Your Honor said you're

13  available.  We're --

14       THE COURT:  That would be fine.

15       MR. MITCHELL:  -- hopeful for an hour, an hour-and-a-

16  half --

17       THE COURT:  All right.

18       MR. MITCHELL:  -- of argument.  There'll be one more

19  additional proffer that Mr. Mintz asked me to make.  And --

20       THE COURT:  Right.

21       MR. MITCHELL:  -- honestly, it's just the costs.  And

22  we're going to have Mr. Avila's team prepare this.

23       THE COURT:  That's fine.

24       MR. MITCHELL:  Estimated --

25       THE COURT:  I thought --

1          MR. MITCHELL:  If we --

2          THE COURT:  I thought, for a variety of reasons, a

3    break would be --

4          MR. MITCHELL:  Right.

5          THE COURT:  -- might be useful.  Might not solve

6    everything, but it could at least narrow the scope of what

7    people --

8          MR. MITCHELL:  And it's just --

9          THE COURT:  -- need to fight about.

10         MR. MITCHELL:  -- additional -- all right, if we

11   have -- we've run this out an additional two months, what's the

12   cost?  We'll put that into the record --

13         THE COURT:  That's fine.

14         MR. MITCHELL:  -- when we come back.  We'll have

15   argument, I think, for an hour-and-a-half --

16         THE COURT:  All right.

17         MR. MITCHELL:  -- to two hours; then we'll be done.

18   But before we break, Your Honor, though, I just want to make an

19   announcement.  Brinks -- I don't have the exact entity name,

20   but Brinks made an objection because they are asserting a

21   setoff right.  They were in possession of certain metals on the

22   petition date and they want to make sure that -- and we've

23   agreed to it, all the parties have, that nothing in the

24   settlement releases --

25         THE COURT:  Affects any of that.

1          MR. MITCHELL:  Yeah, the stipulation to the -- links

2     into that, their right of setoff and offset.

3          THE COURT:  All right.

4          MR. MITCHELL:  That's correct.  That way, they can get

5     out of here without --

6          THE COURT:  All right.

7          MR. MITCHELL:  -- coming back for --

8          THE COURT:  And before I hear from other folks, give

9     me one second.  I just wanted to loop back to the claims

10    resolution.  There was a number of claims that are being

11    adjourned to July, some to August.  Some were being allowed as

12    503(b)(9)s.  Some were being -- it was agreed they shouldn't be

13    503(b)(9).  I think I asked but perhaps not precisely enough;

14    what happens to the balance of the motion?  Are you asking it

15    be granted or you're simply adjourning it?

16         MS. FACKLER:  The balance of the claims that I did not

17    address this morning -- we're asking that the objection be

18    sustained and those claims --

19         THE COURT:  All right.

20         MS. FACKLER:  -- be disallowed.

21         THE COURT:  And those are ones where there has been no

22    objection and -- for the reasons set forth in your motion.

23         So let me just -- the one thing -- I don't know that I

24    have a declaration.  I think I have charts.

25         MS. FACKLER:  Okay.

1           THE COURT:  So -- I'm kind of a stickler on the whole

2     evidence thing, so I need somebody to make just a proffer of

3     the evidence so it's clear what I have, because, again, claims

4     are prima facie valid; you have to come forward with evidence

5     to -- but that you can address that at lunch and then come

6     back.

7           MS. FACKLER:  Okay.

8           THE COURT:  And I don't think it'll take very long.

9     And if there is a declaration, let me know.  I didn't -- I

10    don't think there was.  And just for future reference,

11    that's -- often they end up repeating the same things that you

12    have written down somewhere else.  But their evidence and --

13          MS. FACKLER:  Understood.

14          THE COURT:  That's -- so you can address that as well.

15          So with that said, I know there were some people who

16    wanted to -- anybody else who may want to chime in on things

17    before we take the break till 3 o'clock?

18          MR. LUSKIN:  Just clarifica -- sorry.  Does Your

19    Honor -- do you have other matters on between 2 and 3?

20          THE COURT:  I have --

21          MR. LUSKIN:  Is 3 the earliest -- oh, okay.

22          THE COURT:  I have a matter on at 2 and one at 2:30.

23          MR. LUSKIN:  Got it.  Okay.  Thank you.

24          THE COURT:  So I don't think there's any realistic way

25    they'll be done before 3; if there was, I'd tell you to come

1  back at 2:30 just to see.  But you all have other things to do

2  in life.  So --

3         MR. LAUX:  Judge, for the record, Zakarij Laux on

4  behalf of the Rubins and Rubin-related entities.

5         Just, the resolution of our limited objection filed at

6  docket entry 1179, it includes proposed language that would be

7  added to any third-party release.  All parties -- the debtors,

8  the committee, the lenders -- have agreed to the inclusion of

9  that language in any order approving the settlement, assuming

10  that happens.  And we'll be here to witness that.

11         THE COURT:  All right.  Fair enough.  And I assume

12  that, on your motion, you now have agreed on language that

13  should go in the proposed order, to address the circumstance we

14  talked about this morning?

15         MR. LAUX:  We will agree on that --

16         THE COURT:  Okay.

17         MR. LAUX:  -- via email, before we submit the order.

18         THE COURT:  Great.  Thank you so much.

19         MR. LAUX:  Thank you, Judge.

20         THE COURT:  All right, anybody else who wishes to be

21  heard before we take a break?

22         UNIDENTIFIED SPEAKER:  There was just a request to

23  open the CourtCall line also at 3.

24         THE COURT:  Yes.  Absolutely.  So, for folks who are

25  on CourtCall -- thank you very much for that reminder; I

1   appreciate it -- we will dial back in.  I don't remember

2   whether I have CourtCall -- anyone's on for CourtCall at 2 and

3   2:30.  We may already have an open line.  But we certainly will

4   have the line open for this matter at 3, if it's not already

5   open.

6          And, sir, did you have something to --

7          MR. WESTON:  No; I was just going to say, in regards

8   to what Mr. Mitchell said regarding the Brinks settlement,

9   we've agreed upon language with the secured lenders and the

10  debtor, to include them in any settlement.

11         THE COURT:  Thank you very much.

12         All right.  Ms. Borges?

13         MS. BORGES:  Now, I don't know if I'm going to be

14  necessary to come back at 3, Your Honor.  The objection that we

15  joined in, which was 1173, docket number -- the debtor has

16  actually addressed all the objections that we raised in that

17  document.  They gave us a clarification.  They gave us some

18  numbers.  They addressed releases.  So just in case we do not

19  come back at 3 o'clock --

20         THE COURT:  That's fine.

21         MS. BORGES:  -- I wanted to put that on the record.

22         THE COURT:  If people's issues have been resolved and

23  you don't appear this afternoon, I will not be at all

24  personally offended.  I understand you have other things to do

25  in life.  So that's fine.  And it probably will make sense to

1  start at 3 o'clock, just to identify whatever issues have been

2  resolved and so we can make sure we understand the state of

3  play.

4         All right, with all that said, thank you very much for

5  your assistance in managing all this, and I'll see you all at

6  3.

7         (Recess from 12:53 p.m., until 3:44 p.m.)

8         THE COURT:  All right, so thank you for everyone's

9  patience in hanging around while we tended to other cases and

10 other matters.  I appreciate your patience very much.  And it

11 just goes to show that I don't have any better powers of

12 prognostication as to how long hearings are going to last, than

13 you do.  I thought we'd be done by 3 o'clock.  So I appreciate

14 your patience.

15        And I think where we left off, we were going to hear

16 from the customers, unless there's any preliminary matters that

17 need addressing.

18        MS. FACKLER:  Thank you, Your Honor.  May it please

19 the Court.  Again, Katie Fackler for the debtors and debtors-

20 in-possession.  And before we get started on the customers'

21 argument, I wanted to turn back to the issue of evidentiary

22 support for the 503(b)(9) objection.  Attached to the objection

23 as Exhibit D is the declaration of --

24        THE COURT:  Right.

25        MS. FACKLER:  -- Scott Avila, the debtors' --

1          THE COURT:  Oh, there is -- I saw the exhibits.  I

2    didn't see the declaration, and perhaps it was the size of the

3    binder.  All right, if there's a declaration that -- thank you

4    for checking me on that; I appreciate it.

5          MS. FACKLER:  Thank you.  Thank you, Your Honor.

6          MR. MITCHELL:  Your Honor, John Mitchell for the

7    debtors.  If I might, before we turn it over to customers, Mr.

8    Mintz asked that I supplement my proffer of Mr. Avila.  And if

9    I might --

10          THE COURT:  All right.

11          MR. MITCHELL:  -- do that.  And that is, one other

12    thing, if that's okay, Your Honor, about the fund, I think,

13    that's important for your consideration before the customers

14    begin.  And I do need a ruling.  I don't think I ever got a

15    ruling on actually admitting the declaration and my proffer on

16    cash collateral --

17          THE COURT:  Oh.

18          MR. MITCHELL:  -- into evidence.  I'd ask for that as

19    well.  But --

20          THE COURT:  All right, we'll address that in short

21    order.

22          MR. MITCHELL:  Thank you, Your Honor.  If I may

23    proffer Mr. Avila's testimony as chief restructuring officer.

24    If called to testify, he would testify that, with respect to --

25    and I'm referring to page 2 of the exhibit, Your Honor, and

1   this is the actual and projected cash disbursements.  And I'll

2   wait for you to get there --

3           THE COURT:  All right.

4           MR. MITCHELL:  -- if you would like.

5           THE COURT:  I've looked at it, so you can --

6           MR. MITCHELL:  Okay.

7           THE COURT:  -- you can keep going as I catch up.

8           MR. MITCHELL:  There's a projection of operations

9   costs through -- it's actually operating costs, administrative

10  costs, and lender-adequate-protection payments, through August

11  31st.  But you heard today that there's a provision for

12  extension of the August 31st deadline --

13          THE COURT:  Right.

14          MR. MITCHELL:  -- through October.  So we agreed that

15  we would proffer the following:  that if the case remained open

16  through the end of October, two additional months, operating

17  costs would increase by 150,000; estate -- and by the way, to

18  be clear, Mr. Mintz did not agree to these numbers; we just

19  agreed to the proffer.

20          THE COURT:  He's --

21          MR. MITCHELL:  But this is --

22          THE COURT:  Right.

23          MR. MITCHELL:  -- this is Mr. Avila's testimony.  The

24  estate administrative costs would increase by 1.8 million.  And

25  the lender-adequate-protection payments would be approximately

1    1.6 million.  So these are estimated budgeted amounts so that

2    if we had an additional two months, those costs would be

3    incurred.  And I think where we're going with this is, so the

4    84.6-million-dollar pot necessarily would go down by those

5    numbers, because that's a net number here, based off of these

6    projections.  Does that make sense?

7              THE COURT:  Yeah.  Thank you.

8              MR. MITCHELL:  Your Honor, that would conclude the

9    additional proffer of Mr. Avila, and I would ask that the two

10   declarations, this proffer as well as my proffer with respect

11   to the cash-collateral budget, be admitted into evidence.

12             THE COURT:  All right.  Is there any objection to

13   admitting the evidence from Mr. Avila, the original

14   declaration, supplemental declaration, and the exhibit?

15             All right.  There's no --

16             MR. MITCHELL:  One -- I'm sorry; go ahead.  Yeah.

17             THE COURT:  Yes.  Go ahead.

18             MR. MITCHELL:  Well, no, that's fine.  Thank you, Your

19   Honor.  I had one other thing I'd just like to say.

20             THE COURT:  Let me make a ruling, though, because I

21   might forget to do it, twice.  So --

22             MR. MITCHELL:  Okay.

23             THE COURT:  -- I'm going to --

24             MR. MITCHELL:  Oh, sorry.  Go ahead.

25             THE COURT:  -- admit those for purposes of, and in

1  support of, the settlement motion.

2      (Declaration and supplemental declaration of Scott Avila

3  in support of the settlement motion were hereby received into

4  evidence as a Debtors exhibit, as of this date.)

5      THE COURT:  So let me -- is there anybody who has a

6  request to cross-examine Mr. Avila on any of his information?

7      All right, I see no one rising and so there is no such

8  request.  And instead, we're in the arena of legal argument --

9      MR. MITCHELL:  Thank you, Your Honor.

10      THE COURT:  -- which is where we'll go shortly.  All

11  right.

12      MR. MITCHELL:  Your Honor, I don't have the citations

13  exactly handy, but one additional point I wanted to make before

14  the customers begin, and I think it's an important point, if

15  this were to end on August 31st, I think the Court understands,

16  there being 84.6 million estimated pot available for customer

17  claims -- what's also important, though, is, while there is a

18  proposed 31.5-million-dollar payment to be made to the lenders

19  as part of this settlement, the carveout -- and there actually

20  is language that we're proposing in the cash -- excuse me, in

21  the settlement agreement as well as the cash-collateral order.

22  The lenders will disgorge to ensure that carveout payments will

23  be made to make the estate whole, if this makes sense, to the

24  extent the lenders weren't entitled to payment of that 31.5 as

25  their collateral.  So let me --

1        THE COURT:  Meaning, there's been enough

2   determinations that something's ownership of a customer rather

3   than the estate, and that reaches a certain threshold and goes

4   above it --

5        MR. MITCHELL:  Right.

6        THE COURT:  -- that that money would be remitted back

7   to the estate, for purposes of whatever's determined to be

8   owned by someone else?

9        MR. MITCHELL:  Well, no.  If I can -- it's

10  basically -- the lenders have agreed to a carveout -- and I'll

11  maybe actually walk the Court through these numbers and then we

12  can --

13       THE COURT:  All right.

14       MR. MITCHELL:  -- address that point.  The lenders

15  have agreed, as part of the cash-collateral orders today, as

16  well as part of the final cash-collateral order, to a carveout

17  for estate administrative expenses --

18       THE COURT:  Right.

19       MR. MITCHELL:  -- up through today.  That number is

20  10,154,000.  They've also agreed to a carveout, essentially, of

21  their collateral interests, to fund the estate litigation fund,

22  of 5.5 million.

23       THE COURT:  Right.

24       MR. MITCHELL:  If this ended on October 31st, they

25  would also agree to a carveout, to fund the estate

1   administrative expenses, of 4,647,000, projected, going forward

2   through August 31st.  Well, forget about the other two months,

3   just for purpose of this illustration.  And the 503(b)(9) claim

4   reserve, if we get to confirmation and that's paid, is also

5   covered by the carveout.

6           THE COURT:  Right.

7           MR. MITCHELL:  So if we get to the end of the customer

8   litigation and it was determined there wasn't enough lender

9   collateral to make these payments, the 31.5- --

10          THE COURT:  I see what you're saying.

11          MR. MITCHELL:  -- million-dollar payment, but cash has

12  gone out the door to my firm, and the settlement payments and

13  everything else, then the lenders have agreed that they will

14  disgorge those amounts to cover these carveout amounts to the

15  extent necessary, because we've been paid; if that makes sense.

16  They'll make the estate whole or, if I have to disgorge them,

17  they pay me.  We're just moving money around, but we get to the

18  same point.

19          My point is, 84,608,000, that's projected to be the

20  cash pot for the customers at confirmation.  But they have --

21  if you add up all those other numbers I just went through, they

22  have the ability, the customers do or this Court does, to go

23  get an aggregate of another 22,301,000 back from the lenders --

24  if you follow where I'm going with this -- because these

25  payments were made and there wasn't enough lender collateral to

1  go around to say that that was a carveout coming back to us.

2            So in essence, there's approximately 107,000,000

3  dollars between 84,000,000 in a fund when we get to

4  confirmation, plus the ability to go -- lenders reserve all

5  rights and everything, but plus the ability to go back and seek

6  disgorgement of up to 22,300,000 from the lenders.  So you're

7  really looking at a 107,000,000 fund, again, separate and apart

8  from Chapter 5s and all the other things that we're talking

9  about, Your Honor.  I want to make sure you understood that.

10           THE COURT:  All right.  Thank you.

11           MR. MITCHELL:  Thank you.

12           THE COURT:  I will say it's hard to hear those numbers

13  and not think about whether some sort of global resolution

14  doesn't make a lot of sense in this case where -- because, to

15  be candid, I didn't think -- and again, Mr. Mintz and other

16  folks may disagree with your numbers.  So -- but taking your

17  numbers at face value for a moment, that's a higher number than

18  I thought the debtors would present.  And I don't know exactly

19  how much money it's going to take to litigate the nine buckets

20  and the risk involved and how various customers' rights relate

21  to other customers, but certainly there has been an ad hoc

22  committee of customers that maybe is in a position to think

23  about that.

24           I just throw that out for what it's worth.  I'm sure

25  it's a completely unoriginal idea that you all have been

1  thinking about in the course of looking at the case.  Again,

2  I'm sort of the last person to the party on a lot of these

3  things.  But I really thought this was going to be a bit more

4  of a death match over a much smaller amount of money, and so

5  you just begin to think about recoveries and amounts owed

6  versus amounts available.

7           So with that, that's all I have to say.

8           MR. MITCHELL:  Thank you, Your Honor.  That concludes

9  our presentation for the debtors.

10          THE COURT:  All right.

11          MR. MITCHELL:  Thank you.

12          THE COURT:  Thank you.

13          All right.

14          MR. MINTZ:  Thank you, Your Honor.  Benjamin Mintz,

15  Arnold & Porter, counsel for Tiffany & Company.  And I'm

16  speaking on behalf of the parties that filed an objection

17  together with Tiffany to the --

18          THE COURT:  Right.

19          MR. MINTZ:  -- proposed settlement and proposed plan-

20  support agreement.

21          I want to make primarily two legal arguments --

22          THE COURT:  All right.

23          MR. MINTZ:  -- and they really relate back to where

24  Your Honor began the hearing in identifying, I think, the two

25  key issues that I see:  one is the timing issue with respect to

1   the settlement versus the plan, and the second is whether the

2   monies that have been identified as potentially available to

3   satisfy the customer claims adequately address the customer

4   rights and do so in a way that doesn't prejudice the customers'

5   rights.  And I think the answer, as I will walk the Court, is

6   that it in fact does prejudice the rights.  And while everyone

7   stood up here and told you they weren't prejudicing the

8   customers' rights, I think when you walk through the settlement

9   and you walk through the aspects of how the clawback works in

10  the disgorgement provision, it in fact does prejudice the

11  rights of the customers, and that is the very intent of the

12  settlement.

13         But first let me speak to the timing of the structure

14  that were (sic) propose now -- that's proposed right now.  As

15  the debtor set out in the record, or it may have been the

16  committee, there are certain features of the settlement that

17  come in at the settlement date, and then there're certain

18  features that come in play when the plan is confirmed.  And

19  most particularly, the two million dollars that's allocated for

20  503(b)(9) creditors and the waiver of the adequate-protection

21  claim do not come into effect until the plan is confirmed.

22         The plan is not currently confirmable because

23  administrative creditors, particularly the 503(b)(9) creditors,

24  are not being paid in full and they have not consented to the

25  treatment that's proposed under the proposed plan.  In

 1  particular, Tiffany and its co-objectants hold 503(b)(9)

 2  claims, and we have not consented.

 3          So, sitting here today, absent changes in the plan or

 4  changes in the developments of the case, which may very well

 5  happen, but absent that, the plan is not confirmable.  So when

 6  the Court --

 7          THE COURT:  Can I ask you just about the numbers --

 8          MR. MINTZ:  Yes.

 9          THE COURT:  -- for the 503(b)(9)?  That will be

10  helpful to know.

11          MR. MINTZ:  Yeah; let me turn to that.  The --

12  Tiffany's is approximately six million, but let me get each of

13  the amounts from the document.

14          THE COURT:  And just ballpark is fine.  I -- it is

15  what it is, so I'm not going to --

16          MR. MINTZ:  Yeah, I just -- I'm sorry, Your Honor; I

17  remember Tiffany's number is six million --

18          THE COURT:  Right.

19          MR. MINTZ:  -- and -- I actually have it in the

20  pleading; if I can just turn to the --

21          THE COURT:  If it's in the pleading --

22          MR. MINTZ:  -- the right page.

23          THE COURT:  -- then that's fine; I'll go back and take

24  a look.

25          MR. MINTZ:  Yeah.  There's a footnote that identifies

1    the total and I'm just not finding it that quickly.

2              THE COURT:  All right.  That's fine.  I just -- I

3    thought --

4              MR. MINTZ:  Actually, I see --

5              THE COURT:  -- I thought it was --

6              MR. MINTZ:  I found the page.

7              THE COURT:  Oh.

8              MR. MINTZ:  So, Pretium has a 3.9-million-dollar

9    503(b)(9) claim.  Tiffany has a 6.9-million-dollar 503(b)(9)

10   claim.  And Premier Gold has a 10-million-dollar 503(b)(9)

11   claim.  So that's about 20 million dollars of --

12             THE COURT:  20.8.  Okay.

13             MR. MINTZ:  -- 503(b)(9) claims among that group.  And

14   that group does not consent.  So we're faced with a situation

15   where today the proposed plan is not confirmable and the Court

16   is being asked to approve a settlement that includes components

17   of which, which are conditioned on that unconfirmable plan.

18             So I think it's important to draw that distinction.

19   And in assessing the settlement, in some ways you have to

20   disregard those pieces that may not be realizable by the estate

21   if the plan is not confirmed.

22             With respect to the adequate-protection claim, it was

23   noted that there have been some significant concessions with

24   it, as of the settlement date.  And most particularly, the

25   adequate-protection claim would not obtain recovery against the

1    5.5-million-dollar litigation fund because it's part of the

2    carveout, and it would not obtain recovery from the avoidance

3    actions.  And that is true as described on the record, but the

4    adequate-protection claim does have significant effect with

5    respect to the remaining assets of the litigation trust.  And

6    that's what was not identified to Your Honor by the parties.

7              So the adequate protection is intended -- the

8    adequate-protection claim is intended to have an impact, and

9    that's why the lenders want to keep it, because it's going to

10   sweep up all of the assigned causes-of-action recovery that

11   would be realized by the estate if the plan is not confirmed.

12   So if we're in a world where the case gets converted to Chapter

13   7, that adequate-protection claim, which is asserted at

14   eighteen million dollars, is going to take back all of the

15   value that's been contributed by the lenders in respect of the

16   causes of action.

17             So in evaluating the settlement, it's really not

18   proper to give credit to those assigned causes of action,

19   unless we were in a situation where all of the consideration

20   that the lenders were giving was being put on the table now.

21   In contrast, the lenders are getting the full benefits of the

22   settlement now; they're getting the release and they're getting

23   the undisputed assets.  And they're getting to keep those,

24   subject to the disgorgement obligation, which I'll talk about

25   separately.  But in large measure, beyond that limited right,

1   there is no clawback or disgorgement that can go back to the

2   lenders.  And that's at the same time that the estate is not

3   getting the full benefit of the settlement.

4          So the -- I'm not here to blow everything up.  And I

5   understand that a lot of hard work was done on this

6   transaction, and -- but it didn't include the customers in that

7   process.  And there's a simple solution to this.  If they

8   really want to do a settlement outside the plan and the lenders

9   want to get the benefit of the releases and the undisputed

10  assets, then all of the consideration that's supposed to come

11  in through the settlement should come in on the settlement

12  effective date.  We shouldn't be in a position where there's

13  effectively a death trap that remains in place after the

14  settlement's approved, so that creditors are faced with a

15  choice where they can say, "Well, we're either going to support

16  the proposed plan or not," and there's differing values and

17  differing consequences that flow from those choices.  The

18  settlement -- if the settlement makes sense to the estate, then

19  the estate should get the full benefits of that settlement at

20  the same time that the lender gets its benefits.  That's the

21  only fair way to do a settlement.

22         There was a lot of discussion -- I think a few

23  references by attorneys that said, the alternative here is

24  Chapter 7, this is better than Chapter 7.  The standard for

25  approval of a settlement is not whether it's better than

1   Chapter 7.  They have to show that it meets the lowest range of

2   reasonableness and, in assessing that, Your Honor has to

3   continue the -- consider the actual value that's really coming

4   into the estate.  And I think, when you take into account the

5   effects of the adequate-protection claim and the lack of the

6   two million dollars, it falls short of that.

7           So let me talk about the second issue, which is the

8   scope of the release, the ownership reserve, and the

9   disgorgement right.  There was a lot of statements that were

10  made, in the motion and throughout this proceeding, that this

11  settlement doesn't affect the customers' procedures and it

12  doesn't affect the ownership rights.  And there's actually a

13  provision in the cash-collateral order that says it doesn't

14  prejudice the rights of the customers under the ownership

15  procedures.

16          But as I understand the deal -- and I would ask any

17  counsel to stand up and correct me if I'm stating this

18  incorrectly, but I'm not -- I don't think I am and I don't

19  think anyone's going to correct me in this regard -- if the

20  monies that are available for the customers fall short of the

21  amount of money that the customers can establish as ownership

22  property, there is not a full ability of the customers to

23  capture that back from the lenders.

24          What you heard described right before I stood up was

25  an ability to claw back in respect of the amount of the

1    carveout, which was described as being about twenty-two million

2    dollars.  Before last night, the clawback was limited to seven-

3    and-a-half million.  The clawback was limited to the settlement

4    payment.  And then in the cash-collateral order that got filed

5    late last night, the clawback -- what I refer to as the

6    clawback; I think they call it a disgorgement provision.  But

7    that clawback was now recast as the amount of the carveout.  So

8    I certainly applaud that it's been increased, but it's setting

9    a benchmark.

10           So what this case was premised on from the beginning

11   was that the owners had a dispute with the debtors and the

12   lenders over whether their property was owned -- whether the

13   metals were owned by the customers.  And it was said from the

14   outset of this case, in the cash-collateral orders and in

15   hearings, that those rights wouldn't be prejudiced and the

16   assets would be preserved for the benefit of those customers,

17   pending the litigation.

18           What they're doing under the settlement is

19   compromising that right, without our consent.  They're saying

20   that, yes, we will set aside money for you, and it will be more

21   money than maybe we thought it would be, and there'll be this

22   potential clawback to make it more.  But it's not -- but it is

23   limited and it's not sufficient to capture the potential for

24   what the customers may be able to establish in litigation.  If

25   we are able to establish that there's ownership rights more

1  than 104 million dollars or whatever that calculation that was

2  done, we should have the benefit of being able to make that

3  claim.  Under the settlement, that right is entirely cut off,

4  and we would not have any recourse in respect of that ownership

5  claim.  So it in fact prejudices the customers' rights, even

6  though they've told the Court that that's not what's happening.

7          In addition, there's a shifting of risk.  And I want

8  to turn back to the second declaration -- the supplemental

9  declaration of Scott Avila and the -- I guess what's page --

10  let's start with page 7 of 9, which shows the sources of cash

11  that are available to the estate.  There is a total of 165

12  million that's identified, 135 million of which is realized,

13  and 29 million which is on the come.  Now, we've heard that the

14  debtors believe it will come in and that it's subject to

15  ongoing payments and receivables.  But it's not here yet.  So

16  there's twenty-nine million that has not been realized yet by

17  the estate.  And it's certainly not clear what risks there may

18  be to the collection of that money.  Whatever risk there may be

19  is being borne by the customers.

20          And let's turn to page 8 of 9 of that declaration.

21  And if you look how the ownership reserve is calculated, it's

22  basically the net number after all the topline items are taken

23  care of.  So you kind of start at 165 million, take out all

24  these deductions, and you're left with 84 million.  And we

25  heard that if the case actually goes through October 15th,

1   which it contemplates, that would be 81 million that's

2   available for the customers.  If the 26 million doesn't come

3   in, that 81 million will be 65 million.  If the admin reserve

4   is higher than what's projected here or the priority-claim

5   reserve is higher than what's projected here, that 65 million

6   will be even less.

7        So the reality of the structure that's proposed here

8   is one which puts the costs of the estate, the collections of

9   the estate, and the risks associated with both of those,

10  entirely on the back of the customers.  And that's not fair and

11  appropriate and it's not consistent with what has been the

12  mantra of this case:  that the customer ownership rights would

13  be preserved pending the litigation process that's ongoing.

14       I'd refer Your Honor to the interim cash-collateral

15  order, most recently the eighth interim cash-collateral order,

16  docket number 1160.  I won't read it into the record, but

17  paragraph 6 has a very clear and broad reservation-of-rights

18  provision that says, basically, nothing that's going to happen

19  in this case -- actually, I'll -- I will read the last part,

20  because I think it's important.  It says, "All of the foregoing

21  rights are expressly preserved, and no action taken or not

22  taken by the debtors after the petition date, with respect to

23  such Disputed Property, including, without limitation, the

24  refinement, commingling, or sale or other disposition thereof,

25  shall affect the rights of the customer counterparty in or with

1  respect to the Disputed Property."

2          I'd also note that the lenders, in addition to the

3  thirty-one million, have received or will receive about ten

4  million dollars of adequate-protection payments during the

5  course of the case.  So again, to the extent that the customers

6  could show that those adequate-protection payments were coming

7  from ownership property, we would have no recourse, because our

8  recourse is limited to the carveout amount and, if we're

9  otherwise able to show that recourse should be greater than

10  that, we're stuck.

11          Your Honor, I think that's -- there's some other

12  technical arguments we made with respect to the confirmability

13  of the plan, in our brief, but I think --

14          THE COURT:  Right.

15          MR. MINTZ:  -- those are really secondary.  And I

16  would conclude at that point.

17          THE COURT:  All right.  No, this is the -- sort of the

18  guts of the economics and how things would play out.

19          MR. MINTZ:  Yes.

20          THE COURT:  This is helpful.

21          MR. MINTZ:  Okay.

22          THE COURT:  Thank you very much.

23          MR. MINTZ:  Thank you.

24          THE COURT:  So let me ask sort of a -- sort of outside

25  the scope of the settlement motion that's on for hearing.  So

1    this is one of those instances that often happens in cases
2    where people are having essentially plan discussions in real
3    time, and sometimes it's in the context that we have to start
4    somewhere.  Certainly there've been some ownership interests
5    that have been -- questions that have been teed up with me the
6    other day.  I haven't ruled on those.  There're others that are
7    going to be teed up in the near term.

8            So there are a number of different moving pieces.
9    You'll have to assess a couple things:  whether there's --
10   whether it's appropriate to -- now that the lenders, the
11   committee, and the debtors are on board to expand the scope of
12   the discussion to other parties, that is, the customers, with
13   the hope of reaching a global resolution and, if there's some
14   interest in that, whether there's any particular rulings that
15   would help clarify issues for purposes of what's already been
16   briefed and argued.

17           Now, my understanding of the monetary scope of what's
18   been argued was some twenty-five or twenty-six million dollars.
19   So it certainly is not something that ends the inquiry or would
20   bridge any gap.  But you all know what's coming down the pipe,
21   in a way I don't.  And so -- and I mention this all in the
22   context of, oftentimes in cases, as you know very well, people
23   say we could fight about a hundred things, maybe a thousand
24   things, but, Judge, if you handle these five in this order,
25   somewhere along that process the smoke will clear, and we'll do

1   our job and do something you're all very good at, which is to,

2   sort of, figure out how to make it work without litigating

3   everything.

4          So again, I never know in a case.  And so I'm not

5   trying to strongarm anybody.  I'm just trying to point out

6   things to the extent that it's useful when attorneys have

7   discussions with clients, and try to put some things out there,

8   to the extent they're useful.

9          So --

10         MR. MINTZ:  So, Your Honor, my reaction, speaking for

11  my client and not for the other --

12         THE COURT:  Right.

13         MR. MINTZ:  -- objecting parties -- and I think

14  discussions are good.  I think that having -- and we're

15  certainly willing and able to participate in those discussions;

16  we've made overtures to do so and we're prepared to have those

17  discussions, to see if there's a global kind of resolution.

18  Tiffany is on the continuum of customer claims -- if you kind

19  of put where you started at Monday's hearing with what I'll

20  call are the weaker claims, and the continuum towards the

21  stronger --

22         THE COURT:  Right.

23         MR. MINTZ:  -- Tiffany's at the other end.  And I

24  think everybody --

25         THE COURT:  Well, because you have 503(b)(9) as well

 1  as other separate --

 2          MR. MINTZ:  Correct.

 3          THE COURT:  -- grievance -- right.

 4          MR. MINTZ:  And we actually have an agreement that

 5  does exactly what the debtor says is a requirement of the

 6  bailment.  We say our agreement does say segregate our goods,

 7  we keep ownership, and give it back to us.  So we kind of meet

 8  all of those things.  I think, from their standpoint, their

 9  argument with us would be, well, okay, even if you had a

10  bailment, the stuff isn't there anymore, so where does that

11  leave you?  So --

12          THE COURT:  No, again, I -- yeah; no, I recognize that

13  there's a lot of things that haven't been teed up yet.  They've

14  been hinted at.  So --

15          MR. MINTZ:  But in terms of the ruling and, I think,

16  the way Your Honor's thinking about the ownership money, I

17  think one piece that I want to make sure Your Honor understands

18  is I -- and I know the lenders are of this view; they don't

19  view the eighty-four million as available for the customers.

20  They want to knock out all the customers entirely and get that

21  money.  So --

22          THE COURT:  Right.

23          MR. MINTZ:  -- I think -- if they weren't doing that,

24  I think the customers could kind of live with the eighty-four

25  million and work it out amongst themselves.  But that's not the

1  reality -- that's not the world in which we're in.  That

2  just -- so it's not as --

3           THE COURT:  It's not as simple as --

4           MR. MINTZ:  It's not as simple as --

5           THE COURT:  -- as --

6           MR. MINTZ:  Yeah.

7           THE COURT:  -- looking at the litigation that's been

8  teed up.

9           MR. MINTZ:  Exactly.

10          THE COURT:  Yeah.  Okay.  Fair enough.  Fair enough.

11          All right, anybody have a brief response, or are we

12 going to end on that note?  Or anybody else wish to be heard?

13 Let me put it that way.

14          MR. LUSKIN:  I'd like to be heard, Your Honor.

15 Michael Luskin for the lenders.  Just to point out very

16 briefly, first -- and in -- I'm not responding point by point

17 to Mr. Mintz, but the paydown is thirty-one-and-a-half million

18 dollars.  Your Honor asked this morning where's -- what are the

19 undisputed assets.  I briefly replied:  Asahi, 24.5 and change;

20 pre-paids, 5 million; carbon, 3.2 million.  There's also a list

21 on the Avila affidavit, first exhibit of what I'll call the

22 cats and dogs.  They're half a million or less, each.  That

23 adds up to another 1.78 million.  The total amount of available

24 undisputed is 34.669.  We're taking, under the settlement,

25 31.5, leaving behind 3.169.  There's more hidden value for the

1   estate right there.  Undisputed assets that are not being paid

2   down, 3.169.

3          Second point:  A hundred percent of the refined-metal

4   proceeds, that is, what was delivered by these customers and

5   then refined and sold, is 75.6 million.  That's in the Avila --

6   same exhibit -- supplemental declaration.  The reserve -- this

7   morning's number was 85 million.  That 10 million dollars in

8   extra money more than covers interest and fees that the

9   customers now attack, that Mr. Mintz attacks.  And if the

10  reserve could be as high as 107 million, which is what you just

11  heard, it more than covers the interest and fees that you heard

12  were under attack.

13         And in any event, those are legitimate, usual, and

14  customary adequate-protection payments under an interim cash-

15  collateral order.  What the final does is it makes them final

16  and nondisgorgeable.  Perfectly usual and ordinary in adequate-

17  protection, final-cash-collateral-order situations.

18         One point which really no one's made yet, I think, is

19  that the customers' objection implicates the value of their

20  claims, which we've heard nothing about.  I mean, they're

21  proceeding as if their claims are 132 million dollars, the face

22  value of what you get when you add up all the buckets.  It's

23  the last page of the Avila affidavit.  They're basically

24  seeking a hundred-percent insurance coverage in this case, and

25  that's just not how it works.  They don't handicap the

1    likelihood of success on their claims, and that's just not a

2    reasonable position.

3          I'm not suggesting that the Court needs to conduct a

4    mini-trial on the claims.  Those claims aren't being settled

5    now.  But certainly Your Honor has some idea of the strength of

6    some of those claims.  Look at the bucket 1 claims we just

7    argued.  Certainly the Court has some idea about that.  And I

8    think that it would be completely unreasonable to attribute a

9    zero-percent litigation risk to those claims.

10          I can assure you that Mr. Mintz is not telling

11   Tiffany's that they have zero litigation risk here, that their

12   claim is a slam dunk and they're going to win a judgment of a

13   hundred percent.  He's given them a handicap percentage number

14   and it is not a hundred percent.  If it's fifty-fifty, call

15   these things a coin toss.  Half of 132 million is 66 million,

16   well under the amount being reserved, and a completely

17   reasonable way to assess whose ox is being gored in this

18   settlement.  They are more than adequately covered for any

19   likely outcome in these cases.

20          And I guess I just want to end with -- well, I've got

21   one more point on the customer claims, of course.  All their

22   claims are -- well, they were talking about the 503(b)(9)s, and

23   the only point on the 503(b)(9)s, of course, is that they're

24   all contingent; that's, if they lose their customer ownership

25   claims, they come back and they assert 503(b)(9), they assert

 1  general unsecured claims, both of which are subject to

 2  preference attack.  And there are substantial preference

 3  attacks available.  We've heard nothing about that.  The

 4  customers apparently are not handicapping any of their claims

 5  as 503(b)(9) or general unsecureds.

 6          And I think the -- just check my notes for one second.

 7          Your Honor did ask have we -- is there a possibility

 8  of expanding the scope of discussions and is there a ruling

 9  that would help.  The ruling -- the two rulings, frankly, that

10  would help -- but the one ruling today that would help would be

11  to approve this settlement, because it does provide a path.  It

12  is not the be-all and end-all.  There is no plan on file, no

13  disclosure statement.  The confirmation process has not

14  formally begun.  Of course we're talking.  Of course that's --

15  we've been talking with the committee since the day after they

16  were appointed.  There's no secret about that.  That's what

17  we're supposed to do, and we all know that and we all do it.

18          Has the customer litigation been a phenomenal

19  distraction?  Yes, it has.  But it cannot derail the progress

20  of the case.  And the proposed plan assumes the worse:  that we

21  do not have settlements with the customers.  I'm sure we will.

22  I'm sure that, once this is behind us, if we can have this plan

23  approved by the Court, the settlement plan and the plan-support

24  agreement and the final cash-collateral order -- we have a path

25  that'll cover us the next two-and-a-half, three months, and of

1   course we'll have discussions.  I'm not very confident that

2   global discussions will be possible, because as you just heard

3   and as you of course know, the customer claims cover a wide

4   spectrum; they vary greatly, one bucket to the next.  And I'm

5   not sure that the customers will be able to speak with one

6   voice or make a proposal that -- a global proposal that would

7   resolve their claims.  I just don't know at this point.

8         Will there be one-off discussions with major

9   claimants?  I'm sure there will be.  Overtures have begun,

10  though nothing concrete has begun.  Are the parties considering

11  things like mediation?  We certainly are.  We're all talking

12  about that.  Will that continue?  Yes.  Approval of this

13  settlement will make that possible, will greatly enhance the

14  process.  We'll have a target and we'll have a time line.  And

15  we have the reserve.

16        The final point, then, that I would make is that --

17  the one I started with this morning, which is, at the end of

18  the day, this is a settlement.  Lot of moving parts.  Business

19  judgment of the two fiduciaries is that the eighty-five-

20  million-dollar reserve is adequate.  They, as fiduciaries, have

21  taken into litigation risk handicapping, the power of the

22  preference claims against these customers, the negotiating

23  leverage it gives the debtors' estates.

24        And the bank's position is very clear.  The paydown is

25  one of the many moving parts of the deal.  We're not retrading

1  that.  The settlement, as a whole, taken as a whole, is

2  reasonable, it's fair.  Is it an insurance policy for the

3  customers?  No.  And if that's what they want or if that's what

4  the Court thinks they're entitled to, there can't be a deal.

5  We're not an insurance company.  And it is a responsible

6  exercise of the two fiduciaries' business judgment and, of

7  course, of my client's as well.

8          So the three motions should be approved, that is,

9  settlement, plan support, and final cash collateral.  Thank

10 you, Your Honor.

11         THE COURT:  All right, thank you.

12         Anyone else --

13         MR. MITCHELL:  At one --

14         THE COURT:  -- wish to be heard?

15         MR. MITCHELL:  -- point, I'd ask to make -- I didn't

16 know if you need to go from -- Your Honor, may I be heard

17 quickly?  Your Honor, I'll be brief.  It's always dangerous

18 when lawyers play financial advisors on the fly.  But --

19         UNIDENTIFIED SPEAKER:  Uh-oh.

20         MR. MITCHELL:  Yeah.  To kind of address one of the

21 points Mr. Mintz made, if I can ask the Court to turn to page 2

22 of the Avila declaration.  This has to do with the risk of

23 collection of those A/Rs, that thirty million in A/R.

24         THE COURT:  Right.

25         MR. MITCHELL:  So there's a -- if we get to August

 1   31st and we collected everything, we would have 91,308,000 in

 2   the bank.

 3          THE COURT:  Right.

 4          MR. MITCHELL:  Forget about funding the plan, for now,

 5   Your Honor.  If we didn't collect a dime of the thirty million

 6   in A/R, by logical implication we'd have sixty-one million in

 7   the bank.  But the estate would still have -- or the customers,

 8   however you want to look at it, would still have the right not

 9   to disgorge twenty-two million, because the two-million-dollar

10   503(b)(9) claim reserve would not be paid at that point if we

11   didn't go to confirmation.  But you'd still have the twenty

12   million in other admins, properly disgorgeable from the thirty-

13   one.  So that essentially takes, available to the customers, up

14   to eighty-one.

15          According to Mr. Mintz, we should solve to be perfect,

16   by my math, for ninety-six million and no risk, because that's

17   the seventy-five million that we collected from metal sales

18   that we refined, ourselves.  Plus, you have the twenty million

19   for the impure third-party refining.  That gets you up to

20   ninety-six million.  So you've got eighty-one securing ninety-

21   six.  If you don't collect one cent of the thirty million in

22   A/R, which is not realistic to presume today, all you need is a

23   fifty-percent collection rate and you get that eighty-one up

24   close to the ninety-six and you're protecting the customer pool

25   as it exists today.  And that's kind of the point I wanted to

1   make.

2          I think there's adequate protection.  I know 361

3   doesn't apply.  Not going to make that argument.  But it's

4   adequate; may not be to every cent.  But even if you only

5   realized a fifty-percent return, you're protecting the ninety-

6   five million that they have a colorable claim against, subject

7   to all the arguments that Mr. Luskin made about, obviously,

8   having to look at the merits of those when you lay this --

9          That was the one point I want to make.  Otherwise, we

10  certainly join and would encourage the Court to approve the

11  settlement.

12         THE COURT:  All right.

13         Anyone else?

14         MR. MINTZ:  Your Honor, one final point.  So what I --

15  my premise was confirmed:  they are prejudicing the ownership

16  rights, and they are doing so because they think they're

17  adequately protecting those rights.  But they are prejudicing

18  them, which was a premise of this case from day one:  that if

19  that wouldn't happen, that the rights would be litigated

20  through the ownership procedures.  And now they want to change

21  that -- those set of rules midstream through the settlement,

22  and that should -- that's just not appropriate.

23         THE COURT:  All right.  Thank you very much.

24         So there's been a lot of argument today, and there's

25  also been a lot of additional information thrown sort of on the

1  table in the last twenty-four hours, between things filed last
2  night and discussions of proffers today.  So I'm going to take
3  the matter under advisement.  This and the other matter that's
4  under advisement, I know, are important to having the case move
5  forward.  And I know the settlement and the plan support and
6  the final cash collateral all go hand in glove, and so
7  they're -- I consider that sort of one matter and then the
8  customer bucket 1 claims the other matter.

9       I will do my best to get a ruling to you as soon as I
10  can.  I am actually camping next week on an island in Lake
11  George.  So it's -- I confess it's not going to happen next
12  week.  So -- but I certainly will let folks know.  What I would
13  likely do is do a bench ruling, given the timing considerations
14  and how much quicker I can get that to you than a written
15  decision.

16       So that's where I am, just in the interest of candor,
17  so you won't have to be checking your email to look for court
18  notifications and wonder if that's something -- so I probably
19  would likely call folks, schedule something, and then read a
20  bench decision.

21       MR. MITCHELL:  Your Honor, I'm going to ask -- just
22  kind of throw this out here -- if the Court'll approve
23  continued spending of cash collateral on an interim basis, on a
24  to-be-submitted order consistent with prior interim orders,
25  pursuant to the budget that we presented the Court?

1          THE COURT:  Yeah, I was going to ask if that --

2          MR. MITCHELL:  Yeah.

3          THE COURT:  That's why I'm sort of telling you where I

4     am.  I would assume that that's the way to go, and that's how

5     we've been handling things.  Do the lenders consent to that

6     approach?

7          MR. LUSKIN:  We need a budget.  The budget that's

8     submitted is the settlement budget, going all out.  We will

9     confirm -- I can confirm on the record that we will operate on

10    an interim basis.  I'm not sure when our next hearing is; I

11    think July 2nd perhaps.  But I would just ask that we get a

12    week-to-week budget that's consistent with what we've been

13    doing.

14         Give me a two-week budget as soon as you can.

15         But some order in the record is fine for today, as far

16    as --

17         THE COURT:  All right.

18         MR. LUSKIN:  -- I'm concerned.

19         THE COURT:  Then I will so order the record.  And I

20    appreciate parties really focusing on the things we need to

21    fight about and the things we don't need to fight about.  So,

22    thank you for that.  So the record is so ordered.

23         And with all that said, I still -- when I hear people

24    talk about numbers in this way, it really just does strongly

25    suggest settlement, frankly.  I think the hurdle in this case

1   is the disparate group of customers.  And the ability to get

2   forty-odd customers to the table is, I think -- has been and --

3   it is and has been the challenge in this case throughout.  So I

4   think if the customer claims were differently postured, that

5   that would be a lot less of an issue.  But it is what it is.

6          MR. LUSKIN:  Just on that point, I should have added,

7   there also is a -- what I believe will be a powerful incentive

8   for all parties to revisit settlement or open settlement, and

9   that is, the discovery expenses are about to increase

10  dramatically as depositions start to kick in.

11         THE COURT:  When is -- what's the timing on that?

12         MR. LUSKIN:  Next couple of weeks.  Yeah, I think --

13  or maybe they start right after July 4.  Somewhere -- it's

14  coming; it's coming quickly.

15         THE COURT:  Yeah, and I know --

16         MR. LUSKIN:  And you know how expensive that is.

17         THE COURT:  Every case, there's a -- we have quite a

18  few folks here in the courtroom, and that is not something that

19  happens without a cost.  I'm free.  So --

20         MR. LUSKIN:  Well --

21         THE COURT:  -- which is, I guess, my problem.

22         But yeah, I mean, again, I -- my general attitude is I

23  just try to point out issues.  And again, I'm well aware that

24  you all -- there're smart counsel in this room and you all have

25  thought about the very issues I'm pointing out.  So -- but

1   sometimes I certainly know that it can help give a little

2   traction where traction might otherwise be lacking.  So -- but

3   I don't know, sort of, where things are in terms of

4   discussions.  But I know what's in front of me, and I will

5   endeavor to get it addressed as quickly as possible.  Thank you

6   very much for what were very efficient presentations today.

7   And have a good evening.

8         UNIDENTIFIED SPEAKER:  Thank you.

9     (Whereupon these proceedings were concluded at 4:29 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3                            E X H I B I T S

4  DEBTORS'        DESCRIPTION           MARKED   ADMITTED

5  --             Declaration and                 89

6                 supplemental

7                 declaration of Scott

8                 Avila in support of

9                 Debtors' omnibus

10                objection to 503(b)(9)

11                claims

12 COMMITTEE'S     DESCRIPTION           MARKED   ADMITTED

13 --             Declaration of David             49

14                Greenblatt (docket

15                1122-4)

16

17 RULINGS:                               PAGE   LINE

18 Debtors' motion for second amended     24      8

19 order approving uniform procedures for

20 resolution of partnership disputes,

21 granted.

22 Debtors' motion for entry of a         28      3

23 protective order to govern production

24 of certain confidential documents,

25 granted.

```
 1

 2   RULINGS (cont'd.):                          PAGE   LINE

 3   Debtors' third motion for entry of an        29      10

 4   order extending the time to assume or

 5   reject certain unexpired leases,

 6   granted.

 7   Debtors' third omnibus motion to             29      22

 8   reject certain leases, effective as of

 9   June 29th, granted.

10   Application for an                           30       8

11   administrative-expense claim made by

12   Pyropure is adjourned to August 1st

13   omnibus hearing.

14   Continued spending of cash collateral       116      19

15   on an interim basis is approved.

16

17

18

19

20

21

22

23

24

25
```

1

2                         C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10

11    _____

12    Clara Rubin

13

14    eScribers

15    352 Seventh Ave., Suite #604

16    New York, NY 10001

17

18    Date:  June 17, 2019

19

20

21

22

23

24

25