**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | |
| MIAMI METALS I, INC., *et al.*,[1] | ) | Case No. 18-13359 (shl) |
| | ) | |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

## MEMORANDUM OF DECISION ON DEBTORS'
## AND SENIOR LENDERS' JOINT MOTION FOR SUMMARY
## JUDGMENT AS TO BUCKET 1 CUSTOMERS [ECF NO. 938]

Before the Court is the Debtors' and Senior Lenders' Joint Motion for Summary

Judgment as to Bucket 1 Customers (the "Motion") [ECF No. 938]. The Court is not deciding

the Motion in its entirety. Rather, the Court's ruling today covers eight of the 26 Bucket One

Customers (as defined herein) where the factual record is most developed and hopefully should

offer some general guidance for the other Customers (as defined herein) going forward.

## BACKGROUND

When the Debtors filed their motion to approve use of cash collateral [ECF No. 10] back

in November 2018, they received more than 40 objections and responses from customers

(collectively, the "Customers" and each a "Customer") claiming ownership interests in raw

metals and other assets that the Debtors believe constitute property of the estate. In January, the

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation ("RMC")), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC ("RMC2")), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38th Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

Court entered an order establishing uniform procedures to resolve such ownership disputes in an efficient and systematic way. *See* ECF No. 395. Consistent with such procedures, the Debtors and Senior Lenders[2] grouped the Customers into different "buckets" and filed this Motion to address the claims made by the Customers in so-called Bucket One.[3] *See* Mar. 21, 2019 Hr'g Tr. at 32:8–10 [ECF No. 872] ("The debtor lenders [sic] would like to bring forward dispositive motions on certain issues—we've been talking about buckets, concurrently while discovery is going on.").

According to the Debtors, Bucket One is comprised of Customers who sold raw materials to the Debtors pursuant to the Debtors' "Standard Terms and General Operating Conditions," which are attached as Exhibit B (with respect to the Debtor formerly known as RMC) and Exhibit C (with respect to the Debtor formerly known as RMC2) to the Amended Declaration of Scott Avila in Support of the Motion (the "Avila Declaration" or "Avila Decl.") [ECF No. 1005]. *See* Motion at 1. Broadly, the Debtors and the Bucket One Customers disagree as to whether the terms signed by the Bucket One Customers (the "Executed Terms") provide for a purchase and sale or a bailment of the Bucket One Customers' metals. The Debtors argue that the Executed Terms unambiguously evidence a purchase and sale and that no extrinsic evidence need be or even can be considered. The Bucket One Customers argue that the contracts contain elements of

---

[2]    The "Senior Lenders" are: Coöperatieve Rabobank U.A., New York Branch; Brown Brothers Harriman & Co.; Bank Hapoalim B.M.; Mitsubishi International Corporation; ICBC Standard Bank Plc; Techemet Metal Trading LLC; Woodforest National Bank; and Bank Leumi USA.

[3]    The "Bucket One Customers" are: 7645635 Canada Inc. o/a Ottawa Gold Buyer; Alex Morningstar Corp. d/b/a Morningstar's; Anjay Corp.; Auris Noble, LLC; Bay Area Metals; Brilliant Jewelers / MJJ Inc.; Cyber-Fox Trading, Inc.; Deb Schott, Inc.; Design Gold Group, Inc.; Eddie & Co. of NY, Inc. d/b/a Diamond Kingdom; FCP Diamonds, LLC; Geib Refining Corp.; General Refining and Smelting Corp.; INTL FCStone Ltd; Mid-States Recycling, Inc.; Midwest Refineries, LLC; Mitchell Levine (Erie Management Partners, LLC) (Plat/Co.); Music City Group, LLC; Noble Metal Services, Inc.; PPS, Inc. d/b/a Braswell & Son; Pyropure, Inc. d/b/a Pyromet; Queen of Pawns & Jewellery, Inc.; San Diego Gold Exchange, Inc.; So Accurate Group, Inc.; Texas EZPAWN, L.P.; and The Gold Refinery, LLC / Norman Bean.

both sale and bailment, requiring the Court to look at the parties' course of dealing. The Bucket One Customers further posit that the Debtors' course of dealing with each of them evidences bailment relationships. The Bucket One Customers submitted supporting evidence in varying degrees, with some submitting no evidence at all. *Compare* Alex Morningstar Corp.'s Joinder in "Bucket 1" Customers' Joint Opposition to Debtors' and Senior Lenders' Joint Motion for Summary Judgment [ECF No. 1090] (attaching a declaration from their principal describing course of dealing with RMC and supporting documentation in the form of transaction documents from a typical sale) *with* Joinder of Pyropure, Inc. d/b/a Pyromet in "Bucket 1" Claimants' Response to and Brief Opposing Joint Motion for Summary Judgment [ECF No. 1083] (stating their intent to join in the Joint Response to Debtors' and the Senior Lenders' Joint Statement of Mutual Undisputed Facts (the "Joint Response") [ECF No. 1081], but offering no declaration, exhibits, or any other evidentiary support).[4]

Notwithstanding the Debtors' claim that all 26 Bucket One Customers signed "standard" terms, there are actually multiple iterations of such terms, with some Bucket One Customers having signed no terms at all. *See* Avila Decl., Composite Ex. D. Cognizant of this issue, the Court has reviewed Composite Exhibit D to identify Bucket One Customers who are similarly situated and where there is a sufficiently developed factual record for a ruling. Based on that review, the Court has separated out for a ruling today those Bucket One Customers for whom the Debtors have submitted a complete set of Executed Terms with RMC. These eight Customers— a group that the Court will refer to as the "Silo One Customers"—are:

---

[4]      Nine of the Bucket One Customers—Anjay Corp., Auris Noble, LLC, Bay Area Metals, Brilliant Jewelers / MJJ Inc., Eddie & Co. of NY, Inc. d/b/a Diamond Kingdom, Music City Group, LLC, Queen of Pawns & Jewellery, Inc., San Diego Gold Exchange, Inc., and Texas EZPAWN, L.P.—did not file anything at all in response to the Debtors' Motion or SUF (as defined herein). Four of the Bucket One Customers—Deb Schott, Inc., FCP Diamonds, LLC, PPS, Inc. d/b/a Braswell & Son, and Pyropure, Inc. d/b/a Pyromet—filed boilerplate statements or joinders to the Joint Response but failed to provide any supporting evidence. *See* ECF Nos. 1083, 1091, 1092, 1094.

- Alex Morningstar Corp. d/b/a Morningstar's;
- Bay Area Metals;
- Brilliant Jewelers / MJJ Inc.;
- Geib Refining Corp.;
- Mitchell Levine (Erie Management Partners, LLC) (Plat/Co.);
- Noble Metal Services, Inc.;
- Pyropure, Inc. d/b/a Pyromet; and
- Texas EZPAWN, L.P.

The Silo One Customers do not have identical Executed Terms, but any differences in such terms are immaterial for purposes of today's ruling. For the avoidance of doubt, today's ruling does not encompass Bucket One Customers for whom the Debtors did not attach a complete set of Executed Terms with RMC or any Executed Terms at all. Nor does it encompass Bucket One Customers whose Executed Terms pertain to RMC2.

## LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56 governs the granting of summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). "In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

4

To the extent that a party asserts that a fact cannot be or is genuinely disputed, such party must provide support for its position by either:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Rule 56 also contemplates situations where a non-moving party is unable to present facts that are essential to justify its opposition to a motion for summary judgment. In such instance, the Court may: (1) defer considering the motion or deny it, (2) allow time to obtain affidavits or declarations or to take discovery, or (3) issue any other appropriate order. *See* Fed. R. Civ. P. 56(d) (formerly Fed. R. Civ. P. 56(f)). However, this requires the non-moving party to submit an affidavit showing: (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts. *See Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999). "The requirement of a sufficient affidavit or declaration is a strict one." *Halebian v. Berv*, 869 F. Supp. 2d 420, 438 (S.D.N.Y. 2012) (citing *Gurary*, 190 F.3d at 43–44 ("[T]he failure to file such an affidavit is fatal[.]")).

If a party fails to properly support its own assertion of fact or address another party's assertion of fact, the Court may, among other things, consider the fact undisputed for purposes of the motion or grant summary judgment if the motion and supporting materials show that the movant is entitled to it. *See* Fed. R. Civ. P. 56(e); *see, e.g.*, *Sanchez v. Nat'l Cleaning Co.*, 11 F. Supp. 2d 453, 454 (S.D.N.Y. 1998) ("Rule 56(e) provides that if the non-movant fails to respond

5

to a summary judgment motion by setting forth specific facts showing that there is a genuine

issue for trial, then summary judgment, if appropriate, shall be entered against the adverse

party.") (internal quotations omitted).

### B. Choice of Law

The Debtors, the Senior Lenders, and the majority of the Silo One Customers assert that

Florida law governs the dispute. *See* Motion at 11–12; *see also* ECF Nos. 425, 444, 468, 478,

481. Other Customers in Bucket One, including two of the Silo One Customers, contend that

New York law may govern. *See* ECF No. 463. Still other Silo One Customers do not take a

position as to choice of law at all. *See* ECF Nos. 411, 452. As the outcome of the disputes is the

same under both Florida and New York law, the Court need not perform a choice of law analysis

but will cite to both Florida and New York statutes and case law. *See* Motion at 10; *IBM v.

Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter,

however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the

absence of substantive difference, however, a New York court will dispense with choice of law

analysis[.]"); *see generally* Joint Memorandum of Law of Bucket 1 Customers in Opposition to

the Debtors' and Senior Lenders' Motion (the "Opposition") [ECF No. 1080] (citing to the

harmonious laws of Florida and New York throughout).

### C. Contract Interpretation

A key question posed by today's dispute is how to interpret the Executed Terms. A

written agreement that is clear and unambiguous on its face must be enforced according to its

terms. *See Gibney v. Pillifant*, 32 So. 3d 784, 785 (Fla. 2d Dist. Ct. App. 2010) ("[T]he actual

language used in the contract is the best evidence of the intent of the parties, and the plain

meaning of that language controls.") (internal quotation marks omitted); *see also Greenfield v.*

*Philles Records*, 98 N.Y.2d 562, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]"). Where a contract is unambiguous, the intent of the parties must be gleaned from "the four corners of the document." *Landmark Am. Ins. Co. v. Pin-Pon Corp.*, 155 So. 3d 432, 437 (Fla. 4th Dist. Ct. App. 2015) (citation omitted); *see also De Luca v. De Luca*, 300 A.D.2d 342, 342 (N.Y. App. Div. 2d Dep't 2002). A written document intended by the parties to be the final embodiment of their agreement may not be contradicted, modified, or varied by extrinsic evidence. *See King v. Bray*, 867 So. 2d 1224, 1226 (Fla. 5th Dist. Ct. App. 2004); *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 436 (N.Y. 2013); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990).

As one court has observed, "[t]he issue of whether a contract represents a bailment or a sale is not an uncommon problem in industries, such as refining, where a company must make arrangements with another entity to process its raw materials." *In re Handy & Harman Refining Grp. Inc.*, 271 B.R. 732, 736 (Bankr. D. Conn. 2001). As such, "[c]ourts dealing with contracts having both bailment and sale characteristics look beyond the four corners of the contract and examine the various circumstances that led to the contractual arrangement." *Id.*

### D. Purchase and Sale Agreements

Both Florida and New York state law provide that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Fla. Stat. Ann. § 672.204(1); N.Y. U.C.C. § 2-204(1). "Even though one or more terms are left open[,] a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Fla. Stat. Ann. § 672.204(3); N.Y. U.C.C. § 2-204(3);

7

*see also Petroleum Traders Corp. v. Hillsborough Cnty.*, 2009 WL 1456430, at *1 (M.D. Fla. May 22, 2009) ("Here, the undisputed facts reveal that shortly after the acceptance of the Plaintiff's proposal, the Defendants began placing orders and accepting deliveries for gas and diesel and paid in accordance with the prices offered in the bid documents.  Despite the lack of an enforceable written contract, the parties clearly evidenced their agreement for the sale and purchase of fuel in each instance."); *Wellington Farms of Massachusetts, Inc. v. Capital Area Food Bank*, 156 A.D.3d 662, 664 (N.Y. App. Div. 2d Dep't 2017) (finding an enforceable contract where plaintiff established that parties had reached an agreement for the purchase of a truckload of frozen ground turkey to be delivered on a specified date at a specified location, despite the fact that the invoices submitted contained varying prices).

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  Fla. Stat. Ann. § 672.202; N.Y. U.C.C. § 2-202.  Nevertheless, such terms "may be explained or supplemented (a) by course of performance, course of dealing, or usage of trade[,] and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."  *Id.*

"A 'sale' consists in the passing of title from the seller to the buyer for a price."  Fla. Stat. Ann. § 672.106(1); N.Y. U.C.C. § 2-106(1).  However, "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled."  Fla. Stat. Ann. § 672.305(1); N.Y. U.C.C. § 2-305(1).  "Unless otherwise explicitly agreed[,] title passes to the buyer at the

time and place at which the seller completes her or his performance with reference to the physical delivery of the goods[.]"  Fla. Stat. Ann. § 672.401(2); N.Y. U.C.C. § 2-401(2).

Under Florida law, the only essential term in a contract for the sale of goods is the quantity.  Fla. Stat. § 672.201(1) & cmt. 1 ("The only term which must appear [in the writing] is the quantity term[,] which need not be accurately stated but recovery is limited to the amount stated.").  Citing this statutory provision, one Florida court declined to find that a party's custom formula quotes for customized nutritional supplements constituted a contract but did find that the corresponding purchase orders and electronic communications evidenced satisfaction of the remaining elements necessary for contract formation because they supplied a quantity term.  *See Nutrimatix Inc. v. Xymogen, Inc.*, 2017 WL 385753, at *13 (M.D. Fla. Jan. 27, 2017).

### E.  Bailments

Both Florida and New York state law define bailment as the "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it."  *Affiliated FM Ins. Co. v. Dependable Warehousing & Distrib., Inc.*, 303 F. Supp. 3d 1329, 1331 (S.D. Fla. 2018) (citing *Monroe Sys. for Bus., Inc. v. Intertrans Corp.*, 650 So. 2d 72, 75 (Fla. 3d Dist. Ct. App. 1994) (quoting *Dunham v. State*, 192 So. 324, 326 (Fla. 1939))); *see also Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001) (quoting *Mays v. New York, N.H. & H.R. Co.*, 97 N.Y.S.2d 909, 911 (N.Y. App. Term 1st Dep't 1950)).

A bailment "'is generally a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner.'"  *Sirpal v. Univ. of Miami*, 684 F. Supp. 2d 1349, 1364 (S.D. Fla. 2010) (quoting *S & W Air Vac Sys., Inc. v. Dep't of Revenue*, 697 So. 2d 1313, 1315 (Fla. 5th Dist. Ct. App. 1997)).  Bailment

bifurcates ownership from possession; general ownership remains with the bailor while the

bailee has lawful possession. *See Cornelius v. Berinstein*, 50 N.Y.S.2d 186, 188 (Sup. Ct. 1944)

("[I]t is a generally recognized feature of bailments that possession of the thing bailed is severed

from ownership; the bailor retains the general ownership, while the bailee has the lawful

possession or custody for the specific purpose of the bailment.").

One type of bailment is a bailment for mutual benefit. "A bailment for the mutual benefit

of the parties is one in which the parties contemplate some price or compensation in return for

the benefits flowing from the fact of bailment." *Armored Car Serv., Inc. v. First Nat'l Bank*, 114

So. 2d 431, 434 (Fla. 3d Dist. Ct. App. 1959). Bailments for mutual benefit include bailments

*locatio operis faciendi* where the bailee is obligated to perform work on the bailed item in

exchange for consideration. *See Adelman v. M & S Welding Shop, Inc.*, 105 So. 2d 802, 803

(Fla. 3d Dist. Ct. App. 1958) (a transaction in which the defendant has possession of the

plaintiff's car to install a trailer hitch is a bailment for mutual benefit); *Aronette Mfg. Co. v.*

*Capitol Piece Dye Works, Inc.*, 6 N.Y.2d 465, 468 (1959) (fabric sent to defendant to be treated

with a waterproofing formula then returned is held on bailment).

Over a century ago, the Supreme Court addressed the question of how to differentiate a

sale from a bailment. It observed:

> The recognized distinction between bailment and sale is that, when the identical article is
> to be returned in the same or in some altered form, the contract is one of bailment, and
> the title to the property is not changed. On the other hand, when there is no obligation to
> return the specific article, and the receiver is at liberty to return another thing of value, he
> becomes a debtor to make the return, and the title to the property is changed. The
> transaction is a sale.

*Sturm v. Boker*, 150 U.S. 312, 329 (1893). In another case, the Supreme Court explained that

this rule applies even where the thing delivered is changed or transformed in some manner:

> [W]here logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the *identical articles* delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer.  If, on the other hand, the manufacturer is not bound to return *the same* wheat or flour or paper, but may deliver *any other of equal value*, it is said to be sale or a loan, and the title to the thing delivered vests in the manufacturer.  We understand this to be a correct exposition of the law.

*Powder Co. v. Burkhardt*, 97 U.S. 110, 116 (1878) (emphasis added).

Accordingly, in distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or some altered form; if another thing of equal value is to be returned, the transaction is a sale.

## DISCUSSION

### A.  The Silo One Customers' Executed Terms Unambiguously Do Not Establish a Bailment, But Instead Are Consistent With a Sale

As explained above, the hallmark of a bailment relationship is that the bailor be required to return the identical bailed goods to the bailee in the same or altered form.

The eight Silo One Customers each executed terms with RMC that specifically address this issue.  Such terms state:

> Precious metals are fungible; therefore any unit of material is equivalent to another of like kind i.e. similar quality and/or value, and is deemed adequate payment for purposes of outstanding Pool Accounts.  *Returnable metal represented in a Customer Pool Account does not pertain to specific, segregated, or identifiable metal; rather, it represents a future obligation of RMC to return common inventory of gold, silver, platinum, palladium, or metals owed to Customer.  RMC reserves the right to return precious metals to Customer of like kind representing the ounces of precious metals owed to Customer.*

Avila Decl., Composite Ex. D, Tab 2 at 14 (Alex Morningstar Corp. d/b/a Morningstar's) (emphasis added); Avila Decl., Composite Ex. D, Tab 4 at 19 (Bay Area Metals) (emphasis added); Avila Decl., Composite Ex. D, Tab 5 at 11 (Brilliant Jewelers / MJJ Inc.) (emphasis added); Avila Decl., Composite Ex. D, Tab 11 at 17 (Geib Refining Corp.) (emphasis added);

Avila Decl., Composite Ex. D, Tab 14 (Mitchell Levine (Plat/Co.)) (emphasis added); Avila

Decl., Composite Ex. D, Tab 16 at 19 (Noble Metal Services, Inc.) (emphasis added); Avila

Decl., Composite Ex. D, Tab 18 at 19 (Pyropure, Inc. d/b/a Pyromet) (emphasis added); Avila

Decl., Composite Ex. D, Tab 19 at 12 (Texas EZPAWN, L.P) (emphasis added).

This provision makes clear that, even to the extent metal is returned to a Silo One

Customer rather than sold, it is not the identical metal that that Silo One Customer originally

shipped to the Debtors, nor is it the same metal in altered form.  It is simply metal of "like kind."

While industries like refining often involve contracts contemplating elements of both bailment

and sale, the Court finds that the specific language quoted above precludes the existence of a

bailment with the Silo One Customers because it makes clear that the Debtors have no obligation

to return the same metals that the Silo One Customers gave them.[5]  *See Sturm*, 150 U.S. at 329;

*Burkhardt*, 97 U.S. at 116.

Other language in the Executed Terms confirms this result.  The Court agrees with the

Debtors and the Senior Lenders that multiple provisions of the Executed Terms suggest a

purchase and sale agreement and are inconsistent with a bailment.  These include a provision that

specifically contemplates a purchase and sale agreement, albeit one to be memorialized in a

confirmation email.  This provision states in relevant part:

- **Fixing of Metal:** . . . Customer warrants that any purchase or sale contract has been effectuated by Customer for the sole purpose of securing pricing for the ultimate sale or purchase of precious metals and has not been made for any speculative reason whatsoever.  Customer hereby has an obligation to deliver or purchase said metal to or from RMC . . . . Customer agrees that he has entered into a written, legally binding contract for the sale/purchase of precious metals contained within the confirmation

---

[5]    The Court notes that Music City Group, LLC also has Executed Terms with RMC containing this language. *See* Avila Decl., Composite Ex. D, Tab 15 at 19.  Out of an abundance of caution, the Court has not yet taken a position as to whether today's ruling includes Music City Group because Composite Exhibit D to the Avila Declaration does not contain a complete set of Executed Terms between the Debtors and Music City Group.

> email. Customer further warrants that said contract is in compliance with the Florida
> Uniform Commercial Code[.]

Avila Decl., Composite Ex. D, Tab 2 at 15 (Alex Morningstar Corp. d/b/a Morningstar's); Avila

Decl., Composite Ex. D, Tab 4 at 20 (Bay Area Metals); Avila Decl., Composite Ex. D, Tab 5 at

12 (Brilliant Jewelers / MJJ Inc.); Avila Decl., Composite Ex. D, Tab 11 at 18 (Geib Refining

Corp.); Avila Decl., Composite Ex. D, Tab 16 at 20 (Noble Metal Services, Inc.); Avila Decl.,

Composite Ex. D, Tab 18 at 20 (Pyropure, Inc. d/b/a Pyromet); Avila Decl., Composite Ex. D,

Tab 19 at 13 (Texas EZPAWN, L.P.).

Another provision expressly contemplates a transfer of title in connection with such a

sale. It states in relevant part:

- **Warranty of Title:** Customer warrants to RMC that it has good and marketable title
  to said property, full authority to sell and transfer said property. . . . Customer further
  warrants to RMC that it will fully defend, protect, indemnify, and hold harmless
  RMC from any adverse claim thereto.

Avila Decl., Composite Ex. D, Tab 2 at 11 (Alex Morningstar Corp. d/b/a Morningstar's); Avila

Decl., Composite Ex. D, Tab 4 at 16 (Bay Area Metals); Avila Decl., Composite Ex. D, Tab 5 at

9 (Brilliant Jewelers / MJJ Inc.); Avila Decl., Composite Ex. D, Tab 11 at 14 (Geib Refining

Corp.); Avila Decl., Composite Ex. D, Tab 14 (Mitchell Levine (Plat/Co.)); Avila Decl.,

Composite Ex. D, Tab 16 at 16 (Noble Metal Services, Inc.); Avila Decl., Composite Ex. D, Tab

18 at 16 (Pyropure, Inc. d/b/a Pyromet); Avila Decl., Composite Ex. D, Tab 19 at 10 (Texas

EZPAWN, L.P.).

Furthermore, the Executed Terms state that the parties agree that they are "merchants" as

defined in Article 2, Section 104(1) of the Uniform Commercial Code. *See* Avila Decl.,

Composite Ex. D, Tab 2 at 16 (Alex Morningstar Corp. d/b/a Morningstar's); Avila Decl.,

Composite Ex. D, Tab 4 at 21 (Bay Area Metals); Avila Decl., Composite Ex. D, Tab 5 at 13

(Brilliant Jewelers / MJJ Inc.); Avila Decl., Composite Ex. D, Tab 11 at 19 (Geib Refining

Corp.); Avila Decl., Composite Ex. D, Tab 16 at 21 (Noble Metal Services, Inc.); Avila Decl.,

Composite Ex. D, Tab 18 at 21 (Pyropure, Inc. d/b/a Pyromet); Avila Decl., Composite Ex. D,

Tab 19 at 14 (Texas EZPAWN, L.P.).[6]  This provision supports the notion of a sale—rather than

a bailment—because  Article 2 of the Uniform Commercial Code specifically governs sales, not

bailments.  *See* Fla. Stat. Ann. § 672.106 ("In this chapter unless the context otherwise requires

'contract' and 'agreement' are limited to those relating to the present or future sale of goods.");

N.Y. U.C.C. § 2-106(1) ("In this Article unless the context otherwise requires 'contract' and

'agreement' are limited to those relating to the present or future sale of goods.").

Indeed, the Court notes that the parties knew how to use the term "bailment" when

appropriate—they simply chose not to use the term to establish a bailment on behalf of the Silo

One Customers.  More specifically, the Executed Terms include the following language:

- **Consignment:**  It is expressly agreed upon by both parties that any and all material
  shipped to Customer, and/or delivered to Customer, and/or released to Customer on a
  consignment/bailment basis remains the property of RMC, with a security interest in
  RMC, until the material is returned to RMC[.]

Avila Decl., Composite Ex. D, Tab 2 at 14 (Alex Morningstar Corp. d/b/a Morningstar's); Avila

Decl., Composite Ex. D, Tab 4 at 19 (Bay Area Metals); Avila Decl., Composite Ex. D, Tab 5 at

11 (Brilliant Jewelers / MJJ Inc.); Avila Decl., Composite Ex. D, Tab 11 at 17 (Geib Refining

Corp.); Avila Decl., Composite Ex. D, Tab 14 (Mitchell Levine (Plat/Co.)); Avila Decl.,

Composite Ex. D, Tab 16 at 19 (Noble Metal Services, Inc.); Avila Decl., Composite Ex. D, Tab

18 at 19 (Pyropure, Inc. d/b/a Pyromet); Avila Decl., Composite Ex. D, Tab 19 at 12 (Texas

EZPAWN, L.P.)  This provision contemplates a future situation where RMC obtains title of

---

[6]    The Court acknowledges that this language and the "Fixing of Metal" language quoted above is not
included in the Executed Terms of Silo One Customer, Mitchell Levine (Plat/Co.).  This does not affect the Court's
ruling.

14

metals through a sale and then assumes the role of bailor and bails certain goods to a Silo One

Customer.  The fact that other portions of the Executed Terms do not include similar title

reservations and bailment language support the idea that the transactions at issue here were not

bailments.  *See, e.g.*, *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014)

("Even where there is ambiguity, if parties to a contract omit terms—particularly, terms that are

readily found in other, similar contracts—the inescapable conclusion is that the parties intended

the omission.  The maxim *expressio unius est exclusio alterius*, as used in the interpretation of

contracts, supports precisely this conclusion.") (citing *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d

Cir. 1976)); *Am. Univ. of the Caribbean, N.V. v. Caritas Healthcare, Inc.*, 441 F. App'x 644, 646

(11th Cir. 2011) ("Florida law recognizes the 'doctrine of *expressio unius est exclusio alterius*,'

which 'instructs that when certain matters are mentioned in a contract, other similar matters not

mentioned were intended to be excluded.'") (quoting *Asbestos Settlement Tr. v. City of New York

(In re Celotex Corp.)*, 487 F.3d 1320, 1334 (11th Cir. 2007)).

In the face of these provisions, the Silo One Customers nevertheless argue that the

Executed Terms do not contain key terms necessary to establish a final sale—including, but not

limited to, the sales price, the quantity of goods to be sold, and the timing of the sale.  *See*

Opposition at 23 ("The standard terms do not, standing alone, constitute a sales contract.  No

version of the document is titled 'sales agreement' or the like.  They do not identify any specific

goods, or the price for those (unidentified) goods, or the timing when the (unidentified) goods

will be delivered."), 24 ("Thus, the standard terms reflect that, unless the Customers and the

Debtors identified for 'RMC Purchase' specific sets or quantities of metals delivered by the

Customer for purchase . . . title to the Customer's metals does not pass to the Debtors.").

Instead, they claim that they "owned the precious metal which they entrusted to Debtors under

contracts of bailment established by state law prior to the commencement of the Debtors'

bankruptcy cases." *Id.* at 35.  Relying on this bailment theory, they request—among other

things—that the Court impose the equitable remedy of a constructive trust on Debtors' remaining

inventory of precious metal or the proceeds thereof.  *See id.* at 35–36.

Contrary to the Silo One Customers' assertions, the Executed Terms provide the Silo One

Customers with two options when fixing precious metals with RMC: the "spot" price (the metal

price as determined by global markets at the time of fixing) or the "London PM" price (the metal

price as determined by the London Bullion Market Association at the time of fixing).  *See* Avila

Decl., Composite Ex. D, Tab 2 at 15 (Alex Morningstar Corp. d/b/a Morningstar's); Avila Decl.,

Composite Ex. D, Tab 4 at 20 (Bay Area Metals); Avila Decl., Composite Ex. D, Tab 5 at 12

(Brilliant Jewelers / MJJ Inc.); Avila Decl., Composite Ex. D, Tab 11 at 18 (Geib Refining

Corp.); Avila Decl., Composite Ex. D, Tab 16 at 20 (Noble Metal Services, Inc.); Avila Decl.,

Composite Ex. D, Tab 18 at 20 (Pyropure, Inc. d/b/a Pyromet); Avila Decl., Composite Ex. D,

Tab 19 at 13 (Texas EZPAWN, L.P.).[7]  Moreover, even if there were no price provided in the

Executed Terms, contracts are not void for lack of a fixed price term under Florida or New York

law.  *See* Fla. Stat. Ann. § 672.305(1); N.Y. U.C.C. § 2-305(1).

By contrast, the Court recognizes that Florida law deems quantity to be an essential term

in a contract for the sale of goods.  *See* Fla. Stat. Ann. § 672.201(1) & cmt. 1.  But as the Debtors

and Senior Lenders correctly point out, "a 'contract for sale' can include 'both a present sale of

goods and a contract to sell goods at a future time.'"  Joint Reply Memorandum of Law in

Further Support of the Motion at 14 [ECF No. 1139] (citing Fla. Stat. Ann. § 672.106(1)).  Under

---

[7]    The Executed Terms of Silo One Customer Mitchell Levine (Plat/Co.) similarly provide that the pricing of
gold, silver, platinum, and palladium will be the "Republic Metals purchase price" for each, "based on 2nd London
fix."  Avila Decl., Composite Ex. D, Tab 14.

Florida law, identification of goods to be sold at a future time occurs when the goods are

shipped, marked or otherwise designated by the seller.  *See* Fla. Stat. Ann. § 672.501(b).  As

such, even though execution of the Executed Terms may not, by itself, give rise to finalized

contracts for the sale of goods, the Executed Terms appear to constitute contracts for the *future*

sale of the goods, with such goods being identified after shipment to the Debtors' refinery.[8]  In

any event, nothing about the way price or quantity are addressed here suggests that the parties

intended to establish a bailment here given the other terms cited above.[9]  And because the Silo

One Customers have failed to establish a bailment and have no ownership interest in the disputed

metals, there is no basis to impose a constructive trust.  *See In re Miss. Valley Livestock, Inc.*,

745 F. 3d 299, 304–05 (7th Cir. 2014) ("The remedy of constructive trust applies to a subset of

unjust enrichment: that resulting from the unauthorized or invalid transfer of property. . . . In

such cases . . . the law provides that true ownership of the property never passes from transferor

to transferee.  Although the transferee (such as a bailee) may have actual and even legal

possession, ownership remains vested in the transferor, who has a legal right to demand the

return of the property.").[10]

---

[8]     The parties' pleadings focus largely on the issue of bailment and thus do not spend much, if any, time discussing what kind of sale contract these Executed Terms might constitute under Florida and/or New York law. *Cf. In re New York Internet Co., Inc.*, 2018 WL 1792235, at *6–8 (Bankr. S.D.N.Y. Apr. 13, 2018) (discussing nature of particular contract under New York law as among parties' competing interpretations including successive separate contracts or one option contract) (citing *In re Hawker Beechcraft, Inc.*, 2013 WL 2663193 (Bankr. S.D.N.Y. June 13, 2013)).  Accordingly, the Court is loath to speculate without further briefing.  Given the present record and the parties' need for guidance on the issue of bailment, however, the Court concluded that it was unnecessary to delay issuing this decision.

[9]     The Debtors also argue that the Executed Terms constitute a sale because title to the raw materials passes to Debtors upon delivery pursuant to Section 2-401 of the Uniform Commercial Code.  *See* Motion at 18–20.  The Bucket One Customers disagree, citing to the analogous Florida statute which states the "title to goods cannot pass under a contract for sale prior to their identification to the contract."  Opposition at 23 (citing Fla. Stat. Ann. § 672.401(1)).  Given today's ruling, the Court need not rely on Section 2-401 in reaching its decision.

[10]     A constructive trust would also be inappropriate here because both Florida and New York law preclude a party from pursuing a constructive trust where there is an agreement governing the parties' relationship.  *See, e.g.*, *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st Dist. Ct. App. 2008) (affirming dismissal

**B.   The Debtors' Course of Performance with the Silo One Customers Likewise Does Not Establish a Bailment**

While the Court finds that these Executed Terms unambiguously establish a framework indicative of a sale rather than a bailment and thus extrinsic evidence need not be considered, the Court notes that the Executed Terms may nevertheless by supplemented by the Debtors' course of performance with the Silo One Customers.  *See* Fla. Stat. Ann. § 672.202; N.Y. U.C.C. § 2-202.  The Debtors describe their course of performance in their Joint Statement of Mutual Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7065-1 (the "SUF") [ECF No. 939], which relies on the Avila Declaration for evidentiary support.  In the SUF, the Debtors and Senior Lenders explain how customers from all over the United States and the Western Hemisphere shipped unrefined material, primarily containing gold and silver, to the Debtors for refining, and how the Debtors would then refine this material and produce refined silver and gold bars and casting grains.  *See* SUF ¶ 15 (citing Avila Decl. ¶ 5).  After the Debtors received raw materials from the Customers, the raw metals were assigned lot numbers, weighed, and melted to obtain a homogenous sample for assay testing.  *See* SUF ¶ 17 (citing Avila Decl. ¶ 7).  With the exception of a certain program called "Peace of Mined," which none of the Silo One Customers participated in, the individual customer lots were commingled with other customer lots during the refining process.  *See* SUF ¶¶ 17, 20 (citing Avila Decl. ¶¶ 7, 10).  Importantly, "[t]he Debtors could not identify the raw materials delivered by customers after they were commingled with other lots for refining and during and after the [dissolve process where the raw materials were dissolved in acid to create a solution]."  SUF ¶ 18 (citing Avila Decl. ¶ 8).  They also could

---

of request for imposition of a constructive trust where there was an express contract between the parties governing the subject matter); *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 212–13 (2d Cir. 2004) (holding that the existence of a controlling agreement precludes imposition of a constructive trust under New York state law).  Here, the Executed Terms govern the relationship between the Debtors and each Silo One Customer.

not identify what raw materials or lots were included in the Refined Product or Minted Product (as defined in the SUF). *See id.*

The Joint Response to the Debtors' SUF was filed on behalf of all Bucket One Customers, including the Silo One Customers. While summary judgment requires the Court to consider facts in the light most favorable to the non-moving party, the Court reiterates an observation it made at the hearing held on June 10, 2019: the Joint Response is devoid of any evidentiary support and fails to satisfy the procedural requirements set forth under Rule 56(c).[11] While some Silo One Customers ultimately did provide individual statements and joinders with supporting affidavits, three of them failed to respond to the SUF at all (Bay Area Metals, Brilliant Jewelers / MJJ Inc., and Texas EZPAWN, L.P.) and one submitted a joinder with no supporting evidence (Pyropure, Inc. d/b/a Pyromet [ECF No. 1083]). Nor did any of the Silo One Customers provide affidavits claiming that they had insufficient information to dispute Debtors' facts, as required by Rule 56(d).

Even though many Silo One Customers failed to submit appropriate evidence, the one thing that they did provide was the Joint Response. But the Joint Response does not change the result here. In response to the Debtors' summary of their refining process as set forth in the SUF, the Silo One Customers do not dispute the central facts relied upon by the Debtors. The Joint Response states:

> The Customers do not dispute the general description of the refining process set forth in No. 17; however the Customers dispute the contentions in No. 17 to the extent the Debtors and the Senior Lenders contend that Debtors had the right to move a Customer's goods from assay testing into refining absent the Customer's express agreement,

---

[11]    Indeed, the Bucket One Customers acknowledge this deficiency, noting: "Although a response pursuant to Local Bankruptcy Rule 7056-1(c) would ordinarily include an affidavit to provide evidentiary support for the responses, such is not practicable in the instant case. The Joint Statement is directed to 26 separate and unrelated Customer parties, all with some overlapping and some wholly unique facts and circumstances. The Customers anticipate that each will provide its own evidence to support its opposition to summary judgment at the time the Customers individually join the Customers' joint opposition to the motion for summary judgment." Joint Response at 1 n. 4.

negotiated and reached on a lot-by-lot basis, to do so. The Customers also dispute the
contention regarding the sale or transfer of Refined Product to the mint to the extent the
Debtors and Senior Lenders contend that there could or was any such sale of a given
Customer's refined metal absent such Customer's express agreement, negotiated and
reached on a case by case basis, for such sale.

Joint Response ¶ 17.  Likewise, in response to Debtors 'position that they cannot identify the raw

materials delivered by Customers after they were commingled with other lots for refining and

during and after the dissolution process, the Silo One Customers respond:

The Customers dispute the contentions in No. 18 to the extent the Debtors and Senior
Lenders contend that the raw material delivered by a customer could not be identified as
the goods of that customer after comingling [sic] but before the goods were actually put
into the refining process; the contentions in No. 18 are otherwise not disputed.

Joint Response ¶ 18.

Thus the Silo One Customers do not, at any point, dispute the fact that their raw metals

were commingled with other Customers' raw metals after commencement of the refining

process.  Nor do the Silo One Customers dispute that they delivered to the Debtors varying lots

for refinement—different metals that went through an assay process to determine their level of

purity.  *See* Joint Response ¶ 15 ("The Customers do not dispute that the Debtors refined

precious metals, primarily gold and silver; that Customers shipped unrefined material to Debtors

for refining; nor that Debtors refined the materials and produced bars and casting grains."), ¶ 17

("The Customers do not dispute that, [after raw materials were received by the Debtors, they

were assigned lot numbers, weighed, melted, sampled for assay testing and put into the refining

process, generally on the same day].").  As such, there does not appear to be any dispute that the

Silo One Customers' metals were both commingled and non-fungible[12]—facts that are

inconsistent with a bailment.

---

[12]    The Court notes that the Silo One Customers' Executed Terms contain the language "[p]recious metals are
fungible." *See, e.g.*, Avila Decl., Composite Ex. D, Tab 2 at 14 (Alex Morningstar Corp. d/b/a Morningstar's).
However, this language is found in the "Pool/Toll Account" section of the Executed Terms and refers to any credit

Indeed, the fact that the Silo One Customers' original metals were non-fungible and were commingled during the refining process differentiates their case from many of those cited in the Bucket One Customers' Opposition in support of their position.  For example, in *Pub. Serv. Elec. & Gas Co. v. Fed. Power Commission*, 371 F.2d 1, 4 (3d Cir. 1967), the Third Circuit found that the physical commingling of natural gas from two parties "[did] not compel rejection of historic notions of bailments," but it also specifically referred to the gas as "a fungible commodity."  *See also In re Enron Corp.*, 2003 WL 23965469, at *3 (Bankr. S.D.N.Y. Jan. 22, 2003) ("[C]ommingling *fungible goods* is not categorically antithetical to a bailment" and the fact that a pipeline company "commingled natural gas in [its] pipelines would be insufficient, as a matter of law, to destroy an otherwise valid bailment.") (emphasis added); *In re Fuel Oil Supply & Terminaling, Inc.*, 1987 U.S. Dist. LEXIS 1320, at *10 (S.D. Tex. Jan. 29, 1987) (holding that "if, as in the majority of situations *involving fungible goods*, the commodity is placed in a receptacle where the similar commodities belonging to others are deposited, the transaction is a bailment" and consequently finding a bailment where gas delivered by an oil company was placed in a pipeline and mixed with the gas of others) (emphasis added).

Similarly, *Inglebright v. Hammond*, 19 Ohio 337, 344 (1850) contemplated a situation "[w]here an article *of the same kind and value* [wheat] . . . [was] mingled together by the consent of parties . . . ." (emphasis added).  Another case, *O'Dell v. Leyda*, 46 Ohio St. 244, 247 (1889), likewise specified that the commodity being mixed together was "*like grain* of different owners[.]"  Whereas the goods in those cases were identical prior to being commingled, the Silo One Customers here delivered unique and heterogenous materials of different quality and value to Debtors.  *Compare* ECF No. 463 ¶ 4 (gold scrap and polishing sweeps) *with* ECF No. 1090 at

---

for metal in a Silo One Customer's pool account—not the original metals that that Silo One Customer delivered to the Debtors.

21

Ex. 1 ¶ 7 (accumulated jewelry or scrap metals including gold, silver, and platinum).  As such, these cases do not support the Silo One Customers' position.

## CONCLUSION

For the foregoing reasons, the Court grants the Debtors' and Senior Lenders' Motion with respect to the eight Silo One Customers identified in this decision.  More specifically, the Court concludes that the Silo One Customers do not have any ownership interest in the disputed assets, and the disputed assets claimed as property of these Customers are actually property of the Debtors' bankruptcy estates.  The Silo One Customers are thus left with unsecured claims.

While the Court today only rules on the Silo One Customers, the Court notes that the record currently before it may be useful to other parties in assessing their litigation risk going forward.  The Court encourages the parties to meet and confer about the next steps in these cases in light of this ruling.  The Court will schedule a status conference to assess next steps as to the remaining 18 Bucket One Customers and the remaining non-Bucket One Customers.

The Debtors should settle an order on three days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to the Silo One Customers.

Dated: New York, New York
    August 9, 2019

    _/s/ Sean H. Lane_____
    UNITED STATES BANKRUPTCY JUDGE