UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
In re:                                                                  Chapter 11

MIAMI METALS I, INC., *et al.*,[1]                                       Case No. 18-13359 (SHL)

                                  Debtors.                                    (Jointly Administered)
------------------------------------------------------------------------x

## MEMORANDUM OF DECISION ON
## (I) DEBTORS' PSA MOTION [ECF NO. 1121] AND (II) JOINT SETTLEMENT MOTION OF DEBTORS, OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND SENIOR LENDERS [ECF NO. 1122]

Before the Court is (i) the Debtors' Motion for Entry of an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Debtors to Enter Into and Perform Under Plan Support Agreement (the "PSA Motion") [ECF No. 1121] and (ii) the Joint Motion of Debtors, Official Committee of Unsecured Creditors, and Senior Lenders for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019 (the "Settlement Motion," and together with the PSA Motion, the "Motions") [ECF No. 1122]. For the reasons set forth below, the Court denies the Motions.

## BACKGROUND

On November 2, 2018 (the "Petition Date"), Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), Miami Metals II, Inc. (f/k/a Republic Metals Corporation), and Miami

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38th Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

Metals III LLC (f/k/a Republic Carbon Company) each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. *See, e.g.*, Chapter 11 Voluntary Petition for Non-Individuals Filing for Bankruptcy [ECF No. 1]. Shortly thereafter, the Court entered an order directing that these cases be jointly administered. *See* Order Directing Joint Administration of Related Chapter 11 Cases [ECF No. 44]. The remaining Debtors subsequently filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and these cases were consolidated with the other Debtors' cases for procedural purposes only. *See* Order Directing Joint Administration of Additional Related Chapter 11 Cases [ECF No. 239].

Central to these cases are the disputes between the Debtors who refined precious metals and the customers who provided the Debtors with precious metals for refining (the "Customers"). Generally speaking, the Debtors claim that metals delivered by the Customers for refining became estate property while the Customers maintain that the metals remained property of the Customers until such time as the refined metals were sold to a third party or paid for by the Debtors.

On November 19, 2018, the Office of the United States Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors (the "Committee"). *See* Appointment of Committee [ECF No. 113]. The Committee consists of the following seven Customers: (i) Coeur Rochester, Inc., (ii) Bayside Metal Exchange, (iii) So Accurate Group Inc., (iv) Cyber-Fox Trading, Inc., (v) Minera Triton Argentina S.A., (vi) Pyropure Inc., and (vii) Minera Real de Ora S.A. de C.V. *See id.*

Pursuant to an order entered by the Court on March 1, 2019, the Committee has standing to investigate, prosecute, settle, or abandon: (i) any and all causes of action and claims arising under Chapter 5 of the Bankruptcy Code or equivalent state fraudulent transfer or conveyance

2

laws and (ii) any and all claims or causes of action on behalf of the Debtors' estates against the Debtors' current and former insiders, entities owned/controlled by or related to such insiders, and/or individuals or entities that may have aided, abetted, participated in or otherwise facilitated misconduct by the Debtors' insiders or their related entities. *See* Stipulation and Order Granting Standing to the Committee at 2 [ECF No. 696]. Consistent with this authority, the Committee commenced an investigation of the Senior Lenders'[2] prepetition liens, claims, and conduct shortly after its appointment. *See* Declaration of David Greenblatt in Support of Settlement Motion ¶ 4 (the "Greenblatt Decl.") [ECF No. 1122-4]. The investigation resulted in the Committee identifying potentially colorable claims to challenge the validity, extent, perfection and/or enforceability of certain of the Senior Lenders' liens and claims (the "Potential Challenges"). *See id.* ¶ 7. Such Potential Challenges include:

- Avoidance of the mortgage granted by the Debtors in favor of the Senior Lenders on the real property located at 12800 NW 39th Avenue, Miami, Florida;

- Avoidance of purported liens of Mitsubishi and Techemet on substantially all of the Debtors' assets;

- Avoidance of purported liens on the Debtors' cash holdings in non-Senior Lender accounts as of the Petition Date; and

- Avoidance of purported liens on the Debtors' vehicles, insurance policies, and other assets owned by certain of the smaller Debtor subsidiaries as of the Petition Date.

*See id.* (citing to Settlement Motion ¶ 8).

The Committee has been engaging in discussions with the Senior Lenders since April 2019 regarding a possible global settlement of the Potential Challenges and the exit strategy for these cases. *See* Greenblatt Decl. ¶ 8. These arm's-length negotiations ultimately resulted in the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PSA Motion or the Settlement Motion, as applicable.

parties agreeing to the terms of the settlement memorialized in the agreement attached to the Settlement Motion (the "Settlement") [ECF No. 1122-1]. *See* Greenblatt Decl. ¶ 9; *see also* Declaration of Scott Avila in Support of Motions ¶ 7 (the "Avila Decl.") [ECF No. 1121, Ex. B]. Among other things, the Settlement contemplates that the Parties will enter into a plan support agreement substantially in the form annexed to Exhibit A of the PSA Motion at Schedule 1 (the "Plan Support Agreement"). *See* Settlement § 6. Broadly, the Settlement also provides for: (i) an agreement by the Senior Lenders to increase the Carve-Out (as defined in the Interim Cash Collateral Orders) by $7,500,000, (ii) an assignment of certain claims by the Senior Lenders to the Debtors' estates, (iii) a distribution from Cash Collateral consisting of various proceeds to the Senior Lenders, (iv) the entry the Final Cash Collateral Order, (v) a release of the Senior Lenders by the Committee, the Debtors, and their estates with respect to claims related in any way to the Debtors, prepetition obligations, prepetition liens, prepetition collateral, or the secured credit/lease documents, and (vi) a prohibition on parties-in-interest seeking to exercise the rights of the Debtors' estates to assert any Released Claim against any Released Party. *See generally id.* §§ 4–7.

Although the Settlement and Plan Support Agreement necessarily effect the rights and recoveries of the Customers, the Customers did not participate in negotiations with the Debtors, Committee, or Senior Lenders in formulating the Settlement or the Plan Support Agreement. *See* Avila Decl. ¶ 7 (noting that the Senior Lenders and Committee "engaged in several weeks of extensive, arm's-length negotiations, to which the Debtors[] joined more recently," and that such parties' efforts resulted in a "global" settlement). Perhaps not surprisingly then, multiple Customers filed objections to the Motions.[3] The Debtors, Committee and Senior Lenders filed

---

[3]    *See* Midwest Refineries, LLC's Limited Objection to Debtors' Motion for Entry of an Order under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Debtors to Enter Into and Perform Under Plan Support

an omnibus reply in further support of the Motions on June 11, 2019. *See* Omnibus Reply of Debtors, Committee, and Senior Lenders to Objections Filed to the Motions [ECF No. 1183]. The Court heard argument on the Motions on June 13, 2019.

## **DISCUSSION**

The Court's authority to approve a settlement agreement is set forth in Rule 9019 of the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."). "'[C]ompromises are favored in bankruptcy' because they minimize the costs of litigation and further the parties' interest in expediting the administration of a bankruptcy estate." *Hilsen v. Packles (In re Hilsen)*, 404 B.R. 58, 69 (Bankr. E.D.N.Y. 2009) (quoting *Inv. Exchange Grp., LLC v. Colorado Capital Bank (In re The 1031 Tax Group, LLC)*, 2007 WL 2455176, at *3 (Bankr. S.D.N.Y. 2007)).

In considering whether to approve a proposed settlement, "[i]t is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005). Rather, the court must make an informed and independent judgment as to whether a proposed compromise is "fair and equitable" after apprising itself of "all facts necessary for an intelligent and objective opinion of the

---

Agreement [ECF No. 1166]; Midwest Refineries, LLC's Limited Objection to Joint Motion of Debtors, Official Committee of Unsecured Creditors, and Senior Lenders for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019 [ECF No. 1168]; Objection of Tiffany and Company and Laurelton Sourcing, LLC, Premier Gold Mines Limited, Pretium Exploration Inc., and Yamana Gold Inc. to (i) Debtors' Motion for Entry of an Order under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Debtors to Enter Into and Perform Under Plan Support Agreement [ECF 1121] and (ii) Joint Motion of Debtors, Official Committee of Unsecured Creditors, and Senior Lenders for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019 [ECF 1122] (the "Tiffany Objection") [ECF No. 1171]; Omnibus Objection of Certain Customers to Debtors' Settlement Motions [ECF No. 1173]; Joinder by 7645635 Canada Inc. and Pollock-Cameron Investments Corporation to Objection Filed at ECF 1171 [ECF No. 1175]; Limited Objection of Affected Parties to Joint Motion for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019 [ECF No. 1179]; and Limited Objection and Reservation of Rights of Brink's Global Services U.S.A. Inc. and Affiliated Entities [ECF No. 1181].

probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

In order to assess the fairness and equitability of a proposed settlement, the Second Circuit has articulated certain factors to consider, namely:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether the parties in interest support the proposed settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

Notwithstanding the above factors, the Second Circuit has explicitly instructed "that when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties." *Stanwich Fin. Servs. Corp. v. Pardee (In re Stanwich Fin. Servs. Corp.)*, 377 B.R. 432, 437 (Bankr. D. Conn. 2007) (citing *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1146–47 (2d Cir. 1993)); *see also In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval . . . . [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside.").

A bankruptcy court's obligation to protect the interests of affected persons who are not parties to a particular agreement is also recognized in other contexts. *See, e.g.*, *In re Biolitec, Inc.*, 528 B.R. 261 (Bankr. D. N.J. 2014). In *Biolitec*, the Chapter 11 Trustee filed a motion for entry of an order providing for a structured dismissal of the debtor's Chapter 11 case under Section 105 (among others) of the Bankruptcy Code and approving a settlement agreement under Bankruptcy Rule 9019. While the facts presented before the Court today do not contemplate a structured dismissal, the reasoning expressed by the *Biolitec* court is nevertheless instructive:

> Here, the Motion, while passing the "practicality" test, must be denied because the structured dismissal seeks to alter parties' rights without their consent and lacks many of the Code's most important safeguards. . . . Even if a structured dismissal would result in more assets being made available to the creditor body, such relief may not be approved without assurances that creditor protections provided by confirmation or liquidation pursuant to § 1129 or dismissal or conversion pursuant to § 1112(b) are either present or waived by all parties. If a chapter 11 case could be dismissed solely to avoid additional expenses associated with liquidating the estate, parties would rarely, if ever, convert to chapter 7 and the conversion option in section 1112(b) would essentially be rendered superfluous. . . . Thus, under conversion or dismissal under § 1112(b), all parties to the bankruptcy proceeding are assured that their interests are accounted for and preserved. Here, the proposed structured dismissal arrangement lacks such assurances. Without the consent of all interested parties, it seeks to execute binding assignments of rights and releases of liability, to modify the claims distribution process, to replace the chapter 7 trustee with a Liquidating Trustee that is not subject to the duties and requirements of the Code, and to subordinate the claims of the Non–Debtor Affiliates in the absence of this Court's determination that subordination is warranted. These fundamental Code protections cannot be bypassed without the consent of all parties with an economic stake in the estate.

*Biolitec*, 528 B.R. at 269–70.

In addition to expressing its concerns about impinging on non-settling parties' rights without their consent, the *Biolitec* court also made clear that it could not approve an outcome-determinative settlement that would have the same effect as a sub rosa plan:

> Finally, even though the settlement clearly affects parties' rights by assigning rights and interests, forcing creditors to receive distributions through the Liquidating Trust instead of the bankruptcy process, and subordinating the claims of the Non–Debtor Affiliates, parties other than those to the settlement did not receive disclosures or the opportunity to

7

negotiate or vote on the settlement's provisions. In this respect, the structured dismissal resembles an impermissible sub rosa plan. It is well-established that courts may not approve settlements that have the effect of a sub rosa plan and accomplish an end run around the protection granted creditors in Chapter 11 of the Bankruptcy Code.

*Biolitec*, 528 B.R. at 271–72 (internal quotations omitted).

Applying all these principles here, the Court must deny the Motions. In sum, there are two primary problems with the proposed Settlement: (i) potential prejudice to the Customers' rights and (ii) timing. *See* June 13, 2019 Hr'g Tr. at 93:19–103:10 [ECF No. 1199].

As to the first issue, a key feature of the Settlement is execution of the Plan Support Agreement. *See* Settlement § 6. The Plan Support Agreement, in turn, is premised on a Plan that will create a reserve of all proceeds generated by the sale of precious-metal inventory other than Undisputed Collateral (the "Ownership Reserve") and that will satisfy Customer ownership claims through such Ownership Reserve. *See* Plan Support Agreement, Ex. A at 2–4 (the "Plan Term Sheet"). The Customer ownership disputes are complex and interrelated, and, to date, very few of them have been resolved during the nine-month duration of these cases. While the Ownership Reserve earmarks monies to distribute to Customers as ownership disputes are resolved, the Ownership Reserve by its very nature sets a limit for how much money Customers will ultimately be able to recover. Crucially, no party disputes that the Ownership Reserve may not be sufficient to satisfy all the potential Customer claims. Indeed, the Senior Lenders appear to acknowledge this problem. They attempt to address it by including a provision in the Settlement requiring them to disgorge an amount equal to the Settlement Payment if it is ultimately determined that they do not have an interest in all or some part of the Cash Collateral used to fund the Settlement Payment—in other words, if a Customer subsequently demonstrates a valid ownership interest in the Cash Collateral and there is not enough money in the Ownership Reserve to satisfy its claims. *See* Settlement § 2(d). But even with this disgorgement provision,

8

it does not change the fact that the Debtors, Senior Lenders, and Committee are setting a cap on the recovery of Customers—a cap that could conceivably be inadequate if all Customers prevail on their ownership claims. Instead, the money belonging to the Customers would be used to pay claims against the estate. This is not permissible under Rule 9019.

As to the second issue, the Court is concerned about the timing of the benefits under the Settlement. In short, certain features of the Settlement automatically come into effect on the Settlement Date, whereas others are triggered if and only if the Plan, as set forth under the Plan Support Agreement, is confirmed. The Court is troubled by such sequencing in light of the allegations by certain Customers that the Plan is unconfirmable. *See, e.g.*, Tiffany Objection ¶¶ 11–15. Thus, the current formulation of the Settlement ensures that the Senior Lenders will reap the full benefit of the Settlement on the Settlement Effective Date, regardless of whether or when the Plan is confirmed. *See, e.g.*, Settlement § 4 (Senior Lenders receive the Undisputed Collateral on the Settlement Effective Date); § 7 (Senior Lenders receive release on the Settlement Effective Date). By contrast, the Debtors' estates and Customers will suffer if the Plan fails because their benefits are conditioned on the Plan becoming effective. *See, e.g.*, Plan Term Sheet at 2 ("On the effective date of the Plan, the Secured Parties' Adequate Protection Liens and Adequate Protection Superpriority Claims . . . shall be disallowed, waived, and automatically cancelled."); *id.* ("On the effective date of the Plan, the Secured Parties shall release $2,000,000 of Cash Collateral . . . to fund the 503(b)(9) Fund.").

But even beyond these two problems, the Court is concerned about other provisions of the Settlement. For example, there is a provision allowing the proposed Litigation Trust to surcharge Customers under Section 506(c) of the Bankruptcy Code, even though Section 506(c) by its terms applies to property securing an allowed secured claim and not to property that does

9

not belong to the estate at all, such as the property of the Customers. It is unclear what authority exists for such a provision.

Notwithstanding the Court's rejection today of the Settlement and Plan Support Agreement, the parties may still be able to use this foundation as a framework for a future resolution of these Chapter 11 cases, rather than continue on a path of drawn-out litigation. The Court recognizes the effort and thought that went into the Settlement and also the timing concerns that drove the negotiations; the objecting Customers acknowledged the same during the hearing on the Motions. *See* June 13, 2019 Hr'g Tr. at 98:4-6. The Court encourages the parties to revisit their negotiations in light of the issues identified in this decision.[4]

## **CONCLUSION**

For the reasons stated above, the Court denies the Motions and does not approve the Settlement or the Plan Support Agreement.

The Customers should settle an order on three days' notice. The proposed order should be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel to the Debtors, the Senior Lenders, and the Committee.

Dated:  New York, New York
       August 9, 2019

                                    */s/ Sean H. Lane*
                                    **UNITED STATES BANKRUPTCY JUDGE**

---

[4] The Court's ruling is based on the record at the time of the hearing on these Motions. Thus, it was unnecessary for the Court to delay decision in this matter to address any additional facts and argument regarding a $15 million payment that is the subject of a letter submitted to the Court on August 7, 2019. *See* Letter of Benjamin Mintz dated August 7, 2019 on behalf of Customer Tiffany and Company and Laurelton Sourcing, LLC [ECF No. 1313] (requesting the opportunity to address the issue of the payment in connection with its opposition to these Motions).

10