| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date and Time: October 7, 2019 at 11:00 a.m.<br>Objection Date and Time: September 30, 2019 |

------------------------------------------------------- x
                                                           :   Case No. 18-13359 (SHL)

In re                                                :

REPUBLIC METALS REFINING          :   Chapter 11
CORPORATION, *et al.*,[1]                    :

                              Debtors.   :   (Jointly Administered)
------------------------------------------------------- x

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE AMENDED
JOINT DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF
LIQUIDATION OF DEBTORS**

Dated: New York, New York
        September 30, 2019

                                                         WILLIAM K. HARRINGTON
                                                         UNITED STATES TRUSTEE

                              By:     /s/ *Shannon Anne Scott*
                                       Shannon Anne Scott
                                       Trial Attorney
                                     201 Varick Street, Room 1006
                                     New York, New York 10014
                                     (212) 510-0500

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Republic Metals Refining Corporation, 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194), Republic Metals Corporation, 12900 NW 38th Avenue, Miami, FL 33054 (4378), Republic Carbon Company, LLC, 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833), Republic High Tech Metals, LLC, 13001 NW 38 Avenue, Miami, FL 33054 (6102), RMC Diamonds, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (1507), RMC2, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (4696), J & L Republic LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7604); R & R Metals, LLC, 12900 NW 38th Avenue, Miami, FL 33054 (7848), Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639), and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

TO: THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this objection to the Joint Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Debtors (the "**Disclosure Statement**"). [ECF No. 1401]. In support thereof, the United States Trustee respectfully states:

## PRELIMINARY STATEMENT

The Disclosure Statement should not be approved because it fails to provide creditors with sufficient information to allow them to make an informed choice as to whether to accept or reject the Amended Joint Chapter 11 Plan of Liquidation of Debtors (the "**Plan**"). It has been clear from the very beginning of these cases, that there are a significant number of creditors with 503(b)(9) administrative claims. The Bankruptcy Code provides that unless the holder of such a claim has agreed to a different treatment, that claim must be paid at confirmation. In contrast to other types of claims where a debtor can cram down an entire class of creditors, there is no such provision in the Code to cram down an entire class of administrative expense claimants.

The Debtors' Plan and Plan Restructuring Support Agreement takes the extraordinary step of vitiating clear Code requirements with respect to 503(b)(9) claims by providing that allowed administrative 503(b)(9) expense claimants will not be paid in full, despite the Debtor's failure to secure their consent to alternative treatment[2]. Instead, if a 503(b)(9) creditor does not file an objection to the Plan, it will be somehow assumed to have given its consent to this

---

[2] The Debtors assert that certain administrative 503(b)(9) expense claimants have signed on to the PSA or otherwise agreed to the treatment under the Plan, however, as set forth herein, the existence of claimants that have not provided affirmative consent demonstrate that the Debtors still have not satisfied the mandatory requirements under Section 1129(a)(9). It should also be noted that the Disclosure Statement does not identify administrative 503(b)(9) expense claimants that have agreed to the treatment under the Plan.

2

treatment. The Debtors' propose a reserve of $4,000,000 for a pool of administrative expense claims of approximately $42 Million Dollars while failing to seek consent from each holder of a 503(b)(9) claimant to different treatment under the Plan. The Disclosure Statement fails to fully articulate the reasons and under what legal theory it proposes to do so contrary to Section 1129(a)(9), and as such, the Disclosure Statement cannot be approved. Likewise, the Disclosure Statement fails to adequately explain the amount of assets on hand and, distributions to be made – including the amounts to be paid to settled claims and administrative expenses – and exactly which creditors have signed on to different treatment than they are entitled to under the Code. In fact, there is no explanation as how to much would need to be recovered under the Litigation Trust to fund distributions of for example 20%, 50% or 75% to the 503(b)(9) administrative claimants. Simply put, there is no account, description or clarification of what amounts are needed, the likelihood of recovery and the time for such recovery of the Litigation Trust for the 503(b)(9) administrative expense claimants to make an informed decision to accept different treatment.

      Further, the Debtors seek to discharge the liquidating, corporate Debtors which is impermissible pursuant to the plain language of Section 1142(d)(3) of the Bankruptcy Code. Thus, the discharge should be excluded from the Plan and Disclosure Statement. Finally, the Disclosure Statement and ballot should clearly indicate that the Debtors are seeking the approval of non-consensual third-party releases under the standard set forth by the Second Circuit Court of Appeals in *Metromedia* – and no other procedure to demonstrate consent to the same.

# I. FACTS

## A. The Chapter 11 Filings

1. On November 2, 2018 (the "**Petition Date"**), Republic Metals Refining Corporation, Republic Metals Corporation, and Republic Carbon Company, LLC (the "**Original Debtors**") filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Southern District of New York ("**Court**").

2. On November 21, 2018 (the "**Second Petition Date"**), seven additional related entities – Republic High Tech Metals, LLC; RMC Diamonds, LLC; RMC2, LLC; J & L Republic LLC; R & R Metals, LLC; Republic Trans Mexico Metals, SRL; Republic Metals Trading (Shanghai) Co., Ltd. (the "**Additional Debtors**") - filed voluntary chapter 11 petitions with the Court.

3. The Additional Debtors are affiliates of the Original Debtors and are part of the Original Debtors' ongoing business operations. *See* Debtors' Emergency Motion For Entry of Interim and Final Orders Directing That Certain Orders in the Chapter 11 Cases of Republic Metals Refining Corporation, *et al.* Apply to All Above-Captioned Cases at ¶ 1 [ECF No. 173].

4. On December 4, 2018, the Court entered an order directing the cases filed by Original Debtors and the Additional Debtors (hereinafter collectively referred to as the "**Debtors**") be consolidated for procedural purposes only and jointly administered in accordance with Bankruptcy Rule 1015(b). [ECF No. 239].

5. On November 19, 2019, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**") pursuant to Section 1102(a) of the Bankruptcy Code. [ECF No. 91].

## B. The Debtors' Business Operations

6. The Debtors are engaged in the business of refining precious metals, with a primary focus on gold and silver. *See* Declaration of Scott Avila, as Chief Restructuring Officer, In Support of Chapter 11 Petitions and First Day Motions ("**Avila Declaration**"), ¶ 7. [ECF No. 2]. Suppliers ship unrefined gold and silver to the Debtors, the metal is refined and, depending on the arrangement with the applicable buyer, the Debtors pay for unrefined metal either by check or wire transfer or delivery of refined product (physical metal) in "metals credit" on the London metals exchange. *Id.*

7. The Debtors provide products and services to global mining corporations, financial institutions and jewelry manufacturers. *Id.* at ¶ 9. In addition to refining and minting, vaulting, assaying and risk management/hedging services, the Debtors also have a carbon sampling/processing facility. *Id.*

8. The Debtors allege that in April 2018, they discovered a "significant discrepancy" in its inventory accounting as part of its preparation of 2017 year end financials and quarterly financials for the first quarter, 2018. As a result of this discovery, the Debtors say they hired the accounting firm of Eisner-Amper to conduct a physical inventory of all of the Debtors' inventory. According to the Debtors, on June 8, 2018, the physical inventory was conducted and, thereafter, on June 20, 2018, Eisner-Amper delivered a report confirming inventory discrepancies in the Debtors' books and records. *Id*. at ¶ 36.

9. As of the Petition Date, the Secured Parties[3] were collectively owed (and continue to be owed) more than $177 million by the Debtors under certain credit agreements, master netting agreements, and lease agreements. Disclosure Statement, 6-7.

---

[3] Capitalized terms not defined herein shall have the same meaning as set forth in the Plan.

### C. Cash Collateral Orders

10. With the consent of the Secured Parties, the Court entered eleven (11) orders authorizing the Debtors to use the Secured Parties' cash collateral on an interim basis, at ECF Nos. 54, 277, 372, 538, 675, 864, 987, 1160, 1237, 1356 and 1392 (collectively, the "**Interim Cash Collateral Orders**") in accordance with the budgets attached to each Interim Cash Collateral Order. *Id*. at 11.

11. Pursuant to the Interim Cash Collateral Orders, the Secured Parties assert an Adequate Protection Superpriority Claim in excess of $25,267,000 on account of postpetition diminution in value of their collateral. *Id*. at 12.

### D. Final Cash Collateral Order

12. The Debtors and the Secured Parties have sought entry of a Final Order authorizing the use of cash collateral (the "**Final Cash Collateral Order**" and, together with the Interim Cash Collateral Orders, the "**Cash Collateral Orders**") in connection with Court approval of the Plan Support Agreement. *Id*. at 11.

13. Pursuant to the Final Cash Collateral Order, the Secured Parties agreed to increase the Carve-Out (as defined in the Cash Collateral Orders) by $9,500,000 to include the following: (i) $5,500,000 for the funding of a litigation reserve for the prosecution of claims against the Debtors' insiders, auditors and other third parties and the administration of the Litigation Trust (the "**Estate Litigation Fund**") effective upon the entry of the Final Cash Collateral Order and (ii) $4,000,000 for the funding of a reserve for allowed claims under Section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Fund**") effective on the Plan Effective Date. *Id*. at 11-12.

14. The Debtors propose they will fund (i) the Estate Litigation Fund from Cash Collateral promptly after the entry of the Final Cash Collateral Order and (ii) the 503(b)(9) Fund

from Cash Collateral on the Plan Effective Date. Upon the Debtors' funding of the Estate Litigation Fund and the 503(b)(9) Fund in accordance with the preceding sentence, the Secured Parties shall have no further funding obligations in connection therewith. *Id*. at 12.

15. Finally, the Final Cash Collateral Order further provides that the Debtors shall establish a segregated account (the "**Ownership Reserve**") containing, at all times, an amount equal to the total then outstanding Ownership Claims asserted pursuant to the Uniform Procedures Order, excluding those Ownership Claims which have been previously settled, withdrawn or adjudicated by Final Order at such time. The Ownership Reserve shall be maintained by the Debtors or any successor thereto (including any chapter 7 or chapter 11 trustee, the Litigation Trust, or any successor to the Debtors following the dismissal of the Chapter 11 Cases) and shall only be disbursed pursuant to the terms of the Plan or further Order of the Court. *Id*.

### E. The Sale of the Debtors' Assets to Asahi

16. On February 13, 2019, the Bankruptcy Court approved the sale to Asahi (the "**Asahi Sale**") on a final basis. On February 21, 2019, the Bankruptcy Court entered an Order (a) Approving Sale of Substantially All of Debtors' Assets "Free and Clear" of All Liens, Claims, Encumbrances, and Other Interests, (b) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief (the "**Final Sale Order**"). [ECF No. 658]. On March 7, 2019, the Debtors closed the Asahi Sale for $25,500,000. *Id*.

### F. 503(b)(9) Claims Bar Date and Filed Proofs of Claim

17. On February 28, 2019, the Bankruptcy Court entered an Order (I) Setting Bar Date for Submitting Proofs of Claim Asserted Pursuant to 11 U.S.C. § 503(b)(9), (II) Approving Procedures for the Assertion, Resolution, and Satisfaction of 503(b)(9) Claims, and (III)

Approving Notice Thereof [ECF No. 690], establishing April 12, 2019 at 5:00 p.m. Eastern Time as the deadline for filing proofs of claim pursuant to section 503(b)(9) Of the Bankruptcy Code (the "**503(b)(9) Bar Date**"). *Id*. at 14-5.

18.     As of the 503(b)(9) Bar Date, the total amount of filed claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code was approximately $54.5 million. The deadline for the Debtors to object to 503(b)(9) claims was July 11, 2019, however, the Debtors filed a Motion to extend that deadline by 90 days. [ECF No. 1216]. The Court orally granted the Motion at the hearings on August 1, 2019. *Id*. at 15.

19.     On July 19, 2019, the Bankruptcy Court entered an Order [Doc. No. 1262] sustaining the Debtors' First Omnibus Objection to Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9) [ECF No. 1120], which, together with an Agreed Order on that Objection [ECF No. 1310] and certain settlements entered into as of the date hereof, reduced the total amount of 503(b)(9) claims by over $12 million to approximately $42.7 million. Of the $42.7 million in remaining 503(b)(9) claims (the "**503(b)(9) Claims**"), creditors holding approximately $38.2 million of such claims have allegedly agreed to support the Plan and the proposed 503(b)(9) treatment thereunder either through the Plan Support Agreement or individual settlements. *Id*.

## G. The Plan Support Agreement

20.     On September 13, 2019, the Debtors filed the PSA Motion with the Secured Parties, the Committee, six committee members (the "**Committee Members**") in their individual capacities, and the Customer Parties, which seeks the Court's approval of the Plan Support Agreement.[4] *Id*. at 15. *See also*, ECF No. 1413. The PSA Motion is being heard on October 7, 2019, in conjunction with the Disclosure Statement.

---

[4] The Disclosure Statement refers the claimants to the PSA Motion and the Plan Support Agreement for a complete

21. The Plan Support Agreement provides, *inter alia*, The Estate Litigation Fund, the Assigned Claims, the Assigned Proceeds of Auditor Claims, the Retained Causes of Action, the 503(b)(9) Fund, the Priority Reserves and all causes of action and other rights, title, and assets of the Debtors will be transferred to the Litigation Trust, including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any derivative claims of the Debtors. *Id*. at 16.

22. Pursuant to the Plan Support Agreement, on the Plan Effective Date, the Secured Parties' Adequate Protection Superpriority Claims and Adequate Protection Liens will be disallowed, waived, and automatically cancelled. *Id*. at 12.

**H. The Disclosure Statement**

*(i)    The Litigation Trust*

23. Upon the Effective Date of the Plan, there shall be established a Litigation Trust (the "**Litigation Trust**") pursuant to the terms of the Litigation Trust agreement (the "**Trust Agreement**") which will be filed as part of the Plan Supplement. *Id*. at 19.

24. The Estate Litigation Fund, Assigned Claims, Assigned Proceeds of Auditor Claims, 503(b)(9) Fund, Priority Reserves, and all Retained Causes of Action will be transferred to the Litigation Trust, including without limitation all claims and causes of action arising under chapter 5 of the Bankruptcy Code and any derivative claims of the Debtors. *Id*.

25. The Litigation Trust shall resolve all Claims remaining against the Debtors as of the Effective Date of the Plan and shall make periodic distributions to holders of Claims that are deemed to be "allowed" by the Litigation Trust or the Bankruptcy Court in accordance with the terms of the Plan and Trust Agreement. *Id*.

---

recitation of the terms and conditions set forth therein, which is attached thereto. See Disclosure Statement, ft. 5.

*(ii)    503(b)(9) Claims*

26.    On or as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such 503(b)(9) Claim becomes an Allowed 503(b)(9) Claim, a Holder of an Allowed 503(b)(9) Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed 503(b)(9) Claim, (i) a pro rata distribution from the 503(b)(9) Fund and (ii) subject to the GUC Sharing Formula, a *pro rata* distribution of Litigation Recoveries. *Id*. at 21.

27.    Once holders of Allowed 503(b)(9) Claims recover 75% on account of their Allowed 503(b)(9) Claim(s), then until all Allowed 503(b)(9) Claims are paid in full, 75% of Litigation Recoveries shall be made available for distribution to Holders of Allowed 503(b)(9) claims and 25% of Litigation Recoveries shall be made available for distribution to Holders of Allowed General Unsecured Claims (the "GUC Sharing Formula"). *Id*. *see also*, the PSA, ECF No. 1413 at 12-13.

28.    The PSA also provides:

- Subject to any reasonable agreement with respect to a contingency fee, the net proceeds of any Auditor/Lender Claim shall be distributed (i) first, 100% to the Secured Parties until the Secured Parties receive $3,000,000; (ii) second, 50% to the Secured Parties and 50% to the Litigation Trust until the Secured Parties receive an additional $5,500,000; and (iii) third, 100% to the Litigation Trust (the "Auditor Claim Waterfall").

- On the Effective Date, the Secured Parties will assign the Litigation Trust's portion of the net proceeds of any Auditor/Lender Claim pursuant to the Auditor Claim Waterfall to the Litigation Trust (the "Assigned Proceeds of Auditor Claims").

- The first $1 million in net proceeds generated from either the Assigned Claims against the Debtors' current or former

10

>   > officers and/or the Retained Causes of Action against the
>   > Debtors' current or former officers shall be distributed to
>   > the Secured Parties (the "Secured Party Litigation
>   > Recovery Right").

The PSA, ECF No. 1413 at 10.

29. **The failure to object to confirmation of the Plan by a Holder of an Allowed 503(b)(9) Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code**. *Id*. (emphasis in original).

### III.    ARGUMENT

#### A.    Governing Law

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125. The Bankruptcy Code defines "adequate information" as: Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan . . . . 11 U.S.C. § 1125(a)(1); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999). To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See*

*In re McLean Indus., Inc.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *Adelphia*, 352 B.R. at 596 (*citing Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988)). Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading. *Adelphia*, 352 B.R. at 596.

In short, the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure statement must inform the average creditor as to what it is going to get and when, and what contingencies there are that might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). For the reasons set forth below, the Disclosure Statement does not provide sufficient disclosures appropriate to the circumstances of these cases.

### B. The Disclosure Statement Fails to Set Forth Adequate Information Regarding Why 503(b)(9) Claimants Will Be Deemed to Have Consented to the Plan While Receiving Less Than Their Administrative Claims

Section 1129 of the Bankruptcy Code requires that:

> (a) The court shall confirm a plan only if all of the following requirements are met:
> . . .
> (9) Except to the extent that the holder of a particular claim *has agreed* to a different treatment of such claim, the plan provides that—
>
> (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim . . .

11 U.S.C. § 1129(a)(9) (emphasis added).

Section 507(a)(2) of the Bankruptcy Code provides:

> (a) The following expenses and claims have priority in the following order:
> . . .
> (2) Second, administrative expenses allowed under section 503(b) of this title, unsecured claims of any Federal reserve bank related to loans made through programs or facilities authorized under section 13(3) of the Federal Reserve Act ( 12 U.S.C. 343 ), and any fees and charges assessed against the estate under chapter 123 of title 28.

11 U.S.C. § 507(a)(2)

Finally, Section 503 of the Bankruptcy Code entitled, "Allowance of Administrative Expenses" provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
> ….
> (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in

>               which the goods have been sold to the debtor in the ordinary
>               course of such debtor's business.

11 U.S.C. § 503(b)(9)

      Pursuant to the Disclosure Statement, the Debtors are funding a reserve of $4,000,000 for allowed claims under Section 503(b)(9). What is not clear or adequately explained is the reasons why Section 503(b)(9) Claims of approximately $42.7 million (or some other amount at the time of this objection) are not being paid in full in accordance with the Bankruptcy Code. The Debtors therefore cannot satisfy Section 1129(a)(9) which requires, at a minimum, that the Debtors "cash out" the administrative creditors ***on the effective date*** except to the extent that a particular administrative creditor agree to a different treatment. *See In re Teligent, Inc., et al.*, 282 B.R. 765, 767 (Bkrtcy. S.D.N.Y. 2002) (emphasis added) (stating that the estates were administratively insolvent because the assets were insufficient to satisfy the Lenders' superpriority claims, and nothing was available for distribution to any other creditor, including the administrative and priority creditors). Simply put, confirmation of a plan of reorganization mandates payment in full in cash be made for all allowed expenses of administration. *See In re Emons Industries, Inc.*, 76 B.R. 59, 60 (Bankr. S.D.N.Y. 1987). Stated otherwise, Section 1129(a)(9)(A) brings to an end all of the pre-confirmation super-priorities that the secured parties may have obtained. *Id*. "If the secured parties desire confirmation, the administration claims must be paid in full in cash at confirmation even if it means invading their collateral." *Id*.; *see also Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 508 (S.D.N.Y. 1994) (referring to section 1129(a)(9)(A) as the "administrative solvency" requirement, which is "the ability of the [debtor's] estate to satisfy administrative claims at the confirmation hearing").

The Debtors attempt to justify the failure to pay the 503(b)(9) Claimants in full by the assertion that of the $42.7 million in remaining 503(b)(9) claims, creditors holding approximately $38.2 million of such claims have agreed to support the Plan and the proposed 503(b)(9) treatment thereunder either through the Plan Support Agreement or individual settlements. Disclosure Statement, 15. The Debtors have not provided sufficient evidence to support this assertion and, the fact remains that the as of the Effective Date the 503(b)(9) claimants of $42.7 million are receiving a *pro rata* distribution of $4 million – and nothing more. Indeed, as Judge Bernstein pointed out in *Teligent*, "[b]ecause so little was available for distribution, almost any one of the 454 [503(b)(9) claimants] could prevent confirmation merely by insisting on his right to full payment. *In re Teligent, Inc.* 282 B.R. 768. The Debtors do not have the ability to "cash out" the administrative creditors on the effective date, and without agreements for different treatment, the Debtors have not satisfied the mandatory treatment of claims entitled to priority under Section 1129(a)(9) of the Bankruptcy Code. Also, the Disclosure Statement is confusing as it, for example, fails to explain all amounts that are due to ownership and administrative claims, and the amounts that will be paid out subject to any settlement agreements[5]. Finally, at the very least, the Debtors do not explain how much would need to be recovered by the Litigation Trust for the 503(b)(9) Claimants to receive a 20%, 50% or 75% distribution – or even the likelihood of recovery, at all. Without that analysis, it is impossible for the 503(b)(9) Claimants to make an informed decision to accept different treatment. Accordingly, the Disclosure Statement is inadequate and cannot be approved.

---

[5] A status update is generally provided at hearings in this case as to settlements and claims, however, none of that information is clearly set forth in the Disclosure Statement. For example, according to the August Monthly Operating Report, the Debtors have approximately $121 Million Dollars, yet, the allocation of these amounts and to which creditors these amounts will be distributed to are not established in the Disclosure Statement.

More to the point, the 503(b)(9) creditors cannot expressly or affirmatively consent to their treatment by their silence. Indeed, here, these 503(b)(9) Claimants shall be deemed to consent to their treatment if they do not object to confirmation. *See* Disclosure Statement, 21. This procedure incorrectly promotes that inaction is sufficient to deem an express consent in contradiction to the "has agreed" exception found in the preface of Section 1129(a)(9) of the Bankruptcy Code. *See e.g.*, *In re Jankins*, 184 B.R. 488, 492 n.8 (Bankr. E.D. Va. 1995) ("This Court, however, construes the term 'has agreed' in Section 1129(a)(9) as requiring the affected creditor's affirmative concurrence and not mere failure to object."), and *In re Digital Impact, Inc.*, 223 B.R. 1, 7 & n.1 (Bankr. N.D. Okla. 1998); *In re Molycorp, Inc.*, 562 B.R. 67, 83 (Bankr. D. Del. 2017) (to the extent the committee's counsel's attorneys' fees were allowed administrative expenses, they must be paid pursuant to Section 1129(a)(9)(A)). *But see e.g.*, *In re Teligent, Inc., et al.*, 282 B.R. 765 (upholding implied consent to different and less favorable treatment, however, the debtors prepared and sent a consent form and set up a call center to gather acceptances to the different treatment). The 503(b)(9) Claimants must agree to their treatment because they are not being paid in full on the Effective Date, and furthermore, they are subordinate to returns recovered in the Estate Litigation Fund. The Debtors attempts to circumvent the mandatory requirements under the Bankruptcy Code should not be overlooked and thus, the Disclosure Statement cannot be approved.

Finally, and equally availing is that these administrative claimants are not even afforded the opportunity to vote on the Plan which contradicts the notion that a creditor that fails to cast a vote is deemed to have rejected the Plan. Based on the foregoing, the Debtors are unable to demonstrate that the 503(b)(9) Claimants "agreed" to have their claim paid in a manner that does not comply with Section 1129(a)(9). Consequently, the Debtors failure to satisfy Section

1129(a)(9) of the Bankruptcy Code and the procedure for deeming the Section 503(b)(9) administrative claimants to have consented to the Plan is improper, and the adequacy of the Disclosure Statement cannot be approved.

### C. The Discharge of the Debtors is in violation of Section 1141(d)(3)

Section 1141(d)(3) of the Code makes clear that a liquidating corporate debtor is not entitled to a discharge in bankruptcy. It states, "[c]onfirmation of a Chapter 11 plan does not discharge a debtor if: (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under Section 727(a) of this title if the case were a case under chapter 7 of this title." 11 U.S.C. § 1141(d)(3). Section 727(a) does not grant a discharge if the debtor is not an individual. 11 U.S.C. § 727(a)(1).

Here, the Debtors are not individuals. They are corporate entities that ceased operations, sold substantially all of their assets, proposed a liquidating Chapter 11 plan, and will not continue in business post-confirmation. The Debtors are not allowed a discharge.

The Disclosure Statement provides:

> Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

Disclosure Statement, 18, Section V.

Likewise, the Debtors are seeking a discharge for RTMM. *Id.* at 29. The Debtors improperly attempt to effect a discharge. *See e.g.*, *In re The Fairchild Corp.*, C.A. No. 09-10899, 2014 WL 7215211, at *3 (D. Del. Dec. 17, 2014) (confirmation of a liquidating plan denies a discharge

and dissolves the automatic stay). Thus, the discharge should be excluded from the Plan and Disclosure Statement.

### D. The Disclosure Statement and Ballot Should Confirm that the Debtors Are Seeking Any Third Party Releases Under *Metromedia*

Apparently, the Debtors are relying on *Metromedia* to enforce any third party release in the Disclosure Statement rather than through an unequivocal opt-in procedure. Disclosure Statement, 30. *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005). It is requested that the Disclosure Statement and ballot clearly indicate that the Debtors are seeking third-party releases through this procedure.

### IV. CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court deny the approval of the Disclosure Statement and grant such other and further relief as the Court deems appropriate.

Dated: New York, New York
September 30, 2019

                WILLIAM K. HARRINGTON
                UNITED STATES TRUSTEE

*By:*   /s/ Shannon Anne Scott
      Shannon Anne Scott
      Trial Attorney
      201 Varick Street, Suite 1006
      New York, New York 10014
      Tel. (212) 510-0500
      Fax (212) 668-2255