# EXHIBIT A

# MASTER AGREEMENT FOR PRECIOUS METALS TRANSACTIONS

**THIS MASTER AGREEMENT** is made and entered into as of 4th day of October, 2017 (the "**Effective Date**") between:

**SCMI US INC.**, a corporation organized and existing under the laws of the State of Delaware, having its head office at 300 Madison Avenue, New York, NY 10017 ("**SCMI**");

and

**Republic Metals Corporation**, a company organized and existing under the laws of Florida, USA, having its registered office at 12900 NW 38th Avenue, Miami, FL 33054 Republic Metals Corporation.

**WHEREAS** SCMI and Republic Metals Corporation wish to enter into transactions in and relating to precious metals, and wish to have each such transaction governed by the terms of this Agreement,

## THE PARTIES NOW AGREE AS FOLLOWS:

1. **Definitions and Interpretation**

1.1    In this Agreement, the following definitions shall apply to the following capitalized terms:

(1)    "**Agreement**" shall mean this Master Agreement, together with all Transactions, Confirmations, schedules, attachments, addenda, exhibits, and annexes referenced herein, all of which are incorporated herein by reference.

(2)    "**Business Day**" shall mean a day when the commercial banks are open for business, other than a Saturday, a Sunday or a public holiday in England, New York or Florida.

(3)    "**Close of Business**" shall mean 5 p m London time.

(4)    "**Confirmation**" shall mean, with respect to a Transaction, the written confirmation that the Parties execute after entering into each such Transaction pursuant to this Master Agreement.

(5)    "**Credit Support**" shall mean any credit support in whatever legal or documentary form and comprising any form whatsoever of money, credit, property (whether real or personal, tangible or intangible) or contractual obligation, that is provided or undertaken by a third party in support of a Party's obligations to the other Party under or in connection with this Agreement

(6)    A "**Credit Support Provider**" of a Party shall mean any third party, being a natural or legal person, that provides Credit Support in favour of the other Party.

(7)    "**Default Interest**" shall mean the interest payable by a Party on the other Party's demand, on an outstanding and overdue obligation of the first Party under this Agreement either to pay a sum of money or to make a delivery or redelivery of Material (as the case may be), calculated on the basis of daily compounding from and including the date performance of such obligation is due up to and including the date such obligation is discharged, at a rate per annum equal at all times to LIBOR plus one (1) per cent. Where the outstanding obligation is an obligation to deliver or redeliver Material, daily Default Interest shall be determined by reference to a

notional sum calculated by multiplying the Market Price per troy ounce of the Material at Close of Business on that day by the outstanding quantity yet to be delivered or redelivered Where the outstanding obligation is denominated in a currency other than US Dollars, daily Default Interest shall be calculated by reference to the equivalent US Dollar amount of the underlying obligation, using the Dollar Rate for that currency at Close of Business on that day.

(8)    **"Delivering Party"** shall mean, in respect of any obligation to deliver (or redeliver) Material pursuant to the terms of a Transaction, the Party that is to (re)deliver, or has (re)delivered, such Material to the other Party.

(9)    **"Delivery Location"** shall mean, pursuant to the agreed terms of a Transaction, the location where the Delivering Party is to make any delivery or redelivery of any Material. Where the agreed mode of delivery is credit of Material to an unallocated pool account held with a third party custodian at a depository, the Delivery Location shall be the account nominated by the Receiving Party for such purpose.

(10)    The **"Dollar Rate"** on any particular day shall mean, in respect of:
        (i)    the Euro, the European Central Bank ('ECB') foreign exchange reference rate for the US dollar as established by the afternoon fixing for that day and published on the ECB website;
        (ii)    any other currency, the foreign exchange reference rate for the US Dollar for that day as established and published by the central bank or monetary authority that is responsible for the issue of that currency.

(11)    **"Event of Default"** shall mean any of the events specified in Clause 9.1(i)-(viii) below.

(12)    **"Gold"** and **"Silver"** shall mean, respectively, gold or silver bars, or unallocated gold or silver, complying with the rules of the LBMA relating to good delivery and fineness from time to time in effect, or, if no such rules are in effect or if the parties agree otherwise, complying with such conditions relating to good delivery and fineness as may be agreed by the parties in writing.

(13)    **"Governmental Authority"** shall mean any government, government department, fiscal or revenue authority, regulator or other public authority, or any other body exercising public law functions or invested with public law powers, whether municipal, regional, national, federal or supranational.

(14)    **"Iridium"**, **"Rhodium"** and **"Ruthenium"** shall respectively mean, unless otherwise *agreed in writing by the parties, iridium, rhodium or ruthenium sponge, or* unallocated iridium, rhodium or ruthenium, having a minimum purity of 99.95 %, and complying with such other conditions relating to good delivery and fineness as may be agreed by the parties in writing.

(15)    **"LBMA"** shall mean the London Bullion Market Association or any successor organisation

(16)    **"LIBOR"** on any particular day shall mean the London Interbank Offered Rate for 30-day U.S. Dollar deposits quoted for that day.

(17)    **"LPPM"** shall mean the London Platinum and Palladium Market or any successor organisation.

(18)    **"Market Price"** of a Precious Metal at any particular time shall mean the spot price in USD per toz prevailing in the London wholesale market for that Precious Metal at that time, which prevailing spot price shall be taken to be:

        (a)

    (i)   In the case of Gold, the LBMA Gold Price established at the last electronic auction;

    (ii)  In the case of Silver, the LBMA Silver Price established at the last electronic auction,

    (iii) In the case of Platinum, the LBMA Platinum Price established at the last electronic auction;

    (iv) In the case of Palladium, the LBMA Palladium Price established at the last electronic auction,

    (v)  In the case of Rhodium, Ruthenium and Iridium, the Johnson Matthey base price for, respectively, Rhodium, Ruthenium and Iridium, displayed on Reuters page JMBP, or

(b)  if any of the aforementioned spot reference prices is discontinued, such successor spot reference price for that Precious Metal as is established and generally recognised by dealers in the London wholesale market; or

(c)  if no such successor spot reference price is established, the arithmetic mean of firm quotes for spot delivery of that Precious Metal obtained at or around that time from not less than three banks that are major dealers in the London wholesale market for that Precious Metal, such banks to be selected in good faith and using all reasonable endeavours by the Party that is empowered under this Agreement to determine such prevailing spot price, or

(d)  if fewer than three such quotes are available, the price that the Party empowered under this Agreement to determine such spot reference price determines, in good faith and using commercially reasonable methods, to be the prevailing spot price for that Precious Metal at that time.

(19)  **"Material"** shall mean Precious Metal that is the subject-matter of any Transaction

(20)  **"Non-conforming Material"** shall mean Material that does not conform to one or more of the specifications (whether as to Precious Metal, form, purity or in any other regard other than quantity) agreed in the relevant Transaction.

(21)  **"Palladium"** and **"Platinum"** shall respectively mean, unless otherwise agreed in writing by the parties, either (i) palladium or platinum sponge having a minimum purity of 99.95%, or (ii) palladium or platinum ingots or plate, or unallocated palladium or platinum, complying with such rules of the LPPM relating to good delivery and fineness as may from time to time be in effect, and in either case complying with such other conditions relating to good delivery and fineness as may be agreed by the parties in writing.

(22)  **"Parties"** shall mean SCMI and Republic Metals Corporation, and **"Party"** shall mean either of the Parties

(23)  **"Potential Event of Default"** shall mean any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

(24)  **"Precious Metal"** shall mean any of Gold, Silver, Platinum, Palladium, Rhodium, Ruthenium, or Iridium.

(25)  **"Receiving Party"** shall mean, in respect of any obligation to deliver (or redeliver) Material pursuant to the terms of a Transaction, the Party that is to take (re)delivery, or has taken (re)delivery, of such Material from the other Party.

(26)  **"Tax"** shall mean any sales, use, personal property, value added, customs, import, export or other similar tax, charge, duty, fee, or other impost (but not any tax assessed by reference to the income of a Party or to capital gains accruing to a Party as owner of any Precious Metal) and all penalties and interest thereon arising from or

relating to this Master Agreement or to any Transaction or to any Material or any other transaction contemplated by this Agreement, that is assessed or levied by a Governmental Authority.

(27)    "**toz**" shall mean troy ounce.

(28)    "**Transaction**" shall mean a transaction the material terms of which are agreed between the Parties, which is intended by them to be governed by the terms of this Agreement and which is confirmed, or to be confirmed, by a Confirmation

(29)    "**US $**" or "**US dollars**" or "**USD**" shall mean the lawful currency of the United States of America.

1.2    Other capitalised terms are defined in the body of the text below and appear in bold when defined or first used.

1.3    The titles and other captions of this Agreement are for convenience only and are not to be considered when construing its terms

1.4    A reference to a clause, paragraph or part is, unless stated otherwise, is a reference to a clause or part of this Agreement.

1.5    A reference to a statute or a statutory provision includes a reference to the statute or statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Agreement and any subordinate legislation made or other thing done under the statute or statutory provision whether before or after the date of this Agreement

2.    **Transactions**

2.1    The Parties may from time to time enter into Transactions. Nothing in this Agreement shall be construed as obligating either Party to enter into any Transaction

2.2    Each Party may offer to enter into a Transaction with the other Party orally or in writing, including without limitation by telephone, by email, or by communication over an electronic dealing system. The other Party may accept such offer orally or in writing, including without limitation by telephone, by email, or by communication over an electronic dealing system. At the moment such an offer is so accepted, a legally binding Transaction will have been entered into by the Parties.

2 3    Each Transaction shall be governed by this Agreement and the terms agreed for the particular Transaction, as evidenced by the Confirmation for that Transaction.

2.4    The Parties acknowledge that all Transactions are entered into in reliance on the fact that this Agreement and all Transactions constitute a single agreement between the Parties and the Parties agree that they would not have otherwise entered into this Agreement or any Transaction.

2.5    All transactions in Precious Metals agreed between the Parties shall be Transactions governed by this Agreement unless, at the time any such transaction is entered into, the Parties expressly agree that such transaction is not to be a Transaction governed by this Agreement.

3.    **Confirmations and Monthly Balance Confirmations**

3 1    Upon the Parties entering into a Transaction, SCMI shall, within two (2) Business Days prepare and issue to Republic Metals Corporation a Confirmation stating the material terms of the Transaction as agreed between the Parties

3.2     Republic Metals Corporation shall accept each Confirmation within three (3) Business Days of receipt, provided that if Republic Metals Corporation considers that the content of the Confirmation does not accurately reflect the terms of the Transaction agreed between the Parties, it shall within three (3) Business Days of receipt send notification to SCMI of this fact and of what it believes to be the accurate terms of the Transaction.

3.3     For the avoidance of doubt, a Confirmation serves as evidence of a Transaction but does not constitute the Transaction itself, and the failure by SCMI to issue, or Republic Metals Corporation to accept, a Confirmation in accordance with Clauses 3.1 and 3.2 shall not prejudice or invalidate the legally binding nature or the particular terms of any Transaction entered into by the Parties.

3.4     Notwithstanding any other provision of this Agreement or the terms of any Transaction, a Party may suspend performance of any payment or delivery obligation under a Transaction until the relevant Confirmation for that Transaction has been issued and accepted in accordance with Clauses 3.1 and 3.2.

3.5     For the purpose of reconciling the balance of Transactions outstanding between the Parties every month-end, SCMI shall prepare and issue to Republic Metals Corporation a document detailing the outstanding state of account between the parties as of the last Business Day of each calendar month (such document a **"Monthly Balance Confirmation"**). Republic Metals Corporation shall accept each Monthly Balance Confirmation within ten (10) business days of receipt provided that if Republic Metals Corporation disputes the accuracy of any Monthly Balance Confirmation, it shall within ten (10) business days of receipt notify SCMI of this fact and of what it believes to be the accurate state of account.

3.6     If SCMI receives such notification as is described in Clauses 3.3 or 3.5, the Parties agree to co-operate in good faith to resolve their disagreement and to provide each other with such documentation and other information as each reasonably requires for this purpose.

3.7     Confirmations and Monthly Balance Confirmations, as well as any other notices and confirmations required or permitted to be sent from one Party to the other under this Agreement that the Parties agree are to be subject to this Clause 3.7 (collectively **"Confirmation Documents"**), shall be issued and accepted in accordance with the following procedure. Upon preparation of a particular Confirmation Document by the issuing Party, an individual with authority to issue the Confirmation Document on behalf of the issuing Party shall sign such Confirmation Document and shall send a copy of the document bearing such signature by facsimile machine or email attachment to a fax number or email address nominated by the accepting Party for receipt of such Confirmation Document. On receipt of the Confirmation Document by the accepting Party, an individual with authority to accept such Confirmation Document on behalf of the accepting Party shall countersign it, and shall send a copy of the Confirmation Document bearing such countersignature by facsimile machine or email attachment to a fax number or email address nominated by the issuing Party for receipt of such Confirmation Document. Notwithstanding the foregoing, the Parties may subsequently agree in writing to replace the procedure described above with a secure electronic procedure for the issue and acceptance of Confirmation Documents (or of a particular class of Confirmation Documents).

4.     **Obligations under Transactions**

4.1     At the time of entering into a Transaction, the Parties shall agree their respective payment and delivery obligations under the Transaction, as well as any other obligations and other provisions supplementing or amending the terms of this Master Agreement that are specific to the Transaction), and all such obligations and provisions shall be fully specified in the Confirmation issued by SCMI in accordance with Clause 3.1. The payment and delivery obligations (and any other obligations and other provisions) of particular nominate Transaction types may be specified in one or more annexes to this Agreement (each a **"Transaction Annex"**), which the Parties may at any time agree to incorporate into the Agreement. Upon such incorporation of a Transaction Annex, if the Parties thereafter enter

into a Transaction of the type specified therein, the Parties' respective obligations need not be specified in the Confirmation of such Transaction to the extent that they are specified in such Transaction Annex. As of the Effective Date, the following Transaction Annexes shall be incorporated into this Agreement: Annex I (Outrights), Annex II (Leases), and Annex III (Consignments).

4.2 In the event of any inconsistency between any term of any Transaction Annex and any term of this Master Agreement, the Transaction Annex shall prevail. In the event of any inconsistency between any term of an issued and accepted Confirmation and any term of any other part of this Agreement, including any Transaction Annex, such Confirmation shall prevail.

4.3 Where under a Transaction the Parties have agreed that an obligation to be performed within a period of time, the due date of performance for the purposes of this Agreement shall be regarded as the last day of such period.

4.4 Notwithstanding any other provision of a Transaction Annex or a Confirmation, where an Event of Default or Potential Event of Default has occurred and is continuing in respect of a Party, the other Party may at its discretion suspend performance of any or all of its payment and delivery obligations under this Agreement until such Event of Default or Potential Event of Default is cured. Such suspension of performance shall not constitute a breach or failure of performance or a Potential Event of Default and shall not attract Default Interest.

4.5 If a Party suspends performance of an obligation pursuant to Clause 4.4, and the Event of Default or Potential Event of Default that permitted it to suspend performance is subsequently cured, the new due date for performance of the obligation shall be:
    (i)      in the case of a payment obligation, the second (2nd) Business Day; and
    (ii)     in the case of a delivery obligation.
         (a)     where delivery under the Transaction was agreed to be by credit to a custodian account, the third (3rd) Business Day; or
         (b)     where delivery under the Transaction was agreed to be by actual physical delivery, the fifteenth (15th) Business Day, or if the weight or volume of the Material to be delivered is such that the Parties did not contemplate transportation of the Material by air, or if transportation by a commercial civil aviation service would be impracticable or impossible, the sixtieth (60th) Business Day,

after such Party has obtained evidence demonstrating to its reasonable satisfaction that the Event of Default or the Potential Event of Default has been cured.

## 5.    Delivery of Material

5.1 Under any Transaction, the Delivering Party shall deliver the agreed quantity of Material to the possession of the Receiving Party at the Delivery Location, unless the Parties expressly agree that delivery shall be made at another location. The Parties may agree to effect delivery:
    (i)     by credit of Material to an unallocated pool account held with a third party custodian at a depository; or
    (ii)    by actual physical delivery of Material (including delivery by transfer of a document, such as a bill of lading or a warehouse warrant, entitling the lawful holder of the document to possession of Material).

5.2 If on any date Material of the same type, form and purity would otherwise be deliverable in respect of any Transaction by each party to the other at the same location, then, on such date, each party's obligation to deliver such Material will be automatically satisfied and discharged and, if the aggregate quantity of Material that would otherwise have been deliverable by one Party exceeds the aggregate quantity of Material that would otherwise have been deliverable by the other party, replaced by an obligation upon the party by whom the larger aggregate quantity would have been deliverable to deliver to the other Party the excess of the larger aggregate quantity over the smaller aggregate quantity.

5.3    Under any Transaction, late delivery of any Material by the Delivering Party shall attract Default Interest.

5.4    If the quantity of Material delivered by the Delivering Party is less than the quantity called for under the relevant delivery obligation, then the Receiving Party shall not, by virtue of this fact alone, be entitled to reject the Material delivered. However, the failure to deliver the full quantity of Material shall be regarded as a non-delivery (and thus a Potential Event of Default) in respect of the shortfall. If the quantity of Material delivered by the Delivering Party is in excess of the quantity called for under the relevant delivery obligation, then the Receiving Party shall not, by virtue of this fact alone, be entitled to reject the Material delivered. However, unless the Parties enter into a Transaction in respect of the excess, the Delivering Party, upon learning of the excess delivery, shall promptly arrange for the removal of the excess from the Delivery Location at the Delivering Party's sole cost and expense.

5.5    If the Delivering Party delivers Material that the Receiving Party reasonably considers to be Non-conforming Material, the Receiving Party shall, within thirty (30) days of such delivery, send the Delivering Party notice in writing of this fact, together with details of the quantity and state of the Material and supporting evidence supplied by a reputable and independent third party of suitable expertise (which third party may be a recognised custodian or depository of precious metals, or an agent of such custodian or depository). If the Receiving Party does not send such written notice and supporting evidence within thirty (30) days of a delivery of Material, it shall be barred from bringing any claim for breach of Clause 8.2(ii) in respect of that Material

5.6    If at any time after receiving such notice and supporting evidence as is described in Clause 5.5, the Delivering Party accepts that the Material in question is Non-conforming Material, it shall promptly notify the Receiving Party of this fact.

5.7    The Delivering Party, within 30 days of receipt of such written notice and supporting evidence as is described in Clause 5.5, may send the Receiving Party a written notice, disputing the Receiving Party's claim that the Material is Non-conforming Material, together with appropriate supporting evidence for its contention. During this period of 30 days, the Delivering Party shall be entitled to conduct such investigations and to conduct such tests and examinations on the Material as it reasonably considers necessary, and the Receiving Party shall allow the Delivering Party access to the Material for this purpose. If the Delivering Party fails to send such written notice of dispute to the Receiving Party by the end of the aforementioned 30 day period, it shall be deemed to have notified the Receiving Party on the last day of the 30 day period that it accepts that the Material is Non-conforming Material.

5.8    The Receiving Party may suspend performance of any payment obligation in respect of any Material that it reasonably considers to be Non-conforming Material If, whether before or after receipt of a notice of dispute and supporting evidence as described in Clause 5.7, the Receiving Party accepts that the Material that is the subject of dispute is not Non-conforming Material, it shall (if it has not already done so) make any payment due to the Delivering Party in connection with the delivery of the relevant Material together with Default Interest accruing from the date that delivery was made under the Transaction up to the date such payment is made.

5.9    If, following the procedure described above, the Parties are reasonably and genuinely unable to agree whether or not Material delivered by the Delivering Party is Non-conforming Material, they should in good faith seek to find a suitable compromise to the dispute between themselves. If unable to agree such compromise, the Parties shall request a reputable refiner to nominate an independent expert of appropriate experience and expertise (an "Expert") to determine whether the Material delivered is Non-conforming Material, and shall thereupon appoint the Expert nominated to make such determination. For this purpose, a reputable refiner shall mean (in case the relevant Material is gold or silver) a refiner that is listed on the relevant current Good Delivery List maintained by the LBMA, (in case the relevant Material is platinum or palladium) a refiner that is listed on the relevant current LPPM Good Delivery List, and (in case the relevant Material is any other precious metal) a refiner that is listed on either of the current LBMA or LPPM Good Delivery Lists. If the Parties cannot agree on the

reputable refiner that is to nominate an Expert, the Parties shall each select a reputable refiner to nominate an Expert. The Parties shall thereupon direct the two nominated Experts to jointly nominate a third Expert, and thereupon shall appoint the three Experts to collectively make the required determination, such determination to be by majority if the Experts are unable to make a unanimous determination.

5.10    The Parties shall co-operate in good faith with the Expert(s) and provide the Expert(s) with such documentation and other evidence as he (or they) reasonably requires in order to make his (or their) determination. The determination of the Expert(s) shall be final and binding on the Parties. The costs of the Expert(s) shall be borne by the losing Party.

5.11    Upon notification (including deemed notification) to the Receiving Party of its acceptance that, or upon receipt of the determination of the Expert(s) that, Material delivered is Non-conforming Material, the Delivering Party shall:

    (i)    where delivery under the Transaction was agreed to be by credit to a custodian account, within three (3) Business Days of such notification; or

    (ii)    where delivery under the Transaction was agreed to be by actual physical delivery, within (15) Business Days of such notification, or if the weight or volume of the Material to be delivered is such that the Parties did not contemplate transportation of the Material by air, or if transportation by a commercial civil aviation service would be impracticable or impossible, within sixty (60) Business Days of such notification,

deliver to the Receiving Party replacement Material conforming to the specifications of the relevant Transaction and shall pay Default Interest accruing from the date delivery was due under the Transaction up to the date when the replacement Material is delivered. Upon delivery of such replacement Material, title to the Non-conforming Material shall revest in the Delivering Party if title passed to the Receiving Party, and the Delivering Party shall dispose of the Non-conforming Material solely at its own cost and expense.

5.12    For the avoidance of doubt, the right to receive replacement Material pursuant to Clause 5.11 shall be the Receiving Party's sole and exclusive remedy for the breach of the warranty in Clause 8.2(ii) and for the delivery of Non-conforming Material.

5.13    If the Delivering Party tenders late delivery of any Material, the Receiving Party shall not, by virtue of this fact alone, be entitled to reject the delivery of such Material. This clause is without prejudice to the operation of the provisions of Part 9 or to any right the Receiving Party may have thereunder.

5.14    The Delivering Party under any Transaction shall not be liable to the Receiving Party for any indirect or consequential losses, or any loss of profits or any loss through business interruption, caused by late delivery or non-delivery of any Material, or by any delivery of Non-Conforming Material.

## 6.    Payments and Tax

6.1    All amounts due and payable by a Party under this Agreement shall be paid by interbank wire transfer in U.S Dollars (or, if the Transaction under or in connection with which the payment obligation arises is denominated in another currency, in that currency) in same day funds for value on their due date (or, if such date is not a Business Day, the next succeeding Business Day) to an account nominated by the other Party. Any amount not paid by a Party when due (whether on the stated date, by acceleration or otherwise) shall attract Default Interest

6.2    All amounts due and payable under this Agreement shall be paid in full without any deduction or withholding other than as required by law, and neither Party shall be entitled to assert any credit, set-off, abatement, discount, cross-claim or counterclaim against the other in order to justify withholding payment of any such amount in whole or in part, otherwise than as is expressly permitted by the terms of this Agreement.

6 3    If on any particular date amounts would otherwise become due and payable in the same currency by each Party to the other, then, on such date, each Party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one Party exceeds the aggregate amount that would otherwise have been payable by the other Party, replaced by an obligation upon the Party by which the larger aggregate amount would have been payable to pay to the other Party the excess of the larger aggregate amount over the smaller aggregate amount.

6.4    On any date that a Party ('Party A') is obliged to make payment of any sum to the other Party ('Party B') under this Agreement, Party A may set off against it any obligation of Party B, whether arising under this Agreement or otherwise, to pay to Party A any liquidated sum, provided that such obligation of Party B has matured and remains unfulfilled in full or in part on that date. If the respective payment obligations are denominated in different currencies, Party A shall convert them to US dollar obligations by reference to the relevant Dollar Rate(s) prevailing at the time the set-off is exercised. Party A need not give Party B prior notice before exercising any such right of set-off; however Party A shall notify Party B within a reasonable time of such exercise.

6 5    All prices, rates and other figures quoted and agreed by the Parties in relation to any Transaction shall be presumed to be inclusive of any Tax, unless otherwise indicated. All money amounts stated in any Confirmation shall be presumed to be inclusive of any Tax unless otherwise indicated on the face of the Confirmation.

6.6    All payments due under with this Agreement shall be paid without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law or direction of a Governmental Authority to whose jurisdiction or control a Party or any Material is subject. If such deduction or withholding is so required, then the payer shall:

    (i)    promptly notify the payee of such requirement;

    (ii)    promptly pay to the relevant Governmental Authority the full amount required to be withheld or deducted (including any amount required to be withheld or deducted from any additional amount payable under (iv) below);

    (iii)    promptly forward to the payee an official receipt evidencing such payment to such Governmental Authority; and

    (iv)    promptly pay to the payee such additional amount as may be necessary to ensure that the net amount actually received by the payee equals the full amount the payee would have received had no such deduction or withholding been required

## 7.    Property, Use and Risk

7.1    Subject to the provisions of this Part 7, property in any Material shall pass in accordance with the terms of the relevant Transaction.

7.2    If there exists (whether under this Agreement or otherwise) on the part of a Party ("Party C") any obligation to pay money to the other Party ("Party D"), and such obligation is overdue and remains unfulfilled at or after the time when, but for this Clause 7.2 or Clause 7 3, the general property in any Material would, pursuant to the terms of a Transaction, pass from Party D to Party C, then notwithstanding the terms of such Transaction, the general property in such Material shall remain with Party D and shall only pass to Party C at the moment such obligation or obligations have been discharged in full.

7.3    Where a Potential Event of Default or an Event of Default has occurred in respect of a Party ("Party E") at or after the time when, but for Clause 7.2 or this Clause 7 3, the general property in any Material would pass from the other Party ("Party F") to Party E pursuant to the terms of a Transaction, then notwithstanding the terms of such Transaction, the general property in such Material shall remain with the Party F and shall only pass to Party E at the moment such the Potential Event of Default or Event of Default is cured.

7.4    Under any Transaction, risk in the Material shall pass with possession, such that the Party in possession of any Material shall be responsible for all loss, damage, or disappearance of or with respect to that Material, from any cause whatsoever.

7.5    A Party ("**Party G**") shall ensure that whenever it is in possession of any Material in which the other Party ("**Party H**") has any proprietary interest it shall at all such times take care that all such Material is prudently and adequately insured against damage, loss or disappearance. Each Party shall produce documentary evidence of the existence of such current policy or policies of insurance upon the written request of the other Party. Party G shall execute all appropriate documents reasonably required by Party H to protect Party H's proprietary interest in the Material. Party G shall not, and shall not attempt or purport to, charge or encumber, any such proprietary interest of Party H, and shall take such other actions as Party H may reasonably require to protect H's proprietary interest in the Material

7.6    A Party ("**Party J**") shall be solely responsible for, and shall indemnify and hold harmless the other Party ("**Party K**") from and against any liability, claim, or expense (including, without limitation, any claim relating to product, environmental, or toxic waste liability) arising from Party J's use of any Material (including any Non-conforming Material). Party J shall assume all liability for any loss, damage or injury to persons (whether employees or servants of Party J or otherwise) or property (whether owned by Party J or by any third party), or for any economic loss, arising out of, connected with or resulting from the use, either alone or in combination with other products or materials or substances, of any Material (including Non-conforming Material) delivered by Party K.

7.7    Without prejudice to any other provision of this Part 7, each Party ("**Party L**") grants the other Party ("**Party M**") a security interest over all Material that is in or may come into Party L's possession (actual or constructive) but to which Party M retains title under this Agreement. Each Party hereby grants the other irrevocable authority to act as its agent to file any financing statement or other registration or notification document, or to take other such similar measure as is required by applicable law in any jurisdiction in which such Material is or might be located, in order to perfect, or to put third parties on notice of, such security interest, or to otherwise confer on Party M priority over Party L's unsecured creditors in respect of such Material.

## 8.    Representations and Warranties

8.1    General Representations, Warranties and Covenants.  Each Party represents and warrants to the other Party that:

      (i)    It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization,

      (ii)    It has the power and is authorized to enter into this Agreement and perform its obligations hereunder and in connection with each Transaction;

      (iii)    This Agreement, including, without limitation, all Confirmations, has been duly authorized, executed and delivered by such Party, and the execution, delivery and performance thereof does not violate or conflict with any law applicable to such Party, any provision of such Party's organizational documents, or any order or judgment of any court or Governmental Authority;

      (iv)    All authorizations or consents of, exemptions by and filings with, any Governmental Authority that are required to be obtained or made by it in connection herewith have been obtained or made and are in full force and effect and being complied with,

      (v)    Its obligations under this Agreement, including, without limitation, all Transactions entered into hereunder, are legal, valid and binding obligations, enforceable in accordance with their respective terms except as such enforceability may be limited

by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting the rights and remedies of creditors;

(vi) It will engage in the Transactions contemplated hereunder solely as principal for its own account; and

(vii) It has actual capacity to make or take delivery of Material in the amounts contemplated by this Agreement and each of the Transactions entered into hereunder.

8.2 Representations and Warranties Regarding Material. Each Party represents and warrants to the other Party that:

(i) As Delivering Party, it has, at the time of any actual or notional delivery, full legal and equitable title to all the Material delivered (subject to any proprietary interest of the Receiving Party in such Material or to the extent that such title is limited or qualified by the terms of a Transaction), free and clear of all third party liens, pledges, mortgages, charges, encumbrances, easements, security interests, claims, restrictions, purchase options, third party rights and interests, and/or agreements limiting the use or transfer of such Material;

(ii) All Material delivered or redelivered by it under any Transaction conforms, at the time of such delivery or redelivery, to the description of the Material specified in the Transaction

8.3 The Parties acknowledge that there shall be no express or implied terms in relation to any other than those expressly stated in this Agreement No term of satisfactory quality, merchantability, fitness for a particular purpose or any other term of any nature shall be implied and all terms that might otherwise be implied by virtue of any legal rule or principle (whether deriving from statute, common law, equity, European or international law, custom or otherwise) are hereby excluded. For the purposes of this Clause 8.3, "term" means any condition, warranty, innominate or intermediate term, representation, guarantee or any other term

8.4 The representations and warranties in Clauses 8.1 and 8.2 shall be deemed to be repeated by each Party on each date on which a Transaction is entered into and on which any Material is delivered.

## 9. **Default and Early Termination**

9.1 The commission by, or occurrence in respect of, a Party of any of the following events shall be an Event of Default in respect of that Party ("**the Defaulting Party**"; the other Party being "**the Non-defaulting Party**"):

(i) The Defaulting Party fails to pay in full any amount or make in full any delivery of Material when due (whether at a stated date, upon acceleration, or otherwise) under this Agreement, and after written notification of such failure is given by the Non-Defaulting Party, such failure is not cured:

(a) In the case of a payment obligation, within two (2) Business Days of such notification;

(b) In the case of a delivery obligation where delivery under the Transaction was agreed to be by credit to a custodian account, within three (3) Business Days of such notification; or

(c) In the case of a delivery obligation where delivery under the Transaction was agreed to be by actual physical delivery, within (15) Business Days of such notification, or if the weight or volume of the Material to be delivered is such that the Parties did not contemplate transportation of the Material by air, or if transportation by a commercial civil aviation service would be

impracticable or impossible, within sixty (60) Business Days of such notification.

(ii)     Any representation or warranty (other than the representation and warranty in Clause 8.2(ii)) made or deemed made by the Defaulting Party proves to have been incorrect in any material respect when made or deemed made, and which incorrectness is not cured to the Non-Defaulting Party's reasonable satisfaction within the twenty (20) Business Days after written notification requiring such cure is given by the Non-Defaulting Party.

(iii)    The Defaulting Party fails to perform or observe any obligation (other than a payment or delivery obligation) or covenant or condition to be performed or observed by it under this Agreement, and which failure is not cured within ten (10) Business Days after written notification thereof is given by the Non-Defaulting Party.

(iv)    The Defaulting Party disclaims or repudiates any obligation under this Agreement

(v)     The Defaulting Party or any Credit Support Provider of the Defaulting Party (a) is dissolved; (b) becomes insolvent or fails, or is unable, or admits in writing its inability, generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with, or for the benefit of, its creditors, (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for the winding-up or liquidation of the Party, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition either results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for the winding-up or liquidation of the Party or is not dismissed, discharged, stayed or restrained in each case within fifteen (15) days of the institution or presentation thereof; (e) has a resolution passed by its internal governing body for its winding-up or liquidation; (f) seeks or becomes subject to the appointment of an administrator, *receiver, trustee, custodian or other similar official for it or for all or substantially all* of its assets (regardless of how brief such appointment may be, or whether any obligations are promptly assumed by another entity or whether any other event described in this clause has occurred and is continuing), (g) suffers an event to occur with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) through (f) inclusive; or (h) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

(vi)    The Defaulting Party or any Credit Support Provider of the Defaulting Party *consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to,* another entity and, at the time of such consolidation, amalgamation, merger or transfer:—
    (a)     the resulting, surviving or transferee entity fails to assume, whether by operation of law or pursuant to an agreement reasonably satisfactory to the Non-defaulting Party, all the obligations of the Defaulting Party under this Agreement or (as the case may be) all the Credit Support Obligations of the Credit Support Provider; or
    (b)     the creditworthiness of the resulting, surviving or transferee entity is, in the reasonable judgment of the Non-defaulting Party, materially weaker than that of the *Defaulting Party or (as the case may be) the Credit Support Provider.*

(vii)   The Defaulting Party is the subject of a Change of Control, save that this shall not be regarded as an Event of Default if the Non-defaulting Party has given its prior written consent (which shall not be unreasonably delayed or withheld) to such Change of Control. For the purposes of this clause, "Change of Control" means the acquisition by any person, related group of persons or entity of the power to elect a majority of the board of directors (or equivalent governing organ) of, or otherwise direct the

affairs of, the Defaulting Party, whether such power is acquired by acquisition of shares, equity securities, or any other ownership interest (whether in the Defaulting Party or any other entity), by conclusion of a shareholders' or similar agreement, by alteration of the Defaulting Party's articles, bye-laws or other constitutional documents, or by any other means whatsoever

(viii)   Any Credit Support Provider of the Defaulting Party repudiates or disclaims any Credit Support obligation, or fails to perform any Credit Support obligation or to make available any Credit Support when due, and such failure is not cured within three (3) Business Days after written notification is given to the Credit Support Provider and to the Defaulting Party by the Non-Defaulting Party.

9.2     Subject to Clause 9.3, where an Event of Default has occurred and while it is continuing or remains uncured or is incapable of being cured, the Non-defaulting Party shall have the right to declare a date ("**the Termination Date**") on which all Transactions will terminate in accordance with the provisions in this Part 9. Declaration of a Termination Date must be accomplished by the Non-defaulting Party sending written notice (a "**Termination Notice**") in accordance with Part 13, which notice must identify itself as a Termination Notice, and must specify the Termination Date. The Termination Date must.
    (i)     be a Business Day; and
    (ii)    be a date no earlier than the date of the deemed receipt of the Termination Notice (as determined in accordance with Clauses 13.2 and 13 3) and no later than tenth (10th) calendar day after the date of the sending of the Termination Notice.

9.3     Where:
    (i)     there occurs any one or more of the Events of Default specified in Clause 9.1(v), and
    (ii)    the Defaulting Party is incorporated in or, has its centre of main operations in, a jurisdiction whose insolvency laws do not permit termination of Transactions to take place after the occurrence of the said Event of Default, or the said Event of Default is governed by a system of law that does not permit termination of Transactions to take place after the occurrence of the relevant Event of Default, or both,

then all Transactions shall automatically terminate on the date on which the relevant Event of Default occurred, and the Termination Date shall be deemed to have been declared on this date.

9.4     Upon the occurrence of a Termination Date, no further payments or deliveries under Transactions will be required to be made. The Termination Date will occur on the date so declared, whether or not the Event of Default that gave rise to such declaration is then continuing. For the purposes of Clause 7.3, such Event of Default shall be deemed to be continuing and incapable of cure.

9.5     Upon the occurrence of a Termination Date, all unperformed payment and delivery obligations of both Parties under all Transactions (each an "**Unperformed Payment Obligation**" or an "**Unperformed Delivery Obligation**", in either case an "**Unperformed Obligation**") shall automatically be discharged and be replaced by a single obligation of one Party to pay the other Party a sum ("**the Termination Settlement Amount**") calculated in accordance with the following provisions of this Part 9. For the avoidance of doubt, this Clause 9.5 shall make no adjustment to, and shall have no effect on, the proprietary rights and interests of the Parties in any Material.

9.6     For the avoidance of doubt, Unperformed Obligations shall include, without limitation, any obligation to pay Default Interest, any obligation to redeliver Material, any payment or delivery obligation whose due date for performance was at any time prior to, on or after the Termination Date, and any contingent payment or delivery obligation, whether the contingency was in respect of the existence of the obligation, the quantum of the obligation, or the timing of its performance. For the purposes of the foregoing, a "contingency" includes any contingency that was to be determined by the exercise of an option or a right of election on the part of a Party, but does not include a Party's right to suspend performance under Clause 4.5, such that Clause 4.5 shall not be regarded as a contingency for the purposes of calculating

the Termination Settlement Amount and the Non-defaulting Party shall base its calculations on assumption that neither Party would have had the right to suspend performance of any Unperformed Obligation.

9.7    The Termination Settlement Amount shall be calculated by the Non-defaulting Party, in good faith and in a commercially reasonable manner. Each Unperformed Obligation shall be assigned a value (a **"Termination Value"**), whose quantum shall be determined in accordance with Clauses 9.8-9.10. Where an Unperformed Obligation was to be performed by the Defaulting Party, its Termination Value shall be positive, where it was to be performed by the Non-defaulting Party its Termination Value shall be negative. The Termination Settlement Amount shall be calculated as the net sum in US dollars of all Termination Values.

9.8    Where an Unperformed Payment Obligation was for a liquidated sum, its Termination Value shall be (i) such liquidated sum discounted to present value (in the case the due date of performance was later than the Termination Date) or (ii) such liquidated sum plus accrued Default Interest, if any (in case the due date of performance was on or before the Termination Date). Where such liquidated sum is denominated in a currency other than US Dollars, its Termination Value shall be the US Dollar equivalent of the value determined in accordance with the foregoing, calculated by reference to the relevant Dollar Rate.

Where an Unperformed Delivery Obligation was for a fixed quantity of Material, its Termination Value shall be determined by taking the US dollar value of the Material, as determined by reference to the relevant Market Price and discounting it to present value (in the case the due date of performance was later than the Termination Date) or (ii) adding accrued Default Interest if any (in case the due date of performance was on or before the Termination Date).

The discount rate to be applied to a future Unperformed Payment Obligation shall be an appropriate interest rate prevailing on the Termination Date determined in accordance with standard market practice in the wholesale cash markets. The discount rate to be applied to a future Unperformed Delivery Obligation shall be an appropriate forward rate or lease rate prevailing on the Termination Date determined in accordance with standard market practice in the relevant wholesale Precious Metals market.

9.9    For the avoidance of doubt, for the purposes of calculating the Termination Value of an Unperformed Delivery Obligation, the proprietary rights and interests in respect of such Material that was to be delivered shall be disregarded and the calculation shall be made on the notional basis that before delivery the general property in such Material was with the Delivering Party and would have passed to the Receiving Party on delivery.

9.10    In determining the quantum of the Termination Value of a contingent Unperformed Obligation, the Non-defaulting Party may consider any or all of the following:

(a)    information, whether supplied by one or more third parties or by internal sources (provided that such internally-sourced information is used of the same type as is used by the Non-defaulting Party for valuation of transactions in the regular course of its business), consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data;

(b)    the results from applying to any information referred to in sub-clause (a) above pricing or other valuation models that are used by the Non-defaulting Party in the regular course of its business in pricing or valuing transactions between the Non-defaulting Party and unrelated third parties;

(c)    quotations (either firm or indicative) supplied by one or more independent third parties that are dealers of good repute in the relevant market, for one or more transactions that would have the effect of preserving the economic equivalent of the Transaction under which the relevant Unperformed Obligation arose.

9.11    The Market Prices of Precious Metals, interest rates, lease rates, forward rates and Dollar Rates to be used in making the calculations pursuant to Clause 9.8 and 9.10 shall be those

prevailing at the time the calculations are made. Such calculations shall be made on the Termination Date, unless the Termination Date occurs by operation of Clause 9.3, in which case the calculations shall be made as soon as reasonably practicable after the Non-defaulting Party learns of the occurrence of the Termination Date.

9.12    Upon calculation of the Termination Settlement Amount, the Non-defaulting Party shall send to the Defaulting Party a notice stating the quantum of such Termination Settlement Amount and containing reasonable details of its calculation of such quantum. The Termination Settlement Amount shall be due and payable on the second (2nd) Business Day of the Defaulting Party's receipt of such notice. Late payment shall bear Default Interest. If the Termination Settlement Amount is a positive number, the Defaulting Party shall pay it to the Non-defaulting Party, if it is a negative number, the Non-defaulting Party shall pay the absolute value of the Termination Settlement Amount to the Defaulting Party. The Parties hereby acknowledge that the Termination Settlement Amount constitutes liquidated damages and that it is a reasonable estimate of the Non-defaulting Party's loss (or gain) caused by the default of the Defaulting Party and the consequent termination of Transactions

9.13    At any time on or after a Termination Date and without prejudice to any of its other rights, the Non-defaulting Party may, at its election, set off any obligation to pay money or deliver Precious Metal that is owed to it by the Defaulting Party, whether under this Agreement or otherwise, against any obligation to pay money or deliver Precious Metal that it owes the Defaulting Party, whether under this Agreement or otherwise. Any such set-off may be exercised without prior notice to the Defaulting Party, but the Non-defaulting Party shall, within a reasonable period after the exercise of a right of set-off, give notice of such exercise to the Defaulting Party. Where any set-off comprises or includes an obligation to deliver Precious Metal, the obligation shall be valued at the Market Price of the Precious Metal in question at the time when the set-off is exercised. Where obligations are denominated in different currencies, the obligations shall be valued in US Dollars using the appropriate Dollar Rate at the time when the set off is exercised. The obligations that may be set off under this Clause 9 13 include future and contingent obligations. The Non-defaulting Party shall value unconditional future obligations by discounting to their present value on the date of the exercise of the set off. Contingent obligations shall be valued by the Non-defaulting Party in good faith in a commercially reasonable manner.

9.14    Upon the declaration of a Termination Date, the Non-defaulting Party shall have the right to immediate possession of any Material (regardless of the physical or chemical state of such Material) in which the Non-defaulting Party retains the general property or in which it holds a security interest, and which is then in the possession of the Defaulting Party, the Defaulting Party's right to possession of such Material shall immediately and automatically terminate, and the Defaulting Party shall promptly deliver up all such Material to the Non-defaulting Party. Each Party hereby grants the other and its lawfully appointed agents an irrevocable licence to enter onto any or all of its premises for the sole purpose of recovering possession of such Material. Upon recovery of possession of any such Material (whether by its own action or by receipt of a delivery from the Defaulting Party), the Non-defaulting Party shall give credit to the Defaulting Party by adjusting the value of the Termination Settlement Amount in the Defaulting Party's favour, such adjustment to be based on the market value of such Material on the date of the Non-defaulting Party's recovery of possession. To the extent that the market value of the recovered Material exceeds the amount of the Termination Settlement Amount (including accrued Default Interest and any indemnity payable pursuant to Clause 9.15) which remains to be paid by the Defaulting Party, the Non-defaulting Party shall *reimburse the Defaulting Party accordingly.*

9.15    Where any Material recovered by the Non-defaulting Party pursuant to Clause 9.14 has diminished in value since its delivery to the Defaulting Party by reason of the Defaulting Party's use, storage, application or processing of the Material, the Defaulting Party shall be obliged to fully reimburse the Non-defaulting Party for reasonable re-refining or other *expenses incurred by the Non-defaulting Party in restoring the Material to its condition on such delivery* If the Material is unable to be so restored, the Defaulting Party shall indemnify the Non-defaulting Party against the diminution in value of the Material, the quantum of such

indemnity to be estimated by the Non-defaulting Party in good faith and in a commercially reasonable manner and to be added to the Termination Settlement Amount.

9.16    Where on the Termination Date the Non-Defaulting Party is in possession of any Material to which the Defaulting Party has the general property, the Non-defaulting Party shall be entitled to appropriate such Material and apply it in satisfaction of any obligation (whether or not arising under this Agreement, whether matured or unmatured, whether contingent or otherwise, and regardless of the currency, place of payment or booking office of the obligation) owed by the Defaulting Party to the Non-defaulting Party. In applying such Material to such obligations, the Non-defaulting Party shall take the Market Value of such Material on the Termination Date and shall act in good faith in a commercially reasonable manner, and, if any such Material remains after full satisfaction of such obligations, the Parties shall arrange for such residual quantity of Material to be delivered to the Defaulting Party, with any delivery costs and storage costs prior to delivery to be shared equally between the Parties.

9.17    Except as otherwise expressly stipulated in this Agreement, the rights and remedies of each Party set forth in this Agreement shall be in addition to, and not in limitation of or alternative to, any other right or remedy each Party may have, whether arising by agreement, at law, in equity, under statute or otherwise.

## 10.    Authority of Individuals

10.1    Each Party shall provide to the other a list of individuals (an "**Authorised Signatory List**"), which shall exhibit each of those individuals' specimen signatures and shall state the scope of authority granted by the Party to each of them to act on its behalf to negotiate and enter into *Transactions, to sign notices, Confirmations and Monthly Balance Confirmations, and to cause that Party to do any and all of the things it is required or permitted to do under this Agreement.* The accuracy and authenticity of such Authorised Signatory List shall be certified by a director, company secretary or similar officer of the Party, or by a notary or legal professional. Each Party hereby represents and warrants to the other that it has duly granted to each individual the authority to act on its behalf as set out in its Authorised Signatory List.

10.2    Neither Party shall revoke, limit or otherwise modify the authority of any individual as described in an Authorised Signatory List, or as otherwise notified under this Clause 10.2, without giving prior written notice to the other Party and any such revocation, limitation or modification without such prior written notice shall be ineffective A Party shall be deemed not to have actual or constructive knowledge of such revocation, limitation or modification unless and until such prior written notice is received by that Party.

## 11.    Force Majeure

11.1    Subject to Clause 11.2, in the event either Party is prevented or delayed from performing any of its obligations under a Transaction as a result of an event or condition which is beyond the reasonable control of a Party (including, without limitation, any act of God; any failure of transportation facilities; strikes or labour controversies of any nature, explosions; fires; floods; wars; riots, revolutions; rebellions; blockades; embargoes; any act, restriction, requisition, regulation, or order, of any Governmental Authority, whether or not later proved to have been invalid) ("**Force Majeure**"), that Party's obligations to the extent affected by such Force Majeure shall be suspended during the period of such Force Majeure.

11.2    Neither Party shall in any circumstances be entitled to invoke Force Majeure or frustration in respect of any payment obligation or to suspend any payment obligation by reason of Force Majeure. In respect of any payment obligation in a currency other than US Dollars, if payment in that currency on the due date is impossible, whether because of the imposition of exchange controls or for any other reason whatsoever, then on such date such payment obligation shall be automatically discharged and replaced by an obligation to make immediate payment of an equivalent amount in US Dollars, such equivalent amount to be calculated using the

appropriate Dollar Rate on that date. If it becomes impossible for a Party owing a payment obligation to tender payment by interbank transfer, that Party shall at its own expense arrange another mechanism of payment that is acceptable to the other Party.

11 3    The Party (**Party P**) which is prevented or delayed from performing by Force Majeure shall promptly advise the other Party (**Party Q**) of its inability to meet its obligations under the applicable Transaction, specifying the cause of the Force Majeure and the estimated extent to which performance will be impacted, and shall advise Party Q when such Force Majeure ceases Party P shall act with all reasonable diligence to remedy or mitigate the effects of such Force Majeure.

11.4    In the event Party P is prevented or delayed by Force Majeure from performing its obligations under a Transaction for a continuous period of forty (40) days or more, then Party Q shall have the right to liquidate the Transaction by sending written notice to Party P specifying a date (the "**Liquidation Date**") on which the Transaction will be liquidated. The Liquidation Date shall not be earlier than the deemed date of receipt by Party P of the notice and not later than ten (10) days after the sending of the notice.

11.5    Upon the occurrence of a Liquidation Date in respect of a Transaction, Party Q shall calculate an amount (the "**Liquidation Amount**") in respect of the Transaction. The Liquidation Value shall be calculated by calculating the Termination Values, as of the Liquidation Date, of all Unperformed Obligations under the Transaction in accordance with the provisions of Clauses 9.9-9.11, as if Party Q were the Non-defaulting Party and Party P the Defaulting Party, and taking the net sum of all such Termination Values. The Liquidation Amount shall be payable by one Party to the other on the second (2nd) Business Day following the Liquidation Date.

## 12.    Governing Law and Jurisdiction

12.1    In this Clause 12, "**Relevant Dispute**" shall mean any dispute or claim (including those in respect of non-contractual disputes or claims) arising out of or in connection with, or relating to, this Agreement, any particular Transaction or Transactions, or any Material; and "**Relevant Proceeding**" shall mean any action, proceeding, suit, or other judicial, quasi-judicial or regulatory process or other dispute resolution process whose subject matter is a Relevant Dispute

12.2    This Agreement, including all Transactions, and all Relevant Disputes shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of conflicts of laws thereof

12.3    The United Nations Convention on Contracts for the International Sale of Goods shall not in any way apply to, or govern this Agreement or any Transaction.

12 4    Each Party irrevocably attorns and consents to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City over any Relevant Dispute. Each Party hereby consents to such courts' exercise of personal jurisdiction over it. Each Party hereby irrevocably waives the defence of inconvenient forum to the maintenance of a Relevant Proceeding in such courts and any right to have a Relevant Proceeding heard elsewhere on account of the place of incorporation or residence or domicile of such Party. Each Party shall appoint an agent for service in the State of New York.

12.5    Nothing in Clause 12.4 above shall prevent a Party from bringing a Relevant Proceeding in any jurisdiction in the world other than England (an "**Ancillary Proceeding**") provided that the sole object of such Ancillary Proceeding is one or more of the following:
    (i)    to enforce a judgment or order obtained in a Relevant Proceeding;
    (ii)   to apply for interim relief or protection in respect of any Material that is located in the jurisdiction where such Ancillary Proceeding is brought; or

(iii)    to enforce or support any interim relief or remedy granted in the course of any other Relevant Proceeding.

12.6    Each Party, to the fullest extent permitted by applicable law, irrevocably waives all rights it may have to trial by jury in any Relevant Proceeding or Ancillary Proceeding.

12.7    In respect of any Relevant Proceeding, including any Ancillary Proceeding, to the extent that a Party or any of its revenue, assets or properties shall be entitled, in any jurisdiction, to any immunity from any action or suit, from any execution or enforcement of judgment or any judicial process or proceeding or other relief or remedy in aid of execution or enforcement of judgment, that Party hereby irrevocably waives such immunity to the fullest extent permitted by the laws of such jurisdiction

13.    **Notices**

13.1    Except as otherwise provided in this Agreement, or as may otherwise be agreed by the Parties, a notice or other communication required or permitted under this Agreement shall be of no effect unless made by (i) facsimile transmission, (ii) personal delivery, (iii) airmail requiring signature on delivery, (iv) commercial courier or (v) email. All notices shall be sent to the following respective addresses, or at such other address as a Party may by notice specify:

To  **SCMI:**

1.    Confirmations of Transactions and/or settlement instructions

| | |
|---|---|
| To: | *Commodity Back Office, Sumitomo Corporation Europe Ltd* (Dept. code:LDNBB) |
| Attn: | Manager, Commodity Back Office |
| Mail address: | Vintners' Place, 68 Upper Thames Street, London EC4V 3BJ |
| Telephone: | 44-(0) 20-7246-3668 |
| Facsimile: | 44-(0) 20-7246-3923 |
| Email: | back@scgcuk.com |

2.    Monthly Balance Confirmations

| | |
|---|---|
| To: | London Centre Accounting, Sumitomo Corporation Europe Ltd (Dept. code: LDNBJ) |
| Attn: | Department General Manager |
| Mail address: | Vintners' Place, 68 Upper Thames Street, London EC4V 3BJ |
| Telephone: | 44-(0) 20-7246-3668 |
| Facsimile: | 44-(0) 20-7246-3948 |
| Email: | pmbc.lbj@sumitomocorp com |

3.    All other notices and notifications

| | |
|---|---|
| To: | SCMI US Inc., Front Office |
| Attn: | Hitoshi Ishida President |
| Mail address: | 300 Madison Avenue, New York, NY 10017 |
| Telephone: | 212-207-0525 |
| Facsimile: | |
| Email. | Hitoshi.Ishida@sumitomocorp.com |

To:  Republic Metals Corporation
Attn: David Comite (CFO)
Phone: 786-270-2469
Fax. 305-675-8454
Email: DAVID COMITE@REPUBLICMETALSCORP.COM

13.2    If a notice or other communication has been properly sent or delivered in accordance with Clause 13.1, it shall be deemed to have been received:
(i)      if sent by facsimile, at the time of transmission,
(ii)     if delivered personally, at the time of delivery;

|       |       |                                                                                              |
|-------|-------|----------------------------------------------------------------------------------------------|
|       | (iii) | if sent by airmail, 9.00 00 a.m. on the fifth Business Day after posting;                    |
|       | (iv)  | if sent by commercial courier, on the date and at the time of signature of the courier's delivery receipt; or |
|       | (v)   | if sent by email, at the time of transmission.                                               |

13.3   For the purposes of Clause 13.2:

   (i)   all times are to be read as local time in the place of deemed receipt; and

   (ii)  if deemed receipt is not within business hours (meaning 9.00 am to 5.00 pm Monday to Friday on a day that is not a public holiday in the place of receipt), the notice or other communication shall be deemed to have been received when business next starts in the place of receipt

## 14.    Assignments and Third Party Rights

14.1   Neither Party may assign to any third party this Agreement or any right, benefit or claim arising under, or in connection with, this Agreement, unless and until the Party has obtained the prior written consent of the other Party to such assignment. Any purported assignment without such prior written consent is void and without effect.

14.2   Neither Party may declare a trust for any third party beneficiary of any right, benefit or claim arising under or in connection with this Agreement, unless and until the Party has obtained the prior written consent of the other Party to such declaration. Any purported declaration of trust without such prior written consent is void and without effect.

14.3   Except as may be expressly stipulated otherwise in this Agreement, no third party has any right under any legal, equitable principle or statutory provision to enforce, or to enjoy the benefit of, any provision of this Agreement.

## 15.    Voluntary Termination

15.1   This Agreement may be voluntarily terminated on five (5) Business Days' prior notice by one Party to the other, such that upon such voluntary termination, the Parties shall enter into no new Transactions. Such voluntary termination shall not affect any Transaction outstanding at the time such termination is effective, which shall remain subject to the terms and conditions of this Agreement until all outstanding obligations are performed or satisfied.

## 16.    General

16.1   Binding Effect.  This Agreement shall inure to the benefit of, and be legally binding upon, the Parties and their successors and assigns.

16.2   Entire Agreement.  This Agreement, including the Confirmations delivered hereunder, and the other documents delivered in connection herewith, constitutes the entire agreement between the Parties relating to the subject matter hereof, and supersedes any prior agreements, arrangements and understandings between the Parties relating to such subject matter, which prior agreements, arrangements and understandings shall automatically terminate upon execution of this Agreement. Each Party confirms that it has neither made nor relied upon any representation or warranty in connection with this Agreement other than those expressly set out herein.

16.3   Amendment.  No amendment or waiver of any provision of this Agreement shall become effective unless the same shall be in writing, expressed to amend or waive this Agreement, and executed by the Parties.

16.4   Waivers.  No failure, delay or omission to exercise any right, power or remedy accruing to any Party, upon any breach or default of any other Party, shall impair any such right, power, or remedy nor shall it be construed to be a waiver of any such breach or default, or any

acquiescence therein or for any similar breach or default thereafter occurring.    Unless otherwise expressly provided in this Agreement, any waiver, permit, consent or approval of any kind on the part of any Party of any breach or default under this Agreement, or any waiver of any provisions or conditions of this Agreement, must be in writing to be effective. Such waiver, permit, consent or approval shall be effective only to the extent specifically set forth in such writing

16.5    Severability.    If any provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, this shall not affect:
   (i)    the legality, validity or enforceability of any other provision of this Agreement in that jurisdiction, or
   (ii)    the legality, validity or enforceability of that or any other provision of this Agreement in any other jurisdiction.

16 6    Further Assurances  Each Party agrees that from time to time, at the reasonable request of the other Party and without further consideration, it will execute and deliver such other documents and take such other actions as counsel for such other Party reasonably requests in order to effect the intent of the Parties.

16.7    Non-business Days. Unless otherwise provided herein, if any obligation of any Party under or in connection with this Agreement is due to be performed on a day that is not a Business Day, then such obligation shall be performed on the next succeeding Business Day.

16 8    No Agency  Nothing in this Agreement shall constitute either party the agent or legal representative of the other party, nor establish any relationship of partnership between the parties  Neither Party is authorized to create any obligation on behalf of the other Party

16.9    Conflicts of Interest. No director, employee or agent of either Party shall give or receive any commission, fee, rebate, gift, or entertainment of significant cost or value in connection with this Agreement or enter into any other business arrangement with any director, employee, or representative of the other, without prior written notification to the other Party.    Any representative(s) authorized by either Party may request to review the applicable records of the other Party for the sole purpose of determining whether there has been compliance with this paragraph and the other Party shall reasonably cooperate with such request.

16.10    Consequential Losses  Other than as expressly specified in this Agreement, neither Party shall be liable to the other for any incidental, consequential, indirect, special, exemplary, contingent, or punitive damages for any breach of contract or warranty, or for the tender of Nonconforming Material, whether such putative liability is based on breach of warranty, breach of contract, tort, negligence, strict liability, equitable principles or otherwise.

16.11    Inadequacy of Damages. Without prejudice to any other rights or remedies that a Party may have, each Party acknowledges and agrees that damages alone would not be an adequate remedy for any breach of the terms of this Agreement by the other Party. Accordingly, each Party shall be entitled, without proof of special damages, to the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach of the terms of this Agreement.

16.12    Language. This Agreement is drafted in the English language. Any notice given under or in connection with this Agreement shall be in the English language. All other documents provided under or in connection with this Agreement shall be in the English language, or accompanied by a certified English translation. If this Agreement or any such other document is translated into any other language, the English language text shall prevail (unless the document is a constitutional, statutory or other official document).

16.13    Telephone Communications. Each Party acknowledges and accepts that the other may record any telephone conversation or communication between the employees or other representatives of the Parties made pursuant to the terms of or otherwise in connection with this Agreement and that such recording may be submitted in evidence in proceedings before any tribunal.

16.14   Survival. All terms and conditions of this Agreement regarding representations and warranties, liability incurred upon or prior to termination, and governing law, along with all other terms and conditions that, by their sense and context, are intended to survive the execution, delivery, performance, termination or expiration of this Agreement, shall survive and continue in effect

**17.    Confidentiality**

17.1    Each Party undertakes that it shall not at any time disclose to any person any confidential information concerning the business, affairs, customers, clients or suppliers of the other Party or of any member of the group of companies to which the other party belongs, except as permitted by Clause 17.2.

17.2    Each Party may disclose the other Party's confidential information:

 (i)  to its employees, officers, representatives or advisers who need to know such information for the purposes of carrying out the Party's obligations under this Agreement or of assessing the other Party's creditworthiness and its ability to perform its obligations under this Agreement; and

 (ii)  as may be required by law, court order or any Governmental Authority.

17.3    No Party shall use the other Party's confidential information for any purpose other than to perform its obligations under this Agreement or to assess the other Party's creditworthiness and its ability to perform its obligations under this Agreement.

17.4    Each party shall ensure that its employees, officers, representatives or advisers to whom it discloses the other party's confidential information under Clause 17.2 above comply with the provisions of this Part 17.

**18.    Counterparts, Date of Effectiveness, Termination of Previous Agreements**

18.1    This Master Agreement and any Schedule hereto may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

18.2    This Master Agreement and any Schedule hereto shall become effective on the date of its execution

18.3    Immediately upon this Master Agreement becoming effective, all subsisting master trading agreements providing for the leasing of, or for the spot and forward sales of, precious metals made between the Parties before the execution of this Master Agreement shall immediately and automatically terminate, notwithstanding any term in any such master trading agreement providing for any condition, procedure, formality, notice etc for its termination, and the terms of this Master Agreement shall supersede and replace in full all previous arrangements, agreements, understandings, customs and practices of the Parties in relation to transactions in precious metals.

*[Signature Page to follow]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized officers, as of the Effective Date.

Per: _____

Name: _Hitoshi Ishida_

Title: _President_

Date: _Oct 4th, 2017_

For and on behalf of
**SCMI US INC.**

Per: _____

Name _Jimmy Gavilan_

Title _SVP Market Development_

Date: _October 4th, 2017_

For and on behalf of
**REPUBLIC METALS CORPORATION**

## Annex I -- OUTRIGHTS

**A**    **Transaction Type**

I A.I    Pursuant to Clause 4.1, this Annex I sets out the terms of Outrights, where an **"Outright"** means a Transaction for the spot or forward sale of Material pursuant to which one Party (**"the Seller"**), in consideration of the receipt of a sum (**"the Consideration"**) paid or to be paid by the other Party (**"the Buyer"**), will sell Material to the Buyer in such quantity or quantities and deliverable at such times and places as agreed between the Parties. The Consideration shall be calculated as the price per toz of the Precious Metal to be purchased under the Outright (**"the Contract Price"**) multiplied by the total quantity in toz of Material to be purchased.

I.A.2    The Contract Price may be agreed either as a single fixed amount or as a pricing formula such that the actual quantum of the Contract Price may without further agreement between the Parties be determined at a future date or dates by reference to such formula and to data derived from independent sources and available to both Parties

**B**    **Obligations under Outrights**

I B 1    The Seller shall deliver to the possession of the Buyer the agreed quantity of Material to be purchased (except to the extent that the Material is already in the possession of the Buyer pursuant to another Transaction, to which extent the Seller shall have no delivery obligation). Delivery shall be in the agreed quantity or quantities on one or more agreed dates (each a **"Delivery Date"**) at the agreed Delivery Location(s).

I.B.2    The Buyer shall pay the Consideration to the Seller. Unless the Parties have agreed another payment date or dates in writing, the Consideration shall be payable in full (i) on the Delivery Date (or pro rata on each Delivery Date if there are multiple Delivery Dates), or (ii) to the extent that the Material is already in the possession of the Buyer pursuant to another transaction, on the date on which the Buyer would otherwise be required to relinquish possession of such Material pursuant to the terms of such transaction (or if there are multiple such dates, pro rata on each such date).

I.B.3    Under an Outright, once Material has been appropriated to the Outright, the general property in such Material shall remain with the Seller until the Buyer has paid in full the Consideration under that Outright (including any Default Interest for late payment of the Consideration), whereupon property shall pass to the Buyer. For the avoidance of doubt, this Paragraph is without prejudice to the provisions of Part 7 of this Agreement.

## ANNEX II – LEASES

### A   Transaction Type

II A 1   Pursuant to Clause 4.1, this Annex II sets out the terms of Leases, where a "**Lease**" means a Transaction for the bailment of Precious Metal, whereby one one Party as bailor ("**the Lessor**") on an agreed date ("**the Delivery Date**") delivers an agreed quantity of Material ("**the Leased Material**") to the possession of the other Party as bailee ("**the Lessee**") at an agreed Delivery Location, on terms that the Lessee: (i) has the right to enjoy quiet possession of the Leased Material until an agreed future date ("**the Expiry Date**"), (ii) on the Expiry Date must redeliver the Leased Material to the Lessor at an agreed Delivery Location ("**the Return Location**") and (iii) *must pay an agreed sum ("**the Lease Fee**") to the Lessor*

### B   Obligations under Leases

II.B.1   The Lessor shall deliver to the Lessee the Leased Material at the Delivery Location on the Delivery Date of the Lease (except to the extent that the Leased Material is already in the possession of the Lessee at the time the Lease is concluded, to which extent there shall be no delivery obligation on the Lessor's part).

II.B.2   The Lessee shall redeliver the Leased Material to the possession Lessor at the Return Location by Close of Business on the Expiry Date of the Lease, unless a new Transaction has been agreed to by the Parties in respect of the Leased Material under the terms of which the Lessee is have possession of the Leased Material or otherwise dispose of it, in which case the Lessee shall have no obligation to redeliver the Leased Material. For the avoidance of doubt, if the Parties have agreed such a new Transaction in respect of a portion of Leased Material, the Lessee's obligation shall be to redeliver the remaining portion of the Leased Material in respect of which no new Transaction has been agreed.

II B.3   The Lessee shall pay the Lease Fee to the Lessor. The Lease Fee shall be due and payable on the Expiry Date of the Lease, unless the Parties have agreed another payment date or dates.

II.B.4   The Lease Fee shall be calculated as the quantity of Leased Material in toz multiplied by the Base Price multiplied by the number of calendar days from and including the Commencement Date to and including the day before the Expiry Date multiplied by the Lease Rate divided by 360. For the purposes of this paragraph II.B.4, the "**Base Price**" means the notional price per toz of the Leased Material agreed between the Parties, the "**Lease Rate**" means the annual interest rate (expressed as a percentage) for the Lease agreed between the Parties and the "**Commencement Date**" means the date agreed between the Parties as the commencement date of the Lease. For the avoidance of doubt, where the Lessor is to deliver the Leased Material by crediting it to an unallocated pool account held with a third party custodian at a depository, the Commencement Date shall be the Delivery Date, and where the Leased Material is in the possession of the Lessee under an existing Transaction, the Commencement Date shall be the agreed end date of such Transaction; in other cases, the Commencement Day may be a date prior to the Delivery Date

II.B.5   For the avoidance of doubt, prior to the Expiry Date of any Lease, the Lessee shall have no right to redeliver the Leased Material or to otherwise close the Lease before the Expiry Date. Should the Lessee unilaterally relinquish possession of the Leased Material at the Return Location or any other location before the Expiry Date of the Lease, it shall remain liable for the full payment of the Lease Fee on the due date for payment. For the avoidance of doubt, if before the Expiry Date the Parties agree a new Transaction in respect of the Leased Material (or any portion of it), the Lessee shall remain liable for the full payment of the Lease Fee on the due date for payment, unless the Parties have expressly agreed otherwise.

II.B.6   The Lessor shall at all times retain the general property in the Leased Material during the term of the Lease. The Parties acknowledge that each Lease is a true Lease in which the Lessor retains title to and property in the Leased Material and that settlement by return of the Leased

Material in specie is contemplated. For the avoidance of doubt, if before the Expiry Date the Parties agree another Transaction in respect of the Leased Material (or any portion of it), then unless otherwise expressly agreed by the Parties, no proprietary right or interest in such Leased Material that is to be created, modified or extinguished by such Transaction shall be so created, modified or extinguished (as the case may be) before the Expiry Date of the Lease. For the avoidance of doubt, this Paragraph is without prejudice to the provisions of Part 7 of this Agreement.

## ANNEX III – CONSIGNMENTS

### A    Transaction Type

III.A.1    Pursuant to Clause 4.1, *this Annex III sets out the terms of Consignments, where a* "**Consignment**" means a Transaction under which one Party ("**the Consignor**") on an agreed date ("**the Delivery Date**") delivers an agreed quantity of Material ("**the Consigned Material**") to the other Party ("**the Consignee**") at an agreed Delivery Location on terms that the Consignee· (i) has the right to possess the Consigned Material until an agreed future date ("**the Final Purchase Date**"), (ii) has both the right and the obligation to purchase all of the Consigned Material on or before the Final Purchase Date at such times and in such quantities and at such prices (each a "**Purchase Price**") as the Parties shall agree in accordance with the provisions of this Annex, (iii) shall pay each Purchase Price and (iv) shall either pay a daily accruing fee ( "**the Consignment Fee**") in respect of the Consigned Material, or, if the Parties so agree, shall pay no Consignment Fee

III.A.2    Consignments under which the Consignee is obliged to pay a Consignment Fee may alternatively be described as Overdraft Leases.

### B    Obligations Under Consignments

III.B.1    The Consignor shall deliver the Consigned Material to the possession of the Consignee on the Delivery Date

III.B.2    If a Consignment Fee is payable under the Consignment, the Consignee shall pay the whole of the accrued Consignment Fee on the Final Purchase Date  For the avoidance of doubt, late payment shall attract Default Interest.

III.B.3    If a Consignment Fee is payable under the Consignment, the Consignment Fee shall begin to accrue on the **Commencement Date**, and shall accrue daily thereafter  The amount accruing to the Consignment Fee on any particular day shall be calculated as the **Outstanding Balance** (in toz) at the commencement of that day multiplied by the **Base Price**, multiplied by the **Consignment Rate** divided by 360  For the purposes of this paragraph III.B.3:

   (a)    "Outstanding Balance", in toz, means, in respect of the Consignment, (i) on the Commencement Date, the quantity of Consigned Material to be delivered on the Delivery Date, and (ii) at any other particular time, the quantity of Consigned Material that remains to be purchased by the Consignee by the Final Purchase Date (calculated as the initial quantity of Consigned Material minus the cumulative quantity of Consigned Material purchased by the Consignee up to that time);

   (b)    the "Consignment Rate" means the annual interest rate (expressed as a percentage) for the Consignment agreed between the Parties;

   (c)    the "Base Price" means a nominal price per toz of the Consigned Material agreed between the Parties; and

   (d)    the "Commencement Date" means the date agreed between the Parties as the commencement date of the Consignment. For the avoidance of doubt, where the Consignor is to deliver the Consigned Material by crediting it to an unallocated pool account held with a third party custodian at a depository, the Commencement Date shall be the Delivery Date, and where the Consigned Material is in the possession of the Consignee under an existing Transaction, the Commencement Date shall be the agreed end date of such existing Transaction; in other cases, the Commencement Day may be a date prior to the Delivery Date.

III.B.4    The Consignee shall purchase the whole quantity of the Consigned Material by Close of Business on the Final Purchase Date  Purchases shall be effected in accordance with the remaining provisions of this Part B.

III.B.5    A purchase of Consigned Material may be concluded between the Parties at any time before Close of Business on the Final Purchase Date, in accordance with the following procedure.

(i)    the Consignee shall contact the Consignor (whether by telephone, or email or other electronic messaging system) and request the Consignor to quote a price per toz of Consigned Material;

(ii)    on receipt of such request from the Consignee, the Consignor shall with reasonable promptness quote such a price;

(iii)    on receipt of such price quote, the Consignee shall state the quantity (if any) of Consigned Material to be purchased (being a quantity less than or equal to the current Outstanding Balance) at such quoted price. Upon the Consignee stating such quantity, the Parties shall have made a legally binding agreement for the Consignor to sell and the Consignee to purchase the Consignment Material in the quantity stated at the price quoted. The Purchase Price shall be calculated as such quoted price per toz multiplied by such stated quantity.

III.B.6  The Consignee shall pay the relevant Purchase Price in full on the second (2nd) Business Day following each purchase. Late payment shall attract Default Interest.

III.B.7  Within two (2) Business Days of each purchase of Consigned Material, SCMI shall prepare and issue a notice confirming the purchase (each a "**Purchase Notice**"), which shall state the quantity of Consigned Material purchased, the Purchase Price and the new Outstanding Balance. Republic Metals Corporation shall accept the Purchase Notice within two (2) Business Days of receipt, provided that if Republic Metals Corporation considers that the content of the Purchase does not accurately reflect the terms of the Purchase it shall within three (2) Business Days of receipt notify SCMI of this fact and of what it believes to be the accurate terms of the purchase. Issue and acceptance of Purchase Notices shall be subject to Clause 3.7.

III.B.8  If by Close of Business on the Final Purchase Date there is a positive Outstanding Balance, then (except to the extent that the Parties have entered into a new Transaction in respect of, and the Consignor has released the Consignee from its obligation to purchase, such Outstanding Balance) the Consignee shall automatically be deemed to have made a purchase of the whole of the Outstanding Balance at that time. The price per toz of the Outstanding Balance shall be the Market Price of the relevant Precious Metal at Close of Business on the Final Purchase Date plus a reasonable premium based on the market rate prevailing in the relevant local market on the Final Purchase Date, as determined by the Consignor acting reasonably and in good faith. Paragraphs III.B.6 and III B 7 above shall apply to such purchase

III.B.9  Under a Consignment, the general property in the Outstanding Balance shall remain with the Consignor at all times. The general property in any Consigned Material purchased shall remain with the Consignor until payment in full of the relevant Purchase Price (including any Default Interest on such Purchase Price), at which time property shall pass to the Consignee. For the avoidance of doubt, if before the Final Purchase Date the Parties agree another Transaction in respect of the Outstanding Balance (or any portion of it), then unless otherwise expressly agreed by the Parties, no proprietary right or interest in such Outstanding Balance that is to be created, modified or extinguished by such Transaction shall be so created, modified or extinguished (as the case may be) before the Final Purchase Date of the Consignment. For the avoidance of doubt, this Paragraph is without prejudice to the provisions of Part 7 of this Agreement.