**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:                                                      Chapter 11

MIAMI METALS I, INC., *et al.*, [1]                         Case No. 18-13359 (SHL)

                           Debtors.

------------------------------------------------------------x        (Jointly Administered)

## DECISION AND ORDER DENYING SUMMARY JUDGMENT

**A P P E A R A N C E S :**

**AKERMAN LLP**
*Counsel for the Debtors*
2001 Ross Avenue
Suite 3600
Dallas, TX 75201
By:     Yelena E. Archiyan, Esq.

**LUSKIN, STERN & EISLER LLP**
*Attorneys for Senior Lenders*
Eleven Times Square
New York, NY 10036
By:     Michael Luskin, Esq.
        Stephan A. Hornung, Esq.
        Alex Talesnick, Esq.

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Miami Metals I, Inc. (f/k/a Republic Metals Refining Corporation), 15 West 47th Street, Suites 206 and 209, New York, NY 10036 (3194); Miami Metals II, Inc. (f/k/a Republic Metals Corporation ("RMC")), 12900 NW 38th Avenue, Miami, FL 33054 (4378); Miami Metals III LLC (f/k/a Republic Carbon Company, LLC), 5295 Northwest 163rd Street, Miami Gardens, FL 33014 (5833); Miami Metals IV LLC (f/k/a J & L Republic LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7604); Miami Metals V LLC (f/k/a R & R Metals, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (7848); Miami Metals VI (f/k/a RMC Diamonds, LLC), 12900 NW 38th Avenue, Miami, FL 33054 (1507); Miami Metals VII (f/k/a RMC2, LLC ("RMC2")), 12900 NW 38th Avenue, Miami, FL 33054 (4696); Miami Metals VIII (f/k/a Republic High Tech Metals, LLC), 13001 NW 38th Avenue, Miami, FL 33054 (6102); Republic Metals Trading (Shanghai) Co., Ltd., 276 Ningbo Road, Huangpu District, Shanghai, P.R. 200001 China (1639); and Republic Trans Mexico Metals, S.R.L., Francisco I. Madero No. 55 Piso 5, Local 409, Centro Joyero Edificio Central, Delegación Cuauhtémoc, Mexico DF 6000 (2942).

**DORSEY & WHITNEY LLP**
*Attorneys for Premier Gold Mines Limited*
51 West 52nd Street
New York, NY 10019
By:    Eric Lopez Schnabel, Esq.
       Daniel P. Goldberger, Esq.

**ARNOLD & PORTER KAYE SCHOLER LLP**
*Attorneys for Tiffany & Co.*
250 West Fifth Street
New York, NY 10019
By:    Benjamin Mintz, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

       Before the Court is the former Debtors' and the Senior Lenders' joint motion [ECF No.

1201] (the "Summary Judgment Motion") seeking summary judgment as to an ownership dispute

with one of its customers, Premier Gold Mines Limited ("Premier Gold").  Debtors are in the

business of refining precious metals.  Premier Gold is one of seven customers (each, a

"Customer" and collectively, the "Customers") that originally comprised Buckets 3, 4 and 5,

with the term "bucket" being a convention used to separate disputes between the Debtors and

their customers into categories based on the similarity of the legal issues.  The Senior Lenders[2]

are secured lenders of Debtors whose recovery in the case is impacted by the outcome of those

customer disputes.  The Customers initially comprising Buckets 3, 4 and 5 were:

- Bucket 3 – Customers, Argonaut Gold, Inc., First Majestic Silver Corp. and Pretium
  Exploration Inc.;

- Bucket 4 – Customer, Coeur Mining, Inc.; and

---

[2]     The Senior Lenders are Coöperatieve Rabobank U.A., New York Branch; Brown Brothers Harriman & Co.;
Bank Hapoalim B.M.; Mitsubishi International Corporation; ICBC Standard Bank Plc; Techemet Metal Trading LLC;
Woodforest National Bank; and Hain Capital Investors Master Fund, Ltd. as successor-in-interest to Bank Leumi
USA.

- Bucket 5 – Customers, Premier Gold, Yamana Gold Inc. and Minas de Oroco Resources, S.A. DE CV.

The customer disputes with six of the seven Customers have been resolved, leaving only Premier Gold.  For the reasons set forth herein, the Court denies the Debtors' and Senior Lenders' Summary Judgment Motion as to Premier Gold.

## BACKGROUND

A.  The Chapter 11 Cases

Each Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on either November 2, 2018 or November 21, 2018.  On December 23, 2019, the Court entered an order confirming the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation (the "Plan") [ECF No. 1491-2].  *See* Findings of Fact, Conclusions of Law, And Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan of Liquidation [ECF No. 1668].  The Effective Date (as defined therein) of the Plan occurred on January 7, 2020 and, as such, the Plan was substantially consummated.  *See* Notice of (A) Occurrence of the Effective Date of Plan, (B) Deadline to File Administrative Claims and (C) Deadline to File Rejection Damages Claims [ECF No. 1682].[3]

B.  The Ownership Disputes

On November 2, 2018, the Debtors filed the Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief [ECF No. 10] ("Cash Collateral Motion") seeking court authorization for the use of cash collateral.  Various

---

[3]    While the Debtors have liquidated under the terms of the confirmed Plan, for purposes of this decision, the Court shall continue to refer to them as the Debtors.

customers of the Debtors filed over 40 objections and responses to the Cash Collateral Motion, asserting ownership interests in certain metals that the Debtors believed constituted property of the estate (collectively, the "Ownership Disputes"). To facilitate the resolution of the Ownership Disputes in an efficient and systematic manner, the Court entered the Order Approving Uniform Procedures for Resolution of Ownership Disputes [ECF No. 395], subsequently amended on April 15, 2019 [ECF No. 913], June 14, 2019 [ECF No. 1196] and October 28, 2019 [ECF No. 1516] (the "Uniform Procedures Order"), which established global procedures to address the Ownership Disputes. Pursuant to the Uniform Procedures Order, Customers were categorized and grouped into various "buckets" based on the type of contract governing their respective relationships with the Debtors.

In August 2019, the Court granted summary judgment as to the Debtors and Senior Lenders with respect to the Ownership Disputes relating to a subset of Bucket 1 Customers. *See In re Miami Metals I, Inc.*, 603 B.R. 727 (Bankr. S.D.N.Y. 2019) (the "Bucket 1 Decision"). There, the Court concluded that the governing "Standard Terms and General Operating Conditions" between the Debtor formerly known as RMC and those respective customers (the "Bucket 1 Standard Terms") established a sale as opposed to a bailment relationship. *See id.* at 735 (stating that the executed terms are consistent with a sale rather than a bailment). The Court concluded that multiple provisions in the Bucket 1 Standard Terms were unambiguously consistent with a sale and thus made it unnecessary to consider any extrinsic evidence of the parties' relationship. *See e.g., id.* at 736 (citing to a provision in the Bucket 1 Standard Terms that "precludes the existence of a bailment . . . because it makes clear that the Debtors have no obligation to return the same metals . . . [given to] them"); *see also id.* (noting that "[o]ther language in the [Bucket 1 Standard Terms] confirms this result"). The Court further noted that,

4

while consideration of extrinsic evidence was unnecessary, the undisputed fact that these customers' metals were commingled and also was inconsistent with a bailment. *See id.* at 742. As such, the Court held that the precious metals given to the Debtors by these Customers were property of the estate, that the subset of Bucket 1 Customers lacked any ownership interests in these metals, and that these customers should instead be treated as unsecured creditors in this bankruptcy case. *Id.*

C.    The Premier Gold Ownership Dispute

Premier Gold is part of so-called "Bucket 5", which is comprised of Customers whose agreements are "silent as to when title [of the metals] passe[s] from each Bucket 5 Customer to [Debtor, Miami Metals II, Inc. (f/k/a Republic Metals Corporation)]."  Summary Judgment Motion at 12.  The Ownership Dispute with Premier Gold centers principally on two agreements: (1) the Letter Agreement between Republic Metals Corporation ("RMC") and Premier Gold Mines Limited, dated as of September 30, 2016 (the "Premier Gold Agreement") and (2) the "Standard Terms and General Operating Conditions" (the "Premier Gold Standard Terms") executed just before the parties entered into the Premier Gold Agreement. *See* Declaration of Scott Avila in Support of Debtors and the Senior Lenders' Joint Motion for Summary Judgment as to Bucket 3, 4 and 5 Customers [ECF No. 1204] (the "Avila Declaration") ¶¶ 17, 18; Composite Exhibit B, Tab 5 to the Avila Declaration (copy of the Premier Gold Agreement); Composite C, Tab 1 to the Avila Declaration (copy of the Premier Gold Standard Terms).

The Premier Gold Standard Terms are essentially identical to the Bucket 1 Standard Terms that the Court previously addressed in its Bucket 1 Decision but for the following provisions which were excluded from the Premier Gold Standard Terms:

- Special provisions governing insurance, delivery, weighing and sampling for express delivery shipments; and

- Language providing that the "Standard Terms and Conditions shall be deemed to be incorporated into each and every transaction between RMC and Customer, whether or not specifically stated therein."

*Compare* Exhibit B to the Amended Declaration of Scott Avila in Support of the Motion [ECF No. 1005] (copy of the Bucket 1 "Standard Terms and General Operating Conditions" between RMC and the respective customer) *with* Composite C, Tab 1 to the Avila Declaration (copy of the Premier Gold Standard Terms).  Relying on this Court's Bucket One Decision and the similarity between the Bucket One Standard Terms and the Premier Gold Standard Terms, the Debtors assert that the Premier Gold Standard Terms—much like the Standard Terms in the Bucket One decision—unambiguously provide for the sale of raw materials, thereby making those metals property of the estate.

Premier Gold disagrees, contending that the Premier Gold Standard Terms do not apply here.  *See* Premier Gold's Counterstatement of Undisputed Fact ¶ 28; *see also* Premier Gold Mines Limited's Memorandum in Opposition to Debtors' and Senior Lenders' Joint Motion for Summary Judgment as to Bucket 3, 4 and 5 Customers [ECF No. 1465] ("Premier Gold Opposition") at 21–22.  Premier Gold relies on the integration clause in Section 15.3 of the Premier Gold Agreement, which provides:

> [The Premier Gold Agreement] constitutes the entire agreement between the parties with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements, between the parties with respect thereto.  There are no representations, warranties, terms, conditions, opinions, advice, assertions of fact, matters, undertakings or collateral agreements, express, implied or statutory, by or between the parties (or by any representative thereof) with respect to the subject matter hereof other than as expressly set forth in this letter agreement.

Premier Gold Agreement § 15.3.  Premier Gold notes that the Premier Gold Agreement was executed approximately one week after the execution of the Premier Gold Standard Terms.  Given the integration clause in the Premier Gold Agreement, the argument goes, the later executed Premier Gold Agreement supersedes the Premier Gold Standard Terms.  *See* Premier

Gold Agreement at 11 (signature page reflecting an execution date of September 30, 2016);

Premier Gold's Counterstatement of Undisputed Facts ¶ 28 (arguing that the integration clause,

coupled with the later execution of the Premier Gold Agreement, renders the Premier Gold

Standard Terms inapplicable); Dec. 4, 2019 Hr'g Tr. 28:16–18 (Debtors stating that the Premier

Gold Standard Terms are generally executed "on day 1 and then on day 7 or 10 they sign the

contract that we're talking about").

Moreover, Premier Gold further asserts that the Premier Gold Agreement "indisputably

contemplates a bailment relationship by allowing Premier Gold to utilize RMC's refining

services only."  Premier Gold Opposition at 1.  Premier Gold relies on the testimony of Michael

Waisome, Director of Sales for Mining at RMC, who testified that the parties were engaged

solely in a refining relationship as opposed to one for purchase and sale.  *See* Exhibit 4 to the

Goldberger Declaration at 3 (confirming that RMC's relationship with Premier Gold was simply

one of refining services as opposed to selling metals).  Michael Waisome both negotiated and

executed the Premier Gold Agreement, and managed the Debtors' relationship with Premier

Gold.  *See* Premier Gold Opposition at 1.

By its own terms, the Premier Gold Agreement terminated on April 30, 2017, which

parties acknowledged at the hearing on these matters.  *See* Section 10.1 to the Premier Gold

Agreement ("This letter agreement . . . shall terminate on April 30, 2017); Dec. 4, 2019 Hr'g Tr.

68:23–26 (Premier Gold acknowledging that the Premier Gold Agreement "per its terms,

terminated within twelve months").  As the termination issue had not been addressed or briefed

in the parties' papers, the Court directed the parties to inform the Court of their position as to

whether the Premier Gold Agreement continued to remain in effect notwithstanding the

termination provision.  *See* Dec. 4, 2019 Hr'g Tr. 155:16–24 (noting that an outstanding issue

7

was what to do with the termination of the Premier Gold Agreement); *see also* Feb. 10, 2020

Hr'g Tr. 9:21–10:5 [ECF No. 1719] (directing parties to file statements with the Court as to their

position on the termination matter).  The Senior Lenders and Premier Gold subsequently

submitted separate letters to the Court, stating their position that the Premier Gold Agreement

"remained in effect and [the] parties continued to operate thereunder through the Petition Date

notwithstanding the earlier termination date in the document."  Position Statement of Senior

Lenders [ECF No. 1715]; *see also* Letter to the Honorable Sean H. Lane [ECF No. 1718] (stating

that Premier Gold agrees with the Senior Lenders' position that the Premier Gold Agreement

"governs the business relationship between Premier [Gold] and the Debtors during all applicable

periods, including [and] through the [P]etition [D]ate").  Given the parties' positions, the Court

deems the Premier Gold Agreement to be in force for all relevant periods.

D.  The Parties' Course of Dealing

In addition to their written agreements, the parties presented evidence of their course of

dealing.  These facts about the parties' course of dealing are undisputed unless otherwise noted.

Customers, including Premier Gold, provided raw materials to the Debtors for refining,

resulting in the production of "refined silver and gold bars and casting grains."  *See* Premier

Gold's Counterstatement of Undisputed Facts ¶ 15 (stating that Premier Gold does not dispute

Debtors' account that RMC refined precious metals and produced gold bars and casting grains).

Premier Gold made two shipments of gold and silver doré to RMC in October 2018, the first of

which arrived on October 15, 2018 and the second of which arrived on October 29, 2018.  *See*

Premier Gold Opposition at 9 (noting that Premier Gold shipped substantially all of its property

to RMC in two separate shipments in October).  Following the initial receipt of raw materials,

the Debtors divided shipments into separate lots which were assigned lot numbers based upon

the overall weight of the shipment. *Id.* ¶ 16 (stating that Premier Gold does not dispute the Debtors' account of how shipments were handled). Such lots were assayed to estimate the amounts of precious metals contained in each respective lot. *See id.* (stating that Premier Gold does not dispute the Debtors' account that the lots were subsequently weighed and melted to obtain homogenous samples for assay testing). A final settlement was reached when RMC and the respective customer agreed upon the metal content in the respective lot. *Id.* (stating that Premier Gold does not dispute the Debtors' account of how final settlements were reached).

The Debtors state that, prior to final settlement, a customer could elect, among other things, to receive an advance payment of a portion of the estimated value of the lot in either U.S. Dollars or "metal credits" to a customer's Loco London metal account—generic metal credits that originate from the Debtors' unallocated metal account at its own metal bank, ICBC. *See* Debtors and the Senior Lenders' Joint Statement of Mutual Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 ¶ 17; Premier Gold Standard Terms at 17–18 (outlining the terms for payment of advances which include "wire transfer, check, metal transfer or otherwise"). Unlike allocated metal accounts where customers maintain full title to the metal in the account held on their behalf, unallocated metal accounts only provide a customer with a general entitlement to an amount of metal that is backed by the bullion stock of the dealer or depository where the account is maintained. Debtors and Senior Lenders' Reply Memorandum of Law in Further Support of Joint Motion for Summary Judgment as to Bucket 3, 4 and 5 Customers [ECF No. 1552] at 3–4 (describing the differences between allocated and unallocated accounts pursuant to the definitions set forth by the London Bullion Market Association, the governing body of the Loco London market). Premier Gold disputes this, contending that "[a]t

times . . . RMC transferred physical metal to Premier's desired location . . . after the refining

process was complete."  Premier Gold's Counterstatement of Undisputed Facts ¶ 17.

Following the assay and sampling process, the raw materials proceeded to the refining

stage and, except for "Peace of Mined" customers (i.e., downstream customers whose materials

were separately processed and thus 100% traceable), individual customer lots were "commingled

with other customer lots, various cleanup material and residue material."  *Id.* ¶¶ 18, 20–21

(stating that Premier Gold does not dispute Debtors' account of the "Peace of Mined" program).

All parties agree that Premier Gold was not a "Peace of Mined" downstream customer and that

its raw materials were commingled with that of other customers during the refining process.  *See*

*id.* ¶ 23 (Premier Gold acknowledging that "it was not a downstream customer and that it was not

paid to utilize the Peace of Mined program"); *see also* Dec. 4, 2019 Hr'g Tr. 77:10–25.

Both parties also agree that—after refining—Premier Gold received metal credits to its

unallocated account at ScotiaMocatta.  *See* Dec. 4, 2019 Hr'g Tr. 78:10–13 (Premier Gold

acknowledging to the Court that it maintained an unallocated metal bank account); Exhibit 4 to

Declaration of Daniel P. Goldberger in Support of Premier Gold Mines Limited's Memorandum

in Opposition to Debtors' and Senior Lenders' Joint Motion for Summary Judgement as to

Bucket 3, 4 and 5 Customers [ECF No. 1468] (the "Goldberger Declaration") at 7 (Waisome

testifying that RMC "receive[d] [Premier Gold's] material and . . . process[ed] it, refine[d] it, and

then credit[ed] their account at their—at their nominated bank on their behalf and then . . .

charge[d] them a refining service.").  However, the parties characterize their post-refining

relationship differently.  On the one hand, Debtors assert that "Premier never received physical

metal, only unallocated Loco London metal credits."  *See* Debtors and Senior Lenders' Reply

Memorandum of Law in Further Support of Joint Motion for Summary Judgment as to Bucket 3,

4 and 5 Customers [ECF No. 1552].  On the other hand, Premier Gold contends that "[a]t times,

RMC transferred physical metal to Premier's desired location per its instructions after the

refining process was complete."  Premier Gold's Counterstatement of Undisputed Facts ¶ 17; ¶

18 (Premier Gold stating that it disputes Debtors' account that the refined gold and silver was

either sold or sent to the mint for the production of value-added minted and casted products,

asserting instead that "Premier's refined metal was returned to Premier"); *id.* ¶ 19 ("Premier also

disputes that RMC had no obligation to return Premier's raw materials in the same or altered

form").

But while Premier Gold talks about receiving refined gold and silver back after refining,

the record does not evidence any physical transfer of metal from RMC to Premier Gold but

rather a transaction among so-called "metal banks."  As the Chief Financial Officer of Premier

Gold explained, the delivery of gold and silver to Premier "was usually achieved through the

London metals exchange market through accounts maintained by bullion banks," which enable

"customers to trade and move ounces of gold between parties through the London exchange

without having to undergo the expense of continually physically moving actual gold bars."

Declaration of Steve Filipovic In Support of Premier Gold Mines Limited's Opposition to

Debtors' and Senior Lenders' Joint Motion for Summary Judgment as to Bucket 5 Customers

[ECF No. 1467] ¶¶ 4, 21.  Filipovic notes that "[a]lthough gold can be and often is moved . . .

bullion banks are a common industry method of facilitating the free trading of these precious

metals without the need to always move the *actual* refined metal."  *Id.* (emphasis added).

Specifically, Filipovic states that "[t]ypically . . . RMC would deliver ounces of gold to Premier

by a deposit into its ScotiaMocatta account.  This deposit into Premier's SociaMocatta account

could be through actual physical delivery to ScotiaMocatta or through physical delivery

elsewhere . . . and then a transfer of ounces to ScotiaMocatta through the exchange." *Id.* ¶ 23.
*See also* Section 6.2 of the Premier Gold Agreement (providing that, upon the fixing of the metal
and deduction of applicable charges, payment for the gold and silver will be made in either
"USD . . . transferred to the Customer's designated USD account . . . [or] [a]lternatively, if the
Customer decides to operate on a toll basis, the metal(s) due from each lot of Material . . .
transferred to the Customer's designated metal account(s).").

In addition to the parties' dealing as to refining and payment, the parties also entered into
a Hedge Contract Confirmation dated September 28, 2018 (the "Hedge Agreement"), which
governed a specific "spot sale" of gold from Premier Gold to RMC in exchange for which
Premier would be paid in U.S. Dollars. *See* Premier Gold's Counterstatement of Undisputed
Facts ¶ 27(a) (noting that Premier Gold entered into an agreement to govern a specific
transaction with RMC). The Hedge Agreement references the Premier Gold Standard Terms but
does not reference the Premier Gold Agreement. *See* Exhibit 13 to the Goldberger Declaration
("By agreeing to [RMC's] Standard Terms and General Operating Conditions, and receiving this
e-mail confirmation, Customer agrees that he has entered into a written legally binding contract
with [RMC] to sell the precious metals identified").

## LEGAL STANDARD

A. <u>Summary Judgment</u>

Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy
Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56. Specifically, "summary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to

a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting

Fed. R. Civ. P. 56). "The party seeking summary judgment bears the burden of establishing that

no genuine issue of material fact exists and that the undisputed facts establish [the movant's]

right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61

(2d Cir. 1995). If "the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 288 (1968)). The burden then shifts to the non-moving party to produce "sufficient

specific facts to establish that there is a genuine issue of material fact for trial." *Lipton v. Nature

Co.,* 71 F.3d 464, 469 (2d Cir. 1995) (citation omitted).

"A fact is material when it might affect the outcome of the suit under governing law."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). "In deciding whether

material factual issues exist, all ambiguities must be resolved and all reasonable inferences must

be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395,

at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986)). Nonetheless, "the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "The Court may

also grant some but not all of the relief requested in a summary judgment motion if it finds

disputed issues of fact as to some of the issues presented." *In re Residential Capital, LLC*, 533

B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)). Properly supported facts

contained in a statement of material facts that are not specifically controverted by an opposing

party are deemed to be admitted.  *See* S.D.N.Y. Local Bankruptcy Rule 7056-1(d) ("Each

numbered paragraph in the statement of material facts required to be served by the moving party

shall be deemed admitted for purposes of the motion unless specifically controverted by a

correspondingly numbered paragraph in the statement required to be served by the opposing

party.").

### B.   Choice of Law

As provided for in the Statement of Claimed Ownership and Claims of Premier Gold

Mines Limited at 5 [ECF No. 451] ("Premier Gold Customer Statement"), Premier Gold states

that the laws of the State of Florida and the Province of Ontario (Canada) are applicable to its

Ownership Dispute.  *See also* Premier Gold Standard Terms at 18 (concerning agreements

governing the fixing of metals, "Customer . . . warrants that said contract is in compliance with

the Florida Uniform Commercial Code . . . and agrees to waive any defenses under Florida

Uniform Commercial Code § 672.201"); Premier Gold Agreement § 13.7 (stating that the

Premier Gold Agreement "shall be exclusively governed by and construed in accordance with

the laws of the Province of Ontario and the federal laws of Canada applicable therein").  While

the Debtors do not take a position on the applicable jurisdiction, both the Debtors and Premier

Gold agree that the laws under either jurisdiction are "substantially the same."  Premier Gold

Customer Statement at 3; *see also* Summary Judgment Motion at 16 (stating that laws of Florida

and Canada are "harmonious" and thus, foreclose any "need for the Court to perform any choice

of law analysis").  Accordingly, the Court need not perform a choice of law analysis and will cite

to the substantially similar laws of both jurisdictions.

C.  Contract Interpretation

A written agreement that is clear and unambiguous on its face must be enforced

according to its terms.  *See Gibney v. Pillifant*, 32 So. 3d 784, 785 (Fla. 2d Dist. Ct. App. 2010)

("[T]he actual language used in the contract is the best evidence of the intent of the parties, and

the plain meaning of that language controls.") (internal quotation marks omitted); *Eli Lilly & Co.*

*v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, para. 54 (Can.) (noting that the determination of the

contractual intent of parties is to be done "by reference to the words . . . used in drafting the

document . . . in light of the surrounding circumstances which were prevalent at the time").  A

written document intended by the parties to be the final embodiment of their agreement may not

be contradicted, modified, or varied by extrinsic evidence.  *See King v. Bray*, 867 So. 2d 1224,

1226 (Fla. 5th Dist. Ct. App. 2004) (stating that the essence of the parol evidence rule provides

that a written document intended to be the final embodiment of parties' agreement cannot be

modified by parol evidence); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, para. 54

(Can.) (excluding consideration of extrinsic evidence of subjective intent where a document is

"clear and unambiguous on its face").  As for the matter of whether a contract represents a

bailment or a sale, "[c]ourts dealing with contracts having both bailment and sale characteristics

look beyond the four corners of the contract and examine the various circumstances that led to

the contractual arrangement."  *In re Handy & Harman Refining Grp. Inc.*, 271 B.R. 732, 736

(Bankr. D. Conn. 2001).

D.  Bailment vs. Purchase and Sale

Bailment is generally defined as the "delivery of personalty for some particular purpose,

or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it

shall be redelivered to the person who delivered it."  *Affiliated FM Ins. Co. v. Dependable*

*Warehousing & Distrib., Inc.*, 303 F. Supp. 3d 1329, 1331 (S.D. Fla. 2018) (citing *Monroe Sys. for Bus., Inc. v. Intertrans Corp.*, 650 So. 2d 72, 75 (Fla. 3d Dist. Ct. App. 1994) (quoting *Dunham v. State*, 192 So. 324, 326 (Fla. 1939))). A bailment "'is generally a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner.'" *Sirpal v. Univ. of Miami*, 684 F. Supp. 2d 1349, 1364 (S.D. Fla. 2010) (quoting *S & W Air Vac Sys., Inc. v. Dep't of Revenue*, 697 So. 2d 1313, 1315 (Fla. 5th Dist. Ct. App. 1997)). *See also Mason v Westside Cemeteries Ltd.,* [1996] OJ No 1387, para. 21 ("A bailment is created when one person receives possession of a thing from another upon an undertaking to keep and return or deliver the thing, or to deal with it according to current or future directions of the other.").

As this Court previously recognized, "in distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or some altered form; if another thing of equal value is to be returned, the transaction is a sale." *Miami Metals I*, 604 B.R. at 735; *see also Sturm v. Boker*, 150 U.S. 312, 329 (1893) ("The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed."); *Powder Co. v. Burkhardt*, 97 U.S. 110, 116 (1878) ("[I]f the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment . . . . If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be sale . . . and the title to the thing delivered vests in the manufacturer."). *See also Coro (Canada) Inc. (Trustee of) v. Enthone-OMI (Canada) Inc.*, [1997] O.J. No. 4704, 36 O.R. (3d) 563 (Ony. Gen. Div.) (noting that for a

transaction to be considered a bailment, the "identical subject-matter normally would have to be returned").

In contrast, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price."  Fla. Stat. Ann. § 672.106(1).  *See also* Ontario Sale of Goods Act, R.S.O. 1990, c. S.1, § 1 ("A contract of sale of goods is a contract whereby the seller transfers or agrees to transfer the property in the goods to the buyer for a money consideration, called the price, and there may be a contract of sale between one part owners and another.").  "Unless otherwise explicitly agreed[,] title passes to the buyer at the time and place at which the seller completes her or his performance with reference to the physical delivery of the goods[.]"  Fla. Stat. Ann. § 672.401(2). *See also* Ontario Sale of Goods Act, R.S.O. 1990, c. S.1, § 18 ("Where there is a contract for the sale of specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred."); Ontario Sale of Goods Act, R.S.O. 1990, c. S.1, § 19  (setting forth rules for ascertaining the intention of the parties as to when title passes to the buyer based on the type of transaction contemplated).  Under Florida law, the only essential term in a contract for the sale of goods is the quantity.  Fla. Stat. § 672.201(1) & cmt. 1 ("The only term which must appear [in the writing] is the quantity term[,] which need not be accurately stated but recovery is limited to the amount stated.").

## **DISCUSSION**

### A.  Applicability of the Standard Terms

While Premier Gold disputes the applicability of the Premier Gold Standard Terms given the integration clause in the Premier Gold Agreement, the Court disagrees.  Section 15.3 of the Premier Gold Agreement provides that "[The Premier Gold Agreement] constitutes the entire agreement between the parties *with respect to the subject matter hereof* and cancels and

supersedes any prior understandings and agreements, between the parties with respect thereto."
Premier Gold Agreement § 15.3 (emphasis added).  By its own terms, therefore, the scope of the
Premier Gold Agreement is restricted only to the subject-matter covered under the agreement
which includes, among other things, materials as set forth in Section 1, delivery as set forth in
Section 2, shipping and insurance as set forth in Section 3, weighing and sampling procedures as
set forth in Section 5, pricing as set forth in Section 6 and inspection and audit rights as set forth
in Section 7.  *See* Premier Gold Agreement §§ 1–3, 5–7.

There are certain overlapping provisions between the Premier Gold Standard Terms and
the Premier Gold Agreement, including provisions governing arbitration, risk of loss, and
weighing and melting procedures.  As to these provisions, the Premier Gold Agreement controls.
But the Premier Gold Standard Terms encompass other topics not discussed in the Premier Gold
Agreement such as pool accounts, which are "ledger accounts representing the amount of
returnable metal owed to Customer (if account reflects a positive balance), or the amount of
metal owed to RMC (if the account reflects a negative balance)" in the Debtors' accounting
system.  Premier Gold Standard Terms at 17.  Premier Gold does not dispute that a pool account
was used for its account.  *See* Exhibit 21 to the Goldberger Declaration at 6–7 (containing
excerpts from the testimony of Jason Rubin where he was asked to describe the Debtors' pool
accounts).  As such, the Court deems the Premier Gold Standard Terms to govern and apply to
the Debtors' relationship with Premier Gold as to the pool accounts as well as any other matter
addressed in the Premier Gold Standard Terms that falls outside of the subject-matter in the
Premier Gold Agreement.

As noted, the Premier Gold Standard Terms are virtually identical to the Bucket 1
Standard Terms but for two provisions.  The first includes special terms governing insurance,

delivery, weighing and sampling in connection with express delivery shipments.  *See* Bucket 1

Standard Terms at 7.  The second is additional language in the integration clause for the Bucket 1

Standard Terms which states that "[i]n addition, these Standard Terms and Conditions shall be

deemed to be incorporated into each and every transaction between RMC and Customer, whether

or not specifically stated therein."  Bucket 1 Standard Terms at 9.  These two differences are

immaterial to the present dispute—indeed, no party relies on them—and do not impact the

applicability of the Bucket 1 Decision to the Premier Gold Standard Terms.  Thus, the Premier

Gold Standard Terms, standing alone, would establish that no bailment existed, consistent with

the Bucket 1 Decision.  *See Miami Metals*, 603 B.R. at 735–41 (discussing how the Bucket 1

Standard Terms unambiguously support a finding of a purchase and sale relationship as opposed

one of bailment).  As it does not stand alone, however, the Court turns to the Premier Gold

Agreement.

B.  Summary Judgment is Inappropriate as Weighing of the Merits is Necessary

As previously noted, the parties agree that the Premier Gold Agreement remained in

effect notwithstanding its termination by its own terms.  On its face, it is unclear whether the

Premier Gold Agreement contemplates either a bailment or a sale relationship.  The opening

paragraph of the Premier Gold Agreement explicitly provides that its terms and conditions relate

to both the "refining *and* forward/spot sales of precious metal produced by [Premier Gold's]

Mercedes Mine."  Premier Gold Agreement at 1 (emphasis added); *see* Premier Gold Opposition

at 13 (acknowledging that the Premier Gold Agreement "contemplates both 'refining' services

by RMC . . . and for 'forward/spot sales'").  Section 6.2 of the Premier Gold Agreement, which

governs payments, is similarly broad:

> Upon the fixing of the metal and deduction of applicable charges, including without
> limitation, the Refining Charge and, if applicable the interest charge, the USD will

be transferred to the [Premier Gold's] designated USD account for the value outturn date(s).

Alternatively, *if [Premier Gold] decides to operate on a toll basis*, the metal(s) due from each lot of Material shall be transferred to the Customer's designated metal account(s) (i.e., London, Zurich, etc.) for value outturn date.

Premier Gold Agreement § 6.2 (emphasis added).[4]  The highlighted language of Section 6.2 suggests that the ultimate nature of the relationship—one of toll refining or of a sale transaction—is, in fact, at the election of Premier Gold.  Moreover, unlike the Premier Gold Standard Terms and the Bucket 1 Standard Terms, the Premier Gold Agreement lacks the specific language that destroys the possibility of a bailment.  *See e.g.*, *Miami Metals Inc.*, 604 B.R. at 736 (noting the Bucket 1 Standard Terms provide for the return of metal of "like kind"); *id.* at 737 (noting that the Bucket 1 Standard Terms include terms contemplating a transfer of title); *id.* (discussing the references in the Bucket 1 Standard Terms to the term, "merchants," as defined in Article 2 of the UCC).

Given this lack of clarity in the Premier Gold Standard Terms and the Premier Gold Agreement, the Court must consider extrinsic evidence to determine whether the parties here contemplated a sale or a bailment.  Thus, summary judgment is inappropriate at this juncture. *See Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment"); *Alicea v. Empire Blue Cross and Blue Shield*, 274 F.3d 90, 98 (2d Cir. 2001) (vacating the lower court's granting of summary judgment where the relevant documents

---

[4]    Akin to a bailment, in industry parlance, toll refining is a "[s]ituation in which the owner of ore or concentrate contracts the refining of the metal to another party for a fee but the refined metal remains under the original ownership for final sale or disposition." *Definition of toll refining*, MINDAT.ORG (Jan. 12, 2021, 9:45 AM), https://www.mindat.org/glossary/toll_refining#:~:text=Situation%20in%20which%20the%20owner,for%20final%2 0sale%20or%20disposition.

were ambiguous and consideration of extrinsic evidence was necessary).  As noted in the Court's

Bucket 1 Decision, in mixed contracts containing both bailment and sale characteristics, courts

will often "look beyond the four corners of the contract and examine the various circumstances

that led to the contractual arrangement." *Miami Metals Inc.*, 604 B.R. at 733 (quoting *In re*

*Handy & Harman Refining Grp. Inc.,* 271 B.R. 732, 736 (Bankr. D. Conn. 2001).  Indeed, courts

have rejected summary judgment in instances where contracts contain elements of both.  *See e.g.,*

*Handy & Harman*, 271 B.R. at 737 (concluding that the contract, which contains "both language

of bailment and sale," is "ambiguous, and, therefore, inappropriate for summary judgment").

Indeed, the extrinsic evidence offered by the parties here only confirms the lack of clarity

on the question of ownership.

On the one hand, Michael Waisome, Director of Sales for Mining at RMC, who

negotiated and executed the Premier Gold Agreement and managed the Debtors' relationship

with Premier Gold, testified during his deposition that the Debtors' relationship with Premier

Gold was one for "refining services" as opposed to a purchase and sale relationship.  *See* Exhibit

4 to the Goldberger Declaration at 3 (confirming that RMC's relationship with Premier Gold was

simply one of refining services as opposed to selling metals); *see also id.* at 6–8 (reiterating that

RMC and Premier Gold's relationship was for "refining services . . . which is the toll refining"

and confirming that Premier Gold was "not selling to RMC but [was] instead using refining

services only").  Of course, his characterization of the relationship as one solely for refining

services is somewhat at odds with the language of the Premier Gold Agreement itself.  *See*

Premier Gold Agreement at 1 (providing for the "refining *and* forward/spot sales of precious

metal produced by [Premier Gold's] Mercedes Mine") (emphasis added); Premier Gold

Opposition at 13 (acknowledging that the Premier Gold Agreement "contemplates both 'refining' services by RMC . . . and for 'forward/spot sales'").

On the other hand, there is no dispute as to other facts that suggest a sale, including that: Premier Gold's raw materials were commingled with that of other customers; Premier Gold was not a "Peace of Mined" downstream customer (i.e., those whose raw materials were separately treated and were fully traceable); and Premier Gold received metal credits to an unallocated account. *See* Premier Gold's Counterstatement of Undisputed Facts ¶ 23 (Premier Gold acknowledging that it was not a "Peace of Mined" downstream customer); Dec. 4, 2019 Hr'g Tr. 77:10–25 (noting that Premier Gold does not dispute that its raw materials were commingled with that of other customers during the refining process); *id.* at 78:10–13 (acknowledging that Premier Gold's metal bank account was unallocated); *see also* Exhibit 4 to the Goldberger Declaration at 7 (including, as support for Premier Gold's opposition to summary judgment, Waisome's testimony stating that RMC "receive[d] [Premier Gold's] material and . . . process[ed] it, refine[d] it, and then credit[ed] their account at their—at their nominated bank on their behalf and then . . . charge[d] them a refining service."). Each of these facts renders it difficult to conclude that RMC was obligated to or even capable of returning the "identical" gold or silver to Premier Gold so as to constitute a bailment. *See Sturm*, 150 U.S. at 329 ("[W]hen the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and title to the property is not changed."); *Coro (Canada) Inc. (Trustee of) v. Enthone-OMI (Canada) Inc.*, [1997] O.J. No. 4704, 36 O.R. (3d) 563 (Ony. Gen. Div.) (stating that the "identical subject-matter normally would have to be returned" for a transaction to be considered a bailment); *Miami Metals I*, 604 B.R. at 735 (noting that the "test of a bailment is that the

*identical* thing is to be returned in the same or altered form; if another thing of equal value is to be returned, the transaction is a sale") (emphasis added).[5]

Given this conflicting extrinsic evidence, the Court cannot decide the ultimate evidence without weighing the merits of parties' submitted evidence, which is inappropriate at summary judgment.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Matsushita*, 475 U.S. at 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)) (stating that summary judgment is appropriate where if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'").

## CONCLUSION

For the foregoing reasons, the Court denies the Debtors' and Senior Lenders' Summary Judgment Motion.  The parties shall meet and confer within 21 days of this order about the appropriate path for resolving this dispute in light of the Court's decision. The parties shall contact Chambers to schedule a status conference to take place within 45 days of this order.

Dated: New York, New York
      January 13, 2021

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE

---

[5]      The Court finds Premier Gold's argument on this record that doré before refining is fungible to be entirely unpersuasive.  *See* Dec. 4, 2019 Hr'g Tr. 79:4–5 (stating that the Court is of the position that "doré is not fungible"); *id.* at 79:24–80:1, 81:8–9 (stating that the Court's understanding of why the doré needs to be assayed is precisely "because it's not all the same . . . it's not the same until it's refined").  Raw materials delivered for refining that were not "identical prior to being commingled" but were rather "unique and heterogeneous materials of different quality and value" should be considered non-fungible.  *Miami Metals I*, 604 B.R. at 742 (distinguishing the raw materials Bucket 1 customers delivered for refining from other cases where commodities were identical such as grain).  The Court has previously observed that the commingling of non-fungible metals is inconsistent with a bailment.  *See e.g.,* *Miami Metals*, 603 B.R. at 741 (noting that the commingling of non-fungible metals are "facts that are inconsistent with a bailment").