**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:                                              Chapter 11

MIAMI METALS I, INC., *et al.*,                     Case No. 18-13359 (SHL)

                      Liquidated Debtors.          (Jointly Administered)

------------------------------------------------------------x


## MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT OF THE SENIOR LENDERS, SCMI AND THE LEVINE PARTIES

**A P P E A R A N C E S :**

**AKERMAN LLP**
*Counsel for the Debtors*
2001 Ross Avenue
Suite 3600
Dallas, TX 75201
By:    Yelena E. Archiyan, Esq.

**LUSKIN, STERN & EISLER LLP**
*Attorneys for Senior Lenders*
Eleven Times Square
New York, NY 10036
By:    Michael Luskin, Esq.
        Stephan A. Hornung, Esq.
        Alex Talesnick, Esq.

**BORGES & ASSOCIATES, LLC.**
*Attorneys for SCMI US Inc.*
575 Underhill Blvd – Ste 118
Syosset, New York 11791
By:    Wanda Borges, Esq.
        Sue L. Chin, Esq.

**SHUMAKER, LOOP & KENDRICK, LLP**
*Counsel to Mitchell Levine, and Erie Management Partners, LLC*
101 E. Kennedy Blvd., Suite 2800
Tampa, Florida 33602
By:    Steven M. Berman, Esq.

**STEINHILBER SWANSON LLP**
*Co-Counsel to Mitchell Levine, and Erie Management Partners, LLC*
112 W. Washington, Suite 850
Madison, WI 53703
By:    Michael P. Richman, Esq.

**ARNOLD & PORTER KAYE SCHOLER LLP**
*Attorneys for Tiffany & Co.*
250 West Fifth Street
New York, NY 10019
By:    Benjamin Mintz, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are motions for summary judgment filed by the Senior Lenders in this

case as to two groups of customers of the above-captioned Debtors (the "Debtors"): 1) SCMI US

Inc. ("SCMI"); and 2) Mitchell Levine and Erie Management Partners, LLC (the "Levine

Parties").[1]  *See* Memorandum of Law in Support of the Senior Lenders' Motion for Summary

Judgment as to Customer Statement of SCMI US Inc. [ECF No. 1731] ("Senior Lenders' SCMI

Motion"); Memorandum of Law in Support of the Senior Lenders' Motion for Summary

Judgment as to Customer Statements of Mitchell Levine and Erie Management Partners, LLC

[ECF No. 1759] ("Senior Lenders' Levine Motion").  SCMI and the Levine Parties have filed

cross motions for summary judgment against the Senior Lenders as well.  *See* Motion for

Summary Judgment as to Title Property Claim of Mitchell Levine and Erie Management

Partners, LLC and Supporting Memorandum of Law [ECF No. 1752] ("Levine's Motion");

Memorandum of Law of SCMI US Inc. in Support of Cross-Motion for Summary Judgment and

---

[1]        The "Senior Lenders" are Coöperatieve Rabobank U.A., New York Branch, Brown Brothers Harriman &
Co., Bank Hapoalim B.M., Mitsubishi International Corporation, ICBC Standard Bank Plc, Techemet Metal Trading
LLC, Merced Partners Limited Partnership, Athilon Capital Corp. LLC, and Hain Capital Investors Master Fund,
Ltd.  Senior Lenders' SCMI Motion at 5.

in Opposition to the Senior Lenders' Motion for Summary Judgment [ECF No. 1769] ("SCMI's

Motion").

The motions concern who owned precious metals deposited by these customers with the

Debtors.  If the metals were owned by the Debtors, the metals—or their cash equivalent—is

available to pay the claims of the Senior Lenders in these bankruptcy cases.  If the metals were

owned by the customers, the customers are entitled to receive the full value of the metals.

In support of their respective summary judgment motions, the parties have submitted

statements of undisputed facts and various evidence.[2]  On October 19, 2020, a hearing on these

arguments took place before this Court.  For the reasons set forth below, the Court denies the

cross motions as to SCMI, grants the Senior Lenders' motion as to the Levine Parties and denies

the motion filed by the Levine Parties.

## BACKGROUND

### A. The Chapter 11 Cases

The Debtors were in the business of refining precious metals that they received from their

customers.  Each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy

Code on either November 2, 2018 or November 21, 2018 [ECF No. 1 in each Debtor case] (the

"Petition Date").

---

[2]      Senior Lenders' Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1730] ("Senior Lenders' 7056 Statement re SCMI"); Mitchell Levine and Erie Management Partners, LLC's Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1753] ("Levine's 7056 Statement"); The Senior Lenders' Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1758] ("Senior Lenders' 7056 Statement re Levine"); SCMI US Inc.'s Statement of Undisputed Facts and Response to the Senior Lenders' Joint Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1768] ("SCMI's 7056 Statement"); Mitchell Levine and Erie Management Partners, LLC's Response to Senior Lenders' Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1775] ("Levine's 7056 Response"); Senior Lenders' Response to Mitchell Levine and Erie Management Partners, LLC's Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1779] ("Senior Lenders' Response to Levine's Statement"); Senior Lenders' Response to SCMI US Inc.'s Statement of Undisputed Facts Pursuant to S.D.N.Y. Local Bankr. Rule 7056-1 [ECF No. 1790] ("Senior Lenders' Response to SCMI's Statement").

3

On December 23, 2019, the Court entered an order confirming the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation [ECF No. 1491-2] (the "Plan"). *See* Findings of Fact, Conclusions of Law, And Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Second Amended Joint Chapter 11 Plan of Liquidation [ECF No. 1668]. The Effective Date of the Plan occurred on January 7, 2020, and the Plan was substantially consummated. *See* Notice of (A) Occurrence of the Effective Date of Plan, (B) Deadline to File Administrative Claims and (C) Deadline to File Rejection Damages Claims [ECF No. 1682].

B.   The Ownership Disputes

In the first month of these cases, the Debtors filed the Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing and (IV) Granting Related Relief [ECF No. 10] ("Cash Collateral Motion"), seeking Court authorization for the use of cash collateral. Various customers of the Debtors filed more than 40 objections and responses to the Cash Collateral Motion, asserting ownership interests in certain raw metals and other assets that the Debtors believed were property of the bankruptcy estate (collectively, the "Ownership Disputes"). To facilitate efficient resolution of the Ownership Disputes, the Court entered the Order Approving Uniform Procedures for Resolution of Ownership Disputes [ECF No. 395], which was subsequently amended on several occasions. *See* ECF No. 913, ECF No. 1196 and ECF No. 1516 (collectively, the "Uniform Procedures Order"). Under the Uniform Procedures Order, customers were categorized and grouped into various "buckets" for resolution based on the type of contract governing each customer's relationship with the Debtor. The Levine Parties and SCMI are part of the so-called Bucket 8 group of customers in this case.

4

The Court has already made rulings as to several of the Ownership Disputes.

In August 2019, the Court granted summary judgment for the Debtors and Senior Lenders on a subset of the Debtors' customers in Bucket 1, whose relationships were governed by the so-called Standard Terms ("Standard Terms") of Debtor Republic Metals Corporation ("RMC"). *See In re Miami Metals I, Inc.*, 603 B.R. 727 (Bankr. S.D.N.Y. 2019) (the "Bucket One Decision"). In that decision, the Court concluded that the Standard Terms established a sale of precious metal to Debtor RMC as opposed to a bailment relationship where ownership remained with the customers. *See id.* at 735. In reaching its decision, the Court noted that the metal to be returned to the customers after refining by RMC was simply metal of "like kind," rather than the identical metal deposited by the customer or the same metal in altered form. *Id.* at 736. As such, the Court held that the disputed assets were property of the estate and that the subset of Bucket One customers lacked any ownership interests in the disputed assets. *Id.* at 742.

In January 2021, the Court denied summary judgment as to the Debtors and Senior Lenders with respect to customer Premier Gold Mines Limited, concluding that there were disputed issues of material fact as to whether the precious metal given by Premier Gold to Debtor RMC was a sale or a bailment. Decision and Order Denying Summary Judgment [ECF No. 1939] (the "Buckets 3-5 Decision"). More specifically, the Court concluded that there were material differences between the Standard Terms at issue in the Bucket One Decision and the agreement governing Premier Gold such that a trial was necessary to determine the intent of the parties. *Id.* at 23.

The cross motions for summary judgment currently before the Court address whether the agreements between the Debtor RMC and these customers are leases—with the precious metal in question remaining property of the customers—or agreements that conveyed the property to

Debtor RMC.  There are different agreements at issue in each set of motions, so the Court will discuss each separately.

C.  SCMI

SCMI and RMC entered into a Master Agreement for Precious Metals Transactions in 2017 [ECF No. 1812-1] (the "Master Agreement"); *see* Senior Lenders' 7056 Statement re SCMI ¶ 11.  The Master Agreement is governed by New York law.  Master Agreement, Section 12.2. The Master Agreement contains three annexes, and the parties agree that transactions at issue here are governed by Annex II, which is entitled "Leases."  Senior Lenders' 7056 Statement re SCMI ¶ 12; SCMI's 7056 Statement ¶¶ 12, 52.   Annex II provides:

> Pursuant to Clause 4.1, this Annex II sets out the terms of Leases, where a "Lease" means a Transaction for the bailment of Precious Metal, whereby one . . . Party as bailor ("the Lessor") on an agreed date ("the Delivery Date") delivers an agreed quantity of Material ("the Leased Material") to the possession of the other Party as bailee ("the Lessee") at an agreed Delivery Location, on terms that the Lessee: (i) has the right to enjoy quiet possession of the Leased Material until an agreed future date ("the Expiry Date"), (ii) on the Expiry Date must redeliver the Leased Material to the Lessor at an agreed Delivery Location ("the Return Location") and (iii) must pay an agreed sum ("the Lease Fee") to the Lessor.

Senior Lenders' 7056 Statement re SCMI ¶ 12; SCMI's 7056 Statement ¶ 12; Master Agreement, Annex II – Leases.

Pursuant to the Master Agreement, SCMI and RMC entered into eight transactions from October 2017 through November 2018.  SCMI's 7056 Statement ¶ 53; Senior Lenders' Response to SCMI's Statement ¶ 53.  Under one such transaction, RMC leased 600,000 troy ounces of precious metals ("Toz") of silver from April 3, 2018 until May 3, 2018 for a fee of $15,557.[3]

---

[3] "The troy ounce is the standard unit used to weigh precious metals like gold and silver.  A troy ounce, when converted into grams, is equal to 31.103 grams, which makes it heavier and therefore worth more than the traditional ounce, equal to 28.349 grams." *What is a Troy Ounce?*, GOLDSILVER, https://goldsilver.com/blog/what-is-a-troy-ounce/ (last visited Oct. 12, 2021).

Senior Lenders' 7056 Statement re SCMI ¶ 36; SCMI's 7056 Statement ¶¶ 36, 53.  At the expiration of that term, the lease was rolled over three times; first until July 3, 2018, then again until September 7, 2018, and for a third time until November 7, 2018.  *Id.*  Fees of $32,179.53, $33,968.00, and $28,880.86, respectively, were due for each of those three respective, subsequent terms.  *Id.*  On November 5, 2018—three days after these bankruptcy cases were filed—SCMI demanded return of the 600,000 Toz of silver as property of SCMI.[4]  SCMI's 7056 Statement ¶ 73; Senior Lenders' Response to SCMI's Statement ¶ 73.  On November 7, 2018, the final expiration date of the last rollover from the April 3rd transaction, the final lease fee of $28,880.86 was not paid to SCMI nor was the 600,000 Toz of unallocated silver returned.  Senior Lenders' 7056 Statement re SCMI ¶ 41; SCMI's 7056 Statement ¶¶ 74-75.

The Master Agreement placed no restrictions on RMC's use of pool account silver credits during the duration of each term.  Senior Lenders' 7056 Statement re SCMI ¶ 19; SCMI's 7056 Statement ¶ 19.  Indeed, both parties agree that the Master Agreement allowed RMC to freely use the pool account silver credits without restrictions.  *Id.*; *see also* Master Agreement, Annex II.A.1.

SCMI contends that these transactions are plain, straightforward leases and, therefore, the silver in question is owned by SCMI.  SCMI's Motion at 7-8.  If the Court finds a true lease, SCMI would be entitled to a return of 600,000 Toz of silver or the cash equivalent of $8,652,000 currently held in escrow in this case.  *Id.* at 7, 16.  But Senior Lenders dispute that any silver in RMC's possession on the Petition Date was property of SCMI and contend that any silver in the possession of RMC was subject to the Senior Lenders' lien.  Senior Lenders' Response to

---

[4]    SCMI filed their initial customer statement on January 17, 2019 [ECF No. 428] and filed their amended customer statement on September 13, 2019 [ECF No. 1408].

SCMI's Statement ¶ 73. Senior Lenders dispute that any true lease could exist here, noting that the silver in question was merely a metal credit in the Loco London exchange rather than any specifically identifiable silver.[5] Senior Lenders' Response to SCMI's Statement ¶¶ 53, 58-61, 63-68. The Senior Lenders instead assert that these transactions were in fact disguised financing arrangements and were treated as such on SCMI's own books and records. Senior Lenders' 7056 Statement re SCMI ¶ 38.

Senior Lenders emphasize that prior to the Petition Date, RMC's Loco London account was zeroed out and closed. Senior Lenders' 7056 Statement re SCMI ¶ 39; SCMI's 7056 Statement ¶ 39. But an escrow account was set up in this case to set aside sufficient funds to pay any valid ownership claims. *See* Memorandum of Decision on (I) Debtors' PSA Motion and (II) Joint Settlement Motion of Debtors, Official Committee of Unsecured Creditors, and Senior Lenders [ECF No. 1318] ("PSA Decision") at 8; Debtors' Motion for Entry of an Order Authorizing Debtors to Enter and Perform Under an Amended Plan Support Agreement [ECF No. 1413] ("Revised PSA Motion") at 6 of 59.

D. Mitchell Levine and Erie Management Partners

The second set of motions involves metal deposited with RMC by Mitchell Levine and his companies. Mr. Levine has been involved in the precious metal industry for over 25 years, and he founded a precious metal refinery company called Asset Recovery Management ("ARM"). *See* Levine's 7056 Statement ¶ 1; Senior Lenders' 7056 Statement re Levine ¶ 22.

---

[5]    As "physical transfer of the precious metals is burdensome and expensive, industry participants generally settle their transaction through the Loco London electronic clearing system." Senior Lenders' SCMI Motion at 5. "All Loco London transactions are backed by silver that actually is physically in place in London." SCMI's 7056 Statement ¶ 31 (citing Hitoshi Ishida Tr.). "Customer pool accounts are entries in RMC's books and records that reflect RMC's obligations to its Customers denominated in ounces of a specific type of metal." Senior Lender's 7056 Statement re Levine ¶ 14; Levine's 7056 Response (contending that the metals in the pool account were indeed a reflection of the metals held by RMC).

Erie Management Partners, LLC is the successor to ARM.  Levine's 7056 Statement ¶ 12.[6]  Mr.

Levine contends that his relationship began with RMC's Richard Rubin in the 1990s when Mr.

Levine initially deposited his metals, and the relationship continued with other employees under

the same terms as originally struck.  Levine's 7056 Statement ¶¶ 2, 14.  For more than 20 years,

Mr. Levine and ARM sent for further refining hundreds of lots of gold, silver and platinum to

RMC.  Levine's 7056 Statement ¶ 3.  Levine contends that, throughout that time, he had the

option to (i) take delivery of the refined metal, (ii) sell the metal to RMC for payments, or (iii)

retain the metal in his pool account with RMC.  *Id.*[7]

Around 2008, Mr. Levine closed his refining business due to health issues but kept his

inventory of gold and silver with RMC, both individually and in the name of Erie Management.

Senior Lenders' 7056 Statement re SCMI ¶ 24; Levine's 7056 Response ¶ 24.  Mr. Levine and

the Senior Lenders agree that his individual pool account of metal has remained static since

2008, consisting of some 2,323.908 Toz. of gold and 57,663.822 Toz. of silver.  Senior Lenders'

7056 Statement re Levine ¶ 28; Levine's 7056 Response ¶ 28.  The parties agree that all of Erie

Management's gold and silver was delivered (at least) prior to January 1, 2015.  Senior Lenders'

7056 Statement re Levine ¶ 29; Levine's 7056 Response ¶ 29.  Indeed, the Levine Parties

contend that Erie Management's silver was delivered even sooner, prior to 2011.  Levine's 7056

Response ¶ 21.

The Levine parties and Senior Lender have not provided any written agreement between

the parties up through and including 2013.  But starting in 2014, Mr. Levine signed three

versions of RMC's Standard Terms: the first dated April 14, 2011 on behalf of Erie

---

[6]      Levine and Erie Management Partners filed their customer statement on January 18, 2019 [ECF No. 468].
[7]      Regarding this third option of retaining metal in pool accounts, the Senior Lenders dispute that Mr. Levine
in fact had that option and argue instead, upon delivery to RMC, title transferred to RMC under section 2-401 of the
UCC.  Senior Lenders' Response to Levine's 7056 Statement ¶ 3.

Management, the second dated December 13, 2013 as an update again on behalf of Erie

Management, and the third dated October 14, 2014 on behalf of Mr. Levine, individually.  Senior

Lenders' 7056 Statement re Levine ¶ 21; Levine's 7056 Response ¶ 21.

Each of the three Standard Terms provides that the customer has a "pool account" which

is a "ledger account representing the amount of returnable metal owed to Customer (if account

reflects a positive balance), or the amount of metal owed to RMC (if the account reflects a

negative balance)."  Declaration of Stephan E. Hornung in Support of the Senior Lenders'

Motion for Summary Judgment as to Customer Statements of Mitchell Levine and Erie

Management Partners, LLC [ECF No. 1810] (the "Hornung Decl."), Ex. A.  As discussed in the

Bucket One Decision, the Standard Terms provide that the metals in a pool account is

"fungible," such that:

> [A]ny unit of material is equivalent to another of like kind i.e. similar quality
> and/or value, and is deemed adequate payment for purposes of outstanding Pool
> Accounts. Returnable metal represented in a Customer Pool Account does not
> pertain to specific, segregated, or identifiable metal; rather, it represents a future
> obligation of RMC to return common inventory of gold, silver, platinum,
> palladium, or metals owed to Customer. RMC reserves the right to return precious
> metals to Customer of like kind representing the ounces of precious metals owed
> to Customer.

Hornung Decl., Ex. A; Bucket One Decision at 736.  The Court concluded in the Bucket One

Decision that these Standard Terms established a sale as opposed to a bailment relationship given

that the Debtors were under no obligation to return the same metal deposited by the customer.

Bucket One Decision at 735-36.

In January 2015, Mr. Levine approached RMC to discuss income-generating alternatives

to simply storing the metals.  Senior Lenders' 7056 Statement re Levine ¶ 30; Levine's 7056

Statement ¶ 15.  Beginning in February 2015 and continuing through October of 2018—the

month preceding the Petition Date of these chapter 11 cases—RMC paid a monthly fee to Mr.

Levine and Erie Management.  Levine's 7056 Statement ¶¶ 16-17; Senior Lenders' 7056 Statement re Levine ¶ 32.  These payments were calculated by multiplying the precious metal pool account balances of the Levine Parties by the average daily second London fix price, and then by the agreed upon rate of 1.35 percent.  Levine's 7056 Statement ¶ 16; Senior Lenders' 7056 Statement re Levine ¶ 32.  RMC's monthly fee invoices to the Levine Parties state that these fees were governed by RMC's Standard Terms.  Senior Lenders' 7056 Statement re Levine ¶ 32.

While Mr. Levine confirms that he executed the Standard Terms on three occasions, he disputes that those terms govern the parties' relationship to the extent that his metals were delivered to RMC before the execution of the Standard Terms.  Levine's 7056 Response ¶ 21.  As all of Mr. Levine's metals were delivered prior to 2008 and all of Erie Management's by 2011 (according to the Levine Parties), the Levine Parties contend that these metals should be treated differently than the other pool account customers addressed in the Bucket One Decision.  Senior Lenders' 7056 Statement re Levine ¶ 28, 29; Levine's 7056 Response ¶ 21.  Because the Levine Parties contend that their pool account balances were largely consistent before the first Standard Terms were signed in 2011, the Levine Parties believe the Standard Terms should not usurp the existing relationship under which the metals previously had been held.  Levine's 7056 Response ¶ 21.  In short, Mr. Levine contends that his relationship with the Debtor RMC should be governed by Mr. Levine's original agreement with Richard Rubin.  *Id.* (citing Levine Tr. and the Declaration of Mitchell Levine in Support of Motion for Summary Judgement [ECF No. 1754] (the "Levine Decl.") ¶ 9).  As for the fee, Mr. Levine believes that RMC stored his metal and paid him rent, citing compliance documentation whereby RMC was used "for storage."  Levine's 7056 Statement ¶ 8.  While no written lease has been provided by either party to the

Court, Senior Lenders' 7056 Statement re Levine ¶ 33; Levine's 7056 Response ¶ 33, the Levine

Parties rely upon Section 2A-204 of the Uniform Commercial Code (the "U.C.C."), to argue that

a lease was created.  Levine's Motion at 25. The Levine Parties contend that the parties used the

standard form for the lease invoices because "the system wasn't set up to have a specific lease

fee letterhead or label."  Levine's 7056 Response ¶ 32 (citing Jason Rubin Tr.).  They contend

that the "invoices were sent using RMC's form 'purchase invoice' (which therefore necessarily

included its form language that *purchases* were governed by RMC's Standard Terms)."  *Id.* [8]

        The Senior Lenders contend that the metal in question is not the property of the Levine

Parties and instead was owned by RMC.  Senior Lenders' 7056 Response re Levine ¶ 6.  Citing

to the Standard Terms and this Court's Bucket One Decision, the Senior Lenders purport the

deposit of these metals to be akin to a sale as governed by RMC's Standard Terms.  Senior

Lenders' 7056 Response re Levine ¶ 6.  They assert that upon delivery to RMC for refining,

therefore, title to the raw materials transferred to RMC pursuant to Section 2-401 of the U.C.C.

Senior Lenders' 7056 Response re Levine ¶ 5.

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Summary Judgment

        Federal Rule of Civil Procedure 56, as made applicable by Federal Rule of Bankruptcy

Procedure 7056, provides that summary judgment should be granted "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[8]        But the Levine Parties also refuse to concede that no written lease exists.  Levine's 7056 Response ¶ 33
(citing Levine Decl. ¶ 21, Ex. 6 and Levine Tr.).  They rely on a February 26, 2015 email from David Comite, CEO
of RMC, to Mr. Levine that "the required paperwork" for a lease proposal was being prepared and testimony from
Mr. Levine that he executed such a written lease.  *Id.*; Levine Decl. Ex. 6 [ECF No. 1808]. Mr. Levine and Erie
Partners attribute the absence of the written lease to RMC's failure to share a copy contemporaneously or produce it
with these bankruptcy proceedings.  Levine's 7056 Response ¶ 33.

matter of law." Fed. R. Civ. P. 56.  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).  A fact is "material" if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  "When the movant demonstrates through competent evidence that no material facts are genuinely in dispute, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed. R. Civ. P. 56(e)); *see also Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir. 1995).

"In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita Elec. Indus.*, 475 U.S. at 587).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48.  Properly supported facts included in a statement of material facts that are not specifically controverted by an opposing party are deemed admitted.  *See* S.D.N.Y. Local Bankruptcy Rule 7056-1(d) ("Each numbered paragraph in the statement of material facts

13

required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

Where a party has filed a cross-motion for summary judgment, as is the case here, the Court must "pay particular attention to the parties' respective burdens of proof, persuasion, and production." *In re WorldCom, Inc.*, 339 B.R. 56, 23 (Bankr. S.D.N.Y. 2006). First, "[w]hen faced with a cross-motion for summary judgment, the court must consider the merits of each motion independently of the other." *Id.* (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). It may be implied through the filing of a cross-motion that the parties agree no material issues of fact exist, but this Court is not bound by any such implicit assumption. *Id.*; *Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996), *aff'd*, 110 F.3d 892 (2d Cir.1997).

B. Choice of Law

The Senior Lenders and SCMI both agree that New York law applies to the Master Agreement between SCMI and Debtor RMC and all disputes arising thereunder. Master Agreement, Section 12.2; Reply Memorandum of Law in Further Support of the Senior Lenders' Motion for Summary Judgment as to the Customer Statement of SCMI US Inc. and in Opposition to SCMI US Inc.'s Cross-Motion for Summary Judgment [ECF No. 1791] ("Senior Lenders' Reply to SCMI") at 18; SCMI's Motion at 19.[9]

---

[9]    Despite a discussion in various pleadings of the law of the United Kingdom—and an expert on such law—the parties agree that this dispute is not governed by English law. Reply Memorandum of Law of SCMI US Inc. in Further Support of Cross-Motion for Summary Judgment and in Opposition to the Senior Lenders' Motion for Summary Judgement [ECF No. 1822] ("SCMI's Reply") at 15; Senior Lenders' Reply to SCMI at 17.

As for Levine and Erie Management, Senior Lenders and the Levine Parties agree that Florida law governs this dispute but that both Florida and New York law would create the same outcome.  Senior Lenders' Levine Motion at 17; Levine's Motion at 25, n.15.[10]

Since the outcome of the disputes is the same under both Florida and New York law, the Court need not distinguish a choice of law analysis and will cite to both Florida and New York statutes and case law.  *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict. . . . In the absence of substantive difference, however, a New York court will dispense with choice of law analysis[.]").

C.  Applicable State Law

State law determines whether an agreement should be characterized as either a lease or a financing arrangement.  *Butner v. United States*, 440 U.S. 48, 54 (1979).  "Whether an agreement is a true lease or a secured financing arrangement under the Bankruptcy Code is a question of state law."  *In re Continental Airlines, Inc.*, 932 F.2d 282, 294 (3d Cir. 1991) (citing H.R. Rep. No. 95–595, at 314 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6271).  When a transaction is denominated as a lease, the burden of proof is on the party purporting it to be something else.  *In re Zaleha*, 159 B.R. 581, 586 (Bankr. D. Idaho 1993) ("[W]here the transaction is denominated a lease, the burden is upon the [opposing party] to demonstrate that the transaction is in fact a disguised security interest rather than a true lease.").

Both Florida and New York have adopted versions of the U.C.C.  The U.C.C. defines the term "lease" as distinct from a "sale."  A lease is "a transfer of the right to possession and use of

---

[10]    As discussed, the only written agreements that exist between the parties are the Standard Terms signed on three occasions.  Hornung Decl., Ex. A, B, C.  These Standard Terms all have a "Forum/Jurisdiction" paragraph designating state or federal courts sitting in Miami-Dade County, Florida to hear any dispute, but they are silent on choice of law.

goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease." N.Y. U.C.C. § 2-A-103(1)(j) (McKinney 1995); FLA. STAT. § 680.1031(j) (1990).  "Under New York law, the transfer of absolute control and possession at an agreed rental distinguishes a lease from a different arrangement."  *In re Euro-American Lodging Corp.*, 365 B.R. 421, 430 (Bankr. S.D.N.Y. 2007). The U.C.C. provides that a lease may be made "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of a lease contract."  N.Y. U.C.C. § 2-A-204; FLA. STAT. § 680.204(1).

"A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  *W.W.W. Assocs. v. Giancontieri*, 77 N.Y. 2d 157, 163 (1990).  "Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'"  *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (citing *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992)).  The case law is the same in Florida; a written agreement that is clear and unambiguous on its face must be enforced according to its terms, with the actual language used in the contract being the best evidence of the parties' intent.  *Gibney v. Pillifant*, 32 So. 3d 784, 785 (Fla. 2d Dist. Ct. App. 2010).  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  *W.W.W. Assocs.*, 77 N.Y. 2d at 163; *see also Landmark Am. Ins. Co. v. Pin-Pon Corp.*, 155 So. 3d 432, 437 (Fla. 4th Dist. Ct. App. 2015).

The plain meaning of terms in a written agreement is given serious weight.  "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the

plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y. 2d 562, 569 (2002). "A plain meaning analysis requires the term be associated with a meaning in a contract consistent with its common usage." *Celotex Corp. v. AIU Ins. Co (In re Celotex Corp.)*, 175 B.R. 98, 107 (Bankr. M.D. Fla. 1994). "It is too well settled for citation that, if a written agreement contains no obvious or latent ambiguities, neither the parties nor their privies may testify to what the parties meant but failed to state." *Oxford Commercial Corp. v. Landau*, 12 N.Y.2d 362, 364 (1963).

Thus, it is well established that "[p]arole evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron*, 20 N.Y.3d at 436. The parole evidence rule "imparts stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses . . . infirmity of memory . . . [and] the fear that the jury will improperly evaluate the extrinsic evidence." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162 (citing Fisch, New York Evidence § 42, at 22 [2d ed.]).[11]

"Whether or not a contract provision is ambiguous is a question of law to be resolved by a court." *Van Wagner Advert. Corp. v. S & M Enterprises*, 67 N.Y.2d 186, 191 (1986). "[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court." *Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982). In Florida, "[t]he determination of whether the terms of a contract are ambiguous is a question of law." *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1232 (M.D. Fla. 2012).

---

[11]    Under Florida law, parole evidence of a contemporaneous oral agreement is admissible—under the so-called inducement exception—to vary, change or reform a written document, but not to directly contradict it. *Ungerleider v. Gordon*, 214 F.3d 1279, 1284 (11th Cir. 2000). But the burden of proof for this inducement exception is quite high, and no party here invokes this exception. *See Ungerleider*, 214 F.3d at 1285.

## II.    **SCMI**

Applying these legal standards to the undisputed facts, the Court concludes that the cross motion for summary judgment as to SCMI must be denied.  In short, the Master Agreement between the parties is ambiguous as to whether the parties entered into a lease (as maintained by SCMI) or a transaction that transferred ownership of the metal to Debtor RMC (as argued by the Senior Lenders).

The Court must deny the Senior Lenders' motion given the ample language in the Master Agreement referring to this transaction as a lease.  Both parties agree that Annex II of the parties' agreement—entitled "Leases"—governs the transactions at issue.  Senior Lenders' 7056 Statement re SCMI ¶ 12; SCMI's 7056 Statement ¶ 12.  In describing the parties' relationship, Annex II repeatedly uses terms the term lease and other terms consistent with a lease transaction. Master Agreement, Annex II.  For example, it talks about the terms of the "Leases," and refers to a "Lessor," "Lessee," the "Leased Material, "and the "Lease Fee."[12]  Master Agreement, Annex II, § II.A.1; *see* N.Y. U.C.C. § 2-A-204 (McKinney 1995) (a lease may be formed "in any manner sufficient to show agreement, including conduct which recognizes the existence of a lease contract."); FLA. STAT. § 680.204(1) (1990).  The substantive terms of the agreement also appear consistent with a lease.  After the lease duration here, the Debtor RMC was required to "redeliver" an equal amount of silver to SCMI or pay a default interest of LIBOR plus 1%. Senior Lenders' 7056 Statement re SCMI ¶ 20; SCMI's 7056 Statement ¶ 20 (citing Master Agreement §§ 1.1(7), 9.1(i)(b)).[13]

---

[12]    SCMI also points to numerous emails from around the time the Master Agreement was executed in October of 2017, describing "leasing," "lease transactions," and "leasing AND trading."  SCMI's 7056 Statement ¶¶ 48, 50, 52, 54-60, 63-69.

[13]    Alternatively, the parties could agree to extend the maturity date, commonly referred to as "rolling."  *Id.*; *see also* Master Agreement, Annex II.

The Master Agreement also placed no restrictions on Debtor's use of the metal credits. Senior Lenders' 7056 Statement re SCMI ¶ 19 (Debtor RMC was entitled to use the silver credits during the duration of the lease freely "for whatever they need."); SCMI's 7056 Statement ¶ 19. This feature is consistent with a lease. *See U.S. Bank National v. Windstream Services*, LLC, 2019 WL 948120, at *13 (Bankr. S.D.N.Y. 2019) ("The primary feature of a lease is the 'transfer of exclusive possession and absolute control'").

Relying on the Bucket One Decision, the Senior Lenders argue that SCMI cannot establish ownership because there was no lease of specific identifiable metals at stake, only metal credits in SCMI's pool account with the Debtor. But the Senior Lenders have not identified any authority that prevents a party from leasing such metal credits. The Senior Lenders claim that such a transaction is like lending cash, and thus really a financing. But the lease of metal credits is not the same as lending cash, as a party retaining ownership of metal credits would assume the risk of changes in the value of the metal; such exposure would not exist in a transaction to lend cash.[14] And as the written agreement here opts explicitly for a transaction using metals credits rather than cash, the Court must give effect to that decision. *See* N.Y. U.C.C. § 2-A-204 (a lease may be formed in any manner sufficient to show an agreement). The Senior Lenders also argue that they should prevail because the Debtors ultimately held no metal or metal credits that would be available to pay SCMI. But that argument ignores that the parties established a fund for ownership claims like this one, with the Court requiring such a fund be sufficient to pay all valid ownership claims. PSA Decision at 8; Revised PSA Motion at 6 of 59.

---

[14]    The Court notes that the Senior Lenders papers focus single mindedly upon their argument that this transaction was a financing. They spend little, if any, time addressing what the agreement says about ownership.

Given the repeated reference to a lease—in all forms of the word—throughout Annex II, SCMI has a much stronger argument than the Senior Lenders for SCMI's position that the parties entered into a lease.  But there are two provisions in the Master Agreement that create an ambiguity on that question and require the Court to deny SCMI's Motion.

Despite using the term "lease" multiple times, Annex II uses the phrase "bailment of Precious Metal" and identifies SCMI as "bailor" and RMC as "bailee."  Master Agreement, Annex II.A.1.  While a lease and a bailment have certain similarities, they are not identical.[15] Given that the object of the transaction here was metal credits, the transaction here would appear not appear to satisfy the requirements for a bailment.  *In re Miami Metals I, Inc*., 603 B.R. at 735 ("[I]n distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or some altered form; if another thing of equal value is to be returned, the transaction is a sale.").  SCMI asks the Court to overlook bailment language in the Master Agreement, deeming it a mere drafting or scrivener's error.  SCMI's Motion at 16, 23 n.8; SCMI's Reply at 13-14.  "The contract law doctrine of scrivener's error, or mutual mistake, allows a court of equity to reform a contract where a written agreement does not reflect the clear intent of the parties due to a drafting error."  *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp.2d 850, 894 (N.D. Ill. 2009), *aff'd*, 615 F.3d 808 (7th Cir. 2010).  But the Senior Lenders suggest this is not the case here.  They note that SCMI originally claimed in this bankruptcy that these transactions were a bailment, only changing its tune after this Court's Bucket One Decision

---

[15]     A bailment "is generally a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner."  *Sirpal v. Univ. of Miami*, 684 F. Supp. 2d 1349, 1364 (S.D. Fla. 2010) (quoting *S & W Air Vac Sys., Inc. v. Dep't of Revenue*, 697 So. 2d 1313, 1315 (Fla. 5th Dist. Ct. App. 1997)).  Like a lease, a bailment separates possession from ownership; general ownership remains with the bailor while the bailee has lawful possession.  *See Cornelius v. Berinstein*, 50 N.Y.S.2d 186, 188 (Sup. Ct., Onondaga Cty. 1944) ("[I]t is a generally recognized feature of bailments that possession of the thing bailed is severed from ownership; the bailor retains the general ownership, while the bailee has the lawful possession or custody for the specific purpose of the bailment.")

made such a position untenable.  Senior Lenders' SCMI Motion at 6, n.4; Senior Lenders' Reply

to SCMI at 11.[16]

      The second provision of the Master Agreement that undercuts SCMI's position is the

security interest granted to SCMI.  Section 7.7 of the Master Agreement says that "Each Party

('Party L') grants the other Party ('Party M') a security interest over all Material that is in or may

come into Party L's possession (actual or constructive) but to which Party M retains title under

this Agreement."  Master Agreement, Section 7.7.  As SCMI US never perfected that security

interest, *see* Senior Lenders' 7056 Statement re SCMI ¶ 22; SCMI's 7056 Statement ¶ 22, the

Senior Lenders argue that SCMI is no more than a general unsecured creditor.  Senior Lenders'

SCMI Motion at 16.  SCMI disputes the significance of its failure to file a U.C.C.-1 financing

statement, saying it was not obligated to do so given that title resided with SCMI.  SCMI's 7056

Statement ¶ 22.  But the Court has a more fundamental question.  Why would SCMI be provided

with a security interest in the metal credits if—as SCMI claims—SCMI retained ownership of

the credits?  At the very least, this provision—together with the use of the term bailment

elsewhere—renders the parties' intent ambiguous when reading this language in a light most

favorable to the Senior Lenders.  This is true even given the frequent use of the term "lease" in

the agreement.  *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Ag.*, 155 B.R. 824, 838

(Bankr. N.D.N.Y. 1993) (courts are not bound by labels used by the parties).  *In re PCH Assocs.*,

804 F.2d 193, 199 (2d Cir. 1986) (judges must look at the totality of circumstances and are not

bound by labels).

---

[16]    SCMI's original Customer Statement filed on January 17, 2019 [ECF No. 428] was amended on September
13, 2019 [ECF No. 1408], several weeks after the Bucket One Decision.

### III.    <u>The Levine Parties</u>

The Levine Parties contend that they entered into a lease of their precious metals to Debtors governed by Article 2A of the U.C.C.  The Levine Parties note that metals had been deposited by the Levine Parties with RMC many years before and were never owned by the Debtors.  The Senior Lenders disagree, arguing that the Levine Parties entered into the Standard Terms with RMC and thus are covered by this Court's Bucket One Decision.[17]  The Senior Lenders contend that the transactions in question were commercial loans tied to metal credits held in unallocated pool accounts.

Applying the legal standard to the undisputed facts and given this Court's prior Bucket One Decision, the Court must side with the Senior Lenders.  Mr. Levine signed three versions of the Standard Terms in 2013 and 2014.  Hornung Decl., Ex. A, B, C.  Each set of the Standard Terms includes an identical introductory clause about the broad applicability of the Standard Terms to all transactions between the parties.  The language makes clear that the Standard Terms govern the relationship of the parties, and supersede any other agreements:

> RMC's Standard Terms is the governing document with respect to any and all business dealings between RMC and customer and shall override any and all provisions, terms, and stipulations in Customer purchase orders, sales orders and/or any other Customer documents.

Hornung Decl., Ex. A, B, C.  The introduction defines customer very broadly, as anyone "transacting business with RMC in any manner whatsoever."  *Id.*  As a signatory, the Levine Parties qualify as customers.  The same introductory paragraph of the Standard Terms says that "[a]ny contract or agreement entered into between Customer and RMC will operate as if the terms represented in this Standard Terms were made expressly a part thereof."  *Id.*  Given these

---

[17]    Indeed, Mr. Levine participated in the briefing in advance of the Bucket One Decision. *See* Declaration of Mitchell Levine in Opposition to Joint Motion of Debtors and Senior Lenders for Summary Judgment as to Bucket 1 Customers [ECF No. 1096].

broad provisions, any transactions by the Levine Parties with Debtor RMC is covered by the Standard Terms.

With the Standard Terms applying to the Levine Parties, the Court's prior Bucket One Decision on the meaning of the Standard Terms applies. In that Bucket One Decision, the Court found the parties' relationship under the Standard Terms akin to a sale since any fungible metal of "like kind" would be acceptable to be returned, and the Court rejected the contention that a transaction under the Standard Terms was bailment.[18] *In re Miami Metals I, Inc.*, 603 B.R. at 735 ("[I]n distinguishing bailments from sales, the test of a bailment is that the identical thing is to be returned in the same or some altered form; if another thing of equal value is to be returned, the transaction is a sale.").

The Levine Parties have not provided a written lease. The only evidence that the Levine Parties have of a leasing relationship is extrinsic evidence, including the testimony of an RMC salesperson about what kind of relationship that salesman thought existed between the parties. Levine's 7056 Statement ¶ 4, n.2 (citing testimony of Steven Warbet). But that sort of parole evidence is only permitted when a written contract is determined to be ambiguous. *Sutton*, 55 N.Y.2d at 554; *W.W.W. Assocs.*, 77 N.Y. 2d at 163 ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); *see also Landmark Am. Ins. Co.*, 155 So. 3d at 437. As for the contention that the Levine Parties had a different relationship, notwithstanding Mr. Levine's signature on three copies of the Standard Terms, that argument fails given the broad scope of the Standard Terms. The Standard Terms make clear that they "override any and all" other

---

[18]    The relevant sections of the Standard Terms excerpted in the Bucket One Decision are also in the Standard Terms signed by the Levine Parties. *See In re Miami Metals I, Inc.*, 603 B.R. at 736 (discussing return of fungible "like kind" metal).

agreements and govern "all business dealings" between these parties. While Mr. Levine may sincerely have had a different understanding of the parties' relationship, he is charged with knowledge of the terms of the contract that he signed on three different occasions. *See Gibney v. Pillifant*, 32 So. 3d 784, 785 (Fla. 2d Dist. Ct. App. 2010).

## **CONCLUSION**

For the foregoing reasons, the Court grants Senior Lenders' Motion as to the Levine Parties and denies the Motion filed by the Levine Parties. The Court denies the Cross Motions filed by the Senior Lenders and SCMI. The Senior Lenders should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon opposing counsel.

Dated: New York, New York
       October 15, 2021

                                         */s/ Sean H. Lane*_____
                                         UNITED STATES BANKRUPTCY JUDGE